1

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
                     SAVANNAH DIVISION


UNITED STATES OF AMERICA              )
                                      )
        vs.                           )
                                      )          CASE NOS.
PABLO RANGEL-RUBIO,                   )   4:18-CR-00274-LGW-BWC-1
JUAN RANGEL-RUBIO,                    )   4:18-CR-00274-LGW-BWC-2
HIGINIO PEREZ-BRAVO,                  )   4:18-CR-00274-LGW-BWC-3
                                      )
_____Defendants._____)
```

```
                       MOTIONS HEARING
          BEFORE THE HONORABLE BENJAMIN W. CHEESBRO
                September 17, 2019; 10:37 a.m.
                     Savannah, Georgia
APPEARANCES:

For the Government:        TANIA D. GROOVER, Esq.
                           CHRISTOPHER HOWARD, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov
                           christopher.howard@usdoj.gov


For the Defendant          JEFFREY L. ERTL, Esq.
Pable Rangel-Rubio:        Federal Defender Program, Inc.
                           100 Peachtree Street
                           Suite 1700
                           Atlanta, Georgia  30303
                           (404) 688-7530
                           jeff_ertel@fd.org


                           WILLIAM DOW BONDS, Esq.
                           The Bonds Law Firm
                           33 Bull Street
                           Suite 540
                           Savannah, Georgia 31401
                           (912) 335-3220
                           dowbonds@yahoo.com
```

2

```
For the Defendant              MARK EVAN OLIVE, Esq.
Juan Rangel-Rubio             Law Offices of Mark E. Olive, PA
                              320 West Jefferson Street
                              Tallahassee, Florida   32301
                              (850) 224-0004
                              meolive@aol.com


                              GEORGE R. ASINC, Esq.
                              Asinc & Associates
                              445 Goshen Road
                              Rincon, Georgia 31326
                              (912) 484-7437
                              geo6152@comcast.net


For the Defendant              JOHN R. MARTIN, Esq.
Higinion Perez-Bravo          Martin Brothers, PC
                              1099 St. Louis Place
                              Atlanta, Georgia   30306
                              (404) 433-7446
                              jack@martinbroslaw.com


                              ROBERT PAUL PHILLIPS, III, Esq.
                              Phillips, Carson & Phillips
                              420 West Broughton Street
                              2nd Floor
                              Savannah, Georgia 31401
                              (912) 232-0081
                              bplaw@msn.com


Reported by:                   Debbie Gilbert, RPR, CCR
                              Official Court Reporter
                              801 Gloucester Street
                              Post Office Box 1894
                              Brunswick, GA 31521-1894
                              (912) 262-2608 or (912) 266-6006
                              debra_gilbert@gas.uscourts.gov


                                   - - -
```

3

INDEX TO EXAMINATIONS

| Witness | Page |
|---|---|
| RUSSELL STETLER | 15 |
| Direct Examination by Mr. Ertl | 15 |
| Cross-Examination by Ms. Groover | 58 |
| | |
| RICHARD SINGER | 67 |
| Direct Examination by Mr. Ertl | 67 |
| Cross-Examination by Ms. Groover | 78 |

- - -

INDEX TO EXHIBITS

| Defendants' Exhibit | For Description | Identification | Admitted |
|---|---|---|---|
| 1 | Declaration of Frederick Chen | 10 | 10 |
| 2 | Declaration of Richard Singer | 70 | 70 |
| 3 | Report of the Committee on Defender Services Judicial Conference of the United States | 7 | 7 |
| 4 | Declaration of Russell Stetler | 30 | 31 |
| 5 | Declaration of Kevin McNally | 11 | 12 |

| | | | |
|---|---|---|---|
| 6 | The Federal Death System, a Statistical Survey | 9 | 77 |
| 7 | Mexico Travel Advisory | 54 | 55 |
| 8 | Documents (Sealed) | 71 | 77 |
| 9 | Documents (Sealed) | 73 | 77 |
| 10 | Documents (Sealed) | 73 | 77 |
| 11 | Documents (Sealed) | 74 | 77 |
| 12 | Documents (Sealed) | 74 | 77 |
| 13 | Documents (Sealed) | 75 | 77 |

5

1                    P R O C E E D I N G S

2              (Call to order at 10:37 a.m.)

3         THE COURT:  Good morning, everyone.

4         SPEAKERS:  Good morning, Your Honor.

5         THE COURT:  Ms. Mixon, please call the case.

6         THE CLERK:  Case Number 4:18-CR-274, United States of

7    America versus Pablo Rangel-Rubio, Juan Rangel-Rubio and Higinio

8    Perez-Bravo.  Tania Groover, Chris Howard for the Government.

9    Jeffrey Ertel, William Dow Bonds for Defendant Pablo

10   Rangel-Rubio.  George Asinc and Mark Olive for Defendant Juan

11   Rangel-Rubio.  John Martin, Robert Paul Phillips for Defendant

12   Higinio Perez-Bravo.

13        Your Honor, we have the interpreter Julia Davis for the

14   hearing today.

15        THE COURT:  Thank you, Ms. Mixon.  Before we get

16   started, would you please swear in Ms. Davis?

17        THE CLERK:  Yes, Your Honor.

18        (Interpreter Julia Davis sworn.)

19        INTERPRETER DAVIS:  I do.

20        THE CLERK:  Thank you.  Please state your full name and

21   spell your last name for the record.

22        INTERPRETER DAVIS:  Julia Davis, D-a-v-i-s.

23        THE CLERK:  Thank you.

24        THE COURT:  Ms. Davis, thank you for your service today.

25   And I'm going to ask you to let me know if at any time you need

6

1    to take a break or if you have trouble hearing or if you need

2    anybody to slow down and speak a little bit more clearly.  Can

3    you do that for me, ma'am?

4         INTERPRETER DAVIS:  Yes, Your Honor.

5         THE COURT:  Thank you.  And similarly, I will give that

6    same guidance to everyone who is presenting today.  Please be

7    conscientious of the interpreter.  Speak slowly and clearly so

8    she can get everything and convey that to defendants.

9         I set this hearing down to take up argument and any

10   evidence in support of defendant's motion Number 128 on the

11   docket, which is a motion to afford defendant due process and

12   effective assistance of counsel as titled and that specifically

13   asks The Court to order the Government to provide more time to

14   consider submissions from the defendants related to the decision

15   to pursue the death penalty.  That motion is docketed as

16   Document 128 and then as amended in Document 130.

17        I will also note that there are two motions pending by

18   Defendant Juan Rangel-Rubio and by Defendant Higinio Perez-Bravo

19   that seek to adopt the motions of Defendant Pablo Rangel-Rubio.

20        I will grant those two motions to adopt, both Document

21   140 and 148, and allow those defendants to adopt the motions

22   filed of behalf of Defendant Pablo Rangel-Rubio.

23        As far as the presentations go today, have the

24   defendants coordinated as far as who is going to present

25   argument or any evidence on behalf of the defendants?

7

1    MR. ERTL:  We have, Your Honor, and I think that will be

2    me.

3    THE COURT:  It's Mr. Ertl; correct?

4    MR. ERTL:  Yes.

5    THE COURT:  Can you summarize briefly so I have a sense

6    of what you intend to present here today during the course of

7    the proceeding?

8    MR. ERTL:  Yes, Your Honor.  We have a series of

9    documents and two live witnesses.  The first witness that I

10   would present would be Russell Stetler.  I also have

11   declarations from other live witnesses that I would anticipate

12   introducing during their testimony.

13   I also have -- and I've provided copies to the

14   Government or with one exception and I will provide that after

15   the hearing.  I have a couple of -- it's called the Spencer

16   report.  It's an update of a -- and I have courtesy copies for

17   The Court.  May I approach, Your Honor?

18   THE COURT:  You may.

19   MR. ERTL:  And I will say I will be --

20   THE COURT:  If you will provide a copy to Ms. Mixon.

21   (Defendants' Exhibit 3 was marked for

22   identification.)

23   MR. ERTL:  This is Defendants' Exhibit Number 3, and I

24   will proffer it as the report of the Committee on Defender

25   Services Judicial Conference of the United States update on the

8

1    cost and quality of defense representation in federal death

2    penalty cases.  It's September 2010 report and it deals with

3    specifically, Your Honor, that -- the reason I introduce it is

4    that it deals with the frequency in which the Attorney General

5    follows the no-death recommendation of the local US Attorney in

6    death penalty cases, and I will point The Court to specifically

7    because it's a rather large document --

8         THE COURT:  Mr. Ertl, I will give you just a moment to

9    get into that.  Let's cover, though, what the full scope what

10   you're presenting.  You mentioned Mr. Stetler as a witness and I

11   think you have a second in-person witness?

12        MR. ERTL:  Yes, sir.  His name is Richard Singer.  He is

13   a court-certified interpreter and that has to do with the

14   discovery, Your Honor, the voluminous discovery and how long it

15   will take us to provide access to our clients of that discovery,

16   sort of the logistical problems that I put out in the brief.

17   Mr. Singer will testify that he has reviewed I think six pages

18   of discovery.

19        I will introduce those, and I would ask, Your Honor,

20   because of the protective order, once those are introduced, that

21   they be put under seal.  I think that would be the appropriate

22   thing here, but Mr. Singer was given six pages of discovery that

23   I say are representative samples.

24        He timed the interpretation of each of those documents,

25   and based on those -- on that timing projects how long it would

9

1    take to read various portions of the discovery, interpret it for

2    the defendants.

3          THE COURT:  And what is the nature of Mr. Stetler's

4    testimony?

5          MR. ERTL:  Mr. Stetler is -- will be -- he is the

6    national mitigation coordinator.  He will talk about the -- what

7    goes into a mitigation investigation, and particularly he will

8    also discuss some of the problems that are -- will be associated

9    with conducting such an investigation in Mexico.

10          THE COURT:  All right.

11               (Defendants' Exhibit 6 was marked for

12               identification.)

13          MR. ERTL:  I also have one other document, Judge, that I

14    would like to introduce.  It is called -- and this will be

15    Defendants' Exhibit Number 6 -- and I'm sorry, I don't have

16    copies for everybody -- I misplaced them -- The Federal Death

17    System, a Statistical Survey.  It was done by the United States

18    Department of Justice, and it reviews the death penalty system

19    from 1988 to 2000, and I have one copy for The Court,

20    Defendants' Exhibit Number 6.

21          THE COURT:  Have you provided a copy of that to the

22    Government?

23          MR. ERTL:  I will provide it.  I have talked to Ms.

24    Groover about it, and I will e-mail her a copy of that probably

25    later today.

10

1          THE COURT:  Ms. Groover, are you familiar with this

2   document?

3          MS. GROOVER:  The Government is familiar with that, Your

4   Honor.

5               (Defendants' Exhibit 1 was marked for

6               identification.)

7          MR. ERTL:  Judge, and I don't know if you want to do

8   this now.  I have two declarations, one of which I think the

9   Government is objecting to, but the other one is agreed upon,

10  the admission of, and the first one would be Defendants' Exhibit

11  Number 1, and that is the declaration of Frederick Chen.

12         If I may approach, Your Honor?  I've already provided

13  copies of this to the Government.  And that is the one that is

14  unobjected-to, Your Honor.

15         Mr. Chen is the computer systems analyst in our office

16  and he -- his declaration talks about the discovery and how much

17  of the discovery there is, how many pages of discovery, how many

18  hours of recorded jail calls, how many hours of recorded witness

19  interviews and the like of that, and that obviously will serve

20  as sort of the basis for Mr. Singer's testimony.  Based on Mr.

21  Chen's review of the discovery, Mr. Singer made some

22  projections.

23         THE COURT:  Mr. Ertl, just take up this declaration of

24  Mr. Chen first.  Is that correct, Ms. Groover, there is no

25  objection to this declaration?

1      MS. GROOVER:  Correct, Your Honor.

2      THE COURT:  What is the next declaration?

3           (Defendants' Exhibit 5 was marked for

4           identification.)

5      MR. ERTL:  The next declaration is of Kevin McNally,

6  Your Honor, and it's -- I will tender right now as Defendants'

7  Exhibit Number 5.  This I believe the Government does have an

8  objection to.

9      Mr. McNally is the -- is one of members of the Federal

10 Death Penalty Resource Counsel Project that assists court-

11 appointed lawyers in death penalty cases around the nation.

12     He has been I think associated with it since 1992 and he

13 talks about he relies on the Department of Justice survey that I

14 or document that I have already tendered and he talks about that

15 the frequency in which the Attorney General, in his experience,

16 the frequency in which the Attorney General follows the

17 recommendation of the local US Attorney when there's a no-death

18 recommendation, and that all goes obviously, Judge, to our

19 position that this is -- this presentation is a critical stage

20 in the proceeding.  It is a very important one, if we are able

21 to convince the local US Attorney not to -- to send up a no

22 recommendation to the Attorney General, that that is

23 overwhelmingly followed; the chance of that happening are

24 overwhelmingly in our favor.  So that -- those are the bases,

25 the reason for those.

1        THE COURT:  Mr. Ertl, before you proceed, let me hear

2    from the Government as to the objection to the McNally

3    declaration.

4        MS. GROOVER:  Thank you, Your Honor.  The Government

5    objects as for the admissibility for lack of foundation and for

6    relevancy.

7        First of all, for lack of accuracy.  The current

8    numbers, there are no current numbers in that report, and it's

9    not relevant because the numbers are so old.  They are relying

10   on data produced by the Department of Justice to present to the

11   professional inquiry but that data stops at 2010, and

12   furthermore, his declaration is based on Internet news searches,

13   reviewing documents, interviews.  There is nothing recent from

14   the Department of Justice and -- because the process is

15   confidential, and in Footnote 3, it's based on what can be

16   extrapolated from knowing just how the protocol works in general

17   and -- but it's nothing specific, and so it's just speculation

18   as to when the Attorney General and the US Attorneys differ, and

19   so we would object with respect to relevancy and lack of

20   foundation.

21       THE COURT:  Well, I will overrule the objection to the

22   extent it goes to admissibility of the declaration, but I will

23   consider those arguments made relative to the weight of the

24   statements made by Mr. McNally in the course of this

25   declaration.

1          And Mr. Ertl, is there anything that you would add

2     that's not included in the declaration in terms of argument as

3     to the issues that Ms. Groover just raised regarding the

4     confidential nature of the process, lack of foundation,

5     speculative nature of the testimony contained in the

6     declaration?

7          MR. ERTL:  Judge, I think the declaration itself lays

8     out that Mr. McNally and that project is responsible for

9     tracking the cases nationwide, and we understand that it is

10    confidential, so we -- you know, it's not that the US Attorneys

11    are telling them, yes, we've sent up this recommendation or that

12    recommendation, but there's a way in which you can sort of

13    figure it out, and that is by -- if the US Attorney's Office, if

14    we don't like get an audience with the US Attorney's Office, we

15    know that their recommendation is no.

16          If we get an audience with the US Attorney and we don't

17    get called up to DC, we know that the Government's

18    recommendation is no because it's only -- only when the US

19    Attorney or one of the capital case committee members wants to

20    hear from us that we get sent up there, so he can speculate --

21    it's true it's based somewhat on speculation, but there is good

22    solid basis for the speculation.  We haven't interview and he

23    hasn't interviewed all the US Attorneys, and I think even if he

24    did, they couldn't disclose what their recommendations are per

25    protocol.  It is to be confidential, but it's not wild

14

1    speculation.  It's based on his monitoring of the death penalty

2    cases nationwide.

3         THE COURT:  I understand the criticisms and I understand

4    the arguments in support of the declaration made.

5         MR. ERTL:  Judge, there is just one housekeeping matter.

6    I would like to introduce Mr. William Lazono and Gabriel

7    Gutierrez from the Mexican Consul who are here in court today.

8         THE COURT:  All right, thank you.

9         Ms. Groover, does the Government have any witnesses or

10   evidence it intends to present?

11        MS. GROOVER:  Not at this time, Your Honor, only

12   argument at the appropriate time.

13        THE COURT:  So I will structure the hearing in this way.

14   I would like for counsel to Defendants to present their

15   witnesses first.

16        Once the witness presentation is complete, I will ask

17   the defendants to present any argument in support of their

18   motion.  I will then hear from the Government in response and

19   then give the defendants an opportunity for any rebuttal

20   argument at the close of the hearing.

21        Mr. Ertl, if you would like to proceed with your

22   witnesses.

23        MR. ERTL:  Thank you, Your Honor.  Call Mr. Russell

24   Stetler.

25

15

1                        RUSSELL STETLER,

2    having been first duly sworn, was examined and testified as

3    follows:

4         THE CLERK:  Thank you.  You may be seated.  Please state

5    your full name, spell your last name for the record, state your

6    occupation and your business address.

7         THE WITNESS:  My name is Russell Stetler, R-u-s-s-e-l-l,

8    S-t-e-t-l-e-r.  I am a national mitigation coordinator for the

9    federal death penalty projects, and I am based in the office of

10   the federal public defender for the Northern District of

11   California in Oakland, California.

12        THE COURT:  Mr. Ertl, before you begin, Mr. Stetler, I

13   will just remind you that we have an interpreter who is

14   assisting with the hearing.  I will ask you to be conscientious

15   and speak slowly and clearly so that she can hear you and this

16   proceeding is being taken down by the court reporter as well so

17   be conscientious of her, too.

18        Ms. Davis, I will encourage you to move around the

19   courtroom as you need to in order to position yourself so you

20   can hear everyone fully.

21        You may proceed, Mr. Ertl.

22        MR. ERTL:  Thank you.

23                     DIRECT EXAMINATION

24   BY MR. ERTL:

25   Q.   You talked about you're the mitigation coordinator for the

16

1    federal death penalty projects.  What are the federal death

2    penalty projects?

3    A.    They are projects created by the defender services office

4    in Washington that provide assistance to attorneys in federal

5    court under the Criminal Justice Act either in connection with

6    prosecutions under the federal death penalty act or cases on

7    habeas corpus, so there are really two main projects in the

8    rubric of Federal Death Penalty Resource Counsel.

9    Q.    What exactly is your -- what exactly are your duties and

10   responsibilities?

11   A.    I consult with lawyers who have cases in federal court,

12   capital cases in federal court, on issues relating to

13   mitigation, investigation and presentation of mitigation

14   evidence.

15   Q.    Was your -- when was your position created?

16   A.    2005.

17   Q.    Pursuant to what?

18   A.    An authorization from the defender services committee.

19   Q.    Are you familiar with the Spencer report?  You've heard me

20   talk about it here in court today.

21   A.    Yes, I am.

22   Q.    Is your position as mitigation coordinator described in

23   there?

24   A.    It's described in the 2010 update.

25   Q.    Let me show you what's been previously marked -- may I

17

1    approach, Your Honor?

2         THE COURT:  You may.

3    Q.   (By Mr. Ertl) -- as Defendants' Exhibit 3.  It's been

4    admitted.  Can you tell me, can you tell The Court what that

5    is?

6    A.   Yes.  This is a report to the committee on defender

7    services of the judicial conference of the United States, an

8    update on the cost and quality of defense representation in

9    federal death penalty cases.  It's dated September 2010 and it

10   updates the original 1998 report by Judge Spencer.

11   Q.   I would ask you to flip to Pages 111 and 112 of the

12   report.  And can you read into the record the description of

13   your position?

14   A.   Yes.  "In 2004, the defender services committee authorized

15   the position for a national mitigation coordinator in a federal

16   defender office to assist in expanding the availability and

17   quality of mitigation work in death penalty cases in the federal

18   courts.  In addition to leveraging his own significant knowledge

19   and skills through case consultation, the national mitigation

20   coordinator has enhanced defense representation and contributed

21   to cost containment efforts by recruiting more mitigation

22   specialists to work on federal capital cases, matching

23   mitigation specialists with counsel and providing expanded

24   training opportunities both for defender staff and for private

25   mitigation specialists who are authorized to work on federal

18

1    cases.  This training enhances the skills and availability of

2    such professionals."

3    Q.    Thank you.  Before you were the national mitigation

4    coordinator, did you have any other experience or any other

5    positions dealing with death penalty cases?

6    A.    Yes.

7    Q.    Can you tell us?

8    A.    Immediately before taking this position in 2005, I was the

9    director of investigation and mitigation at the New York State

10   capital defender office.  That office was created by statute

11   when the death penalty was reenacted in New York state, and it

12   had a mandate to see that indigent defendants facing death

13   penalty prosecutions received effective representation.

14        It provided both direct representation and assistance to

15   lawyers assigned by the courts.  Before that, I was a chief

16   investigator at the California appellate project from 1990 to

17   1995, and that office was a non-profit funded by the California

18   Supreme Court and the defender services office to coordinate the

19   representation of the large number of people under sentence of

20   death in California.

21        So it did not do significant direct representation but was

22   a resource to assist the lawyers who were appointed on death

23   penalty appeals and state postconviction and federal habeas

24   corpus, and before that, I began working on death penalty cases

25   in 1980, and from 1980 to 1990, I worked in a private capacity

1    investigating death penalty cases and other homicide cases, but

2    I did about a hundred homicide cases in which a couple of dozen

3    were death penalty cases, and that was just in a private

4    capacity working for public defender offices or for appointed

5    counsel.

6    Q.    Are you aware of any training programs that focus on the

7    development of mitigation evidence?

8    A.    Yes.

9    Q.    Can you tell us about that?

10   A.    Yeah.  There have been training programs that focused on

11   mitigation almost as long as the modern death penalty has been

12   in effect.  You know, I worked in California in 1980 to 1985.

13   There was an annual death penalty conference that was attended

14   by hundreds of people and it always had significant

15   presentations on investigation and prosecution of mitigation

16   evidence.

17        Nationally, the -- since most of these cases in state

18   court were handled by public defender offices, a large national

19   organization of public defenders, which is called the National

20   Legal Aid Defender Association, began holding national death

21   penalty training programs, and those programs were divided in

22   two segments.  One focused on mitigation and the other on

23   litigation.

24        And in the 1990's, the National Association of Criminal

25   Defense Lawyers, which is the largest national organization of

1    the private defense bar, also began a national training program

2    called Making the Case for Life, which was very much a

3    mitigation-focused program and continues to today.

4          In addition, the NAACP legal defense fund held an annual

5    capital punishment project throughout this period.  That

6    organization had been involved in much of the early litigation

7    of the death penalty and they had a conference which invited

8    people from all the jurisdictions that had active death penalty

9    cases to sort of share their practice experiences and wisdom.

10   Q.   Are there current programs that are -- are those in the

11   past or are they currently active?

12   A.   They are currently active and there are other additional

13   programs now.

14   Q.   Have you attended continuing legal education programs

15   dealing with mitigation investigation?

16   A.   Yes.

17   Q.   And how many times would you think?

18   A.   I don't have a precise number, but it's over 400 times.

19   Q.   Have you ever served as faculty at one of these trainings?

20   A.   Yes, again, more than 500 continuing legal education

21   programs.

22   Q.   Were those national, local, regional?

23   A.   All of those.

24   Q.   How many jurisdictions have you been invited to give CLE's

25   in?

21

1    A.    I think the easiest way to answer that is say almost all

2    of the jurisdictions which now have the death penalty with three

3    exceptions, Montana, Nebraska and South Dakota.  They have a

4    very tiny death row.  But all other the jurisdictions that have

5    state death penalties and, of course, about a hundred times I've

6    served on faculty in connection with cases in federal court.

7    Q.    How about federal death penalty training programs?

8    A.    Yes.

9         MR. ERTL:  Did you get that, I'm sorry?  I just mumbled.

10   Q.    (By Mr. Ertl)  How many times would you estimate you've

11   participated in federal death penalty trainings?

12   A.    About a hundred.

13   Q.    Have you --

14   A.    Excuse me, that's a hundred federal programs.  That's not

15   all trial level programs.

16   Q.    Okay, and that's --

17   A.    Just to clarify.

18   Q.    -- always dealing with mitigation?

19   A.    Yes, but that's both trial and habeas corpus.

20   Q.    Have you assisted in planning trainings?

21   A.    Yes.

22   Q.    Can you tell us a little bit about that?

23   A.    At various times, I have served on planning committees for

24   those national conferences that I mentioned.  I was the cochair

25   of the California capital case defense seminar for six years.

1    That seminar has expanded to the point where it's attended by

2    over 1200 people, has a number of plenary sessions and 60 or 70

3    workshops with a big track on mitigation, and in my current

4    capacity, I have assisted one of the federal death penalty

5    projects in a substantive mitigation program that has been held

6    annually since 2004.

7        I took my job in 2005, so from that point on, I was

8    actively involved with that project in the substantive

9    mitigation training.  It's a four-day program that is devoted

10   exclusively to mitigation issues and then I helped design a

11   mitigation skills program which was held for the first time in

12   2012 and has now been held ten times all together.

13       It's being held twice a year and that's designed to teach

14   skills, standards that relate to mitigation investigation and

15   presentation and it's an interactive program where people use a

16   case hypothetical to brainstorm issues, analyze information from

17   life history, records, and get on their feet and conduct

18   interviews with actors playing the roles of clients, family

19   members and so forth.

20   Q.   And the people that attend that, are they lawyers,

21   mitigation investigators or a combination of both?

22   A.   Combination of both, and again, part of the goal of that

23   program is to increase the capacity, specifically to increase

24   the capacity in federal court.

25   Q.   And did you say that's been conducted ten times since

23

1    2012?

2    A.    That's correct.

3    Q.    And is that again a four-day program?

4    A.    Yes.

5    Q.    Have you taught at -- you mentioned that you were the

6    cochair of the California death penalty training.  Have you

7    taught at what's commonly known as death penalty colleges?

8    A.    Yes.

9    Q.    Can you tell us first of all what a death penalty college

10   is.

11   A.    Well, they are a little different.  Instead of just having

12   talking heads giving lectures, the death penalty colleges and

13   other bring-your-own-case programs invite teams to come and

14   brainstorm their cases with experienced faculty and with peer

15   teams.

16       So it's a combination of lectures followed by small group

17   discussion, and we've had death penalty college at Santa Clara

18   University Law School in California since roughly 1992.

19       There was another one at DePaul College of the Law in

20   Chicago and then following in 2005 President Bush in his State

21   of the Union address announced that he was going to secure

22   funding for training people in death penalty defense, and a

23   number of organizations formed a consortium to organize programs

24   with that funding and those programs were held in multiple

25   locations around the country, all focused again on an

24

1    interactive model where people would come and talk about the

2    issues in their cases, brainstorm the issues with experts and

3    with peer defense teams from other places and, you know, one

4    hopes come out with a -- with a better sense of what to do in

5    their individual cases.

6    Q.    In the trainings that you've conducted and designed, do

7    you focus any of the training on interviewing techniques?

8    A.    Yes.

9    Q.    What other skills are involved in training somebody in

10   mitigation?

11   A.    Well, there are two main components of mitigation

12   investigation.  One is gathering and analyzing documentary

13   information about clients and their families.  It's a

14   multi-generational investigation so we try to obtain records,

15   medical records, school records, work records and so forth for

16   clients, their parents and a generation beyond that when we can,

17   and that provides a sort of skeletal architecture with hard

18   dates and specific information that's generated by the myriad

19   institutions that shape our lives, and then in addition to the

20   hard information from those records, the other main skill

21   involves interviewing.

22         Mitigation interviews are often facing what we call

23   barriers to disclosure.  We're asking people about what happened

24   in their family when a client was growing up.  Often we're

25   asking embarrassing, invasive questions about traumatic

1    experiences that people may have had or we're asking information

2    about mental health issues that may run in a family, and we all

3    as ordinary human beings have resistance to sharing that kind of

4    information with strangers, and so what we train in our programs

5    is ways to overcome those barriers to disclosure through

6    patience and building rapport and trust, and in addition to

7    those ordinary kind of universal barriers that we all have,

8    there are additional barriers based on how we identify

9    ourselves, our badges of social identity, whether it's politics

10   or race or ethnicity or education, religion.

11        All of those things may be further differences between

12   ourselves and the clients and their families, so we advocate for

13   diverse teams so that we can bridge some of these gaps, but we

14   also train everyone to recognize how those differences create

15   barriers and how patience and trust-building, rapport-building

16   can overcome the barriers to disclosure.

17   Q.   I think you talked about part of your job is consulting

18   with people in federal death penalty cases?

19   A.   Yes.

20   Q.   You do that as part of your mandate now?

21   A.   Yes.

22   Q.   Do you also consult with people who have state death

23   penalty cases?

24   A.   Occasionally, I will consult of a state case pro bono, but

25   my official duties are on federal cases only.  However, if

26

1    someone is sentenced to death in state court and that case

2    reaches federal court in habeas corpus, that is within the

3    definition of my job.

4    Q.    Let's go before 2005 when you took on the national

5    coordinator job.  Did you consult with people in -- who had

6    state death penalty cases?

7    A.    Yes, absolutely.

8    Q.    Have you published anything related to, first of all, the

9    death penalty and secondly to mitigation?

10   A.    Yes.  My publications are almost exclusively about

11   mitigation.  I've published 10 law review articles, several book

12   chapters and a number of articles in defense bar magazines.

13   Q.    Have you had a role in drafting any death penalty -- well,

14   are there death penalty manuals out there?

15   A.    Yes, there have been death penalty manuals for a long

16   time, generally generated in individual states.  I helped to

17   shape the California manual's discussion of mitigation issues

18   beginning in the 1990's.  We created a whole separate volume of

19   the California trial manual on mitigation, and then as I

20   mentioned before, I was at the New York capital defender office

21   from 1995 to 2005 and helped to draft the section on mitigation

22   in the New York manual as well.

23   Q.    Can you explain what is the manual, what's it intended to

24   do?  What is --

25   A.    Well, it's just to give trial lawyers a resource for

27

1    handling their first case, keep them current on the law and

2    effective practice in death penalty cases, so it's not something

3    which is published once and frozen in time.  All of these

4    manuals evolve over time.

5        The first California manual was published in the early

6    1980's and in hard copy only.  Now it's published on a digital

7    form and a new edition comes out every year and is distributed

8    at the capital case defense seminar that I mentioned.

9    Q.    We've talked a lot about what you've published and the

10    training you've done.  Have you personally conducted mitigation

11    investigations?

12    A.    Yes.

13    Q.    Could you estimate in how many cases?

14    A.    Hundreds of cases.  I don't have a precise number.  I

15    mean, in my individual capacity, couple of dozen cases in the

16    1980's, and then as I moved into institutional offices, there

17    was a large volume of cases, and again, California had the

18    largest death row in the country even in the early 1990's, and

19    so our office worked on scores of cases in that timeframe that I

20    was there in 1990 and '95, and then when I was in New York 1995

21    to 2005 our office had effectively first refusal rights on

22    cases.

23        We took as many cases as we could on direct

24    representation.  We were notified by statute when somebody was

25    arrested in a potential death penalty case.  And we jumped into

1  those cases immediately.  If there was some reason why we could

2  not take the case because of our own work load being too

3  stretched, we still provided assistance to private lawyers who

4  had those cases, and in that ten-year timeframe, there were over

5  800 cases that were death-eligible, and we were actively

6  involved as early as possible in investigating, mitigation, also

7  investigating culpability issues so that we could meet with

8  prosecutors and try to persuade them not to go forward seeking

9  the death penalty, and so the number of cases where a formal

10  notice seeking the death penalty in those New York cases was a

11  very tiny fraction of the 800, it was, you know, 50 to 60 cases

12  I believe, and of that, the cases which continued all the way

13  through to a penalty trial was much, much smaller.  I think we

14  had 15 death penalty trials in that timeframe.

15  Q.    Have you ever been qualified as an expert in the

16  courtroom?

17  A.    Yes.

18  Q.    Do you know, can you give me an estimate of how many times

19  and possibly where?

20  A.    Yes, it's over 30 times, and it's been in state and

21  federal courts.  Alabama, Arkansas, Arizona, California,

22  Colorado, Idaho, Iowa, Louisiana, Missouri, Nevada,

23  Pennsylvania, South Carolina, Tennessee, Texas and Wyoming.

24  Q.    I noticed that was alphabetical.

25  A.    I try.  It's the only way I can remember things.

1    Q.    And what type of proceedings -- first of all, what are you

2    a testifying expert about?

3    A.    About mitigation in death penalty cases and it's both

4    pretrial cases and postconviction or habeas corpus cases, so

5    sometimes it's a pretrial proceeding about funding or whether

6    somebody can get a fair trial when -- on a resentencing

7    proceeding after lots of mitigation evidence has been lost and

8    in postconviction proceedings mostly on what was the standard of

9    care at the time of the original trial and whether trial counsel

10   met that standard in their performance.

11   Q.    Has there ever been an instance when a court did not --

12   when you were tendered as an expert and a court did not qualify

13   you?

14   A.    No.

15   Q.    If you are aware, has your testimony been cited in court

16   opinions or by courts?

17   A.    Yes, several times.

18   Q.    Can you give us some examples?

19   A.    Yeah.  In federal district courts in a habeas Section 2255

20   proceeding that is arising out of a federal death sentence in

21   *United States versus Johnson*, I was cited by Judge Bennett in

22   the Northern District of Iowa.

23         In *State versus Wessinger* in the Middle District of

24   Louisiana, Judge Brady cited my testimony in a 2254 federal

25   habeas corpus case arising out of a state death judgment.

30

1         Similarly in the district of Wyoming, Judge Allen Johnson

2    cited my testimony in the case of *Dale Eaton*, E-a-t-o-n, and

3    then there are a couple of cases in State Court, Judge John

4    Cruzot, C-r-u-z-o-t, in Dallas, Texas cited my testimony

5    extensively in the *Jonathan Reed* case, *State v. Reed*.  Judge

6    Cruzot is no longer on the bench, but he is now the district

7    attorney of Dallas County.  And in a federal habeas case that

8    was sent back to state court in Marshall County, Nevada,

9    Judge -- I think it's Polaha, P-o-l-a-h-a cited my testimony in

10   the *Gutierrez* case, G-u-t-i-e-r-r-e-z.

11         MR. ERTL:  May I approach, Your Honor?

12         THE COURT:  You may.

13             (Defendants' Exhibit 4 was marked for

14              identification.)

15   Q.   (By Mr. Ertl)  I'm showing you what has previously been

16   marked as Defendants' Exhibit Number 4.  Do you recognize that

17   document?

18   A.   I do.

19   Q.   What is it?

20   A.   It's the declaration I prepared for this proceeding.

21   Q.   Does that declaration accurately summarize your background

22   and experience?

23   A.   Yes.

24         MR. ERTL:  Judge, I would offer Mr. Stetler as an expert

25   in the area of mitigation investigation.

1        THE COURT:  You're tendered as an expert under Rule 10.

2        MR. ERTL:  I'm sorry, I tender -- I move for the

3   admission of Defendants' Exhibit Number 4.

4        THE COURT:  Any objection to this exhibit?

5        MS. GROOVER:  No objection, Your Honor.

6        THE COURT:  It's admitted.

7        MR. ERTL:  Then I tender Mr. Stetler as an expert.

8        THE COURT:  I will note that it's not clear the rules of

9   evidence are applied to this hearing under 1101(d) so his

10  designation as an expert may be inconsequential.  What's the

11  Government's position?

12       MS. GROOVER:  We have no objection to qualifying him as

13  an expert.

14       THE COURT:  I will accept him as an expert though that

15  designation may not be consequential here, but in any case...

16       MR. ERTL:  Thank you, Your Honor:

17  Q.   (By Mr. Ertl)  Let me talk a little bit about your

18  personal experiences in conducting mitigation.  You talked a

19  little bit before that you've conducted dozens if not hundreds

20  of mitigation investigations.  So you've personally -- and I

21  will call them domestic mitigation investigations -- you've

22  personally conducted those?

23  A.   Yes.

24  Q.   And have you also supervised others who are conducting

25  domestic mitigation investigations?

32

1  A.    Yes.  From 1990 to '95 at the California appellate project
2  and from 1995 to 2005 at the capital defender office in New
3  York, I was doing some on-the-ground investigation but mainly
4  supervising others who were conducting the investigations.
5  Q.    And were those -- were you supervising people in your own
6  office who were conducting their mitigation investigations?
7  A.    Yes and to some extent also coordinating with outside
8  mitigation specialists who were working with the private --
9  privately-retained -- private court-appointed lawyers.
10 Q.    Would you have an estimate on how many times you consulted
11 or supervised domestic mitigation investigations?
12 A.    Again, it's hundreds.  I don't have a precise number, but
13 we were heavily involved in a huge fraction of the cases in New
14 York.
15 Q.    Would it be fair to say that the mitigation investigations
16 that you supervised were over multiple jurisdictions or was it
17 just within New York and California?
18 A.    Well, what I supervised in those periods, yes, was limited
19 to those two jurisdictions but statewide in both California and
20 New York and then more recently since 2005 I have consulted with
21 people.  I have not been their direct supervisor but I have
22 consulted on federal cases all over the country.
23 Q.    In contrast to domestic mitigation investigations, have
24 you conducted international, I will call it international or
25 foreign mitigation investigations?

33

1    A.    Yes.

2    Q.    Can you give me an estimate about how many times?

3    A.    I think roughly half a dozen times where I worked outside

4    the country myself and that would be in some places close to

5    home, Canada, Puerto Rico and the Virgin Islands.  I know Puerto

6    Rico and Virgin Island are not really foreign countries but they

7    are very different from conducting investigation stateside, and

8    then in Germany, Nigeria and Honduras.

9         I also supervised people in those offices that I mentioned

10   who investigated in Colombia, Dominican Republic, Jamaica,

11   Mexico, Peru and Thailand.  Maybe more but that's my frail

12   memory.

13   Q.    Maybe I should have asked this question earlier.  What is

14   mitigation?

15   A.    Well, mitigation is the evidence which can persuade a

16   decision maker, whether it's a prosecutor or a reviewing judge

17   or an individual juror, not to impose the death penalty, so it

18   is evidence that humanizes, which identifies human frailties and

19   disadvantages.

20        It may help to explain why a capital offense happened

21   although there is no requirement of explanation.  Some things

22   are inherently mitigating, but it's any of that evidence which

23   can inspire compassion and mercy by virtue of the way that it

24   has humanized the capital accused.

25   Q.    You talked a little bit before about your trainings and

34

1    you were testifying as an expert on the standard of care.  Can

2    you inform The Court what is the standard of care when it comes

3    to conducting mitigation investigations and where do you -- how

4    do you come to -- how do you come to that standard of care?

5    A.    Well, briefly, it's beginning the mitigation investigation

6    as soon as possible.  In New York, we had what we called a

7    beachhead protocol, so at the very moment someone was charged

8    with a potential capital offense, someone went to meet the

9    client at the jail and someone else went to meet the client's

10   family to begin the process of explaining to them the

11   seriousness of the allegations.

12        And the investigation is, as I said before, is always on

13   two tracks.  You are seeking to collect all of those

14   biographical records for the client and family members and other

15   people who were in the household, all of the records that kind

16   of document significant events in a client's life and then

17   beginning that painstaking process of building rapport and trust

18   with family members so that they become comfortable in sharing

19   rather intimate details of what went on in a family, if there

20   has been familial domestic violence, if there are family

21   histories of mental illness, for example, if there has been, you

22   know, brutality in the home in childhood, other forms of

23   deprivation, there's maternal exposure to alcohol during

24   pregnancy.  Those are things that people don't automatically

25   want to reveal so you build trust, begin to elicit information

1    about those sorts of issues and in addition you use your records

2    to get people to open up.

3        Sometimes when the records tell you things that the family

4    has not disclosed, they realize at that point there is no point

5    in trying to keep it a secret any longer and they become more

6    forthcoming.  The records are very valuable for preparing

7    witnesses to testify.  They also allow us to conduct more

8    thorough interviews and, you know, the interviews are not a

9    one-shot event.  Building the trust and rapport takes time.

10       Gathering the records takes time even in this country

11   where records tend to be better centralized.  Often you will

12   send out a request for records with an authorization from the

13   client and it takes weeks, sometimes months, to get a full

14   response.  Sometimes you have to go visit the institutions in

15   person, and in the case of witnesses, you know, our sort of

16   mantra in this area is multiple in-person one-on-one

17   face-to-face interviews for the same reason we have face-to-face

18   testimony in court.  We want to see the people that we're

19   talking with.

20       We want them to see us and understand who we are and

21   understand the, you know, complicated world of death penalty

22   litigation because there's no real corresponding feature to

23   mitigation in ordinary non-capital proceedings.

24   Q.    You said one on one.  What's important about that?  Why

25   wouldn't you want to bring like four or five family members into

36

1    the living room and talk to them all at once?

2    A.    Well, that's fine for meeting and greeting people, but you

3    want to talk to people individually so that they can open up and

4    share things that they may not want to discuss in front of the

5    other people.

6         If you have a household in which there was serious

7    physical violence in the home, if the perpetrator of that

8    violence is still in the family, other family members aren't

9    going to want to discuss it in front of that person.

10        So you want to do it -- you want to conduct your

11   interviews in the home because that's going to provide the best

12   memories of the client but you want to do it individually so

13   that people are not tailoring what they tell you because of the

14   presence of other people and you want them to feel that what

15   they are telling you is confidential to the extent you're not

16   sharing it with other people; we may need it for presentation at

17   a later point, but it's -- and it's going to be shared with the

18   defense team, but we're not gossiping.

19        We're not talking to other relatives about what we're

20   learning from individuals.  We are just harvesting that

21   information as thoroughly as we can and it takes time and

22   patience.

23   Q.    I think I got you a little off track.  I think you were

24   talking about records gathering as one aspect of the standard of

25   care.  What is the -- if there is more that you wanted to

37

1    deliver, if not what is the second?

2    A.    The second is the interviewing and, of course, the

3    investigation starts with the client.  You will obviously sit

4    down with the client and learn as much as possible from the

5    client's own memory about who are the significant people, who

6    can give you more information and it sorts of radiates outward.

7        It's, you know, we call it a social history investigation,

8    and so it starts with a client, radiates outward to other

9    members of the family and then the community in which he grew up

10   and you will use your records oftentimes to identify teachers,

11   neighbors, other people who knew the client in his developmental

12   years, so you're not entirely dependent on people who were as

13   closely associated as family members so it's an interactive

14   process between the gathering and analyzing the records and

15   identifying potential witnesses and conducting those interviews.

16       INTERPRETER DAVIS:  Excuse me, Your Honor, the

17   interpreters would like to switch.

18       THE COURT:  Yes, ma'am.  I understand we have Ms.

19   Gonzales here as well as backup for our interpreter.  Mr. Ertl,

20   I ask you to pause for just a moment.  Ms. Mixon, would you

21   please swear in Ms. Gonzales at this time?

22       THE CLERK:  Yes, Your Honor.

23       (Interpreter Gonzales sworn.)

24       INTERPRETER GONZALES:  Yes, I swear.

25       Thank you, Your Honor.

38

1    THE CLERK:  Please state your full name and spell your

2    last name for the record.

3    INTERPRETER GONZALES:  Michelle Gonzales, 08103.

4    THE COURT:  Ms. Gonzales, ready to proceed.

5    INTERPRETER GONZALES:  I'm sorry, Your Honor, the

6    interpreter is used to saying her credentials.  G-o-n-z-a-l-e-s.

7  Q.    (By Mr. Ertl)  You just used the term "developmental

8    years."  Can you tell The Court what you mean by that.  What

9    are developmental years and why are they important?

10  A.    Well, we are interested in what shaped the individual

11    growing up, what frailties he may have as a result of his life

12    circumstances during childhood.

13    One of the Supreme Court cases that gave us guidance in

14    this area, the *Eddings* case, *Eddings v. Oklahoma*, said youth is

15    not just a chronological fact.  It's a time of life when we are

16    vulnerable to outside influences, whether it's peer pressure to

17    do things or whether it's the circumstances in the home.

18    And, you know, that's an old case from the early 1980's,

19    and I think that has focused a lot of the mitigation

20    investigation to what happened to individuals when they were

21    growing up and, of course, jumping ahead to more recent cases

22    such as the *Atkins versus Virginia* case that created an

23    exemption for people with intellectual disability, two prongs of

24    the test for intellectual disability are something that occurred

25    in the developmental years and adaptive functioning, so we're

1    looking for how the individual was able to develop skills in

2    childhood, what negative influences he was exposed to and

3    actually doesn't even start with birth.

4        It goes back to what's in the DNA, what was encoded in

5    terms of familial genetic loading or genetic vulnerabilities to

6    mental conditions including cognitive conditions and was there

7    exposure to alcohol or trauma when the individual was in the

8    womb and then what happened in the early developmental period,

9    was an individual exposed to neurotoxins or head injuries that

10   could have affected brain development because brain development

11   begins in utero and remains a very significant issue through

12   particularly in early childhood but throughout childhood, and

13   brain damage is something that has been a significant part of

14   mitigation for as long as the modern death penalty has had

15   sentencing proceedings, so we've always looked for brain damage

16   because if someone has a brain that isn't functioning properly,

17   there are issues of impulse control and other mental conditions

18   that may be highly relevant to whether a juror will exercise

19   that mercy function.

20   Q.    You mentioned that -- you used the term "neurotoxin."

21   What is neurotoxin?

22   A.    Something that harms the brain.

23   Q.    Could those -- you mentioned exposure to alcohol in utero.

24   Would the alcohol in that situation be a neurotoxin?

25   A.    Yes, absolutely.

40

1    Q.    But can neurotoxins also be part of the environment?

2    A.    Yes, absolutely.

3    Q.    So --

4    A.    If you have someone who grew up in an agricultural

5    community where pesticides were sprayed, for example, children

6    exposed to that pesticide have a potential neurotoxin exposure.

7    You know, whether you have clean drinking water, things that

8    we're all concerned about with our own children and

9    grandchildren, are precisely around this issue.

10   Q.    So part of a mitigation investigation is actually looking

11   into the environment that the defendant and the client grew up?

12   A.    Yes.

13   Q.    You mentioned a couple of times a multi-generational

14   investigation.  Can you explain what that is?

15   A.    Yes.  I think I mentioned that there are genetic

16   vulnerabilities to mental illness and to mental impairments that

17   pass from one generation to the next.  You know, when you are as

18   old as I am and you go for your annual checkup, your doctor is

19   absolutely obsessed with what's running in your family, what did

20   your parents and grandparents die of.

21        So we've kind of understood in the medical area that there

22   are vulnerabilities that we inherit from our parents and

23   grandparents, and more recently -- I think this is really only

24   in the last 30 or 40 years -- there's been a recognition that

25   there are similar genetic vulnerabilities to mental disorders

41

1    and it doesn't mean if your mother suffered from schizophrenia

2    that you will also have that disorder any more than your father

3    dying from a heart attack means you will die from a heart

4    attack.  It just means that there is this genetic loading, this

5    genetic predisposition or vulnerability and it's something that

6    mental health experts will want to know about, and they are

7    frequently involved in part of the presentation of mitigation.

8    Q.    What is the mitigation investigation?  What is the role of

9    that in a mental health workup, if you will?

10   A.    Well, I think there are a couple of ways of looking at it.

11   One is you want to use your mitigation investigation to identify

12   what kind of expert you need.  For example, if your life history

13   investigation shows that there have been repeated head injuries,

14   for example, then you're probably going to get mental health

15   experts who are experts on the brain and the impact of these

16   injuries, whether it's a neuropsychologist or neurologist, a

17   neuropsychiatrist, but helping to identify what kind of experts

18   you need based on what you're finding in the mitigation

19   investigation.

20        If you have indications from your interviews of

21   developmental delays, potential deficits in adaptive

22   functioning, then maybe your mental health experts are going to

23   be focused entirely on intellectual disability issues, and that

24   would mean not only a neuropsychologist to do testing of

25   intellectual functioning but also people who are specialized in

42

1    examining and analyzing an individual's behavior developmental

2    milestones and so forth.

3         If someone grew up in a very violent environment, whether

4    it's domestic violence or, you know, completely safe home but a

5    violent neighborhood, where you had to negotiate how to get to

6    school because of gang violence, then you may want a trauma

7    expert, and so you don't just randomly choose a mental health

8    expert but you try to choose experts based on what you have

9    learned in the mitigation investigation and I said there were

10   two parts to it.

11        The other part is not just choosing the expert but

12   deciding what questions they will address, so it's not just a

13   one-size-fits-all evaluation.  You know, it's not like an

14   ordinary evaluation for competency or sanity, criminal

15   responsibility.  Mitigation embraces things that happened over

16   the entire life span of the individual, so you want to frame the

17   questions that the expert is going to address based on what you

18   have learned in the mitigation investigation.

19   Q.    So it sounds to me -- correct me if I'm wrong -- that

20   mitigation investigation should be almost complete before a

21   decision on a mental health -- whether mental health evaluation

22   is necessary, and, Two, what type of expert to employ?

23   A.    Substantially underway.

24        MS. GROOVER:  Your Honor, I would like to object to the

25   continued questioning about the prospective -- specifics of the

43

1    mitigation.  The Government has no objection that this is an

2    expert as to the standard of care required, but what is the

3    relevancy as to whether The Court has additional time to grant

4    additional time in this proceeding?

5         THE COURT:  Mr. Ertl, response.

6         MR. ERTL:  Judge, I think this goes to what -- I think

7    that is a separate issue, whether this Court has the authority

8    to grant that time and, of course, our position is it does, but

9    this informs The Court on how much time.  Should The Court

10   decide that you do have the authority, this witness is going to

11   inform how much time is going to be reasonably necessary for us

12   to conduct mitigation investigation, and part of that

13   investigation in this instance would possibly be presenting the

14   Government with evidence that the client suffers from some

15   mental illness or defect, so this all goes as to how much time

16   should The Court find it has the authority.

17        THE COURT:  I understand the objection.  I will observe

18   that Mr. Stetler's testimony has been that the mitigation

19   investigation process is complex, multi-faceted, involving a

20   number of different concerns and he's laid a lot of foundation.

21        I've yet to hear any testimony specific to this case why

22   it would connect some of those concepts, and I understand why

23   you want to go into that, but as to the issues of the relevance

24   to inquiry right now, I understand that part of the defendant's

25   motion is if The Court does have authority, then it should order

44

1    an extension and that it intends to present some suggested

2    extension as well, so it is relevant at this time, but I

3    encourage Mr. Ertl to get to the specifics of this case and

4    exactly that.

5            MR. ERTL:  Judge, I will contrast domestic investigation

6    with international for Mexican, specifically to Mexico in just a

7    few minutes.

8    Q.    (By Mr. Ertl)  Okay, so...

9        Are you personally familiar with the special complexities

10   that are involved in conducting mitigation investigation of

11   foreign nationals?

12   A.    I have some experience in that area, yes, both from

13   personal experience and from supervising people who have had to

14   conduct investigations abroad.

15   Q.    I know we talked about jurisdiction of the countries that

16   you investigated in or supervised before so I'm not going to go

17   into that.  Have you personally conducted a mitigation

18   investigation in Mexico?

19   A.    No.

20   Q.    Have you -- why is that?

21   A.    Well, I am not ethnoculturally competent to conduct an

22   investigation in Mexico.  You need people who are bilingual and

23   people who know more about Mexican culture than I know.

24        So when I worked in the capital defender office in New

25   York, we had a few cases involving Mexican nationals, and we

45

1    sent people from our staff -- I think it was entirely from our

2    staff -- who were bilingual and did have that kind of training,

3    and, you know, I definitely consulted with them when they

4    returned.

5        In some cases, we talked on the phone while they were

6    there, so I understood the problems that they were facing and I

7    helped shape what was ultimately presented in mitigation, in the

8    proffers that we did subsequently, but it was other people who

9    conducted the investigation on the ground.

10   Q.    In some of the trainings, in any of the trainings that

11   you've been either -- that you've either developed or taught in,

12   is there a training about conducting investigations of foreign

13   nationals?

14   A.    Yes.  There are enough cases involving foreign nationals

15   that it has become a regular component of capital defense

16   mitigation training to have specific sessions on the problems of

17   investigating abroad.

18   Q.    What is the general view of mitigation specialists who are

19   investigating foreign national cases?

20   A.    That they are the hardest cases to investigate, most

21   arduous.

22   Q.    Why is that?

23   A.    Things that we take for granted in this country are just

24   completely different in foreign countries, particularly less

25   developed countries, third-world countries.  Start with the most

46

1    basic concerns, physical security, safety.  You know, many of

2    our clients in this country come from neighborhoods that may be

3    crime-ridden, gang-infested, but we know in advance what those

4    neighborhoods are.

5        We can consult, even if it's in a different jurisdiction,

6    we can consult with local public defenders to get help and

7    physical protection.  People can go with us to dangerous places.

8    Mexico, in particular, is a different story, and this applies to

9    many foreign countries.

10       There are physical safety risks because of ongoing gang

11   violence, risk of kidnapping, carjacking.  You only need look at

12   the State Department's advisory notices for whatever country

13   you're visiting.

14       And also in this country, we know if something goes wrong,

15   we can take out our cell phone and call 911.  One of the things

16   that the State Department makes clear about Mexico and some of

17   the other places where I have sent mitigation investigators is

18   that there are places where they are unable to ensure the

19   protection of American citizens traveling --

20       MS. GROOVER:  Your Honor, I would like to object to this

21   line of answer as it's speculation.  This witness has not

22   personally conducted a mitigation investigation in this

23   scenario, and he's relying just generally on State Department

24   warnings for providing this testimony.

25       THE COURT:  All right.

47

1              MR. ERTL:  Judge, I'm going to bring it specifically to

2    a specific region in this case, and I'm going to introduce the

3    document from the State Department about a travel advisory.

4              THE COURT:  I'm going to sustain the objection.  Mr.

5    Stetler testified that he has not conducted a Mexican

6    investigation and he's not qualified to conduct a Mexican

7    investigation because of his cultural and linguistic

8    limitations.  He can testify generally about his knowledge about

9    international investigations, which he has conducted.

10             MR. ERTL:  But he's supervised them.  He's supervised

11   people who are conducting.  So as a supervisor, he's familiar.

12   He's familiar with the obstacles that are going to arise in

13   investigating a case in Mexico because he's had to send people

14   there and he's had to deal with those issues.

15             THE COURT:  My understanding is he has not supervised a

16   Mexican mitigation; is that correct?

17             MR. ERTL:  No, I think that's incorrect.  He did

18   supervise.  He said that earlier, in his earlier, he had

19   supervised the Mexican.  I will ask that question again just to

20   clarify.

21             THE COURT:  Please do, and let's keep this testimony

22   constrained to his direct experiences and what his

23   qualifications are.

24   Q.    (By Mr. Ertl)  Have you supervised a mitigation

25   investigation that was conducted in Mexico?

48

1    A.    Yes.

2    Q.    And do you know approximately how many times?

3    A.    It's a small number.  I would say probably three or four.

4    Q.    And in those investigations that took place in Mexico, did

5    there -- were you made aware of difficulties, problems that

6    arose in those investigations?

7    A.    Yes.  In addition to the safety issues, there were often

8    problems just in locating the people that they wanted to talk

9    to.

10          Again, the contrast with this country is we have

11   commercial databases which will provide addresses for people

12   that we're trying to find.  There's nothing comparable for

13   identifying where people live, and then once we have developed

14   information about where someone lives in Mexico, often we're

15   talking about places that are very difficult to find, remote

16   areas that are unpaved, unmarked and where my investigators, my

17   mitigation specialists, have had to have local guides who could

18   figure out where the village was or where the nearest village

19   was so that they could then try to find the people, and the

20   interaction between safety issues and these logistical issues is

21   important also because if there are safety issues and we can't

22   stay in an unsafe area in the evening and we have people who are

23   working, dawn to dusk, it's very, very hard to establish a time

24   when you can make the contact with the witnesses.

25          I mean, obviously we deal with these problems as they

49

1   arise, but those are the sorts of complications which are

2   typical.

3   Q.    Why couldn't you bring the witnesses to you like to your

4   hotel?

5   A.    Well, that's a good question.  The problem is that you

6   really are trying to interview people in the area where the

7   client actually grew up because you want to see the conditions

8   there.

9        You want to photograph and document what that village is

10  like.  You want to know whether there is electricity and running

11  water, whether the houses are one-room structures in which large

12  numbers of people are living; is there indoor cooking or is the

13  cooking at a wood fire outside, so you want to go on the ground

14  to the location and, in addition, that's going to lead you to

15  witnesses that you don't know about.  If you bring all the

16  witnesses just to your hotel, awkward as that probably is going

17  to be for the witness, you're not going to find all the other

18  people that are neighbors or coworkers or childhood friends that

19  might be part of your expanding investigation because, when

20  you're on the ground, you're not just seeing five specific

21  people.  You're trying to figure out who are the other people

22  who could provide useful information.

23  Q.    In your experience in supervising Mexican -- mitigation

24  investigations conducted in Mexico, were there other

25  complications once the witnesses were found?

1    A.    Yes.  Because, again, I indicated that there are barriers

2    to disclosure, things that people find very awkward to talk

3    about and that's compounded when people come from another

4    culture.

5        You have cultural attitudes towards mental illness,

6    towards childrearing or what is appropriate discipline in the

7    home and also suspicion of us as coming from the United States.

8        It's hard for them to understand the defense function

9    generally.  They are not schooled in the United States criminal

10   justice system, but especially they are not likely to know

11   anything about what a sentencing proceeding is going to be, so

12   we need to explain to the family members and other witnesses

13   that we are there on behalf of their son, brother, loved one,

14   person from their community, and also that this is a very

15   serious proceeding in which everything we learn about their

16   background may be relevant to the punishment in the case.

17       Many of these countries that I've mentioned don't have a

18   death penalty, don't have a sentencing proceeding and mitigation

19   is a brand-new concept in, you know, for American jurors.  You

20   know, when they sit in death penalty cases, they learn about

21   mitigation, something they haven't heard about before, and it's

22   the same for clients' family members, relatives, teachers and so

23   forth.  We have to explain this unusual concept that they

24   probably never heard of before.

25   Q.    What's your experience in the ability to gather records in

51

1    Mexico?

2    A.    They are very scarce and they are not centralized.   So

3    they are precious when they are found but they are extremely

4    difficult to find.

5    Q.    I'd like to if I can talk to you now about the importance

6    of presenting mitigation in the preauthorization stage of the

7    case like this case is.  Could you generally explain why

8    presenting mitigation in the preauthorization stage is

9    important?

10   A.    Well, it is a very important decision that the local US

11   Attorney's Office has to make in terms of its recommendation to

12   main Justice and the Defense wants to provide as robust a

13   submission as possible.  In addition, the early investigation

14   may disclose evidence of intellectual disability, for example,

15   which would be potentially dispositive.

16        The case may not need to go forward as a death penalty

17   case and wouldn't even have to be decided at main Justice if

18   there is overwhelming evidence of intellectual disability, so

19   whatever you work up in this early investigation has tremendous

20   importance and, of course, you know, as the Spencer report

21   update that you showed me earlier makes clear, there is a

22   tremendous cost-saving if there is not going to be an

23   authorization, so it isn't just for the sake of the individual

24   defendants, but in terms of court time and resources, the

25   presentation that is made to the local US Attorney and

52

1    potentially also made to the Department of Justice has all of

2    that significance about how complicated this case is going to

3    be, whether it needs to go forward as a death penalty case, and

4    again as I think I have mentioned, many, many death-penalty-

5    eligible cases do not proceed to a notice to seek the penalty or

6    are resolved and that's another area.

7         If cases are resolved by negotiated disposition, it is

8    often because of the evidence that can be presented in the

9    preauthorization submission.

10         Sometimes part of the presentation is a willingness to

11   agree to a negotiated plea and the mitigation investigation not

12   only may influence the prosecution in deciding whether there are

13   reasons why they should not seek the death penalty or why this

14   case is not as clearcut as they initially thought, and in

15   addition you are identifying in this investigation people who

16   may be important allies who can help clients grapple with very,

17   very difficult decisions about whether to enter into a plea,

18   people who care about whether the client lives or dies, people

19   who will put money on his books 20 years from now, people who

20   will take his phone calls but want to ensure that he is not

21   executed.  So all of those things kind of interrelate.

22   Q.   We talked -- you talked about in general mitigation

23   investigation and specifically now we've talked about some of

24   the problems in conducting one in Mexico.

25         How -- I know it's going to be a difficult question -- how

53

1    long do you need to conduct a proper mitigation investigation?

2          THE COURT:  Please wait before you answer.  The

3    interpreters are swapping.

4          INTERPRETER DAVIS:  Thank you, Your Honor.

5          THE COURT: Ready to proceed, Ms. Davis?

6          INTERPRETER DAVIS:  Yes, Your Honor.  Thank you.

7          THE COURT:  Go ahead, Mr. Stetler.

8          THE WITNESS:  I can't give you an exact number of

9    months.

10          MS. GROOVER:  Objection, speculation.  He's only done

11    three or four cases in Mexico.

12          MR. ERTL:  I will just relate it to -- if you want to

13    just talk about general mitigation investigation, take Mexico

14    out of the equation.

15          THE COURT:  All right, you can answer it.

16          THE WITNESS:  I think you want the mitigation

17    investigation to be sufficiently substantial that you've

18    identified themes, you've identified potential mental health

19    issues so that you can make a robust presentation to the

20    prosecution.

21    Q.    (By Mr. Ertl)  In your opinion, could a proper mitigation

22    investigation be conducted in four months?  Would it take

23    longer than four months to do a proper mitigation

24    investigation?

25    A.    Yes.

54

1   Q.   Could it take up to a year?

2   A.   Yes.

3   Q.   Could take longer?

4   A.   Yes.

5   Q.   And the problems that we've discussed about conducting

6   mitigation investigation in Mexico, that just compounds the

7   difficulties in a mitigation investigation in general; right?

8   A.   Yes.

9   Q.   I think -- Mr. Stetler, you talked a little bit before

10  about travel advisories.  Did you check -- did you look into

11  travel advisories in particular to some of the geographical

12  locations that are important in this case -- well, first of all,

13  strike that.

14       Let me go back.  Were you informed of geographical

15  locations in this case that a mitigation investigation would be

16  conducted into?

17  A.   Yes.

18  Q.   And did you do any research to find out if there were

19  travel advisories associated with those geographical locations?

20  A.   Yes.

21              (Defendants' Exhibit 7 was marked for

22              identification.)

23  Q.   (By Mr. Ertl)  If I may approach, Your Honor.  Let me show

24  you what's been previously marked as Defendants' Exhibit Number

25  7.  I've provided a copy to the Government already, Judge.

55

1       Can you take a look at Defendants' Exhibit 7 and see if

2   you recognize that?

3   A.    Yes.

4   Q.    Okay, what is it?

5   A.    It's a Mexico travel advisory from the Department of

6   State.

7   Q.    And can you tell us what the Department of State generally

8   advises about travel to Mexico?

9   A.    The general advice is exercise increased caution due to

10  crime and kidnapping.  Some areas have increased risk.

11  Q.    And Defendants' Exhibit 7, is that a document that you

12  obtained?

13  A.    Yes, I just --

14  Q.    How did you obtain it?

15  A.    Looked it up on the Internet.

16       MR. ERTL:  Judge, I would move for the admission of

17  Defendants' Exhibit Number 7.

18       THE COURT:  Any objection?

19       MS. GROOVER:  Your Honor, the Government has no

20  objection to The Court taking under advisement the public

21  advisories from the Department of State.  However, with respect

22  to the relevancy, there's different levels, and there has been

23  no foundation to what levels apply and specifically as related

24  to the case where potential witnesses or records are located.

25  Q.    (By Mr. Ertl)  I will try to remedy that, Judge.  I think

56

1    you said you were told of some geographical locations where

2    investigation had to take place in this case; correct?

3    A.    Yes.   The first page of my declaration indicated specific

4    geographic regions, and one of them, Rio Bravo, is in Tamaulipas

5    state, and if you -- the specific advisory listings are

6    alphabetical.

7        If you turn to that page -- it's not a numbered page, but

8    the page which covers Tamaulipas state, it's Level 4, do not

9    travel due to crime and kidnapping.

10   Q.    And we also have I think Chiapas.   Is there any type of

11   advisory for -- let's do it this way.   Hildago, Mexico City and

12   Chiapas are the other three.

13   A.    Yeah.   I think most of the areas are what the State

14   Department calls Level 2.   Again, violent crime, homicide,

15   kidnapping, carjacking, robbery, widespread.   US Government has

16   limited ability to provide emergency services to US citizens,

17   and in the case of Level 4 with Tamaulipas state, violent crimes

18   such as murder, armed robbery, carjacking, kidnapping, extortion

19   and sexual assault is common.   Gang activities including gun

20   battles and blockades is widespread.   Armed criminal groups

21   target public and private taxi or buses as well as private

22   automobiles travelling through Tamaulipas, often taking

23   passengers hostage and demanding ransom payments.   Federal and

24   state security force have limited capability to respond to

25   violence in many parts of the state.

57

1          MR. ERTL:  Can I have a moment, Your Honor?

2          THE COURT:  You may.

3    Q.   (By Mr. Ertl)  Let's go back to mitigation, I'm sorry.  I

4    forgot this, to go over this.

5          Is it important to understand -- to have a good

6    understanding of the case, of the discovery in a capital case,

7    before you start to conduct a mitigation investigation?

8    A.   Well, it's simultaneous with the mitigation investigation.

9    I wouldn't wait to begin the investigation, but obviously the

10   two go hand in hand, so understanding the discovery is

11   absolutely critical.

12   Q.   And you talked a little bit earlier about building a

13   rapport with the family and the client.  How in your experience,

14   what are some of the ways that you can build rapport -- let's

15   talk about -- with the client?

16   A.   Well, you want to build rapport with the client by

17   listening to the client's explanation relevant to culpability.

18   If they have leads that they want you to pursue, you want to

19   investigate those.  You want to have an ongoing dialog about

20   what the evidence is that the Government intends to present, and

21   so it's that interactive dialog that's going to help the client

22   understand how serious the case is, but also see whether you are

23   pursuing their suggestions, their leads and not just ignoring

24   them.

25         They are going to pay very close attention to how you're

58

1    investigating the guilt/innocence issues in the case, and that's

2    why you have a full team, not just a lawyer and mitigation

3    specialist.

4    Q.    In your experience, is it important for the defendant to

5    have an understanding of what is in the discovery as part of

6    your mitigation investigation?

7    A.    Yes, absolutely.

8            MR. ERTL:  That's all I have, Your Honor.

9            THE COURT:  All right, Ms. Groover, any

10    cross-examination?

11            MS. GROOVER:  Yes, thank you, Your Honor.

12                              CROSS-EXAMINATION

13    BY MS. GROOVER:

14    Q.    Good afternoon.

15    A.    Good afternoon.

16    Q.    Sir, did you personally consult on this particular case

17    for today?  Did you personally consult for mitigation?  Are you

18    part of the mitigation investigation for this case today?

19    A.    No.

20    Q.    So you didn't review any of the file prior to coming

21    today?

22    A.    I looked at the indictment.  I mean, as you probably saw,

23    my declaration was prepared just a week ago, so I'm not involved

24    in ongoing consultation.

25    Q.    So your familiarity with this case has to do with the

59

1    indictment and speaking with, I assume, Mr. Ertl in preparing

2    for today?

3    A.    That's correct.

4    Q.    So you're really not in a position to determine how much

5    time is necessary for this particular case to develop a

6    mitigation timeframe?

7    A.    I don't have details about what that will be.

8    Q.    Okay.  And would you agree that possible mitigation

9    investigations would include counsel reviewing all the discovery

10   produced by the Government in this case?

11   A.    Oh, yes, that's important.

12   Q.    And would you agree that possible mitigation investigation

13   would include interviewing the actual client, the defendant?

14   A.    That's where you start.

15   Q.    And would you agree in a case where you have foreign

16   nationals involved possible mitigation investigation would

17   include reviewing the alien file of the individual?

18   A.    You want to review any documents that you can obtain.

19   Q.    Would you agree that possible mitigation investigation

20   would include interviewing past employers of an individual in

21   the United States?

22   A.    Of course.

23   Q.    And would you also agree that possible mitigation

24   investigation would include interviewing possibly individuals

25   from the Department of Justice or prosecutors, other case agents

60

1    on the case?

2    A.    If -- if they are willing to speak to you.

3    Q.    Yes.  Would you agree that possible mitigation

4    investigation would include speaking with local law enforcement

5    that had personally investigated the case?

6    A.    Again, if they are willing to speak to you, you want to

7    obtain information from as many sources as you can, but they are

8    not a substitute for the broad international investigation that

9    I described.

10    Q.    Of course.  Of course.  And would you also agree that if a

11    defendant has a prior federal criminal conviction, a good way, a

12    possible mitigation investigation would include reviewing that

13    prior PSI?

14    A.    Yes, of course, and you want to see the -- the outcome of

15    that case, you want to see whether it's something that should be

16    reinvestigated at this point, so you always are looking at any

17    prior criminal allegations or convictions and see what's the

18    basis for setting them aside.

19    Q.    And those other prior cases will give good basis for

20    starting, for gathering the history and characteristics of the

21    defendant; correct?

22    A.    Well, to a very limited extent.  They are not at all the

23    same as conducting the sort of biographical investigation that

24    I've described.

25    Q.    Would you agree that in general these are just simple

61

1    straightforward steps that counsel can do here in the United

2    States as part of a mitigation investigation?

3    A.    It will do all of those, but, again, we're talking apples

4    and oranges.  It's important to get information from every

5    possible source, but it's not a substitute for the investigation

6    that needs to take place on the ground.

7    Q.    And would you also agree that if a defendant is a foreign

8    national but has been in the United States for some period of

9    time, for example, at least ten years, there's possible

10   mitigation investigation and evidence that can be found here

11   within the United States?

12   A.    Of course.

13   Q.    And would you agree that these are only parts, that this

14   preliminary investigation can continue throughout the entire

15   case?  It doesn't have to stop with respect to presentation to

16   the local prosecutor's office?

17   A.    No.  I certainly would not suggest that investigation ends

18   with the preauthorization submission but it needs to be

19   sufficiently robust that at the time of the submission you are

20   touching on the major issues that you've identified with months

21   and months of work so that it's going to be consistent with what

22   you continue to explore with a view to presentation in the event

23   the case goes to a penalty proceeding.

24   Q.    Now in your declaration on I believe it's Page 29, you

25   indicate that you have supervised staff who went to Mexico for

62

1    mitigation and you've previously testified today approximately

2    three or four times; is that correct?

3    A.    I think that's right.  I don't want to exaggerate.  It may

4    have been more.

5    Q.    And do you recall what years these were when you

6    supervised the Mexican mitigation investigation?

7    A.    Between 1995 and 2005.  I have a vivid recollection of one

8    case in Brooklyn where virtually all the men from the village

9    had moved to Brooklyn and the investigation on the ground in

10   Mexico found that only women, children and elderly people

11   remained and so it was a fascinating investigation, and there

12   was a de facto mayor of the village in Brooklyn who would go

13   around and talk to all the men who had come from that village,

14   collect unofficial taxes and then communicate back to the

15   village, you know, "We're putting in a new water system, and all

16   of the men who were working in the United States are

17   contributing to that," so it was a fascinating, you know,

18   particular story that stays in my mind.

19   Q.    Okay, and so you have been involved in cases in Mexico,

20   the three to four, between 1995 and 2005; is that fair?

21   A.    That's correct.

22   Q.    So are you familiar with the Mexican Capital Legal

23   Assistance Program?

24   A.    I've had a little contact.

25   Q.    And describe the contact that you've had, sir.

63

1    A.    I participated in one of their training programs in

2    California some years ago.

3    Q.    And what's your understanding of the Mexican Capital Legal

4    Assistance Program?

5    A.    That they -- the Mexican Capital Legal Assistance Program

6    attempts to facilitate the work of counsel on behalf of their

7    nationals.

8    Q.    You have no reason to dispute that it was created by the

9    Mexican Government in approximately 2000?

10   A.    Sounds right.

11   Q.    And --

12   A.    And, of course, the Mexican Government, like our

13   Government, changes from one administration to the next so I

14   think it's -- it has gone through different transformations over

15   the years.

16   Q.    And would you agree that one of the main purpose is to

17   help defense attorney construct biographic -- biography of the

18   accused to humanize them; that's one of their main purposes,

19   would you agree?

20   A.    I think they assist in that.

21   Q.    They help determine poverty issues and family dysfunction

22   and developmental disabilities?

23   A.    Yes.

24   Q.    So they assist tracking down mitigation evidence; would

25   you agree with that?

64

1    A.    They can.

2    Q.    And do you also agree that the program arranges for

3    lawyers to go to Mexico to track down school, hospital records

4    and travel and pays for travel costs?

5    A.    I don't know about payment, but they provide assistance in

6    some of these areas.

7    Q.    So in your declaration -- I believe it's on Page 29 -- you

8    indicate that defense personnel are really on their own in these

9    mitigation investigations.  Would you agree that you're not

10   really on your own with the Mexican Capital Legal Assistance

11   Program?

12   A.    Well, there's limits to how much assistance they can

13   provide.  And as the State Department said in some of these

14   areas, you know, there's no 911 call.  The US Government can't

15   help you, and there are areas where the Mexican Government can't

16   help you either.

17   Q.    And you're familiar with the justice manual as part of the

18   death protocol process?

19   A.    Yeah.  I'm not an expert on it.

20   Q.    Have you reviewed it?

21   A.    Not for this proceeding.

22   Q.    Okay.  Do you have any reason to dispute that the defense

23   counsel -- that the justice manual would provide defense counsel

24   another opportunity to present mitigation evidence not just in a

25   local level but in the event that the matters proceeded to

65

1    another stage?

2    A.    You mean at main Justice?

3    Q.    Yes.

4    A.    Yes.

5    Q.    And would you also agree that if a notice to seek death

6    penalty is filed the justice manual further provides an

7    opportunity for the United States on its own to request that the

8    notice to seek the death penalty could be withdrawn for a number

9    of reasons?

10   A.    Yes.  It is often a lot of efforts in that area based on

11   changed circumstances.

12   Q.    And do you also agree that even if a notice of death is

13   filed, the justice manual provides an opportunity for the

14   defendant through his counsel to request that that be withdrawn?

15   A.    Yes.

16   Q.    So would you agree that even after a preliminary

17   mitigation investigation, counsel can learn of new mitigation

18   agreements and have multiple opportunities to present the new

19   evidence and arguments in mitigation before and after a decision

20   is made?

21   A.    That is hypothetically true.

22   Q.    Okay.

23   A.    And there are many instances in which, in spite of an

24   early decision, the decision has been changed.  However, there

25   is no substitute for, you know, what I've referred to as a

66

1    robust initial presentation.

2         MS. GROOVER:  Thank you.  Your Honor, may I have just

3    one moment, please?

4         THE COURT:  You may.

5         MS. GROOVER:  Just briefly, Your Honor.

6         THE COURT:  Proceed.

7    Q.    (By Ms. Groover)  Again, you go back to the importance in

8    your opinion of this robust mitigation investigation, but in

9    this case, you're not familiar at all with what has been done

10   or what needs to be done and so you have no idea what kind of a

11   timeframe would be necessary; would you agree?

12   A.    Yes.  I don't know the details of what has been done.

13        MS. GROOVER:  Thank you.  No further questions.

14        THE COURT:  Any redirect?

15        MR. ERTL:  Nothing further, Your Honor.

16        THE COURT:  Thank you, Mr. Stetler.  You can step down.

17        MR. ERTL:  May Mr. Stetler be excused?  He has a plane

18   to catch.

19        THE COURT:  He may.  Mr. Ertl, I understand you have Mr.

20   Singer as your next witness and I believe you said he intends to

21   testify about the discovery in this case and review --

22        MR. ERTL:  It will be brief, if you want to do that.

23        THE COURT:  Let's take a ten-minute recess and we will

24   reconvene and take up Mr. Singer.

25              (Recess from 12:27 p.m. to 12:39 p.m.)

67

1          THE COURT:  Mr. Ertl, are you ready to proceed with your

2    next witness?

3          MR. ERTL:  Yes, Your Honor, we call Richard Singer.

4                         RICHARD SINGER,

5    having been first duly sworn, was examined and testified as

6    follows:

7          THE CLERK:  Thank you.  You may be seated.  Please state

8    your full name, spell your last name for the record, state your

9    occupation and your business address.

10          THE WITNESS:  My name is Richard Singer, S-i-n-g-e-r.

11    I'm a federally certified court interpreter and I reside in

12    Atlanta, Georgia.

13          MR. ERTL:  Just, I just, for what it's worth, this will

14    be our last witness, and so if The Court is inclined to go

15    through without a lunch break, we're more than okay with that.

16          THE COURT:  All right.

17                       DIRECT EXAMINATION

18    BY MR. ERTL:

19    Q.    Okay, Mr. Singer, are you self-employed or do you work for

20    a company?

21    A.    I'm self-employed.

22    Q.    You said you're a court certified interpreter.  How long

23    have you been a court certified interpreter?

24    A.    I was certified by the Administration of the United States

25    Courts in 1982, so I have been doing this for approximately 37

68

1   years now.

2   Q.    What exactly does it take to become a federally certified

3   court interpreter?

4   A.    Basically you have to have native English skills as well

5   as I've completed courses in interpretation.  There are three

6   basic skills for that interpretation, which are sight

7   translation, consecutive interpretation and simultaneous

8   interpretation as these excellent professionals are doing right

9   here, so you have to be able to do this.

10  Q.    Just a little bit...

11  A.    I noticed this before, but it doesn't quite carry.  So you

12  need to be able to listen to what is going on in the courts and

13  simultaneously interpret for The Court as well as defendants.

14  Q.    And in what courts, if you will, have you served as an

15  interpreter?

16  A.    I've been an interpreter in district courts in Georgia,

17  Northern District and Middle District in Alabama, Tennessee,

18  South Carolina, North Carolina, and I have worked also in

19  Florida and in Mississippi.

20  Q.    Other than courts, have you provided interpreting services

21  for any organization or governmental agents?

22  A.    Yes.  I'm also a conference interpreter and I have worked

23  extensively in academic and professional conferences.  I work

24  for the Centers of Disease Control and Prevention, for the

25  Carter Center.  I'm also certified by the United States

69

1    Department of State for seminar and conference interpretation.

2    Q.    Other than as a federally certified interpreter, have you

3    been otherwise employed?

4    A.    Oh, yes, I was previously director of international

5    marketing for Lockheed Martin Aircraft Company and I did this in

6    Canada and in South America.  I also worked many years in Spain

7    and in Argentina with Polygram Record Group.

8    Q.    So is -- were you born in the United States?

9    A.    No, I was born in Argentina.

10   Q.    And how long did you live there before you moved somewhere

11   else?

12   A.    Well, I came to the United States permanently when I was

13   about 38 years old, but I am -- as I said, I have native

14   language skills in English and Spanish.  As I said, I was born

15   and raised and educated in Argentina.

16         My parents are Americans, so we had a completely bilingual

17   home and bilingual education in all the schools that I attended.

18   Q.    How did you become involved in this case?

19   A.    I was asked by the federal defender office, by yourself,

20   if I could look at some exemplars of documents and basically

21   read them and time how long it would take to read an example

22   page of the material that was given to me.

23   Q.    Okay, and did you prepare -- well, did you and I prepare a

24   declaration?

25   A.    Yes, we did.

70

1    MR. ERTL:  If I may approach, Your Honor.

2    THE COURT:  You may.

3        (Defendants' Exhibit 2 was marked for

4        identification.)

5  Q.   (By Mr. Ertl)  Let me show you what has been previously

6  marked as Defendants' Exhibit Number 2 for identification.

7       Do you recognize that document?

8  A.   Yes, I do.

9  Q.   What is it?

10 A.   This is my declaration concerning the pages that I have

11 read and the timing that it took and essentially an estimate of

12 total time that it would take to work through all the material

13 that I've been told is involved in this case.

14 Q.   Did you sign that?

15 A.   I did.

16    MR. ERTL:  Judge, I move for the admission of

17 Defendants' Exhibit Number 2.

18    THE COURT:  Any objection?

19    MS. GROOVER:  No objection.

20    THE COURT:  It's admitted.

21 Q.   (By Mr. Ertl)  Let's take care of one of my mistakes in

22 this document right off the bat.  Would you look at Footnote 5?

23 A.   Uh-huh.

24 Q.   And you see that first line that says, "In addition to the

25 35,000" -- or second line, I'm sorry.  "In addition to the

71

1    35,000 pages that calculate the above"?

2    A.    That's correct.  I see it.

3    Q.    That is not consistent with the 37,000 pages that appear

4    in Paragraph 4; correct?

5    A.    Right.

6    Q.    So that 35,000 in Footnote 5 should actually be 37,000?

7    A.    That's correct.

8    Q.    Now, you said a few minutes ago that I had asked you to

9    interpret some documents and time yourself for how long it took?

10   A.    That's right.

11              (Defendants' Exhibit 8 was marked for

12              identification.)

13   Q.    (By Mr. Ertl)  I'm going to show you a series of

14   documents.  Let me show you what I've marked as Defendants'

15   Exhibit Number 8 for identification.

16   A.    Uh-huh.

17            MR. ERTL:  Judge, these are the documents that I think

18   we need put under seal.

19            THE COURT:  All right.

20            MR. ERTL:  Some type of protective order.

21            THE COURT:  Mr. Ertl, is there any request that the

22   hearing be sealed or just the documents?

23            MR. ERTL:  Just the documents itself.  I'm not going to

24   get into the contents.

25            THE COURT:  Ms. Groover, any objection to placing these

72

1   under seal and proceeding in open court?

2        MS. GROOVER:  No objection.

3        THE COURT:  These will be placed under seal and not

4   available publicly on the court docket.

5   Q.   (By Mr. Ertl)  Do you recognize Defendants' Exhibit Number

6   8?

7   A.   I do.

8   Q.   Is that one of the documents I asked you to interpret?

9   A.   Yes.

10  Q.   Can you tell The Court how long it took you to interpret

11  Defendants' Exhibit Number 8?

12  A.   On the first read, this document took me one minute and

13  eight seconds.

14  Q.   And that document, does it look like -- how would you

15  describe it?

16  A.   It appears to be a copy of a transcript, a court

17  reporter's transcript.

18  Q.   And you said it took you how long?

19  A.   One minute and eight seconds.

20       MR. ERTL:  Move for the admission of 9 or 8, I'm sorry.

21       MS. GROOVER:  No objection to all of these.

22       MR. ERTL:  If I can, Judge, I'm just going to give all

23  the copies to Mr. Singer and to Your Honor.

24       THE COURT:  Yes, please do.

25

73

1          (Defendants' Exhibit 9 was marked for

2          identification.)

3   Q.    (By Mr. Ertl)  Defendants' Exhibit Number 9, is that a

4   document I asked you to interpret?

5   A.    Yes, it is.

6   Q.    Can you describe what the document is?

7   A.    Yes.  It is an affidavit and an application for a search

8   warrant.

9   Q.    How long did it take you to interpret that document?

10  A.    This one took me approximately seven minutes on the first

11  read.

12  Q.    Seven minutes?

13  A.    Yes.

14          (Defendants' Exhibit 10 was marked for

15          identification.)

16  Q.    (By Mr. Ertl)  If you would, look now at Defense Exhibit

17  Number 10.  What does that appear -- do you recognize that

18  document?

19  A.    Yes, I do.

20  Q.    Is that one of the documents I asked you to interpret?

21  A.    Yes, it is.

22  Q.    And can you tell The Court what it appears to be, that

23  document?

24  A.    This is an investigative report from the Garden City

25  Police Department.

74

1   Q.    And it's Page 3 of 8?

2   A.    Correct.

3   Q.    How long did it take you to interpret that document?

4   A.    This document took me four minutes and 54 seconds and

5   37/10ths on the first read.

6   Q.    So approximately four minutes and 37 seconds?

7   A.    It's the tenths that count.

8                    (Defendants' Exhibit 11 was marked for

9                    identification.)

10  Q.    (By Mr. Ertl)  Let me show you, take a look at Defendants'

11  Exhibit Number 11?

12  A.    Yes.

13  Q.    Do you recognize that?

14  A.    I do.

15  Q.    Is that a document I asked you to interpret?

16  A.    It is.

17  Q.    Can you tell The Court how long it took you to interpret

18  Defendants' Exhibit Number 11?

19  A.    To read this entire application, this took two minutes and

20  52 seconds.

21                   (Defendants' Exhibit 12 was marked for

22                   identification.)

23  Q.    (By Mr. Ertl)  Defendants' Exhibit Number 12, can you take

24  a look at that.  Is that a document you're familiar with?

25  A.    Yes, I did.

75

1    Q.    And what if you can describe it?

2    A.    This is a list of phone calls, cell phone calls,

3    indicating date, time, originating number and terminating

4    number.

5    Q.    Okay, and there are other -- there's other information on

6    that but you were advised not to interpret that?

7    A.    That is correct, I did not.  I read only the initiating

8    and terminating numbers.

9    Q.    Is that a document I asked you to interpret?

10   A.    Yes, it is.

11   Q.    And how long did that take?

12   A.    This one took me six minutes.

13                    (Defendants' Exhibit 13 was marked for

14                    identification.)

15   Q.    (By Mr. Ertl)  And finally Defendants' Exhibit Number 13?

16   A.    Yes.

17   Q.    Is that a document that you're familiar with?

18   A.    Yes.  This was another one of the documents that you gave

19   me.

20   Q.    And what does it appear to be?

21   A.    This a bank extract indicating withdrawals and other

22   subtractions, basically ATM and debit card extractions.

23   Q.    Did you time yourself when interpreting that document?

24   A.    I did.  This one took me five minutes and 19 seconds.

25   Q.    Okay.  As part of what I asked you to do in this case, did

76

1   you average the time it took on four of -- particularly these

2   documents?

3   A.    Yes, I did.  I took all the time that all these six

4   different documents, took me to basically sight translate, to

5   read them, and I came to an average of approximately four

6   minutes.

7   Q.    These are only the first four document?

8   A.    Yes.

9   Q.    Defendants' Exhibit 8, 9, 10, and 11, not the bank records

10  and the phone records?

11  A.    No, sorry, that is the average for the entire six

12  documents.  I did not do the first four, I'm sorry.  I

13  misunderstood that.  Let me see that.

14  Q.    Do you have your declaration up there?

15  A.    Yes, is that correct?

16  Q.    In Paragraph 4.

17  A.    Yes.

18  Q.    Could you take a look at that and see if it refreshes your

19  recollection as to which documents you took the average of?

20  A.    Correct.  I'm terribly sorry.  I stand corrected.  It was

21  the four documents, and that was the four minutes approximately.

22  Q.    And in your -- approximately four minutes?

23  A.    Yes.

24  Q.    And did I ask you to assume there were a certain number of

25  documents that were representative of those four documents?

77

1  A.    Yes, approximately 37,000.

2  Q.    And based on your timing of your -- and the average of

3  those reading -- interpretation of those four documents, how

4  long would it take you to interpret those to a Spanish-speaking

5  client?

6  A.    Approximately 2300 hours based on that time.

7        MR. ERTL:  Did I move for the admission of Number 2?  Is

8  that in?

9        THE COURT:  I don't believe you have.

10       MR. ERTL:  I move for the admission of Mr. Singer's

11  declaration, Defendants' Exhibit 2.

12       MS. GROOVER:  No objection.

13       THE COURT:  It's admitted.

14  Q.    (By Mr. Ertl)  Let me clarify something that I may have

15  left a little muddy.  When I use the term "interpret," when I

16  said how long did it take you to interpret, what exactly did

17  you do?

18  A.    It's what I call sight translation, which is essentially

19  interpretation.  You read the document, which is, in this case,

20  the original Spanish and -- I'm sorry, original English and read

21  it out into Spanish, and this is essentially interpretation, but

22  it's actually called sight translation.

23  Q.    And that's exactly what you did with all of the documents?

24  A.    That is what I did with all of these documents.

25       MR. ERTL:  No more questions.

78

1    THE COURT:  For housekeeping you're tendering 9, 10, 11,

2    12 and 13 as well?

3    MR. ERTL:  Correct, Your Honor.

4    THE COURT:  And there is no objection?

5    MS. GROOVER:  Correct.

6    THE COURT:  Those are admitted.  Any cross-examination,

7    Ms. Groover?

8    MS. GROOVER:  Yes, briefly, Your Honor.

9                        CROSS-EXAMINATION

10    BY MS. GROOVER:

11    Q.    Good afternoon, sir.

12    A.    Good afternoon.

13    Q.    Do I understand correctly that the only document that you

14    have reviewed are the documents outlined in this declaration?

15    A.    That is correct.

16    Q.    But yet you have an understanding of how many thousands of

17    pages there are; correct?

18    A.    It was suggested to me by Mr. Ertl that there are

19    approximately 37,000 pages of similar documents.

20    Q.    Have you been retained to begin translating these

21    documents?

22    A.    No, I have not.

23    Q.    To your knowledge, has anyone else been retained to review

24    those documents?

25    A.    I have no information.

79

1   Q.   Are you familiar, are there other ways to translate these

2   documents besides sight translation?

3   A.   I mean, they can be translated directly, which is written

4   translation, which takes considerably longer.

5   Q.   Are you familiar with any electronic processes or

6   applications to assist with translation?

7   A.   Yes, none very good.

8   Q.   You haven't found any electronic applications to assist

9   you?

10  A.   There are a lot of advances in computer translation these

11  days, but it still requires a human touch.

12  Q.   Okay, and to review?

13  A.   As well as to review.

14  Q.   Would you agree some applications like Google Doc app can

15  assist with your translation?

16  A.   Yes, they probably could.  They have gotten much better

17  over the years.  They were laughable when they started.

18  Q.   I understand, but that could save some of this time?

19  A.   Potentially.

20  Q.   Also with respect to -- and I apologize, I don't have a

21  numbered copy in front of me -- the documents that you

22  translated specifically, will you look at the phone records.

23  A.   Yes.

24  Q.   How exactly are you translating that, sir?  Are you

25  translating only the top column words or are you translating

80

1    every single number from --

2    A.    Every single number in the first five columns.

3    Q.    Okay.  So instead of letting the numbers speak for

4    themselves on a translated document, you are translating them in

5    Spanish, the number?

6    A.    Yes.  In timing this particular document I read all the

7    numbers out loud.

8    Q.    Would you agree that it would be possible to only

9    translate the columns and let the numbers speak for themselves

10   in a document such as this?

11   A.    Yes.

12   Q.    And same with respect to Defendants' Exhibit 13, the bank

13   record document.  Did you also translate this number for number

14   and word for word?

15   A.    Number for number and word for word.

16   Q.    Would you agree in a document such as this, the numbers

17   could speak for themselves and you would only necessarily need

18   to translate the words?

19   A.    Not necessarily.  This document has a lot of other words

20   included in it as to where the withdrawal was made or the

21   payment was made.

22        Some of it refers to beverage purchases, to billing and

23   all those things need to be translated or interpreted for a

24   Spanish speaker.

25   Q.    But, for example, the date column, is it possible to just

81

1    translate the date at the top, the word "date" and let the

2    actual date numbers speak for themselves in that column?

3    A.    Yes, that's possible.

4    Q.    And same with the amount on the far right side.  Is it

5    possible to only have to translate the word "amount" and let the

6    numbers speak for themselves?

7    A.    Yes, that's correct, as long as the reader has a copy of

8    this right in front of him.

9    Q.    And again, you have not begun any of these translations or

10   have not been hired to do this?

11   A.    No, I have not.

12        MS. GROOVER:  Thank you.  I have no further questions.

13        THE COURT:  Any redirect?

14        MR. ERTL:  Nothing, Your Honor, that I think.

15        THE COURT:  Mr. Singer, you can step down.  Mr. Ertl, I

16   understand that was your last witness?

17        MR. ERTL:  Yes.

18        THE COURT:  Do you have any other documentary evidence

19   that you would like to submit?

20        MR. ERTL:  None, Your Honor.

21        THE COURT:  And Ms. Groover, to confirm, the Government

22   has no witnesses or documents.

23        MS. GROOVER:  That is correct, Your Honor, only

24   argument.

25        THE COURT:  Mr. Ertl, it's your motion.  I will take

82

1    arguments from you at this time, and before you get started, I

2    want to be clear, I've read all the filings related to this.

3    I've reviewed most of the authority that's been cited, not all

4    of the key cases that have been cited, so I'm very familiar with

5    the issues and the law surrounding it so no need to rehash with

6    argument what is submitted in writing.

7         MR. ERTL:  Judge, whatever The Court's practices, if The

8    Court would indulge us, we would like to get the transcript and

9    brief the issues to you.  If we -- if you want to go forward

10   now, we can do that.

11        THE COURT:  As I understand it with regard to the

12   testimony that was provided here today, that relates primarily

13   to two issues and that being the amount of time that would be

14   requested by the defendants and also the need for any extension

15   at all based on the facts of this case, but the testimony here

16   today wouldn't relate to the other issues, which are the legal

17   questions regarding The Court's authority or any requirement

18   under the due process clause or the Sixth Amendment as well.  Is

19   that your understanding?

20        MR. ERTL:  Yes.

21        THE COURT:  Well, I will take argument on those other

22   issues.  To the extent there's need for briefing related to the

23   transcript later on, we will take that up after this hearing.

24        MR. ERTL:  I just want to -- another thing based on what

25   you just said.  The testimony we put in here other than Mr.

1    Singer was not necessarily specific to this case.  If there --

2    if The Court was asking about what has been done so far, if we

3    are going to present that, that would have to be in an ex parte

4    setting I believe because otherwise we would be getting into

5    matters I don't think the Government is entitled to, but I don't

6    think that -- I don't think that's necessary but I was just

7    curious based on your --

8         THE COURT:  Let's table any of those issues for now and

9    take up arguments now on the precise legal issues and again

10   those relating to the due process argument and effective

11   assistance of counsel and then the inherent authority issues as

12   well.

13        MR. ERTL:  Well, Judge, I think we have laid out what I

14   think is the law.  We've provided some cases, the Puerto Rico

15   case that says this is a critical stage.  There is also a Puerto

16   Rico case that says it is not.

17        What I will say is this circuit has not addressed it.

18   There isn't a District Court in the Eleventh Circuit that has

19   addressed the issues that we present here, so as far as -- I'm

20   not saying we're writing on a clean slate.  Circuit wide, it's

21   an open question.

22        Our position is two-fold, Judge.  First the I think

23   *Evitts versus Lucey* and *Ohio Parole Board versus Woodard* sort of

24   lay out the framework.

25        You don't have to provide the process, but once you do

84

1    provide a process, some form of due process applies, and I think

2    that's what *Ohio Woodard* -- *Ohio Parole versus Woodard* talks

3    about.

4          You have where executive clemency, there are at least

5    minimal due process concerns that apply to things as unique as

6    executive clemency.  It's almost identical, and the Supreme

7    Court in a plurality opinion, I think it's actually Justice

8    O'Connor that provides the deciding vote that says at least some

9    minimal due process applies to executive clemency.

10          Here the Government is saying it would be in violation

11    of the separation of powers doctrine.  We're not asking The

12    Court to interfere with their discretion.  What we're asking The

13    Court for is a timeframe that allows the defendants to present a

14    meaningful presentation -- make a meaningful presentation to the

15    US Attorney, delaying that decision only briefly, so we can

16    conduct mitigation investigation, more importantly, so we can

17    get it -- have our clients understand the nature of the case

18    against them.

19          I think the most important thing -- and I'm not sure I

20    say this in the brief -- is the Government, one of the things

21    that the protocol sets out is that any -- all of the decision

22    makers have to consider the relative strength of the case.  We

23    have to assess that.

24          I will speak for me.  I don't know most of the players

25    in this case.  There are huge numbers of -- huge numbers of

85

1    names that I have to talk to my client about to find out what he

2    can tell me about them.

3         Before I can talk to him about those people, he has to

4    understand what they have said about him.  So he has to have

5    read the discovery or have had it read to him to -- before we

6    can make an assessment, a reasonable assessment, of the strength

7    of the Government's case.

8         For instance, you know, if one of the witnesses, if my

9    client knows that one of the witnesses has some prior

10   convictions that I don't know about --

11        THE COURT:  Let me bring it back to the legal issues and

12   I want to take up the issue of due process completely

13   independently from the issue of effective assistance of counsel

14   and address those under their relative lines of authority.

15        So you discuss evidence in the *Ohio Parole Board* cases

16   but my reading of those cases and the law as it's been described

17   in those cases is that The Court first identified a protected

18   liberty interest, and then once a protected liberty interest was

19   identified, it then determined that due process rights attached

20   to evaluate that liberty interest, but in each of those cases,

21   it was where the State had adopted some sort of statutory

22   provision or some mechanism that provided a fundamental liberty

23   interest to those individuals that was then the object of the

24   procedural protections.

25        I've not seen a case -- and I don't see one in the

1    briefs -- that makes a similar sort of conclusion related to

2    provisions in the justice manual or even in the federal context

3    for something like a death penalty determination.

4          Can you point to a case in the federal sphere that

5    identifies that first step, the protected liberty interest?

6          MR. ERTL:  I do not believe there is one, no.  I think

7    the closest we have are those -- I think it's *McGill* and I can't

8    think of the other case that find that there's an inherent

9    authority in The Court to set a schedule, that The Court has

10   inherent authority to do that, but I cannot find a case on point

11   with this, but I think the clemency aspect is analogous almost

12   directly because it's the State creates a process, and as you

13   can see, in *Ohio versus Woodard*, there is no right to clemency,

14   but there is a right to the process.

15         Here there is a right to the process, and I think about

16   it like -- like this, Judge.  If we came in here and -- this is

17   not the case -- but if we came in here and said -- and we found

18   evidence that the Government only allows a presentation under

19   the protocol if the defendant was white, there would be a due

20   process violation.  There would be an equal protection

21   violation.

22         If there is a process set up and then there is something

23   that interferes with the defendant's right to that process, he

24   has a liberty interest here.  His liberty interest is that's

25   hopefully not having a death sentence sought against him.

87

1    That's the liberty interest here.

2         So I think *Ohio versus* -- *Ohio Parole Board versus*

3    *Woodard* I think is analogous.  I think it says there are at

4    least minimal due process and I think at its fundamental, due

5    process requires meaningful right to be heard.

6         On effective assistance, Judge, I think this Puerto Rico

7    case -- there are a host, as I'm sure you know -- and I think I

8    cited it -- that there are a host of cases that find it's not a

9    critical stage, but I think when you examine the nature of the

10   proceedings that it is a critical stage.

11        The fact that -- I would say -- let's say over 80

12   percent of the time the Attorney General follows the no

13   recommendation of the local US Attorney shows how important that

14   stage is, so I think there are no cases on point and -- except

15   for that Puerto Rico District Court case, but I think it's open

16   and I think if you look at what determines a critical stage of

17   the proceedings, this fits.

18        THE COURT:  The Government's response is that, in part,

19   that for a proceeding to be a critical stage for the purpose of

20   effective assistance, it needs to be adversarial and there needs

21   to be some aspect that impairs the Defense on the merits for it

22   to qualify.  Do you disagree that those are considerations under

23   that test?

24        MR. ERTL:  I think they are considerations.  I think

25   this is adversarial.  I think if you look at the -- I think I

88

1    covered it in the reply.  The Government, at least initially,

2    has decided it is going to seek permission to pursue the death

3    sentence; otherwise, we wouldn't have been given the opportunity

4    to make a presentation, so they are at least contemplating it.

5         If we can't go in there and -- well, if they are

6    contemplating it and we have to go in there and convince them

7    otherwise, it's adversarial in that.  They are other -- I don't

8    want to say they are biased, but they are not -- the playing

9    field is not level.

10        They have already found whatever reason it is and they

11   have absolute right to find whatever reason to tilt towards the

12   death sentence.

13        THE COURT:  Right, but where the cases have found

14   critical stage, it was an adversarial proceeding in the sense

15   that there were two adversaries proceeding before a neutral.

16        Here it's an interface just between the two adversaries.

17   There is no confrontation.  It is simply that negotiation or

18   exchange or relationship between the two.  That strikes me as

19   fundamentally different.

20        MR. ERTL:  It might be different, but I don't think it

21   carries the day.  I think there's still a substantial -- there

22   are substantial rights that can be won or lost at this stage,

23   and clearly if we lose it at this stage, if it goes to a death

24   penalty trial, we've -- there are scores of problems or -- I

25   don't say problems -- scores of disadvantages that go to a

89

1    defendant in a capitally prosecuted case versus a, if you will,

2    a regular trial.  The death qualification of jurors, for

3    example, eliminates a whole host of people because of their

4    belief for or against -- or also against capital punishment.

5           THE COURT:  Would you agree that there's a difference

6    between an important stage and critical stage for purposes of

7    the Sixth Amendment?

8           MR. ERTL:  Yes.  I think for the Sixth Amendment to

9    attach, it has to be a critical stage.

10          THE COURT:  And there are many important stages where

11   the Sixth Amendment would not attach in the course of federal

12   criminal prosecution?

13          MR. ERTL:  I would -- yeah, there are.  I just don't

14   think this is one of them.  I think this a critical stage where

15   the defendant stands to lose a lot if he is not able to

16   meaningfully participate.

17          THE COURT:  All right.  Regarding the inherent authority

18   component, the third part of the argument here, you indicated

19   that you may not be in a position to make a request as to the

20   specific amount of time or at least to go into detail about

21   what's been performed as of today's date.  What can you

22   represent to The Court about that?

23          MR. ERTL:  Well, I can't speak for the other defendants.

24   I can tell you that I have spent personally I would say well

25   over a hundred hours, because of the protective order, at the

90

1    Liberty County jail having discovery read to the defendant.

2           I mean, I would say probably hundreds, and we are not --

3    I would think even a tenth of the way through.  And I think Mr.

4    Pablo Rangel-Rubio is -- he is -- I don't know if he is unique,

5    but everything, he is named in every count, he's -- so all of

6    the discovery is extremely relevant to him, to the money

7    laundering, to the harboring, to the three different various I

8    will say murder counts.  So he has to have -- he has to have

9    access to all of it, and I think -- and it's my position that,

10   you know, until we can get everything -- I don't want to say

11   read to him, but give him access, meaningful access, to the

12   discovery, we can't really make a presentation.

13          It's not fair to make him go forward when he doesn't

14   necessarily know all the evidence, so I can say and I believe

15   The Court has signed a -- signed the order amending the

16   protective order.

17          For me -- I'm not going to speak for the other

18   defendants -- that will speed things up because I now can take a

19   Spanish-speaking paralegal and have them, you know, spend a week

20   at a time at the jail and going through the discovery with him,

21   so that -- the mitigation investigation is going on on a

22   parallel track, you know, so I think my biggest problem with the

23   discovery is getting my client access to the discovery.

24          THE COURT:  But I'm still not hearing a specific ask for

25   time.

1          MR. ERTL:  Well, if I was going to ask for a specific

2    time, we asked the Government for I believe six months in that

3    last letter if I'm not mistaken, and that's what I would ask

4    for.

5          I don't know what the other defendants would ask for.  I

6    can't speak to the state of their investigation or their -- but

7    I would ask for something like that so we have six months, so

8    March.

9          THE COURT:  All right.  Now, under the guides to

10   judiciary policy there are recommendations to set certain

11   deadlines in the case and those include the deadline for the

12   defendant's submission, the deadlines for the US Attorney

13   submission to main Justice and then the deadline for the notice

14   of filing in the death notice.

15         Now the Government has challenged The Court's authority

16   to impose certain of those deadlines, but as I understand it,

17   there is no challenge to the authority of The Court to impose

18   that third and final deadline, the deadline for the filing of

19   the death notice in the case.

20         If The Court were to lack authority on those first two,

21   would the defendants be making a request for a deadline about

22   filing of the death notice?

23         MR. ERTL:  I think the request I would -- the request I

24   would make is give you a date and say they can't do it before

25   then.  I wouldn't be asking for a deadline.

1    I would be asking for at least enough time for me to

2 conduct the investigation so I can have an opportunity to

3 convince them that death is not the appropriate track for this

4 case.

5    THE COURT:  All right.  Ms. Groover.

6    MS. GROOVER:  Thank you, Your Honor.  The Government's

7 position is laid out in our response in opposition and it has

8 not changed and I believe it is articulated in that response.

9 So I just briefly overview it.

10    First, initially with respect to the due process claim,

11 the Government's position is that we don't even get there

12 because we are still in the prosecutorial discretion at this

13 point, and we're still making the decision about what

14 sentences -- what charges to bring and what sentence to

15 ultimately pursue, so the Fifth Amendment due process clause

16 would not be implicated in that, and any due process that the

17 defendants would be entitled to are still provided to them in

18 the process of the proceedings, and so we believe there is no

19 violation and it doesn't even apply at this stage.  At the heart

20 of their motions seeking relief is the justice manual, our

21 internal procedures, and respectfully, it's the Government's

22 position that it's not within The Court's purview, and there is

23 no rights conferred under the justice manual.

24    The protocol generally does provide a series of layers

25 and safeguards in place before a decision is made whether or not

1    to seek the death penalty.  Right now we're talking about the

2    very first stage.  We're at the first stage when the US Attorney

3    makes his initial recommendation, and that's not something

4    that's taken lightly.  There are a number of things as outlined

5    in the justice manual that must be considered and will be

6    considered.

7         It's not a simple seek or no seek.  We review the facts

8    and the supporting evidence, the discussion of all the

9    prosecutorial considerations such as the role that he played,

10   obstruction of justice and whether or not that occurred, if

11   there's any retaliation, if there's any criminal conduct to be

12   considered and the behavior while incarcerated.

13        There's analysis of the threshold intent factors.  There

14   is analysis of the aggravating factors and there's application

15   of mitigating factors as well as background and criminal record

16   of the victim and the defendants and the view of the victim's

17   family on whether or not to seek the imposition of the death

18   penalty.

19        So those are the materials that are put together and

20   considered and provided to the Attorney General's review

21   committee, and if anyone, the US Attorney or one reviewer on the

22   committee requests a conference, then the defense counsel are

23   invited to meet with the capital review committee prior to a

24   final decision is made.

25        So there are multiple layers of opportunities where

94

1  defense counsel would be offered an opportunity to present any

2  type of mitigation or arguments or evidence, and then finally

3  after a decision is made, there are still opportunities for that

4  decision to be reviewed again, new mitigation evidence.

5       The US Attorney himself could ask for reconsideration or

6  the defendant through counsel could ask for a reconsideration,

7  and so, although in this particular case, no decision has been

8  made, yet he wants to delay the process of the first layer, and

9  the Government has yet to hear, except this arbitrary number,

10  six months to a year, how much time is really necessary, and we

11  have yet to hear specifics about what has been done.

12       Without getting into attorney/client privilege -- we

13  don't want to get into that -- but we have not heard generally

14  what has been done, what still needs to be done and what it will

15  take to get that.

16       Instead, what the Government is hearing is attempts to

17  delay, and, with all due respect, it is time to move this case

18  forward, and the Government is not seeking to deny them any

19  opportunity to continue their mitigation investigation and then

20  present additional mitigation evidence.

21       We're just seeking to move this process along to the

22  very first stage of a rather lengthy important process.  And so,

23  first of all, it's the Government's position that the justice

24  manual itself does not provide any kind of substantive rights to

25  the defendants to seek relief under.

1        Almost every single circuit court who has considered

2   whether or not the justice manual in general provides rights has

3   held that, including the Eleventh Circuit.  And there are a few

4   circuit courts who have actually considered this in context of

5   the death penalty protocol.

6        THE COURT:  Ms. Groover, let me ask you a question.

7   Part of your argument is there will be another opportunity to

8   present later on.  But you also argue that the justice manual

9   doesn't provide any substantive right, so is there any mechanism

10  to enforce that or ensure that that's actually going to happen?

11       MS. GROOVER:  The Government is telling you as an

12  officer of The Court we comply with our justice manual.  We have

13  complied and we will comply.

14       There have been some cases where defense counsel have

15  filed motions to dismiss the death notice on the ground that the

16  justice manual has not been complied with.

17       It's my understanding that those cases, they have not

18  dismissed the notice to seek, and so the end result, though, is

19  there's no -- there's no -- The Court does not have the

20  authority under the justice manual if the justice manual is not

21  complied with, but there is recourse under the Constitution and

22  under the Federal Death Penalty Act because, once you have a

23  notice of death has been filed, that decision has been made, but

24  there's still opportunity for the Defense to present mitigating

25  evidence to the ultimate trier, the juror, and for the juror who

96

1    is actually going to make that decision to weigh the aggravating

2    and the mitigating evidence.

3           THE COURT:  But that would only come after the AG's

4    decision; correct?

5           MS. GROOVER:  That would be correct, but the AG is a

6    just a notice of what the Government would be seeking.  It is

7    not the imposition of the sentence.

8           So the defendants, although if they make arguments that

9    they have somehow been denied the protocol, they would still

10   have an opportunity to ensure that their rights are upheld

11   throughout the trial and the litigation of this case.

12          THE COURT:  I want you to focus on the third issue,

13   which is the inherent authority more so than the constitutional

14   arguments.

15          MS. GROOVER:  Obviously, there are different District

16   Court opinions that conflict on this issue.  There's the *McGill*

17   case that finds that The Court does have the inherent authority

18   under Section 670 to set deadlines, and then there's also the

19   *Sloan* decision and those cases are competing.

20          It's the Government's position that the *Sloan* court got

21   it right and that the *McGill* case is factually distinguishable

22   from this particular case.  In *McGill*, the defendants didn't

23   even have discovery at that time.

24          INTERPRETER DAVIS:  Interpreter begs The Court, ask

25   counsel to slow down.

97

 1        MS. GROOVER:  Thank you for reminding me to slow down.

 2   I apologize.

 3        In the *McGill* decision, it's the Government's

 4   understanding from reading that case that the defense counsel

 5   did not even have access to discovery at that point in time.

 6        And so it's the Government's belief from reading the

 7   opinion that part of The Court's decision in imposing that

 8   schedule had to do with imposing schedules with respect to

 9   discovery and use the recommendations under Section 670, but,

10   Your Honor, the *Sloan* court I believe interpreted it accurately

11   as Section 670 is not an inherent rule that The Court must

12   follow, but it's rather a recommendation, and it's the

13   Government's understanding from reading the Spencer report, from

14   the 2010, that the entire purpose of Section 670 is to help

15   streamline this process because these cases are inherently slow,

16   and they do take time.

17        Death is different, as many cases in courts have noted,

18   but courts became frustrated at the delay in the Attorney

19   General filing a notice whether it will seek or will not seek,

20   so it's the Government's understanding that the purpose behind

21   Section 670 is to help streamline things and not delay it even

22   further.

23        THE COURT:  Let me break this issue into two parts as I

24   see it.  Under the inherent authority analysis, there's a

25   question whether The Court can order the Government to extend

1    the deadline and the second question is whether it should in the

2    particular case.

3          My concern on the first part about whether the

4    Government can, looking at the split of approaches taken by

5    these District Courts, in *McGill* the court notes that the

6    judiciary policy guidelines are developed jointly by the staff

7    of the Department of Justice and defender services, and they

8    contemplated The Court imposing a deadline just like what the

9    defendant is asking for in this case, but here you're arguing

10    that The Court lacks even the ability to impose a deadline

11    that's been proposed there.  How do you reconcile that?

12          MS. GROOVER:  Recognizing it's not the strongest arm and

13    recognizing that the courts have found that absolutely you have

14    the ability to do that, it's the Government's position that

15    those are recommendations and not a fullout inherent rule of The

16    Court, but recognizing that it's possible that some courts have

17    found that The Court does have the authority to order a

18    deadline, we would just get back to this case in particular and

19    note that, I believe, One, that's been done, and, B, a

20    reasonable opportunity has already been granted.

21          In the May 14th I believe order from 2019, The Court

22    stayed all proceedings until the Attorney General makes a

23    decision on whether or not he will seek or not seek the death

24    penalty.

25          In that order, The Court notes that July 8th, 2019 is

99

1    the date for Defense to submit evidence and arguments in

2    mitigation to the US Attorney's Office, and so indirectly, The

3    Court has complied with Section 670 and did put forth a date for

4    defense counsel to submit their mitigation arguments, and then

5    even looking more specifically at this case, the Government

6    feels like it's not necessary to impose and extend a deadline

7    because the Government has provided a reasonable opportunity

8    under the justice manual and as well as this court has as well

9    provided defense counsel a reasonable opportunity to begin this

10   preliminary mitigation investigation and to submit any evidence

11   or arguments to the local US Attorney, to our office.

12        Defense counsel filed a motion to stay all proceedings

13   to allow them to focus on this issue, to allow them not to worry

14   about the substantive issues -- the motions to suppress and

15   that, rather, to take time to go to Mexico, if necessary, and

16   develop mitigating argument and evidence.

17        The Government did not object to that motion and

18   rather allow -- did not object to allow The Court to stay the

19   proceeding and indeed The Court did and allowed them the

20   opportunity to not worry about going through suppression issues

21   and other evidentiary issues and not even worrying about

22   litigation issues with respect to the death penalty, but rather

23   giving them sufficient time and reasonable opportunity to begin

24   their mitigation investigation, and so defendants have been on

25   notice of the protocol since December of 2018.

1    They have been continuously represented by very

2    competent counsel.  They have had learned counsel since end of

3    February of 2019, and they have had an opportunity with the

4    criminal proceedings that were stayed to focus on mitigation,

5    and the Government respectfully submits that they have had an

6    appropriate amount of time and they've been given a reasonable

7    opportunity under the totality of the circumstances of this

8    case, and we respectfully submit that additional time is not

9    necessary.

10    THE COURT:  Let me ask you just a couple more questions

11    on this question of can The Court issue this order.  You're

12    familiar with the deadlines that are suggested in 670.

13    The first is a deadline for the defendant to submit

14    argument and evidence to the local US Attorney's Office.  The

15    second is deadline for the US Attorney's Office to make its

16    recommendation to main Justice, and the third is a deadline for

17    the Government generally to file its notice in the case.

18    Is it your position that The Court lacks authority for

19    all three of those deadlines or only some of those deadlines?

20    MS. GROOVER:  It's the Government's position that The

21    Court absolutely has the authority to invoke the deadlines to

22    file the death penalty, and indeed the district courts in our

23    district, the Southern District of Georgia, have done that.

24    It's the Government's position, though, with respect to

25    internal submissions that the local US Attorney's Office gives

1    to the Attorney General, to main Justice, that that is an

2    entirely in-house procedure that we would respectfully disagree

3    that The Court has the authority to order, but we do recognize

4    the clear language in Section 670 and that courts have disagreed

5    with that.

6         It's just the Government's position that those

7    recommendations in Section 670 are to help streamline things and

8    help get the Government moving and not delay things.

9         THE COURT:  What about that first deadline, the deadline

10   for the defendant to submit their evidence and argument to the

11   local US Attorney's Office?  Is it your position that The Court

12   lacks authority to impose that deadline?

13        MS. GROOVER:  It is, Your Honor, but, again, recognize

14   that there have been courts that disagree with that.

15        THE COURT:  If The Court does lack authority for those

16   first two deadlines but has the authority to, as you conceded,

17   to order the Government to file a notice by a certain date, do

18   you have a position in this case as to The Court's authority in

19   this case?

20        MS. GROOVER:  The Government is in a position now to

21   make our recommendation to the Attorney General, quite frankly,

22   and in candor to The Court, we did not after the motion was

23   filed until there's a ruling on that, so we are in a position to

24   submit that as soon as possible, and then it's the Government's

25   understanding it can take several months for that review process

1    so we would respectfully request at least several months before

2    the death notice must be filed.

3          THE COURT:  Did you hear Mr. Ertl's suggestion when I

4    asked him about the deadline for the filing of the death notice

5    that they would be amenable to the corollary, that the

6    Government could not file a notice before a certain date to

7    allow time to conduct an investigation and submit to main

8    Justice.  What would the Government's position be on that?

9          MS. GROOVER:  We would have no objection to that

10   proceeding.

11         THE COURT:  All right, thank you, Ms. Groover.

12         MS. GROOVER:  Thank you, Your Honor.

13         THE COURT:  Mr. Ertl, any rebuttal?

14         MR. ERTL:  Judge, I think -- I think what's important --

15   first of all, I don't think the District Court's order staying

16   the proceedings or The Court's order staying the proceedings

17   even substantially complies with 670.  I think it was The Court

18   just reiterating a representation that the Government made that

19   it's currently scheduled for July 8th.  I don't think it was a

20   deadline either intended or otherwise.

21         I think here, Judge, I think you do have authority to --

22   I think obviously Judiciary, the defender services, and the

23   Department of Justice thought you had authority when they

24   promulgated Section 670.

25         I think that the Government, I think -- the Government's

1    right that this is to streamline things, but streamlining this

2    could also -- this case would be considerably streamlined if we

3    were successful in convincing the local US Attorney here that

4    death was not an appropriate punishment in this case.

5         The case would be streamlined.  Costs would be saved.  I

6    think, as Mr. Stetler said, it's cost effective to do this stuff

7    up front because a trial would be costly for the Government,

8    costly for The Court, costly for the taxpayers.

9         So it's -- it's -- the streamlining is indeed what we're

10   asking to do here.  We're asking to say give us an opportunity

11   to present to you a meaningful mitigation case, a meaningful

12   presentation, and we can streamline this because I believe we

13   will be able to convince them not to go forward.  So I think --

14   something else, it just went out of my head.

15        Thank you.

16        THE COURT:  And I do have one additional issue that I

17   want to address that's related to this.  There's a pending

18   motion that's filed by Defendant Perez-Bravo.  It's Document

19   Number 57, and that was a motion for The Court to order the

20   Government to file a death notice, and I believe that that

21   motion requested that that notice be filed within ten days.

22        Based on the presentations here today, I want to know if

23   that defendant is persisting in that motion or if they withdraw

24   it.  It seems inconsistent with the positions taken here on this

25   request for more time by Mr. Ertl.  I will give you a moment to

1    confer.  Again, that's Document Number 57.

2        MR. MARTIN:  That motion was actually filed before I

3    became involved in this case, but I tell you my experience.

4    I've had more than 30 of these cases over the years.  No, we

5    don't want that deadline imposed for them to make a notice.  I

6    tell you practically why.

7        My experience is if they cannot make their decision by

8    that deadline, they just go ahead and notice the case as a death

9    penalty case and say, "We will reconsider later," and we don't

10   want to be in that posture.

11       We're not insisting on that deadline for the Government

12   to make their decision.  What we are agreeing to or supporting

13   is the giving us enough time to put together materials so that

14   they can make a good decision.

15       I will point out, you know, counsel said that she would

16   be -- she's prepared to submit these things already to the

17   Government, to Washington, but that's -- the protocol requires

18   that any such submission -- excuse me -- to include any

19   submission from the Defense but they don't even have that from

20   at least two of the defendants, so that would be an inadequate

21   presentation to Washington.

22       I mean, that's an important part of this process was to

23   make sure that the Defense has had its opportunity to present

24   matters which the Government is not privy to, indeed does not

25   really have an incentive to find out and so, therefore, they

105

1  would be making their decision without sufficient information,

2  so that's just my two cents.

3          THE COURT:  All right.  I understand all that.

4          And to clarify, though, as a matter of housekeeping, I

5  understand the timing of that previous motion asking for the

6  death notice, that was before learned counsel was appointed, and

7  so I want to make clear, is that defendant now withdrawing that

8  motion?

9          MR. MARTIN:  Yes, yes.

10         THE COURT:  All right.  And I understand that Defendant

11  Juan Rangel-Rubio and Defendant Higinio Perez-Bravo joined in

12  the motion that's been presented here today, and I just want to

13  open up the floor to their counsel for any other comments that

14  need to be added to make sure everyone has had an opportunity to

15  present or speak.  Is there anything further from those

16  defendants?

17         MR. MARTIN:  On behalf of the Perez-Bravo, we are

18  satisfied with the presentation put on by cocounsel.

19         THE COURT:  I'm going to take this matter under

20  advisement.  I will issue a written order with my conclusions

21  and findings.

22         That will conclude the proceedings in this case.  We

23  will take ten minutes and reconvene for our next case.

24         MS. GROOVER:  Your Honor, if I may, may I make a

25  clarification?  Just wanted -- I apologize.

106

1        THE COURT:  You may.

2        MS. GROOVER:  Thank you, Your Honor.  I just want to

3   make sure I did not misspeak.  The local -- our US Attorney

4   office, we have our material gathered and we are prepared to

5   begin that confidential process up to the review committee, but

6   we have -- and I want to make sure I didn't misspeak.  That is a

7   confidential process.  The recommendation officially has not

8   been made, but we are prepared to make that as soon as The Court

9   authorizes.

10       THE COURT:  That was my understanding from your previous

11  representation.  You are marshalled together and ready to go but

12  you've not taken the next step.  Thank you for that

13  clarification.

14       MR. MARTIN:  Can I ask you one question?  We filed on

15  Friday an ex parte motion regarding a discovery attorney, and I

16  don't know if you want to hear from us any more about that today

17  since we are all here.

18       THE COURT:  I'm not going to take up that matter here

19  today.

20       MR. MARTIN:  Fine.  Just remind you of one thing, we're

21  not asking for a dime from this Court.

22       THE COURT:  Thank you.  Anything further?

23       (Proceeding concluded at 1:43 p.m.)

24                    CERTIFICATION

25

107

1      I certify that the foregoing is a true and correct

2  transcript of the stenographic record of the above-mentioned

3  matter.

4

5

7  _____    11/14/2019

8  Debra Gilbert, Court Reporter        Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25