UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) SUPERSEDING INDICTMENT NO. |
| | ) 4:18-CR-274 |
| v. | ) |
| | ) 8 U.S.C. § 1324(a)(1)(A)(v)(I) |
| PABLO RANGEL-RUBIO, | ) Conspiracy to Conceal, Harbor and |
| | ) Shield Illegal Aliens |
| JUAN RANGEL-RUBIO, and | ) |
| | ) 18 U.S.C. § 1956(h) |
| HIGINIO PEREZ-BRAVO | ) Money Laundering Conspiracy |
| | ) |
| | ) 18 U.S.C. § 1957 |
| | ) Money Laundering Transactions |
| | ) Over $10,000 |
| | ) |
| | ) 18 U.S.C. § 1512(k) |
| | ) Conspiracy to Kill a Witness |
| | ) |
| | ) 18 U.S.C. § 1513(f) |
| | ) Conspiracy to Retaliate Against a |
| | ) Witness |
| | ) |
| | ) 18 U.S.C. § 1958(a) |
| | ) Conspiracy to Commit |
| | ) Murder-For-Hire |
| | ) |
| | ) 18 U.S.C. §§ 3591, 3592 |
| | ) Notice of Special Finding |

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

### Eliud Montoya

1.     Eliud Montoya immigrated to the United States.  After completing the

naturalization process, Mr. Montoya became a United States citizen in 2009.     On

August 19, 2017, Mr. Montoya was murdered.  He was shot near his home in Garden

City, Georgia.

2.     Prior to his death, Mr. Montoya lived as a United States citizen with his family in Garden City, Georgia.  To support his wife and children, Mr. Montoya lawfully worked for Wolf Tree, a wholly owned subsidiary of The Davey Tree Expert Company ("Company").  Mr. Montoya—sometimes referred to by his colleagues as the "General"—worked on a crew and was responsible for trimming trees around utility lines.

3.     The Company contracted with Georgia Power to maintain and trim trees around the utility lines in the Savannah, Georgia area.

### Pablo Rangel-Rubio

4.     **DEFENDANT PABLO RANGEL-RUBIO** was a foreign national, illegally present in the United States.  He lived at 275 Milton Rahn Road, Rincon, Georgia (the "Compound").

5.     Despite his status as an illegal alien unlawfully in the United States, **DEFENDANT PABLO RANGEL-RUBIO** worked as a supervisor for the Company. In that capacity, he managed and supervised all Company employees in the Savannah area, including Mr. Montoya.

6.     **DEFENDANT PABLO RANGEL-RUBIO** was responsible for hiring employees, completing their new hire employment paperwork, completing timesheet paperwork, and submitting payroll information for Company employees that worked in the Savannah, Georgia area.  **DEFENDANT PABLO RANGEL-RUBIO** was responsible for meeting with employees and verifying identification documents, all despite his status as an illegal alien.

### Juan Rangel-Rubio

7.      DEFENDANT JUAN RANGEL-RUBIO was DEFENDANT PABLO RANGEL-RUBIO'S brother.   DEFENDANT JUAN RANGEL-RUBIO was a foreign national, illegally present in the United States.   Like his brother, DEFENDANT JUAN RANGEL-RUBIO lived at the Compound.

8.      DEFENDANT JUAN RANGEL-RUBIO was unlawfully employed by the Company and unlawfully worked for his brother, DEFENDANT PABLO RANGEL-RUBIO.      DEFENDANT JUAN RANGEL-RUBIO assisted with trimming trees around the power lines.

### Higinio Perez-Bravo

9.      DEFENDANT HIGINIO PEREZ-BRAVO ("DEFENDANT PEREZ-BRAVO") was a foreign national, illegally present in the United States, and lived in Savannah, Georgia.

10.     DEFENDANT PEREZ-BRAVO was an associate of DEFENDANT PABLO RANGEL-RUBIO and unlawfully performed work for DEFENDANT PABLO RANGEL-RUBIO at the Compound.

### Hiring and Employment of Illegal Aliens

11.     DEFENDANT PABLO RANGEL-RUBIO unlawfully hired illegal aliens to work for the Company.  At all times material to this Superseding Indictment, most of the Company employees supervised by DEFENDANT PABLO RANGEL-RUBIO were illegal aliens.

3

12.     When illegal aliens sought employment with the Company in the Savannah area, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, provided the illegal alien applicants with assumed identities, specifically the names and social security numbers of others.   The illegal aliens then used the assumed identities to work for the Company unlawfully.

13.     To conceal the illegal aliens' unlawful status and ineligibility to work in the United States, **DEFENDANT PABLO RANGEL-RUBIO** used the assumed identities to complete employment paperwork, timesheets, and payroll information for the illegal aliens.

## Siphoning of Illegal Aliens' Pay

14.     Come payday, **DEFENDANT PABLO RANGEL-RUBIO** obtained paychecks from the Company made out to the illegal aliens' assumed identities.

15.     **DEFENDANT PABLO RANGEL-RUBIO**, with assistance from others, unlawfully paid the illegal aliens in cash for their work for the Company and sometimes withheld money from the illegal aliens' wages for personal financial gain.

16.     **DEFENDANT PABLO RANGEL-RUBIO** unlawfully diverted paychecks in the names of false employees to his own bank account for his personal financial gain.

17.     **DEFENDANT PABLO RANGEL-RUBIO**, aided abetted by **DEFENDANT JUAN RANGEL-RUBIO**, unlawfully diverted paychecks in the names of false employees to **DEFENDANT JUAN RANGEL-RUBIO'S** bank account for **DEFENDANT JUAN RANGEL-RUBIO'S** personal financial gain.

4

18.     As a result of **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO'S** unlawful scheme to hire and employ illegal aliens, **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** collectively received over $3,500,000.

## Reporting the Scheme

19.     On or about April 18, 2017, Mr. Montoya contacted the Company to report **DEFENDANT PABLO RANGEL-RUBIO'S** unlawful scheme to hire and employ illegal aliens.

20.     On or about April 24, 2017, Mr. Montoya submitted a written complaint to the Company concerning **DEFENDANT PABLO RANGEL-RUBIO'S** unlawful scheme to hire illegal aliens.

21.     On or about April 24, 2017, **DEFENDANT PABLO RANGEL-RUBIO** received Mr. Montoya's written complaint exposing the unlawful scheme to hire illegal aliens.

22.     Between on or about April 24, 2017 and May 10, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** called a meeting of the Savannah-area Company employees to discuss Mr. Montoya's complaint. **DEFENDANT PABLO RANGEL-RUBIO** had Mr. Montoya's written complaint read aloud to the Savannah-area Company employees in Mr. Montoya's presence.

23.     On or about August 17, 2017, Mr. Montoya again exposed **DEFENDANT PABLO RANGEL-RUBIO'S** unlawful scheme to hire illegal aliens by reporting the violations to the United States Equal Employment Opportunity

Commission ("EEOC"). The EEOC is a federal agency responsible for enforcing federal employment laws.

24.     Mr. Montoya reported to the EEOC that:   **DEFENDANT PABLO RANGEL-RUBIO** was an illegal alien; most of the Company's employees working under   **DEFENDANT    PABLO    RANGEL-RUBIO**    were    illegal    aliens; **DEFENDANT PABLO RANGEL-RUBIO** had social security numbers that were unlawfully used by illegal aliens at the Company; **DEFENDANT PABLO RANGEL-RUBIO** paid the illegal aliens in cash and did not always pay the workers for the hours they worked; illegal aliens without valid licenses were unlawfully driving work trucks for the Company; and accidents were not properly handled because the workers were illegal aliens.

25.     **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** knew that Mr. Montoya exposed the unlawful employment scheme.

26.     **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** conspired to murder Mr. Montoya for exposing their unlawful employment scheme.

27.     **DEFENDANT PABLO RANGEL-RUBIO** paid **DEFENDANT PEREZ-BRAVO** to help **DEFENDANT JUAN RANGEL-RUBIO** kill Mr. Montoya.

## COUNT ONE
*Conspiracy to Conceal, Harbor, and Shield Illegal Aliens*
8 U.S.C. § 1324(a)(1)(A)(v)(I)

28. Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

29. Beginning in or about December 2007 and continuing through on or about November 20, 2017, the exact dates being unknown to the Grand Jury, in Chatham County and Effingham County, within the Southern District of Georgia, and elsewhere, the Defendants,

### PABLO RANGEL-RUBIO and
### JUAN RANGEL-RUBIO,

aided and abetted by each other and by others known and unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit an offense against the United States, that is, knowingly and in reckless disregard of the fact that aliens had come to, entered, and remained in the United States in violation of the law, did conceal, harbor, and shield said aliens from detection for the purpose of commercial advantage or private financial gain in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

## OBJECT OF THE CONSPIRACY

30. The object of the conspiracy was to make money from the unlawful employment of illegal aliens.

## MANNER AND MEANS OF THE CONSPIRACY

31.     It was part of the conspiracy that conspirators would unlawfully provide housing for illegal aliens who had come to, entered, and remained in the United States in violation of the law.

32.     It was further part of the conspiracy that conspirators would obtain names and social security numbers of others for the use of illegal aliens who had come to, entered, and remained in the United States in violation of the law.

33.     It was further part of the conspiracy that conspirators would sell or provide the names and social security numbers of others to illegal aliens who had unlawfully come to, entered, and remained in the United States in violation of the law.

34.     It was further part of the conspiracy that conspirators would unlawfully hire illegal aliens who had unlawfully come to, entered and remained in the United States, to work for the Company using the names and social security numbers of others.

35.     It was further part of the conspiracy that conspirators would falsely complete employment and payroll paperwork for illegal aliens using names and social security numbers of others to allow illegal aliens to unlawfully work for the Company under assumed names.

36.     It was further part of the conspiracy that conspirators would falsely complete timesheet paperwork for illegal aliens using assumed names to produce Company paychecks.

8

37.     It was further part of the conspiracy that conspirators would use cellular phones, computers, and the internet to communicate with the Company to direct the mailings and deposits of Company paychecks in the assumed names of illegal aliens.

38.     It was further part of the conspiracy that conspirators would divert Company paychecks in the assumed names of illegal aliens to conspirators' home addresses, post office box, and bank accounts.

39.     It was further part of the conspiracy that conspirators would pay the illegal aliens in cash and sometimes keep a portion of the money earned by the illegal aliens.

40.     It was further part of the conspiracy that conspirators would retaliate against whistleblowers for exposing the unlawful scheme to hire illegal aliens.

## OVERT ACTS

41.     In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the conspirators committed or caused to be committed at least one of the following overt acts, among others, in the Southern District of Georgia and elsewhere:

42.     On or about July 21, 2016, and continuing through on or about August 20, 2017, **DEFENDANT PABLO RANGEL-RUBIO** unlawfully provided shelter and housing at the Compound for **DEFENDANT JUAN RANGEL-RUBIO** and other illegal aliens who had come to, entered, and remained in the United States in violation of the law.

43.     On or about July 21, 2016, **DEFENDANT PABLO RANGEL-RUBIO** wired $121,709.94 from his Bank of America account ending in 2147 to a real estate law firm to purchase the Compound.

44.     On or about August 4, 2016, **DEFENDANT PABLO RANGEL-RUBIO** transferred $81,364.65 from his Wells Fargo account ending in 6752 through Check #99 to Sylvania Manufactured Homes to purchase a manufactured home to be located on the Compound.

45.     In or about 2004 and continuing through on or about August 20, 2017, the exact dates begin unknown, **DEFENDANT PABLO RANGEL-RUBIO** unlawfully authorized J.R., an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

46.     On or about December 17, 2012, **DEFENDANT PABLO RANGEL-RUBIO**, without J.R.'s authorization, canceled J.R.'s direct deposit for the week and arranged for the paycheck be mailed to **DEFENDANT PABLO RANGEL-RUBIO'S** post office box.

47.     On or about December 26, 2012, **DEFENDANT PABLO RANGEL-RUBIO**, without J.R.'s authorization, canceled J.R.'s direct deposit for the week and directed the paycheck be mailed to **DEFENDANT PABLO RANGEL-RUBIO'S** post office box.  **DEFENDANT PABLO RANGEL-RUBIO** then received the paycheck into his Bank of America account ending in 2385.

48.     On or about February 24, 2015, **DEFENDANT PABLO RANGEL-RUBIO**, without J.R.'s authorization, canceled J.R.'s direct deposit and arranged it

be sent to **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2385.

49.　On or about April 6, 2015, **DEFENDANT PABLO RANGEL-RUBIO**, without J.R.'s authorization, canceled J.R.'s direct deposit and arranged that a regular check be mailed.

50.　Beginning in or about 2008 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** hired and unlawfully employed J.L.S.G., an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

51.　Beginning in or about 2008 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others known and unknown, provided J.L.S.G. a social security number belonging to another person so J.L.S.G. could work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company. **DEFENDANT PABLO RANGEL-RUBIO** charged J.L.S.G. approximately $120 for the social security number.

52.　Beginning in or about 2016 and continuing through August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, falsely completed timesheet paperwork for J.L.S.G. to allow J.L.S.G. to work at the Company under an assumed name.

53.     Between 2014 and 2016, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** hired and unlawfully employed R.R.B., an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

54.     Between 2014 and 2016, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** falsely completed employment and payroll paperwork for R.R.B. using a name and social security of another so that R.R.B. could work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

55.     Between 2014 and 2016, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** arranged for R.R.B.'s Company paychecks in the assumed name of R.R. to be deposited into **DEFENDANT PABLO RANGEL-RUBIO'S** bank account.

56.     Between 2014 and 2016, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, paid R.R.B., an illegal alien, in cash.

57.     Beginning in or about April 2017 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, unlawfully employed R.R.H., an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company under an assumed name.

58.     Beginning in or about April 2017 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** directed that R.R.H. be paid in cash.

12

59.    Beginning in or about September 2013 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** hired and unlawfully employed J.R., an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.    **DEFENDANT PABLO RANGEL-RUBIO** charged J.R. $1,500 for J.R's use of names and social security numbers of others.

60.    Beginning in or about September 2013 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, falsely completed employment and payroll paperwork for J.R. using names and social security numbers of others to allow J.R. to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

61.    Beginning in or about September 2013 and continuing through in or about April 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** provided the assumed name of A.T.H. to J.R. so he could work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

62.    Beginning in or about April 2017 and continuing through in or about July 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others, provided the assumed name of F.S.L. to J.R. so he could work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

63.    Beginning in or about July 2017 and continuing through on or about August 20, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-**

**RUBIO**, aided and abetted by others, provided the assumed name of M.V. to J.R. so he could work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

64.     Beginning in or about February 2017 and continuing through on or about May 9, 2017, the exact dates being unknown, **DEFENDANT PABLO RANGEL-RUBIO** received Company paychecks in the assumed name of M.V. in his Bank of America accounts ending in 2385 and 2147.

65.     On or about August 14, 2017, **DEFENDANT PABLO RANGEL-RUBIO** received a text message concerning the assumed and real identities of workers scheduled to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

66.     Beginning at a time unknown, but from at least 2008 and continuing through on or about August 20, 2017, **DEFENDANT PABLO RANGEL-RUBIO** unlawfully employed **DEFENDANT JUAN RANGEL-RUBIO**, an illegal alien, to work for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

67.     Beginning at a time unknown, but from at least 2008 and continuing through on or about August 20, 2017, **DEFENDANT JUAN RANGEL-RUBIO** illegally worked under several different assumed names for **DEFENDANT PABLO RANGEL-RUBIO** at the Company.

68.     Beginning at a time unknown, but from at least on or about December 14, 2007, and continuing through on or about August 20, 2017, **DEFENDANT JUAN RANGEL-RUBIO** unlawfully received over $500,000 from the unlawful scheme to

hire illegal aliens who had come to, entered, and remained in the United States in violation of the law.

69.     Beginning at a time unknown, but at least from on or about December 14, 2007, and continuing through on or about November 20, 2017, **DEFENDANT PABLO RANGEL-RUBIO** unlawfully received over $2,500,000 from the scheme to hire illegal aliens who had come to, entered, and remained in the United States in violation of the law.

70.     On or about August 19, 2017, **DEFENDANTS PABLO RANGEL-RUBIO, JUAN RANGEL-RUBIO** and **PEREZ-BRAVO**, aided and abetted by each other, killed Mr. Montoya after he exposed the unlawful employment scheme.

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), (a)(1)(A)(iii), (a)(1)(B)(iv), and Title 18, United States Code, Section 2.

**COUNT TWO**
*Money Laundering Conspiracy*
18 U.S.C. § 1956(h)

71.     Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

72.     Beginning in or about 2008 and continuing through on or about November 20, 2017, the exact dates being unknown to the Grand Jury, in Chatham County and Effingham County, within the Southern District of Georgia, and elsewhere, the Defendants,

**PABLO RANGEL-RUBIO and**
**JUAN RANGEL-RUBIO,**

aided and abetted by each other, did knowingly and intentionally combine, conspire, confederate and agree with each other, and with others known and unknown, to conduct and attempt to conduct financial transactions affecting interstate commerce, with funds which were proceeds of a specified unlawful activity, that is, conspiracy to conceal, harbor, and shield illegal aliens from detection for the purpose of commercial advantage or private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), and which funds the defendants knew to be the proceeds of some form of unlawful activity, and did conspire to do so with the intent to promote the carrying on of the aforesaid specified activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

**OVERT ACTS**

73.     In furtherance of the conspiracy, the conspirators committed and caused to be committed in the Southern District of Georgia and elsewhere, financial

transactions affecting interstate commerce, using funds which were, and which the defendants knew to be, proceeds of the unlawful conspiracy to conceal, harbor, and shield illegal aliens from detection for the purpose of commercial advantage or private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), including, but not limited to, the transactions shown below:

74.     Between December 14, 2007 and November 20, 2017, conspirators deposited more than $2,000,000 of Company money into **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America accounts ending in 2385, 8908, and 2147 and Wells Fargo account ending in 6752.

75.     Between December 14, 2007 and November 20, 2017, conspirators deposited more than $600,000 of Company money in the name of **DEFENDANT PABLO RANGEL-RUBIO** into **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America accounts ending in 2385, 8908, and 2147.

76.     Between December 14, 2007 and August 24, 2017, conspirators deposited more than $500,000 of Company money into **DEFENDANT JUAN RANGEL-RUBIO'S** Bank of America accounts ending in 8386 and 6931.

77.     Between December 14, 2007 and June 6, 2008, conspirators deposited more than $21,000 of Company money in the name of **DEFENDANT JUAN RANGEL-RUBIO** into **DEFENDANT JUAN RANGEL-RUBIO'S** Bank of America accounts ending in 8386 and 6931.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS THREE THROUGH FIVE
*Money Laundering Transactions Over $10,000*
18 U.S.C. § 1957(a)

78.   Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

79.   On or about the dates set forth below, in the Southern District of Georgia and elsewhere, **DEFENDANT PABLO RANGEL-RUBIO**, aided and abetted by others known and unknown to the Grand Jury, did knowingly engage in the following monetary transactions by, through, and to a financial institution, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, that was derived from a specified unlawful activity, that is, conspiracy to conceal, harbor, and shield illegal aliens from detection for the purpose of commercial advantage or private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), knowing that the property was criminally derived:

| COUNT | DATE | DESCRIPTION OF MONETARY TRANSACTION |
|-------|------|--------------------------------------|
| 3. | July 21, 2016 | The wiring of $121,709.94 from **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2147 to a real estate law firm |
| 4. | August 4, 2016 | The transfer of $81,364.65 from **DEFENDANT PABLO RANGEL-RUBIO'S** Wells Fargo account ending in 6752 through Check # 099 to Sylvania Manufactured Homes |
| 5. | June 6, 2017 | The wiring of $20,000 from **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2147 to **DEFENDANT PEREZ-BRAVO'S** Wells Fargo account ending in 1913 |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

### COUNT SIX
*Conspiracy to Kill a Witness*
18 U.S.C. § 1512(k)

80.     Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

81.     Beginning in or about April 2017 and continuing through on or about August 19, 2017, the exact dates being unknown to the Grand Jury, in Chatham County and Effingham County, within the Southern District of Georgia, and elsewhere, the Defendants,

### PABLO RANGEL-RUBIO and
### JUAN RANGEL-RUBIO,

aided and abetted by each other and by others known and unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit an offense against the United States, that is, to kill a witness with intent to prevent the attendance, testimony, production of a record or document in an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(1)(A) and (a)(1)(B), which resulted in the death of Eliud Montoya.

### OBJECT OF THE CONSPIRACY

82.     The object of the conspiracy was to kill Mr. Montoya to prevent him from providing testimony and producing records or documents in an official proceeding conducted by the EEOC.

## MANNER AND MEANS OF THE CONSPIRACY

83.    It was part of the conspiracy that conspirators would intimidate Mr. Montoya for exposing the unlawful employment scheme.

84.    It was further part of the conspiracy that conspirators would use cellular telephones to communicate with each other.

85.    It was further part of the conspiracy that conspirators would use vehicles to conduct surveillance to determine Mr. Montoya's schedule and pattern of activity.

86.    It was further part of the conspiracy that conspirators would conduct surveillance to identify Mr. Montoya's location to kill Mr. Montoya.

87.    It was further part of the conspiracy that conspirators would pay other conspirators for their roles in killing Mr. Montoya.

## OVERT ACTS

88.    In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the conspirators committed or caused to be committed at least one of the following overt acts, among others, in the Southern District of Georgia and elsewhere:

89.    On or about May 4, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wrote Check #189 in the amount of $6,000 from his Bank of America account ending in 2385 to **DEFENDANT PEREZ-BRAVO**.

90.    On or about May 5, 2017, **DEFENDANT PEREZ-BRAVO** cashed Check #189 in the amount of $6,000.

91.     On or about June 6, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wired $20,000 from **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2747 to **DEFENDANT PEREZ-BRAVO'S** Wells Fargo account ending in 1913.

92.     In or about August 2017, **DEFENDANT PABLO RANGEL-RUBIO** conducted surveillance of Mr. Montoya near Mr. Montoya's home to determine Mr. Montoya's schedule and pattern of activity.

93.     On or about August 18, 2017, **DEFENDANTS JUAN RANGEL-RUBIO** and **PEREZ-BRAVO** conducted physical surveillance near Mr. Montoya's home to try and locate Mr. Montoya.

94.     On or about August 19, 2017, **DEFENDANT PEREZ-BRAVO** drove **DEFENDANT JUAN RANGEL-RUBIO** near Mr. Montoya's home to locate and kill Mr. Montoya.

95.     On or about August 19, 2017, **DEFENDANT JUAN RANGEL-RUBIO** shot and killed Mr. Montoya near his home in Garden City, Georgia.

96.     On or about August 19, 2017, after Mr. Montoya's death, **DEFENDANT JUAN RANGEL-RUBIO** communicated with **DEFENDANT PABLO RANGEL-RUBIO** by telephone.

97.     On or about August 19, 2017, after Mr. Montoya's death, **DEFENDANT PEREZ-BRAVO** picked up **DEFENDANT JUAN RANGEL-RUBIO** near the murder scene and drove him away.

All done in violation of Title 18, United States Code, Sections 1512(k) and 2.

### COUNT SEVEN
*Conspiracy to Retaliate Against a Witness*
18 U.S.C. § 1513(f)

98.     Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

99.     Beginning in or about April 2017 and continuing through on or about August 19, 2017, the exact dates being unknown to the Grand Jury, in Chatham County and Effingham County, within the Southern District of Georgia, and elsewhere, the Defendants,

### PABLO RANGEL-RUBIO and
### JUAN RANGEL-RUBIO,

aided and abetted by each other and by others known and unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit an offense against the United States, that is, to kill a witness with intent to retaliate against the witness for attendance at an official proceeding and for any testimony given or any record, document or other object produced by the witness in an official proceeding in violation of Title 18, United States Code, Section 1513(a)(1)(A), (f), which resulted in the death of Eliud Montoya.

### OBJECT OF THE CONSPIRACY

100.    The object of the conspiracy was to kill Mr. Montoya in retaliation for providing testimony and producing records or documents in an official proceeding conducted by the EEOC.

## MANNER AND MEANS OF THE CONSPIRACY

101.   It was part of the conspiracy that conspirators would intimidate Mr. Montoya for exposing the unlawful employment scheme.

102.   It was further part of the conspiracy that conspirators would use cellular telephones to communicate with each other.

103.   It was further part of the conspiracy that conspirators would use vehicles to conduct surveillance to determine Mr. Montoya's schedule and pattern of activity.

104.   It was further part of the conspiracy that conspirators would conduct physical surveillance to identify Mr. Montoya's location to kill Mr. Montoya.

105.   It was further part of the conspiracy that conspirators would pay other conspirators for their role in killing Mr. Montoya.

## OVERT ACTS

106.   In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the conspirators committed or caused to be committed at least one of the following overt acts, among others, in the Southern District of Georgia and elsewhere:

107.   On or about May 4, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wrote Check #189 in the amount of $6,000 from his Bank of America account ending in 2385 to **DEFENDANT PEREZ-BRAVO**.

108.   On or about May 5, 2017, **DEFENDANT PEREZ-BRAVO** cashed Check #189 in the amount of $6,000.

109.   On or about June 6, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wired \$20,000 from **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2747 to **DEFENDANT PEREZ-BRAVO'S** Wells Fargo account ending in 1913.

110.   In or about August 2017, **DEFENDANT PABLO RANGEL-RUBIO** conducted surveillance of Mr. Montoya near Mr. Montoya's home to determine Mr. Montoya's schedule and pattern of activity.

111.   On or about August 18, 2017, **DEFENDANTS JUAN RANGEL-RUBIO** and **PEREZ-BRAVO** conducted physical surveillance near Mr. Montoya's home to try and locate Mr. Montoya.

112.   On or about August 19, 2017, **DEFENDANT PEREZ-BRAVO** drove **DEFENDANT JUAN RANGEL-RUBIO** near Mr. Montoya's home to locate and kill Mr. Montoya.

113.   On or about August 19, 2017, **DEFENDANT JUAN RANGEL-RUBIO** shot and killed Mr. Montoya near his home in Garden City, Georgia.

114.   On or about August 19, 2017, after Mr. Montoya's death, **DEFENDANT JUAN RANGEL-RUBIO** communicated with **DEFENDANT PABLO RANGEL-RUBIO** by telephone.

115.   On or about August 19, 2017, after Mr. Montoya's death, **DEFENDANT PEREZ-BRAVO** picked up **DEFENDANT JUAN RANGEL-RUBIO** near the murder scene and drove him away.

All done in violation of Title 18, United States Code, Sections 1513(f) and 2.

24

## COUNT EIGHT
*Conspiracy to Commit Murder-For-Hire*
18 U.S.C. § 1958(a)

116.   Paragraphs 1 through 27 of the Superseding Indictment are incorporated by reference as if fully set forth herein.

117.   Beginning in or about May 2017 and continuing through on or about August 19, 2017, the exact dates being unknown to the Grand Jury, in Chatham County and Effingham County, within the Southern District of Georgia, and elsewhere, the Defendants,

### PABLO RANGEL-RUBIO and
### HIGINIO PEREZ-BRAVO,

aided and abetted by each other and by others known and unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to use or cause another to use facilities of interstate commerce, for the purpose of murdering Eliud Montoya for money and the promise of money, in violation of the laws of the United States and the State of Georgia, which resulted in the death of Eliud Montoya.

## OBJECT OF THE CONSPIRACY

118.   The object of the conspiracy was to kill Mr. Montoya in exchange for money.

## MANNER AND MEANS OF THE CONSPIRACY

119.   It was part of the conspiracy that conspirators would use cellular telephones to communicate with each other during the conspiracy.

120.   It was further part of the conspiracy that conspirators would conduct physical surveillance to identify Mr. Montoya's location to kill Mr. Montoya.

121.   It was further part of the conspiracy that conspirators would pay other conspirators for their role in killing Mr. Montoya.

122.   It was further part of the conspiracy that conspirators would accept money for their role in killing Mr. Montoya.

## OVERT ACTS

123.   In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the conspirators committed or caused to be committed at least one of the following overt acts, among others, in the Southern District of Georgia and elsewhere:

124.   On or about May 4, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wrote Check #189 in the amount of $6,000 from his Bank of America account ending in 2385 to **DEFENDANT PEREZ-BRAVO**.

125.   On or about May 5, 2017, **DEFENDANT PEREZ-BRAVO** cashed Check #189 in the amount of $6,000.

126.   On or about June 6, 2017, **DEFENDANT PABLO RANGEL-RUBIO** wired $20,000 from **DEFENDANT PABLO RANGEL-RUBIO'S** Bank of America account ending in 2747 to **DEFENDANT PEREZ-BRAVO'S** Wells Fargo account ending in 1913.

127. In or about August 2017, **DEFENDANT PABLO RANGEL-RUBIO** conducted surveillance of Mr. Montoya near Mr. Montoya's home to determine Mr. Montoya's schedule and pattern of activity.

128. On or about August 18, 2017, **DEFENDANTS JUAN RANGEL-RUBIO** and **PEREZ-BRAVO** conducted physical surveillance near Mr. Montoya's home to try and locate Mr. Montoya.

129. On or about August 19, 2017, **DEFENDANT PEREZ-BRAVO** drove **DEFENDANT JUAN RANGEL-RUBIO** near Mr. Montoya's home to locate and kill Mr. Montoya.

130. On or about August 19, 2017, **DEFENDANT JUAN RANGEL-RUBIO** shot and killed Mr. Montoya near his home in Garden City, Georgia.

131. On or about August 19, 2017, after Mr. Montoya's death, **DEFENDANT PEREZ-BRAVO** picked up **DEFENDANT JUAN RANGEL-RUBIO** near the murder scene and drove him away.

All done in violation of Title 18, United States Code, Sections 1958(a), and 2.

## NOTICE OF SPECIAL FINDINGS

132.   The allegations contained in Counts Six, Seven, and Eight are hereby re-alleged and incorporated by reference as if fully set forth herein.

133.   As to Counts Six, Seven, and Eight of the Superseding Indictment, **DEFENDANT PABLO RANGEL-RUBIO**, who 18 years of age or older at the time of the offense:

   a.   Intentionally killed Eliud Montoya (18 U.S.C. § 3591(a)(2)(A)).

   b.   Intentionally inflicted serious bodily injury that resulted in the death of Eliud Montoya (18 U.S.C. § 3591(a)(2)(B)).

   c.   Intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(C)).

   d.   Intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(D)).

   e.   Procured the commission of the offense by payment, and promise of payment, of anything of pecuniary value (18 U.S.C. § 3592(c)(7)).

   f.   Committed the offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8)).

g.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

134. As to Counts Six and Seven of the Superseding Indictment, **DEFENDANT JUAN RANGEL-RUBIO**, who was 18 years of age or older at the time of the offense:

a.    Intentionally killed Eliud Montoya (18 U.S.C. § 3591(a)(2)(A)).

b.    Intentionally inflicted serious bodily injury that resulted in the death of Eliud Montoya (18 U.S.C. § 3591(a)(2)(B)).

c.    Intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(C)).

d.    Intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(D)).

e.    Committed the offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8)).

f.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

135.    As to Count Eight of the Superseding Indictment, **DEFENDANT PEREZ-BRAVO**, who was 18 years of age or older at the time of the offense:

    a.    Intentionally killed Eliud Montoya (18 U.S.C. § 3591(a)(2)(A)).

    b.    Intentionally inflicted serious bodily injury that resulted in the death of Eliud Montoya (18 U.S.C. § 3591(a)(2)(B)).

    c.    Intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(C)).

    d.    Intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and Eliud Montoya died as a direct result of such act or acts (18 U.S.C. § 3591(a)(2)(D)).

    e.    Committed the offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8)).

    f.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

## FORFEITURE ALLEGATION

The allegations contained in Counts One through Eight of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 982(a)(6), and Title 28, United States Code, Section 2461(c).

Upon conviction of the offense set forth in Count One of this Superseding Indictment, **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(6), any property real or personal, that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense, or was used to facilitate, or was intended to be used to facilitate, the commission of the offense, which includes, but is not limited to, approximately 26.62 acres of real property located at 275 Milton Rahn Road. Rincon, Georgia 31326.

Upon conviction of the offense set forth in Count Two of this Superseding Indictment, **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property. The property to be forfeited includes, but is not limited to, approximately 26.62 acres of real property located at 275 Milton Rahn Road. Rincon, Georgia 31326.

Upon conviction of one or more of the offenses set forth in Counts Three through Five of this Superseding Indictment, **DEFENDANT PABLO RANGEL-**

**RUBIO** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense(s), or any property traceable to such property. The property to be forfeited includes, but is not limited to, approximately 26.62 acres of real property located at 275 Milton Rahn Road. Rincon, Georgia 31326.

Upon conviction of one or more of the offenses set forth in Counts Six and Seven of this Superseding Indictment, **DEFENDANTS PABLO RANGEL-RUBIO** and **JUAN RANGEL-RUBIO** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

Upon conviction of Count Eight of this Superseding Indictment, **DEFENDANTS PABLO RANGEL-RUBIO** and **HIGINIO PEREZ-BRAVO** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

If any of the property described above, as a result of any act or commission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c).

A True Bill.

David H. Estes
First Assistant United States Attorney

Tania D. Groover
Assistant United States Attorney
*Lead Counsel

Karl I. Knoche
Assistant United States Attorney
Chief, Criminal Division

Chris Howard
Assistant United States Attorney
*Co-lead Counsel