

**Robert A. Leonard, Ph.D.**
**Forensic Linguist**
**Mill Neck, NY 11765**
Phone: (516) 522-0227 (516) 477-3834
www.Forensiclanguage.com

## I.   Background & Qualifications

I, Dr. Robert Leonard, am a tenured Professor of Linguistics at Hofstra University. I am the Director of Hofstra's graduate program in Linguistics: Forensic Linguistics, a program approved by the Regents of the State of New York to confer degrees. I serve as the founding Director of Hofstra's Institute for Forensic Linguistics, Threat Assessment, and Strategic Analysis, and of the Forensic Linguistics Capital Case Innocence Project, a joint venture with the Hofstra Law School, and founding co-Director of the Joint MA-JD program with the Law School. I have taught linguistics at the college level for some thirty-five years, including thirty-one years at Hofstra where I have created over thirty courses in linguistics. I served for seven years as Chair of Hofstra's Department of Comparative Literature, Languages, and Linguistics, the department that includes linguistics, literature, and twelve foreign language degree programs.

I have been qualified as an Expert in Linguistics, under Frye and under Daubert, twenty-seven times in fourteen states, including Arizona, California, Colorado, Florida, Illinois, Indiana, Michigan, Montana, New Jersey, New York, Nevada, Oregon, Pennsylvania, and South Carolina, and in six Federal Districts in Newark, NJ, Austin, TX, New York, NY, San Jose, CA, Tampa, FL, and Denver, CO. I have testified as a linguistic expert before World Bank ICSID Tribunals in Washington, DC, and Paris.

I have testified about issues related to linguistics on behalf of government agencies and defendants in criminal cases involving murder and other felonies. I have also consulted on scores of other criminal cases at the request of law enforcement agencies including the U.S. Department of Justice, throughout the United States, Canada, the United

1

Kingdom, and Europe, as well as on scores of civil cases, for clients including Apple, Facebook, and the Prime Minister of Canada.

I received a Ph.D. in linguistics from Columbia University in 1982 with research specialties in semantic theory—theory of human linguistic communication—and sociolinguistics. My research specialty is the juxtaposition of those two fields: the meaning of words and how humans communicate in the real world. I am regularly consulted by the FBI, Joint Terrorism Task Force, police and counter-terrorism units throughout the US, UK, Canada, and Europe in cases where language evidence is at issue.

I received a B.A. from Columbia College in 1970, where I was elected to Phi Beta Kappa and graduated with honors, and received an M.A. and M.Phil. from Columbia Graduate School, where I was awarded a Faculty Fellowship.

I serve as a member of the Editorial Board of the Oxford University Press scholarship series Language and the Law and a as member of the Capital Case Oversight Committee Jury Working Group for the State of Arizona.

I have authored and co-authored both technical and popular articles in the field of linguistics. My technical articles have undergone extensive peer-review prior to publication by leading academic publishing houses.

I have been employed by the FBI Behavioral Analysis Unit-1 (Counterterrorism and Threat Assessment) to offer my expertise in specific cases, train federal agents, and analyze and advise on their Communicated Threat Assessment Database (CTAD).

I have lectured worldwide on the topic of linguistics, on advances in the application of linguistic theory to issues of real-world interactions, including specifically the meaning of words and other linguistic resources and their use in contexts such as intelligence analysis, interrogations, confessions, deception, trademarks, contract disputes, and wills. Invited lectures include, "Forensic linguistics: using language evidence in criminal, threat, and intelligence cases, with special reference to homicides" to the NYPD Detective Bureau Homicide Investigators Course; the plenary address to the Ohio Attorney General's Conference on Law Enforcement; a lecture on "Speech Acts, Schemata and the Cooperative Principle: Three Useful Concepts in Understanding a False Confession: Linguistics Theoretical Issues in Forensic Linguistics Cases" at Georgetown University; "Testing Linguistic Theory: Systems of Identity, Honor and Power: Food

2

Behavior in a Swahili City-State, and a Federal Extortion Case in a Texas Court" at the Institute for Social and Economic Research & Policy of Columbia University; "The application of linguistic theory to cases of profiling, authorship & counterterrorism" at the University Seminars of Columbia University: Language and Cognition; "Forensic linguistics for Investigative Practitioners: Threat Assessment, Counter-Terrorism; Linguistic Profiling and Authorial Attribution" at John Jay College of Criminal Justice of the City University of New York, and "Sociolinguistics as Forensic Science" at the Forensic Linguistics Workshop for Law Enforcement Practitioners, Behavioral Analysis Unit-1 (Counter-terrorism and Threat Assessment), National Center for the Analysis of Violent Crime, Critical Incident Response Group, Federal Bureau of Investigation, Quantico, VA.

## II. General Principles of Linguistics

Linguistics is a well-established science, and there are scores if not hundreds of professional peer-reviewed journals. Linguistics is the scientific study of language and is recognized as such by the American Academy of Sciences. Linguists are regularly granted research funds by the National Science Foundation. In virtually any major university or college, a student can major in linguistics, and many major universities grant a Ph.D. degree in linguistics. There are academic associations and peer-reviewed professional journals within the field of linguistics. Sociolinguistics is an established branch of linguistics with peer-reviewed professional journals.

The English language has two main meanings for the word linguist: one, a speaker adept at a foreign language, and two, a scientist who studies human language as a set of real-world phenomena. Academic, scientific linguists belong to the second group (although many are also adept at foreign languages).

*Forensic linguistics* is the application of the science of linguistic investigation to issues of law. Forensic linguistics augments legal analysis by applying rigorous, scientifically accepted principles of analysis to legal evidence like notices, contracts, letters, confessions, and recorded speech.

Linguists—as all scientists—seek to explain the non-random distribution of data.

3

Just as bullets do not randomly issue from firearms nor are chemical concentrations randomly spread throughout a human body, words are not found to randomly issue from the keyboards and mouths of speakers of English or any other language. Words adhere to patterns; these patterns are the subjects of systematic observation of scientific linguists.

As in all other sciences, linguistics solves problems by constructing competing hypotheses and then considering which hypothesis better explains the non-random distribution of the data.

To illustrate linguistics as a science, a useful analogy is to medical experts. They describe and define what X-rays and MRI's show; so linguistic experts describe and define the underlying structure of written and spoken language. Both sets of experts can do this because they are trained and skilled in what to look for as they assess the meanings and implications discovered in their observations.

# III.  The Present Case

I have been asked by counsel to Perez to use my training, experience, and expertise in linguistics to review Perez's interrogation and whether Perez understood his Miranda rights.

Linguists' methodological procedures are similar to those of any other science. We begin with the articulated problem, gather language data about that problem, apply known linguistic research and theory to that data, and conclude with an answer based on linguistic science.

In this report I will apply well-established scientific linguistic analytical methods to the language evidence at issue, drawing upon features from a considerable body of peer-reviewed scientific literature.

**The Miranda warning used Spanish terms unlikely to be understood by Perez**

The field of linguistics is concerned not only with language structure and communicative competence in general, but also with how speakers and writers use language most accurately and effectively to communicate information in *specific social contexts to specific audiences.*

4

A first procedure in this case is to determine the linguistic context, which means the linguistic ability demanded of the hearers. To make this judgment, linguists examine the vocabulary, syntax (order of words and sentence structure), semantics (word meaning), pragmatics (the meaning of words in context, and the meaning of a whole interchange), and types of language structures like jargon, complex sentences, etc., in relationship to the linguistic ability of those who receive it.

The Spanish terms used in the Miranda warning given to Perez include *tribunal* and *proporcionar*. Although it may be efficient and necessary for specialized fields -- such as law and medicine -- to use in-group terminology within their specialized contexts, a serious communication problem arises when such terms are used to lesser-educated laypersons who are not familiar with them.

Linguists describe this problem as the use of the inappropriate *sociolinguistic register*. *Sociolinguistics* is the study of language and how it is used in the real world. *Register* here means "a variety of language that is used by a specific group in a specific communicative context." Registers vary according to what group is using them, and within that group by formality. For example, a senator formally addressing congress will use a certain register, and a different register when at the dining room with senator friends, and different again with neighbors. A mother uses one register to her five-year-old and a different one to her workmates. If this report were written to other linguists, it would discuss, without definition, *framing, discourse structures, discourse sequencing, lexemes, communities of practice, morphology*, and the *well-formedness of perlocutionary speech acts*. Plumbers have their own speech patterns with their own jargon, and lawyers and judges have their own speech varieties as well. All of that is efficient and normal, until one uses one's insider-register, with its own internal vocabulary, to outsiders like poorly-educated Perez.

I and my team used these sources of evaluation to assess the terms *tribunal* and *proporcionar*:
- Dictionary of the Royal Spanish Academy ✓
- Panhispanic Spanish Legal Dictionary ✓
- A Frequency Dictionary of Spanish —
- CREA Oral Corpus of Spanish ·

5

- CORPES Corpus of XXI Century Spanish
- Sociolinguistic Corpus of Mexico City Spanish
- Wordreference synonyms dictionary
- Google Ngram synonym comparison across current and recent generations

The results:

*Tribunal* **'court'** is a very specific, legal term, characterized by high formality register and high education necessary for use in oral speech. It is absent in the oral speech of lower economic class Spanish speakers in Mexico. The data collected in the sources above suggest its much more frequent synonym 'corte' would be a better understood alternative.

*Proporcionar* **'provide'** was likely a literal translation of 'provide' (which even in English is not the most easily understood term for this use). 'Proporcionar' is a very frequent term in written materials, especially outside of the legal language, but it is also characterized by high formality and high education. It is not common in oral speech and absent in lower economic class oral speech in Mexico. The data collected in the sources above suggest its much more frequent synonyms 'ofrecer' or even 'facilitar' would be better understood alternatives.

## Importantly, the rights were not explained clearly to Perez

CLARITY ON FREE ATTORNEY:
The Miranda rights given to the defendant were not clear on the point that an **attorney** may be provided <u>for free</u> to Perez. It mentions the attorney two times, using the verb "**proporcionar**", which, as noted, is a more formal and less frequent synonym of "offer". Neither of the verbs imply <u>free</u> nature of the offer (see dictionary and corpus data). The <u>cost</u> of the attorney is never discussed.

GAUGING PEREZ'S UNDERSTANDING OF RIGHTS:
The officer mentions an attorney one more time, when gauging Perez's willingness to speak to them "without the attorney present" (p. 10). Perez actually does not have the chance to answer this particular question, because Snipes follows up with another question: "And you do **understand the rights**, yes?", to which Perez responds with "Yes" (p. 11). This is not an effective way to know whether in fact, and what exactly, someone understands. In the best of circumstances, people may think they understand but in reality, they do not. More commonly, especially in situations in which there is a clear power differential, such as between officers and civilians, the least powerful over-agree with the most powerful.

The officer makes several confusing attempts at gauging Perez's **understanding** and **agreement** to be questioned. He <u>emphasizes just the final right to stop talking</u> whenever Perez wants, as well as adding the rewarding aspect of cooperation. This is exactly what we see Perez understand: he confirmed that **he understood the questioning part**, saying "that's fine, the questions you want" and "yes, as far as the questions you're going to ask, I am not offended…". It is unclear how not being offended was taken as an indication that Perez understood his rights.

6

There is no indication that Perez understood the content or the purpose of the Miranda rights. In fact, Perez's questions about the reason of interrogation, his lack of attention to the waiver (he didn't read the refusal), and his opposition to sign it -- all suggest that **Perez did not understand the purpose of the Miranda declaration or all of its content**, or the ramifications of his assent.

PEREZ'S QUESTIONS DURING MIRANDA DECLARATION:
During the Miranda rights reading, Perez never asked about or mentioned his right to have an attorney with him or whether it would cost him money. Perez does ask what **options** he has: specifically, what would happen if he refuses to talk and what would happen if he agrees to talk. The officer never mentions an attorney as an option. **The officer only says that Perez will go to jail if he doesn't talk and that, if he does talk, his cooperation may count in his favor**, although he can't promise anything for sure. This is a skewed explanation of Perez's options, which are in the Miranda declaration.

## IV.    Conclusion

In conclusion, Perez's rights were not clearly explained. The agent used terms of art that a person of Perez's background was highly likely not to understand. His right to a free attorney was not made clear. There was on the part of the agents no response or questioning elicited by his nonsensical statement that he was not "offended" by the questions. When Perez asked about his options, no mention of an attorney was forthcoming.

Signed,

*Robert A. Leonard*

Robert A. Leonard
January 15, 2021

7