GOVERNMENT'S EXHIBIT NO.
Document 490-9    Filed

CASE NO. 4:18-CR-274

UNITED STATES OF AMERICA

vs.

PABLO RANGEL-RUBIO, ET AL

MARKED FOR IDENTIFICATION

6-17-2021

FILED IN EVIDENCE

KMixen

JOHN TRIPLETT, CLERK OF COURT

44-JUL Champion 20

Champion
July, 2020

Professor Richard Rogers [a1]
University of North Texas
Denton, Texas
940-565-2671
Email Richard.Rogers@unt.edu

Eric Y. Drogin, J.D., Ph.D., ABPP [a2]
Harvard Medical School
Boston, Massachusetts
339-200-9131
Email edrogin@bidmc.harvard.edu

Minqi Pan, M.A. [a3]
University of North Texas
Denton, Texas
Email MinqiPan@my.unt.edu

Copyright © 2020 by National Association of Criminal Defense Lawyers. All rights reserved.

## ASK NOT WHAT *MIRANDA* HAS TO DO WITH YOU (AND YOUR CLIENTS): WHAT CAN *YOU* DO WITH *MIRANDA*?

It would be easy to misconstrue the full import of the *Miranda* decision as simply an attempt to "level the playing field" with respect to custodial statements. That theory would run something like this: the police have the badges, weapons, investigative technology, and interrogative savvy. Pitted against them are sometimes frightened, often disoriented arrestees with no tangible resources, further disadvantaged in many instances by intellectual limitations, rudimentary education, and chronic mental illness. Justice depends upon restricting the ability of law enforcement to exploit its natural advantages in the pursuit of confessions at any cost.

So far, nothing has been posited with which the core readership of *The Champion* is likely to disagree. However, there is much more. Like the criminal justice system as a whole, the fundamental purpose of *Miranda* warnings is to arrive at the truth, via a fair and informed process. This process advises and supports the role of every participant in courtroom proceedings. Defense attorneys advocate zealously on behalf of those defendants whose legal status is materially worsened by improperly, unfairly, and unconstitutionally obtained statements. Prosecutors are strongly vested in ensuring that persons detained by law enforcement are actually those who committed the offenses in question. Judges are acutely aware that procedural justice is a necessary precondition to substantive justice. Juries aspire to provide just decisions based upon the most full and accurate evidence.

Here is the bottom line: *Miranda* only works effectively when legal and forensic professionals are committed to its success. There never will be enough time and resources to screen every single arrest for a properly conducted interrogation. That means that everyone involved in these matters--not limited to defense counsel--needs not only to remain aware of *Miranda* issues, and not only to be prepared to act when such issues are identified, but also to seek such issues out actively when certain specific, scientifically verified markers are present. *Miranda* is not just about the conduct of the police in custodial questioning. It extends much further to address the effectiveness of particular *Miranda* warnings in adequately conveying Fifth Amendment rights. Far beyond police practices, it additionally applies to the clinical and mental health capacities of questioned detainees.

### *Miranda* Words Matter--But *Which* Words?

In the seminal case of *Miranda v. Arizona*,[1] the U.S. Supreme Court (per Justice Warren) declared that when a criminal suspect is taken into custody:

> **\*21** He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.[2]

A widespread and strongly held assumption is that the public at large, and offenders in particular, already know their rights, having been inundated with police dramas and other media products involving Mirandized suspects.[3] Regarding offenders, about 85 percent of police chiefs are convinced that such persons are already well-informed of their *Miranda* rights.[4] Despite its pervasiveness, this assumption remains profoundly wrong. Offenders, undergraduates, and community members continue to share a fundamental misunderstanding of the *Miranda* protections. Even though nearly all adults can parrot the opening sentence about the "right to remain silent," that does not ensure a correct understanding.[5] Among those claiming to know their *Miranda* rights, about one-fourth of the public still failed to realize that their right to silence is constitutionally protected and cannot be used as incriminating evidence.[6] In deciding whether to assert the "right to counsel," more than one-third of recently arrested detainees are wrongly convinced that police questioning can continue--likely for hours--until defense counsel is physically present.[7]

To make things even more complicated, which words really matter when it comes to *Miranda* warnings? At the dawn of the *Miranda* era, attorneys and law enforcement personnel discovered early that challenging these warnings because the "right" words were not used--that is, the *precise* words in the passage reproduced *supra*--was not enough. On this matter, the *Miranda* decision itself refers to "other fully effective means"[8] of conveying warning components. The Court revisited this notion 15 years later in *California v. Prysock*,[9] declaring that the classic *Miranda* language was not intended to serve as a "talismanic incantation" and that the Court had never offered a "precise formulation of the warnings given a criminal defendant."[10] Indeed, one national survey identified 888 unique versions of general *Miranda* warnings.[11]

*Miranda* words matter in reality because they largely determine what arrestees can comprehend and apply to their waiver decisions. Paying attention to what words were actually used and their legally relevant meanings is one crucial factor in determining the relevance of a *Miranda*-related legal challenge.

**The Professional Neglect Hypothesis**

As previously noted, *Miranda*-oriented Fifth Amendment safeguards represent systemic issues that extend far beyond law enforcement to encompass the roles and functioning of courts, attorneys, and forensic practitioners. In the last decade, it has become convenient to blame excesses in police questioning alone for subsequent miscarriages of justice. For example, the American Psychology-Law Society (AP-LS) in its White Paper[12] referred directly to the *Miranda* decision for its detailed descriptions of police deceptions and purposeful trickery carried out in a coercive environment to subjugate the wills of many custodial suspects. This authoritative report, while acknowledging a decline of police practices of the past, noted that "psychological interrogation is inherently compelling, if not coercive, to the extent that it relies on sustained pressure, manipulation, trickery, and deceit."[13] Without condoning any unjust practices, other professionals must shoulder their own responsibilities for ensuring the validity of *Miranda* waivers, as the precondition to custodial confessions. Unfortunately, professional neglect of *Miranda*-relevant issues appears to be largely pervasive.

One goal of this article is to define and directly address the *professional neglect hypothesis*,[14] with a principal focus on defense attorneys and the forensic practitioners they seek to retain. Put in simple terms, counsel and their consultants may simply turn a blind eye--even in egregious cases--to pivotal issues regarding suspects' understanding of the *Miranda* warning and their reasoning in rendering waiver decisions. Here are two particularly egregious examples:

> **1.** Suspects, who have "completed" the 8th grade, yet read at a level about three grades lower, are provided with a *Miranda* warning that requires at least a high school reading level for adequate comprehension.
>
> **2.** Suspects--irrespective of their abilities--are orally administered a *Miranda* warning and waiver that exceeds 150 words in length.

These two examples, while egregious, are nonetheless commonplace. For the first, it utterly defies common sense to expect suspects to recall and understand *Miranda* warnings that exceed their reading levels by seven grades or more. Can one simply bypass reading challenges by resorting to oral administrations? As discussed below, the answer is *categorically no*. For the second, approximately 10 percent of general *Miranda* warnings exceed 175 words. To make matters worse, about one-third of juvenile *Miranda* warnings exceed this length. [15]

Counsel's susceptibility to the professional neglect hypothesis should not be construed as any indictment of legal practitioners, in terms of either insufficient effort or a lack of professionalism. For decades, we have observed firsthand the ever-expanding scope of duty and the mounting caseloads experienced by criminal defense lawyers in both the private and public sectors. The issues here are ones of priority and planning, not of dedication or skill.

Forensic practitioners, too, may understandably believe that they are constrained in pretrial evaluations to address only the referral question--such as competency to stand trial or criminal responsibility--without any reference to material that is not directly delineated. In actuality, forensic reports often go beyond the referral issue, including ancillary data, such as family and employment history, utilizing a format sometimes recommended by prominent forensic psychologists. [16] Although forensic practitioners must "carefully respect professional boundaries" and not "delve into extraneous matters," they nonetheless "may want to alert the involved attorneys about their concerns," should any problems arise when asking examinees to, for example, "recall the *Miranda* warning in their own words." [17]

In broadening the forensic screening perspective, it should also be noted that many suspects display considerable susceptibility to police coercion, including those who unwittingly provide false confessions following their *22 *Miranda* waivers. [18] Murrie and Zelle [19] have offered a thoughtful review of *Miranda* abilities, cataloguing developmental, cognitive, and psychopathological factors that affect *Miranda* waivers. As noted by these scholars, situational variables--such as stress and sleep deprivation--may also play highly consequential roles. Thus, comprehensive appraisals of *Miranda* abilities involve a complex interplay between psychological, interpersonal, and situational factors.

Rather than attempting to provide a sweeping overview of these interdependent factors, this article concentrates primarily on cognitive impairment, which strongly affects *Miranda* abilities. Because of space limitations, serious mental disorders (SMDs) are only briefly mentioned.

**Cognitive Impairment and SMDs**

Cognitive impairment encompasses a spectrum of verbal and nonverbal capacities that include both intellectual ability and academic-based achievement. Analyses of the latter emphasize reading and listening comprehension, which are obviously the most relevant to the comprehension of *Miranda* warnings. Although psychological impairment can be construed broadly, practitioners typically concentrate on SMDs, focusing on both disorders and the specific symptoms that factor into assigning diagnoses.

By design, cognitive impairments are considered more in terms of degree when it comes to assessing *Miranda* abilities. This means that various levels of seriousness are considered. In contrast, SMDs typically require severe psychopathology in order to be directly relevant to *Miranda* issues. The reason for this asymmetry is entirely pragmatic. Even mild to moderate impairment of cognitive abilities (e.g., limited reading comprehension) may substantially diminish *Miranda* understanding, whereas mild and moderate psychological symptoms tend to have only a minimal effect on *Miranda* comprehension. [20]

Custodial suspects generally experience some levels of psychological stress, with depression being particularly relevant.[21] Unlike cognitive impairment, mild to moderate levels of SMD symptoms do not necessarily represent an increased risk of failed *Miranda* comprehension and reasoning.[22] Professionals might even conclude that some distress and related depressed feelings may actually reflect an accurate appraisal or "normal" reaction to detainees' circumstances. Thus, only moderate to extreme SMD impairments directly diminish *Miranda* abilities. In particular, psychotic symptoms heighten the risk of compromised *Miranda* abilities.[23]

**Cognitive Impairment and *Miranda***

Accurate recall and understanding place high cognitive demands on suspects, especially for oral comprehension. Before addressing *Miranda* abilities directly, the following question will lay the groundwork: *Under the best of circumstances, how much do persons typically recall when provided with spoken material?* The simple answer is that only about 50 percent recall immediately after the material is presented.

The courts as well as attorneys may need to be educated about the severe limits of oral comprehension. Two primary sources of data address this. The first source involves oral recall on the Wechsler Memory Scale,[24] a well-validated and widely used memory test. Persons are tested on orally presented stories that tend to be substantially briefer than most *Miranda* warnings (i.e., 64 and 86 words). Well-educated adults in a nonstressful environment tend to remember only about half (47 percent) of the material.

The second source of data involves research on undergraduates administered orally representative *Miranda* warnings.[25] These well-educated participants in the control condition (i.e., relaxing with no tasks) still remembered only half of the material (49 percent). Instructively, undergraduates in the experimental condition (i.e., being apprehended "stealing" a watch and then Mirandized) remembered even less (39 percent). Taken together, only about half of orally presented material was recalled, even by well-educated persons experiencing only transient situational stressors.

**Screening for *Miranda* Comprehension**

Persons classified in the average or above range of verbal intelligence (i.e., Verbal IQ scores of 90 or higher) typically understand the gist of the *Miranda* warning and do not make egregious errors in applying it to their own circumstances. That said, however, no amount of intelligence or general education provides any reliable, guaranteed assurance of well-functioning *Miranda* abilities.[26] Therefore, we respectfully submit that *all* detainees deserve a one-minute screening of their *Miranda* understanding.

The brief screening described in Box 1 simply asks detainees for their understanding of three crucial terms commonly used in *Miranda* warnings. If confused about "appointed counsel," for example, how can most detainees make rational decisions about opting for legal representation when it appears beyond their financial means? Of equal significance, many detainees and members of the public fundamentally misconstrue the "right to silence" as simply an option rather than a constitutional safeguard against self-incrimination. Finally, the term "waiver" represents a formidable threat to accurate understanding because of its legalese and required reading level (i.e., typically requiring a college education to correctly define). While these profound misunderstandings are more common in detainees, they still occur frequently with undergraduates[27] as well as with members of the general public.[28]

**Box 1**

**One-Minute Screening of *Miranda* Terms for Every Detainee**

1. What is meant by *appointed counsel?*

2. What is meant by *right to silence*?

**3. What is meant by *waiver of rights*?**

Prior to this one-minute screening, we recommend that counsel first asks defendants if they have a good understanding of their *Miranda* rights. We have a very good reason to believe most detainees will respond affirmatively, even those who completely fail to understand. Although some may lack accurate appraisal of their *Miranda* knowledge, many more are likely to be motivated by positive impression management in concealing their limitations (see the later discussion concerning the "cloak of competence"). Why ask then? Both attorneys and forensic practitioners may fall prey to the widespread but false assumption that "everyone already knows the *Miranda* warnings."[29] This type of constructive feedback may help professionals to debunk their longstanding misassumptions about *Miranda* being "common knowledge." The one-minute screening was created to test *23 actual *Miranda* understanding, and as such, circumvent predictable problems with suspects' self-awareness of their own limitations. From our perspective, it should be considered as a standard practice with every detainee. As a rough analogy, would anyone ever put much stock in what applicants for drivers' licenses *say* about their visual abilities? To avoid such obvious subjectivity and concomitant inaccuracies, state agencies for motor vehicles systematically screen all applicants with a brief vision test. The same practice may be equally prudent for all defendants who have relinquished their constitutional protections by waiving their *Miranda* rights.

## Cognitive Impairment

This and following sections will use the term *failed Miranda comprehension*. It has long been conceptualized in *Miranda* research as a failure to recall even 50 percent of a warning.[30] This very stringent standard clearly exceeds academic standards (i.e., less than 60 percent for failing a course) and indicates severely compromised *Miranda* comprehension. Indeed, it could be argued that this standard is *overly* stringent in not identifying moderately compromised abilities. In addition, the research on representative *Miranda* warnings was "spoon-fed" to the detainees; this material was presented one component (statement) at a time rather than hearing the entire warning as in real-word applications.

Even small decrements in verbal intelligence (sometimes verbal IQ is abbreviated to VIQ) increase the percentages of detainees with failed *Miranda* comprehension. Defendants with subaverage verbal intelligence (i.e., less than 90) are at a high risk of either diminished (50 to 69 percent recall) or failed (<50 percent recall) comprehension.[31]

Understandably, *Miranda* studies of cognitive impairment tended to focus on very severe deficits in overall ability, leading to a diagnosis of *intellectual disability* (formerly termed "mental retardation"). In one of the earliest investigations, Fulero and Everington[32] observed moderate to severe *Miranda*-comprehension deficits, especially among adults with intellectual disabilities in community-based settings (e.g., group homes). More recently, Rogers and Drogin[33] systematically investigated pretrial detainees with verbal IQ scores in the typically intellectually disabled range. All were found to have failed *Miranda* comprehension, even those in the upper range (i.e., Verbal IQs 60 to 69). *Miranda* reasoning followed a similar pattern; all have failed *Miranda* reasoning when Verbal IQs fell below 60.

Erickson, Salekin, Johnson, and Doran[34] confirmed these devastating negative results for community participants with Verbal IQ scores close to 60. Regarding *Miranda* comprehension, their average recall was slightly more than one detail. In other words, they failed to recall about 87 percent of the *Miranda* warning typically employed in that Alabama jurisdiction. Their *Miranda* misconceptions were much higher when compared to pretrial detainees.

This section emphasizes the *masking of severe cognitive deficits*, which is common among persons with limited intellectual abilities. The motivation to appear competent and capable is entirely understandable; indeed, it is shared by most persons. However, the danger lies in accepting such presentations at face-value. Therefore, we recommend that involved professionals simply test for response styles.

Given the willingness to please commonly found among suspects with *24 intellectual disabilities, Brodsky and Bennett[35] set forth practical recommendations that may assist legal counsel and forensic practitioners with respect to potential *Miranda* cases. Each recommendation is illustrated in the following subsections.

**Cloak of Competence**

Brodsky and Bennett [36] applied the highly relevant term *cloak of competence* to the longstanding efforts by some persons with severe cognitive deficits to appear "normal" in the context of police questioning. Thinking more broadly, this tendency to mask personal weaknesses may be common to most persons regardless of their cognitive abilities. Nonetheless, this cloak of competence may have profound consequences. If affirmative answers about *Miranda* rights are taken at face-value, attorneys and forensic practitioners may entirely overlook profound, *Miranda*-relevant deficits.

The appraisal of the cloak of competence can be straightforward in two steps: First, ask arrestees if they understand several legal terms used in their advisements. Second, test their actual knowledge by asking for their meanings when police are involved. Some practitioners may wish to substantiate their conclusions by documenting some of the more extensive evidence in their forensic reports. Rogers, Sewell, and Drogin [37] developed and extensively tested 36 *Miranda*-relevant words, resulting in the Miranda Vocabulary Scale ("MVS"). With one simple modification, the MVS could be adapted to assess systematically the cloak of competence in *Miranda* cases. As a preliminary step, examinees with limited cognitive abilities could be asked whether they understand these *Miranda*-relevant words, presented efficiently in a single list. Then, the MVS could be administered, following standard directions. The cloak of competence might then be amply demonstrated when examinees claim to know and understand most words but fail to have even a rudimentary understanding for at least half of them.

**Suggestibility**

Suggestibility--sometimes referred to as "interrogative suggestibility" [38] within the context of police questioning--assumes that arrestees have internalized statements by law enforcement and have accepted them as their own. To test for suggestibility, defense counsel can easily ask leading questions unrelated to arrestees' *Miranda* abilities: (1) "Isn't the jail food about the best you have ever eaten?" or (2) "Don't most jailers treat you like a friend?" Forensic practitioners also have the option of administering a general measure of suggestibility (i.e., Gudjonsson Suggestibility Scale [39]). However, they should be aware of its many untested assumptions and basic shortcomings as a measure of suggestibility. [40]

**Social Conformity**

Attorneys and forensic practitioners alike should seek to identify persons with limited cognitive abilities who have learned to present with social conformity--sometimes broadened to social desirability (i.e., going further than just conformity). Both response styles are characterized by overly positive self-presentations. As observed by Brodsky and Bennett, [41] persons exhibiting social conformity often exhibit a longstanding pattern of seeking to please and desiring approval, especially from persons of authority. It can often be assessed in a straightforward manner: "When would it be a good idea to disagree with me, as your lawyer?" The emotional response (e.g., a reaction of alarm and anxiety) may be just as revealing as any verbal response.

**Acquiescence**

Rogers and his colleagues [42] have studied the construct of acquiescence, typically defined as "yea-saying," which may have a more substantial role in *Miranda* assessments than either suggestibility or social conformity. It avoids several important yet untested assumptions of suggestibility. In addition, it may be conceptually more relevant than social conformity. Although admissions to criminal behavior could possibly be viewed as socially conforming (e.g., taking responsibility), the content of such disclosures (e.g., crimes causing intentional injury to others) can certainly be construed as strongly nonconforming, and definitely not socially desirable.

Acquiescence is most clearly assessed by presenting two or more questions for which affirmative responses are logically inconsistent. Consider the following two questions about a burglary: Were you somewhere else when this burglary happened? Did the police get the right person when they arrested you? Affirmative answers to both would be initial evidence of acquiescence. Obviously, these questions are much more likely to be effective if separated by unrelated questions.

Acquiescence can also be directly measured in relationship to *Miranda* abilities by forensic practitioners. The Miranda Acquiescence Questionnaire ("MAQ") [43] addresses pairings of responses related to *Miranda* rights and concomitant police practices to evaluate the presence of yea-saying with conflicting, if not contradictory, statements. Rogers and Drogin [44] recommended that eight or more acquiescent pairings be strongly considered as evidence of an acquiescent response style. High levels of acquiescence have been observed on the MAQ for persons with mild to moderate intellectual disabilities with approximately 40 percent of the pairings being in the acquiescent direction. [45]

## *Miranda* Referrals

Defense attorneys must be fully cognizant of their goals in making specific *Miranda* referrals to forensic practitioners. While preparing for a suppression hearing, attorneys must be realistic about what they hope to accomplish. In *Conducting Miranda Evaluations*, Rogers and Drogin [46] articulated potentially more achievable goals, such as a very favorable plea bargain and an agreement to limit or eliminate the defendant's confession. Occasionally, one or more charges will simply be dropped without a plea to avoid protracted suppression proceedings.

As articulated by Rogers and Drogin, [47] defense attorneys may face a steep uphill battle regarding the credibility of defendants. Self-serving deceptions at the time of arrest frequently include denial of any responsibility followed by minimizing their involvement and excuse-making for any harm that was caused.

We strongly recommend that *Miranda* referrals should clearly delineate *Miranda* issues and specialized methods to address these issues. Why this level of detail? Here are two goals:

1. Avoid overlooking potential *Miranda* issues.

2. Ensure the forensic report has the strongest substantiation for its conclusions.

Regarding the first, for example, A-1 and A-2 (Box 2) provide critical information for contextualizing the defendant's *Miranda* comprehension. If components of the used *Miranda* warning far exceed his or her reading comprehension, this marked disparity is important to underscore.

| BOX 2: REFERRAL CHECKLIST FOR *MIRANDA* CONSULTATIONS BY FORENSIC PRACTITIONERS | |
|---|---|
| A. Administered *Miranda* warning | 1. What is its length? |
| | 2. What is the reading level for each *Miranda* component and overall? |
| B. *Miranda* recall | 3. What is the arrestee's immediate recall when the entire warning is provided? When scored on the MCT, what are the arrestee's abilities compared to other pretrial defendants? |
| | 4. (if available for oral administration) What is the arrestee's immediate recall when the recording of the actual *Miranda* warning is played? |

| | |
|---|---|
| C. *Miranda* vocabulary | 5. (for juveniles) What is the arrestee's understanding of *Miranda*-relevant words as measured by the MRCI Comprehension of Miranda Vocabulary (CMV-II)? |
| | 6. (for adults) What is the arrestee's understanding of *Miranda*-relevant words as measured by the SAMA Miranda Vocabulary Scale (MVS)? Is this level aligned with compromised or intact *Miranda* abilities? |
| D. *Miranda* reasoning | 7. What are basic *Miranda* misconceptions as measured by the SAMA Miranda Quiz (MQ for adults) or SAMA Juvenile Miranda Quiz (JMQ for youth)? |
| E. *Miranda* decision-making | 8. What were the arrestee's reasons for relinquishing his or her rights? Making incriminating statements? |
| | 9. Using the SAMA Miranda Reasoning Measure (MRM), what was the arrestee's level of reasoning (impaired, questionable, or rational) in making the waiver decision? |
| F. Feigned *Miranda* abilities | 10. Using specialized SAMA scales for the MQ, JMQ, and MVS, are the data aligned with genuine or faked efforts? |

\*25 With reference to #2, this uphill struggle must openly be acknowledged and clearly addressed by the referring attorneys and their retained forensic practitioners. In addition to psychological testing (e.g., intelligence, achievement, and diagnostic), specialized *Miranda* measures should also be administered. Why? They provide a comparative analysis regarding how this examinee compares to hundreds of pretrial detainees or legally involved juveniles on *Miranda*-relevant tasks. In addition, several scales systematically evaluate levels of effort and potential malingering. This valuable information is useful to both sides of the bar in providing evidence regarding the genuineness of the effort in assessing *Miranda* impairment. Before discussing Box 2 further, the two specialized *Miranda* measures are summarized in the next subsection.

## Specialized *Miranda* Measures

The Miranda Rights Comprehension Instruments ("MRCI")[48] were validated almost exclusively with legally involved juveniles. The Comprehension of Miranda Vocabulary-II ("CMV-II") is composed of 16 *Miranda*-relevant words with most requiring only a low educational level to be successful. Function of Rights in Interrogation ("FRI") is composed of three subscales, whose names are self-explanatory: Nature of the Interrogation ("FRI-NI"), Right to Counsel ("FRI-RC"), and Right to Silence ("FRIRS"). As the most central measure, Comprehension of Miranda Rights-II ("CMR-II") addresses the person's understanding of a simplified *Miranda* warning using easily understood words. The MRCI warning is provided one component at a time, both orally and in writing. Given its easiness in both content and delivery, the MRCI's results may not reflect the person's real-world experience at being Mirandized.[49] When the results indicate *intact* functioning, forensic practitioners need to be cautious in drawing any conclusions, weighing the MRCI against the actual warning and delivery that was used. However, when the MRCI results indicate *impaired* functioning, forensic practitioners may make a strong case regarding compromised *Miranda* comprehension because of the MRCI's simplified warning and unchallenging one-component delivery. Since the publication of the MRCI manual, Sharf, Rogers and their colleagues[50] have provided percentiles by age categories to ensure a stronger basis for forensic conclusions.

The Standardized Assessment of Miranda Abilities ("SAMA")[51] is intended to systematically assess *Miranda* abilities for adult arrestees with five measures. *Miranda* recall is scored on the SAMA Miranda Comprehension Template ("MCT"), which uses the actual *Miranda* warning administered to a particular arrestee and the same method (e.g., oral or written) of delivery. The SAMA Miranda Vocabulary Scale ("MVS") is composed of 36 *Miranda*-relevant words in order to assess their meanings at the time of police questioning. *Miranda* misconceptions can be assessed in two versions: the SAMA Miranda Quiz ("MQ") for adult arrestees and the Juvenile Miranda Quiz ("JMQ")[52] for legally involved youth. The real-world waiver decision is examined via the SAMA Miranda Reasoning Measure ("MRM"), which evaluates the quality of short-and long-term reasons

used in the actual waiver. Finally, the MAQ--described earlier--assesses yea-saying or acquiescence. An important feature of the SAMA is that feigning screens have been developed for the MQ, JMQ, and MVS.

**Referral Issues and Specialized Measures**

As discussed, an analysis of the *Miranda* warning actually used provides an essential context for evaluating *26 the person's true *Miranda* abilities (see Box 2). As the next step, each examinee's baseline knowledge and ability to recall the warning used are vitally important in evaluating his or her working memory, although it is widely recognized that situational stressors may substantially diminish these abilities. In order to provide standardization, the MCT scoring is a highly efficient way of determining their abilities at *Miranda* recall as compared to a representative sample of pretrial detainees (see Box 2). Obviously, the use of legalese and generally difficult words may easily stymie *Miranda* understanding. For youth, the MRCI provides some coverage via the CMV. For adult arrestees, the MVS provides a more extensive coverage of *Miranda*-relevant words.

*Miranda* reasoning and waivers are covered primarily by the SAMA measures, such as the MQ, JMQ, and MRM (see Box 2, D and E). Common misperceptions (e.g., one's silence being self-incriminating) may lead to irrational decisions (e.g., having no choice but to talk). The JMQ utilizes simplified MQ items plus commonly found misconceptions in arrested juveniles (e.g., officers being on their side). The actual waiver decisions are assessed via the MRM, which examines the pros and cons associated with exercising and waiving *Miranda* rights.

Finally, the interests of justice are not served if arrestees successfully pretend to have compromised *Miranda* abilities when this is not the case. Therefore, feigning screens have been implemented with the MQ, JMQ, as well as the MVS (see Box 2, F).

**Conclusion**

Most seasoned criminal law practitioners will readily acknowledge that *Miranda* issues can be difficult to discern, complex, and highly consequential. In capital cases, the validity of *Miranda* waivers can literally become a matter of life and death. In the daily rush of pressing legal matters, counsel can be forgiven for failing to catch some misunderstood *Miranda* advisements and invalid waivers, but this is cold comfort for clients and their appellate attorneys left pondering for years to come how results might have been different but for opportunities lost. Brief screenings (see Box 1) and focused inquiries should address *Miranda* comprehension and reasoning in many, if not most, cases where post-waiver confessions constitute the pivotal evidence. Forensic practitioners are encouraged to adopt a proactive role regarding *Miranda* issues in the context of procedural justice. When formal consultations are requested, Box 2 ensures that forensic practitioners systematically address *Miranda* warnings and their comprehension, as well as the crucial underpinnings of waiver decisions.

**Footnotes**

| | |
|---|---|
| a1 | Richard Rogers, Ph.D., ABPP, is Regents Professor of Psychology at the University of North Texas. He authored two *Miranda* books with Dr. Eric Drogin including *Mirandized Statements* for attorneys. He has developed specialized tools for improving *Miranda* consults and serves as a consultant on *Miranda* matters. |
| a2 | Eric Y. Drogin, J.D., Ph.D., ABPP is an attorney and board-certified forensic psychologist on the faculties of the Harvard Medical School and the Harvard Forensic Psychiatry Fellowship, and currently serves as Chair of the American Bar Association's Section of Science & Technology Law (2020-21). |
| a3 | Minqi Pan, M.A., worked four years as a Mental Health Specialist on a maximum-security unit at North Texas State Hospital-Vernon. He recently joined the Rogers team at the University of North Texas to pursue his doctoral training for a career as a clinical forensic psychologist. |
| 1 | *Miranda v. Arizona*, 384 U.S. 436 (1966). |
| 2 | *Id.* at 479. |

3   Richard Rogers, Jill E. Rogstad, Nathan D. Gillard, Eric Y. Drogin, Haley L. Blackwood & Daniel W. Shuman, *'Everyone Knows Their Miranda Rights': Implicit Assumptions and Countervailing Evidence*, 16 PSYCHOL. PUB. POL'Y & LAW 300 (2010).

4   Brian K. Payne, Victoria Time & Randy R. Gainey, *Police Chiefs' and Students' Attitudes About Miranda Warnings*, 34 J. CRIM. JUST. 653 (2006).

5   RICHARD ROGERS & ERIC Y. DROGIN, MIRANDIZED STATEMENTS: SUCCESSFULLY NAVIGATING THE LEGAL AND PSYCHOLOGICAL ISSUES (2014).

6   Richard Rogers, Chelsea E. Fiduccia, Eric Y. Drogin, Jennifer A. Steadham, John W. Clark III & Robert J. Cramer, *General Knowledge and Misknowledge of Miranda Rights: Are Effective Miranda Advisements Still Necessary?* 19 PSYCHOL. PUB. POL'Y & LAW 432 (2013).

7   See Rogers et al., *supra* note 3.

8   See Miranda, *supra* note 1, at 340.

9   California v. Prysock, 453 U.S. 355 (1981).

10  *Id.* at 359.

11  Richard Rogers, Lisa L. Hazelwood, Kimberly S. Harrison, Kenneth W. Sewell & Daniel W. Shuman, *The Language of Miranda in American Jurisdictions: A Replication and Further Analysis*, 32 LAW & HUM. BEHAV. 124 (2008).

12  Saul M. Kassin, Steven A. Drizin, Thomas Grisso, Gisli H. Gudjonsson, Richard A. Leo & Allison D. Redlich, *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3 (2010).

13  *Id.* at 6.

14  Richard Rogers, Nathan D. Gillard, Chelsea Wooley & Chelsea Fiduccia, *Decrements in Miranda Abilities: An Investigation of Situational Effects Via a Mock-Crime Paradigm*, 35 LAW & HUM. BEHAV. 392 (2011).

15  RICHARD ROGERS, KEITH W. SEWELL, ERIC Y. DROGIN & CHELSEA E. FIDUCCIA, STANDARDIZED ASSESSMENT OF MIRANDA ABILITIES (SAMA) PROFESSIONAL MANUAL (2012).

16  ALAN M. GOLDSTEIN & NAOMI E. S. GOLDSTEIN, EVALUATING CAPACITY TO WAIVE MIRANDA RIGHTS (2010).

17  RICHARD ROGERS & ERIC Y. DROGIN, CONDUCTING MIRANDA EVALUATIONS: APPLICATIONS OF PSYCHOLOGICAL EXPERTISE AND SCIENCE WITHIN THE FORENSIC CONTEXT 30 (2019).

18  See Goldstein & Goldstein, *supra* note 16.

19  Daniel C. Murrie & Heather Zelle, *Criminal Competencies*, in 1 APA HANDBOOK OF FORENSIC PSYCHOLOGY 115-157 (Brian L. Cutler & Patricia A. Zapf, eds., 2012).

20  See Rogers & Drogin, *supra* note 5.

21  See Rogers et al., *supra* note 15.

22  See Rogers & Drogin, *supra* note 5.

23  *Id.*

24  DAVID WECHSLER, MANUAL FOR THE WECHSLER MEMORY SCALE (4th ed. 2009).

25  See Rogers et al., *supra* note 15.

26   *See* Rogers & Drogin, *supra* note 5.

27   *See* Rogers et al., *supra* note 14.

28   Richard Rogers, *A Little Knowledge Is a Dangerous Thing ... Emerging Miranda Research and Professional Roles*, 63 AM. PSYCHOL. 776 (2008).

29   Richard Rogers, Lisa L. Hazelwood, Kenneth W. Sewell, Haley L. Blackwood, Jill E. Rogstad & Kimberly S. Harrison, *Development and Initial Validation of the Miranda Vocabulary Scale*, 33 LAW & HUM. BEHAV. 381 (2009).

30   *See* Rogers, *supra* note 28; *see* Rogers et al., *supra* note 29.

31   *See* Rogers & Drogin, *supra* note 5.

32   Solomon M. Fulero & Caroline Everington, *Assessing Competency to Waive Miranda Rights in Defendants with Mental Retardation*, 19 LAW & HUM. BEHAV. 533 (1995).

33   *See* Rogers & Drogin, *supra* note 17.

34   Sydnee L. Erickson, Karen L. Salekin, Lauren N. Johnson & Stephanie C. Doran, *The Predictive Power of Intelligence: Miranda Abilities of Individuals with Intellectual Disability*, 44 LAW & HUM. BEHAV. 60 (2020).

35   Stanley L. Brodsky & Allyson D. Bennett, *Psychological Assessments of Confessions and Suggestibility in Mentally Retarded Suspects*, 33 J. PSYCHIATRY & LAW 359 (2005). In order to develop a fuller historical perspective, *see also* ROBERT B. EDGERTON, THE CLOAK OF COMPETENCE: STIGMA IN THE LIVES OF THE MENTALLY RETARDED (1967).

36   *Id.*

37   *See* Rogers et al., *supra* note 15.

38   Gisli H. Gudjonsson, *A New Scale of Interrogative Suggestibility*, 5 PERSONALITY & INDIV. DIFFERENCES 303 (1984).

39   GISLI H. GUDJONSSON, THE GUDJONSSON SUGGESTIBILITY SCALES MANUAL (1997).

40   *See* Rogers & Drogin, *supra* note 17.

41   *See* Brodsky & Bennett, *supra* note 35.

42   *See* Rogers et al., *supra* note 15.

43   KIMBERLY S. HARRISON & RICHARD ROGERS, MIRANDA ACQUIESCENCE QUESTIONNAIRE (MAQ) (2012); *see* Rogers et al., *supra* note 15.

44   *See* Rogers & Drogin, *supra* note 17.

45   *See* Erikson et al., *supra* note 34.

46   *See* Rogers & Drogin, *supra* note 17.

47   *Id.*

48   NAOMI E. S. GOLDSTEIN, HEATHER ZELLE & THOMAS GRISSO, MIRANDA RIGHTS COMPREHENSION INSTRUMENTS (MRCI) MANUAL (2011).

49   Richard Rogers, Allyson J. Sharf, Rachel M. Carter, Darby B. Winningham & Rose N. Sternad, *The MRCI with Juvenile Detainees: Optimizing Performance or Emphasizing Ecological Validity?* 36 BEHAV. SCI. & LAW 1 (2018).

50  Richard Rogers, Allyson J. Sharf, Rachel M. Carter, Sarah A. Henry, Margot M. Williams & Emily V. Robinson, *Validity and Representative Data of the MRCI with Legally Involved Juveniles*, 24 ASSESSMENT 591 (2017).

51  *See* Rogers et al., *supra* note 15.

52  Allyson J. Sharf, Richard Rogers, Margot M. Williams & Eric Y. Drogin, *Evaluating Juvenile Detainees' Miranda Misconceptions: The Discriminant Validity of the Juvenile Miranda Quiz*, 29 PSYCHOL. ASSESSMENT 556 (2017).

44-JUL CHAMP 20

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.