1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA           )
                                   )
            v.                     )
                                   )         CASE NO.
JUAN RANGEL-RUBIO,                 )   4:18-CR-274-LGW-CLR-2
                                   )
_____Defendant._____)




JURY TRIAL
BEFORE THE HONORABLE LISA GODBEY WOOD
October 25, 2022; 9:00 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                           CHRISTOPHER HOWARD, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov
                           christopher.howard@usdoj.gov


For the Defendant:         KATIE A. BREWINGTON, Esq.
                           The Brewington Law Firm, LLC
                           P. O. Box 11153
                           Savannah, Georgia  31412
                           (912) 704-0858
                           kabrewington@gmail.com


Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov
                              - - -

2

I N D E X

PAGE

Jury Voir Dire                                          12

Jury Selection                                           4

Court's Initial Instructions                           103

OPENING STATEMENTS                                     119

GOVERNMENT WITNESSES

    MARIA MONTOYA
        Direct Examination By Ms. Groover            133

    OSCAR CRUZ
        Direct Examination By Mr. Howard             148
        Cross-Examination By Ms. Brewington          171

    JOSE SANTOS GUTIERREZ
        Direct Examination By Ms. Groover            175
        Cross-Examination By Ms. Brewington          192

    JOEL REYES PENA
        Direct Examination By Mr. Howard             195
        Cross-Examination By Ms. Brewington          204
        Redirect Examination By Mr. Howard           206

E X H I B I T S

| GOVERNMENT'S EXHIBITS | I.D.'d | ADMITTED |
|---|---|---|
| No. 1-102 | 133 | 133 |

(102 withdrawn

4

1          P R O C E E D I N G S

2          (Call to order at 9:06 a.m.)

3      THE CLERK:  Good morning, ladies and gentlemen.

4      SPEAKERS:  Good morning.

5      THE CLERK:  Can everybody hear me?  If at any time you

6  cannot hear me, please just raise your hand.  I will speak

7  louder and repeat my question if I need to.

8          So I'm going to start by calling the roll.  As I call

9  your name, I'm also going to call your juror number, which is

10  the number that's on your sticker.  So all throughout today,

11  throughout the process, you will refer to the juror number

12  that's your sticker, so I'm going to call your name and juror

13  number and if you will please just say "here."

14      Juror Number 1, Reginald Anderson.

15      PROSPECTIVE JUROR NUMBER 1:  Here.

16      THE CLERK:  Juror Number 2, Sonya Ashburn.

17      PROSPECTIVE JUROR NUMBER 2:  Here.

18      THE CLERK:  Juror Number 3, Joy Bell.

19      PROSPECTIVE JUROR NUMBER 3:  Here.

20      THE CLERK:  Juror Number 4, Michael Bennett.

21      PROSPECTIVE JUROR NUMBER 4:  Here.

22      THE CLERK:  Juror Number 5, Justin Bisard.

23      PROSPECTIVE JUROR NUMBER 5:  Here.

24      THE CLERK:  Juror Number 6, Mark Blanchard.

25      PROSPECTIVE JUROR NUMBER 6:  Here.

5

1          THE CLERK:  Juror Number 7, Hunter Booth.

2          PROSPECTIVE JUROR NUMBER 7:  Here.

3          THE CLERK:  Juror Number 8, Carrie Chick.

4          PROSPECTIVE JUROR NUMBER 8:  Here.

5          THE CLERK:  Juror Number 9, Christina Croley.

6          PROSPECTIVE JUROR NUMBER 9:  Here.

7          THE CLERK:  Juror Number 10, Austin Davis.

8          PROSPECTIVE JUROR NUMBER 10:  Here.

9          THE CLERK:  Juror Number 11, Robert Davis.

10          PROSPECTIVE JUROR NUMBER 11:  Here.

11          THE CLERK:  Juror Number 12, Brenda Dixon.

12          PROSPECTIVE JUROR NUMBER 12:  Here.

13          THE CLERK:  Juror Number 13, Denise Donica.

14          PROSPECTIVE JUROR NUMBER 13:  Donica, here.

15          THE CLERK:  Juror Number 14, Ronald Echols.

16          PROSPECTIVE JUROR NUMBER 14:  Here.

17          THE CLERK:  Juror Number 15, Rita Ehrhart.

18          PROSPECTIVE JUROR NUMBER 15:  Here.

19          THE CLERK:  Juror Number 16, Maribeth Evans.

20          PROSPECTIVE JUROR NUMBER 16:  Here.

21          THE CLERK:  Juror Number 17, Rachel Forester.

22          PROSPECTIVE JUROR NUMBER 17:  Here.

23          THE CLERK:  Juror Number 18, Felix Galindez?  Juror

24  Number 18, Felix Galindez.  Juror Number 18 is not present.

25          Juror Number 19, Anthony Garner.

6

1        PROSPECTIVE JUROR NUMBER 19:  Here.

2        THE CLERK:  Juror Number 20, Jessica Gonzalez.

3        PROSPECTIVE JUROR NUMBER 20:  Here.

4        THE CLERK:  Juror Number 21, Nicholas Grafton.

5        PROSPECTIVE JUROR NUMBER 21:  Here.

6        THE CLERK:  Juror Number 22, Melissa Green.

7        PROSPECTIVE JUROR NUMBER 22:  Here.

8        THE CLERK:  Juror Number 23, Brittany Harte.

9        PROSPECTIVE JUROR NUMBER 23:  Here.

10       THE CLERK:  Juror Number 24, Alfreda Hatton.

11       PROSPECTIVE JUROR NUMBER 24:  Here.

12       THE CLERK:  Juror Number 25, Eden Hayslip.

13       PROSPECTIVE JUROR NUMBER 25:  Here.

14       THE CLERK:  Juror Number 26, Regina Hibbett.

15       PROSPECTIVE JUROR NUMBER 26:  Here.

16       THE CLERK:  Juror Number 27, Robert Hill.

17       PROSPECTIVE JUROR NUMBER 27:  Here.

18       THE CLERK:  Juror Number 28, Carol Hines.

19       PROSPECTIVE JUROR NUMBER 28:  Here.

20       THE CLERK:  Juror Number 29, Forrest Hunter.

21       PROSPECTIVE JUROR NUMBER 29:  Here.

22       THE CLERK:  Juror Number 30, Daniel Kane.

23       PROSPECTIVE JUROR NUMBER 30:  Here.

24       THE CLERK:  Juror Number 31, Imani Lattimore.

25       PROSPECTIVE JUROR NUMBER 31:  Here.

1          THE CLERK:  Juror Number 32, Stacy Leonard.

2          PROSPECTIVE JUROR NUMBER 32:  Leonard, here.

3          THE CLERK:  Juror Number 33, Donna Merritt.

4          PROSPECTIVE JUROR NUMBER 33:  Here.

5          THE CLERK:  Juror Number 34, Clelia Moore.

6          PROSPECTIVE JUROR NUMBER 34:  Here.

7          THE CLERK:  Juror Number 35, Heather Newsome.

8          PROSPECTIVE JUROR NUMBER 35:  Here.

9          THE CLERK:  Juror Number 36, Amy Ochoa.

10         PROSPECTIVE JUROR NUMBER 36:  Here.

11         THE CLERK:  Juror Number 37, David Palmer.

12         PROSPECTIVE JUROR NUMBER 37:  Here.

13         THE CLERK:  Juror Number 38, Charity Parker.

14         PROSPECTIVE JUROR NUMBER 38:  Here.

15         THE CLERK:  Juror Number 39, Cathy Porter.

16         PROSPECTIVE JUROR NUMBER 39:  Here.

17         THE CLERK:  Juror Number 40, Gregory Robinson.

18         PROSPECTIVE JUROR NUMBER 40:  Here.

19         THE CLERK:  Juror Number 41, Matthew Roseman.

20         PROSPECTIVE JUROR NUMBER 41:  Here.

21         THE CLERK:  Juror Number 42, Benjamin Schumm.

22         PROSPECTIVE JUROR NUMBER 42:  Schumm, here.

23         THE CLERK:  Schumm.

24         PROSPECTIVE JUROR NUMBER 42:  Yes, Schumm.

25         THE CLERK:  Juror Number 43, Elizabeth Scully.

8

1         PROSPECTIVE JUROR NUMBER 43:  Here.

2         THE CLERK:  Juror Number 44, Ariana Session.

3         PROSPECTIVE JUROR NUMBER 44:  Here.

4         THE CLERK:  Juror Number 45, Yolanda Sharpe.

5         PROSPECTIVE JUROR NUMBER 45:  Here.

6         THE CLERK:  Juror Number 46, Vivienne Shipman-Davis.

7         PROSPECTIVE JUROR NUMBER 46:  Here.

8         THE CLERK:  Juror Number 47, Kenyata Singleton.

9         PROSPECTIVE JUROR NUMBER 47:  Here.

10         THE CLERK:  Juror Number 48, Ashley Stanley.

11         PROSPECTIVE JUROR NUMBER 48:  Here.

12         THE CLERK:  Juror Number 49, Sarah Strickland.

13         PROSPECTIVE JUROR NUMBER 49:  Here.

14         THE CLERK:  Juror Number 50, John Sullivan.

15         PROSPECTIVE JUROR NUMBER 50:  Here.

16         THE CLERK:  Juror Number 51, Wyndale Tanner.

17         PROSPECTIVE JUROR NUMBER 51:  Here.

18         THE CLERK:  Juror Number 52, Sally Tarasovic.

19         PROSPECTIVE JUROR NUMBER 52:  Tarasovic, here.

20         THE CLERK:  Juror Number 53, Sebastian Taylor.  Juror

21 Number 53, Sebastian Taylor, Juror Number 53 is not present.

22         Juror Number 54, Patricia Tucker.  Juror Number 54

23 Patricia Tucker.  Juror Number 54 is not present.

24         Juror Number 55, Jose Velazquez.

25         PROSPECTIVE JUROR NUMBER 55:  Here.

9

1          THE CLERK:  Juror Number 56, James Wheeler.

2          PROSPECTIVE JUROR NUMBER 56:  Here.

3          THE CLERK:  Juror Number 57, Joseph Zellers.

4          PROSPECTIVE JUROR NUMBER 57:  Here.

5          THE CLERK:  Juror Number 58, Allison Zipperer.

6          PROSPECTIVE JUROR NUMBER 58:  Here.

7          THE CLERK:  Is there anybody present whose name I did

8   not call, please raise your hand.

9          Would all members of the jury panel please stand and

10  raise your right hand to be sworn.

11          (Prospective jurors sworn.)

12          THE CLERK:  Thank you.  You may be seated.  Is there

13  anybody for any reason who did not answer "I do" to the oath,

14  please raise your hand.

15          I will now be asking a series of questions, so please

16  listen carefully to each one of them.  If you have a positive

17  answer to the question if you will raise your hand and the CSO

18  will come to you with the microphone.

19          Is there anyone here who has an excuse as to why they

20  cannot serve during this term of court, please raise your hand.

21          Are each of you citizens of the United States?  If the

22  answer is no, please raise your hand.

23          Are each of you at least 18 years of age or older?  If

24  the answer is no, please raise your hand.

25          Have each of you resided for a period of at least one

1 year within the following counties which comprise the Savannah

2 Division for the Southern District of Georgia?  Those counties

3 are Bryan, Chatham, Effingham and Liberty.  If the answer is no,

4 please raise your hand.

5        Do any of you presently have any charge pending against

6 you or have you ever been convicted in any state or federal

7 court of record of a crime punishable by imprisonment for more

8 than one year?  If the answer is yes, please raise your hand.

9        Are each of you able to read, write and understand the

10 English language?  If the answer is no, please raise your hand.

11        Are any of you incapable by reason of physical or mental

12 infirmity to render satisfactory jury service at this time?  If

13 the answer is yes, please raise your hand.

14        Are any of you members of the fire or police department

15 of any state, district, territory, possession or subdivision

16 thereof?  If the answer is yes, please raise your hand.

17        Are any of you volunteer safety personnel who serve

18 without compensation as firefighters or members of a rescue

19 squad or ambulance crew for a public agency?  If the answer is

20 yes, please raise your hand.

21        Are any of you members in the active service with the

22 armed forces of the United States?  If the answer is yes, please

23 raise your hand.

24        Are any of you public officers in the executive,

25 legislative or judicial branches of the government of the United

1   States or any state, district, territory or possession or

2   subdivision thereof who are actively engaged in the performance

3   official duties?  If the answer is yes, please raise your hand.

4        In just a few moments, the Judge is going to come out

5   and ask you an additional series of questions.  Each time she

6   does if you have a positive answer to the question if you will

7   please raise your hand and you'll stand and give your name and

8   your juror number when you answer the question.

9        (Honorable Lisa Godbey Wood enters the courtroom.)

10        THE COURT:  Good morning.

11        SPEAKERS:  Good morning.

12        THE COURT:  Ms. Sharp, call the case.

13        THE CLERK:  Case Number CR-4:18-274, United States of

14   America versus Juan Rangel-Rubio, Christopher Howard, Tania

15   Groover for the Government, Katie Brewington for the Defense.

16        THE COURT:  Ready for the United States?

17        MS. GROOVER:  We are ready to proceed.

18        THE COURT:  Ready for the Defense?

19        MS. BREWINGTON:  Ready, Judge.

20        THE COURT:  Ms. Sharp, have the interpreters been sworn?

21        THE CLERK:  Your Honor, they have not.

22        THE COURT:  I'm going to ask each interpreter to come

23   forward to the well of the court to receive the oath, and Ms.

24   Sharp, if you will administer it.

25        (Interpreters Elizabeth Giersberg and Davor Zidovec were

12

1    sworn.)

2         THE CLERK:  If you will please state your full name for

3    the record.

4         INTERPRETER GIERSBERG:  Elizabeth Giersberg.

5         INTERPRETER ZIDOVEC:  Davor Zidovec.

6         THE COURT:  Thank you both.

7         Ladies and gentlemen, in just a few moments, I'm going

8    to be asking you questions about your qualifications to sit as

9    jurors in this case.

10         Now, this particular part of the case is known as the

11    voir dire examination.  Those are just old French words and what

12    they mean is "speak the truth."

13         Each of you has just taken an oath in which you promised

14    to do that, to truthfully answer the questions that are put

15    before you.  Please understand that these questions are not

16    posed to you to pry into your personal life or poke into your

17    business.

18         Rather, they are designed to find what everyone in our

19    country is entitled to and that's a fair and impartial jury to

20    hear his case.

21         So, you see, these questions are designed to figure out

22    whether you might have had some experience or some particular

23    training that might in some way influence the way that you view

24    the issues in this case.

25         Now, in this particular case, we anticipate that the

1  trial will last approximately four to five days.  We will be in

2  session all day today, all day Wednesday, all day Thursday.  We

3  will not meet on Friday, and we will resume on Monday if

4  necessary and continue if necessary until Tuesday.

5          Jury selection is rarely convenient.  Truth is, jury

6  service is most often inconvenient.  But it is a high civic duty

7  that some of you may be asked to perform.

8          Now, Ms. Sharp, was there anyone seeing excuse?

9          THE CLERK:  No, Your Honor.

10          THE COURT:  Thank you.  The procedure that we will

11  follow this morning is I'm going to ask a series of preliminary

12  questions.  If you have a positive response, raise your hand and

13  the marshal will bring a microphone to you.

14          When the microphone reaches you, if you will stand and

15  give us first your name and jury number and then proceed with

16  your answer.  Once I ask a series of preliminary questions, Ms.

17  Sharp will randomly draw a number of you who will be reseated

18  and I'll ask some additional questions.

19          I'll then turn to counsel at sidebar to determine if

20  there are any other followup questions that you would like me to

21  ask.

22          Once all the questions are asked, then the attorneys are

23  allowed to exercise what are called preemptory strikes, that is,

24  they will strike a number of you.  They will do so silently by

25  having the marshal walk a piece of paper back and forth between

14

1    the counsel tables, and once all those strikes are exercised,

2    those of you who remain will form the jury to hear this case.

3         Throughout the selection process and throughout the

4    trial itself, you're going to be seeing certain courthouse

5    personnel.  Let me go ahead and identify who they are and what

6    their jobs are.

7         The lady seated front to my left is Ms. Debbie Gilbert.

8    She's my court reporter.  It's her job to write down every word

9    that's said in this room while we're in session.

10        The lady seated to my right in the front is Ms. Whitney

11   Sharp, and as you've seen already, it is her duty to administer

12   oaths, to keep track of exhibits and keep the trial running

13   smoothly.

14        The lady seated front and center is Ms. Kim Mixon.

15   She's also a courtroom deputy on staff with The Court.  She will

16   be here only during the jury selection process.

17        The ladies and gentlemen seated to the right are law

18   clerks on staff with The Court.  They are lawyers.  It's their

19   duty to help me resolve legal issues should they arise during

20   the trial, and finally the ladies and gentlemen in the gray

21   slacks and blue jackets are court security officers with the

22   court.

23        Their military experience and law enforcement experience

24   combines to keep perfect discipline in the court at all times.

25   They are important to you selected to serve because, if you have

1    any need with regard to your comfort or any desire to

2    communicate with The Court in any way, they will be your conduit

3    to The Court.

4        Let me go ahead and begin to tell you a little bit about

5    the case.  As you've heard from the call of the case, this is

6    the case of the United States of America versus Juan

7    Rangel-Rubio.

8        I'm going to read to you some pertinent parts from the

9    charging instrument that's called the superseding indictment.

10   That indictment is not considered as evidence.  It is merely a

11   formal accusation against the defendant, Mr. Rangel-Rubio, but

12   it is not to be considered as evidence.  You must not consider

13   it as evidence of the defendants' guilt nor must you be

14   influenced by the fact that the indictment has been filed

15   against the defendant.

16       The indictment alleges generally that Mr. Eliud Montoya

17   immigrated to the United States, and after completing the

18   naturalization process, he became a US citizen in 2009.

19       It alleges that on August 19th, 2017, Mr. Montoya was

20   murdered.  He was shot near his home in Garden City, Georgia.

21   The indictment alleges that at the time Mr. Montoya had been

22   employed with a company called Wolf Tree, which is a wholly

23   owned subsidary of the Davey Tree Expert Company.  It alleges

24   that the defendant, Mr. Juan Rangel-Rubio, was also employed by

25   that company.

1    Count 1 of the indictment alleges conspiracy to conceal,

2    harbor and shield illegal aliens in violation of 8 USC Section

3    1324.  It alleges that the object of that conspiracy was to make

4    money from the unlawful employment of illegal aliens.

5    Count 2 of the indictment alleges a money-laundering

6    conspiracy in violation of 18 USC Section 1956(H).

7    Count 6 of the indictment alleges conspiracy to kill a

8    witness in violation of 18 USC Section 1512(K).  It alleges that

9    the object of that conspiracy was to kill Mr. Montoya to prevent

10   him from providing testimony and producing records or documents

11   in an official proceeding conducted by the Equal Employment

12   Opportunity Commission.

13   Finally.  Count 7 of the indictment alleges conspiracy

14   to retaliate against a witness in violation of 18 USC Section

15   1513.  The object of the conspiracy, the indictment alleges, was

16   to kill Mr. Montoya in retaliation for providing testimony and

17   producing records or documents in an official proceeding

18   conducted by the EEOC.

19   Now, the defendant has entered a plea of not guilty to

20   the indictment denying that he committed any of the offenses

21   alleged in the indictment.

22   Now that you've heard a summary of the indictment, I

23   will begin the questions to you.  Remember if you have a

24   positive response, raise your hand and the marshal will bring

25   the microphone to you.  When he does or she does, state your

1    name and jury number and then proceed with your answer.  Some

2    questions we may take here at sidebar and I will let you know.

3           The first question, ladies and gentlemen, do any of you

4    already know about this case, either through your own personal

5    experience or by reading about it or learning about it through

6    any form of media?  Anybody already know about this case.  And

7    we will take your response at sidebar.  Counsel, if you will

8    join me.

9           (The following occurred at sidebar.)

10           THE COURT:  Ms. Brewington, would you like the defendant

11    here at sidebar or are you comfortable proceeding?

12           MS. BREWINGTON:  I'm comfortable proceeding.

13           THE COURT:  Yes, ma'am, your name and juror number.

14           PROSPECTIVE JUROR NUMBER 48:  Ashley Stanley, Number 48.

15           THE COURT:  And tell me what it is that you've learned.

16    Talk kind of closer to it.

17           PROSPECTIVE JUROR NUMBER 48:  Oh, I'm sorry.  So I was a

18    law enforcement officer for Pooler and Bloomingdale.  I was

19    raised right on the border of Pooler and Garden City.  I know

20    several officers that work for Garden City.  Of course, it was

21    all over the news there in Chatham County, WTOC, SAV.  So it's

22    ...

23           THE COURT:  Would the extent of your information that

24    you have make it difficult for you to be fair in this case?

25           PROSPECTIVE JUROR NUMBER 48:  No, I don't think it would

18

1    make it where I couldn't be fair.

2         THE COURT:  Would you be able to fair and impartial to

3    both sides?

4         PROSPECTIVE JUROR NUMBER 48:  Of course.

5         THE COURT:  The jury instructions that I'm going to give

6    every person selected to serve states that you can base your

7    verdict only on the evidence that's presented here in the

8    courtroom disregarding anything that you may have learned

9    outside of court.  Would you do that?

10         PROSPECTIVE JUROR NUMBER 48:  Yes, ma'am.

11         THE COURT:  As far as what it is that you've learned

12    outside the courtroom, can you tell us what that is?  What do

13    you remember?

14         PROSPECTIVE JUROR NUMBER 48:  So basically just about

15    the murder that took place with the employees of the tree

16    service and that it was a possible witness that was murdered for

17    giving information.

18         THE COURT:  So it sounds like you know sort of what I

19    summarized here; is that about right?

20         PROSPECTIVE JUROR NUMBER 48:  That is correct.

21         THE COURT:  Beyond that, have you learned anything else?

22         PROSPECTIVE JUROR NUMBER 48:  Not any inside details,

23    no.  Like I said, it's basically just what the news would tell

24    us about it.

25         THE COURT:  What about your association with law

19

1    enforcement?  Would that cause you any problems to be fair and

2    impartial to the defendant as well?

3          PROSPECTIVE JUROR NUMBER 48:  No, ma'am, I don't think

4    so.

5          THE COURT:  Any questions?

6          MS. BREWINGTON:  I didn't hear what you did with law

7    enforcement.

8          PROSPECTIVE JUROR NUMBER 48:  I was a law enforcement

9    officer with the City of Pooler and City of Bloomingdale.

10          MS. BREWINGTON:  When was that?

11          PROSPECTIVE JUROR NUMBER 48:  2010 and 2012 with the

12    City of Pooler and I did 2013 with the City of Bloomingdale.

13          THE COURT:  Any other questions?

14          MR. HOWARD:  No.

15          THE COURT:  You can return to your seat.

16          Thank you, ma'am.

17          (The following occurred in open court.)

18          THE COURT:  Ladies and gentlemen, my next question is I

19    want to explore whether you know any of the trial participants.

20    As you heard this morning, the United States is represented by

21    two Assistant United States Attorneys, Ms. Tania Groover and Mr.

22    Christopher Howard.  If you will both stand.

23          Are any of you related by blood or marriage to either of

24    these two prosecuting attorneys, Ms. Groover and Mr. Howard?  Do

25    any of you know either of them in any capacity?  Ms. Groover, if

20

 1   you will remain standing and call out the name of the United

 2   States Attorney and each of his assistants.

 3        MS. GROOVER:  The United States Attorney for the

 4   Southern District of Georgia is David Estes, and his assistants

 5   in the Savannah office are Justin Davids, Greg Gilluly, Ryan

 6   Grover, Louie (Alex) Hamner, John Harper, Darron Hubbard,

 7   Matthew Josephson, Jennifer Kirkland, Karl Knoche, Woelke

 8   Leithart, Marcela Mateo, Bradford Patrick, Frank Pennington,

 9   Jonathan Porter, Bishop Ravenel, Mary Sue Robichaux, Channell

10   Singh, Jennifer Solari, Michael Spitulnik, James Stuchell and

11   Bradley Thompson, and his assistants in the Augusta office are

12   Jason Blanchard, Jeremiah Johnson, Tara Lyons, Patricia Rhodes,

13   Jessica Rock, Giustina Simon, Jennifer Stanley, Shannon Statkus

14   and Henry Syms, Jr.

15        THE COURT:  Thank you, Ms. Groover.  Are any of you

16   related by blood or marriage to the United States Attorney or

17   any of his assistants?  Do any of you know any of those

18   attorneys in any capacity?  Yes.

19        PROSPECTIVE JUROR NUMBER 30:  Daniel Kane, Juror 30.  I

20   know John Harper.

21        THE COURT:  And how do you know Mr. Harper?

22        PROSPECTIVE JUROR NUMBER 30:  He's a friend of mine.

23        THE COURT:  Would the fact that your friend is in the

24   same office as these prosecuting attorneys influence your

25   decision in this case in any way.

21

1           PROSPECTIVE JUROR NUMBER 30:  No.

2           THE COURT:  Would you be fair and impartial to both

3    sides?

4           PROSPECTIVE JUROR NUMBER 30:  Yes.

5           THE COURT:  All right, thank you.  The defendant in this

6    case is represented by an Attorney Katie Brewington.

7           Ms. Brewington, if you will stand.  Are any of you

8    related by blood or marriage to Ms. Brewington?  Do any of you

9    know her in any capacity?  And Ms. Brewington, I understand you

10   will have attorney Lindy Moody at your side during the case; is

11   that correct?

12          MS. BREWINGTON:  Yes, Judge.

13          THE COURT:  Ms. Moody, if you will stand.  Are any of

14   you related by blood or marriage to Attorney Lindy Moody?  Do

15   any of you know her in any capacity?  All right, thank you.

16          Ms. Brewington, are there any attorneys that you

17   practice with in the Southern District of Georgia?

18          MS. BREWINGTON:  There is no other attorneys, Judge.

19          THE COURT:  All right, the defendant in this case is Mr.

20   Juan Rangel-Rubio.  Mr. Rangel-Rubio, if you will stand.  Are

21   any of you related by blood or marriage to Mr. Rangel-Rubio?  Do

22   any of you know him in any capacity?

23          Thank you, sir, you may have a seat.

24          Ms. Groover, if you will stand and introduce your case

25   agent.

1        MS. GROOVER:  Special Agent Harley Snipes with Homeland

2   Security Investigations.

3        THE COURT:  Are any of you related by blood or marriage

4   to this case agent?  Do any of you know him in any capacity?

5   All right, sir, you may have a seat.

6        Ms. Groover, if you will now stand and call out the

7   names of any witnesses who you might call during your

8   presentation of your case.

9        MS. GROOVER:  Yes, Your Honor.  Briefly if I may, during

10  the presentation of our case, there will be another individual

11  at counsel table.  Her name is Edwina Frame.  She works in our

12  office and will be assisting with the presentation of exhibits.

13       THE COURT:  Do any of -- she's not here yet to see her

14  but her name is Edwina Frame.  Are any of you related by blood

15  or marriage to Edwina Frame, who is employed by the US

16  Attorney's Office in Savannah, Georgia?  Do any of you know her

17  in any capacity?

18       All right, proceed with your witnesses.

19       MS. GROOVER:  Thank you, Your Honor.  Potential

20  witnesses in this case include Maria Montoya, Oscar Cruz, Jose

21  Santos Gutierrez, Joel Reyes Pena, Juan Ramirez, Ruben Ramirez

22  Hernandez, Jerad Brown, Raymundo Espino Vega, Carmen Brown,

23  Diego Torres, Gerardo Hernandez, Garden City Police Department

24  Lieutenant Roberto Rodriguez, Maria Gonzalez-Flores, Homeland

25  Security Investigations Special Agent Anthony Miranda, Stanley

23

1    Turner, Dr. Natasha Grandhi with the Georgia Bureau of

2    Investigation, ATF Firearms Examiner Kevin Rippman, Higinio

3    Perez-Bravo, Chad Fitzgerald with the FBI, US Attorney's Office

4    Investigative Auditor Karen Hartley and Homeland Security

5    Investigations Special Agent J. C. Lopez.

6             THE COURT:  Ladies and gentlemen, are any of you related

7    by blood or marriage to any of those potential Government

8    witnesses?  Do any of you know any of them in any capacity?

9             PROSPECTIVE JUROR NUMBER 48:  Ashley Stanley, Number 48.

10            THE COURT:  Who do you know?

11            PROSPECTIVE JUROR NUMBER 48:  I know Detective Roberto

12   Rodriguez with the Garden City Police Department.

13            THE COURT:  Was that through your prior employment?

14            PROSPECTIVE JUROR NUMBER 48:  It is, yes.

15            THE COURT:  Did you work with that detective?

16            PROSPECTIVE JUROR NUMBER 48:  The department that I

17   worked for worked with Garden City hand in hand on several

18   cases.  Not this particular case, but several others.  I also

19   went through the police academy with Detective Rodriguez.

20            THE COURT:  So that person was a member of your class?

21            PROSPECTIVE JUROR NUMBER 48:  Yes.

22            THE COURT:  Would those associations with that witness

23   cause you to credit their testimony more than you would others?

24            PROSPECTIVE JUROR NUMBER 48:  Honestly I'm going to say

25   yes but I could still be fair.

24

1          THE COURT:  All right.  Would you be fair and impartial

2     to both sides?

3          PROSPECTIVE JUROR NUMBER 48:  Yes, ma'am.

4          THE COURT:  Are you familiar with any other potential

5     witnesses in the case?

6          PROSPECTIVE JUROR NUMBER 48:  No other names sounded

7     familiar.

8          THE COURT:  And your jury number?

9          PROSPECTIVE JUROR NUMBER 48:  48.

10         THE COURT:  And, counsel, we will do followup later.

11    Anyone else familiar with those potential government witnesses?

12         The defendant is not required to produce any witnesses

13    or any evidence whatsoever.  Ms. Brewington, if you are aware of

14    any possible witnesses that the defendant may call in addition

15    to those whose names have already been called, if you will call

16    out their names at this point.

17         MS. BREWINGTON:  No witnesses, Judge.

18         THE COURT:  All right, thank you.  Are any of you

19    employees, officers, shareholders or directors of Wolf Tree or

20    Davey Tree Experts?  Are any of your family members so

21    associated with either of those two companies?

22         Do any of you have any physical challenge, be it

23    hearing, sight or otherwise, that would render you incapable of

24    performing your duties as a juror in this case?

25         Do any of you have any bias or prejudice for or against

25

1   the Government or the defendant?  Do any of you have any

2   religious or philosophical beliefs that would impair your

3   ability to sit in judgment in this case?

4           Do any of you now or have you ever worked for the United

5   States of America including having served in the armed forces?

6           PROSPECTIVE JUROR NUMBER 55:  Jose Velazquez, Juror

7   Number 55.  I served in the army for six years.

8           THE COURT:  What years were those?

9           PROSPECTIVE JUROR NUMBER 55:  1998 to 24.

10          THE COURT:  And what was your rank upon discharge?

11          PROSPECTIVE JUROR NUMBER 55:  E-5 Sergeant.

12          THE COURT:  All right, thank you, sir.

13          PROSPECTIVE JUROR NUMBER 27:  Robert Hill, Number 27.  I

14  was in the United States Navy for four years.

15          THE COURT:  And what years were those?

16          PROSPECTIVE JUROR NUMBER 27:  '91 through '94.

17          THE COURT:  What was your rank upon discharge?

18          PROSPECTIVE JUROR NUMBER 27:  E-3.

19          THE COURT:  Thank you, sir.

20          PROSPECTIVE JUROR NUMBER 28:  Carol Hines, Juror Number

21  28, I was in the army '94 through 2005.

22          THE COURT:  And your rank?

23          PROSPECTIVE JUROR NUMBER 28:  Sergeant E-5.

24          THE COURT:  Thank you, ma'am.  Do any of you currently

25  have any litigation against the United States of America or do

26

1   you contemplate any in the near future?  Have you or any close

2   member in your family ever been employed in a law enforcement

3   capacity?

4         PROSPECTIVE JUROR NUMBER 39:  Hi, I'm Cathy Porter,

5   Juror Number 39, and my husband is retired law enforcement for

6   30 years and then he worked for the District Court in Savannah

7   for eight years as a CSO.

8         THE COURT:  Tell me what his name is.

9         PROSPECTIVE JUROR NUMBER 39:  Kenneth Porter.

10        THE COURT:  And what group was he with before he became

11  a CSO?

12        PROSPECTIVE JUROR NUMBER 39:  He was with Savannah

13  police.

14        THE COURT:  And do you recall what his highest rank was

15  at that time?

16        PROSPECTIVE JUROR NUMBER 39:  He was lieutenant and he

17  was assistant commander of the counter narcotics.

18        THE COURT:  And can you share with us what his years of

19  service was in both of those capacities.

20        PROSPECTIVE JUROR NUMBER 39:  Let's see, he started in

21  '74 at the police department and retired in 2004 and went to

22  work the first of 2005 with the federal court and worked eight

23  years there, so 2013.

24        THE COURT:  Would that prior employment by your husband

25  influence your decision in this case in any way?

27

1           PROSPECTIVE JUROR NUMBER 39:  No.

2           THE COURT:  Would you be fair and impartial to both

3    sides?

4           PROSPECTIVE JUROR NUMBER 39:  Yes.

5           THE COURT:  All right, thank you, ma'am.

6           PROSPECTIVE JUROR NUMBER 48:  Ashley Stanley, Number 48.

7           THE COURT:  Detail for us again your employment.

8           PROSPECTIVE JUROR NUMBER 48:  From 2010 to 2012, I

9    worked as a law enforcement officer for the City of Pooler, and

10   in 2013, I worked for the City of Bloomingdale as a law

11   enforcement officer.  My husband is also retired from the City

12   of Pooler after 20 years.

13          THE COURT:  And what is his name?

14          PROSPECTIVE JUROR NUMBER 48:  John Stanley.

15          THE COURT:  Would those associations influence your

16   decision in this case in any way?

17          PROSPECTIVE JUROR NUMBER 48:  No.

18          THE COURT:  Would you be fair and impartial to both

19   sides?

20          PROSPECTIVE JUROR NUMBER 48:  Yes.

21          THE COURT:  All right, thank you, ma'am.

22          PROSPECTIVE JUROR NUMBER 34:  Clelia Moore, I'm Juror

23   Number 34.  I have a son who is a retired policeman who worked

24   in Spartanburg, South Carolina and he now is employed for the

25   City of Spartanburg as animal control.

28

```
1            THE COURT:  And what years has he served?

2            PROSPECTIVE JUROR NUMBER 34:  Oh, dear, let me think.

3   Probably '70 -- let's see, what is this -- 2000 and -- probably

4   '80 -- I'm going to say '82 to 2002.  That's approximate.

5            THE COURT:  And what was his highest position reached?

6            PROSPECTIVE JUROR NUMBER 34:  Well, he actually spent

7   part of that time as head of security at Coastal Carolina

8   University, and when he was there he was a major.

9            THE COURT:  Would anything about his employment

10  influence your decision in this case in any way?

11           PROSPECTIVE JUROR NUMBER 34:  No, ma'am.

12           THE COURT:  Would you be fair and impartial to both

13  sides?

14           PROSPECTIVE JUROR NUMBER 34:  Yes, ma'am.

15           THE COURT:  Thank you.

16           PROSPECTIVE JUROR NUMBER 19:  Anthony Garner, Juror

17  Number 19.  I have a sister who is a probation officer in

18  Savannah.

19           THE COURT:  Is she with the State of Georgia?

20           PROSPECTIVE JUROR NUMBER 19:  Yes.

21           THE COURT:  Would anything about that employment with

22  your sister influence your decision in this case in any way?

23           PROSPECTIVE JUROR NUMBER 19:  No, I don't think so.

24           THE COURT:  On your oath as juror, would you be fair and

25  impartial to both sides?
```

29

1          PROSPECTIVE JUROR NUMBER 19:  Yes.

2          THE COURT:  All right, thank you, sir.

3          A juror selected to sit on this case must be able to

4    render a verdict solely based on the evidence presented at the

5    trial and in the context of the law as I will give it to you in

6    my instructions, disregarding any idea or notions about the law,

7    any beliefs about the law that you may have encountered from

8    outside sources.  Is there anybody who would be unable to do

9    that?

10          The Government has the burden to prove the defendant's

11    guilt beyond a reasonable doubt.  You see, there's a presumption

12    of innocence in criminal trials.  As the defendant sits here

13    now, he is presumed innocent.  That presumption follows him

14    throughout the trial.  Is there anyone who believes that the

15    defendant is guilty right now?  Is there anyone who would not

16    require the Government to comply with its burden of proving

17    guilt?

18          Is there any member of the panel who has any special

19    disability that would make serving difficult?  As I mentioned

20    before, the indictment that I summarized for you, the indictment

21    is not evidence.  Is there anyone who doesn't understand that?

22          The law does not permit you to base your verdict on

23    emotions such as sympathy, prejudice, vengeance, fear or

24    hostility.  Is there anybody who would be unwilling or unable to

25    put emotions out of their mind and base the verdict on the facts

1    as presented as evidence?

2          Our law provides that a defendant does not have to

3    testify in a criminal case.  It's the Government's burden to

4    prove the defendant guilty of the charges alleged in the

5    indictment beyond a reasonable doubt.  The defendant doesn't

6    have to prove anything.  Is there anyone who will not follow

7    that principle of law?

8          Does anybody believe that a defendant's failure to

9    testify would be an indication of guilt?  Is there anyone who

10   would tend to believe the testimony of a government agent or

11   police officer over a private citizen simply because of that

12   witness' position?  Is there anyone who would tend to believe

13   the testimony of a private citizen over that of a government

14   agent or police officer simply because of that witness'

15   position?

16         Those of you who have worked in law enforcement have

17   already identified yourself.  Aside from those people, have any

18   of you received any training in law enforcement?

19         Do any of you have any reason why you couldn't give this

20   case your undivided attention and render a fair and impartial

21   verdict based on the evidence presented to you in the context of

22   the instructions on the law that I will deliver to you?  Are

23   there any of you who for any reason whatsoever could not or

24   would not render a fair and impartial verdict based on the

25   evidence in the context of the law?

1          If there are any positive responses to this question, I

2    will take them at sidebar.  And my question to you is:  Have any

3    of you or a close member of your family been involved in a

4    criminal proceeding either as a victim, a witness or a

5    defendant?  So you or a close family member ever been involved

6    in a criminal proceeding as a victim, or a witness or as a

7    defendant?  And if you will join me at sidebar.

8          (The following occurred at sidebar.)

9          THE COURT:  And again, Ms. Brewington, I will just take

10   it that you're fine being here at sidebar without Mr.

11   Rangel-Rubio unless you let me know that you want him here.

12         MS. BREWINGTON:  Yes, Judge.

13         THE COURT:  Ms. Stanley, tell us your response.

14         PROSPECTIVE JUROR NUMBER 48:  So my husband was actually

15   convicted of a federal felony back in 2014.

16         THE COURT:  All right, was that in Savannah?

17         PROSPECTIVE JUROR NUMBER 48:  It was.

18         THE COURT:  And who was the presiding judge?

19         PROSPECTIVE JUROR NUMBER 48:  I don't remember that.

20         THE COURT:  All right.

21         PROSPECTIVE JUROR NUMBER 48:  But Mike Schiavone was his

22   attorney.

23         THE COURT:  Do you remember who the particular

24   prosecutor was?

25         PROSPECTIVE JUROR NUMBER 48:  That I don't remember

32

1    either.

2            THE COURT:  Did you attend the trial?

3            PROSPECTIVE JUROR NUMBER 48:  I did.

4            THE COURT:  Was it in the federal courthouse in

5    Savannah?

6            PROSPECTIVE JUROR NUMBER 48:  It was.  It wasn't a jury

7    trial, though.

8            THE COURT:  It was a bench trial?

9            PROSPECTIVE JUROR NUMBER 48:  Uh-huh, he did a pleading.

10            THE COURT:  He pled guilty.  What was the charge?

11            PROSPECTIVE JUROR NUMBER 48:  Misprision of a felony.

12            THE COURT:  What was the underlying felony?

13            PROSPECTIVE JUROR NUMBER 48:  I don't know.

14            THE COURT:  Well, what did he help accomplish?

15            PROSPECTIVE JUROR NUMBER 48:  They accused him of

16    helping his family, which was the Fowlers from Pooler.

17            THE COURT:  So they accused him of trying to help out

18    his family?

19            PROSPECTIVE JUROR NUMBER 48:  Uh-huh.

20            THE COURT:  And what kind of problem was his family

21    having?

22            PROSPECTIVE JUROR NUMBER 48:  So that was the Fowler

23    family from Pooler that was I guess charged with the running

24    drugs and having a moonshine still and whatever.

25            THE COURT:  Oh, okay.  Well, do you feel like he was

33

1    treated fairly?

2            PROSPECTIVE JUROR NUMBER 48:  No, honestly.

3            THE COURT:  Would that experience influence the way you

4    view trials and so forth and the justice system?

5            PROSPECTIVE JUROR NUMBER 48:  It's definitely left a

6    sour taste in my mouth.

7            THE COURT:  Would it be hard to remove that?

8            PROSPECTIVE JUROR NUMBER 48:  Probably.

9            THE COURT:  Any questions?  Any objection to excusing

10   Ms. Stanley?

11           MS. BREWINGTON:  No objection, Your Honor.

12           MS. GROOVER:  No objection.

13           THE COURT:  This may not be the best jury for you to

14   serve on, and so I am going to excuse you with the thanks of The

15   Court for your honest answer and your prompt attendance.  Thank

16   you, Ms. Stanley.

17           PROSPECTIVE JUROR NUMBER 48:  Do I need to wait?

18           THE COURT:  You can leave if you want.

19           PROSPECTIVE JUROR NUMBER 48:  Okay, thank you.

20           THE COURT:  And I see that you're Number 3.  Tell us

21   your name.

22           PROSPECTIVE JUROR NUMBER 3:  Joy Bell.

23           THE COURT:  Tell us your response.

24           PROSPECTIVE JUROR NUMBER 3:  I was a witness in a case

25   in Hawaii in I think 2003, just to identify some equipment that

34

1    was taken out of my classroom.

2         THE COURT:  I see.  So you were a teacher and some

3    equipment was stolen.

4         PROSPECTIVE JUROR NUMBER 3:  Yes.

5         THE COURT:  Do you remember if it was a federal or state

6    case?

7         PROSPECTIVE JUROR NUMBER 3:  State.

8         THE COURT:  Would anything about that experience

9    influence your decision in this case in any way?

10        PROSPECTIVE JUROR NUMBER 3:  No.

11        THE COURT:  Would you be fair and impartial to both

12   sides?

13        PROSPECTIVE JUROR NUMBER 3:  Definitely.

14        THE COURT:  Was it a positive experience or a negative

15   experience or neutral?

16        PROSPECTIVE JUROR NUMBER 3:  Neutral.

17        THE COURT:  Any questions?

18        MS. BREWINGTON:  No questions.

19        THE COURT:  All right, thank you, ma'am.

20        MR. HOWARD:  In response to the question regarding

21   anybody has heard about this -- we will get to it.

22        THE COURT:  Yes, ma'am, your name and juror number.

23        PROSPECTIVE JUROR NUMBER 36:  Jury Number 36, Amy Ochoa.

24   I had misunderstood the question about the federal employment

25   earlier.

35

1          THE COURT:  Federal employment?

2          PROSPECTIVE JUROR NUMBER 36:  I am just a civilian

3     federal employee.  I thought it was just military so I raised my

4     hand and I put it back down.

5          THE COURT:  I see.  In what capacity?

6          PROSPECTIVE JUROR NUMBER 36:  I work for the Department

7     of Interior, United States Fish and Wildlife Service.  I'm a

8     park ranger.

9          THE COURT:  You are a park ranger?

10         PROSPECTIVE JUROR NUMBER 36:  Uh-huh.

11         THE COURT:  Where do you serve?

12         PROSPECTIVE JUROR NUMBER 36:  The Savannah Coastal

13    Refuges Complex, which includes Savannah Wildlife Refuge, Harris

14    Neck, Blackbeard Island, Wassaw, Wolf Island on Coastal Georgia.

15         THE COURT:  And how long have you served in that

16    capacity?

17         PROSPECTIVE JUROR NUMBER 36:  One year, two years.

18         THE COURT:  Would anything about that service influence

19    your decision in this case?

20         PROSPECTIVE JUROR NUMBER 36:  No.

21         THE COURT:  Would you be fair and impartial to both

22    sides?

23         PROSPECTIVE JUROR NUMBER 36:  Yes.

24         THE COURT:  Any further questions?

25         MS. GROOVER:  No.

1          THE COURT:  Thank you, ma'am.  What were you saying?

2          MR. HOWARD:  So you had asked earlier if anybody had

3    heard about this, any news coverage of it.  I think there was

4    more than one hand that was raised.  We spoke with one person,

5    but I think somebody had raised their hand.  Maybe at the end,

6    if there are any more questions, maybe we can revisit that.

7          THE COURT:  Yeah, we need to do that.

8          Your name and juror number.

9          PROSPECTIVE JUROR NUMBER 52:  Sally Tarasovic, Number

10   52.  I'm sorry.  I worked for Pennsylvania state police in the

11   eighties.  I testified against a guy that shot his mother three

12   times in the head.  I came into the barracks.  I was the only

13   one there, so I let him in and I was just a dispatcher, but I

14   ended up having to testify against him in court and he got

15   convicted.

16         THE COURT:  So you were a dispatcher?

17         PROSPECTIVE JUROR NUMBER 52:  Yes.

18         THE COURT:  This was what state?

19         PROSPECTIVE JUROR NUMBER 52:  Pennsylvania.

20         THE COURT:  This was in the eighties?

21         PROSPECTIVE JUROR NUMBER 52:  Yes.

22         THE COURT:  And you were called as a witness in a case

23   where a man shot his --

24         PROSPECTIVE JUROR NUMBER 52:  Wife.

25         THE COURT:  Wife in the head.  Would anything about your

37

1   experience as a dispatcher or your experiences in that

2   particular proceeding influence your decision in this case in

3   any way?

4         PROSPECTIVE JUROR NUMBER 52:  I don't think so, no.

5         THE COURT:  On your oath as a juror, would it?

6         PROSPECTIVE JUROR NUMBER 52:  No.

7         THE COURT:  Would you be fair and impartial to both

8   sides?

9         PROSPECTIVE JUROR NUMBER 52:  I think so.

10        THE COURT:  On your oath as a juror, would you?

11        PROSPECTIVE JUROR NUMBER 52:  Yes.  Also my daughter was

12  a victim of sexual assault by my ex-husband.  He was convicted

13  in like 2015.  She was like a -- between her age of 15 and 17 is

14  when this occurred.  She came forward and whatever and so

15  there's that.

16        THE COURT:  What state did that occur in?

17        PROSPECTIVE JUROR NUMBER 52:  That was in Tattnall

18  County, Georgia.

19        THE COURT:  And what year was that?

20        PROSPECTIVE JUROR NUMBER 52:  I think it was 2008 when

21  she came forward and like made the first accusation, but it took

22  a really long time for it to actually come to trial.

23        Thinking it was close to 2014 or 2015 when it actually

24  came to trial, and he pled guilty and he didn't -- he just got

25  probation.

1          THE COURT:  Do you feel like he was treated fairly?

2          PROSPECTIVE JUROR NUMBER 52:  I feel like he should have

3    gone to jail.

4          THE COURT:  Would anything about that experience

5    influence your decision in this case in any way?

6          PROSPECTIVE JUROR NUMBER 52:  No.

7          THE COURT:  Would you be fair and impartial to both

8    sides?

9          PROSPECTIVE JUROR NUMBER 52:  Yes.

10          THE COURT:  Any questions?

11          MS. BREWINGTON:  No, Your Honor.

12          THE COURT:  Thank you, ma'am.

13          (The following occurred in open court.)

14          THE COURT:  I asked about law enforcement training.  Do

15    any of you have any legal training in any capacity, any training

16    in the law?

17          PROSPECTIVE JUROR NUMBER 2:  My name is Sonya Ashburn,

18    Number 2.

19          THE COURT:  Ms. Ashburn, can you please stand up?

20          PROSPECTIVE JUROR NUMBER 2:  I'm a paralegal.

21          THE COURT:  Where do you work?

22          PROSPECTIVE JUROR NUMBER 2:  Currently I don't work.

23    I'm at home.

24          THE COURT:  What was your last job?

25          PROSPECTIVE JUROR NUMBER 2:  It was probably five, six

39

1    years ago.

2            THE COURT:  And who was that with?

3            PROSPECTIVE JUROR NUMBER 2:  Martha Hall.

4            THE COURT:  And what kind of law were you assisting

5    with?

6            PROSPECTIVE JUROR NUMBER 2:  Family.

7            THE COURT:  Have you ever worked in the criminal law

8    field?

9            PROSPECTIVE JUROR NUMBER 2:  A few cases, not many.

10           THE COURT:  Have you ever worked any federal cases?

11           PROSPECTIVE JUROR NUMBER 2:  No.

12           THE COURT:  All right, thank you, ma'am.

13           Have any of you ever had any dealings with the United

14   States Attorney's Office, Homeland Security Investigations, the

15   Savannah Police Department, the Garden City Police Department,

16   the Georgia Bureau of Investigations or the Bureau of Alcohol,

17   Tobacco, Firearms and Explosives, the FBI or the US Equal

18   Employment Opportunity Commission?  Any of you had any dealings

19   with any of those law enforcement or federal agencies?

20           The practice of plea bargaining is something many of you

21   may have heard of.  It is a lawful and proper practice.  In this

22   trial, you may hear from a witness or witnesses who have entered

23   a plea of guilty pursuant to a plea agreement with the

24   Government.

25           Would any of you not be able to be fair and impartial in

40

1  considering that witness' testimony?

2        Have any of you formed opinions about federal, state or

3  local law enforcement agents that would affect your ability to

4  be fair and impartial during the trial of this case?

5        Have any of you ever had a bad experience with our

6  criminal justice system that would affect your ability to be

7  fair in this case?  Do any of you support a ban on guns or

8  firearms or belong to an antigun organization?

9        Do any of you belong to a crime prevention group such as

10  a neighborhood watch?  Would any of you find it intimidating or

11  troubling to express your opinion if it was different from the

12  majority of the other jurors?

13        Do any of you think that our laws do not apply to aliens

14  who are here illegally?  Do any of you belong to groups that

15  advocate for immigration reform?  Have any of you ever been a

16  whistleblower or filed a complaint against another employee at

17  work?  Marshal.

18        PROSPECTIVE JUROR NUMBER 23:  Brittany Harte, 23.  I did

19  file a complaint against my supervisor.

20        THE COURT:  And approximately what year was that?

21        PROSPECTIVE JUROR NUMBER 23:  Last year so ...

22        THE COURT:  Has it resolved yet?

23        PROSPECTIVE JUROR NUMBER 23:  I ended up leaving and I

24  got a new job.

25        THE COURT:  All right.  Did that leave a bad taste in

41

1  your mouth?

2      PROSPECTIVE JUROR NUMBER 23:  I really like my new job

3  and it's closer to home, and so it ended up being positive.

4      THE COURT:  And in general, what was the nature of the

5  dispute that you had with your former employer?

6      PROSPECTIVE JUROR NUMBER 23:  Just I guess treating some

7  people differently than others.

8      THE COURT:  All right.

9      PROSPECTIVE JUROR NUMBER 23:  I guess we -- I'm a school

10 teacher so it was --

11     THE COURT:  Would you feel more comfortable discussing

12 the details at sidebar?

13     PROSPECTIVE JUROR NUMBER 23:  It doesn't matter to me.

14 Yeah, it was just like we had to cover double classes so ...

15     THE COURT:  All right.  And you eventually found a job

16 that you like better?

17     PROSPECTIVE JUROR NUMBER 23:  Yes.

18     THE COURT:  Would anything about that experience

19 influence your decision in this case in any way?

20     PROSPECTIVE JUROR NUMBER 23:  No.  I mean, once I did

21 report to the district, they ended up offering me another

22 position so, I mean, I felt like it went the right way.

23     THE COURT:  Would you be fair and impartial to both

24 sides in this case?

25     PROSPECTIVE JUROR NUMBER 23:  Yes.

42

```
1            THE COURT:  Thank you, ma'am.

2            PROSPECTIVE JUROR NUMBER 23:  Thank you.

3            THE COURT:  Have any of you ever felt discriminated

4    against at work because of your age or race or gender or

5    national origin?

6            PROSPECTIVE JUROR NUMBER 5:  I'm Justin Bisard.  I'm

7    Juror Number 5.

8            THE COURT:  Tell me about your experience in that

9    regard.

10           PROSPECTIVE JUROR NUMBER 5:  So it was like at a police

11   corporate convention, and a police officer dropped a gun.  You

12   know, I turned it in, but at first they thought we stole it

13   because they couldn't find it -- you know what I'm saying -- and

14   I have dreads, you know, kind of typical stereotype.

15           THE COURT:  How did that end up resolving?

16           PROSPECTIVE JUROR NUMBER 5:  Well, he didn't check like

17   at the front desk to see if anybody found it first, so then he

18   kind of started telling it so the police convention got kind

19   of -- got like crazy, and when they end up asking the hotel

20   manager, then the police officer ended up, you know, turning in

21   the gun and letting them know that they had -- like I had turned

22   it in.  I had found it.

23           THE COURT:  Would anything about that experience

24   influence your decision in this case in any way?

25           PROSPECTIVE JUROR NUMBER 5:  Not at all.
```

1    THE COURT:  Would you be fair and impartial to both

2  sides?

3    PROSPECTIVE JUROR NUMBER 5:  Of course.  Of course.

4    THE COURT:  All right, thank you, sir.

5    Having heard all of the questions that have been put

6  forth to you at this point, does any reason occur to any of you

7  why you would not be able to be fair and impartial to both

8  sides.

9    PROSPECTIVE JUROR NUMBER 42:  I'm Benjamin Schumm.  I'm

10  Juror Number 42.  Just thinking back to the question about would

11  I have any bias towards somebody testifying attached to a plea

12  bargain, I might not be able to separate that.

13    THE COURT:  All right.  Counsel, if you will come to

14  sidebar, and Juror Number 42, who I believe, Mr. Schumm.

15    PROSPECTIVE JUROR NUMBER 42:  Yes, ma'am.

16    THE COURT:  Let me explore that with you just a bit.

17    (The following occurred at sidebar.)

18    THE COURT:  So Juror Number 42, Mr. Schumm, and you were

19  thinking back toward the question that I asked about there may

20  be a witness who testifies that has entered into a plea of

21  guilty under a plea bargain, and you let us know that that may,

22  you may have trouble separating that; is that correct?  Tell me

23  what you mean by that.

24    PROSPECTIVE JUROR NUMBER 42:  Just that I would be under

25  the impression that there might be some kind of incentive for

44

1    the individual to testify for their own benefit.

2            THE COURT:  So you would tend to doubt their testimony

3    because they got something in return for their --

4            PROSPECTIVE JUROR NUMBER 42:  I don't know that I could

5    ignore it.  It's different than other witnesses.

6            THE COURT:  I see.  Any questions?

7            MS. BREWINGTON:  No.

8            MS. GROOVER:  No.

9            THE COURT:  Any objection to excusing Mr. Schumm?

10           MS. GROOVER:  No, no objection.

11           MS. BREWINGTON:  No objection.

12           THE COURT:  Very much appreciate your truthful answer

13   and we will find a different jury for you to serve on some day,

14   but this one is probably not the best one for you, so I am going

15   to excuse you with the thanks of The Court.

16           PROSPECTIVE JUROR NUMBER 42:  Okay, thank you.

17           THE COURT:  Thank you.  Ms. Groover, there's one more.

18           And you are Juror Number 15?

19           PROSPECTIVE JUROR NUMBER 15:  Yes.

20           THE COURT:  Ms. Ehrhart, tell me your response.

21           PROSPECTIVE JUROR NUMBER 15:  So not necessarily to this

22   question, I just wanted to get clarification.  There was a

23   question, a few questions back about Homeland Security.  I am an

24   immigrant and I have gone through the legal process, so I don't

25   know if that would be an answer to one of your questions.  The

45

1    way you worded that question I don't think it really applies.

2        THE COURT:  So you want to let us know that you're a

3    naturalized citizen?

4        PROSPECTIVE JUROR NUMBER 15:  Correct.

5        THE COURT:  Is that correct?  And would anything about

6    your naturalization influence your decision in this case in any

7    way?

8        PROSPECTIVE JUROR NUMBER 15:  I don't think so.  I think

9    I will be still be following the law.

10        THE COURT:  On your oath as a juror --

11        PROSPECTIVE JUROR NUMBER 15:  Correct.

12        THE COURT:  -- would you be fair and impartial to both

13    sides?

14        PROSPECTIVE JUROR NUMBER 15:  I believe so, I would

15    follow the evidence.

16        THE COURT:  Any questions?

17        MS. GROOVER:  No.

18        MS. BREWINGTON:  No.

19        THE COURT:  All right, thank you, ma'am.

20        Yes, ma'am, you're Juror Number 58 and your name.

21        PROSPECTIVE JUROR NUMBER 58:  Allison Zipperer.

22        THE COURT:  Okay.

23        PROSPECTIVE JUROR NUMBER 58:  As I've been thinking

24    about it, I do apologize for not speaking sooner, I don't

25    feel -- I may have some partiality with someone who has a plea

46

1    deal because of my father.  We had a federal case back in 1990.

2    It was involving drugs.  My dad went to prison.

3         And I don't know, from my experience of offering plea

4    deals, they were trying to get people to turn against him to rat

5    and things like that, and I don't know if I can be impartial to

6    people who have already been offered plea deals.

7         THE COURT:  Do you feel like it would be hard for you to

8    be fair?

9         PROSPECTIVE JUROR NUMBER 58:  Yes, ma'am, I absolutely

10   do.

11        THE COURT:  Any objection to excusing this witness?

12        MS. BREWINGTON:  No objection.

13        THE COURT:  I appreciate your honesty.  Thank you.

14        Good morning.  You're Juror Number 25.

15        PROSPECTIVE JUROR NUMBER 25:  I'm not sure I could be

16   unemotional with this trial in the sense of based off of what

17   I'm hearing already.  I have a feeling I'm going to go a certain

18   way.  I could feel it.

19        THE COURT:  She can't hear you.

20        PROSPECTIVE JUROR NUMBER 25:  I wanted to be honest

21   about that because I could feel myself already thinking about it

22   getting emotional.

23        THE COURT:  Do you feel like it would be difficult to

24   put your emotions aside?

25        PROSPECTIVE JUROR NUMBER 25:  It would be difficult,

47

1    yes, I feel it would be -- yeah, I want to be honest.

2        THE COURT:  Any objections to excusing this juror?  You

3    may be excused.  Thank you, ma'am.

4        PROSPECTIVE JUROR NUMBER 25:  Yes.

5        (The following occurred in open court.)

6        THE COURT:  All right, ladies and gentlemen, just a few

7    more questions.  Are any of you fluent in the Spanish language?

8        PROSPECTIVE JUROR NUMBER 55:  Juror Number 55, Jose

9    Velazquez, yes, I am fluent in Spanish.

10        THE COURT:  Thank you, sir.  Anyone else?

11        PROSPECTIVE JUROR NUMBER 20:  Jessica Gonzalez, Number

12    20, and, yes, I am fluent in Spanish.

13        THE COURT:  Thank you, ma'am.  Are any of you

14    naturalized citizens?

15        PROSPECTIVE JUROR NUMBER 55:  Yes, Your Honor, Juror

16    Number 55, Jose Velazquez, I'm naturalized.

17        THE COURT:  What year did you achieve naturalization?

18        PROSPECTIVE JUROR NUMBER 55:  I believe 2004.

19        THE COURT:  All right, thank you, sir.

20        PROSPECTIVE JUROR NUMBER 15:  Rita Ehrhart, Juror Number

21    15, I became naturalized in 2012.

22        THE COURT:  Thank you, ma'am.

23        Ladies and gentlemen, at this point, Ms. Sharp is going

24    to randomly draw names and have you reseated.  Once she draws

25    those names, we're going to take a quick comfort break and we

48

1    will proceed.  Ms. Sharp.

2         THE CLERK:  Ladies and gentlemen, as your name is called

3    if the first 14 will have a seat in the jury box, and then those

4    of you on this side of the courtroom, if you'll just kind of

5    shuffle and make room to fill the first probably three rows here

6    on this side.

7         Juror Number 45, Yolanda Sharpe.  Juror Number 43,

8    Elizabeth Scully.  Juror Number 46, Vivienne Shipman-Davis.

9    Juror Number 16, Maribeth Evans.  Juror Number 20, Jessica

10   Gonzalez.  Juror Number 37, David Palmer.  Juror Number 8,

11   Carrie Chick.  Juror Number 35, Heather Newsome.  Juror Number

12   34, Clelia Moore.  Juror Number 44, Ariana Session.  Juror

13   Number 19, Anthony Garner.  Juror Number 6, Mark Blanchard.

14   Juror Number 4, Michael Bennett.  Juror Number 36, Amy Ochoa.

15   Juror Number 15, Rita Ehrhart.  Juror Number 24, Alfreda Hatton.

16   Juror Number 33, Joy Bell.  Juror Number 31, Imani Lattimore.

17   Juror Number 23, Brittany Harte.  Juror Number 9, Christina

18   Croley.  Juror Number 29, Forrest Hunter.  Juror Number 5,

19   Justin Bisard.  Juror Number 10, Austin Davis.  Juror Number 40,

20   Gregory Robinson.  Juror Number 7, Hunter Booth.  Juror Number

21   52, Sally Tarasovic.  Juror Number 47, Kenyata Singleton.  Juror

22   Number 28, Carol Hines.  Juror Number 41, Matthew Roseman.

23   Juror Number 22, Melissa Green.  Juror Number 2, Sonya Ashburn.

24   Juror Number 27, Robert Hill.

25         THE COURT:  Ladies and gentlemen, we are nearing the

1    very end of the questioning.  As I said before, we're about to

2    take a brief comfort break.  It's important that you look

3    exactly where you are seated because when we come back from the

4    break you need to sit right back where you are, whether you're

5    on this side, this side.  Sit in your exact seat when we return.

6         I'm going to give you four rules that those of you who

7    are selected to serve will hear so many times that you can say

8    them to yourself, and I repeat them so much not because I like

9    to hear myself say them but because they are so important, so on

10   this break it is important that each of you don't discuss the

11   case.  You can talk with people about anything else, about

12   football, Halloween, whatever, but do not discuss the case on

13   this or other any break.  Keep an open mind.  We haven't even

14   begun the case.  We're not even finished with jury selection, so

15   keep an open mind.  Don't read, watch or listen to anything in

16   the media and don't do any independent research.

17        With that we will take a brief 15-minute comfort break.

18   We will be in recess until 10 minutes until 11:00.  Remember

19   those four rules.  Return to your seats and the marshals can

20   help you find the various restrooms in the building.

21        With that, the let's rise for these citizens.  And we

22   will be in recess until 10 'til 11:00.

23        (Recess from 10:34 a.m. to 10:53 a.m.)

24        THE COURT:  Ladies and gentlemen, welcome back into the

25   courtroom.  We did have one juror, Number 44, who had an

50

1    emergency, so we're going to randomly draw a replacement for her

2    seat for Number 44.  Ms. Sharp, if you will proceed.

3         THE CLERK:  Juror Number 30, Daniel Kane, and if you

4    will just come replace her seat.

5         THE COURT:  As I said, I have a last set of questions to

6    ask each of you individually.  As your name is called by Ms.

7    Sharp, if you will stand.  They'll bring the microphone to you

8    and I will walk you through the questions that are listed on the

9    sheet of paper that the marshals distributed.  Ms. Sharp again.

10        THE CLERK:  Juror Number 45, Yolanda Sharpe.

11        THE COURT:  Ms. Sharpe, your name?

12        PROSPECTIVE JUROR NUMBER 45:  Yolanda Sharpe.

13        THE COURT:  And where do you live?

14        PROSPECTIVE JUROR NUMBER 45:  In Savannah.

15        THE COURT:  How long have you lived there?

16        PROSPECTIVE JUROR NUMBER 45:  About 58 years.

17        THE COURT:  What is your occupation?

18        PROSPECTIVE JUROR NUMBER 45:  I am retired, but I went

19   back to work part time.  I am now systems navigator for the

20   Liberty County School System.

21        THE COURT:  And prior to that retirement, what was the

22   nature of your work?

23        PROSPECTIVE JUROR NUMBER 45:  I was a school social

24   worker.

25        THE COURT:  Are you married?

51

1          PROSPECTIVE JUROR NUMBER 45:  I am.

2          THE COURT:  And what does your spouse do?

3          PROSPECTIVE JUROR NUMBER 45:  My husband is a supervisor

4    for the International Longshoremen Association.

5          THE COURT:  Do you have children?

6          PROSPECTIVE JUROR NUMBER 45:  I do.

7          THE COURT:  How old are they?

8          PROSPECTIVE JUROR NUMBER 45:  38, 37, 34.

9          THE COURT:  And that are their occupations?

10          PROSPECTIVE JUROR NUMBER 45:  My 38-year-old is an event

11    planner.  My 37-year-old works for the International

12    Longshoreman Association and so does my 34-year-old.

13          THE COURT:  Have you ever served in the military?

14          PROSPECTIVE JUROR NUMBER 45:  No, I haven't.

15          THE COURT:  Have you ever served on a jury before?

16          PROSPECTIVE JUROR NUMBER 45:  No, I haven't.

17          THE COURT:  And your level of education?

18          PROSPECTIVE JUROR NUMBER 45:  I have a master's degree.

19          THE COURT:  All right, thank you, ma'am.

20          THE CLERK:  Juror Number 43, Elizabeth Scully.

21          THE COURT:  Ms. Scully, your full name.

22          PROSPECTIVE JUROR NUMBER 43:  Elizabeth Wardlaw Scully.

23          THE COURT:  Where do you live?

24          PROSPECTIVE JUROR NUMBER 43:  Richmond Hill, Georgia.

25          THE COURT:  How long?

52

1          PROSPECTIVE JUROR NUMBER 43:  30 years.

2          THE COURT:  And what is your occupation?

3          PROSPECTIVE JUROR NUMBER 43:  I'm retired.

4          THE COURT:  From?

5          PROSPECTIVE JUROR NUMBER 43:  I was a computer

6    instructor.

7          THE COURT:  Are you married?

8          PROSPECTIVE JUROR NUMBER 43:  Yes, I am.

9          THE COURT:  And what does your spouse do?

10         PROSPECTIVE JUROR NUMBER 43:  He's retired as well.

11         THE COURT:  From?

12         PROSPECTIVE JUROR NUMBER 43:  He was a salesman for

13   Rockwell.

14         THE COURT:  Do you have any children?

15         PROSPECTIVE JUROR NUMBER 43:  I do.  I have a daughter

16   who is 34, son who is 30.

17         THE COURT:  And what do they do?

18         PROSPECTIVE JUROR NUMBER 43:  My daughter is an

19   advertising and media person.  My son is a salesman as well.

20         THE COURT:  Have you ever served in the military?

21         PROSPECTIVE JUROR NUMBER 43:  No.

22         THE COURT:  Have you ever served on a jury before?

23         PROSPECTIVE JUROR NUMBER 43:  Yes.

24         THE COURT:  And without telling me what the verdict was,

25   was a verdict reached?

53

1          PROSPECTIVE JUROR NUMBER 43:  Yes.

2          THE COURT:  And your level of education?

3          PROSPECTIVE JUROR NUMBER 43:  I have a BS.

4          THE COURT:  Thank you.

5          THE CLERK:  Number 46, Vivienne Shipman-Davis.

6          THE COURT:  Good morning, your full name.

7          PROSPECTIVE JUROR NUMBER 46:  Good morning.  Vivienne

8    Annette Shipman-Davis.

9          THE COURT:  Where do you live?

10          PROSPECTIVE JUROR NUMBER 46:  Midway, Georgia.

11          THE COURT:  How long?

12          PROSPECTIVE JUROR NUMBER 46:  Off and on for 25 years.

13          THE COURT:  What's your occupation?

14          PROSPECTIVE JUROR NUMBER 46:  I'm an educator.  I have

15    done a lot of things.  Right now I'm on a break.  My mother

16    passed last year so I kind of took a break to take care of my

17    dad.

18          THE COURT:  What age children do you work with?

19          PROSPECTIVE JUROR NUMBER 46:  High school mainly and

20    some middle school.

21          THE COURT:  Are you married?

22          PROSPECTIVE JUROR NUMBER 46:  My husband passed four

23    years ago?

24          THE COURT:  Do you have children?

25          PROSPECTIVE JUROR NUMBER 46:  I do.

54

1          THE COURT:  How old are they?

2          PROSPECTIVE JUROR NUMBER 46:  28, 22 and 13.

3          THE COURT:  Do the older ones, what are their

4     occupations?

5          PROSPECTIVE JUROR NUMBER 46:  My son is in the United

6     States Army.  He's in intelligence, and my daughter, the

7     22-year-old, is in college and then the 13-year-old is in middle

8     school.

9          THE COURT:  Have you ever served in the military?

10         PROSPECTIVE JUROR NUMBER 46:  No, I have not.

11         THE COURT:  Have you ever served on a jury before?

12         PROSPECTIVE JUROR NUMBER 46:  No.

13         THE COURT:  And your level of education.

14         PROSPECTIVE JUROR NUMBER 46:  I have a Ph.D.

15         THE CLERK:  Juror Number 16, Maribeth Evans.

16         THE COURT:  Ms. Evans, your full name.

17         PROSPECTIVE JUROR NUMBER 16:  Maribeth Rose Evans.

18         THE COURT:  Where do you live?

19         PROSPECTIVE JUROR NUMBER 16:  Savannah, Georgia.

20         THE COURT:  How long?

21         PROSPECTIVE JUROR NUMBER 16:  About 36 years.

22         THE COURT:  And your occupation.

23         PROSPECTIVE JUROR NUMBER 16:  Nurse.

24         THE COURT:  Do you have a specialty or --

25         PROSPECTIVE JUROR NUMBER 16:  Not at this time.  I've

55

1    been doing care management.

2         THE COURT:  Are you married?

3         PROSPECTIVE JUROR NUMBER 16:  I am.

4         THE COURT:  And what does your spouse do?

5         PROSPECTIVE JUROR NUMBER 16:  He works at Gulfstream

6    Aerospace.

7         THE COURT:  Do you have children?

8         PROSPECTIVE JUROR NUMBER 16:  I do.

9         THE COURT:  How old?

10        PROSPECTIVE JUROR NUMBER 16:  42, 40, 36, 31, 30 and 30.

11        THE COURT:  My goodness.  What are their occupation?

12        PROSPECTIVE JUROR NUMBER 16:  My daughter is a nurse.

13   The next one is a director for a Japanese company.  The third

14   one works for an insurance company.  The fourth one is a

15   military spouse at Fort Bragg.  The fifth one is a chemist and

16   the sixth one is in NSA.

17        THE COURT:  Have you ever served in the military?

18        PROSPECTIVE JUROR NUMBER 16:  Just as a spouse and a

19   mom.

20        THE COURT:  Your husband was in which branch?

21        PROSPECTIVE JUROR NUMBER 16:  No.  My first husband.

22        THE COURT:  What branch was that?

23        PROSPECTIVE JUROR NUMBER 16:  Air force.

24        THE COURT:  Have you ever served on a jury before?

25        PROSPECTIVE JUROR NUMBER 16:  No.

56

1          THE COURT:  And your level of education.

2          PROSPECTIVE JUROR NUMBER 16:  Associate's degree.

3          THE COURT:  All right, thank you, ma'am.

4          THE CLERK:  Juror Number 20, Jessica Gonzalez.

5          THE COURT:  Ms. Gonzalez, your full name.

6          PROSPECTIVE JUROR NUMBER 20:  Jessica Lynn Gonzalez.

7          THE COURT:  Where do you live?

8          PROSPECTIVE JUROR NUMBER 20:  Hinesville, Georgia.

9          THE COURT:  How long?

10          PROSPECTIVE JUROR NUMBER 20:  About 22 years.

11          THE COURT:  What is your occupation?

12          PROSPECTIVE JUROR NUMBER 20:  I work at Gabriel House

13   Ranch in Midway.  Mr. Osteen is the owner.  He's also a lawyer

14   in Hinesville.

15          THE COURT:  What do you do there?

16          PROSPECTIVE JUROR NUMBER 20:  I'm a caregiver.

17          THE COURT:  Are you married?

18          PROSPECTIVE JUROR NUMBER 20:  No, ma'am.

19          THE COURT:  Do you have children?

20          PROSPECTIVE JUROR NUMBER 20:  No, ma'am.

21          THE COURT:  Have you ever served in the military?

22          PROSPECTIVE JUROR NUMBER 20:  No, ma'am.  My dad did.

23          THE COURT:  And what branch was he?

24          PROSPECTIVE JUROR NUMBER 20:  He was master first class.

25   I think that's how you say it or master sergeant or something

57

1    like that.

2            THE COURT:  In the army?

3            PROSPECTIVE JUROR NUMBER 20:  In the army, yes, ma'am.

4            THE COURT:  Have you ever served on a jury before?

5            PROSPECTIVE JUROR NUMBER 20:  No.  This is my first

6    time.

7            THE COURT:  And your level of education.

8            PROSPECTIVE JUROR NUMBER 20:  Just high school.

9            THE COURT:  Thank you, ma'am.

10           PROSPECTIVE JUROR NUMBER 20:  Yes, ma'am.

11           THE CLERK:  Juror Number 37, David Palmer.

12           THE COURT:  All right, Mr. Palmer, your full name.

13           PROSPECTIVE JUROR NUMBER 37:  David Whitney Palmer.

14           THE COURT:  Where do you live?

15           PROSPECTIVE JUROR NUMBER 37:  I live in Savannah,

16   Georgia.

17           THE COURT:  How long?

18           PROSPECTIVE JUROR NUMBER 37:  Two years.

19           THE COURT:  What is your occupation?

20           PROSPECTIVE JUROR NUMBER 37:  I'm a claims adjuster for

21   an insurance company.

22           THE COURT:  Are you married?

23           PROSPECTIVE JUROR NUMBER 37:  No.

24           THE COURT:  Do you have any children?

25           PROSPECTIVE JUROR NUMBER 37:  No.

58

1          THE COURT:  Have you ever served in the military?

2          PROSPECTIVE JUROR NUMBER 37:  I have not.

3          THE COURT:  Ever served on a jury before?

4          PROSPECTIVE JUROR NUMBER 37:  No.

5          THE COURT:  And your level of education.

6          PROSPECTIVE JUROR NUMBER 37:  Bachelor of science.

7          THE COURT:  All right, thank you, sir.

8          THE CLERK:  Juror Number 8, Carrie Chick.

9          THE COURT:  And your full name.

10         PROSPECTIVE JUROR NUMBER 8:  Carrie Stanley Chick.

11         THE COURT:  Where do you live?

12         PROSPECTIVE JUROR NUMBER 8:  Guyton, Georgia.

13         THE COURT:  How long?

14         PROSPECTIVE JUROR NUMBER 8:  13 years.

15         THE COURT:  What is your occupation?

16         PROSPECTIVE JUROR NUMBER 8:  I'm a teacher.

17         THE COURT:  What grade?

18         PROSPECTIVE JUROR NUMBER 8:  Middle school, sixth,

19    seventh and eighth graders.

20         THE COURT:  Are you married?

21         PROSPECTIVE JUROR NUMBER 8:  Yes, ma'am.

22         THE COURT:  What does your spouse do?

23         PROSPECTIVE JUROR NUMBER 8:  He is the university

24    photographer at Georgia Southern.

25         THE COURT:  Do you have children?

59

1    PROSPECTIVE JUROR NUMBER 8:  Yes, ma'am.

2    THE COURT:  How old?

3    PROSPECTIVE JUROR NUMBER 8:  Five and three.

4    THE COURT:  Have you ever served in the military?

5    PROSPECTIVE JUROR NUMBER 8:  No, ma'am.

6    THE COURT:  Ever served on a jury before?

7    PROSPECTIVE JUROR NUMBER 8:  No, ma'am.

8    THE COURT:  And your level of education.

9    PROSPECTIVE JUROR NUMBER 8:  BFA.

10    THE COURT:  Thank you, ma'am.

11    THE CLERK:  Juror Number 35, Heather Newsome.

12    THE COURT:  Ma'am, your full name.

13    PROSPECTIVE JUROR NUMBER 35:  Heather Newsome.

14    THE COURT:  Where do you live?

15    PROSPECTIVE JUROR NUMBER 35:  Ellabell, Georgia.

16    THE COURT:  How long?

17    PROSPECTIVE JUROR NUMBER 35:  About 20 years.

18    THE COURT:  What is your occupation?

19    PROSPECTIVE JUROR NUMBER 35:  I'm not employed.

20    THE COURT:  Have you pursued any line of work?

21    PROSPECTIVE JUROR NUMBER 35:  Not recent.  I have kids.

22    THE COURT:  That's a job.

23    PROSPECTIVE JUROR NUMBER 35:  Yeah, it is.

24    THE COURT:  Are you married?

25    PROSPECTIVE JUROR NUMBER 35:  I am.

60

1        THE COURT:  And what does your spouse do?

2        PROSPECTIVE JUROR NUMBER 35:  He is maintenance.  He

3   works, does maintenance for Ikea in Port Wentworth.

4        THE COURT:  How old are your children?

5        PROSPECTIVE JUROR NUMBER 35:  I have a 19-year-old

6   stepson and then I have a 14-year-old daughter, ten-year-old son

7   and a seven-year-old daughter.

8        THE COURT:  Does the older child work outside the home?

9        PROSPECTIVE JUROR NUMBER 35:  He does.  He's in the

10  navy.

11       THE COURT:  Have you ever served in the military?

12       PROSPECTIVE JUROR NUMBER 35:  No, ma'am.

13       THE COURT:  Have you ever served on a jury before?

14       PROSPECTIVE JUROR NUMBER 35:  No, ma'am.

15       THE COURT:  And your level of education.

16       PROSPECTIVE JUROR NUMBER 35:  High school diploma.

17       THE CLERK:  Juror Number 34, Clelia Moore.

18       THE COURT:  Your full name.

19       PROSPECTIVE JUROR NUMBER 34:  Clelia Wayne Pugh Moore.

20       THE COURT:  And where do you live?

21       PROSPECTIVE JUROR NUMBER 34:  I live in Savannah.

22       THE COURT:  How long?

23       PROSPECTIVE JUROR NUMBER 34:  About five years.

24       THE COURT:  What is your occupation?

25       PROSPECTIVE JUROR NUMBER 34:  I'm a retired art

61

1    educator.

2         THE COURT:  And what grades did you work with?

3         PROSPECTIVE JUROR NUMBER 34:  I taught elementary and I

4    taught middle gifted and then I taught college.

5         THE COURT:  Are you married?

6         PROSPECTIVE JUROR NUMBER 34:  I'm widowed.

7         THE COURT:  What did your spouse do?

8         PROSPECTIVE JUROR NUMBER 34:  He worked for bridge

9    design in South Carolina.

10         THE COURT:  Do you have children?

11         PROSPECTIVE JUROR NUMBER 34:  I have two sons.

12         THE COURT:  How old are they?

13         PROSPECTIVE JUROR NUMBER 34:  One is 54 and he is a

14    freelance photographer, and the other is 50 and he is a

15    policeman working with animal control.

16         THE COURT:  Have you ever served in the military?

17         PROSPECTIVE JUROR NUMBER 34:  No.

18         THE COURT:  Ever served on a jury?

19         PROSPECTIVE JUROR NUMBER 34:  Once.

20         THE COURT:  Without telling me what the verdict was, was

21    a verdict reached?

22         PROSPECTIVE JUROR NUMBER 34:  No.

23         THE COURT:  Is that because the jury was hung or because

24    an agreement was reached?

25         PROSPECTIVE JUROR NUMBER 34:  An agreement was reached.

62

```
1          THE COURT:  And your level of education?

2          PROSPECTIVE JUROR NUMBER 34:  Master's.

3          THE COURT:  Thank you, ma'am.

4          THE CLERK:  Juror Number 30, Daniel Kane.

5          THE COURT:  Your full name.

6          PROSPECTIVE JUROR NUMBER 30:  It's Daniel Luke Kane.

7          THE COURT:  Where do you live?

8          PROSPECTIVE JUROR NUMBER 30:  Savannah, Georgia.

9          THE COURT:  How long?

10         PROSPECTIVE JUROR NUMBER 30:  2007, I guess.

11         THE COURT:  What is your occupation?

12         PROSPECTIVE JUROR NUMBER 30:  I'm a bartender and a

13    server.

14         THE COURT:  Are you married?

15         PROSPECTIVE JUROR NUMBER 30:  No.

16         THE COURT:  Do you have any children?

17         PROSPECTIVE JUROR NUMBER 30:  No.

18         THE COURT:  Ever served in the military?

19         PROSPECTIVE JUROR NUMBER 30:  No.

20         THE COURT:  Ever served on a jury before?

21         PROSPECTIVE JUROR NUMBER 30:  No.

22         THE COURT:  And your level of education.

23         PROSPECTIVE JUROR NUMBER 30:  Bachelor's of science.

24         THE COURT:  Thank you, sir.

25         THE CLERK:  Juror Number 19, Anthony Garner.
```

63

1          THE COURT:  Sir, your full name.

2          PROSPECTIVE JUROR NUMBER 19:  Anthony Terrell Garner.

3          THE COURT:  Where do you live?

4          PROSPECTIVE JUROR NUMBER 19:  Savannah, Georgia.

5          THE COURT:  How long?

6          PROSPECTIVE JUROR NUMBER 19:  38 years.

7          THE COURT:  What is your occupation?

8          PROSPECTIVE JUROR NUMBER 19:  Insurance broker.

9          THE COURT:  Are you married?

10         PROSPECTIVE JUROR NUMBER 19:  No.

11         THE COURT:  Do you have any children?

12         PROSPECTIVE JUROR NUMBER 19:  Yes, four.

13         THE COURT:  How old are they?

14         PROSPECTIVE JUROR NUMBER 19:  18, 17, 15 and 14.

15         THE COURT:  Does the older one work outside the home?

16         PROSPECTIVE JUROR NUMBER 19:  College.

17         THE COURT:  Have you ever served in the military?

18         PROSPECTIVE JUROR NUMBER 19:  No.

19         THE COURT:  Ever served on a jury before?

20         PROSPECTIVE JUROR NUMBER 19:  Yes.

21         THE COURT:  Without telling me what the verdict was, was

22    a verdict reached?

23         PROSPECTIVE JUROR NUMBER 19:  Yes.

24         THE COURT:  And your level of education.

25         PROSPECTIVE JUROR NUMBER 19:  High school.

64

1        THE COURT:  Thank you, sir.

2        THE CLERK:  Juror Number 6, Mark Blanchard.

3        THE COURT:  Your full name.

4        PROSPECTIVE JUROR NUMBER 6:  Mark Lionel Blanchard.

5        THE COURT:  Where do you live?

6        PROSPECTIVE JUROR NUMBER 6:  Hinesville, Georgia.

7        THE COURT:  How long?

8        PROSPECTIVE JUROR NUMBER 6:  Approximately 13 years.

9        THE COURT:  What is your occupation?

10       PROSPECTIVE JUROR NUMBER 6:  I did truck driving for a

11  career.  I just recently switched to I work for JCB.  I build

12  skidsters.

13       THE COURT:  You build what?

14       PROSPECTIVE JUROR NUMBER 6:  Skidsters, heavy equipment.

15       THE COURT:  Are you married?

16       PROSPECTIVE JUROR NUMBER 6:  Yes, ma'am.

17       THE COURT:  And what does your spouse do?

18       PROSPECTIVE JUROR NUMBER 6:  She works at JCB, too.

19       THE COURT:  What is her role there?

20       PROSPECTIVE JUROR NUMBER 6:  Parts control.

21       THE COURT:  Do you have children?

22       PROSPECTIVE JUROR NUMBER 6:  Yes.

23       THE COURT:  And how old are they?

24       PROSPECTIVE JUROR NUMBER 6:  I have a son that's 34, a

25  daughter that's 27, a stepdaughter that's 27, another

65

1    stepdaughter that's 22 and a stepson that's 17.

2         THE COURT:  The older children, what are their jobs?

3         PROSPECTIVE JUROR NUMBER 6:  My son does engineering.

4    My daughter, she does -- she's a CNA, med tech.  Her oldest

5    daughter works in a bank.  Her middle daughter works as an

6    assistant manager for Parker's and the youngest one is at home.

7         THE COURT:  Have you ever served in the military?

8         PROSPECTIVE JUROR NUMBER 6:  No, ma'am.

9         THE COURT:  Have you ever served on a jury before?

10         PROSPECTIVE JUROR NUMBER 6:  Yes.

11         THE COURT:  And without telling me what the verdict --

12         PROSPECTIVE JUROR NUMBER 6:  As an alternate, I don't

13    know if that matter.

14         THE COURT:  Was a verdict reached?

15         PROSPECTIVE JUROR NUMBER 6:  No.

16         THE COURT:  Was it because an arrangement was reached or

17    because the jury was hung?

18         PROSPECTIVE JUROR NUMBER 6:  Because an arrangement was

19    met.

20         THE COURT:  And your level of education.

21         PROSPECTIVE JUROR NUMBER 6:  High school.

22         THE COURT:  Thank you, sir.

23         THE CLERK:  Juror Number 4, Michael Bennett.

24         THE COURT:  All right, sir, your full name.

25         PROSPECTIVE JUROR NUMBER 4:  Michael Scott Bennett.

66

1          THE COURT:  Where do you live?

2          PROSPECTIVE JUROR NUMBER 4:  Savannah, Georgia.

3          THE COURT:  How long?

4          PROSPECTIVE JUROR NUMBER 4:  About 44 years.

5          THE COURT:  What's your occupation?

6          PROSPECTIVE JUROR NUMBER 4:  I am an automotive service

7   writer, been a technician for 30 years, ten years service

8   writer.

9          THE COURT:  Are you married?

10         PROSPECTIVE JUROR NUMBER 4:  Yes, ma'am.

11         THE COURT:  And what does your spouse do?

12         PROSPECTIVE JUROR NUMBER 4:  She is an office manager

13  for a plumbing company.

14         THE COURT:  Do you have children?

15         PROSPECTIVE JUROR NUMBER 4:  Two.

16         THE COURT:  How old?

17         PROSPECTIVE JUROR NUMBER 4:  My daughter is 35.  My son

18  is 29.  My daughter is a logistics operator for Southern States

19  in Savannah, and my son works for an electrical company in

20  Pooler.

21         THE COURT:  Have you ever served in the military?

22         PROSPECTIVE JUROR NUMBER 4:  I have.

23         THE COURT:  What branch, remind me?

24         PROSPECTIVE JUROR NUMBER 4:  I was in the air guard for

25  six years, four years active, two years inactive, two years load

67

1    master, two years crew chief.

2            THE COURT:  Upon discharge what was your rank?

3            PROSPECTIVE JUROR NUMBER 4:  E-3, something like that.

4    That's a long time ago.

5            THE COURT:  What years was it?

6            PROSPECTIVE JUROR NUMBER 4:  '80 to '86.

7            THE COURT:  And have you ever served on a jury?

8            PROSPECTIVE JUROR NUMBER 4:  Yes.

9            THE COURT:  Without telling me what the verdict was, was

10    a verdict reached?

11            PROSPECTIVE JUROR NUMBER 4:  Yes, ma'am.

12            THE COURT:  And your level of education.

13            PROSPECTIVE JUROR NUMBER 4:  High school.

14            THE COURT:  All right, thank you, sir.

15            THE CLERK:  Number 36, Amy Ochoa.

16            THE COURT:  Your full name.

17            PROSPECTIVE JUROR NUMBER 36:  Amy Catherine Ochoa.

18            THE COURT:  Where do you live?

19            PROSPECTIVE JUROR NUMBER 36:  Savannah, Georgia.

20            THE COURT:  How long?

21            PROSPECTIVE JUROR NUMBER 36:  23 years.

22            THE COURT:  And what is your occupation?

23            PROSPECTIVE JUROR NUMBER 36:  I'm a civilian federal

24    employee with the US Fish and Wildlife Service.

25            THE COURT:  You're a marshal?

68

1            PROSPECTIVE JUROR NUMBER 36:  Park ranger.  I'm not law

2    enforcement, though.  I'm your friendly park ranger.  Just

3    kidding.

4            THE COURT:  Do you wear the tri-hat?

5            PROSPECTIVE JUROR NUMBER 36:  No.  That's park service.

6    Unfortunately, we don't have to wear the flat hats.

7            THE COURT:  Are you married?

8            PROSPECTIVE JUROR NUMBER 36:  Divorced.  Domestic

9    partner for about 15 years.

10           THE COURT:  And what does your partner do?

11           PROSPECTIVE JUROR NUMBER 36:  He works for the Savannah

12   Bee Company.

13           THE COURT:  In what capacity?

14           PROSPECTIVE JUROR NUMBER 36:  Shipping manager.

15           THE COURT:  Do you have children?

16           PROSPECTIVE JUROR NUMBER 36:  I have one child, 17, high

17   school student working at Starbuck's.

18           THE COURT:  Have you ever served in the military?

19           PROSPECTIVE JUROR NUMBER 36:  No, ma'am.

20           THE COURT:  Have you ever served on a jury before?

21           PROSPECTIVE JUROR NUMBER 36:  I have.

22           THE COURT:  And was a verdict reached?

23           PROSPECTIVE JUROR NUMBER 36:  Yes, ma'am.

24           THE COURT:  Your level of education?

25           PROSPECTIVE JUROR NUMBER 36:  Bachelor of science.

69

1          THE COURT:  Thank you, ma'am.

2          THE CLERK:  Juror Number 15, Rita Ehrhart.

3          THE COURT:  Ms. Ehrhart, your full name.

4          PROSPECTIVE JUROR NUMBER 15:  Rita Ehrhart.

5          THE COURT:  Where do you live?

6          PROSPECTIVE JUROR NUMBER 15:  Richmond Hill.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR NUMBER 15:  18 years.

9          THE COURT:  What's your occupation?

10          PROSPECTIVE JUROR NUMBER 15:  Personal banker.

11          THE COURT:  Are you married?

12          PROSPECTIVE JUROR NUMBER 15:  Yes.

13          THE COURT:  What does your spouse do?

14          PROSPECTIVE JUROR NUMBER 15:  He's retired, and he was

15  electronic fields engineer working on flight simulators,

16  helicopters for the military.

17          THE COURT:  Do you have children?

18          PROSPECTIVE JUROR NUMBER 15:  Yes, two, 15 and 17.

19          THE COURT:  Have you ever served in the military?

20          PROSPECTIVE JUROR NUMBER 15:  No.

21          THE COURT:  Have you ever served on a jury before?

22          PROSPECTIVE JUROR NUMBER 15:  No.

23          THE COURT:  And your level of education.

24          PROSPECTIVE JUROR NUMBER 15:  Master's.

25          THE COURT:  Thank you, ma'am.

70

1          THE CLERK:  Juror Number 24, Alfreda Hatton.

2          THE COURT:  Ma'am, your full name.

3          PROSPECTIVE JUROR NUMBER 24:  Alfreda Latasha Hatton.

4          THE COURT:  And where do you live?

5          PROSPECTIVE JUROR NUMBER 24:  Hinesville, Georgia.

6          THE COURT:  How long?

7          PROSPECTIVE JUROR NUMBER 24:  15 years.

8          THE COURT:  What is your occupation?

9          PROSPECTIVE JUROR NUMBER 24:  I'm a manager.

10         THE COURT:  Of what type of enterprise?

11         PROSPECTIVE JUROR NUMBER 24:  I have two businesses.

12  One is Marathon and another is a smoke shop.

13         THE COURT:  Are you married?

14         PROSPECTIVE JUROR NUMBER 24:  No.

15         THE COURT:  Do you have any children?

16         PROSPECTIVE JUROR NUMBER 24:  A 15-year-old son.

17         THE COURT:  Have you ever served in the military?

18         PROSPECTIVE JUROR NUMBER 24:  No, ma'am.

19         THE COURT:  Have you ever served on a jury before?

20         PROSPECTIVE JUROR NUMBER 24:  No, ma'am.

21         THE COURT:  And your level of education.

22         PROSPECTIVE JUROR NUMBER 24:  High school.

23         THE COURT:  Thank you, ma'am.

24         THE CLERK:  Number 3, Joy Bell.

25         THE COURT:  Your full name.

71

1          PROSPECTIVE JUROR NUMBER 3:  Joy K. Bell.

2          THE COURT:  And where you do live?

3          PROSPECTIVE JUROR NUMBER 3:  Springfield.

4          THE COURT:  How long?

5          PROSPECTIVE JUROR NUMBER 3:  35 years.

6          THE COURT:  What is your occupation?

7          PROSPECTIVE JUROR NUMBER 3:  I was a high school

8    secondary -- a high school science teacher.

9          THE COURT:  Are you married?

10          PROSPECTIVE JUROR NUMBER 3:  I am.

11          THE COURT:  What does your spouse do?

12          PROSPECTIVE JUROR NUMBER 3:  He's retired U. S. Army

13    officer.

14          THE COURT:  What rank did he achieve?

15          PROSPECTIVE JUROR NUMBER 3:  Colonel.

16          THE COURT:  Do you have children?

17          PROSPECTIVE JUROR NUMBER 3:  One.

18          THE COURT:  How old?

19          PROSPECTIVE JUROR NUMBER 3:  17.

20          THE COURT:  Have you ever served on a jury before?

21          PROSPECTIVE JUROR NUMBER 3:  I have not.

22          THE COURT:  Ever served in the military?

23          PROSPECTIVE JUROR NUMBER 3:  No, only as a spouse.

24          THE COURT:  And your level of education.

25          PROSPECTIVE JUROR NUMBER 3:  Master's.

72

1          THE COURT:  Thank you, ma'am.

2          THE CLERK:  Juror Number 31, Imani Lattimore.

3          THE COURT:  All right, Ms. Lattimore, your full name.

4          PROSPECTIVE JUROR NUMBER 31:  Imani Michelle Lattimore.

5          THE COURT:  And where do you live?

6          PROSPECTIVE JUROR NUMBER 31:  Hinesville, Georgia.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR NUMBER 31:  About 20-something years.

9          THE COURT:  What is your occupation?

10         PROSPECTIVE JUROR NUMBER 31:  I'm a self-employed hair

11    stylist.

12         THE COURT:  Are you married?

13         PROSPECTIVE JUROR NUMBER 31:  No, ma'am.

14         THE COURT:  Do you have any children?

15         PROSPECTIVE JUROR NUMBER 31:  I have one daughter.  She

16    is three.

17         THE COURT:  Have you ever served in the military?

18         PROSPECTIVE JUROR NUMBER 31:  No.

19         THE COURT:  Ever served on a jury before?

20         PROSPECTIVE JUROR NUMBER 31:  No.

21         THE COURT:  And your level of education.

22         PROSPECTIVE JUROR NUMBER 31:  Associate's degree.

23         THE COURT:  All right, thank you, ma'am.

24         THE CLERK:  Number 23, Brittany Harte.

25         THE COURT:  Ma'am, your full name.

73

1          PROSPECTIVE JUROR NUMBER 23:  Brittany Holman Harte.

2          THE COURT:  Where do you live?

3          PROSPECTIVE JUROR NUMBER 23:  Savannah, Georgia.

4          THE COURT:  How long?

5          PROSPECTIVE JUROR NUMBER 23:  For seven years now but I

6    used to live there as a child as well.

7          THE COURT:  And what is your occupation?

8          PROSPECTIVE JUROR NUMBER 23:  I'm a school librarian.

9          THE COURT:  What age?

10          PROSPECTIVE JUROR NUMBER 23:  Elementary.

11          THE COURT:  Are you married?

12          PROSPECTIVE JUROR NUMBER 23:  I am married, yes.

13          THE COURT:  And what does your spouse do.

14          PROSPECTIVE JUROR NUMBER 23:  He is a logistics manager.

15          THE COURT:  Do you have children?

16          PROSPECTIVE JUROR NUMBER 23:  No.

17          THE COURT:  Have you ever served in the military?

18          PROSPECTIVE JUROR NUMBER 23:  No.

19          THE COURT:  Ever served on a jury before?

20          PROSPECTIVE JUROR NUMBER 23:  No.

21          THE COURT:  And your level of education.

22          PROSPECTIVE JUROR NUMBER 23:  A master's degree.

23          THE COURT:  Thank you, ma'am.

24          PROSPECTIVE JUROR NUMBER 23:  Thank you.

25          THE CLERK:  Number 9, Christina Croley.

74

1        THE COURT:  Ms. Croley, your full name.

2        PROSPECTIVE JUROR NUMBER 9:  Christina Marie Croley.

3        THE COURT:  Where do you live?

4        PROSPECTIVE JUROR NUMBER 9:  Pooler.

5        THE COURT:  How long?

6        PROSPECTIVE JUROR NUMBER 9:  Two years.

7        THE COURT:  What is your occupation?

8        PROSPECTIVE JUROR NUMBER 9:  Retired, newspaper editor.

9        THE COURT:  Which newspaper did you work for?

10       PROSPECTIVE JUROR NUMBER 9:  *Stars and Stripes*.

11       THE COURT:  Is that a military?

12       PROSPECTIVE JUROR NUMBER 9:  It's for the military.

13       THE COURT:  Are you married?

14       PROSPECTIVE JUROR NUMBER 9:  Yes.

15       THE COURT:  And what does your spouse do?

16       PROSPECTIVE JUROR NUMBER 9:  He's retired real estate

17  management.

18       THE COURT:  Do you have a family military connection?

19       PROSPECTIVE JUROR NUMBER 9:  No.

20       THE COURT:  Do you have children?

21       PROSPECTIVE JUROR NUMBER 9:  One, a daughter, 33.  She's

22  in digital marketing.

23       THE COURT:  Have you ever served in the military?

24       PROSPECTIVE JUROR NUMBER 9:  No.

25       THE COURT:  Ever served on a jury before?

75

1          PROSPECTIVE JUROR NUMBER 9:  No.

2          THE COURT:  And your level of education.

3          PROSPECTIVE JUROR NUMBER 9:  College.

4          THE COURT:  Thank you, ma'am.

5          THE CLERK:  Juror Number 29, Forrest Hunter.

6          THE COURT:  Mr. Hunter, your full name.

7          PROSPECTIVE JUROR NUMBER 29:  Forrest Kyle Hunter.

8          THE COURT:  Where do you live?

9          PROSPECTIVE JUROR NUMBER 29:  Richmond Hill.

10          THE COURT:  How long?

11          PROSPECTIVE JUROR NUMBER 29:  22 years.

12          THE COURT:  What is your occupation?

13          PROSPECTIVE JUROR NUMBER 29:  Operations manager,

14   Southern Aviation, Pooler.

15          THE COURT:  Are you married?

16          PROSPECTIVE JUROR NUMBER 29:  Yes.

17          THE COURT:  What does your spouse do?

18          PROSPECTIVE JUROR NUMBER 29:  She works at a sporting

19   goods store in Jesup, Georgia.

20          THE COURT:  Do you have children?

21          PROSPECTIVE JUROR NUMBER 29:  Yes.

22          THE COURT:  How old?

23          PROSPECTIVE JUROR NUMBER 29:  16, 22 and 24.

24          THE COURT:  Do the older children work?

25          PROSPECTIVE JUROR NUMBER 29:  Students.

76

1          THE COURT:  Have you ever served in the military?

2          PROSPECTIVE JUROR NUMBER 29:  No, ma'am.

3          THE COURT:  Have you ever served on a jury before?

4          PROSPECTIVE JUROR NUMBER 29:  No, ma'am.

5          THE COURT:  And your level of education.

6          PROSPECTIVE JUROR NUMBER 29:  High school.

7          THE COURT:  Thank you, sir.

8          THE CLERK:  Juror Number 5, Justin Bisard.

9          THE COURT:  All right, your full name.

10         PROSPECTIVE JUROR NUMBER 5:  Justin Bisard.

11         THE COURT:  And where do you live?

12         PROSPECTIVE JUROR NUMBER 5:  I live in Effingham or

13    Rincon.

14         THE COURT:  How long?

15         PROSPECTIVE JUROR NUMBER 5:  It's been about 14, 15

16    years.

17         THE COURT:  What is your occupation?

18         PROSPECTIVE JUROR NUMBER 5:  I own a detailing company

19    so self-employed.

20         THE COURT:  Detail like cars?

21         PROSPECTIVE JUROR NUMBER 5:  Yeah, cars, RV's, trucks,

22    whatever you need cleaned up.

23         THE COURT:  Are you married?

24         PROSPECTIVE JUROR NUMBER 5:  No, no, I'm single.

25         THE COURT:  Do you have any children?

77

1          PROSPECTIVE JUROR NUMBER 5:  No, no children.

2          THE COURT:  Have you ever served in the military?

3          PROSPECTIVE JUROR NUMBER 5:  No, ma'am.

4          THE COURT:  Ever served on a jury before?

5          PROSPECTIVE JUROR NUMBER 5:  No, ma'am.

6          THE COURT:  And your level of education?

7          PROSPECTIVE JUROR NUMBER 5:  High school.  I got like

8   two years in college.

9          THE COURT:  Thank you, sir.

10          THE CLERK:  Juror Number 10, Austin Davis.

11          THE COURT:  Mr. Davis, your full name.

12          PROSPECTIVE JUROR NUMBER 10:  Austin Wyatt Davis.

13          THE COURT:  Where do you live?

14          PROSPECTIVE JUROR NUMBER 10:  Springfield, Georgia.

15          THE COURT:  How long?

16          PROSPECTIVE JUROR NUMBER 10:  12 years.

17          THE COURT:  What is your occupation?

18          PROSPECTIVE JUROR NUMBER 10:  I'm an X ray tech.

19          THE COURT:  Are you married?

20          PROSPECTIVE JUROR NUMBER 10:  No, ma'am.

21          THE COURT:  Do you have any children?

22          PROSPECTIVE JUROR NUMBER 10:  No, ma'am.

23          THE COURT:  Have you ever served in military?

24          PROSPECTIVE JUROR NUMBER 10:  No, ma'am.

25          THE COURT:  Ever served on a jury before?

78

1    PROSPECTIVE JUROR NUMBER 10:  First time.

2    THE COURT:  And your level of education.

3    PROSPECTIVE JUROR NUMBER 10:  BS.

4    THE COURT:  Thank you.

5    THE CLERK:  Juror Number 40, Gregory Robinson.

6    THE COURT:  Mr. Robinson, your full name.

7    PROSPECTIVE JUROR NUMBER 40:  Gregory Patrick Robinson.

8    THE COURT:  Where do you live?

9    PROSPECTIVE JUROR NUMBER 40:  Savannah, Georgia.

10   THE COURT:  How long have you lived there?

11   PROSPECTIVE JUROR NUMBER 40:  47 years.

12   THE COURT:  What is your occupation?

13   PROSPECTIVE JUROR NUMBER 40:  Operations manager for

14   Industrial Supply.

15   THE COURT:  Have you ever served in the military?

16   PROSPECTIVE JUROR NUMBER 40:  No, ma'am.

17   THE COURT:  Are you married?

18   PROSPECTIVE JUROR NUMBER 40:  No, ma'am.

19   THE COURT:  Do you have any children?

20   PROSPECTIVE JUROR NUMBER 40:  I have a 26-year-old

21   daughter in retail management.

22   THE COURT:  And have you ever served on a jury before?

23   PROSPECTIVE JUROR NUMBER 40:  I have not.

24   THE COURT:  Your level of education.

25   PROSPECTIVE JUROR NUMBER 40:  BS.

79

1          THE COURT:  All right, thank you.

2          THE CLERK:  Juror Number 7, Hunter Booth.

3          THE COURT:  All right, sir, your full name.

4          PROSPECTIVE JUROR NUMBER 7:  Hunter E. Booth.

5          THE COURT:  And where do you live?

6          PROSPECTIVE JUROR NUMBER 7:  Guyton, Georgia.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR NUMBER 7:  Five years.

9          THE COURT:  What's your occupation?

10         PROSPECTIVE JUROR NUMBER 7:  I'm technology support for

11   Chatham County Board of Education.

12         THE COURT:  Are you married?

13         PROSPECTIVE JUROR NUMBER 7:  Yes.

14         THE COURT:  And what does your spouse do?

15         PROSPECTIVE JUROR NUMBER 7:  She's a teacher.

16         THE COURT:  Do you have any children?

17         PROSPECTIVE JUROR NUMBER 7:  No, ma'am.

18         THE COURT:  Have you ever served in the military?

19         PROSPECTIVE JUROR NUMBER 7:  No, ma'am.

20         THE COURT:  Ever served on a jury before?

21         PROSPECTIVE JUROR NUMBER 7:  No, ma'am.

22         THE COURT:  And your level of education.

23         PROSPECTIVE JUROR NUMBER 7:  BS.

24         THE COURT:  All right, thank you.

25         THE CLERK:  Juror Number 52, Sally Tarasovic.

80

1          THE COURT:  All right, ma'am, your full name.

2          PROSPECTIVE JUROR NUMBER 52:  Sally Louise Tarasovic.

3          THE COURT:  Where do you live?

4          PROSPECTIVE JUROR NUMBER 52:  Savannah.

5          THE COURT:  How long?

6          PROSPECTIVE JUROR NUMBER 52:  29 years.

7          THE COURT:  What is your occupation?

8          PROSPECTIVE JUROR NUMBER 52:  I'm the manager of Forward

9   Intermodal in Savannah.  It's a trucking company.

10          THE COURT:  Are you married?

11          PROSPECTIVE JUROR NUMBER 52:  Divorced.

12          THE COURT:  What does your former spouse do?

13          PROSPECTIVE JUROR NUMBER 52:  He was an engineer for

14   Gulfstream.

15          THE COURT:  Do you have children?

16          PROSPECTIVE JUROR NUMBER 52:  I have a daughter, 31.

17   She's self-employed.

18          THE COURT:  In what capacity?

19          PROSPECTIVE JUROR NUMBER 52:  She was in the same

20   business that I'm in and she has recently just quit her job, and

21   she's exploring a few different things, merchandising,

22   caregiving, just different things right now.

23          THE COURT:  Have you ever served in the military?

24          PROSPECTIVE JUROR NUMBER 52:  No, ma'am.

25          THE COURT:  Ever served on a jury?

81

1           PROSPECTIVE JUROR NUMBER 52:  No, ma'am.

2           THE COURT:  And your level of education.

3           PROSPECTIVE JUROR NUMBER 52:  Associate's.

4           THE CLERK:  Number 47, Kenyata Singleton.

5           THE COURT:  Sir, your full name.

6           PROSPECTIVE JUROR NUMBER 47:  Kenyata Alquawon

7      Singleton.

8           THE COURT:  Where do you live?

9           PROSPECTIVE JUROR NUMBER 47:  Guyton.

10          THE COURT:  How long?

11          PROSPECTIVE JUROR NUMBER 47:  Five years.

12          THE COURT:  What's your occupation?

13          PROSPECTIVE JUROR NUMBER 47:  International Paper power

14     boiler operator.

15          THE COURT:  Are you married?

16          PROSPECTIVE JUROR NUMBER 47:  Yes.

17          THE COURT:  What your spouse do?

18          PROSPECTIVE JUROR NUMBER 47:  She doesn't work.

19          THE COURT:  Is she a homemaker?

20          PROSPECTIVE JUROR NUMBER 47:  She used to work in the

21     health field.

22          THE COURT:  Do you have children?

23          PROSPECTIVE JUROR NUMBER 47:  Yes.

24          THE COURT:  How old?

25          PROSPECTIVE JUROR NUMBER 47:  22, 18, 14, 13 and 10.

82

```
 1              THE COURT:  Do the older children work outside the home?

 2              PROSPECTIVE JUROR NUMBER 47:  The oldest works at

 3     Target.

 4              THE COURT:  Have you served in the military?

 5              PROSPECTIVE JUROR NUMBER 47:  No.

 6              THE COURT:  Ever served on a jury?

 7              PROSPECTIVE JUROR NUMBER 47:  No.

 8              THE COURT:  And your level of education.

 9              PROSPECTIVE JUROR NUMBER 47:  High school.

10              THE COURT:  Thank you, sir.

11              THE CLERK:  Juror Number 28, Carol Hines.

12              THE COURT:  Ms. Hines, your full name.

13              PROSPECTIVE JUROR NUMBER 28:  Okay, Carol Conyers Hines.

14              THE COURT:  Where do you live?

15              PROSPECTIVE JUROR NUMBER 28:  I live in Riceboro.

16              THE COURT:  How long?

17              PROSPECTIVE JUROR NUMBER 28:  Two years.

18              THE COURT:  What is your occupation?

19              PROSPECTIVE JUROR NUMBER 28:  I'm a teacher.

20              THE COURT:  What grades?

21              PROSPECTIVE JUROR NUMBER 28:  Sixth through eighth.

22              THE COURT:  Are you married?

23              PROSPECTIVE JUROR NUMBER 28:  I am married.

24              THE COURT:  And what does your spouse do?

25              PROSPECTIVE JUROR NUMBER 28:  He's an educator.
```

83

1          THE COURT:  What grades?

2          PROSPECTIVE JUROR NUMBER 28:  Sixth through eighth.

3          THE COURT:  Do you have children?

4          PROSPECTIVE JUROR NUMBER 28:  I do.  I have a son, 36.

5    He's a financial analyst and I have a daughter, 34, who works

6    with credit card fraud.

7          THE COURT:  Uncovering that or --

8          PROSPECTIVE JUROR NUMBER 28:  Yeah, uncovering and

9    preventing.

10          THE COURT:  And have you ever served in the military?

11          PROSPECTIVE JUROR NUMBER 28:  I have.

12          THE COURT:  What branch, remind me.

13          PROSPECTIVE JUROR NUMBER 28:  Army.

14          THE COURT:  And you were a sergeant?

15          PROSPECTIVE JUROR NUMBER 28:  Sergeant, yes.

16          THE COURT:  Have you ever served on a jury before?

17          PROSPECTIVE JUROR NUMBER 28:  I have not.

18          THE COURT:  And your level of education.

19          PROSPECTIVE JUROR NUMBER 28:  I'm a specialist.

20          THE COURT:  Thank you.

21          THE CLERK:  Juror Number 22, Melissa Green.

22          I skipped Number 41, Juror Number 41, Matthew Roseman.

23          THE COURT:  Mr. Roseman, your full name.

24          PROSPECTIVE JUROR NUMBER 41:  Matthew Roseman.

25          THE COURT:  Where do you live?

84

1          PROSPECTIVE JUROR NUMBER 41:  Savannah.

2          THE COURT:  How long?

3          PROSPECTIVE JUROR NUMBER 41:  15 years.

4          THE COURT:  What is your occupation?

5          PROSPECTIVE JUROR NUMBER 41:  I'm a sales manager for an

6    alcohol distribution company.

7          THE COURT:  Are you married?

8          PROSPECTIVE JUROR NUMBER 41:  I am not.

9          THE COURT:  Do you have any children?

10         PROSPECTIVE JUROR NUMBER 41:  I do not.

11         THE COURT:  Have you ever served in the military?

12         PROSPECTIVE JUROR NUMBER 41:  No.

13         THE COURT:  Ever served on a jury?

14         PROSPECTIVE JUROR NUMBER 41:  Yes.

15         THE COURT:  And without telling me what the verdict was,

16   was one reached?

17         PROSPECTIVE JUROR NUMBER 41:  Yes.

18         THE COURT:  And your level of education.

19         PROSPECTIVE JUROR NUMBER 41:  I have a BA.

20         THE CLERK:  Now Juror Number 22, Melissa Green.

21         THE COURT:  All right, ma'am, your full name.

22         PROSPECTIVE JUROR NUMBER 22:  Melissa Green.

23         THE COURT:  Where do you live?

24         PROSPECTIVE JUROR NUMBER 22:  Pooler.

25         THE COURT:  How long?

1          PROSPECTIVE JUROR NUMBER 22:  13 years.

2          THE COURT:  And what is your occupation?

3          PROSPECTIVE JUROR NUMBER 22:  Small business owner and a

4     recruiter for a home healthcare agency.

5          THE COURT:  As far as the small business goes, what is

6     the nature?

7          PROSPECTIVE JUROR NUMBER 22:  Commercial cleaning,

8     janitorial.

9          THE COURT:  Are you married?

10         PROSPECTIVE JUROR NUMBER 22:  Yes.

11         THE COURT:  What does your spouse do?

12         PROSPECTIVE JUROR NUMBER 22:  He is a case manager for

13    Savannah Tech.

14         THE COURT:  And when you say case manager, tell me what

15    that is.

16         PROSPECTIVE JUROR NUMBER 22:  He is working with the

17    grant-funded program within Savannah Tech and they help

18    returning citizens find job placement, housing, that sort of

19    thing.

20         THE COURT:  Do you have any children?

21         PROSPECTIVE JUROR NUMBER 22:  Four.

22         THE COURT:  How old?

23         PROSPECTIVE JUROR NUMBER 22:  26, 25, 23, 19.

24         THE COURT:  And do they work outside the home?

25         PROSPECTIVE JUROR NUMBER 22:  All except for the 19.

86

1          THE COURT:  And what are their jobs, the older ones?

2          PROSPECTIVE JUROR NUMBER 22:  The oldest one, she is a

3    manager for Wal-Mart logistics.  My son, he is retired from the

4    army.  He's a security officer now.  My middle daughter, she is

5    on FMLA.  She had a baby one month old.  She's a dispatcher for

6    Chatham County, and my 19-year-old, she's a student at Augusta

7    University.

8          THE COURT:  Have you ever served in the military?

9          PROSPECTIVE JUROR NUMBER 22:  No.

10          THE COURT:  Have you ever served on a jury before?

11          PROSPECTIVE JUROR NUMBER 22:  Yes.

12          THE COURT:  And without telling me what the verdict was,

13    was one reached?

14          PROSPECTIVE JUROR NUMBER 22:  Yes.

15          THE COURT:  And your level of education.

16          PROSPECTIVE JUROR NUMBER 22:  MBA.

17          THE CLERK:  Juror Number 2, Sonya Ashburn.

18          THE COURT:  Ms. Ashburn, your full name.

19          PROSPECTIVE JUROR NUMBER 2:  Sonya Kay Ashburn.

20          THE COURT:  Where do you live?

21          PROSPECTIVE JUROR NUMBER 2:  Springfield, Georgia.

22          THE COURT:  How long?

23          PROSPECTIVE JUROR NUMBER 2:  Four years.

24          THE COURT:  What is your occupation?

25          PROSPECTIVE JUROR NUMBER 2:  Currently I stay home with

87

1    my grandchildren.

2         THE COURT:  Was there a time when you were in the work

3    force?

4         PROSPECTIVE JUROR NUMBER 2:  I did.

5         THE COURT:  What jobs did you pursue?

6         PROSPECTIVE JUROR NUMBER 2:  I was a paralegal.

7         THE COURT:  And you shared with us the nature of that

8    work.  Are you married?

9         PROSPECTIVE JUROR NUMBER 2:  I am.

10        THE COURT:  What does your spouse do?

11        PROSPECTIVE JUROR NUMBER 2:  He works at Gulfstream.

12        THE COURT:  And your children, how old are they?

13        PROSPECTIVE JUROR NUMBER 2:  I have a 34-year-old, a 32,

14   31, 29 and 28.

15        THE COURT:  And what are their jobs?

16        PROSPECTIVE JUROR NUMBER 2:  34 is a homemaker.  32 is

17   an accountant.  31 works at Gulfstream.  29 works in insurance

18   and 28 works at Southern Metals.

19        THE COURT:  Have you ever served in the military before.

20        PROSPECTIVE JUROR NUMBER 2:  Only as a spouse.

21        THE COURT:  And remind me your spouse's branch.

22        PROSPECTIVE JUROR NUMBER 2:  He was in the army.

23        THE COURT:  And what was his rank upon discharge?

24        PROSPECTIVE JUROR NUMBER 2:  Chief warrant, 4.

25        THE COURT:  Have you ever served on a jury before.

88

1          PROSPECTIVE JUROR NUMBER 2:  No, ma'am.

2          THE COURT:  Your level of education.

3          PROSPECTIVE JUROR NUMBER 2:  Bachelor of political

4   science.

5          THE COURT:  Thank you, ma'am.

6          THE CLERK:  Juror Number 27, Robert Hill.

7          THE COURT:  Mr. Hill, your full name.

8          PROSPECTIVE JUROR NUMBER 27:  Robert Scott Hill.

9          THE COURT:  Where do you live?

10         PROSPECTIVE JUROR NUMBER 27:  Clyo.

11         THE COURT:  How long?

12         PROSPECTIVE JUROR NUMBER 27:  Eight and a half years.

13         THE COURT:  What is your occupation?

14         PROSPECTIVE JUROR NUMBER 27:  I'm a forklift operator at

15  Dollar Tree distribution center in Savannah.

16         THE COURT:  Are you married?

17         PROSPECTIVE JUROR NUMBER 27:  Engaged to my ex-wife.

18         THE COURT:  And what is her occupation?

19         PROSPECTIVE JUROR NUMBER 27:  She's a bus driver for

20  Effingham County.

21         THE COURT:  What age children does she drive?

22         PROSPECTIVE JUROR NUMBER 27:  She drives a special ed

23  bus so everywhere from elementary on up through high school.

24         THE COURT:  Do you have children?

25         PROSPECTIVE JUROR NUMBER 27:  We have a 29, a 29 and a

89

1      24.

2            THE COURT:  And what are their occupations?

3            PROSPECTIVE JUROR NUMBER 27:  One is a retail manager.

4      One is in school and the 24-year-old drives a Class A dump truck

5      for a hauling company.

6            THE COURT:  Have you ever served in the military?

7            PROSPECTIVE JUROR NUMBER 27:  Yes, ma'am.

8            THE COURT:  And remind me which branch.

9            PROSPECTIVE JUROR NUMBER 27:  U. S. Navy.

10           THE COURT:  Have you ever served on a jury before?

11           PROSPECTIVE JUROR NUMBER 27:  No, ma'am.

12           THE COURT:  And your level of education.

13           PROSPECTIVE JUROR NUMBER 27:  High school, ma'am.

14           THE COURT:  Thank you.

15           All right, this next question is for just those of you,

16     the 32 of you that I just asked the followup questions.  I want

17     to make sure that I didn't miss any hands.  I had asked earlier

18     this morning if any of you already knew about this case before

19     you got here, if any of you had already heard about it.

20           Those 32 of you who have just stood and gone through the

21     litany of questions with me, any of you already know about the

22     case before you got here this morning?  All right, counsel,

23     briefly to sidebar.

24           (The following occurred at sidebar.)

25           THE COURT:  I tried to ask all the questions that you

1    posed.  I might have phrased them a little bit differently or

2    combined them but did I miss anything?  Is there anything else I

3    need to ask either of the panel as a whole or individual jurors?

4         MS. BREWINGTON:  I've got nothing.

5         MR. HOWARD:  On the side of caution, maybe a catch-all

6    question, the way you phrased the last question, so to the

7    extent did anybody raise their hands but weren't called on for

8    any of those questions --

9         THE COURT:  Wait, what?  Anybody raise their hand?

10        MR. HOWARD:  But they weren't called on, so the concern

11   would be somebody in response to one of your questions that

12   raised their hand that they weren't called on, so as sort of

13   catch-all to make sure everybody who raised their hand in

14   response to an affirmative question.

15        THE COURT:  You've confused me.  I'm not going to ask

16   that by any means.

17        MS. GROOVER:  I think the confusion is that there were

18   people who raised their hand that heard about the case and --

19        THE COURT:  But I just asked them very directly have you

20   heard about the case, and they haven't.  So I could ask them

21   confirm that you didn't raise your hand this morning when I

22   asked it the first time, but it's been such a great jury

23   selection, I don't want to ask a bad question.

24        MR. HOWARD:  Understood.

25        (The following occurred in open court.)

1        THE COURT:  Ladies and gentlemen, that concludes all the

2  questions that need to be asked this morning at this point.  As

3  I mentioned before, the attorneys are going to exercise their

4  preemptory strikes.  They are going to strike a number of you by

5  exchanging the paper back and forth among the tables.  Marshal,

6  if you will start that process.

7        As counsel is making their final strikes, I will say to

8  all of you, once the names are read of the individuals selected

9  to serve on the jury, those who are not selected to serve, when

10 we break, you will be excused from further action on this case,

11 and it will be with the sincere thanks of The Court because you

12 appeared promptly and willing to serve, and as a result you will

13 not be called to serve for at least two years in federal court.

14       This counts as your service because you have put in all

15 morning here, willing to serve.  Those of you who are selected

16 to serve, once you're seated, you will be sworn in as jurors.

17 We will take a brief break.  You will find refreshments and

18 restrooms in your jury room during the break.

19       You will come back in and I will give you some

20 preliminary instructions on how to proceed with the case and

21 your duties as jurors and so forth.  I'll invoke a rule of

22 sequestration regarding the witnesses, and at that point we will

23 break for lunch.  You will be free to go to lunch whenever you

24 want.  You're not from this area and so the marshals can give

25 you suggestions for close places to eat.

1          Once you return from lunch, we will launch right into

2     the witnesses and proceed throughout the afternoon.  We start

3     court promptly every morning at 9:00.  We do as we did this

4     morning, have a brief comfort break, 15 minutes, mid-morning,

5     proceed until lunch break and break for lunch and come back and

6     have a brief 15-minute afternoon break, and then we wrap up

7     every day about 5:00 or 5:30 depending on where we are in the

8     natural course of a witness' testimony.

9          I will say also that during your service as a juror from

10    time to time you might see the parties or the attorneys on the

11    elevator or in the parking lot or something of that nature.

12    They won't speak to you.  It's not that they are being rude.

13    It's just that they are following my directions not to speak

14    with you.  We want everyone outside of this courtroom to know

15    what we know inside of it, and that is that the trial will be

16    conducted according to the rules, fairly and impartially, and

17    somebody might see you talking with an attorney and maybe you

18    were only exchanging pleasantries but it could be

19    misinterpreted, and for that reason I directed the attorneys and

20    the parties not to speak with you at all when we're outside the

21    courtroom.

22          THE CLERK:  Ladies and gentlemen if you are seated in

23    the jury box, if you will please find a seat back in the

24    courtroom, please.

25          Ladies and gentlemen, as your name is called if you will

1    please come forward and have a seat in the jury box.  Juror

2    Number 43, Elizabeth Scully.  Ms. Scully, if you will have a

3    seat at the next to last seat on the top.  Juror Number 46,

4    Vivienne Shipman-Davis.  Juror Number 16, Maribeth Evans.  Juror

5    Number 37, David Palmer.  Juror Number 35, Heather Newsome.

6    Juror Number 19, Anthony Garner.  Juror Number 6, Mark

7    Blanchard.  Juror Number 4, Michael Bennett.  Juror Number 36,

8    Amy Ochoa.  Juror Number 29, Forrest Hunter.  Juror Number 10,

9    Austin Davis.  Juror Number 40, Gregory Robinson.  Juror Number

10   41, Matthew Roseman.  Juror Number 27, Robert Hill.

11           THE COURT:  Counsel, does this appear to be the jury as

12   selected by counsel.

13           MS. GROOVER:  Yes, Your Honor.

14           THE COURT:  Ms. Brewington?

15           MS. BREWINGTON:  Yes, Your Honor.

16           THE COURT:  Is there any reason to believe that it was

17   not fairly and impartially selected?

18           MS. GROOVER:  No, Your Honor.

19           MS. BREWINGTON:  Judge, can I have a sidebar?

20           THE COURT:  Yes.

21           (The following occurred at sidebar.)

22           MS. BREWINGTON:  So, I have a Batson challenge mostly

23   because, out of their strikes, I think there was only one white

24   female.  Everybody else was either black females, Hispanic

25   females or black males.  We only ended up with two black people

94

1    on our jury out of the entire panel that was definitely more --

2    it looked like it was more diverse before those challenges were

3    made.

4         THE COURT:  All right, so you're making a Batson

5    challenge.

6         MS. BREWINGTON:  Uh-huh.

7         THE COURT:  And set forth your prima facie case.

8         MS. BREWINGTON:  So basically out of their challenges or

9    their strikes, there is one black male, one Hispanic female,

10   there is one, two, three black females who said nothing and then

11   another -- and then a white female.

12        THE COURT:  And you each gave up a strike voluntarily;

13   right?

14        MS. BREWINGTON:  We did.

15        THE COURT:  So you only exercised five strikes and you

16   think there were a black male, Hispanic female, two black

17   females and a white female.

18        MS. BREWINGTON:  Three black females, yes.  Number 24,

19   Number 31, Number 44 were black females.  Number 5 was a black

20   male.  Number 20 was a Hispanic female.

21        THE COURT:  Wait, so they exercised five strikes; right?

22        MS. BREWINGTON:  Five, yes.

23        THE COURT:  Okay, and of those five, one was a black

24   male.

25        MS. BREWINGTON:  Number 5, black male.

95

```
 1          THE COURT:  A Hispanic female.

 2          MS. BREWINGTON:  Number 20, yes, ma'am, female.

 3          THE COURT:  And a black female.

 4          MS. BREWINGTON:  Number 24.

 5          THE COURT:  And a black female.

 6          MS. BREWINGTON:  Number 31.

 7          THE COURT:  And a white female.

 8          MS. BREWINGTON:  Yes.

 9          THE COURT:  And can you give me those numbers again, the

10  black male was.

11          MS. BREWINGTON:  Number 5.

12          THE COURT:  And the Hispanic female.

13          MS. BREWINGTON:  Number 20.

14          THE COURT:  And black female.

15          MS. BREWINGTON:  Number 24.

16          THE COURT:  And the other black female.

17          MS. BREWINGTON:  31.

18          THE COURT:  And the white female.

19          MS. BREWINGTON:  Where did she go?

20          THE COURT:  52?

21          MS. BREWINGTON:  45.  That's a black female.

22          THE COURT:  52.  Oh, that's yours.

23          MS. BREWINGTON:  45, another black female.

24          THE COURT:  So three black females, a Hispanic female

25  and a black male.
```

96

1          MS. BREWINGTON:  Correct.

2          THE COURT:  All right, as far as I do find that you've

3    produced sufficient evidence to draw a conclusion that an

4    inference of discrimination has occurred, and so the burden now

5    shifts back to you to produce non-discriminatory reasons for

6    those strikes if you can.

7          MR. HOWARD:  We will, Your Honor.  What I would do is I

8    propose sort of walking through strike by strike our rationale,

9    and Ms. Groover will supplement that with additional reasons,

10   and let's go through them sort of in the order of striking

11   beginning with Juror Number 20.

12          Juror Number 20, based on my observations, was not as

13   attentive to other jurors in response to questions; that is,

14   while The Court was asking questions, she did not seem to pay

15   attention in the same manner that other jurors are.  That's a

16   concern for the Government as we present our case.  We want to

17   ensure that the jurors are attentive and listening to all the

18   evidence presented.

19          THE COURT:  Just one second.

20          (The following occurred in open court.)

21          THE COURT:  Ladies and gentlemen, let me just say we're

22   not conspiring against you.  We're almost finished.  We will be

23   able to proceed in just a moment.  We do appreciate your

24   patience.  It's important.  We're almost there.

25          (The following occurred at sidebar.)

97

1          THE COURT:  Proceed.

2          MR. HOWARD:  Turning now to Juror Number -- go ahead.

3          MS. GROOVER:  Additionally, Juror Number 23 speaks

4    Spanish, Your Honor.

5          THE COURT:  Is there anyone else that remains on the

6    panel that speaks Spanish?

7          MS. GROOVER:  Not that answered in the affirmative.

8          THE COURT:  Okay, and anything further regarding Number

9    20?

10          MR. HOWARD:  No, Your Honor.

11          THE COURT:  Then with regard to your next juror.

12          MR. HOWARD:  Next juror is Number 45, so Juror Number

13    45's husband worked with the longshoremen association.  You

14    know, there's some concerns that we have with the activities of

15    the longshoremen association.  Certainly not to disparage an

16    entire group, but there have been allegations in the past.

17    There have been law enforcement activities with respect to

18    longshoremen.  It raised our concern from the Government's

19    perspective of her husband's employment with the longshoremen

20    association.

21          MS. GROOVER:  In addition, Your Honor, I did observe her

22    with her eyes closed at one time while she was sitting in the

23    jury box.

24          THE COURT:  All right, and your next juror.

25          MR. HOWARD:  Turning to the next one, Your Honor, it's

1    Juror Number 5.  Juror Number 5 described a negative, a really

2    negative encounter that he had with law enforcement.  And I

3    think that is concerning since a number of law enforcement

4    witnesses will be presented in this case.  I think the nature of

5    his employment, he described having a detail business,

6    self-employed.  I think when we factor in people who have longer

7    periods of employment, perhaps more stable employment, so that

8    the issue of employment was a secondary concern for the

9    Government.  I think that's it as to 5.

10          THE COURT:  Then 24 and 31.

11          MR. HOWARD:  Number 31, Your Honor, 31 reported being

12   unemployed and single.  Again, the lack of employment is

13   concerning to the Government.  I think she may have mentioned

14   doing --

15          MS. GROOVER:  Hair.

16          MR. HOWARD:  -- hair stylist.  Did not seem to be stable

17   employment compared to some of the other jurors who did have

18   longer ties to the community, more stable employment, than sort

19   of hair stylist which does seem to fluctuate, and I would also

20   note that 31 was sitting right behind us during the second part

21   of the jury selection process, so when we turned, we did have

22   the opportunity to observe her, and I would note the same

23   attentive issues that came up earlier with respect to the

24   witness also came up with her, so it was engagement concern for

25   the Government.

99

1          MS. GROOVER:  And the disconnect.  She discloses she was

2    unemployed and then represented to The Court she was employed as

3    a hair stylist.

4          THE COURT:  Go ahead.

5          MR. HOWARD:  I was going to say specifically the little

6    summary of the juror information that we were provided lists her

7    as being unemployed, so that raises concern when the documents

8    that she submitted to The Court that comprise this form conflict

9    with what she is telling The Court, a sort of factual disparity.

10         THE COURT:  And then with regard to 24.

11         MR. HOWARD:  24 owned and operated, I believe, managed a

12   smoke shop.  That's concerning for the Government.  Smoke shops,

13   you know, perhaps fairly, unfairly are -- there's an association

14   with marijuana.

15         There is an association with illicit activity.  There's

16   a certain stigma with respect to those smoke shops so the nature

17   of that business, the concern from the Government's perspective

18   if she decides the guilt or innocence in a criminal case and

19   also there's a sort of regulatory oversight over smoke shops

20   that could make her more disfavor the Government, particularly

21   since the nature of those regulations are so in flux right now.

22         THE COURT:  All right, Ms. Brewington, I will give you a

23   chance to rebut any of that.

24         MS. BREWINGTON:  Number 44, I will just say that there

25   were many jurors that said that they had some type of

1    association with longshoremen but they are only pointing out

2    this particular one, Number 31.

3        THE COURT:  Is there anybody remaining on the jury that

4    has a longshore association?

5        MS. BREWINGTON:  Judge, that would take me a minute to

6    go back and see.  I just remember hearing it a lot over the last

7    couple of hours.

8        THE COURT:  Counsel, can anybody point to another juror

9    who is on the jury who has longshoremen --

10       MS. GROOVER:  I cannot think of anyone specifically with

11   longshoremen association.

12       THE COURT:  I did find that Ms. Brewington had set forth

13   a prima facie case, but having heard and considered the

14   explanations given by the prosecution I do find that for all of

15   the five strikes there has been a sufficient race and gender

16   neutral explanation that has been given.

17       I find that based on counsel's demeanor, based on my

18   observation of the potential jurors' demeanor, I find that those

19   are sufficient race and gender neutral explanations.

20       All five of the reasons given have really nothing to do

21   with race or gender.  With regard to Juror Number 5, the

22   negative encounter with law enforcement is sufficient.  With

23   regard to Number 20, her speaking Spanish is a case specific

24   reason to, having nothing to do with gender or race.

25       And with Number 24, the association with the smoke shop

1    and some of the activities that go on at those places is a

2    sufficient race and gender neutral explanation.

3         My only observations of Number 31 is she was not paying

4    attention for a good bit of the jury selection.  And with regard

5    to 45, the rationale given with regard to longshoremen

6    association is certainly race and gender neutral and does have

7    some bearing on law enforcement.

8         It is my understanding that in this district in

9    particular there have been multiple law enforcement exercises

10   and investigations with regard to that particular branch of the

11   longshoremen.

12        Those reasons are all not tied to race.  They are

13   neutral and in many instances have a factual connection to the

14   case.  They are reasonable explanations.

15        The jurors' demeanor along with counsel's demeanor all

16   lead me to conclude that the Batson charge should be overruled

17   and we will proceed accordingly, so when I ask you again if

18   there's any reason, you preserve your objections that you've

19   just made.  All right, counsel.

20        (The following occurred at sidebar.)

21        THE COURT:  Ladies and gentlemen, appreciate that.  We

22   rarely have to have sidebars, but when we do, we keep them as

23   brief as possible, and we are finished with that one.

24        Counsel, I had asked you if there was any reason that

25   you could think of that this jury was not fairly and impartially

1    selected.  Ms. Groover, anything?

2          MS. GROOVER:  No, Your Honor.

3          THE COURT:  And Ms. Brewington?

4          MS. BREWINGTON:  No, Judge.

5          THE COURT:  All right, well, ladies and gentlemen, you

6    have been selected to serve as the jurors in the case of the

7    United States of America versus Juan Rangel-Rubio.  In just a

8    moment, once we excuse those not selected, we're going to have

9    you sworn in as jurors.  We will then take a lunch break for

10   approximately one hour.

11         I'm going to ask that you return to the courtroom in

12   time for us to begin promptly at 1:15 and respect your fellow

13   jurors to get here in plenty of time for us to begin at 1:15.

14         When we do begin, I will complete your instructions on

15   your service.  I will invoke a rule regarding the witnesses and

16   then we will turn to the Government for their opening statement

17   followed by the Defense's opening statement and then we will

18   hear the witnesses.

19         As I said, those of you who are not selected, when we

20   break in just a minute, you're excused from further service and

21   excused with the thanks of The Court for your promptness, for

22   your willingness to serve.

23         This counts as your federal service.  Now you may get

24   called in your respective counties.  Those are different

25   sovereigns, but as for federal service, you performed your duty.

1          Those of you selected remember the four important rules.

2    When we leave the courthouse for lunch, don't discuss the case.

3    Don't make up your mind.  Don't do any independent research and

4    don't read, watch or listen to anything about the case.

5    Marshal, if you will excuse the jurors not selected at this

6    time.

7          Ladies and gentlemen, those of you who are selected, if

8    you will rise to receive the oath, and, Ms. Sharp, please

9    administer it.

10         (Jury panel sworn.)

11         THE COURT:  Please be seated.  I am going to give you

12   just the brief instructions so that you will make sure and

13   follow all of the rules during the lunch break.

14         Now that you've been sworn, I am going to give you the

15   preliminary instructions to guide your participation in the

16   trial.  At the very end of the case, I'll give you detailed

17   instructions about the law.

18         It's going to be your duty to find from the evidence

19   what the facts are.  You and you alone are the judges of the

20   facts.  You will then apply those facts to the law as I give it

21   to you.  You must follow that law whether you agree with it or

22   not.  It will be your duty to decide what happened so you can

23   determine whether the defendant is guilty or not guilty of the

24   crimes charged in the indictment.

25         Now, nothing I may say or do during the course of the

1   trial is intended to indicate or should be taken by you as

2   indicating what your verdict should be.  The evidence from which

3   you will find the facts will consist of the testimony of

4   witnesses, documents, and other things received into the record

5   as exhibits and any facts that the lawyers may agree to or

6   stipulate to or anything that The Court may instruct you to

7   find.

8           As I mentioned at the beginning of the morning, the

9   court reporter is making a complete stenographic record of all

10  that is said during the trial including the testimony of each

11  witness in case it should be necessary at a future date to

12  prepare printed transcripts of any portion of the trial

13  proceedings.  However, such transcripts if ever made will not be

14  made in sufficient time or sufficient format for you to utilize

15  during your deliberations so it's important that you appreciate

16  the testimony as it comes in.

17          However, you will be given access to any kind of papers

18  or tangible evidence that is shown to you.  You will have that

19  back in your jury room when you begin deliberations.

20          So on some occasions, exhibits may be handed to you

21  during the trial.  And others, they will just be shown on a

22  larger screen or on your computer screen.  Don't be concerned

23  because you will get to see and inspect at the end of the case

24  all the exhibits that are received into evidence.

25          Now certain things are not evidence and you must not

1    consider them.  I'll list those for you now.  First of all,

2    statements, arguments and questions by lawyers are not evidence.

3    Objections to questions are not evidence.  Now the lawyers have

4    an obligation to make objections if they believe that evidence

5    is being offered for an improper purpose under the rules of

6    evidence.  But don't be influenced by the objection itself.

7         If an objection is sustained, then ignore the question.

8    If an objection is overruled, treat the answer like you would

9    any other.

10         If you are ever instructed by me that some item of

11   evidence is received for a limited purpose only, it's important

12   that you follow that instruction.  Obviously testimony that The

13   Court has excluded or told you to disregard is not evidence and

14   must not be considered.

15         Also, anything that you may have heard outside the

16   courtroom is not evidence and must be disregarded.  You are to

17   decide the case solely on the evidence presented here in the

18   courtroom.

19         Now, during the course of the trial, I may occasionally

20   ask a question of a witness.  If I do that, it does not indicate

21   that I have any opinion about the facts of the case.  Indeed

22   nothing I say or do should lead you to believe I have any

23   opinion about the facts.  It's for you to decide the facts.

24         I may also have to interrupt the proceeding as we did

25   earlier this morning from time to time to confer with the

1  attorneys about the rules of law that apply in a given

2  situation.  We call that sidebar here at the bench.  If ever we

3  have an extended one, I will have you put somewhere more

4  comfortable than in those chairs but just know that we keep

5  those to a minimum.

6      The attorneys and the parties have worked very hard

7  before this day to organize the case and get it in a

8  presentation form that will go as smoothly as possible out of

9  respect for you.

10      See, we understand that you have busy lives outside of

11  this courtroom and we understand that your service on this jury

12  is just that:  It is service.  And so out of respect to you, the

13  parties and the attorneys deserve their days in court, but they

14  will not waste your time.

15      Now, there are two kinds of evidence that many of you

16  may have learned on TV or the movies.  There's direct and

17  circumstantial evidence.  Direct evidence is direct proof of a

18  fact like that of an eyewitness, while circumstantial evidence

19  is proof of facts from which you may infer or conclude that

20  other facts exist, and I will give you more instructions on that

21  at the end of the case, but I want you to know right from the

22  beginning that you may consider both types of evidence, both

23  direct and circumstantial.

24      Now, it's going to be up to you to decide which

25  witnesses to believe, which witnesses not to believe, how much

1    of any given witness' testimony to accept or reject, and I will

2    give you some guidelines for determining the credibility of

3    witnesses at the end of the case.

4          Now, as you've heard this is a criminal case.  There are

5    three basic rules about a criminal case that you must keep in

6    mind.

7          First, the defendant is presumed innocent until proven

8    guilty.  The indictment brought by the Government against the

9    defendant is only an accusation, nothing more.  It's not proof

10   of guilt or anything else.  The defendant therefore starts out

11   with a clean slate.

12         Second, the burden of proof is on the Government until

13   the very end of the case.  The defendant has no burden to prove

14   his innocence or to present any evidence or to testify.  Since

15   the defendant has the right to remain silent and may choose

16   whether to testify, you cannot legally put any weight on a

17   defendant's choice not to testify.  It's not evidence.

18         Third, the Government must prove the defendant's guilt

19   beyond a reasonable doubt, and I will give you further

20   instructions on that later, but bear in mind that the level of

21   proof required is quite high.

22         Now, in this case, the defendant is charged in Count 1

23   with conspiracy to conceal, harbor and shield illegal aliens in

24   violation of 8 USC Section 1324(A)(1)(A)(V)(1), and I will give

25   you detailed instructions on that law at the end of the case,

1  and those instructions will control your deliberations and

2  decisions, but in order to help you follow the evidence, I will

3  give you a summary of the elements of that offense that the

4  Government must prove to make its case.

5      A defendant can be found guilty of Count 1, conspiracy

6  to conceal, harbor and shield illegal aliens only if the

7  following facts are proven beyond a reasonable doubt:  First

8  that the defendant and one or more persons in some way agreed to

9  try to accomplish a shared and unlawful plan; second, that the

10  defendant knew the unlawful purpose of the plan and willfully

11  joined in it; and finally that the object of the conspiracy was

12  to conceal, harbor or shield from detection within the United

13  States an alien, knowing or in reckless disregard of the fact

14  that the alien had entered or remained in the United States in

15  violation of law and for the purpose of commercial advantage or

16  private financial gain.

17      The defendant is also charged in Count 2 with money-

18  laundering conspiracy in violation of 18 USC Section 1956(H).  A

19  defendant can be found guilty of money-laundering conspiracy in

20  Count 2 only if all of the following facts are proven beyond a

21  reasonable doubt:  First, that two or more people agreed to try

22  to accomplish a common and unlawful plan to violate 18 USC

23  Section 1956; and second, that the defendant knew about the

24  plan's unlawful purpose and voluntarily joined in it.

25      Next, the defendant is charged in Count 6 with

1   conspiracy to kill a witness in violation of 18 USC Section

2   1512(K).  A defendant can be found guilty of Count 6 only if all

3   the following facts are proved beyond a reasonable doubt:

4   First, that two or more people agreed to try to accomplish a

5   common and unlawful plan to kill Eliud Montoya with the intent

6   to prevent his attendance or testimony in an official

7   proceeding; and second, that the defendant knew about the plan's

8   unlawful purpose and voluntarily joined it.

9        Finally, the defendant can be convicted of Count 7,

10  conspiracy to retaliate against a witness in violation of 18 USC

11  Section 1513(F), only if the Government proves beyond a

12  reasonable doubt the following:  First, that two or more people

13  agreed to try to accomplish a common and unlawful plan to kill

14  Eliud Montoya with the intent to retaliate against him for his

15  attendance in an official proceeding or for any testimony given

16  or any record, document or other object produced by him in an

17  official proceeding; and second, that the defendant knew about

18  the plan's unlawful purpose and voluntarily joined in it.

19       As I said, ladies and gentlemen, that is a summary of

20  the elements that the Government is required to prove beyond a

21  reasonable doubt for each of those offenses.

22       At the end of the case, I will give you more detailed

23  instructions regarding each of those allegations.

24       Now, a few words about your conduct as jurors.  First I

25  instruct you that during the trial, you are not to discuss this

1   case with anybody or to permit anybody to discuss it with you.

2   Don't even discuss it amongst yourself.

3         You can talk about football.  You can talk about

4   Halloween.  You can talk about anything else.  You simply can't

5   talk about the case, not until you retire to the jury room at

6   the very end to reach your verdict after you've heard all the

7   evidence and closing arguments and the charge.

8         When I say you're not permitted to talk about the case,

9   by all means I include don't talk about the case electronically.

10  For goodness' sake don't tweet about it or Snapchat or Instagram

11  or post on a blog or anything electronic about the case.

12        When we break for lunch, your family members, your

13  coworkers may say, "Oh, my goodness, you were picked for jury

14  selection; what's the case about?"

15        I instruct you that you are to tell them simply that it

16  is a criminal case; it will be over at least by early next week,

17  and once it's over, you can tell them all about it.  But that's

18  all you can tell them at this point.

19        To do otherwise, would invite them to say something that

20  they may have heard about it and then all the hard work that

21  we've put in this morning to select fair and impartial people

22  like yourself will go out the window, so when anyone asks you

23  about it, let them know only that it's a criminal case and that,

24  once it's all over, you will be able to tell them all about it.

25        Second, I instruct you not to read or listen to anything

1  touching on the case in any way.  That includes any form of

2  media, and if by chance you were to hear something about the

3  case, you need to let the marshal know immediately.  Third,

4  don't do any independent research about the case, and by that I

5  mean the old-fashioned kind; don't go to where something is

6  alleged to have occurred, and I also mean the more modern way of

7  doing research, don't Google anybody, not terms, not people, not

8  events.

9        Finally, don't form any opinion until all the evidence

10  is in.  Keep an open mind throughout the trial.  Our law

11  requires jurors to follow those instructions regarding your

12  conduct to ensure a fair and impartial trial.

13        The reasons are important so I will tell them to you.

14  You see, our law does not permit jurors to talk with anyone else

15  about the case or to permit anybody to talk to them about it

16  because only you are authorized to render a fair verdict.  Only

17  you have been found to be fair; only you have sworn to be fair.

18  No one else is so qualified.

19        Our law does not permit jurors to talk among themselves

20  before deliberations because premature discussions can lead to a

21  premature final decision.

22        Our law doesn't permit you to visit a place discussed in

23  the testimony because you can't be sure that it's the same as it

24  was when it was alleged to have occurred.  By coming to a place

25  you in a sense become a witness, and you may have a mistaken

1   view of the scene.

2        Finally, our law requests that you not read or listen to

3   any news accounts of the case and that you not attempt to

4   research any fact or issue or law related to the case.  That's

5   because, as you know, your decision must be based only on the

6   evidence presented here in the courtroom.

7        You see, the law often uses words or phrases in

8   particularized meanings.  It wouldn't be fair to the parties for

9   you to base your decision on some Google search of what a term

10  is.  Anybody can put anything on the Internet.

11       These attorneys, these parties are counting on you to

12  base your decision only on evidence that's properly before you

13  that's been vetted through the rules of evidence and the proper

14  definitions afforded to important terms.

15       The rules are designed to help guarantee a fair trial

16  and our law consequently sets forth serious consequences if they

17  are not followed and I trust you understand and appreciate the

18  importance of following those rules, and in keeping with your

19  oath, I know you will do so.

20       Now, if you wish during the trial you can take notes,

21  and the marshals will pass out writing implements and paper.  If

22  you do take notes, keep those to yourself until you and your

23  fellow jurors go to the jury room to decide the case.  Don't let

24  note-taking distract you from actually appreciating the evidence

25  as it comes in.

1    You know, sometimes people in school miss things because

2    they are trying to write every word down, so if you do take

3    notes, try to not let it interfere with the actual trial.

4    When you leave the courtroom, you should leave your

5    notes in the jury room and the marshal will secure those.

6    Whether you take notes or not, you should rely on your own

7    memory of what was said.

8    Your notes are an assistance to your memory only.  They

9    are not entitled to any greater weight than your own memory or

10    impression about the testimony and evidence, and by all means,

11    don't allow another juror to take notes for you.  We rely on the

12    collective wisdom of all of you together to come up with a fair

13    and impartial verdict.

14    As I say, when we return from lunch, the trial will

15    begin.  The Government will make an opening statement, which is

16    simply an outline to help you understand the evidence as it

17    comes in.

18    Next the defendant's attorney may but does not have to

19    make an opening statement.  Opening statements are neither

20    evidence nor argument.  They are designed to give you a road map

21    of what each side believes the trial has in store.

22    After opening statements, the Government will present

23    its witnesses, one at a time.  They will be allowed to conduct a

24    direct examination.  The Defense will be allowed to

25    cross-examine and the Government will be allowed a brief

1   redirect.

2          After the Government has presented all of their

3   witnesses, the defendant can but does not have to present

4   witnesses.  If they choose to do so, they will be allowed

5   direct, the Government will be allowed cross and the Defense

6   will be allowed brief redirect.

7          Once all of the witnesses have been presented and all of

8   the evidence admitted, the attorneys will present their closing

9   arguments to you to summarize and interpret the evidence that

10  they believe that you have seen.

11         Then I will instruct you on the law and then you will

12  return to your jury room to deliberate on the verdict.

13         Counsel, are any of your witnesses present or are they

14  coming after lunch?

15         MS. GROOVER:  They are present but not in the courtroom.

16         THE COURT:  If you will bring them forth.

17         MS. GROOVER:  They are on the third floor.

18         THE COURT:  I will invoke the rule once we return from

19  lunch.  Ladies and gentlemen, we will break for lunch until --

20  let's say 1:25, so if you will return to the courthouse in time

21  to begin promptly at 1:25.  Let's rise for this jury.

22         (The jury exits the courtroom.)

23         THE COURT:  Counsel, we will be in recess until

24  approximately 1:25, and I will invoke the rule and then we will

25  launch right into opening.  Ms. Brewington, do you choose to do

115

```
1    an opening?

2              MS. BREWINGTON:  I do, Judge.

3              THE COURT:  Then 1:25.

4              (Recess from 12:20 p.m. to 1:30 p.m.)

5              THE COURT:  All right, let's bring in the jury.

6              (The jury enters the courtroom.)

7              THE COURT:  Welcome back, members of the jury.  I trust

8    you had sufficient time to get lunch.

9              At this point I will turn to the Government, if you will

10   call forth any witnesses that you have present in the

11   courthouse.

12             MS. GROOVER:  Thank you, Your Honor.

13             Maria Montoya is present in the courtroom, and there are

14   a number of witnesses outside the door in addition.  Your Honor,

15   we do have another interpreter that needs to be sworn in as

16   well.

17             THE COURT:  Mr. Interpreter, if you will come forward

18   and we will do that oath at this point.  Ms. Sharp, administer

19   it.

20             (Interpreter Javier Castillo sworn.)

21             INTERPRETER CASTILLO:  Javier Castillo.

22             THE COURT:  Ms. Sharp, if you will call to the well of

23   the court all witnesses who may be called.

24             THE CLERK:  If I can start by getting your name.

25             MR. JOSE LUIS SANTOS GUTIERREZ:  (Through the
```

116

1    interpreter) Jose Luis Santos Gutierrez.

2             THE CLERK:  And you, sir.

3             MR. JOEL ANTONIO REYES:  (Through the Interpreter) Joel

4    Antonio Reyes Pina.

5             MS. CARMEN BROWN:  Carmen Brown.

6             MR. JUAN RAMIREZ MENDOZA:  (Through the Interpreter)

7    Juan Ramirez Mendoza.

8             MS. MARIA MONTOYA:  Maria Montoya.

9             MR. RAYMUNDO ESPINO VEGA: (Through the Interpreter)

10   Raymundo Espino Vega.

11            THE CLERK:  Sir?

12            MR. RUBEN RAMIREZ HERNANDEZ:  Ruben Ramirez Hernandez.

13            THE CLERK:  One more time.

14            MR. RUBEN RAMIREZ HERNANDEZ:  (Through the Interpreter)

15   Ruben Ramirez Hernandez.

16            MR. GERARDO HERNANDEZ:  (Through the Interpreter)

17   Gerardo Hernandez.

18            MR. JERAD BROWN:  Jerad Brown.

19            MS. MARIA DELROSARIO GONZALEZ TORRES:  (Through the

20   Interpreter) Maria Delrosario Gonzalez Torres.

21            MR. DIEGO TORRES:  Diego Torres.

22            THE CLERK:  If you will all please raise your right

23   hand.

24            (Witnesses sworn.)

25            THE COURT:  Ladies and gentlemen, The Court has invoked

1     a rule of procedure which requires all but the parties, the

2     victims and case agent to be outside of the court until you're

3     called into the court to testify.

4            Unless you are a victim or a case agent, you must remain

5     outside the courtroom until called to testify.  Indeed, while

6     waiting to testify, you are not to discuss your testimony with

7     anyone.  However, you can talk about your testimony with the

8     attorneys for either side but not within the earshot of other

9     witnesses.

10           Any violation of that rule could result in you not only

11    being excluded as a witness but being found in contempt of

12    court.

13           Ladies and gentlemen, you may now withdraw from the

14    courtroom.

15           MS. GROOVER:  Your Honor, for purposes of the record,

16    Ms. Montoya would like to remain in the courtroom.

17           THE COURT:  In her status as a victim?

18           MS. GROOVER:  Yes, Your Honor.

19           THE COURT:  Any objection, Ms. Brewington?

20           MS. BREWINGTON:  None, Judge.

21           THE COURT:  Counsel, if there are any witnesses who are

22    not present, I direct you to notify them that The Court has

23    invoked a rule requiring their absence from the courtroom until

24    they are called to testify.

25           MS. GROOVER:  We will so notify them, Your Honor.

1        THE COURT:  Before I call on the Government for opening,

2   ladies and gentlemen, I do want to explain, as you've seen,

3   certain witnesses do not speak English and so we are employing

4   an interpreter to interpret.

5        We seek a fair trial for all regardless of what language

6   they may speak, so we're going to have interpreters to assist us

7   through these proceedings and you should know from the beginning

8   what they can and what they can't do.

9        Basically, the interpreter is here only to help us

10  communicate during the proceedings.  They are not a party to the

11  case.  They have no interest in the case and they will be

12  completely neutral.

13       Accordingly, they are not working for either party.  The

14  interpreter's sole responsibility is to enable us to communicate

15  with each other.  Treat the interpreter of the witness'

16  testimony as if the witness had spoken English and no

17  interpreter was necessary.

18       Do not allow the fact that testimony is given in a

19  language other than English to influence you in any way.  If any

20  of you do understand the Spanish language, disregard completely

21  what the witness says in their native language.  Consider as

22  evidence only what is provided by the interpreter in English.

23       If you think an interpreter has made a mistake, you may

24  bring it to the attention of The Court but you should make your

25  deliberations on the basis of the official interpretation.

1           With that, I will call on the United States for opening

2   statements.  You will recall that the opening statements are

3   neither evidence nor or they the law.  They are provided to give

4   you a road map of what each party intends to cover and you

5   should pay close attention.

6           Mr. Howard.

7           MR. HOWARD:  Thank you, Your Honor.

8           Sometimes, nothing is more dangerous than the truth.

9   This case will show that.  Eluid Montoya worked for Wolf Tree, a

10  tree company.  He saw his colleagues, his coworkers, who were

11  being mistreated.

12          So instead of keeping his head down, instead of ignoring

13  it, he raised his voice.  He went to the company to complain.

14  He went to a federal agency to complain.  He blew the whistle

15  and exposed a multi-million dollar scheme of hiring and

16  mistreating illegal aliens, and for that, this man, Eluid

17  Montoya, was silenced, shot through the mouth, silenced with

18  bullet after bullet, murdered because he had the courage to

19  speak the truth.

20          Fortunately the evidence reveals who murdered Eluid

21  Montoya.  You will hear how Juan Rangel-Rubio told that to

22  agents when he was interviewed and he's right.  The evidence in

23  this case will show that Juan Rangel-Rubio had the motive to

24  murder Eluid Montoya, had the means to do it, and, when

25  presented with the opportunity, he took it.  You can think of it

120

1    as MMO, the motive, the means and the opportunity.

2         Now, when we talk about motive, what we're really asking

3    is why, why kill Eluid Montoya.  Well, to answer that, let's not

4    start with the darkness of his death.  Let's talk about Eluid

5    Montoya's life.

6         Born in Mexico, he immigrated lawfully to the United

7    States.  He became a US citizen.  He raised his family here, and

8    to support them, he worked at a tree company called Wolf Tree

9    where he trimmed and cut trees.  It was hard work.

10        He was a natural-born leader.  You will hear how he got

11   the nickname the General.  And as he worked at Wolf Tree, he saw

12   that his colleagues were working 60 to a hundred hours a week

13   and they weren't being paid overtime.  Sometimes they weren't

14   being paid at all, and if they got injured on the job, they

15   would be told not to go to the hospital.

16        And why, why were his coworkers allowed to be

17   mistreated?  Well, you will hear that most of his coworkers were

18   illegal aliens, people who risked exposing themselves by

19   speaking out.

20        Now perhaps they could have gone to their supervisor;

21   perhaps they could have gone to their foreman.  But you will

22   hear that in the Savannah area, all the Savannah area employees

23   were supervised by Pablo Rangel-Rubio.  You will hear that Juan

24   Rangel-Rubio, his brother, worked as a foreman.

25        Pablo and Juan are both illegal aliens.  You will hear

1    how Pablo hired and arranged for other illegal aliens to work

2    for Wolf Tree, working under assumed names, working under the

3    names of US citizens, and you will hear how Juan was a foreman

4    in charge of a crew of tree trimmers and you will hear this was

5    a profitable business for the Rangel-Rubio brothers.

6              You will hear how they arranged not only to receive pay

7    from the company for their own work but also arranged for other

8    people's paychecks to come to their bank accounts.

9              Juan received up to $3,000.00 a week into his bank

10   accounts from the company.  You will hear Juan describe how he

11   made over a hundred thousand dollars a year.  And you'll see

12   bank records and the financial documents that show Juan and

13   Pablo received over 3.5 million dollars as a result of this

14   scheme.

15             They lived on a 26-acre ranch in Rincon, Georgia.  You

16   will hear it described as a compound.  This was a profitable

17   business, not just for them, but for their family as well.

18   Juan's son and his family members also worked at Wolf Tree, even

19   though they legally couldn't.

20             The scheme that he and his brother engaged in profited

21   not just them but multiple family members as well, and those

22   coworkers, those workers who didn't have lawful status, who

23   weren't part of the Rangel-Rubio family, who risked exposing

24   themselves by speaking out, who were they going to complain to?

25   No one.  They needed a voice.  Eluid Montoya, the General,

1    raised his voice.

2        In April 2017, you will hear how Mr. Montoya filed a

3    complaint with the company against Pablo complaining about his

4    mistreatment of coworkers, complaining that Pablo's retaliating

5    against his coworkers, complaining that the Rangel-Rubio

6    brothers had family members working there even though they

7    legally could not.

8        In the letter, Mr. Montoya warned that he had already

9    taken his complaint to the Department of Labor.  Mr. Montoya

10   didn't try to hide the author of that letter.  He didn't try to

11   submit it anonymously.  The letter begins, "My name is Eluid

12   Montoya," and it ends by providing his phone number.  And what

13   does the company do?  Gives that complaint letter to Pablo

14   Rangel-Rubio.

15       Now at that moment, at that instant, the Rangel-Rubio

16   brothers were on notice.  Eluid Montoya isn't afraid to speak

17   up.  Eluid Montoya isn't going to back down, and he's not going

18   anywhere.

19       Even after Pablo called a company-wide meeting with all

20   the Savannah area employees, had the letter raised in his hand,

21   had the letter read out loud to all the employees, including Mr.

22   Montoya who was there, made it clear that letter meant nothing.

23   Even after that, Eluid Montoya would not stop.

24       That's a problem.  That's a big problem for the

25   Rangel-Rubio brothers.  Think about everything they had to lose

1  by Mr. Montoya speaking up:  Their jobs, all that money, jobs

2  not just for them but for their family members as well, possible

3  deportation, and even possibly going to jail.

4        That explains why the Rangel-Rubio brothers agreed to

5  murder Eluid Montoya.  They saw his silence as their solution.

6  That's motive.

7        Simply wanting someone dead isn't enough.  Shooting and

8  killing someone requires the means to do it.  Guns, ammunition,

9  knowledge to boot.  You will hear how Juan Rangel-Rubio was a

10  combat engineer in the Mexican army.  And you will hear that

11  after Mr. Montoya was murdered that law enforcement searched

12  Juan Rangel-Rubio's residence.  There they found guns and

13  ammunition.  You will hear how the bullets that were pulled from

14  Eluid Montoya's dead body, .22-caliber metal-jacketed

15  hollow-point bullets, you will hear how those were consistent

16  with ammunition found in Juan Rangel-Rubio's kitchen.

17        And you will hear how the bullets pulled from Eluid

18  Montoya's body were fired from the same gun, .22-caliber Magnum,

19  and you will hear Juan describe how he had a .22-caliber Magnum

20  gun, but he had given it away.  Law enforcement never recovered

21  it.

22        In the more than five years since Eluid Montoya 's

23  murder, law enforcement still has never recovered the murder

24  weapon.  In this case, you will not see the gun that murdered

25  Eluid Montoya.  And why not?  One man, sitting in this

1    courtroom, knows where that gun is.

2         To carry out the murder, the Rangel-Rubio brothers

3    needed each other.  Pablo had a lot of money, but as you will

4    hear Juan describe, Pablo didn't even know how to shoot a gun.

5    Juan did.  He had the skills to do it.  He had the willingness

6    to act as a trigger man.

7         But they needed help.  You see, they didn't just want to

8    commit the crime.  They wanted to get away with it.  After all,

9    there's no use in committing a crime if you are just going to

10   get caught, and after all, when Eluid Montoya would inevitably

11   turn up dead, who would be the first suspects?  The Rangel-Rubio

12   brothers.  They had the most to lose by Mr. Montoya speaking

13   out.  They had the most by gain by shutting him up.

14        So they needed somebody who could be reliable, somebody

15   who had a vehicle, somebody who could act as a vehicle driver.

16   Enter Higinio Perez-Bravo.  You will hear how each of those

17   three men took part in the planned calculated assassination of

18   Eluid Montoya.  Three men are responsible for his death.

19        You will decide the guilt of one of them, the defendant,

20   Juan Rangel-Rubio.  Pablo and Mr. Perez-Bravo will have their

21   fates decided in a courtroom on a different day.

22        As to Mr. Perez-Bravo, you will hear how he didn't work

23   at Wolf Tree.  He didn't cut trees or trim trees.  His life work

24   was construction.  You can think of him as a trusty handyman.

25   He performed construction projects at Pablo's house and he was

1  paid well by Pablo.

2          He also had two vehicles, a Cadillac SUV and a white

3  van, vehicles that couldn't be connected to the Rangel-Rubios,

4  and you will hear how Pablo complained to Mr. Perez-Bravo about

5  this problem employee.

6          You will even hear how Pablo mentioned a plan to

7  eliminate the problem employee, and by this time in August of

8  2017, Eluid Montoya was a problem for the Rangel-Rubio brothers.

9          You will hear that on August 16th of 2017, after Mr.

10  Montoya had submitted that letter complaining about Mr.

11  Rangel-Rubio, how the company had suspended, suspended Eluid

12  Montoya.

13          Mr. Montoya contested the suspension.  He challenged it.

14  You will see phone records that show on the day he was

15  suspended, he placed a 15-minute call to Juan Rangel-Rubio.

16          Now, having submitted a letter to the company that

17  didn't result in any significant change, having been suspended

18  by the company, most people at this point would give up.  But

19  the General didn't.

20          The next day, August 17th, 2017, Eluid Montoya goes to

21  the EEOC, a federal agency, and he lodges a complaint, a

22  complaint against Pablo, complaint about the hiring of illegal

23  aliens, a complaint against the treatment of his coworkers.

24          Eluid Montoya took it federal, and he blew the whistle

25  and started that federal process.  And after he had left that

126

1    federal agency, after he had made his complaint, you will hear

2    and you will see phone records which show who he called.  He

3    called Juan Rangel-Rubio.

4         So the next day, August 18th, Juan goes looking for

5    Eluid Montoya, looking for the right time and the right place to

6    kill him.

7         Now, you will hear that Eluid Montoya lived in a mobile

8    home with his wife and his daughters.  The mobile home park

9    where he lived had houses close together.  And there was just

10   one long road, Village Drive.  It was the only road in and out

11   of that mobile home park.

12        You will hear that Juan drove a large burgundy truck,

13   not the type of vehicle to do surveillance.  So Juan borrowed a

14   Cadillac SUV from Mr. Perez-Bravo.  You will see the phone

15   location information from Juan's phone, and you will see

16   surveillance video which shows that Cadillac SUV circling the

17   area of that mobile home park hour after hour, looking for the

18   right time, looking for the right place, but Eluid Montoya was

19   not home that day, that Friday, August 18th, 2017.

20        Juan Rangel-Rubio didn't get his chance to kill that

21   day.  But before Juan left the area, he called Perez-Bravo and

22   he told him to come to that area, to be familiar with that area

23   because they would be coming back the next day, and they did,

24   which brings us to Saturday, August 19th, 2017, Eluid Montoya's

25   last day on earth.

1    Let's talk about how Eluid Montoya died.  Eluid Montoya

2    was seen around 11:34 that morning by a neighbor.  He was seen

3    outside of his house at 59 Village Drive.  Then Mr. Montoya got

4    into his car, drove down Village Drive and turned left onto Old

5    Dean Forest Road.

6        There, he had his large tree service work truck parked.

7    The truck was too large to park next to his mobile home, so he

8    parked it in a quiet, secluded area of the road next to a wooded

9    area.

10        He got out of his car and he started to work on his work

11    truck.  The truck was, as usual, broken down.  He had a lot of

12    problems with that truck, and he was often out there working on

13    it.

14        And that's where his life ended, alone, unarmed,

15    standing next to his tree truck, outside of the view of any

16    surveillance videos with no one around to help him.  The perfect

17    place for a murder.

18        Juan Rangel-Rubio's day, that day, that day of death,

19    Juan's day had started early.  That morning you will hear, he

20    had called Perez-Bravo and told him to meet at a Kroger on

21    Highway 17, and when Mr. Perez-Bravo got there, Juan gets into

22    Mr. Perez-Bravo's white van, and then of all places in the

23    world, where did Mr. Perez-Bravo and Juan go that Saturday?

24    They go to the area of the mobile home park.

25        You will see from the phone location information, you

1    will see the surveillance video that white van circling the area

2    for nearly four hours, waiting for the right time, waiting for

3    the right place to kill Eluid Montoya.

4          You will hear how Mr. Perez-Bravo was driving the van

5    and Juan was sitting in the passenger seat looking out of the

6    window scanning, telling Mr. Perez-Bravo where to turn and where

7    to go, and then Juan told Mr. Perez-Bravo to drop him off at

8    that Pilot gas station.  Juan got out of the van, carrying a

9    little brown bag.  And he told Mr. Perez-Bravo that he would

10   call him when he was ready to be picked up.

11         And then Juan got out and he had his opportunity to kill

12   him.  And he took it.  You will hear how at least five shots

13   tore through Eluid Montoya's body.  And when he was done

14   shooting Eluid Montoya, Juan called for his getaway driver.  He

15   called Mr. Perez-Bravo.

16         You will see in the phone location, which shows

17   Perez-Bravo coming back, picking up Juan and taking Juan back to

18   that Kroger back where Juan had left his large burgundy truck,

19   and after the murder was done, you will hear how Juan placed a

20   phone call to his brother.

21         After Juan had murdered that problem employee who

22   threatened to bring down everything he and his brother had

23   worked for, you will see the call and you will see how he phoned

24   his brother.

25         Ladies and gentlemen, in considering all of that, you

1  will hear and you will see evidence how three men worked

2  together in the planned, calculated assassination of Eluid

3  Montoya.  Each played a role in Mr. Montoya's death and each

4  carried out their role.

5       You will hear how Juan had the money and paid

6  Perez-Bravo not just for the construction, but also the promise

7  of additional work to act as the getaway driver.  You will hear

8  how Juan had acted as the trigger man, and you will hear how it

9  had resulted in the death of Eluid Montoya.

10      Three men each played their role.  Juan and Pablo got

11  what they wanted, the silence of Eluid Montoya.  But the thing

12  about the truth, the thing about the truth that makes it

13  dangerous is it has a way of coming out in the end, and at the

14  end of this case, you will be asked to consider those four

15  conspiracy counts for which Juan Rangel-Rubio is charged.

16      You will hear that a conspiracy is just an agreement to

17  do something unlawful, a sort of partnership in crime.  And

18  because Juan agreed with Pablo to work under an illegal name, to

19  be paid under a US citizen's name, to even pay other illegal

20  aliens, all things that you will hear Juan admitted to, Juan is

21  charged in Count 1 with conspiring with his brother to conceal,

22  harbor and shield illegal aliens, and because they were paid and

23  used banks to receive those payments and to pay illegal aliens,

24  Juan is charged with conspiring with his brother to commit money

25  laundering, Count 2, and then the last two counts, Counts 6 and

1    7 are both the murder counts.

2         Although there are other counts in the superseding

3    indictment, again, the four that concerns this defendant, Counts

4    1, 2, 6 and 7.  Count 6 is why murder Eluid Montoya, to prevent

5    him from going further in that EEOC proceeding, to prevent him

6    from acting as a further witness, to prevent him from providing

7    other documents, to prevent him from doing further damage.

8         And Count 7, Count 7 is the punishment that Eluid

9    Montoya received as a result of the courage for speaking up.  It

10   is murdering in retaliation, murdering because he had the

11   courage to speak out.

12        There was an agreement to kill the General.  Juan knew

13   about it.  Juan made his choice to join it.  Three people played

14   a role.  One person pulled the trigger, time after time after

15   time, which is why at the end of this case the Government will

16   ask you to find based on the evidence, based on the law as the

17   Judge gives it to you and based on your common sense that Juan

18   Rangel-Rubio is responsible for his choices and guilty of the

19   crimes for which he's charged.

20        Thank you.

21        THE COURT:  All right, on behalf of the defendant, Ms.

22   Brewington.

23        MS. BREWINGTON:  Thank you, Judge.

24        Ladies and gentlemen, what happened to Mr. Montoya is

25   tragic.  There is no doubt about it.  But it didn't happen at

131

1     the hands of my client, Juan Rangel-Rubio.  There's two people

2     that did it:  His brother Pablo and Mr. Perez-Bravo.  You're

3     going to see that Pablo was the money man.  He was essentially

4     mob boss.  He was living high on the hog.  He was living in the

5     nicest home.  He was taking all of his money and he was

6     essentially the puppet master of an entire scheme.  He paid

7     Perez-Bravo to not only drive the car but be the trigger man.

8             Why did Perez-Bravo do this?  Well, first he drove the

9     car and he pulled the trigger because he was paid $26,000.00.

10    He was paid that money from Pablo.

11            Now he is pointing that trigger finger to my client,

12    Juan Rangel-Rubio, and he's doing that because he has motive.

13    He has a motive to blame Juan to minimize his own involvement

14    and hopefully get a lesser sentence.

15            His story is the only evidence that points to Juan being

16    the trigger man.  This story is made up after hours of an

17    interview.  He's told to tell the truth 37 times in four hours.

18    He's given promises by the agents that if he talks they will

19    talk to the district attorney about his cooperation.

20            And now he has a plea agreement with a cooperation

21    aspect to that in hopes of getting some type of benefit for his

22    testimony.

23            You-all have heard that the Government has the burden of

24    proof.  You've heard a lot of what they say the evidence is

25    going to be.  We're going to hold them to that burden of proof

1    beyond a reasonable doubt.

2         What they didn't tell you is what you're not going to

3    see.  That's what I'm going to bring out is that reasonable

4    doubt.  What you're not going to see, no murder weapon, no blood

5    linking Juan to Mr. Montoya, no DNA, no fingerprints, no large

6    payments like Mr. Perez-Bravo got.  You cannot see who is

7    driving the cars that are surveilling the trailer park that day.

8    There is no footage of Juan walking to the murder scene.  There

9    is no eyewitness.

10        The evidence is going to show two people had a plan to

11   kill Mr. Montoya.  That was Pablo and Mr. Perez-Bravo.  But the

12   evidence will show that Juan knew nothing about it.  He knew

13   nothing about the plan to murder and he definitely did not join

14   that plan.  He had no idea what Mr. Perez-Bravo was doing that

15   day.

16        After hearing all the evidence, I'm confident that you

17   will come back with a verdict of not guilty to all four charges.

18        Thank you.

19        THE COURT:  On behalf of the United States, call your

20   first witness.

21        MS. GROOVER:  Thank you, Your Honor.  The Government

22   calls Maria Montoya to the stand.

23        THE CLERK:  Ma'am, you were previously sworn, do you

24   still uphold that oath?

25        THE WITNESS:  Yes.

133

1                        MARIA MONTOYA,

2    having been first duly sworn, was examined and testified as

3    follows through the interpreter:

4              THE CLERK:  Thank you.  You may be seated.  And if you

5    will please state your full name for the record.

6              THE WITNESS:  Yes, my name is Maria Montoya.

7              MS. GROOVER:  Your Honor, before we begin with the

8    witness, there is one brief preliminary matter.  Pursuant to our

9    joint trial stipulation, the United moves for the admission of

10   its Exhibits 1 through 102.

11             THE COURT:  Any objection?

12             MS. BREWINGTON:  No, Judge.

13             THE COURT:  Exhibits 1 through 102 are admitted without

14   objection.

15             MS. GROOVER:  Thank you, Your Honor.  Permission to

16   publish freely to the witnesses and to the jury?

17             THE COURT:  Granted.

18                        DIRECT EXAMINATION

19   BY MS. GROOVER:

20   Q.   Good afternoon?

21   A.   Good afternoon.

22   Q.   Is Spanish your first language?

23   A.   Yes.

24   Q.   Do you also speak a little bit of English?

25   A.   Yes.

134

Q.    Are you more comfortable today proceeding in Spanish with
the assistance of an interpreter?

A.    Yes.

Q.    Where are you originally from, what country, ma'am?

A.    From Mexico.

Q.    Were you born in Mexico?

A.    Yes.

And in 2001, did you come to the United States?

A.    That's right.

Q.    And how is it that you came to the United States?

A.    With a work permit that my father got.

Q.    You entered and eventually did you become a permanent
resident of the United States after you entered on a work visa
or permit?

A.    That's right.

Q.    And is the permanent resident card, is that also known as
a green card?

A.    Yes.

Q.    Does this green card, your permanent resident card, allow
you to lawfully live and work in the United States?

A.    That's right.

Q.    And where do you live at right now, please?

A.    On 59 Village Drive in Garden City.

Q.    Is that part of the Savannah Pines Mobile Home Park?

A.    Yes.

135

```
1    Q.    How long have you lived at 59 Village Drive?

2    A.    Been there more than ten years.

3    Q.    Who all lives with you at 59 Village Drive?

4    A.    My two daughters and my mother-in-law.

5    Q.    Your daughters Jaquelin and April?

6    A.    Yes.

7    Q.    And was Jaquelin born in Mexico?

8    A.    Yes.

9    Q.    And was April born here in the United States?

10   A.    That's right.

11   Q.    And are you married, ma'am?

12   A.    Widow.

13   Q.    Was your husband shot and killed on August the 19th of

14   2017?

15   A.    Yes.

16   Q.    Your husband, Eluid Montoya?

17   A.    That's right.

18   Q.    If we could please bring up Exhibit 2.  Do you recognize

19   this photograph, ma'am?

20   A.    Yes.

21   Q.    And who is this?

22   A.    My husband, Eluid Montoya.

23   Q.    Exhibit 22-2, please.  Who is depicted in this photograph?

24   A.    Eluid Montoya.

25   Q.    And Exhibit 22-4, do you recognize this picture, ma'am?
```

136

1    A.    Yes.

2    Q.    Can you tell us who is in this photograph?

3    A.    My husband with his two daughters.

4    Q.    Jaquelin and April?

5    A.    Yes.

6    Q.    Was this picture taken about a year before he was killed?

7    A.    Maybe some years earlier.

8    Q.    Okay.  And was your husband, Mr. Montoya, was he born in

9    Mexico?

10   A.    Yes.

11   Q.    And in 2009, did he become a naturalized United States

12   citizen?

13   A.    Yes.

14   Q.    Please view Exhibit 3, please.  Have you seen this before,

15   ma'am?  Do you recognize this?

16   A.    Yes.

17   Q.    Tell the jury what is this, please?

18   A.    It is his certificate of citizenship.

19   Q.    Of the United States citizenship?

20   A.    Yes.

21   Q.    Before your husband was killed, where did he work at,

22   ma'am?

23   A.    For the company Wolf Tree.

24   Q.    Do you know what year he started at Wolf Tree?

25   A.    I don't remember very well.

137

1   Q.    Did he work as a driver as well as a foreman of a crew?

2   A.    Yes.

3   Q.    And did he also operate like a bucket truck to trim the

4   trees along the power lines?

5   A.    Yes.

6   Q.    Will you please look at Exhibit 2-3.  Do you recognize

7   this photograph, ma'am?

8   A.    Yes.

9   Q.    Can you please tell the jury what we're looking at in

10  Exhibit 2-3?

11  A.    It's a picture of my husband taken with the company truck.

12  Q.    That's the green truck with the yellow behind him?

13  A.    Yes.

14  Q.    Do you know approximately -- I know you don't recall what

15  year he started.  Do you know approximately how long he worked

16  at Wolf Tree, how many years?

17  A.    More than 12 years.

18  Q.    Before he was killed?

19  A.    Yes.

20  Q.    Did he do anything else besides work at Wolf Tree?  Did he

21  have any side jobs?

22  A.    Yes.  He would cut trees on his own.

23  Q.    Did he have his own tree truck that he used to do that for

24  his own business?

25  A.    Yes.

138

1  Q.    And basically would he also just trim the trees and
2  branches after storms?
3  A.    That's right.
4  Q.    Can you describe the truck that he had, his own personal
5  truck?
6  A.    It was a white truck that had black, and it had red parts
7  on it.
8  Q.    And was it a normal size truck that someone could drive or
9  was it a larger truck that needed a special kind of license?
10  A.    Only people with a CDL license could drive it.
11  Q.    Where would he park this large truck?
12  A.    Off to one side of the entrance of the trailer park where
13  we lived.
14  Q.    Was it too large to park it near your house?
15  A.    Yes.  Having trucks like that isn't allowed in the trailer
16  park.
17  Q.    Exhibit 20-5, please.  Ma'am, is this a picture from
18  Google images from 2016 that you're looking at that depicts your
19  husband's tree truck?
20  A.    Yes.
21  Q.    And is this image just a little bit down the street from
22  where Savannah Pines Mobile Park is, the entrance?
23  A.    Yes.
24  Q.    And before his death, what type of car did Mr. Montoya
25  drive?

1    A.    A Honda, gray.

2    Q.    I'd like to take you back to August 19th of 2017.  A tough

3    day.  Can you tell the jury how your day started?

4    A.    That day, I got up about 5:00, 5:30 in the morning to go

5    to work.  And he was sleeping.  I got ready and I left the room,

6    and all I could see was him lying down on the other side of the

7    bed with his back towards me.

8    Q.    Was that the last time you saw your husband alive?

9    A.    Yes.

10   Q.    Did you then go to work that morning?

11   A.    Yes.

12   Q.    At the time, where were you working at, ma'am?

13   A.    At a fast food restaurant.  It's called Chick-Fil-A.

14   Q.    While you were at work that day, did your manager come

15   talk to you and explain that you needed to go home?

16   A.    Yes.  I was working that day and they received a call at

17   the restaurant and somebody wanted to talk to me, and when I

18   picked up the phone, it was my supervisor.  He told me to not be

19   scared but that I had to go home as soon as possible because

20   there were police at the house waiting for me.

21   Q.    And did you go home?

22   A.    Yes.

23   Q.    What did you see when you got to your home?

24   A.    When I went into the trailer park, I saw that there were a

25   lot of police around my husband's truck.

140

1  Q.   Did you stop?

2  A.   No.

3  Q.   Kept going to your house?

4  A.   Yes.

5  Q.   What happened when you got to your house?

6  A.   When I got to my house, there was a police officer waiting

7  at the entrance of my house.

8  Q.   Did he explain what had happened to your husband?

9  A.   When I went into the house, he told me that he had just

10  been murdered.

11  Q.   Did he ask you if you knew of anyone who may have wanted

12  to harm him?

13  A.   Yes, yes, he did ask me.

14  Q.   Do you remember what you said?

15  A.   Yes.

16  Q.   What did you say?

17  A.   I told him that I didn't know.  But after that, my

18  mother-in-law was crying.  My mom was crying and my

19  mother-in-law said, "It was Pablo, he killed him."

20  Q.   Did that then trigger you to go get some work documents

21  for the detective?

22  A.   Yes.

23  Q.   Tell the jury what you did?

24  A.   I had heard that some people had said that he had gone and

25  taken some documents to an office, and so I ran and I went into,

1  over to where the desk was, where the computer was, and I found

2  a black folder.  I reviewed what was inside, and I took it over

3  to the detectives.

4  Q.   What made you think of work when your mother-in-law said,

5  "It was Pablo"?

6  A.   Because Pablo is -- was his boss.

7  Q.   So did you want to give the detective paperwork related to

8  his boss and your husband's work?

9  A.   Yes.

10  Q.   Exhibit 22-1, please.  Have you seen -- do you recognize

11  what's depicted in Exhibit 22-1, ma'am?

12  A.   Yes.  Yes, it's my husband's truck and his car.

13  Q.   The big truck is in most of the photograph; is that

14  correct?

15  A.   Yes.

16  Q.   And the little car to the right of the truck, is that your

17  husband's Honda?

18  A.   Yes.

19  Q.   Focusing on the open door of the truck, are there steps

20  that you can use to climb into the step, the truck?

21  A.   Yes.

22  Q.   Exhibit 22-7, please.  Do you recognize anything in this

23  photograph, ma'am?

24  A.   Yes.  Those are the steps to my husband's truck and there

25  are his glasses and his telephone.

1    Q.    Exhibit 22-10, please.  Do you recognize anything in this

2    photograph, ma'am?

3    A.    Yes.

4    Q.    Can you please tell us what you recognize?

5    A.    That's my husband's car.

6    Q.    Do you notice a yellow notebook, what appears to be a

7    notebook on the dashboard?

8    A.    Yes.

9    Q.    How is it that you recognize that notebook, ma'am?

10   A.    Because I would buy them.

11   Q.    You bought that notebook for your husband?

12   A.    Yes.

13   Q.    Exhibit 22-35, please.  What are we looking at in Exhibit

14   22-5 -- excuse me, 35.

15   A.    It's my husband's car taken from the inside.  There are

16   some keys, the notebook.

17   Q.    Exhibit 22-36.  Is this another angle of the inside of

18   your husband's car, ma'am?

19   A.    Yes.

20   Q.    And Exhibit 22-37, is this photograph focusing in on the

21   key that was inside your husband's car?

22   A.    Yes.

23   Q.    Do you know what that key belongs, goes to?

24   A.    I think it's the key to his truck, his work truck.

25   Q.    And Exhibit 22-38.  Is this a photograph of the inside of

143

1    your husband's car closer to the dashboard?

2    A.    Yes.

3    Q.    Exhibit 22-39.  Is this mail that was addressed, a

4    photograph of mail that was addressed to you?

5    A.    Yes.

6    Q.    Located inside your husband's car?

7    A.    That's right.

8    Q.    Exhibit 22-41, please.  Have you seen the items that are

9    depicted in Exhibit 22-41?

10   A.    Yes.

11   Q.    And can you tell the jury what the items are?

12   A.    It's Jaquelin's certificate of citizenship and an

13   application to get her a passport.

14   Q.    Your daughter Jaquelin?

15   A.    Yes.

16   Q.    Do you believe this was located in your husband's car?

17   A.    Yes.

18   Q.    Was he working on getting her her passport to visit

19   Mexico?

20   A.    Yes.

21   Q.    Exhibit 22-42, please.  Do you recognize what's in this

22   photo, ma'am?

23   A.    Yes.

24   Q.    Can you tell the jury what we're looking at?

25   A.    Those are things that he would use for work and his ID

1    card to be able to get into the port.

2    Q.    Is this inside his vehicle, his Honda?

3    A.    Yes.

4    Q.    In Exhibit 22-43, is this a closeup photo of the badge

5    that was inside the Honda?

6    A.    That's right.

7    Q.    And Exhibit 22-45.  Can you please tell us if you

8    recognize what's depicted in this photograph?

9    A.    Yes.

10    Q.    What is this, ma'am?

11    A.    It's my husband's ID so in order to be able to get into

12    the port.  And his name, General.

13    Q.    Was the General a nickname that your husband was known by?

14    A.    Yes.

15    Q.    Do you know why people called him the General?

16    A.    Because he was in the Mexican army, and I think he got to

17    the rank of general.  And he always liked to be or he was always

18    ahead of everything.

19    Q.    Took charge and took command?

20    A.    Yes.

21    Q.    Exhibit 22-46, please.  Ma'am, is that a photograph of

22    some of your husband's work gear inside his car?

23    A.    Yes.

24    Q.    The hat there that says Wolf Tree, the hard hat?

25    A.    The hard hat, jacket, the cones.

1   Q.    In Exhibit 22-47, is this a tool that was inside your

2   husband's vehicle, ma'am?

3   A.    Yes.

4   Q.    Exhibit 22-48, is this another picture inside the back

5   seat of your husband's car with some tools?

6   A.    Yes.

7   Q.    Exhibit 22-49, is this another photograph of the back seat

8   of your husband's car depicting the tools and cones?

9   A.    That's right.

10  Q.    In Exhibit 22-50, another picture of more tools in the

11  back of your husband's car?

12  A.    Yes.

13  Q.    Exhibit 22-51, do you recognize what's depicted in this

14  photograph, ma'am?

15  A.    Yes.

16  Q.    Is that one of your husband's tools that was inside his

17  car?

18  A.    Yes, it's a blower.

19  Q.    And finally Exhibit 22-52, do you recognize what's

20  depicted in this photograph, ma'am?

21  A.    Yes.

22  Q.    Are these tools in the back, in the trunk of your

23  husband's car?

24  A.    That's right.

25  Q.    Exhibit 24, can we please take a look at Exhibit 24.  Do

146

1    you recognize what's depicted in this photograph, ma'am?

2    A.    Yes.

3    Q.    And what is it?

4    A.    It's a notebook that was inside of his car.

5    Q.    And Exhibit 4, please, can we take a look at Exhibit 4.

6    Do you recognize what's depicted in Exhibit 4, ma'am?

7    A.    Yes.

8    Q.    Can you tell us what is it?

9    A.    It's the envelope that I gave to the detectives.

10   Q.    And Exhibit 4-1.  Excuse me, Exhibit 4-2?

11   A.    Yes.

12   Q.    And what is this, ma'am?

13   A.    It's a check stub from the company where he worked.

14   Q.    Was that inside the envelope that you gave to the

15   detective?

16   A.    Yes.

17        MS. GROOVER:  Your Honor, may I approach the witness?

18        THE COURT:  Yes.

19   Q.    (By Ms. Groover)  Ma'am, I'm handing you what's been

20   marked for identification as Exhibit 5.  Can you please take a

21   look at Exhibit 5 and tell us if you recognize that?

22   A.    Yes.

23   Are these the actual documents that you gave to the detective

24   while he was investigating the murder of your husband?

25   A.    Yes, they are.

147

```
1   Q.    Do you know who Juan Rangel-Rubio is?

2   A.    Yes.

3   Q.    How do you know him?

4   A.    Because he went to the house a few times.

5   Q.    Did he also work with your husband?

6   A.    Yes.

7   Q.    And you mentioned earlier that Pablo was your husband's

8   boss.  Is that Pablo Rangel-Rubio?

9   A.    Yes.

10  Q.    Is Juan Rangel-Rubio related to Pablo Rangel-Rubio if you

11  know?

12  A.    Yes, it's his brother.

13  Q.    And he also worked with your husband; is that correct?

14  A.    Yes.

15        MS. GROOVER:  Your Honor, may I have just one moment,

16  please?

17        THE COURT:  Yes.

18        MS. GROOVER:  No further questions, Your Honor.

19        THE COURT:  Cross-examination, Ms. Brewington.

20        MS. BREWINGTON:  Judge, I have no questions for Mrs.

21  Montoya.

22        THE COURT:  Ms. Montoya, you may step down.

23        MR. HOWARD:  Your Honor, the Government calls Oscar

24  Cruz.  He will not need a translator.

25        THE COURT:  You may need to move to your next witness.
```

1    He doesn't appear --

2         THE CLERK:  He's in custody, Your Honor.

3         THE COURT:  Marshal, are they retrieving him?

4         THE CLERK:  Sir, if before you're seated you'll please

5    raise your right hand.

6                        OSCAR CRUZ,

7    having been first duly sworn, was examined and testified as

8    follows:

9         THE CLERK:  Thank you.  You may be seated, and if you

10   will please state your full name and spell your last.

11        THE WITNESS:  Oscar Cruz, C-r-u-z.

12        MR. HOWARD:  Your Honor, may I proceed?

13        THE WITNESS:  You may.

14                    DIRECT EXAMINATION

15   BY MR. HOWARD:

16   Q.   Sir, I see you're wearing prison clothes.  Are you

17   currently incarcerated?

18   A.   Yes, sir.

19   Q.   Have you pled guilty in federal court to conspiring to

20   harbor, shield and conceal illegal aliens?

21   A.   Yes.

22   Q.   When you get off the stand today, are you returning back

23   to federal prison?

24   A.   Yes.

25   Q.   Before you were sentenced, what did you do for a living?

149

1    A.    Tree work for a tree company in South Carolina.

2    Q.    You are a US citizen; correct?

3    A.    Yes.

4    Q.    Born in the United States?

5    A.    Yes.

6    Q.    Did you previously work for Wolf Tree?

7    A.    Yes.

8    Q.    You mentioned a tree company in South Carolina.  Before

9    working at that tree company in South Carolina, where did you

10   work?

11   A.    At Wolf Tree.

12   Q.    What year did you start with Wolf Tree?

13   A.    2013.

14   Q.    And did Wolf Tree later become a subsidiary of Davey Tree?

15   A.    Yes.

16   Q.    Can you tell the jury how you first got the job at Wolf

17   Tree?

18   A.    Yes.  Back in 2013, I came to Savannah, Georgia to meet my

19   ex-sister-in-law's son that was recently born.  Went to a bar

20   the day and I met Mr. Pablo Rangel's son at the bar, and we

21   exchanged numbers.

22   Q.    And who ultimately hired you at Wolf Tree?

23   A.    Can you repeat the question?

24   Q.    Yes, who ultimately hired you at Wolf Tree?

25   A.    Mr. Pablo Rangel.

1  Q.   If we could pull up Government's Exhibit 7.  Looking at

2  the screen in front of you, do you recognize the individual

3  depicted in Government's Exhibit 7?

4  A.   Yes.

5  Q.   Who is that?

6  A.   Pablo Rangel.

7  Q.   When you first started at Wolf Tree, what were some of

8  your job duties?

9  A.   I started as a groundman back in 2013.

10  Q.   For those unfamiliar with what a groundman is, can you

11  tell the jury what a groundman is?

12  A.   It's a helper of the tree trimmer, dragging limbs, asking

13  customers permission to go into their property to clean the

14  power lines.

15  Q.   On your first day of work, do you recall anyone that you

16  worked with?

17  A.   Yes.

18  Q.   Who was that?

19  A.   Mr. Eluid Montoya.

20  Q.   What was Mr. Montoya's job at Wolf Tree when you first

21  started there?

22  A.   Tree trimmer.

23  Q.   If we could pull up Government's Exhibit 2.  In looking at

24  Page 1 of Government's Exhibit 2, do you recognize that person

25  there?

151

```
1    A.    Yes.

2    Q.    Who is that?

3    A.    Mr. Eluid Montoya.

4    Q.    And did you work with Mr. Montoya at Wolf Tree for several

5    years?

6    A.    Yes.

7    Q.    And outside of work, were there instances where he helped

8    you?

9    A.    Yes.

10   Q.    Can you tell the jury about that?

11   A.    Yeah.  First he helped me to get a cell phone.  Then he

12   helped me file my taxes one year.  And he was a cosigner for a

13   vehicle I used to have.

14   Q.    While working at Wolf Tree, did you come to learn that

15   there were individuals working there who were not in the United

16   States legally?

17   A.    Yes.

18   Q.    How did you learn that?

19   A.    I learned what the guys had -- they would go by different

20   names, and they had a different name on the job briefing that we

21   used to fill out.

22   Q.    Did Eluid Montoya at one point tell you that there were

23   people there that were working illegally?

24   A.    Yes.

25   Q.    Over the years, did you get various promotions at Wolf
```

1    Tree?

2    A.    Yes.

3    Q.    Around 2015, did you become an assistant supervisor?

4    A.    Yes.

5    Q.    Who were you assisting in that role?

6    A.    Pablo Rangel.

7    Q.    What were some of your duties and responsibilities as an

8    assistant supervisor?

9    A.    Set off fliers, customers at front doors, help supplying

10   the crews with chainsaws, paperwork that they needed, customer

11   complaints.

12   Q.    Were there occasions when you filled out worker time

13   sheets?

14   A.    Yes.

15   Q.    And when filling out those time sheets, did you use

16   everyone's real names?

17   A.    No.

18   Q.    Why not?

19   A.    I was instructed to use the names they were working under.

20   Q.    Working under other people's names; is that right?

21   A.    Correct.

22   Q.    Did someone tell you to complete time sheets that way?

23   A.    Yes.

24   Q.    Who?

25   A.    Pablo Rangel.

153

1   Q.    How would you know what names to use for the specific

2   people?

3   A.    As time went by, you know, I pretty much knew everybody

4   which name they were working under.

5   Q.    Was there as well a roster of assumed names that you could

6   consult?

7   A.    Yes.

8   Q.    If we could pull up Government's Exhibit 6, a one-page

9   document that you can review there.  Do you recognize this?

10  A.    Yes.

11  Q.    It's a little bit hard to read.  Does this fairly and

12  accurately depict an example of a time sheet at Wolf Tree?

13  A.    Yes.  That was a weekly time sheet.

14  Q.    And this one you can see in the top middle part of that

15  sheet, does it reflect this is for the week ending June 3rd,

16  2017?

17  A.    Yes.

18  Q.    And if we could zoom in on the left half of that page,

19  does this show about 19 individuals' names and the amount of

20  hours they worked that week?

21  A.    Yes.

22  Q.    And if we could zoom in on those names in that first

23  column on the left side, your name is listed there; correct?

24  A.    Correct.

25  Q.    Pablo's name is listed there as well?

154

1    A.    Yes.

2    Q.    And does that list of employees contain some of the

3    assumed identities that people were using?

4    A.    Yes.

5    Q.    Now, looking at that list, can you tell the jury some of

6    the names that you recognize as being used by other employees to

7    work under?

8    A.    Luciano Rodriguez, Rufino Rodriguez, Fernando Soto, Juan

9    Amaya, Homero Gonzalez, Rafael Moreno, Edgar Cruz, Fernando

10   Montanes, Fernando Hernandez, Giovanni Martinez and Stanley

11   Turner.

12   Q.    At the bottom of the list being Stanley Turner, was there

13   a Stanley Turner that was actually working at Wolf Tree?

14   A.    No.

15   Q.    Do you recall who was working under that name at Wolf

16   Tree?

17   A.    Yes.

18   Q.    Who was that?

19   A.    Jonathan Rangel.

20   Q.    And what, if any, connection is there between Jonathan

21   Rangel and Juan Rangel-Rubio?

22   A.    As far as I know, that's his son.

23   Q.    Jonathan is Juan's name?

24   A.    Yes, sir.

25   Q.    Do you recognize any of those names as names that Juan

1   Rangel-Rubio was using and was working under?

2   A.    As I recall, it's Luciano Rodriguez.

3   Q.    If we could pull up Government's 8.  Do you recognize the

4   individual depicted in Government's Exhibit 8?

5   A.    Yes.

6   Q.    Who is that?

7   A.    Juan Rangel.

8   Q.    Did Juan work at Wolf Tree for several years?

9   A.    Yes.

10  Q.    What type of work did Juan do at Wolf Tree?

11  A.    He was a foreman, an equipment operator.

12  Q.    Do you recall what kind of equipment he operated?

13  A.    It's a giraffe.

14  Q.    What the heck is a giraffe?

15  A.    It's a mechanical trimmer.  It's used -- it has telescopic

16  fiberglass, one with a saw blade on the front.

17  Q.    You mentioned that he was a foreman?

18  A.    Yes.

19  Q.    What does a foreman do?

20  A.    Operates the equipment, make sure that crews are working

21  properly.  If there was any incidents with any customers, he

22  would try to address them.  And make sure the job got -- was

23  done correctly.

24  Q.    Does the foreman tell the crew what to do?

25  A.    Yes.

156

1   Q.    Is the foreman the most senior part of that crew?

2   A.    Yes.

3   Q.    Mr. Cruz, did you ever see Juan with a firearm?

4   A.    Yes.

5   Q.    Can you tell the jury about that?

6   A.    It was at one point he was coming off his -- the machine

7   he was operating, he had a brown -- a brown bag and I asked him

8   what it was, and he said it was a gun for hunting, and it was --

9   he showed it to me.  It was a revolver.

10  Q.    I want to pull back up Government's Exhibit 6 that we

11  looked at, that time sheet listing about 19 names.  Mr. Cruz, is

12  it fair to say that most of the names on here don't match who

13  was actually working?

14  A.    Correct.

15  Q.    Were there other members -- we talked about Jonathan

16  Rangel being Juan's son, but were there other members of Pablo

17  and Juan's family who worked at Wolf Tree while you were working

18  there?

19  A.    Yes.

20  Q.    Now, were they working under their actual names?

21  A.    No.

22  Q.    Was it your understanding that people worked under assumed

23  names because they couldn't legally work in the United States?

24  A.    Correct.

25  Q.    Was there a time that Juan asked you to get a cell phone

157

1   for him?

2   A.   Yes.

3   Q.   Do you know why Juan couldn't go to a cell phone company

4   and open up an account in his own name?

5   A.   I assume he was -- he didn't have the paperwork to get it

6   done being illegal.

7   Q.   By not having his paperwork, did you understand him to be

8   an illegal alien?

9   A.   Yes.

10  Q.   Were there also times when you filled out those time

11  sheets that you left employee names blank?

12  A.   Yes.

13  Q.   Why would you leave them blank?

14  A.   I was instructed to leave them blank.

15  Q.   Do you know for what reason you were leaving them blank?

16  A.   Pablo was going to fill them out.

17  Q.   And what would you do with the time sheets after filling

18  them out?

19  A.   After filling them out, I would send them to Pablo.

20  Q.   So this was not necessarily adding people that worked, but

21  just padding the hours with ghost employees; is that fair to

22  say?

23  A.   Correct.

24  Q.   And you understand that Pablo would fill those blanks with

25  names in later?

1    A.    Yes.

2    Q.    Let's talk about the hiring at Wolf Tree.  During your

3    time at Wolf Tree, did you become familiar with how Wolf Tree

4    employees were hired?

5    A.    Yes.

6    Q.    Who handled most of the hiring?

7    A.    Pablo.

8    Q.    And for the hiring, was there a little bit different

9    process depending on whether you were legally in the United

10   States or not legally in the United States?

11   A.    Yes.

12   Q.    Let's start with somebody who was legally in the United

13   States.  When they wanted a job would they complete an

14   application?

15   A.    Correct.

16   Q.    But for the employees who needed to use someone else's

17   name at Wolf Tree, who would handle their hiring?

18   A.    Pablo.

19   Q.    Was he involved in assigning them a name to work under?

20   A.    Yes.

21   Q.    In terms of being paid, how would illegal aliens working

22   under Pablo be paid?

23   A.    They received paper checks, direct deposits and envelopes

24   with cash.

25   Q.    For those employees paid in cash, how would they receive

159

1    the cash?

2    A.    Pablo would give it to me and I would hand them to those

3    employees.

4    Q.    You handed envelopes of cash to employees?

5    A.    Yes.

6    Q.    For the checks that you mentioned, would the checks be

7    made out to their real name, or would it be made out to the name

8    that they were working under?

9    A.    The name they were working under.

10    Q.    Did you ever hand checks to employees?

11    A.    Yes.

12    Q.    How would the employees deposit or cash those checks that

13    weren't in their real name?

14    A.    By the ATM.

15    Q.    Did you ever cash check for employees?

16    A.    Yes.

17    Q.    Were you ever paid in checks made out to other people?

18    A.    Yes.

19    Q.    Can you tell us a little bit about what led to you

20    receiving paychecks in the name of other people?  After all, you

21    are a US citizen?

22    A.    Yes.  Back in -- if I'm not mistaken -- back in 2016 when

23    we had a hurricane that hit Savannah, I was working really hard,

24    and Pablo, he just, after the work was completed in Savannah, he

25    hand me a check for my hard work.

160

```
 1   Q.    Almost as a type of bonus?

 2   A.    Correct.

 3   Q.    But typically you were paid under your real name; correct?

 4   A.    Correct.

 5   Q.    What would you do after the checks, what would you do with

 6   the checks after you received them?

 7   A.    I would deposit to my account.

 8   Q.    Was that a Wells-Fargo account?

 9   A.    Yes.

10   Q.    In total, did you receive and deposit approximately 35

11   checks totaling more than $15,000.00?

12   A.    Yes.

13         MR. HOWARD:  Your Honor, permission to approach.

14         THE COURT:  You may.

15   (By Mr. Howard)  Sir, I've handed you a 36-page exhibit marked

16   as Government's Exhibit 9.  If you would take a look through

17   that exhibit, and while you're doing so, if we could pull up

18   the first page of Government's Exhibit 9.

19         THE COURT:  Mr. Howard, for scheduling purposes about

20   how much longer do you anticipate your direct exam to be?

21         MR. HOWARD:  About 15 to 20 minutes, Your Honor.

22         THE COURT:  It is time for our afternoon break, so Mr.

23   Cruz, we are going to pause your testimony.

24         During the break, you're to consider yourself still on

25   the stand.  Although the marshals will take you to also have a
```

161

1    comfort break, you're not to discuss your testimony with anyone

2    or allow anyone to discuss it with you; understand?

3            THE WITNESS:  Correct.

4            THE COURT:  Ladies and gentlemen, as I say, it is time

5    for our brief afternoon break.  Remember during this and all

6    breaks, don't make up your mind, talk about the case or do any

7    research.  We will be in recess until 3:15.  Let's rise for this

8    jury.

9            (The jury exits the courtroom.)

10           THE COURT:  All right counsel, we will be in recess.

11           (Recess from 3:01 p.m. to 3:24 p.m.)

12           THE COURT:  All right, let's bring in the jury.

13           (The jury enters the courtroom.)

14           THE COURT:  Mr. Cruz, when we broke for our brief

15   afternoon break, you were sworn to tell the truth.  Do you

16   reaffirm that oath for the balance of your testimony?

17           THE WITNESS:  I do.

18    (By Mr. Howard)  Mr. Cruz, when we left off you were looking at

19   Exhibit 9, which is 36-page exhibit.  Have you had a chance to

20    review that exhibit?

21   A.    Yes.

22   Q.    Does that contain more than 30 checks deposited into your

23   Wells-Fargo account?

24   A.    Yes.

25   Q.    Was a summary prepared for those checks?

162

1   A.   Yes.

2   Q.   Looking at the first page of Government's Exhibit 9, does

3   that show a summary of the checks deposited into your account?

4   A.   Yes.

5   Q.   There's a couple of names there, second column, names of

6   Jerad Brown, Luciano Rodriguez, Rufino Rodriguez and Mario Vega.

7   Do you see that?

8   A.   Yes.

9   Q.   Who are those names?

10  A.   Jerad Brown was the checks I was given, receiving.

11  Luciano Rodriguez, Rufino Rodriguez, excuse me, Rufino Rodriguez

12  was the first check I received from Pablo.  Luciano Rodriguez

13  and Mario Vega, that was a guy, his name is Joel Reyes that I

14  cashed the checks for him.

15  Q.   So these were the names of individuals that were being

16  used by workers at Wolf Tree; correct?

17  A.   Correct.

18  Q.   Did you ask Pablo Rangel why people were working under

19  different names?

20  A.   No.

21  Q.   Did you ask why you were getting checks made out to other

22  people?

23  A.   No.

24  Q.   Is it fair to say you were turning a blind eye?

25  A.   Yes.

163

1    Q.    Mr. Cruz, you profited from the hiring of illegal aliens;

2    correct?

3    A.    Yes.

4    Q.    You mentioned early on that you worked with Mr. Montoya at

5    Wolf Tree; is that right?

6    A.    Yes.

7    Q.    In your discussion with Mr. Montoya, did he ever bring up

8    the issue of the hiring of the illegal aliens?

9    A.    Yes.

10   Q.    Did he complain about it?

11   A.    Yes.

12   Q.    Did he even ask you to write a letter?

13   A.    Yes.

14   Q.    What did he ask you to write?

15   A.    He asked me to write a letter stating that there were

16   illegals working at the Savannah area at Wolf Tree, and I just

17   kept -- kept telling him I was going to the house but I never

18   did.

19   Q.    Did you write that letter?

20   A.    No.

21   Q.    Why not?

22   A.    I just didn't want to get in the -- in the middle of

23   anybody's problems.

24   Q.    Now, did Mr. Montoya alert you he was going to make a

25   complaint against Pablo relating to the hiring and mistreatment

164

1    of illegal aliens?

2    A.    Yes.

3    Q.    What was your reaction to that?

4    A.    I told him he could do whatever he wanted as long as he

5    didn't get me involved.

6    Q.    Didn't get you involved; is that right?

7    A.    Correct.

8    Q.    Later on, did you come to learn that Mr. Montoya filed a

9    complaint with the company about his supervisor Pablo?

10   A.    Yes.

11   Q.    How did you come to learn that Mr. Montoya filed a

12   complaint with the company?

13   A.    Our manager, Chris Branch, he showed me the letter that

14   Mr. Eluid gave -- gave to him.

15   Q.    And do you know how Mr. Branch received the letter?

16   A.    Mr. Montoya gave it to him.

17   Q.    And for the first time we're hearing the name Chris

18   Branch.  Can you explain who Chris Branch is?

19   A.    Yes, he's -- as I recall, he was a manager when I was

20   working at Wolf Tree.

21   Q.    Okay, and Mr. Montoya gave the letter to Mr. Branch and

22   then Mr. Branch showed that letter to you?

23   A.    Yes.

24           MS. BREWINGTON:  Judge, objection to leading.

25           THE COURT:  Sustained.

165

1    (By Mr. Howard)   If we could pull up Government's Exhibit

2    Government's Exhibit 10.   Looking at Government's Exhibit 10,

3    do you recognize that document?

4    A.    Yes.

5    Q.    And this document dated April 21st, 2017, what do you

6    recognize that letter to be?

7    A.    That was the letter that Mr. Chris Branch showed -- showed

8    me.

9    Q.    And is that, do you understand that to be the letter

10   having been filed by Mr. Montoya?

11   A.    Correct.

12   Q.    Now that letter complains about Pablo hiring and

13   mistreating illegal aliens; correct?

14           MS. BREWINGTON:   Objection, leading.

15           THE COURT:   Sustained, rephrase.

16   (By Mr. Howard)   Do you know the content of the letter?

17   A.    Can you repeat that?

18   Q.    Do you know some of the complaints that are made in that

19   letter?

20   A.    What I'm looking at right now, yes.

21   Q.    And what were some of the complaints that Mr. Montoya made

22   in that letter?

23   A.    Employees, people driving without a driver's license.

24   What I'm seeing, you know, being charged $1500.00 for selling --

25   selling employees, something about employees' social security

166

1    number.

2    Q.    Mr. Cruz, did you tell Chris Branch that Pablo was hiring

3    illegal aliens?

4    A.    No.

5    Q.    Why not?

6    A.    I just -- I just didn't.

7    Q.    Now, later on, did you learn that Pablo got a copy of Mr.

8    Montoya's complaint letter?

9    A.    Yes.

10   Q.    How did you learn that Pablo got a copy of that complaint

11   letter?

12   A.    Pablo asked me to set up a meeting, one of our show --

13   showup locations, because he wanted to confront Mr. Montoya

14   about the complaint, and that's when I saw he had that letter.

15   Q.    And were you present for that meeting?

16   A.    Yes.

17   Q.    Who called the meeting?

18   A.    I did because Pablo told me to call the meeting.

19   Q.    Who attended that meeting?

20   A.    All the employees.

21   Q.    In the Savannah area?

22   A.    Yes, besides one that I forgot -- I forgot to let him

23   know.

24   Q.    And did Mr. Montoya attend that meeting?

25   A.    Yes.

167

1   Q.   You described it as a showup meeting; correct?

2   A.   Correct.

3   Q.   Can you describe what occurred at that meeting?

4   A.   We started talking about how everything was going on, and

5   then once everybody arrived, Pablo showed up and then Pablo

6   started con -- confronting Mr. Montoya about the -- the letter.

7   Q.   And staying on Exhibit 10, that letter in front of you, if

8   we could go to the second page of Government's Exhibit 10, and

9   do you see there being signed by Eluid Montoya?

10   A.   Yes.

11   Q.   Now you were discussing this showup meeting in which Pablo

12   brought up this complaint letter submitted by Mr. Montoya; is

13   that right?

14   A.   Yes.

15   Q.   Do you recall anything that Pablo said about that letter?

16   A.   All that I recall is that why did he just put the

17   complaint against him, and then after they started arguing, I

18   got a call from Chris Branch wondering why -- what happened.  I

19   don't -- I didn't know -- I don't even know who called Chris

20   Branch to let him know.

21   Q.   Was that letter read out loud at that meeting?

22   A.   Yes.

23   Q.   Now, after filing the complaint, was Mr. Montoya suspended

24   from the company?

25   A.   Yes.

168

1    Q.    Do you know why he was suspended?

2    A.    He broke the minimum -- minimum of personal distance going

3    between the electrical lines.

4    Q.    Now, before he was suspended, did you overhear a

5    conversation with some Davey Tree managers regarding Mr.

6    Montoya?

7    A.    Yes.

8    Q.    Can you tell the jury about that?

9    A.    Yeah.  They said they wanted to prepare a paper -- a paper

10   trail so they could fire him.

11   Q.    And who did you hear say those things?

12   A.    Michael McCollum, David Jackson, Chris Branch.

13   Q.    And you mentioned they wanted to create a paper trail to

14   have a reason to fire Mr. Montoya?

15   A.    Yes.

16   Q.    Who is Michael McCollum and David Jackson?

17   A.    My knowledge is that Michael McCollum, then he was the

18   vice president of Wolf Tree.  David Jackson was a regional

19   manager, and Chris Branch was our manager.

20   Q.    Now, after Mr. Montoya learned that he was going to be

21   suspended, did he contest that suspension?

22   A.    Yes.

23   Q.    Mr. Cruz, how did you come to learn that Eluid Montoya was

24   killed?

25   A.    Well, I was in the hospital with my wife.  My wife was

1  pregnant then.  Andrew Rodriguez, he and another employee were

2  going to move one of the company trucks to take it to another

3  mechanical shop, and they say -- they told me that they saw a

4  bunch of ambulance and stuff and paramedics and cops at the

5  trailer park where Mr. Montoya used to live, and they got nosy

6  and they went in there and Andrew told me that he saw the

7  paramedics picking up their gear and taping the area and he --

8  he thought that he was dead.

9  Q.    So you learned from a colleague that Mr. Montoya was

10 killed?

11 A.    Yes.

12 Q.    Were you eventually fired from Wolf Tree?

13 A.    Yes.

14 Q.    Why were you fired?

15 A.    Receiving those checks.

16 Q.    After Mr. Montoya's murder, were you federally charged

17 with conspiring to conceal, harbor and shield illegal aliens?

18 A.    Yes.

19 Q.    And you pled guilty; correct?

20 A.    Yes.

21 Q.    As part of your guilty plea, did you enter into a plea

22 agreement with the Government and agree to cooperate?

23 A.    Yes.

24 Q.    Did you testify in the trial of Higinio Perez-Bravo?

25 A.    Yes.

170

1   Q.    Were you then sentenced to prison?

2   A.    Yes.

3   Q.    Are you currently serving your prison sentence?

4   A.    Yes.

5   Q.    If we could pull up Government's Exhibit 11, and is

6   Government's Exhibit 11, is this the plea agreement you entered

7   into?

8   A.    Yes.

9   Q.    Now, if we could turn to the bottom of Page 4, and

10  specifically looking at Paragraph Number 7 on the bottom of Page

11  4, does that set forth your agreement to provide complete and

12  truthful cooperation?

13  A.    Yes.

14  Q.    Are you required to truthfully disclose your knowledge of

15  the offense?

16  A.    Yes.

17  Q.    Truthfully answer any questions put to you by law

18  enforcement?

19  A.    Can you rephrase it?

20  Q.    Are you required to truthfully answer any question put to

21  you by law enforcement?

22  A.    Yes.

23  Q.    Do you get any benefit in this plea agreement if you are

24  not truthful?

25  A.    Can you repeat it?

1  Q.    If you are not truthful, do you get any benefit in this

2  plea agreement?

3  A.    No.

4  Q.    Are you hoping that by cooperating with law enforcement it

5  will result in a reduced sentence?

6  A.    Yes.

7  Q.    And indeed at the time of your sentence earlier, did the

8  Government request that you be sentenced to a lower amount?

9  A.    Yes.

10 Q.    Have you been promised that your sentence today will be

11 reduced if you testify?

12 A.    No.

13 Q.    Will the Judge ultimately be the one to decide if your

14 sentence is reduced or not?

15 A.    Correct.

16        MR. HOWARD:  I have no further questions for this

17 witness, Your Honor.

18        THE COURT:  Cross-examination, Ms. Brewington.

19        MS. BREWINGTON:  Thank you, Judge.

20                       CROSS-EXAMINATION

21 BY MS. BREWINGTON:

22 Q.    Mr. Cruz, it's safe to say that Pablo was the boss?

23 A.    Yes, ma'am.

24 Q.    Was he the one that was doing most of the paperwork?

25 A.    Excuse me?

1   Q.    Was he the one that was doing most of the paperwork?

2   A.    Yes.

3   Q.    And any time that you were told to do paperwork, it was at

4   the direction of Pablo; correct?

5   A.    The only -- the paperwork that I did, it was the storm

6   work time sheets, the time sheet that was Exhibit -- I don't

7   recall the number.  That was a weekly time sheet, which -- which

8   was filled by him and the time sheets I was filling, it was

9   storm work time sheet.

10  Q.    And Pablo told you to do that?

11  A.    Yes, ma'am.

12  Q.    Did he ever tell you to do any other paperwork?

13  A.    Yeah.  When I filled out driver package, which include

14  guys that had license, to fill out those packets.

15  Q.    Was there false information in those packets?

16  A.    No.

17  Q.    You said that Juan is a foreman.  Does that mean that he

18  mainly worked in the field?

19  A.    Yeah.  He worked in the field.

20  Q.    Did you ever see him doing any kind of paperwork?

21  A.    They're -- as the foreman, they are required to fill out

22  the job briefing.

23  Q.    But you didn't see him fill out time sheets for other

24  employees?

25  A.    I didn't see him.

173

1    Q.    Who is the one that gave you checks in other people's

2    names?

3    A.    Mr. Pablo Rangel.

4    Q.    Nobody else gave you any checks but Pablo?

5    A.    Correct.

6    Q.    Did you ever receive extra money from Juan?

7    A.    No.

8    Q.    Did you ever tell Pablo that you were asked by Mr. Montoya

9    to write a letter?

10   A.    I don't -- I don't remember if I told him or not.

11   Q.    Do you remember if you told anybody?

12   A.    Yes, I do remember telling.

13   Q.    Who?

14   A.    Colleagues.

15   Q.    Who did you tell?

16   A.    Like I said, I think it must -- it must have been Jose

17   Santos.

18   Q.    Did you ever tell Juan?

19   A.    I don't remember.

20   Q.    That conversation was just between you and Mr. Montoya;

21   there was nobody else there?

22   A.    Yes, yes.  It was between me and him.

23   Q.    This meeting that occurred, did Juan ever speak at the

24   meeting?

25   A.    No.

174

```
1    Q.    It's safe to say he is just another worker; correct?

2    A.    Correct.

3    Q.    Who suspended Mr. Montoya?

4    A.    David Jackson.

5    Q.    Who is that?

6    A.    He was our regional manager.

7    Q.    So he would have been above Pablo?

8    A.    Yes.

9    Q.    It's safe to say you're only here because of your plea

10   agreement today?

11   A.    Yes.

12   Q.    Do you get out of jail soon?

13   A.    Yes.

14   Q.    And you received a lesser sentence because of your prior

15   testimony?

16   A.    Yes.

17         MS. BREWINGTON:  Nothing further, Judge.

18         THE COURT:  Any brief redirect?

19         MR. HOWARD:  No, Your Honor.  I would ask if he could be

20   excused to the US Marshal.

21         THE COURT:  Is there any objection to this witness being

22   excused?

23         MS. BREWINGTON:  No objection, Judge.

24         THE COURT:  Then we will proceed accordingly and you may

25   step down.  Thank you.  Call your next witness.
```

175

1          MS. GROOVER:  The United States calls Jose Santos

2    Gutierrez and this witness will need the assistance of an

3    interpreter.

4          THE CLERK:  And, sir, you have previously been sworn, do

5    you still uphold that oath?

6          THE WITNESS:  Yes.

7                         JOSE SANTOS GUTIERREZ,

8    having been first duly sworn, was examined and testified as

9    follows through the interpreter:

10         THE CLERK:  Thank you.  If you will please state your

11   full name for the record.

12         THE WITNESS:  Jose -- my name is Jose Luis Santos

13   Gutierrez.

14                        DIRECT EXAMINATION

15   BY MS. GROOVER:

16   Q.   And you speak Spanish, sir; is that correct?

17   A.   Yes, I speak Spanish.

18   Q.   Do you speak English?

19   A.   A little bit.

20   Q.   Is Spanish your first language?

21   A.   Yes.

22   Q.   Do you prefer to proceed today in Spanish with the

23   assistance of an interpreter?

24   A.   Yes.

25   Q.   Are you known by any nicknames, sir?

176

1   A.   Yes.

2   Q.   What is your nickname, sir?

3   A.   They call me El Chilango.

4   Q.   Is that because of where you're from?

5   A.   Could you repeat the question?

6   Q.   Are you called Chilango because of where you're from

7   originally?

8   A.   No.

9   Q.   Why are you called Chilango?

10  A.   Because when I came here, I had a Mexico City accent.

11  Q.   You currently live here in the United States; correct?

12  A.   Yes.

13  Q.   But are you from the United States?

14  A.   No.

15  Q.   Where are you from?

16  A.   From Chiapas, Mexico.

17  Q.   When did you first come to the United States?

18  A.   I'm not real sure, but it was in the eighties, '88, '89.

19  Q.   And have you remained in the United States since that

20  time?

21  A.   No.

22  Q.   Did you go back and forth from Mexico to the United

23  States?

24  A.   Yes.

25  Q.   Each time that you entered the United States, did you ever

177

1    have identification documents such as a visa or a work permit to

2    allow you to lawfully enter the United States?

3    A.    No, none.

4    Q.    How are you able to enter the United States if you did not

5    have a document allowing you to come to America?

6    A.    Oh, with a guide or a coyote as they are called.

7    Q.    Each time you entered illegally without authorization;

8    correct?

9    A.    That's right.

10   Q.    Did you ever work for Wolf Tree while you were here in the

11   United States?

12   A.    Yes.

13   Q.    Do you remember when you started to work for Wolf Tree?

14   A.    2006.

15   Q.    How long did you work for Wolf Tree?

16   A.    Almost 12 years.

17   Q.    Did you work there from 2006 until about 2017?

18   A.    Yes.

19   Q.    How did you get the job at Wolf Tree?

20   A.    Through a friend.

21   Q.    And who hired you?

22   A.    Pablo Rangel.

23   Q.    If we could take a look at Exhibit 7, please.  Do you

24   recognize the person in this photograph, sir?

25   A.    Yes, that's Pablo Rangel.

1   Q.    Was Pablo your boss?

2   A.    Yes.

3   Q.    What was Pablo's job at Wolf Tree?

4   A.    Supervisor.

5   Q.    What did he do as a supervisor?

6   A.    What do you mean?  I don't understand.

7   Q.    Was he in charge of people that worked underneath him?

8   A.    Yes, uh-huh, yes.

9   Q.    Did he hire other people to work at Wolf Tree?

10  A.    Yes.

11  Q.    Did he fill out the paperwork when people started to work

12  at Wolf Tree?

13  A.    Yes, because a lot of us don't know how to write in

14  English.

15  Q.    So Pablo would fill out the paperwork for you?

16  A.    Yes, he would fill them out.

17  Q.    What was your job at Wolf Tree?

18  A.    Well, at the beginning, I would pull branches and put them

19  in the wood chipper.

20  Q.    Did you ultimately become a tree climber then?

21  A.    Yes.

22  Q.    All the time, just trimming the tree limbs around the

23  power lines?

24  A.    Yes.

25  Q.    Did Pablo, your boss, know that you were illegal?

179

1  A.   Yes.

2  Q.   He knew you didn't have status to work?

3  A.   Yes, he knew that I didn't.

4  Q.   How did he know that?

5  A.   I told him.

6  Q.   So how were you able to get a job at Wolf Tree through

7  Pablo without documentation to work?

8  A.   Well, he got me the documents, like false social security

9  number and like a green card, I think.

10 Q.   Pablo got you the documents?

11 A.   Uh-huh, yes.

12 Q.   You said a false -- a fake social security number with

13 your name?

14 A.   Yes.

15 Q.   So you worked under your real name; is that correct?

16 A.   Yes.

17 Q.   But using a fake social security --

18 A.   The entire time.

19 Q.   But you used a fake social security number with your name;

20 is that correct?

21 A.   Yes.

22 Q.   Where did you get the fake documents?  How did that come

23 about?

24 A.   I don't know.  Pablo called a guy.  The guy came over and

25 he took pictures of me and he gave me -- well, two days later he

180

1    gave me the documents.

2    Q.    Did you have to pay for these fake documents?

3    A.    Yes.

4    Q.    Who did you pay?

5    A.    The person who brought the documents.

6    Q.    That Pablo arranged?

7    A.    Yes.

8    Q.    How did you get paid for your work at Wolf Tree?

9    A.    With a check at the beginning.

10   Q.    And then later?

11   A.    I opened a bank account, and I would get the direct

12   deposit.

13   Q.    And you were able to get your own check because it was in

14   your name; correct?

15   A.    That's right.

16   Q.    Did you always get paid for all the hours you worked at

17   Wolf Tree?

18   A.    Not always.  But sometimes hours were missing from my

19   check.

20   Q.    Whose fault was it that there were hours missing from your

21   check?

22   A.    Pablo's because he did the time sheets.

23   Q.    And so your time sheets were sometimes filled out

24   incorrect?

25   A.    Yes.

181

1    Q.    You would work more than was documented on your time

2    sheet; is that correct?

3    A.    That's right.

4    Q.    Did you ever have any other issues with your pay at Wolf

5    Tree?

6    A.    No, I don't remember.

7    Q.    Did you ever complain that you weren't getting paid for

8    all your hours?

9    A.    Yes.

10    Q.    Who did you complain to?

11    A.    To Pablo.

12    Q.    And what did Pablo say about that?

13    A.    "Don't worry.  I'll put them in for next week."

14    Q.    Did he then follow up the next week and add the hours back

15    in?

16    A.    No.

17    Q.    Do you know why he was doing that?

18    A.    I would ask him.  He would say, "Oh, sorry, I forgot."

19    Q.    But he would never correct it then?

20    A.    Huh-uh, no.

21    Q.    Did you work with others at Wolf Tree that were also

22    illegal working with Pablo?

23    A.    Yes.

24    Q.    Did the other individuals who were illegal, did they work

25    in their own name, like you?

182

1    A.    No.

2    Q.    Were they working under fake names?

3    A.    Yes, another name.

4    Q.    And were the illegal aliens working in other names, did

5    they get paid in cash?

6    A.    Yes, they would get paid in cash.

7    Q.    And do you know if these other illegal aliens who got paid

8    in cash if they got paid for all their hours?

9          MS. BREWINGTON:  Objection, speculation.

10         THE COURT:  Sustained, rephrase.

11    (By Ms. Groover)  Do you know if any other illegal alien had

12    trouble with their pay?

13   A.    Yes, I knew of some.

14   Q.    And they had trouble with their pay with their supervisor

15   Pablo; is that correct?

16   A.    Yes.

17   Q.    Do you know if they ever filed a complaint?

18   A.    Well, I don't remember very well.

19   Q.    Okay.  To your knowledge, did any members of Pablo's

20   family, did they work for Wolf Tree at the time?

21   A.    Yes.

22   Q.    What members of Pablo's family worked at Wolf Tree?

23   A.    Carlos Rangel, Leonardo -- I don't know his last name.

24   Who else was there?  Pablo Rangel's son, the son of Juan Rangel

25   and what do you call it?  Well, I don't remember the other

183

1  names.

2  Q.    What about Juan Rangel-Rubio?

3  A.    Juan Rangel, yes, his brother.

4  Q.    Do you know where Pablo lived?

5  A.    The last time?

6  Q.    Yes.

7  A.    No.  When he bought property, I didn't find out where it

8  was.

9  Q.    So let me clarify that.  At one time, did you know where

10  Pablo lived?

11  A.    When he lived at the trailer park of mobile homes on

12  Ferguson Avenue in Savannah, Savannah, Georgia.

13  Q.    At some point, did he move out to a large acre, a ranch?

14  A.    Yes, after that he bought the property and he went to

15  Rincon.

16  Q.    And do you know if members of Pablo's family lived with

17  him on the property in Rincon?

18  A.    Yes.

19  Q.    Talk about Pablo's brother, the defendant, Juan

20  Rangel-Rubio.  What was his job at Wolf Tree?

21  A.    He was a machine operator there.

22  Q.    Was he also a crew leader at times?

23  A.    He was a crew leader for our crew, and then over -- for

24  the bucket trucks, and then I don't know if he was one when he

25  was a machine operator over there.

184

1    Q.    A crew leader, he was the person in charge of a group

2    working at a time; is that right?

3    A.    That's right.

4    Q.    And at times he was your crew leader, your direct

5    supervisor?

6    A.    Yes.

7    Q.    And would you ever give Juan rides to work sometimes?

8    A.    No.

9    Q.    Did you ever see Juan with a gun?

10   A.    Yes.

11   Q.    Tell us about that.

12   A.    One day I saw him with a rifle, an R15, and he showed it

13   to me and he offered it to me to buy from him, and I told him,

14   "No, I'm not interested in weapons."

15       Then he showed me two small guns that he had that would

16   fit into your pocket.  He offered to sell those to me, and I

17   said, "No, I'm not interested in guns."

18   Q.    The two small guns that would fit in a pocket, could you

19   describe those with any more detail?

20   A.    No.  I just remember that they were two small guns and

21   that's all.

22   Q.    Were they the size of being able to fit in the palm of

23   your hand?

24   A.    Yes, they were like a small ...

25   Q.    Did you know Eluid Montoya?

185

1   A.   Yes.

2   Q.   Exhibit 2-2, please.  Is this Eluid Montoya?

3   A.   Could you repeat the question?

4   Q.   Is this a photo of Eluid Montoya?

5   A.   Oh, yes.

6   Q.   And how did you know Mr. Montoya?

7   A.   We were coworkers at the same company.

8   Q.   Were you also friends?

9   A.   Yes.

10  Q.   Did Mr. Montoya have any nicknames?

11  A.   Yes.

12  Q.   What was his nickname?

13  A.   The General.

14  Q.   Do you know why he was called the General?

15  A.   Because he was in the Mexican military.

16  Q.   Do you know when Mr. Montoya started working at Wolf Tree?

17  A.   The same year I did, 2006.

18  Q.   So you worked together with Mr. Montoya from 2006 until

19  2017?

20  A.   Not together but, yes, in the same company.

21  Q.   Did you know if Mr. Montoya also had his own tree-trimming

22  business that he used on the weekends?

23  A.   Yes.

24  Q.   Exhibit 20-5, please.  If we could please take a look at

25  Exhibit 20-5.  Tell us, do you recognize anything in this

186

1    photograph, sir?

2    A.    Oh, yes, that's his truck.

3    Q.    Is that where he would generally park it?

4    A.    Yes.

5    Q.    Do you know if Mr. Montoya always had to work on that

6    truck?

7    A.    Yes.  Since it was a truck that was old, it was a truck

8    that always had problems.

9    Q.    He was often outside there near the truck working on it?

10   A.    Yes.

11   Q.    Do you know if Mr. Montoya had status to be in the United

12   States?

13   A.    Yes.

14   Q.    Was he a US citizen?

15   A.    Yes.

16   Q.    Was Mr. Montoya -- excuse me, was Pablo also Mr. Montoya's

17   boss?

18   A.    Yes.

19   Q.    Do you know if Mr. Montoya and Pablo got along?

20   A.    No, they did not get along.

21   Q.    Do you know why?

22   A.    They always had problems.

23   Q.    What type of problems?

24   A.    Well, because sometimes the trucks wouldn't be fixed or he

25   sent one out to go work over there without lights or, you know,

1  it's always some problems with the coworkers, and he would call

2  them out.  He would say, "Why would you treat people like that?"

3  Or sometimes because Montoya would take a truck for his personal

4  work.

5  Q.    Tell us more about when Mr. Montoya would say, "Why would

6  you treat people like that?"  What was his concern?

7  A.    Well, for the same reasons that he wouldn't pay people or

8  pay late.  More than anything, pay late, like two or three weeks

9  later, and he wouldn't give vacation or holidays, nothing.

10  Q.    Did Mr. Montoya complain about that to Pablo?

11  A.    Well, yeah, he would tell him.

12  Q.    Did Pablo fix the problem?

13  A.    No.

14  Q.    Did Mr. Montoya ever tell you that he was going to do a

15  formal complaint about Pablo because of the way he was

16  mistreating workers?

17  A.    Yes.

18  Q.    What exactly did he tell you, if you remember?

19  A.    Yeah.  He told me that he was going to go to the

20  Department of Labor to make a complaint, and he went -- he went

21  to make a complaint about the mistreatment, and in the

22  Department of Labor, they told him that he had to bring the

23  complaint to his own company, and if the company didn't do

24  something, then come back to them.

25  Q.    Did Mr. Montoya tell you if he ever complained to the

1   company above Pablo about what was going on?

2   A.    Yes.  First he talked to the company, and he told them

3   that there were a lot of illegals working in the company in

4   Savannah, and the company told him, "That's not true; it's

5   impossible."

6   Q.    Did he explain that Pablo was an illegal alien?

7   A.    Yes.

8   Q.    Did the company do anything about Mr. Montoya's complaint

9   that Mr. Montoya told you about?

10  A.    No, because they didn't believe him.

11  Q.    You said you worked with Mr. Montoya for years.  Did these

12  complaints to the company go on for years?

13  A.    Yes, some started in 2012 or 2014, around there.

14  Q.    So after years of it going nowhere, did Mr. Montoya tell

15  you that he had written a formal complaint at some point?

16  A.    Yes.

17  Q.    Did you learn about this a few months before Mr. Montoya

18  was killed?

19  A.    Yes.

20  Q.    How did you learn about the written complaint?

21  A.    Oh, he told me.

22  Q.    And did Mr. Montoya tell you that Pablo found out about

23  the written complaint?

24  A.    Yes.

25  Q.    Were you present at a showup meeting when Pablo talked

189

1  about Mr. Montoya's written complaint?

2  A.    Yes.

3  Q.    Tell the jury what happened at the showup meeting?

4  A.    Well, we all met there, over there at the meeting and

5  Pablo came.  He said, "Oh, you guys aren't going to make fun of

6  me" and saying all this and that.  He says, "You're the one

7  responsible, the one responsible for all these problems," and he

8  read the content of the letter.

9        Well, somebody read it, I think, and a lot of people got

10  upset who were there at the meeting.

11  Q.    Do you remember if Juan, Pablo's brother, was at the

12  meeting?

13  A.    No, I don't remember.

14  Q.    Okay.  Do you remember what Mr. Montoya's reaction was

15  when his letter was read to everybody?

16  A.    Yeah.  He said, "All that's true," and a lot of people got

17  upset because a lot of them wanted to hit him and Montoya went

18  over to the side.

19  Q.    Mr. Montoya was upset?

20  A.    Well, yes, he was upset.

21  Q.    Do you recall a time when Mr. Montoya told you that Pablo

22  came to him trying to get him to withdraw his complaint?

23  A.    Yes.

24  Q.    What exactly did Mr. Montoya explain about that?

25        INTERPRETER CASTILLO:  Interpreter to clarify, Your

190

1    Honor.

2         THE WITNESS:  Yeah, he told me, he said no.  He told me

3    that he said, "No, you've got to stop this," and Montoya says,

4    "No, it's true," and Montoya said that Pablo said, "Yes, but

5    relax, calm down."

6    Q.    (By Ms. Groover)  Did Mr. Montoya ever tell you that he

7    was invited to a lunch with Pablo at one time?

8    A.    Like two times.

9    Q.    And did Mr. Montoya tell you if he ever went to lunch with

10   Pablo?

11   A.    I asked him, "Why didn't you go," and he said, "No, they

12   are going to fuck me up."

13   Q.    Three days before Mr. Montoya was killed, did you learn

14   that he was suspended from Wolf Tree?

15   A.    Yes.

16   Q.    Did Mr. Montoya tell you that?

17   A.    Yes, he called me and he told me.

18   Q.    After he was suspended, is that when he told you he was

19   going to the Department of Labor?

20   A.    No, because he talked with somebody else at the company.

21   The thing with the Department of Labor was earlier.

22   Q.    Is your cell phone number (912) 604-1090?

23   A.    Yes.

24   Q.    Did you have that cell phone number back in August of

25   2017?

191

A.    Yes.

Q.    Do you remember the last time you spoke with Mr. Montoya?

A.    Yes.

Q.    And was it between the time he was suspended and the time that he was killed?

A.    Yes.

Q.    And during that timeframe, did Mr. Montoya call you and tell you that he did, in fact, report it to the Department of Labor?

A.    Yes.  He told me that and -- and also that he had been suspended.

Q.    Backing up for just a moment to the showup meeting, can you tell us who generally was invited to that showup meeting?

A.    Well, the entire group.

Q.    Anyone who worked with the Savannah Wolf Tree was at that meeting; is that correct?

A.    Yes.

Q.    So you may not remember if someone was present, but they were supposed to be there if they worked; is that correct?

A.    The Savannah group met in Savannah and the group that worked in the country had their meetings over there.

Q.    Okay, and did Juan work in the Savannah group?

A.    No.

Q.    Where did Juan work?

A.    In the country, in the area of Springfield, Rincon,

192

1    Guyton.

2    Q.    But he also worked with people in the Savannah crew; is

3    that correct?

4    A.    Yes, sometimes, yes, uh-huh.

5           MS. GROOVER:  Your Honor, may I have just a moment

6    please?  No further questions, Your Honor.

7           THE COURT:  Ms. Brewington, cross-examination.

8           MS. BREWINGTON:  Thank you, Judge.

9                        CROSS-EXAMINATION

10   BY MS. BREWINGTON:

11   Q.    Mr. Gutierrez, you said he got documents for you.  Did you

12   mean Pablo?

13   A.    How was that?  Could you repeat the question?

14   Q.    You earlier said "he" got you documents.  Was it Pablo

15   that got you documents to work?

16   A.    Yes.

17   You said a guy helped him; right?

18           INTERPRETER ZIDOVEC:  I'm sorry?

19    (By Ms. Brewington)  And you said a guy helped him; correct?

20   A.    Uh-huh, yes.

21   Q.    Do you know the name of that person?

22   A.    No.

23   Q.    Where did this happen?

24   A.    In an apartment where Pablo used to live.

25   Q.    Was that on the ranch?

193

1  A.    No, no, no.  In 2006 the company would pay for the rent

2  for each one.

3  Q.    But this was Pablo's apartment alone; correct?

4  A.    Yes.

5  Q.    Was Juan present during that time?

6  A.    I don't think so.

7  Q.    Is it safe to say that Pablo's family members worked out

8  in the field?

9  A.    Yes, many of his family members would work there.

10  Q.    They weren't necessarily management?

11  A.    Yes, in the company.

12  Q.    When you talked to Mr. Montoya, he told you his complaint

13  was just about Pablo; correct?

14  A.    Yes, and also about all the people that were illegal.

15  Q.    But Pablo was the one that was orchestrating everything;

16  correct?

17  A.    Yes, he was in charge of the supervisor.

18  Q.    You said at the showup meeting a lot of people wanted to

19  hit Mr. Montoya; correct?

20  A.    Not many.  Just two of them.  The others -- the others

21  were upset.

22  Q.    Who were the two that wanted to hit Mr. Montoya?

23  A.    One of them is the one that was more upset.  I don't know

24  his name.  They call him Chito.

25  Q.    Do you know who the second person's name was?

194

```
 1   A.    No, I don't remember.

 2   Q.    Many of the workers were upset with Mr. Montoya; correct?

 3   A.    Yes.

 4   Q.    So much that he had to separate himself from all the other

 5   workers?

 6   A.    Well, he was always separate.

 7   Q.    If the company listened to Mr. Montoya, do you think

 8   people would have lost their jobs?

 9         MS. GROOVER:  Objection, speculation.

10         THE COURT:  Sustained, rephrase.

11   (By Ms. Brewington)  What Mr. Montoya was doing could get

12   people deported?

13   A.    I think so, or at least be lost -- lost their job.

14   Q.    People would lose money?

15         INTERPRETER ZIDOVEC:  I'm sorry.

16   (By Ms. Brewington)  And people would lose money?

17   A.    Yes, their work.

18   Q.    So there would be a lot of reasons for people to be mad at

19   Mr. Montoya?

20   A.    Yes.

21   Q.    Do you remember if Juan was at that meeting?

22   A.    No, I don't remember.

23         MS. BREWINGTON:  Nothing further.

24         THE COURT:  Any brief redirect?

25         MS. GROOVER:  No, Your Honor.
```

1          THE COURT:  Any objection to this witness being excused?

2          MS. BREWINGTON:  None.

3          MS. GROOVER:  No, Your Honor.

4          THE COURT:  You may step down, Mr. Gutierrez.

5          Ms. Groover, Mr. Howard, call your next witness.

6          MR. HOWARD:  The Government calls Joel Reyes.

7          THE CLERK:  And, sir, you were previously sworn.  Do you

8    still uphold that oath you were previously sworn?  Do you still

9    uphold that oath?

10          THE WITNESS:  Not here.

11          THE COURT:  I'm sorry, what we're asking you is do you

12    remember when you came in this morning and took an oath to swear

13    to tell the truth?

14          THE WITNESS:  Yes.

15          THE COURT:  And what she wants to know is do you still

16    agree to tell the truth and uphold that oath?

17          THE WITNESS:  Yes.

18                          JOEL REYES PENA,

19    having been first duly sworn, was examined and testified as

20    follows through the interpreter:

21          THE CLERK:  You may be seated.  And, sir, if you will

22    please state your full name for the record.

23          THE WITNESS:  Joel Antonio Reyes Pena.

24                          DIRECT EXAMINATION

25    BY MR. HOWARD:

1   Q.   Sir, where are you from originally?

2   A.   Honduras.

3   Q.   When did you come to the United States?

4   A.   At the beginning of 2013.

5   Q.   Did you come to the United States lawfully?

6   A.   I came illegally.

7   Q.   In August 2017, were you working for a tree company?

8   A.   Yes.

9   Q.   And was that Wolf Tree?

10   A.   Yes, Wolf Tree.

11   Q.   Did it later become a part of Davey Tree Company?

12   A.   Yes.

13   Q.   What year did you start working there?

14   A.   At the end of September, September of 2013.

15   Q.   Who hired you?

16   A.   Pablo Rangel.

17   Q.   Did you complete a job application?

18       MS. BREWINGTON:  Judge, can I interrupt?  We're having a

19  hard time hearing the witness.

20       THE COURT:  Can you get closer to the microphone?

21       Repeat your last question.

22  (By Mr. Howard)  Did you complete a job application?

23   A.   No.

24   Q.   When you were hired, did you have authorization to work in

25  the United States?

197

1   A.    No.

2   Q.    How were you able to work then?

3   A.    Because they would put the papers.

4   Q.    Did someone assign you a name to work under?

5   A.    Yes.

6   Q.    Who?

7   A.    Pablo Rangel.

8   Q.    Did you have to pay Pablo to use that name?

9   A.    Yes.

10  Q.    How did you pay him?

11  A.    From each check he would take out what was convenient.

12  Q.    Do you recall the names that you worked under?

13  A.    Yes.

14  Q.    What names were those if you recall?

15  A.    Armando Trejo.

16  Q.    Do you recall any others?

17  A.    Yes.

18  Q.    What names are those?

19  A.    Armando Soto.

20  Q.    Soto?

21        INTERPRETER ZIDOVEC:  Soto.

22   (By Mr. Howard)  When you started working for Wolf Tree, were

23   you paid in cash?

24  A.    Yes.

25  Q.    And after working there for several years, did you receive

1  several paychecks?

2  A.    Yes.  When -- when working as Armando Trejo, I received

3  checks -- no, no, no, excuse me, Armando Soto I received four

4  checks.

5  Q.    How many hours a week did you typically work?

6  A.    60 hours.

7  Q.    Did you sometimes work more than 60 hours a week?

8  A.    During the storm, at the time of the storm, we worked 100,

9  120 hours, day and night.

10 Q.    How much were you paid an hour?

11 A.    $10.00.

12 Q.    Did you get paid overtime?

13 A.    No.

14 Q.    Did you get paid for vacations or holidays?

15 A.    No.

16 Q.    Did you always get paid on time?

17 A.    No.

18 Q.    Were you ever injured while working at Wolf Tree?

19 A.    Yes.

20 Q.    What happened?

21 A.    I fell from the ramp of the truck and got my foot twisted,

22 my right foot.

23 Q.    Did you go to the doctor?

24 A.    No.

25 Q.    Why not?

1    A.    Because I didn't have the means to go to see a doctor.

2    Q.    Did you talk to Pablo about being hurt?

3    A.    Yes.

4    Q.    What did Pablo say?

5    A.    He gave me four days to rest, and then I went back to work

6    still injured using crutches.

7    Q.    Did you know Juan Rangel-Rubio?

8    A.    Yes, I saw him several times.

9    Q.    How did you know him?

10   A.    At work.

11   Q.    How through work?

12         INTERPRETER ZIDOVEC:  Excuse me?

13   (By Mr. Howard)  How did you know him through work?

14   A.    When they sent me to check the giraffe and sometimes at

15   his house, then Pablo's house.

16   Q.    Did you occasionally work in Juan Rangel-Rubio's group?

17   A.    Yes.

18   Q.    And what was Juan's job?

19   A.    He was the -- he would work trimming.

20   Q.    When Pablo wasn't there, who would be in charge of that

21   group?

22   A.    Oscar Cruz.

23         INTERPRETER ZIDOVEC:  Oscar Cruz?

24         THE WITNESS:  Yes.

25   (By Mr. Howard)  Did Juan act as a foreman for that group?

1    A.    When Pablo was not there, he was in charge of taking care

2    of us.

3    Q.    Sir, are your eyes closed right now?

4    A.    No.

5    Q.    Would you mind looking up at me?

6          Did you ever see Juan with a gun?

7    A.    That was visible, no, but, yes, he was -- he had a gun

8    with him.

9    Q.    Tell me about that?

10   A.    It would be seen that he had -- was carrying a weapon, but

11   he would not show it.

12   Q.    Was it at long gun or a shotgun?

13   A.    A small gun but it would be noticed.

14   Q.    Would you pull up Government's Exhibit 2.  Do you

15   recognize the individual depicted there?

16   A.    It's Eluid Montoya.

17   Q.    How did you know Mr. Montoya?

18   A.    He was a coworker in his group.

19   Q.    Did you and Mr. Montoya ever discuss problems you were

20   having at work?

21   A.    Several times.

22   Q.    And did the two of you discuss writing a letter

23   complaining about Pablo's treatment of employees?

24   A.    Yes.

25   Q.    If we could pull up Government's Exhibit 12 and please

201

1    look at that.  Did you recognize the one-page document on the

2    screen in front of you that's Government's Exhibit 12?

3    A.    Yes.

4    Q.    What is that?

5    A.    The letter that I wrote.

6    Q.    Did you sign the letter?

7    A.    Yes.

8    Q.    Who wrote the letter?

9    A.    I with Mr. Montoya.

10   Q.    Why did you write this letter?  Why did you have this

11   letter written?

12   A.    Because of the mystery that we received from the company.

13   Q.    Now in the letter, if we could zoom in on the first, the

14   top half of the document, the whole document if we could just

15   zoom in on the content of that letter perhaps so that those who

16   want to read it can do so.

17         Now in the letter do you acknowledge that you're working

18   for the company illegally?

19   A.    Yes.

20   Q.    And you're acknowledging that you're using the name and

21   social security number of someone else?

22   A.    Yes.

23   Q.    Do you complain that Pablo charges you $1500.00 for the

24   information of another person; right?

25   A.    Yes.

202

1    Q.    Was your full phone number listed in the bottom of this

2    letter?

3    A.    Yes.

4    Q.    Was the first part of that number redacted for the

5    purposes of this question?

6            INTERPRETER ZIDOVEC:    I'm sorry, could you repeat that

7    for the interpreter?

8    (By Mr. Howard)   Yes.   Was the first part of that number

9    redacted for purposes of this trial?

10           INTERPRETER ZIDOVEC:    For purposes of?

11   (By Mr. Howard)   For purposes of this trial.

12   A.    Could you repeat it, please?

13   Q.    Was your phone number redacted from this document?

14   A.    No, the full number is here but the first numbers cannot

15   be seen.

16   Q.    Were you worried that you would be fired as a result of

17   this letter?

18   A.    Yes.

19   Q.    Why did you and Mr. Montoya put this letter together?

20   A.    Because I didn't have anyone else who would support me for

21   this.

22   Q.    Did Mr. Montoya give one of your complaint letters to the

23   company?

24   A.    Yes.

25   Q.    How did you find out that he had given it to the company?

203

1    A.    Because Pablo Rangel appeared with the letters at the

2    meeting.

3    Q.    Now, what happened at that meeting?

4    A.    He showed the letters and Eluid Montoya felt bad.

5    Q.    Was Mr. Montoya at that meeting?

6    A.    Yes.

7    Q.    Did you speak with him?

8    A.    Yes.  I spoke with him for a moment after the meeting.

9    Q.    Can you describe Mr. Montoya's reaction to that meeting?

10   A.    He bent down.  His blood pressure went up.  Well, I don't

11   know.

12   Q.    Did he look visibly ill?

13   A.    He looked sick and sad at the same time.

14   Q.    Did Mr. Montoya say anything to you?

15   A.    He just said that we didn't -- that we didn't have support

16   from the company.

17   Q.    Were you asked by anyone at the company if you wrote the

18   letter with Mr. Montoya?

19   A.    Yes.

20   Q.    Who?

21   A.    Oscar Cruz.

22   Q.    What did you say when asked?

23   A.    That I hadn't done the letters.

24   Q.    Why did you lie to Mr. Cruz about writing the letter with

25   Mr. Montoya?

204

1   A.    For protection from anything that could happen.

2         MR. HOWARD:  I have no further questions for this

3   witness, Your Honor.

4         THE COURT:  Cross-examination, Ms. Brewington.

5         MS. BREWINGTON:  Thank you, Judge.

6                         CROSS-EXAMINATION

7   BY MS. BREWINGTON:

8   Q.    Mr. Reyes, your only complaints have been about Pablo; is

9   that right?

10  A.    Yes.

11  Q.    He treated everybody in the company badly?

12  A.    Almost everybody.

13  Q.    He would have been the one that fired you for writing that

14  letter?

15  A.    He fired me one time.

16  Q.    What did he fire you for?

17        INTERPRETER CASTILLO:  Your Honor, interpreter needs to

18  clarify.

19        THE COURT:  Yes.

20        THE WITNESS:  He told me that the papers weren't working

21  anymore and to look for one.

22   (By Mr. Howard) Were you mad about that?

23  A.    Well, you could say I was more sad because when they tell

24  you you can't work and you have to go look for one.

25  Q.    Is that why you wrote this letter against Pablo?

205

1   A.    Yes.

2   Q.    So it wasn't because Mr. Montoya asked you to?

3   A.    No.

4   Q.    You wanted to get back at Mr. Pablo for the way he was

5   treating you?

6   A.    Well, I didn't want to get back at him but I just wanted

7   justice to be done.

8   Q.    At this showup meeting, a lot of people were mad?

9   A.    Yes.

10  Q.    They were mad at Mr. Montoya; correct?

11  A.    Them?

12  Q.    The other workers.

13  A.    Yes, they were upset at him and with me also.

14  Q.    Why were they upset with you?

15  A.    Because of the complaints and they said that the company

16  was going to be shut down because of the letters.

17  Q.    This was all coming from other employees?

18  A.    Yes.

19  Q.    It's safe to say many of the employees were mad at you?

20  A.    You could say so.

21  Q.    Many of the employees were mad at Mr. Montoya?

22  A.    Yes.

23  Q.    You said he needed protection from those employees?

24  A.    Yes.

25        MS. BREWINGTON:  Nothing further.

206

1          THE COURT:  Any brief redirect, Mr. Howard?

2          MR. HOWARD:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. HOWARD:

5    Q.    You were asked if Pablo mistreated all of the employees at

6    Wolf Tree; right?

7    A.    Yes.

8    Q.    And you said almost everybody?

9    A.    Yes.

10   Q.    Who were those that he didn't mistreat?

11   A.    His family.  Well, his family worked a lot, but there, it

12   was only him.

13   Q.    His family like Juan Rangel-Rubio?

14   A.    Yes, and his nephews.

15          MR. HOWARD:  No further questions, Your Honor.

16          THE COURT:  Any objection to this witness being excused?

17          MS. BREWINGTON:  No objection.

18          MR. HOWARD:  No, Your Honor.

19          THE COURT:  You may step down.  Thank you, sir.

20          All right, ladies and gentlemen of the jury, it's just

21   about five o'clock and it's been a full day, so we will pause

22   here until tomorrow.  As we do break for the evening, please

23   remember those four important rules.  Don't discuss the case.

24   Don't make up your mind.  Don't do any independent research and

25   don't read anything or listen or watch anything in any form of

207

1    media.

2           We will start promptly at 9:00 a.m. so do as you did all

3    day today and that is be in your jury room in time to start

4    promptly.  Let's rise for this jury.

5           (The jury exits the courtroom.)

6           THE COURT:  Counsel, one thing I neglected to clarify at

7    the beginning of the day.  Attorney Olive who has been on the

8    defense team, of course, has some challenges that prevent him

9    from being in the courtroom, and he did ask for us to open up a

10   phone line for him to listen in to, and the Defense, of course,

11   had no objection to that so that has been available for him to

12   do.

13          All right, I think we're making good progress.  Was

14   there one point of logistics that the United States needed to

15   cover?

16          MR. HOWARD:  Your Honor, I don't know if it's a witness

17   that we're going to get to tomorrow, but we do have a blowup of

18   a photograph that we would like to place on an easel.  We've

19   sort of mapped out the different possibilities, and I think the

20   proposal, the preferred proposal certainly from the Government

21   would be that we put the easel here.  The witness will have

22   basically a laser pointer.  This will allow the jury.

23          The down side is the defendant and defense counsel won't

24   be able to see it, but I wonder if they could sort of be able to

25   move around.

208

1          THE COURT:  Well, I want them to see it, of course.  So

2     where would be the location that they would be in order to see

3     it?

4          MR. HOWARD:  I think even if they sit in the front of

5     defense table, then they should be able to see it.

6          THE COURT:  They, of course, have a right to see every

7     part of the trial, and so we will make sure if, Ms. Brewington,

8     you speak up if that right is in any way impinged, and we will

9     make sure that that right is honored.

10          Counsel, we will begin promptly at 9:00 and we will be

11     in recess.

12          (Proceeding concluded at 4:53 p.m.)

13                    CERTIFICATION

14

15          I certify that the foregoing is a true and correct

16     transcript of the stenographic record of the above-mentioned

17     matter.

18

19     _Debra D Gilbert_

21     _____          11/23/2022

22     Debra Gilbert, Court Reporter          Date

23

24

25