209

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA          )
                                  )
        v.                        )
                                  )         CASE NO.
JUAN RANGEL-RUBIO,                )   4:18-CR-274-LGW-CLR-2
                                  )
_____Defendant._____)



JURY TRIAL
BEFORE THE HONORABLE LISA GODBEY WOOD
October 26, 2022; 9:05 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                           CHRISTOPHER HOWARD, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov
                           christopher.howard@usdoj.gov


For the Defendant:         KATIE A. BREWINGTON, Esq.
                           The Brewington Law Firm, LLC
                           P. O. Box 11153
                           Savannah, Georgia  31412
                           (912) 704-0858
                           kabrewington@gmail.com


Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov
                            - - -

210

I N D E X

PAGE

GOVERNMENT WITNESSES

    JUAN RAMIREZ MENDOZA
        Direct Examination By Mr. Howard        212
        Cross-Examination By Ms. Brewington    221

    RUBEN RAMIREZ HERNANDEZ
        Direct Examination By Mr. Howard        224
        Cross-Examination By Ms. Brewington    227

    JERAD BROWN
        Direct Examination By Ms. Groover      228

    RAYMUNDO ESPINO VEGA
        Direct Examination By Ms. Groover      234
        Cross-Examination By Ms. Brewington    241

    CARMEN BROWN
        Direct Examination By Ms. Groover      242
        Cross-Examination By Ms. Brewington    257

    DIEGO TORRES
        Direct Examination By Ms. Groover      259

    GERARDO HERNANDEZ ANDROTTI
        Direct Examination By Mr. Howard        278

    LIEUTENANT ROBERTO RODRIGUEZ
        Direct Examination By Ms. Groover      283
        Cross-Examination By Ms. Brewington    359
        Redirect Examination By Ms. Groover    370

    MARIA DELROSARIO GONZALEZ FLORES
        Direct Examination By Ms. Groover      373
        Cross-Examination By Ms. Brewington    385
        Redirect Examination By Ms. Groover    386

    ANTHONY MIRANDA
        Direct Examination By Ms. Groover      387
        Cross-Examination By Ms. Brewington    412
        Redirect Examination By Ms. Groover    420

STANLEY TURNER
     Direct Examination By Mr. Howard          421
     Cross-Examination By Ms. Brewington       426

DR. NATASHA GRANDHI
     Direct Examination By Ms. Groover         428

KEVIN RIPPMAN
     Direct Examination By Mr. Howard          451
     Cross-Examination By Ms. Brewington       465

212

P R O C E E D I N G S

1

2          (Call to order at 9:05 a.m.)

3          THE COURT:  All right, let's bring in the jurors.

4          (The jury enters the courtroom.)

5          THE COURT:  Good morning.  Welcome back to the

6    courtroom, ladies and gentlemen of the jury.  When we broke last

7    night, we were progressing through the Government's witnesses.

8          Ms. Groover, Mr. Howard, call your next.

9          MR. HOWARD:  The Government calls Juan Ramirez.

10         THE CLERK:  Sir, yesterday you were previously sworn.

11   Do you still uphold that oath?

12         THE WITNESS:  Yes.

13                    JUAN RAMIREZ MENDOZA,

14   having been first duly sworn, was examined and testified as

15   follows through the interpreter:

16         THE CLERK:  Thank you.  You may be seated.  And if you

17   will please state your full name for the record.

18         THE WITNESS:  Juan Ramirez Mendoza.

19         MR. HOWARD:  Your Honor, may I proceed?

20         THE COURT:  You may.

21                    DIRECT EXAMINATION

22   BY MR. HOWARD:

23   Sir, where are you from?

24   A.    From Mexico.

25   Q.    When did you come to the United States?

213

```
1    A.    In 2004.

2    Q.    Did you come lawfully?

3    A.    No.  Illegally.

4    Q.    After entering the United States, what did you do for

5    work?

6          INTERPRETER CASTILLO:  Interpreter needs to clarify,

7    Your Honor.

8          THE COURT:  Yes.

9          THE WITNESS:  I went to Tennessee.  I was brought there

10   to work at the company Wolf Tree.

11    (By Mr. Howard)  When did you start working for Wolf Tree?

12   A.    May 10th, 2004.

13   Q.    When you were hired in 2004, did you have authorization to

14   work in the United States?

15   A.    Yeah -- no.

16   Q.    After working in Tennessee, did you work in any other

17   states for Wolf Tree?

18   A.    I worked here in Savannah, Georgia.  In Savannah, Georgia,

19   I worked.

20   Q.    Do you know Pablo Rangel-Rubio?

21   A.    Yes.

22   Q.    How do you know him?

23   A.    I met him when I went to work in Savannah from another

24   place.

25   Q.    And was Pablo your supervisor?
```

214

1    A.    Yes, my supervisor.

2    Q.    How were you paid for your work?

3    A.    I was paid, the first years I was paid with a check.

4    Q.    And after being paid with a check in the first years, how

5    were you paid later on?

6    A.    With automatic payments.

7    Q.    Through a bank account?

8    A.    Yes, Bank of America.

9    Q.    Was there a time when you stopped receiving pay?

10        INTERPRETER CASTILLO:  Again, interpreter needs to

11   clarify, Your Honor.

12        THE COURT:  Yes.

13        THE WITNESS:  Yes, in 2014, third month, I went a month

14   and a half without pay.

15   (By Mr. Howard)  What happened that led to you going a month

16   and a half without pay?

17   A.    Because my payment didn't show up in my bank account.  It

18   didn't show up.

19   Q.    Did you complain to anyone?

20   A.    No.  I just told Pablo because he was the only one that

21   could look at my check.

22   Q.    And do you know where your pay went?

23   A.    He had changed the address for my checks to his.

24   Q.    How do you know that?

25   A.    Because I asked Angel who worked with him.  He was his

215

1    assistant.

2    Q.    What did you find out when asking Pablo's assistant?

3    A.    Because he told me to ask Pablo because he didn't know

4    anything.

5    Q.    Did there come a time when you actually saw checks with a

6    different address?

7    A.    No.  Later on, later on, later on, after a month and a

8    half, the money appeared in my account, just the seventh check.

9    Q.    Did any of your coworkers ever complain to Pablo about not

10   being paid in full?

11          MS. BREWINGTON:  Objection, hearsay.

12          THE COURT:  Sustained.  Rephrase.

13   (By Mr. Howard)  Sir, did you ever hear any of your coworkers

14   complain to Pablo about not being paid in full?

15          MS. BREWINGTON:  Hearsay again.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes, several.  Several complained to him.

18   (By Mr. Howard)  And what was Pablo's response?

19          MS. BREWINGTON:  Objection, hearsay.

20          THE COURT:  Sustained.

21   (By Mr. Howard)  And, sir, did you hear Pablo's response to

22   those complaints about not being paid?

23          MS. BREWINGTON:  Hearsay again.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes, I heard that several times.

216

1   (By Mr. Howard)   Now, sir, were you ever injured at work?

2   A.   I fell twice from the machine that I was working on but I

3   was never taken to the hospital.

4   Q.   Why were you not taken to the hospital?

5   A.   Because he said that I didn't have papers for him to take

6   me to the hospital.

7   Q.   Who said that you didn't have papers to take you to the

8   hospital?

9   A.   Pablo always said that.

10  Q.   Did any of Pablo's family members work at Wolf Tree?

11  A.   There are several that worked there.

12  Q.   Do you recall approximately how many of the Rangel-Rubio

13  family members worked at Wolf Tree?

14  A.   Between 10 and 12 people.

15  Q.   And did that include Juan Rangel-Rubio?

16  A.   Yes, he was -- he was -- he was his brother.

17  Q.   Did you know Juan?

18  A.   Yes, I knew him several times.

19  Q.   And did you work with Juan?

20  A.   Yes, I worked with him.

21  Q.   Was there a time that you came to train Juan on a piece of

22  machinery?

23  A.   Yes.   I'm the one that showed him because I was the only

24  one that worked on that machine.

25  Q.   What piece of machinery was that?

217

1    A.    The giraffe, the giraffe.

2    Q.    After you trained Juan on that piece of machinery, what

3    happened to your job?

4    A.    I was dropped down to branch puller, manual.

5    Q.    And did this result in you receiving less pay?

6    A.    Yes, my pay was dropped to 13.89.

7    Q.    Did you ever see Juan with a gun?

8    A.    Yes, he had a .22 revolver.

9    Q.    And when did you see him with that .22 caliber revolver?

10         INTERPRETER CASTILLO:  Your Honor, would Your Honor mind

11   instructing the witness to wait until the interpreter finishes

12   asking the question.

13         THE COURT:  Sir, you need to make sure that the question

14   has been interpreted and your answer has been interpreted.  Try

15   not to speak over the translator; understand?  It's important

16   that we hear everything you say and understand it so you have to

17   wait until everyone is finished speaking before you speak so we

18   can capture all that you say.

19         THE WITNESS:  Okay.

20         THE COURT:  If you will just for clarification repeat

21   your last question, and then once it's translated if you will

22   repeat your answer.

23         Mr. Howard.

24   (By Mr. Howard)  Sir, you mentioned seeing Juan with a

25   .22-caliber revolver.  My question is when did you see him with

218

```
 1   that revolver?
 2   A.    Yes.  In 2016, he carried a weapon every day.
 3   Q.    If we could pull up Government's Exhibit 2.  Sir, in
 4   looking at the screen in front of you, do you recognize the
 5   individual depicted there?
 6   A.    I can't see it very well.
 7         THE COURT:  Marshal, if you will turn that flat screen
 8   toward him.
 9         THE WITNESS:  It's Eluid Montoya, Eluid Montoya.
10   (By Mr. Howard)  And how did you know Mr. Montoya.
11   A.    I worked with him for some time as an assistant.
12   Q.    Did you and Mr. Montoya ever talk about Pablo?
13         INTERPRETER CASTILLO:  Your Honor, the interpreter needs
14   to clarify.
15         THE COURT:  Yes.
16         THE WITNESS:  I just asked him to help me regarding my
17   pay being lowered.
18   (By Mr. Howard)  And did you have discussions with Mr. Montoya
19   about putting together a letter complaining about Pablo?
20   A.    Yes.
21   Q.    If we could pull up Government's Exhibit 59.  Sir, ask you
22   to look on the screen in front of you and ask you if you
23   recognize that letter there?
24   A.    Yes.
25   Q.    And scrolling down to look at the signature, did you sign
```

1    this letter?

2    A.    Yes, I signed it.

3    Q.    Who brought it to you?

4    A.    Eluid Montoya brought it to me to sign.

5    Q.    Did you tell Mr. Montoya what to put in the letter?

6    A.    Yes, I told him -- I told him the normal stuff.  I didn't

7    tell him anything else.

8    Q.    Do you know what Mr. Montoya did with this letter?

9    A.    No.  He just told me that he was going to -- that he was

10   going -- that he was going to send it to the equality.

11   Q.    Now this letter is dated July 22nd, 2017; correct?

12   A.    Yes.

13   Q.    And a few weeks after this letter --

14        THE COURT:  Counsel, if you will hold up just a second.

15   It's been brought to my attention that perhaps one of the

16   screens in the jury box is not operational, so it's important

17   that we're all on the same page, so to speak, at one time.

18        Ms. Sharp, is it possible for you to bring down the big

19   screen and put that up as well?

20        THE CLERK:  It is, Judge.

21        THE COURT:  And in the meanwhile, our IT people will be

22   working on fixing that screen.  It is important that we see all

23   the exhibits.

24        Mr. Howard, if you will just pause until we get that up.

25        MR. HOWARD:  Your Honor, would it help if we turned our

220

1    screen to the jury box.

2         THE COURT:  Let's not do that.  I think we can just use

3    the court system.

4         THE CLERK:  It's got to warm up.

5         THE COURT:  You may need to dim the lights a little bit

6    more.  All right, it appears that all jurors can see your

7    exhibit so if you will continue.

8    (By Mr. Howard)  Thank you, sir.  You observed this letter is

9    dated July 22nd, 2017; right?

10   A.    Yes.

11   Q.    And a few weeks later Mr. Montoya died; is that right?

12   A.    Yes, he died, yes.

13   Q.    Now after you signed the letter but before Mr. Montoya

14   died, did you have any discussions with Pablo?

15   A.    Yes, on August 14th.

16   Q.    What did Pablo say?

17        MS. BREWINGTON:  Hearsay.

18        THE COURT:  Hold on.  Are you asking about Pablo or

19   Juan?

20        MR. HOWARD:  The statement is a statement by Pablo.

21   It's a statement in furtherance of the conspiracy.

22        THE COURT:  Overruled.

23   (By Mr. Howard)  Sir, repeating the question, what did Pablo

24   say to you?

25   A.    He told me not to get involved in any problems.  That's

221

1    all he told me.

2    Q.    And what did you understand him to mean by that?

3    A.    That was a threat for me.

4    Q.    Did you in any way warn Mr. Montoya about Pablo and his

5    family?

6    A.    Yes.

7    Q.    What did you say to him?

8    A.    I told him to watch out for those people.

9    Q.    Which people?

10   A.    Pablo and Juan.

11   Q.    Why did you warn Mr. Montoya to watch out for Pablo and

12   Juan?

13   A.    Because they were armed.

14          MR. HOWARD:  I have no further questions, Your Honor.

15          THE COURT:  Cross-examination, Ms. Brewington.

16          MS. BREWINGTON:  Thank you, Judge.

17                          CROSS-EXAMINATION

18   BY MS. BREWINGTON:

19   Q.    Mr. Ramirez, who paid you by check?

20   A.    The Wolf, the Wolf -- the company Wolf Tree.

21   Q.    And did Pablo give it to you?

22   A.    No, he didn't give me the checks.

23   Q.    Who gave you the checks?

24   A.    Pablo brought them.

25   Q.    You mentioned you had a Bank of America bank account.  How

222

1    did you set that up?

2    A.    I got help to open the account because at that time I

3    didn't have an ID.

4    Q.    Who helped you?

5    A.    The person that was working there with us.

6    Q.    Do you know that person's name?

7    A.    His name is Michael, but he's not here anymore.

8    Q.    Where did you get the ID?

9        THE COURT:  Mr. Ramirez, wait until the translation is

10   complete; understand?  Proceed.

11       THE WITNESS:  At that time I got an ID.  I got a

12   consular ID from the Mexican consulate.

13    (By Ms. Brewington)  Did Pablo ever give you any

14   identification?

15   A.    No, him, no, he never gave me anything.

16   Q.    Did Pablo have access to your bank account?

17   A.    Yes, because he received the paper to deposit into it that

18   I got from the bank that I gave to him.

19   Q.    Did you give him that information?

20   A.    Yes.

21   Q.    So he was able to deposit into your bank account himself?

22   A.    Yes.  That's what he did.

23   Q.    He's the person that dropped your position down at Wolf

24   Tree; is that correct?

25   A.    Yes.

223

1    Q.    He's also the person that determined that you would

2    receive less pay?

3    A.    Yes, he was the only one.

4    Q.    He was the only one you complained about in that letter?

5    A.    Yes, the only one.

6    Q.    Your complaints had nothing to do with Juan?

7    A.    No, no, not that, not him.

8    Q.    Why did you think Pablo was a threat?

9    A.    Because one week prior, he told me -- he told me to

10   withdraw that letter.

11   Q.    Did he carry a gun?

12   A.    Yes, he had a weapon.

13   Q.    Did other workers carry guns?

14   A.    Yes, his nephews, his family members.

15   Q.    Was it common that other workers carried guns?

16   A.    Yes, they had several weapons.

17            MS. BREWINGTON:  Nothing further.

18            THE COURT:  Any brief redirect?

19            MR. HOWARD:  No, Your Honor.

20            THE COURT:  Any objection to this witness being excused?

21            MR. HOWARD:  No, Your Honor.

22            MS. BREWINGTON:  No objection.

23            THE COURT:  You may step down.  Thank you, sir.  All

24   right, call your next witness.

25            MR. HOWARD:  The Government calls Ruben Ramirez

224

1    Hernandez.

2          THE CLERK:  And, sir, if before you're seated, yesterday

3    you were previously sworn.  Do you still uphold that oath?

4          THE WITNESS:  Yes.

5                      RUBEN RAMIREZ HERNANDEZ,

6    having been first duly sworn, was examined and testified as

7    follows through the interpreter:

8          THE CLERK:  Thank you.  You may be seated, and if you

9    will please state your full name for the record.

10          THE WITNESS:  Ruben Ramirez Hernandez.

11          MR. HOWARD:  Your Honor, may I proceed.

12          THE COURT:  You may.

13                      DIRECT EXAMINATION

14    BY MR. HOWARD:

15    Q.    Sir, where are you from?

16    A.    Mexico.

17    Q.    Did you come to the United States?

18    A.    Yes.

19    Q.    When?

20    A.    I don't remember anymore, but it's been years ago.

21    Q.    Did you come to the United States lawfully?

22    A.    No.

23    Q.    And after entering the United States, did you eventually

24    come to Savannah, Georgia?

25    A.    Yes.

225

1    Q.    Did you get a job with a tree company in Savannah?

2    A.    Yes.

3    Q.    Was that Wolf Tree?

4    A.    Yes.

5    Q.    When you worked at Wolf Tree, did you work under your real

6    name?

7    A.    No.

8    Q.    Did you have lawful status to work in the United States

9    when you worked at Wolf Tree?

10   A.    No.

11   Q.    Were you ever injured while working at Wolf Tree?

12   A.    Yes.

13   Q.    What happened?

14   A.    A branch fell here on my head.

15   Q.    Did you go to the hospital?

16   A.    Yes, after I told this guy by the name Oscar to take me to

17   the hospital.

18   Q.    And did you speak with Pablo about going to the hospital?

19   A.    No, only by text.  I texted him to take me to the hospital

20   but he declined.

21   Q.    Did he say why he didn't take you to the hospital?

22   A.    He responded that he was not going to take me because I

23   was undocumented.

24   Q.    Did you know Eluid Montoya?

25   A.    Yes.

226

```
 1    Q.    How did you know him?

 2    A.    Through work.

 3    Q.    Did you discuss your work injury with Mr. Montoya?

 4    A.    Yes.

 5    Q.    Did there come a time when a written complaint was made in

 6    your name?

 7    A.    Yes.

 8    Q.    Whose idea was it to write a letter to the company?

 9    A.    Mr. Montoya and myself.

10    Q.    Who wrote the letter?

11    A.    He did.

12    Q.    Did you sign the letter?

13    A.    Yes.

14    Q.    Do you know if the letter was given to the company?

15    A.    Yes, he told me he had sent it to the company.

16    Q.    If we could pull up Government's Exhibit 60.  Sir, looking

17    at the screen in front of you, do you recognize your signature

18    on that document?

19    A.    Indeed, I do.

20    Q.    And is that the complaint letter?

21    A.    Yes.

22          MR. HOWARD:  I have no further questions for this

23    witness, Your Honor.

24          THE COURT:  Any cross-examination, Ms. Brewington?

25          MS. BREWINGTON:  Thank you, Judge.
```

227

CROSS-EXAMINATION

BY MS. BREWINGTON:

Q.    Mr. Hernandez, what name did you work under?

A.    I don't remember what name they gave me there.

Q.    Who gave you the name?

A.    Oscar.

Q.    Did you pay for that name?

A.    No.

Q.    How were you paid?

A.    Cash.

Q.    Did you have a bank account?

A.    No.

Q.    Your complaints were only against Pablo?

A.    Yes, yes, ma'am.

        MS. BREWINGTON:  Nothing further.

        THE COURT:  Any brief redirect?

        MR. HOWARD:  No, Your Honor.

        THE COURT:  Any objection to this witness being excused?

        MR. HOWARD:  No, Your Honor.

        MS. BREWINGTON:  No.

        THE COURT:  You may step down and you're excused.  Thank you, sir.

        THE WITNESS:  Thank you.

        THE COURT:  Call your next witness.

        MS. GROOVER:  The United States calls Jerad Brown and

228

1    this witness does not need the assistance of an interpreter.

2           THE CLERK:  Sir, yesterday you were previously sworn.

3    Do you still uphold that oath?

4           THE WITNESS:  Yes, ma'am.

5                          JERAD BROWN,

6    having been first duly sworn, was examined and testified as

7    follows:

8           THE CLERK:  If you would, please state your full name

9    for the record.

10          THE WITNESS:  Jerad Lavon Brown.

11                       DIRECT EXAMINATION

12   BY MS. GROOVER:

13   Q.    Good morning, sir.

14   A.    Good morning.

15   Q.    What city do you live in?

16   A.    Springfield, Georgia, right now.

17   Q.    And are you employed, sir?

18   A.    Yes, ma'am.

19   Q.    Where do you work at now?

20   A.    International Longshoreman Association, Savannah, Georgia.

21   Q.    And how long have you worked there, sir?

22   A.    Three years.

23   Q.    Was there a time that you ever misplaced your wallet or

24   lost your wallet?

25   A.    Years ago.

229

1    Q.    Tell the jury about that.

2    A.    Well, it was when I was around 23.  I misplaced my wallet

3    when I was catching a CAT, public transportation in Savannah,

4    Georgia.

5    Q.    And what was in your wallet at the time?

6    A.    Just -- just my ID and a couple of dollars.

7    Q.    Identification document?

8    A.    Yes.

9    Q.    And you're a US citizen; correct?

10    A.    Yes, ma'am.

11    Q.    And at the time when you misplaced your wallet, did you

12    think anything about it or did you report it stolen or anything

13    like that?

14    A.    No, I didn't.  You know, 23 years old, you just go get

15    another one and keep it moving.

16    Q.    Okay.  Fast-forward in life -- was that approximately

17    about 2011 or so when you were that age?

18    A.    Yeah, 2011, that's 21 years old, around that time.

19    Q.    Fast-forward to 2018.

20    A.    Right.

21    Q.    Did you run into some trouble that you found out with the

22    IRS?

23    A.    Yes, I did.

24    Q.    Can you tell the jury about that, please?

25    A.    Yes.  I was buying a home and I guess the IRS found out I

1    was buying a home and sent me some documents saying I owed a

2    significant amount of money, which, working at McDonald's, I

3    don't make that type of money around that age, and then US

4    Customs came knocking on my door around like seven o'clock in

5    the morning, waking me up, waking my six-year-old -- my

6    six-month-year-old up, my wife and saying that I had identity

7    theft and they needed to talk to me about some things.  That's

8    when everything went downhill.

9        I started paying the government because they wanted to

10   take my home -- well, they wanted to take my home and my wages,

11   and, you know, I had to pay up because I wanted my son and my

12   wife to have a house, you know, so I just asked --

13   Q.   Let me stop you there, sir.

14   A.   Right.

15   Q.   So you told us that you went to buy a house in about 2018;

16   is that correct?

17   A.   Right.  Yes, ma'am.

18   Q.   And at that time you also began having problems with the

19   IRS; correct?

20   A.   Right, yes, ma'am.

21   Q.   The IRS sent you notice that you owed back taxes; is that

22   correct?

23   A.   Yes, ma'am.

24   Q.   And did you learn where these taxes were supposedly coming

25   from, what income?

231

1  A.    Yeah, I did learn.  They told me it was from Wolf Tree and

2  I was in a cubicle with people outside and they said I owe a

3  significant amount of money.  I don't remember the amount but

4  all I heard was ooohh.

5  Q.    Did you ever work at Wolf Tree?

6  A.    No, ma'am.

7  Q.    And the IRS said you owed taxes from when you worked at

8  Wolf Tree?

9  A.    Yes, ma'am.

10 Q.    And at the time when you were first told you owed taxes,

11 did you know how to contest that with the IRS?

12 A.    No, I didn't.  They told me to fill out some paperwork for

13 identity theft.

14 Q.    And before you filled out that paperwork for identity

15 theft, were you concerned that your wages would be garnished and

16 your house would be taken because of these back taxes?

17 A.    Yes.

18 Q.    And so did you start to pay on the taxes that you didn't

19 owe for employment that you didn't work at Wolf Tree?

20 A.    Oh, yeah.  It was a crime until proven innocent.

21 Q.    So you started paying on taxes that you did not owe?

22 A.    Yes, ma'am.

23 Q.    And did you eventually have to fill out paperwork to show

24 that you were a victim of identity theft?

25 A.    Yes.

232

1    Q.    And did you have to notify the Federal Trade Commission

2    that you were identity theft, a victim of identity theft?

3    A.    Yes, ma'am.

4    Q.    Did you have to notify the Social Security Administration

5    that you were a victim of identity theft?

6    A.    Yes, ma'am.

7    Q.    And did you ultimately have to file a petition with the

8    tax court and go to court to get the taxes resolved?

9    A.    Yes, ma'am.

10    Q.    Did my office as well as the Department of Homeland

11    Security assist you with that process?

12    A.    Yes, ma'am.

13    Q.    And the problems with the IRS began in about 2018; is that

14    right?

15    A.    Yes, ma'am.

16    Q.    And when did you finally get notice from the IRS that

17    these taxes were taken care of and you no longer had to pay on

18    the earnings you didn't earn?

19    A.    I think around last year, December that ended, but another

20    problem came up about two weeks ago.

21    Q.    What problem was that?

22    A.    The State put a tax lien on my house for $4,000.00.

23    Q.    The Georgia Department of Revenue?

24    A.    Yes.

25    Q.    Is that from taxes from Wolf Tree?

233

1    A.    Yes.  That's from just two years of taxes from Wolf Tree

2    right now.

3    Q.    So now are you working with the Georgia Department of

4    Revenue to correct the taxes that you don't owe?

5    A.    Trying to, going through that, you know, that process,

6    yes.

7    Q.    And at any time did you ever give anyone permission to use

8    your identity and work at Wolf Tree?

9    A.    No, ma'am.

10          MS. GROOVER:  Thank you.  I have no further questions.

11          THE COURT:  Ms. Brewington, any cross-examination?

12          MS. BREWINGTON:  No questions, Judge.

13          THE COURT:  Any objection to this witness being excused?

14          MS. BREWINGTON:  None.

15          MS. GROOVER:  None.

16          THE COURT:  You may be excused.  Thank you, sir.

17          THE WITNESS:  Thank you.

18          THE COURT:  Ms. Groover, Mr. Howard, call your next

19    witness.

20          MS. GROOVER:  Thank you, Your Honor.  The United States

21    calls Raymundo Espino Vega, and this witness will need the

22    assistance of an interpreter.

23          THE CLERK:  And sir, yesterday you were previously

24    sworn.  Do you still uphold that oath?

25          THE WITNESS:  Yes, yes.

234

1                      RAYMUNDO ESPINO VEGA,

2   having been first duly sworn, was examined and testified as

3   follows through the interpreter:

4           THE CLERK:  Thank you.  If you will please state your

5   full name for the record.

6           THE WITNESS:  Raymundo Espino Vega.

7                        DIRECT EXAMINATION

8   BY MS. GROOVER:

9   Q.    And, sir, do you speak Spanish?

10  A.    Yes.

11  Q.    Do you speak any English?

12  A.    A little bit.

13  Q.    Do you prefer to proceed today in Spanish with the

14  assistance of an interpreter?

15  A.    Yes.

16  Q.    Sir, what country are you originally from?

17  A.    From Mexico.

18  Q.    And what year did you come to the United States?

19  A.    In 1999.

20  Q.    And are you now a naturalized United States citizen?

21  A.    Yes.

22  Q.    Did you ever work at Wolf Tree in the Garden City/

23  Savannah area, sir?

24  A.    Yes.

25  Q.    And how long did you work for Wolf Tree, sir?

235

1    A.    With Wolf Tree, 15 years.

2    Q.    Did you begin working at Wolf Tree in approximately 2006

3    or 2007?

4    A.    Uh-huh.

5    Q.    And did you continue to work for Wolf Tree up until about

6    2018 or '19?

7    A.    Yes.

8    Q.    And how did you get the job at Wolf Tree, sir?

9          INTERPRETER CASTILLO:  Your Honor, interpreter needs to

10   clarify.

11         THE COURT:  Yes.

12         THE WITNESS:  Wolf Tree, through a guy that I knew,

13   Flavio Martinez.

14   (By Ms. Groover)  At some point, did Pablo become your

15   supervisor?

16   A.    Yes.  Uh-huh.

17   Q.    If we could please show Exhibit 7.  Sir, do you recognize

18   this man?

19   A.    Yes, yes.  That's Pablo Rangel.

20   Q.    And how were you paid, sir?

21   A.    For me, no, I would get my check.  It would be deposited

22   in my bank.

23   Q.    Did you ever have problems with your paycheck?

24   A.    No.

25   Q.    Were you aware if there were any coworkers who were

236

1    illegal working for Wolf Tree?

2    A.    Yes, yes.

3    Q.    Do you know if your coworkers who were illegal had any

4    problem with their pay?

5    A.    Yes, yes, yes.  I knew about that.

6    Q.    Was Pablo their boss?

7    A.    Yes, uh-huh.

8    Q.    Do you know if your coworkers who were illegal with pay

9    problems, did they complain to anyone?

10   A.    Yes, I learned that they did, that they complained to

11   somebody but nobody paid them any attention.

12   Q.    Did they complain to people -- who did they complain to if

13   you know?

14   A.    At an office that's over there in Savannah.

15   Q.    Are you familiar with any of Pablo's family members?

16   A.    Yes.

17   Q.    Did you work with any of Pablo's family members?

18   A.    Yes, uh-huh.

19   Q.    Approximately how many members of Pablo's family did you

20   work with, sir?

21   A.    Like about five or six.

22   Q.    And do you know if Pablo's family were legal or illegal in

23   this country?

24   A.    They were here illegally.

25   Q.    What about Juan Rangel-Rubio; do you know who that is?

237

```
1    A.    Yes.

2    Q.    And who was that?

3    A.    Who, Juan Rangel?

4    Q.    Yes.

5    A.    Yes, he was Pablo's brother.

6    Q.    Did you work with him?

7    A.    Yes.

8    Q.    What was his job?

9    A.    He was in the bucket or the giraffe, the machine they call

10   the giraffe.

11   Q.    Juan worked in the bucket or the giraffe?

12   A.    On the, uh-huh.

13   Q.    Was he sometimes a crew leader in charge of a group of

14   workers?

15   A.    Yes, yes, yes, uh-huh, he was a leader.

16   Q.    Did you know where Pablo and Juan lived?

17   A.    No.  The last place they lived, no, I never knew it, and I

18   never went to their house.

19   Q.    Did you ever see Pablo's brother Juan Rangel-Rubio with

20   guns?

21   A.    Yes.  Several times.

22   Q.    Tell the jury about the times you saw Juan with guns.

23   A.    Several times, several times because I -- because I drive

24   a pickup truck, and I would give them rides, Juan and everybody,

25   and I would see that they had -- all the time they would have
```

238

1    them in the pickup trucks, yeah, uh-huh, several times.

2    Q.    Would you give these rides during work hours?

3    A.    Yeah.  I would drive the pickup, and Juan, since he was

4    the leader, he would be next to me and the weapons would be

5    right there in the pickup truck.

6    Q.    Describe the guns that you saw that Juan had.

7    A.    Yeah.  There was like a machine gun, like the long weapon

8    and also some short weapons, like a .22, and he also had some

9    small guns that would fit in like the pockets of your pants,

10   uh-huh.  He had two of them.

11          INTERPRETER CASTILLO:  Interpreter, correction.

12          THE WITNESS:  He had like two of them.

13   (By Ms. Groover)  You said he had like two small guns that he

14   could fit in a pocket; is that correct?

15   A.    Yes, yes, uh-huh.

16   Q.    How often would you see him with these two small guns that

17   he could fit in his pocket?

18   A.    No, all the time.  I saw that he had them all the time.

19   Q.    Did he carry the two small guns in his -- with him all the

20   time?

21   A.    Uh-huh, yes, yes.

22   Q.    Sir, do you know who Mr. Montoya is?

23   A.    Yes.

24   Q.    Are you related to Mr. Montoya, sir?

25   A.    No.

239

1    Q.    Are you married to anyone in his family?

2    A.    Oh, yes.

3    Q.    Related to Mr. Montoya through marriage; is that correct,

4    sir?

5    A.    Yes, uh-huh.

6    Q.    And how did you first meet Mr. Montoya?

7    A.    I met Mr. Montoya because he went to work at Wolf Tree.  I

8    was working at Wolf Tree and he went to work at Wolf Tree and I

9    met him there.

10    Q.    And did you ever have conversations with Mr. Montoya about

11    coworkers who were illegal not getting paid?

12    A.    Yes, yes.

13    Q.    And what would Mr. Montoya tell you about the problems

14    that illegal aliens were having with their pay?

15    A.    Yeah, he said that he wasn't in agreement with it because

16    he said that Pablo paid them a pittance.

17    Q.    Did Mr. Montoya want to help them?

18    A.    Yes, that's right, uh-huh.

19    Q.    And help them voice their complaint?

20    A.    Uh-huh, that, too.

21    Q.    Did he tell you what he did about that?  Did Mr. Montoya

22    tell you what he did about the complaints?

23    A.    Yes, uh-huh.

24    Q.    What did he do?

25    A.    No, the only thing that I know is that he went and made

240

1    the complaint at that office, that office that's over there in

2    Savannah.

3    Q.    Do you know if Mr. Montoya and Pablo got along?

4    A.    No, they did not get along, no.

5    Q.    Why not?

6    A.    No, no, because they had differences.  They had

7    differences and they did not get along.

8    Q.    Did the differences concern how Pablo was paying illegal

9    aliens?

10    A.    Uh-huh, that's exactly right.

11    Q.    Did Pablo ever talk to you about the problems with Mr.

12    Montoya?

13    A.    Yeah, yeah, he talked to me.  He told me that he had

14    problems, that they did not get along.

15    Q.    Did Pablo ever tell you that he was upset with Mr.

16    Montoya?

17    A.    Yes.  Uh-huh.

18    Q.    Did Pablo ever come to you to try to get Mr. Montoya to

19    stop these complaints?

20    A.    Yes, that, too.  He did that, too.

21    Q.    Did you ever tell Mr. Montoya that Pablo was upset and

22    wanted him to stop complaining?

23    A.    Uh-huh.

24    Q.    What did Mr. Montoya say in response?

25    A.    No, Mr. Montoya didn't -- he didn't say anything.  He

241

1   didn't say anything to me about what he was going to do.

2   Q.   Did Mr. Montoya ever tell you he was ever worried or

3   concerned?

4   A.   No, no, no.

5        MS. GROOVER:  Your Honor, may I have one moment, please?

6   No further questions, Your Honor.

7        THE COURT:  Cross-examination, Ms. Brewington.

8        MS. BREWINGTON:  Thank you, Judge.

9                      CROSS-EXAMINATION

10   BY MS. BREWINGTON:

11   Q.   Sir, did other workers at Wolf Tree carry guns?

12   A.   No, no.

13   Q.   You never saw anybody else with a gun?

14   A.   No.

15        MS. BREWINGTON:  Nothing further.

16        THE COURT:  Any brief redirect?

17        MS. GROOVER:  No, Your Honor.

18        THE COURT:  Any objection to this witness being excused?

19        MS. BREWINGTON:  No objection.

20        MS. GROOVER:  No, Your Honor.

21        THE COURT:  You may be excused.  Thank you, sir.

22        Call your next witness.

23        MS. GROOVER:  The United States calls Carmen Brown to

24   the stand.

25        THE CLERK:  Good morning, ma'am.

242

1          THE WITNESS:  Hi.

2          THE CLERK:  So yesterday you were previously sworn.  Do

3   you still uphold that oath?

4          THE WITNESS:  Yes.

5                          CARMEN BROWN,

6   having been first duly sworn, was examined and testified as

7   follows:

8          THE CLERK:  Thank you.  If you will please state your

9   full name for the record.

10         THE WITNESS:  Carmen Brown.

11                     DIRECT EXAMINATION

12  BY MS. GROOVER:

13  Q.   Good morning, ma'am.

14  A.   Good morning.

15  Q.   Can you please tell us what city do you live in?

16  A.   Savannah.

17  Q.   And are you employed?

18  A.   I'm retired.

19  Q.   Where are you from originally, ma'am?

20  A.   From Puerto Rico.

21  Q.   How long have you lived in the Savannah area?

22  A.   Since I was seven.

23  Q.   And do you speak Spanish?

24  A.   Yes.

25  Q.   Do you read and write and are you fluent in Spanish?

243

1    A.    I read and write not fluently but I do it.

2    Q.    And do you ever help people translate at times because you

3    know English and Spanish?

4    A.    Yes, ma'am.

5    Q.    Do you know Eluid Montoya?

6    A.    Yes.

7    Q.    Exhibit 2, please.  How do you know Mr. Montoya?

8    A.    I was sitting on my porch and he was across the street

9    cutting some trees, so I walked over there to him and I asked

10   him if he could cut a branch.  He said no but he would come back

11   and cut it for me.

12   Q.    No, because he was --

13   A.    Because he was working and, you know, he was driving a

14   truck and cutting, so he said, "I will be back and take care of

15   it for you because I got my own truck."

16   Q.    And did he come back another time to help you with your

17   branch?

18   A.    Yes, he did.

19   Q.    And tell the jury about that time you had met Mr. Montoya.

20   A.    Well, he called me up and he asked me, he wanted me to do

21   him a favor.  I said, "All right, come on over."  And he came

22   over and we sat on the porch and he asked me if I could make a

23   phone call for him, and he had a letter that he showed me, and

24   he wanted to know that they received that letter so I translated

25   it for him, made the phone call.

244

```
 1        They said they had gotten the letter.  I talked to some
 2   lady.  I don't know who she was, but she was going to
 3   investigate it, so that was it.
 4   Q.   Did he tell you who he wanted to call?
 5   A.   He was -- he was trying to -- I think it was -- he wanted
 6   to call somebody in the office, but he was talking about the
 7   letter because of somebody by the name of Pablo.
 8   Q.   Let me back up.  You gave us a lot of information.  You
 9   said one day he called you and he came over?
10   A.   He called me one -- one evening.
11   Q.   Okay.
12   A.   He called me up and he came over the next day.
13   Q.   Was it after he fixed your tree branch for you?
14   A.   Yes.
15   Q.   So after you established that you speak Spanish and
16   English, after he fixed your tree, he called you up one day;
17   correct?
18   A.   Yes.
19   Q.   And he came over for a favor?
20   A.   Yes.
21   Q.   And at that time, did he tell you what favor he needed
22   when he called you on the phone?
23   A.   He -- he told me a little bit about what was going on,
24   about what was going on in his job, the mistreating.
25   Q.   What exactly did he tell you about his job?
```

245

1   A.   He just told me that he was tired and it had been going on

2   for years, and they were mistreating the workers.

3   Q.   And did he tell you he wanted to do something about it?

4   A.   He told me he wanted to report everything.  He wanted to

5   report it because he was tired of it, that it had been going on

6   for years.

7   Q.   And he felt like nothing was getting done?

8   A.   Nothing was getting done.

9   Q.   And did you help him report it to the company?

10  A.   I made that phone call for him to the company.  He came

11  over and wanted to know they got it, yes.

12  Q.   And you did that for him?

13  A.   Yes, I did.

14  Q.   Do you remember what you told the company?

15  A.   It was just the letter.  He wanted to know if he got --

16  they got the letter.

17  Q.   So he had previously sent them a letter?

18  A.   Yes.

19  Q.   And he was following up to see --

20  A.   To make sure that they got it, yes.

21  Q.   After you made the phone call, did he ask for any more

22  assistance?

23  A.   He wanted -- yes, he did.  He wanted to go to the

24  Department of Labor, and I -- and I said to him, "That's not

25  going to do you any good; we got to" -- I looked in the -- in

246

1    the paper to find out who would help him, and so I found this

2    place, was the EEOC, so we went -- we made -- I believe -- I

3    don't remember.  I believe we made an appointment to go the next

4    day there.

5    Q.    So he was asking, in addition to reporting to the company,

6    he wanted to report his complaints to the Department of Labor;

7    is that correct?

8    A.    Yes, he did.

9    Q.    And he wanted your help to do that?

10   A.    Yes, I did.

11   Q.    And did you help research how to go to the Department of

12   Labor?

13   A.    Yes -- to the EEOC, yes.

14   Q.    In your research, did you determine that the EEOC may be a

15   better fit for him?

16   A.    Yes, I did.

17   Q.    Did you explain that to Mr. Montoya?

18   A.    Yes, I did.

19   Q.    And did he agree to go to the EEOC?

20   A.    Yes, he did.

21   Q.    Okay.  And did you help him go to the EEOC?

22   A.    Yes, I did.  I met him there the next day.

23   Q.    So one day he came to you for a favor and you helped him

24   research and the next day you took him to the EEOC; is that

25   correct?

247

1    A.    Yes, I did.

2    Q.    What happened at the EEOC?

3    A.    We went in, and we asked to -- he was a little on the

4    nervous side, but we went in there and asked to speak to

5    somebody about his problem.

6         And then I noticed that he was sitting there and he was

7    really nervous, fidgeting, going through the paper, and I noted

8    this, and I just patted him and noted it was going to be okay

9    and that's when somebody came in and took him in the room to

10   talk to him.

11   Q.    What exactly about his behavior made you think he was

12   nervous?

13   A.    To me it looked like he was nervous.  He was kind of going

14   through the paperwork and fidgeting about it.  That's when I

15   told him to chill out, it's going to be okay.

16   Q.    Was he acting like that on the porch?

17   A.    A little bit.  Not as much as when we were there.

18   Q.    Did Mr. Montoya speak with someone at the EEOC?

19   A.    Yes, he did.

20   Q.    Did you stay for that?

21   A.    They were going to take -- he wanted me to go in with him.

22   But they wouldn't let me go on, and I asked, "How long is it

23   going to be?"  They said an hour.  I said, "I can't sit here for

24   an hour; I will go home."

25   Q.    And did you follow up with Mr. Montoya to find out what

248

1    happened?

2    A.    I called him in the evening and he answered me that he was

3    still there.

4    Q.    And was that the end of your communications with Mr.

5    Montoya?

6    A.    I'm trying to remember.  He still wanted to go to the

7    Department of Labor, and I told him that I couldn't do it

8    because I had a soccer game to go to out of town.  I was going

9    to go out of town, and I set it for Monday so we were supposed

10    to go there Monday.

11    Q.    So do you remember then what day you took him to the EEOC,

12    what day of the week?

13    A.    I believe it was Thursday.

14    Q.    Okay.  And he wanted to go to the Department of Labor on

15    Friday, the next day; is that right?

16    A.    Yes, yes.

17    Q.    And you couldn't take him on Friday?

18    A.    I couldn't take him, no.

19    Q.    So did you make plans to go on Monday?

20    A.    We made plans for Monday.  I told him I would contact him

21    when I came back.

22    Q.    What happened?  Were you able to go to the Department of

23    Labor?

24    A.    It didn't happen.  I got a call from his sister telling me

25    what happened.

249

1    Q.    And what happened?

2    A.    That they killed him.

3    Q.    That he was killed?

4          THE COURT:  Ma'am, there are some tissues.

5    (By Ms. Groover)  When you found out that he was killed, what

6    did you do next?

7    A.    I got in the car -- I got in the car and went down there

8    to see what was happening, and his sister was already there.

9    Q.    To see what was happening, you went to where he lived?

10   A.    I went straight over there, yeah.

11   Q.    After you went to where he lived, did you see all the cops

12   there and the ambulance?

13   A.    Yeah, I talked to a detective.

14   Q.    Okay.  After you talked with a detective, where did you

15   go?

16   A.    I hung around a little bit and I went home.

17   Q.    What did you do on Monday, the next business day?

18   A.    What did I do?

19   Q.    What did you do on Monday, the next business day?

20   A.    I don't remember.

21   Q.    Do you remember going back to the EEOC?

22   A.    Yes, I went back -- I went back to the EEOC, and I -- and

23   I told the guy that -- that took the intake, I told him, "They

24   have killed him."

25   Q.    Do you remember when you were communicating with Mr.

250

1  Montoya, did you do this by cell phone?

2  A.    Cell phone.

3  Q.    And did you do it in both phone calls and text messages?

4  A.    Yes.

5  Q.    And prior to today, did you have an opportunity to review

6  those phone calls and text messages?

7  A.    Yes.

8  Q.    Government's Exhibit 96, please.

9         MS. GROOVER:  Your Honor, may I approach the witness?

10        THE COURT:  You may.

11  (By Ms. Groover)  Ma'am, I'm handing you what's been marked for

12  identification as Government's Exhibit 96.  Can you please take

13  a look at that and tell me have you seen that before?

14  A.    Yes.

15  Q.    And is this a presentation of your communications with Mr.

16  Montoya?

17  A.    Yes.

18        THE COURT:  Excuse me.  Is there a problem with your

19  screen?

20        Members of the jury, raise your hand if anybody cannot

21  see.  All right, Ms. Sharp, we need to put that on the big

22  screen as well, and if you will let the IT people know and hold

23  on just a second, Ms. Groover, until we get that.

24        THE CLERK:  All you should see is just white on the

25  screen.

251

1          JUROR NUMBER 4:  There's two names there, Ms. Brown's

2     name and Montoya, but that's it.

3          THE CLERK:  Yes.

4          THE COURT:  Proceed.

5     (By Ms. Groover) Exhibit 96, are your phone calls and text

6     message on the left side in blue?

7     A.   Yes.

8     Q.   On the right side, is it Mr. Montoya's phone calls and

9     text messages?

10    A.   Yes.

11    Q.   I'm sorry?

12    A.   Yes.

13    Q.   And whenever a phone call was made, does that appear in

14    a -- will that appear in a circle explaining that that was a

15    phone call?

16    A.   Yes.

17    Q.   When a text message is sent, is that in a square with like

18    a little carat like someone is talking?

19    A.   Yes.

20    Q.   So did Mr. Montoya call you at approximately 2:41 on

21    August the 16th of 2017?

22    A.   Yes.

23    Q.   And is that when he then wanted to come to your house to

24    help with the favor?

25    A.   Yes.

252

```
 1    Q.    And then did you call him that night, ma'am?
 2    A.    Yes.  I texted.
 3    Q.    Did you also send him a text message?
 4    A.    Yes, I did.
 5    Q.    What did you tell him in the text message?
 6    A.    "I see you there."
 7    Q.    Did you tell him "tomorrow at 8:30 at the EEOC"?
 8    A.    Yes, I did.  Yes, I did.
 9    Q.    And you gave him the address?
10    A.    Yes.  Well, I told him the EEO.  I can't remember.  I
11    believe I did, but I told him EEO.  I think I did because I
12    looked it up in the Internet.
13    Q.    And did he call you again that night?
14    A.    Yes.
15    Q.    And then he also responded to your text confirming he
16    would meet you at the EEOC; is that correct?
17    A.    Yes, yes.
18    Q.    And all of that was on Wednesday, the 16th?
19    A.    The 16th.
20    Q.    Of August of 2017; is that correct?
21    A.    Yes, yes.
22    Q.    And then you confirmed again, "See you there"; correct?
23    A.    Yes, I did.
24    Q.    The next day, on August the 17th, that was a Thursday?
25    A.    Yes.
```

253

1    Q.    Is that when you went to the EEOC with Mr. Montoya?

2    A.    Yes, yes, it is.

3    Q.    Did you send him a text message explaining that you were

4    there?

5    A.    Yes.

6    Q.    And did you get there a little early?

7    A.    I did.

8    Q.    So where did you go?

9    A.    I went to the -- to the coffee shop.  I went to a coffee

10   shop and told him to meet me there.

11   Q.    And did he confirm that he would meet you there?

12   A.    No.  We -- no, we met at the EEOC.  We didn't have no

13   coffee.

14   Q.    But he confirmed and sent you a text message saying, "Yes,

15   okay"?

16   A.    Yes, he did.

17   Q.    And did you respond, saying -- what did you tell him in

18   your response, ma'am?

19   A.    "Coming for coffee?"

20   Q.    On Page 2 or if you can see it on your screen, ma'am?  Did

21   you respond and ask him if he was on his way?

22   A.    Yes, I did.  Yes, I did, and I told him that's easy to

23   find.  Yes, I did.

24   Q.    In response to your text, did Mr. Montoya call you?

25   A.    Yes.

254

```
 1    Q.    Did he also send you a text?

 2    A.    He said, "I'm here."

 3    Q.    And the text, did he send that to you in Spanish?

 4    A.    Yes.

 5    Q.    Is that an accurate English translation underneath it,

 6    "Here I am"?

 7    A.    Yes, yes.

 8    Q.    Did you text him in response to come in for coffee?

 9    A.    Yes.

10    Q.    And did you also call him?

11    A.    Yes, I did.

12    Q.    Trying to meet up that morning; correct?

13    A.    Yes.

14    Q.    At that moment did you then go into the EEOC?

15    A.    Yes, we did.

16    Q.    And then you left; correct?

17    A.    After they took him inside the room to talk to him, yes, I

18    did.

19    Q.    And a few hours later at approximately 11:28 a.m., after

20    you had left Mr. Montoya at the EEOC, did you send Mr. Montoya a

21    text to check in on him?

22    A.    Yes, I did.

23    Q.    And what did you say to him?

24    A.    He told me he was still there.

25    Q.    You sent a text that said "coming true fue"?
```

255

1   A.    Yes.

2   Q.    Was that maybe an automatic correct or something?

3   A.    Yes.

4   Q.    And what did Mr. Montoya say in response?

5   A.    He's still here.

6   Q.    "I'm still here," he said it in Spanish?

7   A.    He said it in Spanish.

8   Q.    Is that an accurate English translation below it?

9   A.    Yes, it is.

10  Q.    Did you then send him another text to say --

11  A.    "What's happening," yeah, I called him and asked him what

12  happened.

13  Q.    And he text you back in response?

14  A.    He told me that they were going to investigate.

15  Q.    He texted you that in Spanish?

16  A.    Yes, he did.

17  Q.    Is that an accurate English translation below that?

18  A.    Yes.

19  Q.    Did he send you then another text then in Spanish?

20  A.    Yes, he did.  That's when he was determined to go to the

21  department of employment.

22  Q.    After he told you they were going to investigate, he sent

23  a followup text at 8:38 p.m. that said, "But I still want to

24  continue complaining to the Department of Labor"?

25  A.    He didn't want to stop there.  He just wanted to pursue

256

1  it.

2  Q.   What did you say in your text in response to that?

3  A.   Well, I told him I had to go out of town.

4  Q.   Excuse me, at 8:50 p.m., did you send him a response in

5  Spanish?

6  A.   Yes, yes, I did.

7  Q.   Explaining that "If you want, we can go, but the ones that

8  will be able to help you are them"?

9  A.   Right.

10  Q.   Who were you referring to as "them," the ones who could

11  help them are them?

12  A.   Was EEO, EEOC because the EEOC was the one that could help

13  him.

14  Q.   And did Mr. Montoya, did he respond "Okay"?

15  A.   Yes.

16  Q.   Did you send another text to Mr. Montoya explaining that

17  if he still wanted to go you could take him on Monday?

18  A.   Yes.

19  Q.   And Mr. Montoya responded, "Okay, I'll call you"?

20  A.   Yes.

21  Q.   Did you send him another text?

22  A.   Yes, I did.

23  Q.   And what were you texting him?

24  A.   I texted him he's not impressed with -- with what I showed

25  him, the EEOC going over there.

257

1   Q.   And did Mr. Montoya respond saying that "I have to look

2   but it's more better in the office"?

3   A.   Yes.

4   Q.   And a followup text saying "You know"?

5   A.   Yes.

6   Q.   So was this the end of your communication with Mr. Montoya

7   on that Thursday of August the 17th?

8   A.   Yes.

9        MS. GROOVER:  Your Honor, may I have just a moment,

10  please?  No further questions, Your Honor.

11       THE COURT:  Cross-examination, Ms. Brewington.

12                      CROSS-EXAMINATION

13  BY MS. BREWINGTON:

14  Q.   Ms. Brown, you never went into the room at the EEOC; is

15  that correct?

16  A.   I never what?

17  Q.   You never went --

18  A.   I went into the office and I had to sit outside.  No, I

19  didn't go into the room.

20  Q.   So you have no idea what was said during that meeting?

21  A.   No.

22       MS. BREWINGTON:  No further questions.

23       THE COURT:  Any brief redirect?

24       MS. GROOVER:  No, Your Honor.

25       THE COURT:  Any objection to this witness being excused?

258

1          MS. GROOVER:  None.

2          THE COURT:  Ms. Brewington?

3          MS. BREWINGTON:  No.

4          THE COURT:  All right, you may be excused.  Thank you,

5     ma'am.

6          All right, ladies and gentlemen, it is time for our

7     mid-morning break.  So we will take a break of approximately 15

8     minutes and reassemble to continue with the witnesses at 10:35.

9          Remember on this and every break, don't talk about the

10    case.  Don't make up your mind.  Don't do any independent

11    research and don't discover anything in the media about the

12    case.  Let's rise for this jury.

13         (The jury exits the courtroom.)

14         THE COURT:  And without in any way holding you to it

15    exactly, approximately how many witnesses does the Government

16    anticipate calling?

17         MS. GROOVER:  Anticipate calling --

18         MR. HOWARD:  11 more.

19         MS. GROOVER:  -- 11 more.

20         THE COURT:  And of those, what is the split as far as

21    ones that will be fairly lengthy versus ones that will be on the

22    quick side.

23         MR. HOWARD:  I would say four to five are going to be

24    lengthy.  The remainder are going to be quick.

25         THE COURT:  Counsel, we will be in recess until 10:35.

259

1          (Recess from 10:18 a.m. to 10:42 a.m.)

2          THE COURT:  All right, let's bring in the jury.

3          (The jury enters the courtroom.)

4          THE COURT:  Welcome back, members of the jury.  On

5    behalf of the United States, call your next witness.

6          MS. GROOVER:  Thank you.  The United States calls Diego

7    Torres.

8          THE CLERK:  Sir, you were previously sworn.  Do you

9    still uphold that oath?

10          THE WITNESS:  I do.

11                    DIEGO TORRES,

12    having been first duly sworn, was examined and testified as

13    follows:

14          THE CLERK:  Thank you.  You may be seated.

15          THE WITNESS:  Thank you.

16          THE CLERK:  And if you will please state your full name

17    for the record.

18          THE WITNESS:  Diego Torres.

19                    DIRECT EXAMINATION

20    BY MS. GROOVER:

21    Q.    Good morning, sir.

22    A.    Good morning.

23    Q.    Can you please tell us where you live, sir, what city?

24    A.    I live in Pooler, Georgia.

25    Q.    And can you please tell us your academic background,

260

1    please?

2    A.    I have a bachelor's from the University of Puerto Rico,

3    elementary and secondary education specializing in English as a

4    second language.  I have a master's from NYU, bilingual

5    bicultural education with adaptations for special needs

6    students.

7    Q.    And do you speak Spanish as well?

8    A.    Si, yo hablo muy bien el espanol.  Gracias.

9    Q.    Do you read and write and understand Spanish?

10   A.    Yes.

11   Q.    Are you fluent?

12   A.    I am.

13   Q.    Are you employed?

14   A.    Actually, at this time I am retired.

15   Q.    What did you retire from, sir?

16   A.    I retired from the United States Equal Employment

17   Opportunity Commission.

18   Q.    Is that also known as the EEOC?

19   A.    That's correct.

20   Q.    And when did you retire from the EEOC?

21   A.    I retired on February 1st, 2018.

22   Q.    And what was your position when you retired from the EEOC?

23   A.    I was the bilingual federal investigator.

24   Q.    And when did you begin your career with the EEOC?

25   A.    I started in June of 1994, I believe.

261

1   Q.    25-year career?

2   A.    That's correct.

3   Q.    Tell us, what is the EEOC responsible for?  What is the

4   purpose of the EEOC?

5   A.    The EEOC enforces federal laws regarding discrimination in

6   jobs.

7   Q.    It enforces the laws under the Civil Rights Act?

8   A.    That's correct.

9   Q.    To enforce civil rights against work discrimination?

10  A.    Yes.

11  Q.    Is the EEOC responsible for enforcing federal laws that

12  make it illegal to discriminate against job applicants or an

13  employee based on certain qualities of the person?

14  A.    That's correct.

15  Q.    Those qualities include race?

16  A.    Yes.

17  Q.    Color?

18  A.    Yes.

19  Q.    Religion?

20  A.    Yes.

21  Q.    Sex?

22  A.    Yes.

23  Q.    National origin?

24  A.    Yes.

25  Q.    Age?

262

1   A.    Yes, over 40.

2   Q.    Many civil rights that are protected --

3   A.    Correct.

4   Q.    -- under the EEOC; is that correct?

5   A.    That's correct, to include disability and retaliation.

6   Q.    Does the EEOC have authority to file legal charges of

7   discrimination such as like a lawsuit?

8   A.    Yes, we do.

9   Q.    And if a person believes that they have been discriminated

10  against based on their civil rights, will the EEOC assist the

11  worker in filing a complaint or a lawsuit?

12  A.    Yes, it will.

13  Q.    And does the EEOC also have the authority to investigate

14  discrimination charges against employers?

15  A.    Definitely, yes, it does.

16  Q.    Does the EEOC have the authority to then make findings?

17  A.    Yes.

18  Q.    Describe the process that a person would go through if

19  they wanted to come to the EEOC and file a discrimination

20  charge.

21  A.    The person would either visit the agency, the office

22  locally, wherever they are at, and file a -- fill out a

23  complaint of discrimination.  Once that complaint of

24  discrimination is filled out, he is interviewed or she is

25  interviewed with the investigator assigned to that task on that

1    day.

2        The investigator will then counsel with the director and

3    our legal person.  We have an attorney in the office.  We would

4    then go back to the charging party, which is the person who is

5    charging or forming that complaint.

6        In my case, I would translate as a bilingual investigator

7    and make sure that they understood everything, the process.  A

8    charge is drafted according to the information, notes taken

9    during that interview, which may last between an hour and a half

10   and three hours or so, and the charges are then approved by the

11   director, discussed with the charging party.

12       He or she signs it and it's the official charge of

13   discrimination, which will be filed against the company or what

14   we call the respondent.

15       Once that is done, the company is put on notice.  We

16   verify who the representative will be, the attorney or human

17   resources, et cetera.

18       We file what we call a no-action but a notice of charge

19   where the basis and the issues are identified, and they are put

20   on notice so that no retaliation, no action is taken against

21   that employee or employees if it's a class action case.  No

22   destruction of documents either.

23   Q.   And so then does EEOC begin its investigation as well?

24   A.   Yes, it does.

25   Q.   Okay.  And at the conclusion of the investigation, what

264

1  does the EEOC do with the charging document?

2  A.    Well, what happens is a determination is made based on the

3  investigation.  During that time, of course, legal division for

4  the EEOC, the director and all other management personnel

5  involved would take place as far as also the investigator to

6  discuss all the merits of the case.

7  Q.    And does the EEOC stay with the case through its

8  resolution?

9  A.    I'm sorry?

10  Q.    Does the EEOC stay with the case through its resolution?

11  A.    Definitely, yes.

12  Q.    You indicated you retired as a bilingual federal

13  investigator.  Can you tell us exactly what your specific job

14  duties were at the EEOC?

15  A.    My specific job duties according to the title was -- I was

16  a federal investigator where I would interview the persons

17  coming in to file a charge.

18       I would translate officially the documents or with the

19  person explain everything and make sure that that person

20  understood the processes and what they were doing as far as

21  filing the charge.  I did that for practically 25 years.  I

22  stayed with the commission during my whole tenure.

23  Q.    And so you would personally speak with an individual

24  coming to make a complaint?

25  A.    Definitely.  We have what we call an interview room and it

265

1  would just be the investigator and the person filing the charge

2  that would be interviewed at that time during the process, yes.

3  Q.    And would you help prepare the actual charging -- the

4  charge of discrimination?

5  A.    Correct.  Like I said, I would take notes according to our

6  interview, and, based on that, a charge would be drafted, yes.

7  Q.    And do your duties also include documenting your encounter

8  with the charging party?

9  A.    Yes, I did.  Yes, I did as far as our notes and

10  everything.

11  Q.    And finally your duties include actually sending out the

12  notice of discrimination to the company?

13  A.    Like I said, we would send a notice of charge immediately

14  with no action but informing them, and then the charge, yes,

15  would be sent officially, what we call with an RFI or request

16  for information.

17  Q.    I want to take you back to August 17th, 2017.

18  A.    Okay.

19  Q.    You were not yet retired at that time?

20  A.    Okay.

21  Q.    Do you remember meeting with a man named Eluid Montoya?

22  A.    Of course.

23  Q.    What do you remember about the encounter?

24  A.    He came in and he wanted to file a charge.  He filled out

25  the questionnaire.  He was accompanied with another person who

1    wanted to, I think, translate, but being that I was the official

2    translator for the Government, I had the interview with him.

3         Once he filled out the questionnaire, we sat down, and we

4    spoke about the issues and the bases and we covered every area

5    that EEOC would cover, and based on the information he provided

6    in writing and also verbally, a charge was drafted.

7    Q.    Okay.  You indicated he provided information in writing.

8    Did you have him fill out an intake questionnaire?

9    A.    He filled out the intake questionnaire, yes, he did.

10   Q.    Turning your attention to Exhibit 13, please, if we could

11   please pull that up.

12   A.    Okay.

13   Q.    Can you tell us what we are looking at in Exhibit 13, sir?

14   Sir, is there a document on your screen?

15   A.    It's what we call an intake questionnaire.  Yes.

16   Q.    Is this a document that you gave to Mr. Montoya that he

17   actually filled out?

18   A.    Correct.

19   Q.    Giving some general information about why he's there?

20   A.    I'm sorry.

21   Q.    This gets general information from Mr. Montoya about why

22   he's there, the EEOC?

23   A.    That's correct, yes.

24   Q.    And scrolling through to Page 2 of Exhibit 13, can you

25   tell us exactly what Mr. Montoya put down in his notes about why

267

1   he was there?

2   A.   It says he was discharged by David Jackson, who was a

3   manager, in not signing off on a practice violation that he

4   alleged wasn't true.

5   Q.   Does he have a little arrow off to the side noting there

6   is more information on the other side?

7   A.   It says "other side," yes.

8   Q.   And then turning to Page 3 of Exhibit 13?

9   A.   Correct.

10  Q.   Are those a continuation of Mr. Montoya's notes?

11  A.   Yes.  He was alleging that they are always watching him

12  because of complaining of the wages that were being taken away

13  from other employees and how he was being treated.  In other

14  words, it seemed like a retaliation.

15  Q.   Then turning back to Page 2 of Exhibit 13, did Mr. Montoya

16  continue to explain that he wanted you to investigate this

17  situation?

18  A.   Yes, he did.  He said that because he had put in a

19  complaint on how other employees were treated and that they said

20  that they would look into it and investigate, but basically he

21  wanted for us to continue the investigation based on what was

22  going on.

23  Q.   Turn your attention to Exhibit 15.  Did Mr. Montoya bring

24  anything with him to the meeting?

25  A.   Yes, he did.  He brought a document and it said, "To whom

268

1  it may concern."  It had specific information as to what was

2  going on there, what he was alleging, and he had enumerated the

3  items there.

4  Q.    And so Exhibit 15, Page 1 and -- turning to Page 2, is

5  this the document that Mr. Montoya had prepared and signed and

6  brought to you?

7  A.    That's correct.  It says his name "respectfully" and his

8  signature.

9  Q.    And Page 3 of Exhibit 15, is this another piece of

10 supporting documentation that Mr. Montoya brought you?

11 A.    That's correct.  This is one of the documents he was

12 alleging that -- they were alleging safe practice violation

13 notice, which apparently he didn't have until this moment when

14 he started filing complaints.

15 Q.    Did Mr. Montoya explain he had never been in trouble, had

16 a violation before with his company?

17 A.    From what I recall, yes.

18 Q.    And he was upset that he now suddenly had a safety

19 practice violation?

20 A.    Correct, correct.

21 Q.    And turning to Page 4 of Exhibit 15, is this another

22 document that Mr. Montoya brought to you?

23 A.    That is.

24 Q.    And did the EEOC produce records in this investigation to

25 Homeland Security that was investigating this case?

269

1   A.    You mean like sharing information?

2   Q.    Yes, sir.

3   A.    As a federal agency, we have to keep in contact with all

4   federal agencies concerned, yes.

5   Q.    So when the EEOC provides documents, do they redact

6   information to help protect privacy?

7   A.    That's correct.

8   Q.    So this information did not come to you redacted but the

9   EEOC redacted it?

10  A.    That's correct.

11  Q.    But is this a supporting letter that Mr. Montoya brought

12  to you in support of his complaints?

13  A.    Yes, it is.

14  Q.    And turning to Page 5 of Exhibit 15, is this another

15  supporting letter that Mr. Montoya brought?

16  A.    Correct.

17  Q.    And to Page 6 of Exhibit 15, is this another letter that

18  Mr. Montoya brought to you --

19  A.    It is.  Yes, it is.

20  Q.    -- in support of his claim?  And turning to Page 7 of

21  Exhibit 15, an exhibit -- what is this document, sir?

22  A.    This is a document from the company alleging, showing

23  wages.

24  Q.    Did Mr. Montoya bring this, like a paycheck stub?

25  A.    Yes, he did.

270

1    Q.    In support of his claim?

2    A.    Yes, he did.

3    Q.    And finally Page 8 of Exhibit 15, another --

4    A.    That's correct, yes.

5    Q.    -- page that Mr. Montoya brought you?

6    A.    Yes, yes.

7    Q.    Turn your attention to Exhibit 16.  Can you please tell us

8    if you recognize Exhibit 16, sir?

9    A.    I do.  These are --

10   Q.    What are these?

11   A.    These are the intake notes that I did, and it says it's

12   created by me, Diego Torres, and the date of 2017.

13   Q.    This date is August the 18th.  Was this the next day that

14   you --

15   A.    Correct, when everything is put together before we send

16   out the request for information and process finally all the

17   documents, yes.

18   Q.    So after you had completed meeting with Mr. Montoya, the

19   next day you documented the file?

20   A.    Right.  What I -- we take written notes and put everything

21   together.  Then we sort of summarize everything and make it an

22   official document with us as being the intake officer who does

23   the notes, yes.

24   Q.    And Exhibit -- turning to Exhibit 14-1, please.  Can you

25   tell the jury what are we looking at in Exhibit 14-1?

271

1    A.    We are looking at an official charge of discrimination.

2    This is the official document that the commission produces with

3    the information provided by the charging party in our interview

4    and therefore it's an official document signed and dated by the

5    person who is filing the charge against the respondent or the

6    employer.

7    Q.    Now, did you complete this document on behalf of Mr.

8    Montoya?

9    A.    Based on the information provided in our interview, it was

10   drafted, yes.

11   Q.    And what exactly was the discrimination that was being

12   alleged?

13   A.    National origin and retaliation and also a class action.

14   Q.    Alleging discrimination based on national origin?

15   A.    National origin.

16   Q.    Because illegal aliens are not being paid?

17   A.    Correct, other employees and the commission regardless

18   of -- protects all rights.

19   Q.    Tell the jury about that a little bit.

20   A.    The EEOC is the only federal agency that protects the

21   rights of all workers regardless of their status.  If they have

22   a right to work, they have a right to be protected under the

23   federal law.

24   Q.    So even though someone was an illegal alien, they could

25   still file a discrimination charge?

272

1   A.    Most definitely.

2   Q.    Was there another box that was checked, retaliation?

3   A.    Yes.

4   Q.    Is the retaliation, was that Mr. Montoya?

5   A.    Yes, it is.  Because he had complained initially to the

6   company directly about his national origin and what they were

7   doing, the wages and others that worked with him, that's

8   considered retaliation because they had taken action where he

9   was provided that safety violation, which had never happened

10  until he started complaining.

11  Q.    And in the little box in the middle of the page, is this a

12  typed-up summary of the complaint that Mr. Montoya was making?

13  A.    Correct.  It explains, Number 1, that he -- what -- it

14  talks about when he was hired and he filed internal complaint.

15  It gives you a brief history of what occurred.

16  Q.    And did you prepare this --

17  A.    Yes, I did.

18  Q.    -- summary?

19  A.    Yes.

20  Q.    After speaking with Mr. Montoya?

21  A.    After speaking with him and taking my notes, yes, and, of

22  course, the conversation was in Spanish, and as the official

23  bilingual investigator, it's translated to English.

24  Q.    Okay.  And then to the bottom, if we could -- the bottom

25  of Exhibit 14-1, did Mr. Montoya have an opportunity to review

273

1  it and sign it?

2  A.    Most definitely, yes.  And it was discussed in Spanish.  I

3  read it to him in English and also translated it in Spanish to

4  make sure he understood.

5  Q.    And specifically he signed that he wanted a charge

6  filed --

7  A.    Yes, he did.  Yes, he did.

8  Q.    -- with the EEOC.  And if we could look at Page 2 of

9  Exhibit 14, can you tell us what is documented on Page 2 of

10  Exhibit 14?

11  A.    Basically Roman Number II says what the respondent or the

12  employer did or didn't do, and Number III, it says that he's

13  filing because he believes that he's been discriminated against

14  because of national origin, Hispanic/Mexican, and in retaliation

15  for opposing the unlawful employment practices in the workplace

16  under Title VII of the Civil Rights Act of 1964 as amended.

17        Roman Numeral IV includes the class action where he, as a

18  Hispanic, a member of the class, and others, are discriminated

19  against because of their national origin in violation of Title

20  VII of the Civil Rights Act as amended.

21  Q.    The bottom of Exhibit 14, Page 2, did Mr. Montoya have a

22  chance to review the charge of discrimination page?

23  A.    Yes, he did, and as you notice, it says that he wants to

24  file this charge, that he is aware of that and he swears and

25  affirms that he has read the above charge and that it is true to

274

1    the best of his knowledge, information and the belief of what he

2    is complaining about and he signed it and dated it.

3    Q.    Now, in order for this additional charge of discrimination

4    to be prepared by the EEOC and then signed by Mr. Montoya, did

5    you have to discuss his complaint with anyone?

6    A.    Most definitely.  We have our local director there with us

7    and at that time I believe we had an attorney also for the EEOC,

8    so we would sit and talk about the merits of the charge, the

9    information provided, the evidence, discuss all the issues and

10   bases that we cover and make sure that what he presented and

11   provided to us was covered in the charge as officially as he was

12   alleging.

13   Q.    After you had completed the charge of discrimination and

14   collected the documents from Mr. Montoya and had him sign the

15   official charge, what happened next with your encounter with Mr.

16   Montoya?

17   A.    He had signed the information -- he had signed the charge.

18   We explained to him the process again and then we proceeded to

19   provide the respondent or the company with the information as

20   far as the charges being filed.

21   Q.    So what did you explain exactly to Mr. Montoya what would

22   happen next right before he left the EEOC?

23   A.    We explained to Mr. Montoya that the company was going to

24   be put on notice immediately with no action.  We explained also

25   that they were not to retaliate against him or destroy any

275

 1   documents, and his rights would be protected basically while the

 2   commission would be investigating.

 3   Q.   And so the company is placed on notice and you will

 4   investigate?

 5   A.   Correct.

 6   Q.   Turn your attention to Exhibit 17.  Can you please tell

 7   the jury what are we looking at in Exhibit 17?

 8   A.   This is what we call a notice of the charge of

 9   discrimination.  It indicates Title VII of the Civil Rights Act.

10   It indicates that no action is to be requested at this time, but

11   it is signed by me, and it has the issues and dates there in the

12   block in the bottom there.

13        It talks about discipline, intimidation, suspension and

14   wages specifically, and it talks about the dates, the earliest

15   and the latest, and the director, at that time, Omayra Padilla,

16   signed off on it and my signature as the investigator signing.

17   Q.   This is the actual notice that the EEOC sent to --

18   A.   The Wolf company.

19   Q.   -- Wolf Tree in this case?

20   A.   Yes.

21   Q.   Indicating a charge of the discrimination had been filed

22   at the EEOC; correct?

23   A.   Correct.

24   Q.   And that the company was to take no action; correct?

25   A.   Correct.

276

1   Q.   Because the EEOC was going to investigate; correct?

2   A.   Correct.

3   Q.   It indicated the dates, the earliest being April 24th,

4   2017; is that correct?

5   A.   Correct.

6   Q.   Is that the date of the letter that Mr. Montoya had

7   written and brought to you?

8   A.   This is alleging the earliest that he believes he was

9   start -- being discriminated against, yes.

10   Q.   And the latest being August the 16th of 2017 --

11   A.   The date -- right.

12   Q.   -- when he was -- had the safety violation notice?

13   A.   Correct.

14   Q.   Did you learn that Mr. Montoya had been murdered?

15   A.   Did I learn about it?

16   Q.   Yes.

17   A.   Yes, I did.

18   Q.   How did you learn about that, sir?

19   A.   I believe -- it's been five years.  I recall something in

20   the news, and I remember the person who had accompanied him -- I

21   believe it was Ms. Brown -- had come into the office to let me

22   know what happened that Monday.  She came in crying and upset.

23   I was wondering.  So that's how I officially ...

24   Q.   So you met with Mr. Montoya on Thursday, August the 17th

25   of 2017; is that correct?

277

1   A.   Yes.

2   Q.   That next business day would have been the 21st of August?

3   A.   Correct.

4   Q.   Ms. Brown came back to you?

5   A.   Yes.

6   Q.   Explained that Mr. Montoya was killed?

7   A.   Yes.

8   Q.   Did the EEOC continue with its complaint, nevertheless?

9   A.   At that moment, it's up to management, of course, and,

10  yes, it continues, and whatever the protocol is after that, that

11  was out of my hands.

12  Q.   So the charge of discrimination that Mr. Montoya began did

13  not end with his death?

14  A.   Oh, no, definitely not.

15       MS. GROOVER:  I have no further question.

16       THE COURT:  Ms. Brewington, cross-examination.

17       MS. BREWINGTON:  I have no questions, Judge.

18       THE COURT:  Any objection to this witness being excused?

19       MS. GROOVER:  No.

20       MS. BREWINGTON:  No.

21       THE COURT:  You may step down, and you're excused.

22       THE WITNESS:  Thank you.

23       THE COURT:  Mr. Howard, call your next witness.

24       MR. HOWARD:  The Government calls Gerardo Hernandez.

25       THE CLERK:  Sir, yesterday you were previously sworn.

278

1  Do you still uphold that oath?

2          THE WITNESS:  Okay.

3                    GERARDO HERNANDEZ ANDROTTI,

4  having been first duly sworn, was examined and testified as

5  follows through the interpreter:

6          THE CLERK:  You may be seated.  If you will please state

7  your full name for the record.

8          THE WITNESS:  Gerardo Hernandez Androtti.

9                    DIRECT EXAMINATION

10 BY MR. HOWARD:

11 Q.    Sir, if you would move closer to the microphone and make

12 sure you speak up so everyone can hear you.  Back in August of

13 2017 where did you live?

14 A.    In a trailer park known as Savannah Pines.

15 Q.    Was your address specifically 130 Village Drive in Garden

16 City?

17 A.    Yes.

18 Q.    How long did you live in the Savannah Pines Mobile Home

19 Park?

20 A.    A couple of years.

21 Q.    If we could pull up Government's Exhibit 2.  Sir, looking

22 at that photograph on the screen in front of you, do you

23 recognize that individual?

24 A.    Yes.

25 Q.    Who is that?

279

1    A.    Eluid Montoya.

2    Q.    How did you know Eluid Montoya?

3         INTERPRETER CASTILLO:  Interpreter needs to clarify,

4    Your Honor.

5         THE COURT:  Yes.

6         THE WITNESS:  I met him in about 2006 when I was

7    visiting people at their houses.

8    (By Mr. Howard)  Now, if we could pull up Government's Exhibit

9    18.  Sir, looking at the screen in front of you, has an

10   overhead view of a map of an area in Government's Exhibit 18.

11   Do you recognize the area depicted there?

12   A.    Yes.

13   Q.    What does that show?

14   A.    Where I lived and where Montoya lived.

15   Q.    Using the screen in front of you, can you circle the area

16   where you lived?

17   A.    (Complies with request of counsel.)

18   Q.    Have you circled the area that says "130 Village Drive"?

19   A.    Yes.

20   Q.    Now, if you would, circle the area where Eluid Montoya

21   lived?

22   A.    (Complies with request of counsel.)

23   Q.    And have you circled the area of 59 Village Drive?

24   A.    Yes.

25   Q.    When you would go to and from your house each day, would

280

1    you pass by Mr. Montoya's house?

2    A.    Yes.

3    Q.    I'd like to talk about Saturday August 19th, 2017.  Do you

4    recall that day?

5    A.    Yes.

6    Q.    Let's start in the morning.  Where did you go?

7    A.    To a room that we had at the church, at the church.

8    Q.    So that morning you left to go to a church; is that right?

9    A.    Yes.

10   Q.    When you returned home, did you pass by Mr. Montoya's

11   house?

12   A.    Yes.

13   Q.    What did you notice when you passed by Mr. Montoya's

14   house?

15   A.    I saw him outside, and it looked like he was fixing his

16   car.

17   Q.    And he appeared to be alive; correct?

18   A.    That's right.

19   Q.    What type of vehicle were you driving that day?

20   A.    2012 Toyota Camry, a silver.

21   Q.    If we could pull up Government's Exhibit 19.  Sir, looking

22   at the screen in front of you, a still image of Government's

23   Exhibit 19, do you recognize what's depicted there?

24   A.    Yes.

25   Q.    First of all, let's talk about the area that's depicted

281

1    there.  Do you recognize the area?

2    A.    Yes.

3    Q.    What area is that?

4    A.    It's the entrance for -- to Savannah Pines.

5    Q.    And if we could zoom in on the vehicle in the middle top

6    of that screen.  Do you recognize the vehicle depicted there?

7    A.    Yes.

8    Q.    And what vehicle do you recognize that as being?

9    A.    The one that I was driving that day, my car.

10   Q.    If we could zoom back out to look at the timestamp that

11   says August 19th, 2017, 11:34 a.m., does this image fairly and

12   accurately depict your vehicle that morning at 11:34 a.m.?

13   A.    Yes.

14   Q.    How long does it take to go from where that car is shown

15   to your home in Savannah Pines?

16   A.    Perhaps one or two minutes.

17   Q.    Would it be accurate to say that around 11:34 a.m. on

18   August 19th, you saw Eluid Montoya alive outside his residence?

19   A.    Yes.

20   Q.    Later that day, did you try to leave the mobile home park?

21   A.    Yes.

22   Q.    What did you see when you tried to leave?

23   A.    I saw police cars and firemen.

24   Q.    This happened Saturday, August 19th; correct?

25   A.    Yes.

282

1    Q.    Now the day before, Friday August 18th, did you see Eluid

2    Montoya that day?

3    A.    Yes.

4    Q.    Was he at your house?

5    A.    Yes.

6    Q.    For how long was he at your house on Friday, August 18th?

7    A.    Well, apparently he was there all day.

8    Q.    Do you recall him being there most of the day that Friday,

9    August 18th?

10   A.    Yes.   In the morning with my sisters and in the afternoon

11   when I got there, yes.

12        MR. HOWARD:   I have no further questions for the

13   witness, Your Honor.

14        THE COURT:   Cross-examination, Ms. Brewington?

15        MS. BREWINGTON:   No questions, Judge.

16        THE COURT:   Any objection to this witness being excused?

17        MR. HOWARD:   None from the Government.

18        MS. BREWINGTON:   None.

19        THE COURT:   You may step down, and you're excused.

20   Thank you.

21        Call your next witness.

22        MS. GROOVER:   The Government calls Lieutenant Roberto

23   Rodriguez.

24

25

283

1                      LIEUTENANT ROBERTO RODRIGUEZ,

2    having been first duly sworn, was examined and testified as

3    follows:

4            THE CLERK:  Thank you.  You may be seated, and if you

5    will please state your full name, spell your last, state your

6    occupation and your business address.

7            THE WITNESS:  Roberto Rodriguez, R-o-d-r-i-g-u-e-z.  I'm

8    a lieutenant with the Criminal Investigations Division at the

9    Garden City Police Department and the address is 100 Central

10   Avenue, Garden City, Georgia 31408.

11                       DIRECT EXAMINATION

12   BY MS. GROOVER:

13   Q.   How long have you been a lieutenant with Garden City, sir?

14   A.   A lieutenant, three months.

15   Q.   How long have you been employed with Garden City?

16   A.   13 years.

17   Q.   And your present duties?

18   A.   I'm currently the assistant division commander, which

19   means I'm the second in command for the detectives division at

20   the Garden City Police Department.

21   Q.   And have you also been a crime -- before you were a

22   lieutenant, what were you, sir?

23   A.   I was a sergeant.  Before that, I was a corporal, and

24   before that, I was a -- I got certified as a crime scene

25   technician.

284

1   Q.    Tell the jury what does it mean to be a crime scene

2   technician.

3   A.    It's basically what you see on TV on "CSI."  I took a

4   bunch of classes where I learned how to properly collect

5   evidence, preserve evidence, touch DNA, fingerprint analysis,

6   fingerprint examination.  I can basically get a fingerprint, I

7   can run it through the system and basically do a manual

8   one-to-one comparison and either prove or disprove a person

9   could have or may have committed a crime.

10  Q.    Explain the process how you preserve and process the crime

11  scene, please.

12  A.    Typically when you -- when you arrive on scene, you just

13  do a basic walkthrough of the crime just to see exactly what it

14  is that could have occurred, and you just -- you begin

15  photographing the scene before anything gets touched.  That's to

16  preserve the integrity of the scene, and then you start

17  collecting any physical evidence that you could see on the scene

18  of any crime.

19  Q.    And have you also been the lead investigator in homicide

20  investigations?

21  A.    Yes, ma'am, I have.

22  Q.    Do you speak Spanish, sir?

23  A.    Fluent, yes, ma'am.

24  Q.    And it's your first language?

25  A.    It used to be.  Now English and Spanish are both about 50

285

1   percent.

2   Q.   As part of your duties, do you assist on almost every

3   single case involving a Spanish-speaking witness in Garden City?

4   A.   I do, yes, ma'am.

5   Q.   And as a law enforcement officer in Garden City, are you

6   familiar with the area?

7   A.   I am, yes, ma'am.

8   Q.   And in what capacity were you working back in August of

9   2017?

10  A.   At that time, I was a detective with the Garden City

11  Police Department, and I was currently investigating another

12  violent crime that had occurred the night prior.

13  Q.   I want to direct to your attention to August the 19th of

14  2017.

15  A.   Okay.

16  Q.   Do you recall being dispatched to the investigation of the

17  death of Eluid Montoya?

18  A.   I did, yes, ma'am.

19  Q.   Tell the jury about that, please.

20  A.   I was at a gas station less than two blocks away when I

21  saw a bunch of ambulances and fire trucks going towards the

22  general area.  I didn't have my radio on at the time, but I did

23  see them all going that way followed by police, and so me, being

24  nosy, I drove to the area to see what was going on.

25  Q.   And do you know about what time the call came out over the

286

1  radio?

2  A.    I believe it was sometime around 1:30 if I'm not mistaken.

3  Q.    And what exactly was the call if you recall?

4  A.    It was -- I believe it was an unconscious person.

5  Q.    Is that the location of the 1400 block of Old Dean Forest

6  Road in Garden City?

7  A.    It is, yes, ma'am.

8  Q.    Can you describe that area for the jury?

9  A.    At that time, in 2017, it is a very desolate area.  There

10  is a trailer park -- before you get to the 1400 block, there is

11  a trailer park, and behind that, there's a lot of vegetation, a

12  lot of trash, a lot of debris.  We were having a huge issue,

13  because of how dense, how thick it was in the area, with illegal

14  dumping back there.

15  Q.    Let's help orient the jury.  Let's draw your attention to

16  Exhibit 1.  And is this a map, an overview map of the Savannah

17  area, sir?

18  A.    Correct, yes, ma'am.

19  Q.    The red pin on there, is that the general location of the

20  Savannah Pines Mobile Park Home?

21  A.    Roughly, yes, ma'am.

22  Q.    And Exhibit 11-2, moving in closer, is this just a closer

23  view of the -- keep orienting closer to the Savannah Pines

24  Mobile Home Park?

25  A.    It is, yes, ma'am.

287

1    Q.    Near the intersection of I-95 and I-16?

2    A.    Yes.

3    Q.    Exhibit 1-3, again moving in closer, basically just the

4    location -- basically as you're traveling west on I-16 from

5    Savannah, you would exit off of Georgia State Road 307.  Is that

6    also Dean Forest Road?

7    A.    Yes, ma'am.

8    Q.    Right now, is there just a maddening amount of

9    construction going on in that area?

10   A.    It has vast -- it has changed drastically in the last

11   couple of years.

12   Q.    Is this a picture that fairly and accurately represents

13   what it looked like back in 2017?

14   A.    Yes, ma'am, it is.

15   Q.    Before all the construction?

16   A.    Correct.

17   Q.    Lots of trees between the Savannah Pines Mobile Home Park

18   and I-16; is that correct?

19   A.    Yes.

20   Q.    Staying with Exhibit 1-3, can you identify Old Dean Forest

21   Road there for us?

22   A.    I can, yes, ma'am.

23   Q.    Is that a dead-end -- can you draw on the map where that

24   is, sir.

25   A.    Yes, ma'am.  It dead-ends right at I-16.  That would be

288

1    Old Dean Forest Road.

2    Q.    So there is only one way in and out?

3    A.    There is only one way in and out of that road, yes, ma'am.

4    Q.    Exhibit 1-4, moving even closer to the overview map of

5    Savannah Pines; is that correct?

6    A.    Yes, ma'am.

7    Q.    On this page, can you identify where the International

8    Brotherhood of Electronic Workers building is located?

9    A.    Yes, ma'am, it is right there.

10    Q.    Is that known as the IBEW?

11    A.    Correct, yes, ma'am.

12    Q.    Can you identify IBEW in relation to Dean Forest Road and

13    Old Dean Forest Road?

14    A.    Yes, ma'am.  It is right there at the corner of Airport

15    Park Drive, Dean Forest Road and Old Dean Forest Road.

16    Q.    Kind of capturing that whole entrance area?

17    A.    It captures part of Dean Forest and part of Airport Park

18    Drive and the entire entrance of Old Dean Forest Road.

19    Q.    Exhibit 1-5, moving even closer into the overview map of

20    Savannah Pines, can you please identify the 1400 of Old Dean

21    Forest Road where the location came out or the location where

22    the call came out for the non-responsive body?

23    A.    It would be this general area right about right there.

24    Q.    That's where Mr. Montoya would have been located?

25    A.    Correct, yes, ma'am.

289

1    Q.    And at approximately 1:32 on August 19th, 2017 you heard

2    the call and where do you go exactly?

3    A.    Like I said, I was the Pilot gas station.  It was less

4    than two blocks away.  I got off of State Route 307.  I turn

5    onto Airport Park Drive and the I turn onto Old Dean Forest Road

6    where I saw first responders were now taping off the crime scene

7    as they had suspicious -- suspicion that this would be a

8    suspicious death.

9    Q.    And what did you do?

10   A.    At that time, I looked at the decedent, and I determined

11   that he had some injuries to his face that were definitely

12   suspicious.  Thus I started making phone calls to other

13   investigators to come to the scene.

14   Q.    What did the body look like when you first got there?

15   A.    He was laying upright looking up towards the sky.  He was

16   no pulse, no life.  His eye was extremely swollen and it

17   appeared that his nose was broken.

18   Q.    Did you examine the body briefly at that time?

19   A.    That was just a -- my general observation when I arrived

20   on scene, yes, ma'am.

21   Q.    And what was he wearing, if you recall?

22   A.    He was wearing typical house clothes, some slippers, I

23   believe some sweatpants and a T-shirt.

24   Q.    Any signs of struggle or defensive wounds that you could

25   observe at that time?

290

1    A.    No, ma'am, not at that time.

2    Q.    Do you recall what the weather was like that day?

3    A.    It was -- it was seasonally hot.  It was -- it was pretty

4    hot for the day.

5    Q.    A heat index of 113 degrees?

6    A.    It was north of 110 degrees, yes, ma'am.

7    Q.    Describe the crime scene that was being taped off for the

8    jury.  What exactly did it look like?

9    A.    Like I said, it was extremely dense and thick.  He was

10   more -- when we found him, he -- first responding officers told

11   me that he was more towards the grassy area directly to his left

12   or to the -- I guess refer it to the west of where he was at was

13   a large tree truck, later determined to be his tree truck, and

14   directly in front of that was a Honda Accord that was still

15   running, music playing and the driver's door was opened, later

16   determined to be the victim's as well.

17   Q.    And if we could pull up Exhibit 22-1.  Can you tell the

18   jury what we're looking at in Exhibit 22-1?

19   A.    That is the work truck I just described.  That is the

20   Honda I just described, and the decedent would be on the other

21   side of the work truck, being Old Dean Forest Road.

22   Q.    When you initially started processing the scene, did you

23   notice any signs of struggle throughout the crime scene like a

24   fight had occurred?

25   A.    No, ma'am.

291

1   Q.   Any signs of robbery?

2   A.   No, ma'am.

3   Q.   What made you determine that there was no signs of

4   robbery?

5   A.   For starters, the vehicle, the Honda Accord, was still on

6   and running, key in the ignition.  I believe his wallet and

7   phone were still there with him, so nothing appeared to be

8   taken.  It was later determined that there was also some high-

9   value items inside of that Honda Accord as well.

10  Q.   Did you then conduct a digital forensic and photograph the

11  area?

12  A.   We did, yes, ma'am.

13  Q.   Explain, did you also bag Mr. Montoya's hands to start

14  preserving evidence?

15  A.   We did.

16  Q.   Explain this process to the jury, please.

17  A.   It's just common practice.  When -- homicide investigation

18  at the time, we do that for -- maybe if any touch DNA transfer,

19  if he may have touched any other person, which the DNA could

20  have been transferred from underneath fingernails, hands, if a

21  physical struggle ensued, as well as for gunshot residue to see

22  if Mr. Montoya had fired a shot.

23  Q.   Did you ultimately tow the Honda to Garden City?

24  A.   It was, yes, ma'am.

25  Q.   And why did you tow it to Garden City?

292

1    A.    For two reasons.  It's more of a controlled atmosphere.

2    For us as investigators, we have all of our equipment, all of

3    our tools, for the most part, it stays in our office and because

4    of the fact it was 113 degrees outside and we have a garage that

5    is not as hot.  We can shut the bay doors and turn on the

6    air-conditioning.

7    Q.    Okay.  Did you process and examine the large tree truck?

8    A.    We did, yes, ma'am.

9    Q.    How did you do this?

10   A.    We looked for any bullet trajectories that may have struck

11   the vehicle to try to show where -- my apologies -- we processed

12   the vehicle for any -- I believe any touch DNA and I don't

13   remember if we did fingerprint or not, but later on we -- we

14   examined to see if there was any bullet trajectory that may have

15   struck the vehicle.

16   Q.    And did you run the license tag of the Honda Civic that

17   was running?

18   A.    We did, yes, ma'am.

19   Q.    And what did you determine?

20   A.    It returned to a Mr. Eluid Montoya, who was also -- his

21   demographics and facial features matched that of the decedent or

22   the victim that was on scene.

23   Q.    And did you learn an address that was connected with the

24   Honda?

25   A.    We did, yes, ma'am.

293

1    Q.    Was that 59 Village Drive?

2    A.    It was.

3    Q.    Was that in walking distance to where Mr. Montoya was

4    found?

5    A.    It was, yes, ma'am.

6    Q.    While you were progressing the crime scene, did people

7    start to arrive?

8    A.    They did, yes, ma'am.

9    Q.    Tell the jury about that, please.

10   A.    Family members started to arrive on scene.  His sister,

11   Griselda, arrived on scene and his mother arrived on scene as

12   well, and they provided me with some information as to who may

13   have committed this crime.

14   Q.    Did they also identify Mr. Montoya as their family member?

15   A.    They did.  They advised that the victim could possibly be

16   their brother and son, Eluid Montoya.

17   Q.    Were there also workers that showed up?

18   A.    There was workers that showed up.

19   Q.    Did they explain also that was Mr. Montoya and they worked

20   with him at Wolf Tree?

21   A.    Correct.

22   Q.    Did you have a chance to speak with Mr. Montoya's mother?

23   A.    We did, yes, ma'am.

24   Q.    And what did she tell you?

25   A.    She advised that she suspects that his boss may have had

294

1    something to do with his death.

2    Q.    Did she say who his boss was?

3    A.    She did.

4    Q.    And who was that?

5    A.    Mr. Pablo Rangel.

6    Q.    Did she explain any more to you at that time?

7    A.    I believe she said he also filed an EEOC complaint against

8    the company and Pablo Rangel and that the wife might have more

9    documentation at the residence located at 59 Village Drive.

10   Q.    What did you do next after you spoke with the mother?

11   A.    We went to 59 Village Drive to make contact with Ms. Maria

12   Montoya.

13   Q.    Did you meet Ms. Montoya there?

14   A.    She was not at home at the time.  She was at work.  I had

15   her come back to the house where I spoke to her, yes, ma'am.

16   Q.    And what did you tell her?

17   A.    I informed her of the unfortunate passing of her husband.

18   Q.    Did she give you any paperwork that assisted your

19   investigation?

20   A.    She did, yes, ma'am.

21   Q.    Pull Exhibit 4 up, please.  If you could tell us if you

22   recognize Exhibit 4 and 4-1, too, scrolling through.

23   A.    Yes, ma'am.  That is the documents that was provided by

24   Mrs. Montoya and that was the contents inside the manila

25   envelope provided by Mrs. Montoya.

295

1          MS. GROOVER:  Your Honor, may I approach the witness?

2          THE COURT:  You may.

3     (By Ms. Groover)  I'm handing you what's been marked as

4     Government's Exhibit 5.  Can you please take a look at Exhibit

5     5 and tell us if you recognize that?

6     A.    I do, yes, ma'am.

7     Q.    And what is that, sir?

8     A.    That was the documentations that were provided to me by

9     Mrs. Montoya, which is the documents that Mr. -- the victim, Mr.

10    Montoya, had taken to the EEOC for the formal complaint.

11    Q.    Generally what are those?

12    A.    One of them is a check stub belonging to Mr. Montoya.

13    Some of the paperwork in there I guess was provided by the Equal

14    Employment Opportunity Commission, EEOC, to Mr. Montoya as far

15    as the next steps and what to expect, and then there was three

16    letters written by -- I believe it was three letters written by

17    employees of the company, more of a -- I guess a declaration and

18    one of them was of Mr. Montoya himself.

19    Q.    And in general, what do these statements say?

20    A.    They all I believe say that they are employees of the

21    company, Wolf Tree Service.  They have been working illegally

22    for the company for several years, and they are basically all

23    saying that Mr. Pablo Rangel, their supervisor, has been, I

24    guess, extorting money from them through the business, through

25    wage garnishments and paying them -- I believe paying them under

296

1    what they are supposed to.

2    Q.    And from your review of the paperwork that Mrs. Montoya

3    provided, did it appear that the victim, Mr. Montoya, had taken

4    the documents to the EEOC?

5    A.    Yes, ma'am, it was -- it was apparent those documents had

6    made it to the EEOC.

7    Q.    Because there were some receipts from the EEOC in there?

8    A.    There was the receipts as well as the manila envelope

9    having the EEOC embossed on the top left-hand side.

10   Q.    Exhibit 5-1, please, and scroll through, and if we could

11   scroll through and just tell us generally what are we looking at

12   here?

13   A.    That is just a paycheck stub from Davey Tree Service for

14   Mr. Montoya.  That is the letters provided as a -- through the

15   EEOC to Mr. Montoya.  Some more documentation provided by the

16   EEOC.  More documentation from the EEOC.  Some more documents

17   showing the actual Savannah address on this one, located off of

18   Hodgson Memorial.

19   Q.    If we could pause right there, and this should be -- can

20   you tell us, what are we looking at on your screen, sir?

21   A.    I guess it was more of a diagram of what happens to your

22   EEOC charge.

23   Q.    So kind of information on what happens after you report

24   it?

25   A.    Correct.

297

1   Q.   And the next page, please.

2   A.   It is a -- I guess a status on the tip you provide to the

3   EEOC.

4   Q.   And the next page.

5   A.   And that's an "Attention" also provided by the EEOC.

6   Q.   The next page?

7   A.   That is the first letter that was written by Mr. Joel

8   Reyes, one of the first -- one of the four letters in the

9   envelope.

10  Q.   The next page in Exhibit 5?

11  A.   It's an Immediate Med receipt for Ruben Ramirez.

12  Q.   Next.

13  A.   It is a check stub from Davey Tree Service address to Mr.

14  Juan Ramirez.

15  Q.   Next?

16  A.   That is another check stub for Juan Ramirez.  That is a

17  letter written to the -- I guess to the company by Juan Ramirez,

18  signed by Mr. Ramirez, and it looks like it was notarized by Mr.

19  Eluid Montoya.  Next letter, same thing from Ruben Ramirez

20  Hernandez signed by him and notarized by Mr. Montoya.

21  Q.   And then finally?

22  A.   Mr. Joel Reyes, another letter signed by him, and it looks

23  like it was notarized by Mr. Montoya as well.

24  Q.   After receiving this paperwork from Mrs. Montoya, what do

25  you do next?

298

1    A.    I contacted the Chatham County coroner's office so they

2    could send one of their deputy coroners down here to examine Mr.

3    Montoya.

4    Q.    And then what happened?

5    A.    They arrived on scene.  They began to I guess physically

6    manipulate the body wearing the proper PPE equipment, and that's

7    when we determined that Mr. Montoya had been shot multiple

8    times.

9    Q.    And did you go back then, leave the Montoya residence and

10   go to the crime scene?

11   A.    To the crime scene, yes, ma'am.

12   Q.    What did you observe when you got there?

13   A.    I observed that Mr. Montoya had several what appeared to

14   be gunshot wound injuries on his person.

15   Q.    What if any observations were you able to make at that

16   time about a gunshot and possible a caliber of the bullet?

17   A.    It was rather small.  The hole was rather small, making me

18   believe that the caliber just -- the caliber that was used was a

19   smaller caliber.

20   Q.    Was Mr. Montoya's body then placed in a bag?

21   A.    It was.  It was.  After we photographed him as we found

22   him and then after his body was -- was manipulated or moved, we

23   also photographed that as well, and then once we were done with

24   our investigation of his body, at that time, he was placed into

25   a bag, yes, ma'am.

299

1    Q.    For an autopsy --

2    A.    For a autopsy.

3    Q.    -- as part of your investigation?

4    A.    Correct, yes, ma'am.

5    Q.    And then did you continue and -- processing the crime

6    scene and -- the entire scene?

7    A.    We did, yes, ma'am.

8    Q.    And you indicated you took photographs of the crime scene?

9    A.    We did, yes, ma'am.

10   Q.    Also took photographs of the Honda?

11   A.    We did.

12   Q.    Go through these, please.  If we could look at Exhibit

13   22-1.  This again the --

14   A.    That was the general overlay of our crime scene when we

15   got there.

16        MS. GROOVER:  And Your Honor, at this time I would like,

17   before we continue going through Exhibit 22, would like to make

18   an announcement that they do contain some graphic images for any

19   members in the courtroom that would prefer to step out.

20        THE COURT:  And those of you who are in the gallery of

21   the court if you are concerned about seeing those photos, you

22   are welcome to step out until those photos are complete.

23        All right, proceed.

24   (By Ms. Groover)  Thank you.  Exhibit 22-2, can you tell us

25   what we're looking at?

300

1    A.    That is more of a medium photo from almost the same

2    location of me getting closer towards Mr. Montoya's body.

3    Q.    And 22-3?

4    A.    More of a zoomed-in image of the truck and the Honda.

5    Q.    And if you look to the steps where the door is open, are

6    those steps that you can enter to try to get into the truck?

7    A.    It is, yes, ma'am.

8    Q.    And 22-4?

9    A.    Just now a closer overall of again me getting closer to

10   the crime scene going around the Honda.

11   Q.    22-5?

12   A.    That is just an overview of the truck showing some of the

13   denseness behind the truck as well.

14   Q.    And 22-6?

15   A.    That is just a -- I guess a closer view of the passenger

16   side of the truck, with some tools on the ground.

17   Q.    And then 22-7?

18   A.    That would be the victim's cell phone and his sunglasses.

19   Q.    Items that indicated to you it was not a robbery?

20   A.    Correct.

21   Q.    Exhibit 22-8?

22   A.    That is the overview of the Honda.

23   Q.    And 22-9, from which direction are we looking at here?

24   A.    That is the rear of the Honda with the registration that

25   we ran that returned back to Mr. Montoya.

301

1    Q.    And 22-10?

2    A.    That is showing a yellow composition notebook on the dash

3    of the vehicle as well as the Honda door being open.

4    Q.    And 22-11?

5    A.    Just a closeup now of the composition notebook.

6    Q.    Exhibit 22-12?

7    A.    The interior of the Honda Accord showing the -- there's

8    keys on the passenger seat of that vehicle and I believe were to

9    the actual work truck.

10   Q.    Exhibit 22-13?

11   A.    A closeup of the keys.

12   Q.    Keys to the work truck?

13   A.    Correct, yes, ma'am.

14   Q.    Exhibit 22-14, can you please describe what is depicted in

15   this photograph.

16   A.    That is from the front of the Honda Accord facing the

17   crime scene, an overview of the truck, the Honda and then Mr.

18   Montoya.

19   Q.    Laying there by the grass?

20   A.    Correct, with the thick -- I guess the trees and the

21   shrubbery behind him.

22   Q.    Exhibit 22-15?

23   A.    That is now an overview of Mr. Montoya, how he was found.

24   Q.    Now when you arrived on scene, Mr. Montoya's body, did he

25   look like this, face up?

302

1 A. He was like this, yes, ma'am, but when first responders

2 arrived on scene he was face down.

3 Q. And first responders moved the body?

4 A. Correct, which is typical.  When they get dispatched to an

5 unresponsive, there was very minimal blood at the time.  They're

6 first responders so the first thing they are going to try to do

7 is to save a life.  They moved him out.  They checked for pulse

8 and vitals, and I'm not sure if CPR was performed but that is

9 common practice for us.

10 Q. But when you arrived, that had been completed?

11 A. That had been completed, yes, ma'am.

12 Q. Exhibit 22-16?

13 A. That is just an overview of the debris, the trash, I

14 guess, an overview of where he would have been at when he died

15 and then the surroundings showing how thick and dense it is.

16 Q. So this is on the side, looking at the truck?

17 A. This is -- I am right to the east of the Honda Accord

18 facing the truck.

19 Q. Exhibit 22-17, can you tell us what are we looking at in

20 Exhibit 22-17.

21 A. That is, I believe there is some blood right there on the

22 right with some -- the vegetation having been pushed down.  I

23 believe that's where Mr. Montoya laid and fell, but it's also

24 showing that his flip-flop-style shoes are still attached to his

25 feet, also showing that there was not a struggle.

303

1    Q.    And Exhibit 22-18?

2    A.    Same thing, closeup of his shoes still being on his feet.

3    Q.    In your training and experience, if someone were to run or

4    struggle, would shoes like this typically fall off?

5    A.    Every time their shoes come off.  They are running and

6    they are trying to fight, the first thing to fall off are their

7    shoes or flip-flops.

8    Q.    What if anything did that indicate to you, that his shoes

9    were still on?

10    A.    That there was no struggle.  He did not see it coming.

11    Q.    Exhibit 22-19?

12    A.    That is just showing the work truck that was being

13    performed, the hood being open, the compartment being open,

14    showing that Mr. Montoya was actually working on the truck.

15    Q.    When first responders arrived, this was open?

16    A.    This is exactly how the scene was, yes, ma'am.

17    Q.    And Exhibit 22-20?

18    A.    That's just an overview of the thickness and the truck

19    itself.

20    Q.    And for orientation, at the bottom of the wheel of the

21    truck, are those Mr. Montoya's feet?

22    A.    Those are his feet, yes, ma'am.

23    Q.    And can you describe the angle and the view that we are

24    looking at?

25    A.    So I am slightly to the east of Mr. Montoya where his head

1    was at, a little bit further back, and this would be almost like

2    a zoomed-in image of the truck and -- and the foliage.

3    Q.    All the foliage on the other side of the truck?

4    A.    Correct, yes, ma'am.

5    Q.    And Exhibit 22-21, what are we looking at?

6    A.    That is debris and then the illegal dumping how I was

7    explaining.  We've had an issue of dumping back there, so that

8    would have been slightly to the east of where, southeast of

9    where Mr. Montoya lay.

10   Q.    Exhibit 22-22, can you describe what we're looking at and

11   the direction?

12   A.    This is from the back of the truck going towards Mr.

13   Montoya where he lay, again showing the thickness and the

14   foliage towards the left of where he laid.

15   Q.    And Exhibit 22-23?

16   A.    That is an overview, again, of where Mr. Montoya laid.

17   Q.    Exhibit 22-24, can you describe what are we looking at?

18   A.    There is blood on the ground.  I believe that's where his

19   face was facing, and it appears that he has got some blood on

20   his right hand as well.

21   Q.    From the position of the body, that's where his -- he was

22   face down?

23   A.    His face would have been right there where the blood is

24   at, yes, ma'am.

25   Q.    Can you circle that on your screen?

305

1    A.    (Complies with request of counsel).

2    Q.    And Exhibit 22-25, what are we looking at in this, sir?

3    A.    We observe -- we start observing at this moment that he

4    had some blood on his right hand, so we're starting to take

5    pictures of his hand.

6    Q.    Exhibit 22-26?

7    A.    Same thing.  We're starting to see now he's got it could

8    be a wound in his hand as well, his right hand.

9    Q.    Exhibit 22-27, what is depicted in this photograph, sir?

10   A.    That is a screwdriver that was being used by Mr. Montoya

11   during the work truck, the -- the maintenance on the -- on the

12   vehicle.

13   Q.    Found nearby?

14   A.    It was found consistent to where he lay when the first

15   responders got there.

16   Q.    And what if anything did that indicate to you that you

17   found a screwdriver nearby?

18   A.    Again, that there was no struggle, that he dropped it when

19   he fell.

20   Q.    Exhibit 22-38, what are we looking at here, sir?

21   A.    It appears to be a -- I guess a hole in the back of Mr.

22   Montoya's head.

23   Q.    A smaller -- a smaller hole?

24   A.    Correct.  You could tell by the -- by the scale that it's

25   a significant -- it's a rather small hole.  A small bullet or

1    caliber would have made that -- that hole.

2    Q.    Exhibit 22-29?

3    A.    That is how we first -- how I first saw him with a swollen

4    eye and the bloody nose.

5    Q.    Exhibit 22-30?

6    A.    That is another hole in the back of Mr. Montoya, on his

7    back.  I believe it was his left shoulder, also rather small

8    hole, consistent with a small caliber.

9    Q.    Exhibit 22-31?

10    A.    Two holes also in his back.  Both you can tell are rather

11    small holes, also consistent with a small caliber bullet.

12    Q.    Exhibit 22-32?

13    A.    That is his hand that we took a picture of earlier.  We

14    noticed part of his finger was now missing near his -- I guess

15    would be his -- I guess the middle portion of his finger appears

16    to be a -- from a gunshot wound.

17    Q.    Exhibit 22-33?

18    A.    That is the registration of the tag of the Honda Accord

19    that belonged to Mr. Montoya.

20    Q.    After the processing of the crime scene, took the Honda

21    back to Garden City?

22    A.    Correct.

23    Q.    Are these now a series of photographs that we're about to

24    look at of the Honda being processed?

25    A.    It is, yes, ma'am.

307

1    Q.    In Exhibit 22-34?

2    A.    That is an overview of the left side of the Honda Accord

3    with crime scene tape around it showing that the vehicle was not

4    tampered during transport.

5    Q.    Exhibit 22-35.

6    A.    That is going to be the center console, the front interior

7    of the vehicle.  The composition book did fall down in transport

8    by the tow company, and the keys to the truck are still on the

9    driver's seat.

10   Q.    Exhibit 22-36.

11   A.    That is a closeup of the driver's seat showing the key and

12   the composition notebook.

13   Q.    Exhibit 22-37.

14   A.    Closeup of the key that started the truck.

15   Q.    And Exhibit 22-38.

16   A.    That is showing the key still in the ignition of the Honda

17   Accord.

18   Q.    And the Accord, Honda Accord, was running; correct?

19   A.    The vehicle was running at the time, yes, ma'am.

20   Q.    What if anything did that indicate, that there was a

21   running vehicle with keys in the car?

22   A.    It further validates the fact that this was not a robbery,

23   showing that they didn't steal the vehicle.

24   Q.    Exhibit 22-39?

25   A.    That is a letter addressed to Mr. and Mrs. Montoya and

1    shows their physical address of 59 Village Drive, which is in

2    Garden City.

3    Q.    Exhibit 22-40?

4    A.    This is a yellow folder that was found inside the vehicle.

5    Q.    Exhibit 22-41, what are we looking at here, sir?

6    A.    That is the contents of the yellow folder we just showed,

7    and it appears to be a passport application for I believe Mr.

8    Montoya's daughter.

9    Q.    Does it include a US citizenship certificate?

10    A.    It does, yes, ma'am.

11    Q.    Does it also include a social security card?

12    A.    Yes, ma'am, it does.

13    Q.    What if anything did it indicate to you that these

14    valuable identification documents remained in the car?

15    A.    That they were not stolen; it was not a robbery.

16    Q.    Exhibit 22-42?

17    A.    That will be Mr. Montoya's I guess Georgia Port

18    transportation worker identification card located near the back

19    of the vehicle.

20    Q.    And Exhibit 22-43?

21    A.    His TWIC card again.

22    Q.    And Exhibit 22-44?

23    A.    A closeup of his TWIC card.

24    Q.    And Exhibit 22-45?

25    A.    His Georgia Ports identification card.

1  Q.    That was inside the Honda?

2  A.    Inside the Honda as well, yes, ma'am.  I believe it was --

3  I believe it was on the other side of the TWIC card.  It was --

4  they were back to back on the same keychain.

5  Q.    And Exhibit 22-46.

6  A.    That is the back seat of the vehicle showing its contents.

7  Q.    Work gear from Wolf Tree inside that vehicle?

8  A.    There is a helmet with the name "Wolf Tree" on it and

9  there was also some -- I guess some tools as well, that did

10  indicate tree service.

11  Q.    And Exhibit 22-47, what are we looking at?

12  A.    That is a Stihl chainsaw.

13  Q.    What if anything did that indicate to you that that was in

14  the vehicle?

15  A.    Stihl chain saws -- I know from -- because I own a

16  couple -- are rather expensive.  So if this would have been

17  again a robbery, that is one of the items I deemed should have

18  been taken, and it's still there.

19  Q.    Exhibit 22-48.

20  A.    That is some traffic cones and a T-shirt.  It appears to

21  be another Stihl from the orange item underneath it.

22  Q.    And Exhibit 22-49.

23  A.    Some cones, and then now you can see towards the left

24  under -- on the rear driver's seat a Stihl hand-held blower,

25  still inside the vehicle not taken.

310

1   Q.    Exhibit 22-50.

2   A.    A closeup now of both of the Stihl items in the back seat

3   of the vehicle.

4   Q.    And Exhibit 22-51.

5   A.    That is a closeup of the Stihl blower, handheld blower.

6   Q.    Was this removed from the Honda then to photograph?

7   A.    Correct, yes, ma'am.

8   Q.    And finally Exhibit 22-52.

9   A.    That's more expensive handheld tools in the trunk of the

10  vehicle, further indicating it did not appear to be a robbery.

11          MS. GROOVER:  Your Honor, may I approach the witness?

12          THE COURT:  You may.

13  (By Ms. Groover) Sir, I'm handing you Exhibit 23.  Take a look

14  at that, please, and tell us do you recognize Exhibit 23, sir.

15  A.    I do, yes, ma'am.

16  Q.    What is that?

17  A.    That is the yellow composition book that was originally

18  found on the dash of the Honda Accord.

19  Q.    Exhibit 24, please, if we could pull up Exhibit 24.

20  A.    That is the front of the yellow composition notebook.

21  Q.    The one that's in your hand?

22  A.    The same one I have in my hand.

23  Q.    And Exhibit 24-2, what are we looking at in this exhibit,

24  sir?

25  A.    That is the direct middle of this composition book.  It is

1  a handwritten note.

2  Q.   Did that catch your attention?

3  A.   It did, yes, ma'am.

4  Q.   What did it say?

5  A.   "Discharged by X for three days for not signing a safe

6  practice violation that wasn't true.  They are always watching

7  me because of a complaint I put in on ways they get a foreman

8  treat their employees."

9  Q.   Does that appear consistent with the documentation that

10  you received from Mrs. Montoya?

11  A.   It did, yes, ma'am.

12  Q.   After you finished processing the crime scene and the

13  silver Honda, what did you do next?

14  A.   Once the scene was processed, the vehicle was returned

15  back to Mrs. Montoya.  We began what we call a victimology.

16  That's when we break down a victim's life and find out what

17  could have led to his death.

18      We utilize every resource, and we were unable to gather

19  much information from Mr. Montoya as far as any criminal

20  activity where he is listed as a complainant -- or as an

21  offender as well as any reports documented where he was listed

22  as an offender or a suspect.

23  Q.   Did you learn any official information about a possible

24  suspect?

25  A.   We had the information listed in the reports.  Thus we

1   started making phone calls on the telephone numbers on the

2   complaints that were provided in the manila envelope.

3   Q.   The letters written?

4   A.   The letter, correct, yes, ma'am.

5   Q.   That Mr. Montoya gave to the EEOC?

6   A.   Yes.

7   Q.   Were you able to speak to anyone?

8   A.   We were able to get ahold of one of the three complainants

9   on the letter.  I believe his name was Mr. Joel Reyes.

10  Q.   And did you meet with him and interview him?

11  A.   I did, yes, ma'am.

12  Q.   After speaking with him, did you learn information that

13  led you to want to go look at where Pablo lived?

14  A.   Correct, yes, ma'am.

15  Q.   And did you learn information about where he lived?

16  A.   We did, yes, ma'am.

17  Q.   Where was that?

18  A.   I believe it was 275 Milton Rahn Road and that is located

19  in Effingham County, Georgia.

20  Q.   And were you able to learn anything more about it besides

21  just the address?

22  A.   We were able to get some of the -- we were able to get

23  some police reports that were filed for the general area.  We

24  were able to get some of the residents who lived there, and we

25  were able to get a -- I guess a telephone number for Mr. Pablo

1   as well.

2   Q.   And did you obtain a search warrant for the residence of

3   295 Milton Rahn Road in Rincon, Georgia?

4   A.   Yes, ma'am, a search warrant was applied for and granted

5   by the Effingham County Magistrate Judge.

6   Q.   Now the very next day after the murder on August the 20th

7   of 2017, did you execute the search warrant?

8   A.   I did, yes, ma'am.

9   Q.   And what all agencies were there assisting you?

10  A.   It was a lot of agencies.  It was the Garden City Police

11  Department.  It was Effingham County Sheriff's Department.  It

12  was Homeland Security investigators.  It was the Federal Bureau

13  of Investigation and I believe Alcohol, Tobacco & Firearm was

14  also there as well.

15  Q.   Can you describe the property for the jury?

16  A.   It is a rather large piece of land.  We had given -- were

17  given a rough outline by the Effingham County sheriff deputies

18  of how the area was.  They said it was a rather large piece of

19  land with multiple trailers, campers and a house on the

20  property.

21  Q.   And did you observe actually multiple trailers and campers

22  and a house on the property?

23  A.   During the search warrant, yes, ma'am, we did.

24  Q.   And did you locate -- there were a number of vehicles?

25  A.   There was a handful of vehicles, quite a few vehicles on

314

1    the property, yes, ma'am.

2    Q.    Did you locate a vehicle later determined to be Pablo's

3    work truck?

4    A.    We did, yes, ma'am.

5    Q.    Did you later learn in your investigation that the work

6    truck had GPS location information?

7    A.    The business did have a GPS on the vehicle, yes, ma'am.

8    Q.    Able to be tracked?

9    A.    It was, yes, ma'am.

10   Q.    Did you also locate a vehicle later determined to be the

11   defendant's truck?

12   A.    He -- I believe he was pulled over driving that vehicle as

13   we were executing the search warrant.  He was trying to leave

14   the premises as investigators and officers were pulling onto the

15   property.

16   Q.    Did you locate Pablo?

17   A.    We did, yes, ma'am.

18   Q.    Where was he?

19   A.    He was near the back of the property with another male.

20   Q.    Did you determine where he lived and which dwelling?

21   A.    We did, yes, ma'am.

22   Q.    And did you locate Juan?

23   A.    We did, yes, ma'am.

24   Q.    The defendant?

25   A.    We did.

315

1   Q.    Did you determine where he lived?

2   A.    We did, yes, ma'am.

3   Q.    Did you learn that there were other family members living

4   there at 275 Milton Rahn Road besides just Pablo and Juan?

5   A.    Quite a few, yes, ma'am.

6   Q.    And as part of your search warrant, were you authorized to

7   seize cell phones and firearms and ammunition?

8   A.    Correct.

9   Q.    Did you seize all the cell phones that belonged to Pablo

10  and Juan?

11  A.    We did.

12  Q.    Tell the jury about the phone that you seized from the

13  defendant.

14  A.    Like I said, Mr. Juan was pulled over as he was trying to

15  leave the property.  Inside the vehicle, his phone was seized by

16  Captain Rick Daly and Corporal Bradley from the Effingham County

17  Sheriff's Department.  That phone in turn was turned over to me

18  by them.

19  Q.    Exhibit 25-16, please, what is this a photograph of, sir?

20  Just a moment when it appears on your screen.

21  A.    That is the vehicle that the defendant was driving when he

22  was pulled over on the property.

23  Q.    And the cell phone was located up on the dash of the

24  vehicle?

25  A.    Yes, ma'am.

316

1    Q.    In front of the driver?

2    A.    Correct.

3    Q.    The defendant?

4    A.    Correct.

5    Q.    Did you seize any firearms and ammunition?

6    A.    We seized ammunition inside of that vehicle, yes, ma'am.

7    Q.    And what about the rest of the property, did you seize any

8    firearms and ammunition?

9    A.    We seized a cache of guns and ammunition, yes, ma'am,

10   quite a few.

11   Q.    Approximately 14 firearms?

12   A.    Approximately.

13   Q.    Ammunition located everywhere?

14   A.    Throughout the entire property, yes, ma'am.

15   Q.    Specifically were Juan, the home that Juan lived in, did

16   you locate any items?

17   A.    We located several firearms inside of his camper.

18   Q.    Okay.  Go through the search of Exhibit 25.  Can you tell

19   us what is depicted in Exhibit 25-1?

20   A.    That is where Mr. Pablo Rangel resided.  That is the main

21   house on the property.

22   Q.    And Exhibit -- turning to the next page, if we could go

23   through and you could describe for us what we're looking for in

24   each photograph?

25   A.    That is the inside of Pablo Rangel's residence and

317

1   appeared to be his living room/office.

2   Q.    Exhibit 25-3?

3   A.    Social security cards, identification cards of a person

4   and it appeared to be some employee records as well on the

5   printer.

6   Q.    Exhibit 25-4?

7   A.    More of the paperwork on the desk addressed to multiple

8   people as well as a tag still on the desk.

9   Q.    And Exhibit 25-5?

10  A.    A bunch of documentation belonging to the company.

11  Q.    And Exhibit 25-6?

12  A.    Social security card and a driver's license of -- I

13  believe it was a young lady or of a male.

14  Q.    Okay.

15  A.    Of a young lady, Mrs. Flores Gonzalez.

16  Q.    And Exhibit 25-7, is this a closeup view of this piece of

17  paper?

18  A.    Yes, ma'am, it is.

19  Q.    With her identification documents?

20  A.    Correct.

21  Q.    And Exhibit 25-8, is this a better photograph without the

22  shadow?

23  A.    It is, yes, ma'am.

24  Q.    And Exhibit 25-9?

25  A.    Insurance documentation addressed to Mr. Pablo Rangel.

318

1   Q.    And Exhibit 25-10?

2   A.    Those appear to be I guess work orders or clearing reports

3   and maps for the company.

4   Q.    And Exhibit 25-11?

5   A.    Appear to be a -- I believe it's a direct deposit

6   documentation for an employee, Mrs. Maria Vega.

7   Q.    Exhibit 25-12, another copy of that?

8   A.    Correct.  It's just an overview now.

9   Q.    Moving to Exhibit 25-13, getting outside of Pablo's

10  residence, what are we looking at here?

11  A.    Two, it looks like a pull-behind camper and an actual

12  trailer on the property with multiple vehicles.

13  Q.    And did you learn that different members of Pablo and

14  Juan's family lived in these two dwellings?

15  A.    Correct, yes, ma'am.

16  Q.    And Exhibit 25-14?

17  A.    That is a -- one of the campers, the pull-behind camper.

18  Q.    Exhibit 25-15?

19  A.    Just a closer view of the pull-behind camper's front door.

20  Q.    Exhibit 25-16?

21  A.    That's Mr. Juan Rangel's truck.

22  Q.    And finally Exhibit 25-17?

23  A.    That is a pickup belonging to another male.

24  Q.    Can we highlight on the left side there seems to be some

25  sort of garage or carport or pavilion; do you see that?

319

1    A.    I do, yes, ma'am.

2    Q.    And can you describe that for us.

3    A.    It is a rather large area.  That is where we kept all of

4    the defendants, all of the people that were detained from the

5    property in that general area.  That is where all the

6    investigators were housed at, so it's a rather large area, and

7    it appeared to be a brand-new structure that was added to the

8    property.

9    Q.    Okay.  And Exhibit 26-1, can you tell us what are we

10   looking at in Exhibit 26-1?

11   A.    That is almost like a front porch leading to the

12   defendant's residence.

13   Q.    Juan's residence?

14   A.    Correct, yes, ma'am.

15   Q.    And Exhibit 26-2?

16   A.    That is a closer, getting closer towards the porch before

17   you get to the actual camper belonging to Mr. Juan Rangel.

18   Q.    Kind of a makeshift porch?

19   A.    Correct.  It's a detached -- it looks like it was built

20   after the fact.

21   Q.    Exhibit 26-3?

22   A.    That is a walk-in, that is from the -- appears to be from

23   the porch and that is the front door.

24   Q.    To the defendant's home?

25   A.    Correct.

320

1    Q.    Exhibit 26-4?

2    A.    That is the, I guess the living area, the common area of

3    the residence with the oven -- you can't really see it but the

4    oven is open.

5    Q.    This is inside of the defendant's home?

6    A.    This is inside of the defendant's home, yes, ma'am.

7    Q.    26-5.

8    A.    That is from the far left side of the residence facing

9    towards the far right side of the residence, an overview.

10   Q.    And did you find anything of interest in the defendant's

11   home?

12   A.    Yes, ma'am, we did.

13   Q.    Can you describe, tell us what it is and where it's

14   located in the photograph?

15   A.    We found some ammunition right there inside the oven.

16   Q.    Did you find any firearms?

17   A.    We did.  We found a bunch of firearms in that room, yes,

18   ma'am.

19   Q.    Can you identify them in the photograph for us?

20   A.    You've got a -- I think it's a .45-caliber Smith & Wesson.

21   You've got an AR15.  You've got another gun inside of this bag

22   as well, and there is other guns that will be I guess visible in

23   another photo.

24   Q.    Turning to Exhibit 26-6, is this a different view but of

25   the same, inside of the defendant's residence?

321

1    A.    Yes, ma'am.

2    Q.    And tell us what are we looking at here.

3    A.    Again you've got a rifle here.  You've got the AR15 here

4    and then you've got a small revolver right there.

5    Q.    How big is that revolver?

6    A.    It is so small it fits in your pocket, and you could never

7    tell there was a gun on you.

8    Q.    Would it fit in the palm of your hand?

9    A.    It would, yes, ma'am.

10   Q.    What kind of gun is that; do you know?

11   A.    I don't know, not off the top of my head, no, ma'am, not

12   the actual name.

13   Q.    Exhibit 26-7.

14   A.    That is a -- that is a -- you can see a rifle there.  You

15   can see now a different view of the revolver and this is a pull-

16   apart or break-apart Ruger .22-caliber rifle.

17   Q.    Exhibit 26-8.

18   A.    That is the -- you've got ammunition.  You've got a closer

19   view of the firearm, .45-caliber pistol, and then you've got a

20   holster and you've got the muzzle of an AR15 towards the bottom

21   of the photo.

22   Q.    Exhibit 26-9.

23   A.    That is an overview of the ammunition as well as the

24   .45-caliber pistol.

25   Q.    And Exhibit 27, what is depicted in Exhibit 27, please?

322

1    A.    That is the .22 WMRHP jacketed hollow point that was

2    seized from inside of that oven.

3            MS. GROOVER:  Your Honor, may I approach the witness?

4            THE COURT:  You may.

5    (By Ms. Groover)  Sir, I'm handing you what's been marked as

6    Government's Exhibit 28.  Can you take a look at Exhibit 28 and

7    tell us if you recognize that, sir?

8    A.    I do, yes, ma'am.

9    Q.    What is that?

10   A.    That is an evidence bag that I seized with the ammunition

11   as seen in the photograph.

12   Q.    The box of .22 hollow-point ammunition seized from the

13   defendant's oven?

14   A.    Yes, ma'am.

15   Q.    Did you have a chance to speak with Pablo?

16   A.    I did, yes, ma'am.

17   Q.    And did he explain that he was an illegal alien?

18   A.    He did.

19   Q.    Did he tell you where he was at the time of the murder?

20   A.    I believe he said he was in Brunswick, Georgia.

21   Q.    Did you have a chance to speak with the defendant?

22   A.    I did, yes, ma'am.

23   Q.    And prior to today, well, specifically did you speak with

24   him on Sunday, August the 20th of 2017?

25   A.    Yes, ma'am.

323

1   Q.   The day right after the murder?

2   A.   Yes, ma'am.

3   Q.   And prior to today -- well, what time of day was that when

4   you spoke with him?

5   A.   So we executed the search warrant first thing in the

6   morning, and that lasted, it being such a large area and

7   multiple dwellings, a long time.  I believe at this point, the

8   interview, it was -- it was after five o'clock, in between 5:00

9   and 6:00 p.m.

10  Q.   And was he taken to the Garden City Police Department for

11  an interview?

12  A.   He was, yes, ma'am.

13  Q.   Placed in an interview room?

14  A.   Yes, ma'am.

15  Q.   Was the interview room equipped with a recording system to

16  audio- and video-record the interview?

17  A.   Yes, ma'am.

18  Q.   Was the entire interview or encounter approximately about

19  an hour?

20  A.   Roughly, yes, ma'am.

21  Q.   And who participated in that interview with you?

22  A.   With me, the initial interview was myself and Detective

23  Reyes, who is also fluent in Spanish.

24  Q.   And prior to today, did you have an opportunity to watch

25  and listen to the recording?

324

1    A.    I have, yes, ma'am.

2    Q.    And is it marked as Exhibit 89?

3    A.    Yes, ma'am.

4    Q.    And did the defendant speak Spanish?

5    A.    Yes, ma'am.

6    Q.    And was the interview conducted in Spanish?

7    A.    It was completely in Spanish, yes, ma'am.

8    Q.    And after the interview, did you learn that contractors

9    with Homeland Security Investigations prepared a transcript of

10   the interview that you conducted on August the 20th of 2017?

11   A.    I did, yes, ma'am.

12         THE COURT:  Counsel, let me pause you there for just a

13   moment.  Are you about to get into that phase of the case?

14         MS. GROOVER:  Yes, Your Honor.

15         THE COURT:  It is 10 after noon, and so it is time for

16   our lunch break, and having gone through the photos and then

17   turning toward another phase of the investigation, this is a

18   good opportunity to pause.

19         So ladies and gentlemen of the jury, we will take our

20   lunch break from now until 1:15, so if you will do as you've

21   faithfully done and that is be back in the jury room in time for

22   us to start promptly as 1:15.

23         As we do leave the courthouse for lunch, recall the

24   familiar admonition:  Don't discuss the case; keep an open mind;

25   don't do any research and don't consume any media about the

325

1  case.

2          Now, Detective, although you are, of course, invited to

3  partake in lunch, it's going to be a lonely lunch for you

4  because you need to consider yourself still on the stand during

5  this lunch break, so I specifically direct you not to converse

6  with anybody about your testimony.

7          And when we resume at 1:15, we will pick up where we

8  left off.  All right, so let's rise for the jury.

9          (The jury exits the courtroom.)

10         THE COURT:  All right, counsel, we will be in recess

11  until 1:15.

12         (Recess from 12:12 p.m. to 1:21 p.m.)

13         THE COURT:  All right, let's bring the jury in, and

14  counsel, if at any time there's a cautionary instruction that

15  anyone is requesting mid-trial just give me a heads-up.

16         (The jury enters the courtroom.)

17         THE COURT:  Welcome back, members of the jury.

18         Detective, when we broke for lunch, you were under oath

19  sworn to tell the truth.  Do you reaffirm that oath for the

20  balance of your testimony?

21         THE WITNESS:  I do.

22         THE COURT:  Proceed.

23  (By Ms. Groover)  Thank you, Your Honor.

24  Before the break we were getting ready to discuss your

25  interview with the defendant.  Do you recall that, sir?

1  A.    I do.

2  Q.    Prior to today, you testified that you had a chance to

3  review the recorded copy of the defendant's interview; is that

4  correct?

5  A.    Yes, ma'am.

6  Q.    And is that Exhibit 89 that is in front of you?

7  A.    Yes, ma'am.

8  Q.    And I'll also explain that there was a transcript of the

9  defendant's interview; is that correct?

10 A.    Yes, ma'am.

11 Q.    And the transcript was prepared by contractors with

12 Homeland Security; is that correct?

13 A.    Correct.

14 Q.    And the transcript has the Spanish words on the left and

15 the English translation on the right; is that correct?

16 A.    Correct.

17 Q.    And prior to today, did you have a chance not only to

18 listen to the complete audio of the interview but also follow

19 along with the transcripts both with the Spanish and the English

20 translations?

21 A.    Yes, ma'am.

22 Q.    And is the transcript, Exhibit 90, a true and accurate

23 translation of your entire encounter with the defendant?

24 A.    It is, yes, ma'am.

25 Q.    Now, did you have any difficulty communicating with the

327

1   defendant?

2   A.    No, ma'am.

3   Q.    And during the entire interview, you appeared to

4   understand each other?

5   A.    Correct.

6   Q.    Any time did you need another Spanish speaking agent to

7   come in and help you communicate?

8   A.    No, ma'am.

9   Q.    Were his answers appropriate to your questions?

10  A.    Yes.

11  Q.    Rational responses?

12  A.    Yes, ma'am.

13  Q.    Any confusion or rambling?

14  A.    No.

15  Q.    Describe his speech and diction.

16  A.    It was a normal conversation between two individuals.

17  Q.    Did he appear to be under the influence of any drugs or

18  alcohol?

19  A.    No, ma'am.

20  Q.    What was his demeanor like?  How was he acting?

21  A.    Extremely calm.

22  Q.    And his appearance?

23  A.    He was well groomed.  I believe he said he was working so

24  he was properly dressed for his attire that he would require for

25  work.

328

1    Q.    Nothing that would indicate that he wasn't of sound mind

2    or anything?

3    A.    No, ma'am.

4    Q.    At any time did you use any physical punishment or threats

5    with him?

6    A.    Absolutely not.

7    Q.    At any time did he exhibit any signs of physical

8    discomfort?

9    A.    No, ma'am.

10    Q.    Any indication he had any sleep or food deprivation?

11    A.    No, ma'am.

12    Q.    Any signs he was suffering from any kind of trauma,

13    depression, anything like that?

14    A.    No, ma'am.

15    Q.    At any time did he ask you to repeat or rephrase because

16    he was confused and didn't understand exactly what you were

17    asking him?

18    A.    No, ma'am.

19    Q.    And prior to speaking with him about the subject of your

20    communication, did you advise him of his constitutional rights,

21    his Miranda warnings?

22    A.    We did.

23    Q.    How did you do that?

24    A.    Verbatim by the Garden City constitutional rights form,

25    which is in Spanish.

329

1    Q.    Did he appear to understand his rights?

2    A.    He did, yes, ma'am.

3    Q.    Did he agree to waive those rights and speak with you?

4    A.    He did.  He said as long as we spoke to him in Spanish.

5    Q.    What did you talk to him about?

6    A.    So as any typical interview, I began by just asking basic

7    demographic questions, where he's from.  He said he was from

8    Mexico, originally from Mexico.  I asked him how long he lived

9    in the United States and he stated since he was five years old

10   so over 40 years.

11         He told me, I asked him where he lived at and he told me

12   on the property where the search warrant was executed.  He

13   advised he had a camper in the back where he lived at with his,

14   I guess, girlfriend.  And he -- his son also lived on the

15   property.

16   Q.    Did he explain that he was originally from Mexico?

17   A.    He did, yes, ma'am.

18   Q.    And that he was in the country illegally?

19   A.    Yes, ma'am.

20   Q.    Did he explain who his family was?

21   A.    He did, yes, ma'am.

22   Q.    And tell us about that.

23   A.    He stated the owner of the property was his brother, Pablo

24   Rangel, who lived on the property as well as several other

25   family members who lived throughout the property as well.

330

1   Q.   Did he say that his son Jonathan lived on the property?

2   A.   He, did, yes, ma'am.

3   Q.   As well as a cousin Hipolito?

4   A.   Yes, ma'am.

5   Q.   All lived in different trailers on the property?

6   A.   Correct.

7   Q.   And did he acknowledge that an individual by the name of

8   Maria Flores lived there?

9   A.   Correct.  I believe he specifically said that Maria,

10  Hipolito and Jonathan all lived in the same trailer together.

11  Q.   Did he admit that he worked for the company Wolf Tree

12  using fake names?

13  A.   Correct, yes, ma'am.

14  Q.   Because he was illegal?

15  A.   Because he was an illegal alien, yes, ma'am.

16  Q.   Did he explain he worked for the company since 2003?

17  A.   Correct.

18  Q.   Did he explain some of the fake names he used, for

19  example?

20  A.   He provided a name of I believe Niclaus Rodriguez that was

21  an alias, his work name.

22  Q.   Did he explain how he got that name?

23  A.   His brother gave it to him.  I believe another name that

24  he used was Stanley Turner as well.

25  Q.   Did you ask him what he did, where he was the day of the

1  murder?

2  A.    We did.  I asked him specifically where he was at the day

3  prior, which would have been August the 19th, and he stated that

4  he was at work in Springfield, Georgia, with Maria, Jonathan and

5  Hipolito.

6  Q.    Did he explain where his brother was?

7  A.    Yes, ma'am, he did.

8  Q.    Where did he say his brother was?

9  A.    Was in Brunswick, Georgia.  In fact, he told me that I can

10  review his GPS coordinates on his truck to validate that.

11  Q.    Did he explain if he ever communicated with Pablo on the

12  day of the murder?

13  A.    He did.

14  Q.    What did he tell you?

15  A.    He said he tried calling him at one o'clock telling him he

16  needed hydraulic oil for specific machinery equipment for the

17  job site on Springfield.

18  Q.    Did he admit to having a cell phone?

19  A.    He did.

20  Q.    Did he explain where his cell phone was?

21  A.    Yes, ma'am, he did.

22  Q.    Where was that?

23  A.    It was seized subsequent to the search warrant on the

24  traffic stop the day we did the search warrant off of the

25  Effingham property.

332

1    Q.    The cell phone on the dashboard of the maroon truck that

2    he was driving?

3    A.    Correct.  He was specific it was an iPhone 7 Plus.

4    Q.    Is that the same phone you seized in front of him when he

5    was trying to leave?

6    A.    Correct.  In fact, he also gave me the passcode to the

7    phone, which was his birthday, and that passcode unlocked the

8    phone that was seized inside the vehicle further validating his

9    claim that it was his phone.

10   Q.    Did you ask him if he knew Eluid Montoya?

11   A.    Yes.

12   Q.    What did he say?

13   A.    He said -- he used in past tense, he used to -- he worked

14   for the company and he was shot.

15   Q.    Did you explain to him before that statement that Mr.

16   Montoya was shot?

17   A.    I did not, no, ma'am.

18   Q.    Did he explain anything more about Mr. Montoya?

19   A.    I asked him what kind of person he was.  And he told me

20   that he was not a good guy.  He stated that he would use his

21   citizenship, him being one of the only US citizens for the

22   company, against the illegals and he would take advantage of the

23   illegal aliens for the company.

24   Q.    Did the defendant explain that Mr. Montoya had problems

25   with his brother Pablo?

333

1    A.    Work-related problems, yes, ma'am.

2    Q.    I'd like to pull up Exhibit 90-22, a copy of the

3    transcript of your interview, Page 22 of Exhibit 90, and is

4    there a point towards the bottom you ask him, "Do you think your

5    brother killed him," referring to Mr. Montoya?

6    A.    I did, yes, ma'am.

7    Q.    How did Juan respond?

8    A.    He laughed and he stated, "No, I don't think so, my

9    brother is not -- he wouldn't even kill a fly."

10   Q.    He laughed, his brother didn't kill him?

11   A.    Correct.

12   Q.    Do you question him about firearms?

13   A.    I did, yes, ma'am.

14   Q.    What did he tell you about the firearms?

15   A.    He told me that he is well versed in firearm usage as well

16   as identifying firearms as well.

17          THE COURT:  Ms. Groover, let me pause you there and give

18   the jury a little bit of context.

19          Members of the jury, Exhibit 90 has been identified as a

20   typewritten transcript and partial translation from Spanish into

21   English of an oral conversation heard of the tape recording

22   that's been received into evidence as Exhibit 89.

23          The transcript also purports to identify the speakers

24   engaged in the conversation.  I've admitted the transcript.

25   There's been no objection to it for the limited and secondary

334

1   purpose of helping you follow the content of the conversation.

2          If the audio is played for you here in court or if you

3   choose to listen to it during deliberations, you're specifically

4   instructed that whether the transcript correctly reflects the

5   content of the conversation or the identity of the speakers is

6   entirely for you to decide based on your examination of the

7   transcript in relation to the tape itself as the primary

8   evidence of its own content.

9          If you determine that the transcript is in any way

10  incorrect or unreliable you should disregard it to that extent.

11  All right, proceed.

12  (By Ms. Groover)   Thank you, Your Honor.

13  What did he tell you about the guns?

14  A.   He said a lot of guns were given to them by I guess a

15  friend who used to live in the same trailer park immediately

16  where they lived off of Ferguson Avenue.

17  Q.   And so does he admit to being in possession of multiple

18  guns?

19  A.   He does, yes, ma'am.

20  Q.   And does he explain about Pablo's experience with guns?

21  A.   Correct, he does.

22  Q.   Let's look at Page 27 of Exhibit 90, and on Page 27, does

23  he explain whether or not his brother Pablo would carry guns?

24  A.   He does.

25  Q.   What does he say exactly?

335

1    A.    I asked him, "But what gun does your brother have?"

2          He stated, "I don't know if he has a gun but he -- I don't

3    know if he has a gun, but I believe I had a rifle -- let's see,

4    I believe he had one that looks like a cuerno de chivo, an AK,

5    that one."

6    Q.    Scrolling down to the bottom of Page 27, does he again

7    talk about whether or not Pablo carried firearms?

8    A.    Correct, yes, ma'am.

9    Q.    And what does he tell you?

10   A.    He stated, slightly above that, he says, "Yes, but he

11   doesn't even know how to use it," and then the question is asked

12   by me, "He doesn't know?"

13         And he stated, "No, no, they asked him to take care of it,

14   to take care of it."

15         "Okay."

16         And then his response is "Yes, he has never carried

17   because he doesn't know about firearms.  I don't know about --

18   well, I don't know much but I know how to shoot.  I was in the

19   Mexican military, so sometimes I shoot.  My son shoots with his

20   friends when they sometimes come by but the firearms aren't

21   ours."

22   Q.    Do you then question him also about a phone number for

23   Pablo?

24   A.    We did, yes, ma'am.

25   Q.    And does he admit, explain what phone number Pablo had?

336

1   A.    He did, yes, ma'am.

2   Q.    And does he go further into details about Mr. Montoya and

3   the work problems?

4   A.    Correct.

5   Q.    Does he explain Mr. Montoya was suspended from work?

6   A.    He did.

7   Q.    And did he explain why?

8   A.    I don't believe -- I'm not a hundred sure if he explained

9   why.  I think he said it had something to do with a boss

10  observed him with a safety violation, but I don't know the exact

11  words he used.

12  Q.    Did he explain that Mr. Montoya had a complaint on his

13  brother Pablo?

14  A.    He did tell me he had a complaint without me even asking

15  him.

16  Q.    Did he also explain that the victim called the company?

17  A.    Correct.

18  Q.    And that the victim also explained he didn't want Pablo to

19  be his supervisor?

20  A.    Correct.

21  Q.    Did the defendant explain that there was a meeting when

22  the victim sent the letter in to the company?

23  A.    Correct.

24  Q.    And based on your investigation, was that meeting that he

25  was referring to commonly referred to as the showup meeting?

337

1    A.    It was a showup, yeah.

2    Q.    Where Pablo had his complaint letter read?

3    A.    Where he had a handful of complaint letters, correct, and

4    he read them out loud.

5    Q.    And Juan described that meeting to you?

6    A.    Correct.

7    Q.    Did the defendant admit to carrying a .22-caliber firearm?

8    A.    He did.

9    Q.    And did he specifically say he carries it at work to kill

10   turkeys?

11   A.    Correct.

12   Q.    And does he specifically admit to multiple guns in his own

13   trailer, his own camper?

14   A.    Correct.

15   Q.    Including an R15?

16   A.    Correct.

17   Q.    A .345 pistol?

18   A.    Correct.

19   Q.    An old .22 rifle?

20   A.    Correct.

21   Q.    And another .22 rifle?

22   A.    Correct.

23   Q.    Does he also explain that the bullets and ammunition found

24   in his home belonged to him?

25         MS. BREWINGTON:  Let me object to all the leading that's

338

```
 1   happening.
 2          THE COURT:  Sustained.
 3   (By Ms. Groover)  What did he explain to you about the
 4   ammunition found in his kitchen?
 5   A.   He said that the ammunition was his and his son's,
 6   Jonathan.
 7   Q.   Exhibit 90, the bottom of Page 48 and the top of 49, if we
 8   could take a look at that, please.  Does the defendant talk to
 9   you about a .22 Magnum?  If we go the top of Page 49 as well,
10   pause right there, please.
11   A.   Yes, ma'am.
12   Q.   And who was the first person in the interview to bring up
13   a .22-caliber Magnum?
14   A.   It was the defendant, Mr. Rangel-Rubio.
15   Q.   And what does he say exactly about the .22-caliber Magnum?
16   A.   He says, "It's the caliber for the cartridges of the .22,
17   .22 Magnum, yes, yes; we don't use it anymore because, in fact,
18   he was taken to Chicago."
19   Q.   Referring to the .22-caliber Magnum?
20   A.   Correct.
21   Q.   Does the defendant explain who Stanley Turner is?
22   A.   Yes.
23   Q.   And what does he tell you about Stanley Turner?
24   A.   Stanley Turner was one of the names he used from the
25   company, and Stanley -- one year I guess Stanley realized that
```

1    he had to pay back taxes because Mr. Rangel was using his name

2    for the tree company.  I believe he was also the guy that was

3    friends with his son.

4    Q.    And at the conclusion of the interview, where exactly did

5    the defendant say he was on the day of the murder?

6    A.    On three separate occasions, it was asked where he was at

7    at that time during the homicide, and all three times he came up

8    with the same answer, "I was in Springfield, Georgia."

9    Q.    Working?

10   A.    Working.  Yes, ma'am.

11   Q.    And who did he say he was working with?

12   A.    He was working with I believe Maria Flores, Hipolito

13   Martinez Martinez and his son, Jonathan Rangel.

14   Q.    At the conclusion of your interview with the defendant,

15   did the defendant remain a suspect in the homicide

16   investigation?

17   A.    Yes, ma'am.

18   Q.    What did your investigation lead you to do next?

19   A.    We then went back to the scene of the crime and the

20   general area, and we started canvassing every business for

21   potential video surveillance footage.

22   Q.    Exhibit 21, please.  Can you please tell the jury what are

23   we looking at in Exhibit 21?

24   A.    That is a Google Earth view of the general area where the

25   homicide occurred.

340

1    Q.    Using Exhibit 21, can you please describe locations that

2    you searched for surveillance video?

3    A.    We walked the entire area of Old Dean Forest Road, since

4    there are multiple businesses there, and attempted to review

5    surveillance footage for that general area.  We also went down

6    Airport Park Drive, specifically the IBEW, and a business across

7    the street here, which is further on Old Dean Forest Road, and

8    attempted to review surveillance video on every business in that

9    general area.

10   Q.    Did you find any surveillance video?

11   A.    We did, yes, ma'am.

12   Q.    Can you tell us where you found the video at?

13   A.    I believe we got surveillance video from the Pilot gas

14   station; however, none of that video was useful as far as this

15   investigation goes.

16   Q.    Why not?

17   A.    That's more for employee theft.  There was nothing, no

18   cameras positioned in the general area, meaning the Old Dean

19   Forest Road area.

20   Q.    Did not capture the street?

21   A.    Correct.

22   Q.    What about Savannah Pines; were you able to determine if

23   the trailer park had any surveillance --

24   A.    Savannah Park Mobile Home Park has multiple cameras;

25   however, anything in towards the front of the property was

341

1    inoperable.  No cameras were operating at that time.

2    Q.    What about the IBEW?

3    A.    They had excellent video surveillance footage.

4    Q.    And did you obtain that?

5    A.    We did, yes, ma'am.

6    Q.    How many days' worth of video surveillance did you obtain?

7    A.    I believe roughly 48 hours, the day before and the day

8    after.  Correction, the day before the homicide and the day of

9    the homicide, which was the 18th and the 19th.

10   Q.    Okay, turn your attention to Exhibit 20-1.  Can you please

11   tell the jury what are we looking at in Exhibit 20-1?

12   A.    That is Highway 307, also known as Dean Forest Road, south

13   of Airport Park Drive.  Directly catty-corner at one o'clock

14   that is the IBEW, also known as the International Brotherhood of

15   Electrical Workers.

16   Q.    And can you circle on the screen where the IBEW building

17   is located?

18   A.    It's right there.

19   Q.    And their camera faces which direction?

20   A.    It's facing this way capturing the only entranceway by

21   vehicle towards Old Dean Forest Road.

22   Q.    And Exhibit 20-2, can you tell the jury which direction

23   we're looking at and orient the jury with this picture, please.

24   A.    That is off of Old Dean Forest Road looking north off of

25   Airport Park Drive, and now the IBEW is directly in front of us

342

1  now.

2  Q.   Can you note it on the -- can you circle it, please.

3  A.   This is the IBEW.

4  Q.   So its cameras would have been facing Old Dean Forest

5  Road?

6  A.   Correct, facing towards where we are standing at now.

7  Q.   Exhibit 20-3, can you please orient the jury to what we're

8  looking at and in what direction?

9  A.   The truck with the green trailer is Dean Forest Road.

10  We're physically on Old Dean Forest Road now from Airport Park

11  Drive.  Directly behind where we are standing now is the IBEW.

12  Q.   And you're heading down towards Savannah Pines?

13  A.   Correct, headed towards Savannah Pines Mobile Home Park.

14  Q.   And Exhibit 20-4, can you please orient the jury, what are

15  we looking at?

16  A.   That is directly in front of Savannah Pines Mobile Home

17  Park about a block away from where the homicide scene occurred.

18  Q.   Can you note on this map the location of Savannah Pines?

19  A.   Yes, ma'am, this is the Savannah Pines, the entrance to

20  the trailer park.

21  Q.   Can you note on this map where Mr. Montoya's body was

22  found?

23  A.   Towards that general area right over there.

24  Q.   And Exhibit 20-5, is this a Google image from 2016 of the

25  same area?

343

1    A.    Yes, ma'am, it is.

2    Q.    It is further down from Savannah Pines?

3    A.    Correct.

4    Q.    Where Mr. Montoya's body would have been found?

5    A.    Correct.  In fact, that is his work truck on the Google

6    Earth image.

7    Q.    And getting back to the IBEW then video, what exactly did

8    it capture?

9    A.    We captured -- reviewed countless hours of video, and two

10   vehicles of notoriety stuck out on both days we reviewed the

11   video.

12   Q.    What was it that stuck out to you?

13   A.    The movements of the vehicles and the repetitive movement

14   of the vehicle, specifically a white-in-color work utility van

15   and a Cadillac Escalade SUV.

16         MS. GROOVER:  Your Honor, may I approach the witness?

17         THE COURT:  You may.

18   (By Ms. Groover) Sir, I'm handing you exhibits that are marked

19   as Exhibits 29 and 30, and prior to today -- do you recognize

20   those, sir?

21   A.    I do, yes, ma'am.

22   Q.    And prior to today, have you had an opportunity to review

23   Exhibits 29 and 30?

24   A.    I have, ma'am.

25   Q.    And specifically is Exhibit 29 the available surveillance

344

1    footage from the IBEW for August the 18th of 2017?

2    A.    Correct.

3    Q.    The day before the murder?

4    A.    The day before, yes, ma'am.

5    Q.    And prior to today, did you have an opportunity to review

6    Exhibits 29A through 29H?

7    A.    Yes, ma'am.

8    Q.    And are those clips from the day before of August the 18th

9    of 2017 that captured unusual surveillance footage?

10   A.    Yes, ma'am.

11   Q.    And prior to today, did you have an opportunity to review

12   Exhibit 30?

13   A.    Yes, ma'am.

14   Q.    And is Exhibit 30 the available surveillance footage from

15   the IBEW on August 19th, 2017, the day of the murder?

16   A.    Yes, ma'am.

17   Q.    And prior to today, did you have an opportunity to review

18   Exhibits 30A through 30I?

19   A.    Yes, ma'am.

20   Q.    And 30A through 30I, are those clips of the unusual

21   activity you noticed on the surveillance video from the IBEW on

22   August the 19th of 2017?

23   A.    Yes, ma'am.

24   Q.    Let's begin with Exhibit 29A.  Before we hit play on it,

25   can you orient the jury what we're looking at when Exhibit 29A

345

1   is pulled up?

2   A.    So that is the corner, that is -- this building the camera

3   is facing is the IBEW.  Where that utility truck is at, that

4   white and yellow one, that is Dean Forest Road.

5        That's slight -- that road directly in front of us is

6   Airport Park Drive and the one that runs perpendicular to it is

7   Old Dean Forest Road, so this is facing the intersection of

8   Airport Park Drive and Old Dean Forest Road as well as Airport

9   Park Drive and Dean Forest Road.

10  Q.    And if we could please play Exhibit 29A and if you would

11  please narrate what caught your attention, sir?

12  A.    Yes, ma'am.  At 12:32 and 51 seconds, the white-in-color

13  Cadillac SUV seen entering Airport -- Old Dean Forest Road for

14  the first time.

15  Q.    And then Exhibit 29B, if we could please play Exhibit 29B

16  and if you could please narrate what draws your attention in

17  this clip?

18  A.    At 12:36 and 41 seconds, the white Cadillac Escalade is

19  now seen leaving the area of Old Dean Forest Road and headed

20  towards Dean Forest Road.

21  Q.    Just a few minutes from when it entered?

22  A.    Correct.

23  Q.    And Exhibit 29C, if you could please narrate what catches

24  your attention in Exhibit 29C.

25  A.    At 12:46 and 37 seconds white-in-color Cadillac Escalade

346

1   is once again seen coming onto Old Dean Forest Road.

2   Q.   Ten minutes or so later it's coming back again?

3   A.   Roughly ten minutes, yes, ma'am.

4   Q.   Exhibit 29D, if you could please narrate what you find

5   unusual in this clip?

6   A.   Roughly six minutes later, a white van with a black line

7   on the side and three -- I believe three ladder racks are seen

8   entering into Old Dean Forest Road.

9   Q.   And Exhibit 29D, please explain this video clip to us.

10          MS. EDWINA FRAME:  D or E?

11   (By Ms. Groover)  Exhibit 29E.  Thank you.

12   A.   Roughly a minute after we saw the white van, the white

13   Cadillac Escalade is now seen leaving and then making a right

14   onto a dead-end road of Airport Park Drive.

15   Q.   And Exhibit 29F, if you could please narrate what you find

16   unusual in Exhibit 29F.

17   A.   At 12:56 and 25 seconds, Cadillac Escalade is once again

18   seen on camera approaching the intersection of Dean Forest Road

19   leaving Airport Park Drive, which is a dead-end road.

20   Q.   And Exhibit 29G, if you could please narrate what you

21   observe in Exhibit 29G.

22   A.   The white van we saw entering earlier with the black line

23   in the back and the ladder rack is seen approaching the

24   intersection of Airport Park Drive and Dean Forest Road.

25   Q.   The white van is now leaving?

347

1    A.    Correct.

2    Q.    And finally Exhibit 29H, could you please narrate what you

3    find unusual in Exhibit 29H?

4    A.    Three minutes later, that same van with the ladder rack is

5    seen traveling down Dean Forest Road bypassing Airport Park

6    Drive.

7    Q.    All of this occurred on August 18th of 2017, the day

8    before the murder?

9    A.    Yes, ma'am.

10   Q.    Is it fair to say you watched these two vehicles go back

11   and forth eight times?

12   A.    Yes, ma'am.  Yes, ma'am.

13   Q.    Near the murder scene?

14   A.    Correct.

15   Q.    On the day of the murder, August the 19th of 2017, did you

16   observe unusual activity again?

17   A.    Yes, ma'am.

18   Q.    Exhibit 30A, if you could please describe what we're

19   looking at and what caught your attention?

20   A.    This is now Saturday at nine o'clock in the morning the

21   next day, the white van with the black line and the ladder rack

22   is seen coming off of Old Dean Forest Road and onto Airport Park

23   Drive, which is a dead-end road.

24   Q.    Now this was, you mentioned Saturday?

25   A.    It is Saturday, yes, ma'am.

1    Q.    And what type of, if you go down Old Dean Forest Road

2    where the van was just coming out of --

3    A.    Yes, ma'am.

4    Q.    -- what type of businesses are down there?

5    A.    Those are all commercial businesses, and the majority of

6    them are not open on the weekends.

7    Q.    Okay, and Exhibit 30B, can you please describe what you

8    observe in 30B?

9    A.    15 minutes later the white van with the black line and the

10   ladder rack is seen leaving the dead-end side of Old Dean

11   Forest -- of Airport Park Drive and approaching the intersection

12   of Dean Forest Road.

13    Did the van appear to sit down there about 15 minutes?

14   A.    About 15 minutes, yes, ma'am.  If I may add, the van does

15   have distinctive -- the van is now in reverse bypassing Dean

16   Forest Road, doing a U-turn and going back down I believe Old

17   Dean Forest Road.  The van does have a distinctive -- almost

18   like a puncture on the left side of the van, and it does have a

19   distinctive line on the right side of the van.

20   Q.    So if we could play, back up Exhibit 30B, you indicated

21   that it does a U-turn?

22   A.    Yes, ma'am.

23   Q.    If we could please play the U-turn again.

24   A.    The vehicle stopped at the stop sign.  It is now in

25   reverse off of Dean Forest Road, and then it does a -- I guess a

349

1    U-style or three-point turn from Airport Park Drive back down

2    Old Dean Forest Road, which is where the victim lay.

3    Q.    And you noticed some unusual markings on that white van?

4    A.    Yes, ma'am.

5    Q.    What are they again, please?

6    A.    On the -- on the left side of the vehicle, there is an

7    almost I can describe it as a black hole or black marking,

8    almost circular in style.  On the right side is a -- almost like

9    a black line that goes near the left side of the truck,

10   significantly large, and it does have what appears to be three

11   ladder racks on the roof of the van as well.

12   Q.    And Exhibit 30C, can you please describe what you notice

13   in Exhibit 30C.

14   A.    Almost 40 minutes later, that van with the same black line

15   on the side and the roof rack is seen going down again the

16   dead-end road of Airport Park Drive.

17   Q.    So it's coming out from the Savannah Pines area?

18   A.    Correct.

19   Q.    And going to the dead end?

20   A.    Correct.

21   Q.    Exhibit 30D, can you please explain what you observe in

22   Exhibit 30D.

23   A.    And roughly 30 minutes later, the same white van with the

24   black line on the side and what appears to be three racks is

25   seen coming from the dead-end side of Airport Park Drive and

350

1    going onto Dean Forest Road.

2    Q.    And Exhibit 30E, can you please narrate what you observe

3    in 30E?

4    A.    11:15 that same van with the black line on the side and

5    three racks on the roof is seen coming from Dean Forest Road

6    turning onto -- turning onto Airport Park Drive and then regoing

7    back onto Dean Forest Road.

8    Q.    Does another weird little turn?

9    A.    Did another weird -- yes, ma'am, and then it goes, did a

10    U-turn and it went back towards north -- south on 307.

11    Q.    And Exhibit 30F, what do you notice about any vehicles in

12    Exhibit 30F?

13    A.    See a silver-in-color Toyota Camry going down Dean Forest

14    Road onto Old Dean Forest Road.

15    Q.    Was this at approximately 11:34 in the morning?

16    A.    Yes, ma'am.

17    Q.    As part of the investigation, did law enforcement attempt

18    to identify almost every vehicle caught on these surveillance

19    cameras?

20    A.    Yes.

21    Q.    Were you able to identify the owner of that vehicle and

22    the driver of that vehicle?

23    A.    We were, yes, ma'am.

24    Q.    Who was that?

25    A.    Gerardo, Mr. Gerardo.

351

1  Q.   And Exhibit 30G, if we could please play that for the jury

2  and narrate what you find interesting?

3  A.   11:36 the white van is once again seen at the stop sign of

4  Dean Forest Road turning onto -- at Airport Park Drive making a

5  left onto Dean Forest Road.

6  Q.   And Exhibit 30H, can you please narrate what you find

7  interesting in Exhibit 30H?

8  A.   That white van is approaching the intersection again,

9  bypasses the turn and kept on driving past Airport Park Drive

10 and Old Dean Forest Road.

11 Q.   And finally Exhibit 30I, can you please describe what is

12 observed in Exhibit 30I?

13 A.   11:42 the vehicle is seen bypassing again going down Dean

14 Forest Road south approaching the Pilot Travel Center.

15 Q.   After identifying the vehicles with the unusual activity,

16 what is your objective?

17 A.   To identify whose vehicles those were that were reportedly

18 seen on video surveillance footage.

19 Q.   How do you do that?

20 A.   We actually had that for a little bit of time.  We

21 didn't -- we were trying to figure out who, if anybody,

22 possessed those vehicles.  It wasn't until we started getting

23 cell phone records and tower dumps back that we started putting

24 information together.

25 Q.   And did you also review bank records?

352

1    A.    Correct, yes, ma'am.

2    Q.    And did you find any connection when you reviewed Pablo's

3    Bank of America records?

4    A.    We did, yes, ma'am.

5    Q.    Exhibit 31, could you please tell the jury what are we

6    looking at in Exhibit 31?

7    A.    We are looking at a $6,000.00 Bank of America check for

8    Higinio Perez from Pablo Rangel.

9    Q.    And during the entire time of your investigation, had you

10   heard that name before?

11   A.    We have not.

12   Q.    And in Exhibit 32, do you recognize Exhibit 32, sir, and

13   tell us what this is.

14   A.    This is -- appears to be a bank statement.  Of notoriety

15   was the -- on June the 6th was a $20,000.00 wire transfer from

16   Pablo's to Higinio Perez's bank account.

17   Q.    The check and the wire, did that then lead you to do an

18   investigation onto Perez-Bravo?

19   A.    It does, yes, ma'am.

20   Q.    And are you able to determine where he lived?

21   A.    We did, yes, ma'am.

22   Q.    Where he worked?

23   A.    We did, yes, ma'am.

24   Q.    And what cars he drove?

25   A.    We did, yes, ma'am.

353

1   Q.    And were you able to identify his vehicles?

2   A.    We were, yes, ma'am.

3   Q.    Exhibit 35, please, can you tell us what are we looking at

4   in Exhibit 35?

5   A.    That is a registration card for a South Carolina 2007

6   Chevrolet express van for Mr. Higinio Perez-Bravo.

7   And Exhibit 36, can you tell us what are we looking at in

8   Exhibit 36?

9   A.    Yes, ma'am.  This is also a registration card out of South

10  Carolina for a 2006 Cadillac Escalade, also registered to Mr.

11  Higinio Perez.

12  Q.    Did you conduct surveillance then of Mr. Higinio

13  Perez-Bravo?

14  A.    We did, yes, ma'am.

15  Q.    Take photographs of his vehicles?

16  A.    We did, yes, ma'am.

17  Q.    Exhibit 33, tell us what are we looking in Exhibit 33.

18  A.    That is the white van that -- operated by Mr. Higinio --

19  registered to Mr. Higinio Perez-Bravo with the distinctive black

20  round circle.

21        It also has a magnet on the back side of the driver's side

22  that says "Chiapas" with a telephone number attached to it.

23  That magnet is removable.

24  Q.    Can you circle on this photograph the black dot that

25  you're referring to?

354

1    A.    (Complies with request of counsel).

2    Q.    And that is you observed that in some of the clips?

3    A.    Correct, yes, ma'am.

4    Q.    And can you circle the magnetic sign that you referred to

5    as well?

6    A.    (Complies with request of counsel).

7    Q.    And is there anything else about this van that you

8    noticed?

9    A.    Yes, ma'am, the three ladder racks that was seen on video

10   surveillance footage.

11   Q.    And Exhibit 33-2, is this another photograph?

12   A.    Correct, that's more of a distant photograph of the same

13   van.

14   Q.    Exhibit 33-3?

15   A.    That is the rear of the van under surveillance.

16   Q.    And Exhibit 33-4?

17   A.    That is the right side of the van with that distinctive

18   black marking on the right side of the van, same van, same

19   magnet and same three ladder racks on the top of this vehicle as

20   well.

21   Q.    You were able to determine that the Chiapas sign was

22   removable?

23   A.    It was removable, yes, ma'am.

24   Q.    And Exhibit 33-5?

25   A.    That is just another view of the same van.

355

1    Q.    And is there a phone number?

2    A.    It is, yes, ma'am, Area Code (912) 631-4590.

3    Q.    Were you able to determine whose phone number that is?

4    A.    Yes, ma'am.

5    Q.    Whose number is that?

6    A.    Mr. Higinio Perez-Bravo.

7    Q.    The owner of the vehicle?

8    A.    Yes.

9    Q.    Exhibit 34, can you please take a look at that and tell us

10   what are we looking at?

11   A.    A white-in-color Cadillac Escalade.

12   Q.    Is this Mr. Perez-Bravo's vehicle?

13   A.    Yes, it is.  I believe it's parked in front of his

14   residence as well.

15   Q.    Appear to be consistent with the white Escalade that you

16   observed the day before of the murder?

17   A.    Correct, yes, ma'am.

18   Q.    Now, as part of your investigation, were you able to

19   identify phone numbers belonging to Pablo?

20   A.    Yes, ma'am, we were.

21   Q.    And how did you do this?

22   A.    Multiple ways.  One of the ways was originally when we did

23   the information on Pablo, we utilized our local booking database

24   and we were able to run his information that way and it returned

25   to him.

356

1      Another way was through his brother providing us his

2  brother's, Mr. Juan, providing us Pablo's telephone number as

3  well as getting a search warrant for the phone seized for Pablo

4  coming back to Pablo.

5  Q.    And did your investigation confirm that Pablo's phone

6  number was a number ending in 6350?

7  A.    I believe the first three were 313.

8  Q.    Were you able also to identify the defendant's phone

9  number?

10  A.    We were, yes, ma'am.

11  Q.    How did you do this?

12  A.    The same way.  We did a search warrant on his telephone.

13  That information came back registered through a number out of

14  Verizon, which came back to him, as well as we got I believe

15  cell service for Mr. Juan Rangel, and the number came back to

16  him as well.

17  Q.    And was the number ending in 2816?

18  A.    I believe it was a 677 or 667-2816, yes, ma'am.

19  Q.    And did that also match the number assigned to the cell

20  phone seized from his dashboard?

21  A.    It did, yes, ma'am.

22  Q.    You testified earlier it came back as registered to him.

23  Was it to the defendant or was it perhaps to Oscar Cruz?

24  A.    It was Oscar Cruz, but it was given to Mr. Juan Rangel.

25  Q.    Through your investigation, did you determine that Oscar

1    Cruz got the phone for the defendant?

2    A.    Correct, correct.

3    Q.    But the phone number matched the number on the dashboard

4    in front of the defendant?

5    A.    The number on the phone that was seized that was unlocked

6    with the passcode that he provided.

7    Q.    And as part of the investigation, did you obtain location

8    information from these phone numbers from the carrier?

9    A.    We did, yes, ma'am.

10   Q.    Verizon?

11   A.    Verizon.

12   Q.    And Exhibit 37, down here in front of you, as part of the

13   boxes, did you have an opportunity to review all the records

14   produced by Verizon?

15   A.    Yes, ma'am.

16   Q.    And did you comb through those to look for any location

17   information for Juan and Pablo's phone numbers?

18   A.    We did.

19   Q.    What did you find?

20   A.    The day of the -- of the homicide, Juan was not where he

21   said he was at.  He was not in Springfield, Georgia.

22   Q.    Where was he at?

23   A.    He was in the general vicinity of the homicide.

24   Q.    Did you also obtain phone records, call detail records

25   from Juan, the defendant's phone?

358

1    A.    We did, yes, ma'am.

2    Q.    And did you notice anything unusual about the people he

3    was calling around the relevant time periods?

4    A.    Yes, ma'am.

5    Q.    What did you learn?

6    A.    He was calling Higinio Perez-Bravo as well as Mr. Pablo

7    Rangel-Rubio.

8         MS. GROOVER:  Your Honor, may I have just a moment,

9    please?

10        THE COURT:  Yes.

11   (By Ms. Groover)  Briefly, just following up with respect to

12   the check and the wire that we discussed earlier, if we could

13   please pull up Exhibit 31, please.  This is a check from

14   Pablo's account to Higinio Perez-Bravo; correct?

15   A.    Correct.

16   Q.    What was the date of that?

17   A.    May the 4th of 2017.

18   Q.    Several months before the murder?

19   A.    Quite a few months, yes, ma'am.

20   Q.    And Exhibit 32, please, is this confirmation of the wire

21   from the Bank of America account?

22   A.    Correct.  The date listed on that is June the 6th of 2017.

23   Q.    Again, well before the murder?

24   A.    Over two months before.

25        MS. GROOVER:  Thank you.  Those are all the questions I

359

1    have for the witness, Your Honor.

2            THE COURT:  Cross-examination, Ms. Brewington.

3            MS. BREWINGTON:  Thank you, Judge.

4                        CROSS-EXAMINATION

5    BY MS. BREWINGTON:

6    Q.    Good afternoon, Lieutenant Rodriguez.

7    A.    Good afternoon.

8    Q.    I'm going to take you to the search warrant of the

9    property first.

10   A.    Correct.

11   Q.    This happened the day after the murder; correct?

12   A.    The search warrant was executed the day after the

13   homicide; yes, ma'am.

14   Q.    About how many hours do you think?

15   A.    Less than 24.

16   Q.    So you would think that any kind of evidence that you find

17   there is going to be pretty fresh?

18   A.    Correct.

19   Q.    You were the one that specifically logged every piece of

20   evidence that came out of that search?

21   A.    From my understanding, yes, ma'am.

22   Q.    Just give me an overview of what the property looked like.

23   A.    It is a rather large piece of land.  I believe we did a

24   property record search on it, and it was north of 26 acres, a

25   lot of tree coverage surrounding the entire property.  There was

360

1    the -- I guess we will call it the main house, which was Mr.

2    Rangel, Pablo Rangel's house, and there were multiple other

3    little campers, trailers scattered throughout the property.

4    There is a rather large pond, I guess a manmade pond that was

5    on -- on there as well.

6    Q.   Would you say the biggest house was Pablo's?

7    A.   It was.

8    Q.   By far?

9    A.   Hands down.

10   Q.   He also had other structures around his house?

11   A.   He had a -- I believe the only thing that belonged to him

12   from what I can remember was that brand-new carport that was

13   built.

14   Q.   And that was near his property?

15   A.   Correct, and his work truck, on that photograph, his work

16   truck was actually parked underneath that new carport.

17   Q.   Everybody else was living in squander?

18   A.   Everybody was family.

19   Q.   They were living pretty low compared to Pablo?  For

20   example, Juan was living in the camper?

21   A.   Correct.  The structures themselves, yes, they were --

22   they were -- I guess you would call them more of a lesser

23   quality than Mr. Pablo, but the contents inside, to each his

24   own.  Some people had nicer things than others.

25   Q.   How big do you think Juan's house was?

361

1  A.   The camper itself, I could not recall but it's a typical

2  pull-behind camper.  It's not one of the rather large ones.

3  It's not one of the tiny ones that pop up.  Just a standard

4  pull-behind camper.

5  Q.   Just one that would be pulled behind a regular truck?

6  A.   Correct, pickup truck.

7  Q.   You found some bloody clothes on that property, right?

8  A.   We did.

9  Q.   Where did you find that?

10  A.   I believe it was in Hipolito's residence, Juan's son's

11  house.

12  Q.   Did you test those clothes?

13  A.   I believe it was tested.

14  Q.   Did anything conclusive come from that?

15  A.   Not of evidentiary value, no, ma'am.

16  Q.   That's the only blood that you found anywhere?

17  A.   Correct.  That was the only blood that we found.

18  Q.   Did you ever test Pablo for gunshot residue?

19  A.   I do not recall, no, ma'am.

20  Q.   Did you ever test Juan for gunshot residue?

21  A.   I don't recall.  I don't believe so because of the time,

22  the timeframe, again almost 24 hours after the fact.

23  Q.   The guns found, they were kind of spread all over the

24  property?

25  A.   There was -- there was guns in every -- for the most part

362

1    every male's house that lived there.

2    Q.    Six pistol, six rifles, two shotguns sound right?

3    A.    Yes.

4    Q.    Ammunition everywhere?

5    A.    I believe the total count was over a thousand rounds of

6    ammunition.

7    Q.    Do you remember all of the different rounds of ammunition?

8    A.    We got everything from the smallest possible .22 to a .50-

9    caliber bullet, so everything real small to as big as possible

10   as you can make.

11   Q.    Can you estimate how many different kinds of bullets there

12   were?

13   A.    I cannot, no, ma'am.

14   Q.    Did you test-fire all of those guns?

15   A.    No.  We do not test-fire revolvers because they cannot be

16   entered into the NIBIN database.

17   Q.    They were all inspected, though; correct?

18   A.    They were all visually inspected by myself and then sent

19   out to the specialists, which was the ATF.

20   Q.    And ultimately every single gun turned out to not be the

21   murder weapon; correct?

22   A.    I cannot attest to that because I don't know -- I don't

23   know the results.  As far as I know, no.

24   Q.    You never recovered a murder weapon yourself?

25   A.    I never did, not that I'm aware of, no, ma'am.

363

1    Q.    And through your entire investigation, you haven't seen a

2    murder weapon?

3    A.    No, ma'am.

4    Q.    Was there ever a brown-and-maroon-colored bag found in

5    Juan's property?

6    A.    I'm sorry, brown?

7    Q.    Brown- or maroon-colored bag?

8    A.    Bag?

9    Q.    Bag.

10   A.    I don't recall, ma'am.

11   Q.    Did you find any large amounts of money in Juan's house?

12   A.    No.

13   Q.    You would agree you come in contact with a lot of guns

14   being in law enforcement; correct?

15   A.    I do.

16   Q.    Is a .22-caliber a pretty common gun to have?

17   A.    A .22-caliber?

18   Q.    Anything .22 -- I'm not versed in guns.

19   A.    Yeah.  .22-caliber vary from you got short, you got long

20   and you got Magnum so there's three different variations of

21   .22's.

22   Q.    And these can be readily bought in almost any store that

23   sells guns?

24   A.    As far as I know, yes, ma'am.

25   Q.    Hollow points, they are not anything that's very rare?

364

1   A.    No.

2   Q.    .22-caliber hollow points can be found pretty much

3   anywhere that you could buy a bullet?

4   A.    Correct.  Again they -- you have .22 short, .22 long and

5   then .22 Magnums.  They do vary in prices.  You've got .22 short

6   at the cheaper end and you've got .22 Magnum, which is at the

7   higher end, so you do have more .22 short and .22 long than you

8   do have .22 Magnums.

9   Q.    Would you say that in your experience hollow points are

10  used for home defense?

11  A.    In my experience hollow points is the new ammo that

12  everybody is starting to carry with them.

13  Q.    So it's very common?

14  A.    Yes.

15  Q.    The bullets that were seized on that property, were they

16  consistent with the 14 guns that were seized?

17  A.    Not that I'm aware of, no.

18  Q.    So some of the bullets may not even matched with the guns?

19  A.    I don't know -- I think only one of the guns that we had

20  could actually fire the ammunition that we found.

21  Q.    Explain that to me.

22  A.    So this is -- it's a rim fire.  Again it's a .22.  It's a

23  bigger bullet, so you can't shoot this bigger bullet out of a

24  standard .22 rifle or a standard .22 pistol.  You have to have a

25  very specific gun to shoot that ammunition.

365

1    Q.    Bullets were found in Pablo's house?

2    A.    I believe so, yes, ma'am.

3    Q.    Guns as well?

4    A.    A -- one SKS rifle was found in Pablo's house.

5    Q.    There were a lot of pictures of documents in Pablo's

6    house, social security cards, driver's license.  Would you

7    explain what you think those were?

8    A.    At the time or ...

9    Q.    Through your investigation?

10   A.    It was for what I suspected was providing the information

11   to the illegal aliens, giving them citizen -- giving them

12   documentation from legal -- legal US citizens and providing them

13   to illegals for the purpose of work.

14   Q.    Did it look like Pablo was creating those documents?

15   A.    Like at home creating them, no.

16   Q.    But copying them maybe?

17   A.    Yes.

18   Q.    And he had multiple documents at his leisure?

19   A.    Correct.  He was the -- I guess the supervisor that was

20   the one that housed all of those documents.

21   Q.    He had all of the bank account information for Wolf Tree?

22   A.    I don't know.

23   Q.    Did he have bank account information there?

24   A.    I would assume so.  I can't recall off the top of my head.

25   Q.    Again you are the one that seized all this property?

366

A.    Correct.  There was -- I know that there was direct

deposit information.  There was a lot of paperwork that we

seized.  I don't know the specifics as to exactly what was

seized at the moment.

Q.    Do you recall any kind of paperwork being seized from

Juan's trailer?

A.    I don't remember.  I don't recall any paperwork coming out

of his -- out of his residence.

Q.    Do you recall any checks found in Pablo's house?

A.    I don't remember.

Q.    Do you recall any checks found in Juan's house?

A.    I don't remember.

Q.    Let's go to Bravo's cars; were those processed?

A.    They were photographed and searched.  They were not

forensically processed for DNA, and they were not forensically

processed for fingerprint powder, nothing to that extent, no,

ma'am.

Q.    Why were they not?

A.    It being a work truck and it being almost -- I believe it

was over a year after the fact, we knew we weren't going to get

anything back.

Q.    You assumed you weren't going to get anything back?

A.    Correct.

Q.    But blood can last over a year; correct?

A.    Could be.

1  Q.    DNA lasts a while?

2  A.    Yes, unless it's been cleaned, been over with.  I'm not an

3  expert when it comes to DNA analysis.  I know our laboratory,

4  the GBI, they are very picky on what it is we can submit as far

5  as without having a known, so the probability they were going to

6  test that was going to be slim to none.

7  Q.    Wouldn't it be important to see if those things could be

8  found in that car?

9  A.    If it would have been sooner, yes, we would definitely

10 have processed it, but as long as it's been, we knew we weren't

11 going to get anything off of that.  Just based on my training

12 and experience with DNA analysis, we knew that that was going to

13 be very minimal.

14 Q.    Again you assumed that but you don't know for sure?

15 A.    Correct.

16 Q.    Did you ever search Bravo's home for guns?

17 A.    I believe a search was done by Homeland Security.

18 Q.    Was anything found?

19 A.    No, ma'am.

20 Q.    Did you ever ask him if he owned a gun?

21 A.    I believe it was asked of him, yes, ma'am, not

22 specifically by me.

23 Q.    Do you recall an answer?

24 A.    I believe it was no, but I don't want to guess.

25 Q.    I'm going to get to the actual murder scene.  Was any of

368

1    Juan's hair found?

2    A.    Not that I'm aware of.  I don't know if -- if hair

3    follicle was ever recovered, no, ma'am.

4    Q.    DNA?

5    A.    Not that I'm aware of.

6    Q.    Fingerprints?

7    A.    Not that I'm aware of.

8    Q.    Any kind of physical evidence linking Juan to the murder

9    scene?

10   A.    Physical, no.

11   Q.    Anywhere on the victim's cars?

12   A.    No, not that I'm aware of.

13   Q.    There were bullets recovered; correct?

14   A.    Are you talking we recovered fragmented rounds and

15   bullets.  We did not recover shell casings.

16   Q.    From those fragmented bullets, do you know if there was

17   any DNA found?

18   A.    Not that I am aware of.  I don't know if the lab would

19   actually test those.

20   Q.    Did you ever follow up?

21   A.    So when the autopsy was done, I don't know after that if

22   they were sent on to a lab or not.  I could not attest to that.

23   Q.    Would you have normally been the one to send them off to

24   the lab?

25   A.    No.

369

1   Q.    Who would have been the one?

2   A.    I have no clue.  As far as bullets retrieved from a

3   person, I've never sent those out to the lab for analysis.

4   Q.    But you were the main investigator on this?

5   A.    For the state level, yes, ma'am.

6   Q.    So you wouldn't know about fingerprints either?

7   A.    Correct.

8   Q.    I'm going to go to these cameras, the IBEW cameras.  You

9   can't see how many people are in those cars; correct?

10  A.    We cannot, no, ma'am.

11  Q.    You can't see who is driving those vehicles; correct?

12  A.    Correct.

13  Q.    Was the entire day before and the day of the murder, were

14  those watched by somebody?

15  A.    Yes, ma'am.

16  Q.    Was there ever anything shown of Juan walking to the

17  property?

18  A.    No, not -- very few people -- even if he did walk, that

19  video quality was not that good where you would be able to tell

20  who it was.

21  Q.    Well, we saw the video quality; correct?

22  A.    Correct.

23  Q.    We saw people walking?

24  A.    Correct.

25  Q.    We saw very clearly cars?

370

1    A.    Correct.

2    Q.    So you can't necessarily say that we wouldn't see that

3    clearly?

4    A.    As far as being able to identify Juan, he could have been

5    walking on that sidewalk, and based on that, with prior

6    investigations dealing with IBEW, you cannot make out physical

7    characteristics to identify a person.

8    Q.    You can zoom in on stuff on these cameras, can't you?

9    A.    But it gets pixelated and the image quality gets

10   distorted.

11   Q.    Do you know if anybody ever tried to zoom in on any

12   walkers?

13   A.    On this -- on this particular image?  Yes, we did, and it

14   was -- we had no -- we could not identify anybody.  The more you

15   zoom in, the more it looks like an alien.

16   Q.    You said something interesting about the phones.  You said

17   that Juan was at the murder scene, but you can't say that

18   definitively; you can say that Juan's phone was at the murder

19   scene; correct?

20   A.    Correct.

21          MS. BREWINGTON:  Nothing further.

22          THE COURT:  Redirect?

23          MS. GROOVER:  Yes, Your Honor.

24                         REDIRECT EXAMINATION

25   BY MS. GROOVER:

371

1    Q.    The murder occurred on August the 19th of 2017; correct?

2    A.    It did, yes, ma'am.

3    Q.    And the investigation took quite some time to get records?

4    A.    Correct, yes, ma'am.

5    Q.    And identify Perez-Bravo as the owner of the vehicles on

6    the cameras; is that correct?

7    A.    Correct.

8    Q.    And, in fact, it took until approximately the next year

9    until Perez-Bravo was identified; is that correct?

10   A.    Correct.

11   Q.    It wasn't until approximately the summer of 2018 that the

12   owner of the vehicles, the unusual activities, was made known to

13   law enforcement; is that correct?

14   A.    Correct.

15   Q.    The crime scene, was there anything about the crime scene

16   that would suggest there would be a lot of blood or any blood

17   droppings?

18   A.    No.

19   Q.    Anywhere else besides the actual crime scene?

20   A.    For it -- for it being a shooting scene, it was very

21   minimal blood on scene.

22   Q.    And were you able to determine the type of weapon that was

23   used to kill Mr. Montoya?

24   A.    It was a .22-caliber.

25   Q.    Pistol or revolver?

372

A.    Revolver.

Q.    Are there any shell casings that are left behind when a revolver is used?

A.    No.

Q.    Can you tell the jury about that?

A.    It is cylinder-based.  A semi-automatic pistol, when you shoot, ejects the round.  It being a revolver, it just shoots the bullet and it moves on to the next casing and it moves on to the next casing, and it moves on, housing all of the shell casings still inside the cylinder.  The only time that those shell casings ever come out is when you physically have to manipulate the firearm, press the release and manually remove all of the shell casings at the same time.

Q.    Having the two vehicles being the suspect vehicles and knowing the crime scene, anything about the crime scene suggest there would be any kind of blood found in those vehicles?

A.    No, ma'am.

Q.    Now, a year later when the owner of those vehicles are identified, any reason to suggest that there would be blood or DNA in those vehicles then?

A.    Absolutely not.

Q.    Did law enforcement search the vehicles?

A.    We did.

Q.    Did you find any firearms or ammunition in those vehicles?

A.    We did not.

373

1          MS. GROOVER:  Thank you, Your Honor.

2          THE COURT:  Any objection to this witness being excused?

3          MS. GROOVER:  No, Your Honor.

4          MS. BREWINGTON:  No objection.

5          THE COURT:  You may step down.

6          Ms. Groover, Mr. Howard, call your next witness.

7          MS. GROOVER:  Thank you, Your Honor, the United States

8  calls Maria Flores.

9                    MARIA DELROSARIO GONZALEZ FLORES,

10  having been first duly sworn, was examined and testified as

11  follows through the interpreter:

12          THE CLERK:  And, ma'am, yesterday you were previously

13  sworn.  Do you still uphold that oath?

14          THE WITNESS:  Yes.

15          THE CLERK:  Thank you.  If you will please state your

16  full name for the record.

17          THE WITNESS:  Maria Delrosario Gonzalez Flores.

18                          DIRECT EXAMINATION

19  BY MS. GROOVER:

20  Q.   Good afternoon, ma'am.

21  A.   Good afternoon.

22  Q.   Where are you from?

23          INTERPRETER CASTILLO:  Your Honor, interpreter needs

24  clarification.

25          THE COURT:  Yes.

374

1          THE WITNESS:  Hazlehurst, Georgia.

2   (By Ms. Groover)  And what country are you from originally,

3   ma'am?

4   A.    I'm from San Luis Potosi.

5   Q.    Is that in Mexico?

6   A.    Mexico.

7   Q.    Are you a naturalized United States citizen?

8   A.    Yes.

9   Q.    I want to talk to you about 2017.  Where did you live back

10  in 2017?

11  A.    In Rincon, in Savannah.

12  Q.    And who did you live with?

13  A.    I lived with my partner, Hipolito Martinez, with Jonathan,

14  his nephew, with Refugio, his other cousin, with Juan and with

15  Mr. Pablo Martinez.

16  Q.    Juan, is that Juan Rangel-Rubio?

17          THE COURT:  Ma'am, if you will wait until he translates

18  and then give your answer.  We want to make sure we hear

19  everything you say, so it's important to wait until everyone

20  completes their speech before you begin.

21          Will you restate your question?

22  (By Ms. Groover)  Yes.  Did you live with Juan Rangel-Rubio?

23  A.    Yes.

24  Q.    On a big property where family members lived?

25  A.    Yes.

375

1    Q.    And you, you mentioned Pablo.  Is that Juan's brother?

2    A.    Yes.

3    Q.    And did Pablo own the land that everyone lived on?

4    A.    Yes.

5    Q.    And did everyone live in different trailers on the

6    property?

7    A.    Yes.

8    Q.    Exhibit 25-1, can you please tell us what are we looking

9    at in Exhibit 25-1?

10   A.    That's Pablo's home.

11   Q.    And Exhibit 25-13, can you tell us what are we looking at

12   in Exhibit 25-13.

13   A.    It's the house where I was, the trailer.

14   Q.    Can you please circle on your screen because it will mark

15   for the jury to see where exactly you lived?

16   A.    This trailer.

17   Q.    Will you press on the screen and circle it and a red line

18   should appear.

19   A.    (Complies with request of counsel).

20   Q.    And who lived with you in that trailer?

21   A.    Hipolito Martinez and Juan -- Jonathan Rangel.

22   Q.    So Hipolito and Jonathan lived with you in the trailer?

23   A.    Yes.

24   Q.    Is Jonathan Juan's son?

25   A.    Yes.

376

1    Q.    Who lived in the trailer to the left?

2    A.    Refugio.

3    Q.    And Exhibit 25-16, can you please tell us what are we

4    looking at in Exhibit 25-16?

5    A.    A red truck.

6    Q.    Do you know whose truck that is?

7    A.    I understood that that was Mr. Juan's.

8    Q.    Juan Rangel-Rubio?

9    A.    Yes.

10    Q.    And Exhibit 26-1, can you please tell us what are we

11    looking at in Exhibit 26-1?

12    A.    In that little trailer, that's where Mr. Juan lived with

13    his wife.

14    Q.    How long did you live on this property with the Pablo and

15    Juan and their families?

16          INTERPRETER CASTILLO:  Interpreter needs to clarify,

17    Your Honor.

18          THE COURT:  Yes.

19          THE WITNESS:  I don't remember exactly.  It was about

20    six months.  It was when he bought it that we went over there.

21    (By Ms. Groover)  When Pablo bought the land?

22    A.    Yes.

23    Q.    And then you moved there along with his family?

24    A.    Yes.

25    Q.    Where did Pablo and Juan and his family work?

377

1    A.    In -- at the Georgia Power Company.

2    Q.    Do you know the name Wolf Tree?

3    A.    Yes.

4    Q.    And what is Wolf Tree?

5    A.    They take down trees.

6    Q.    Is that where Pablo and Juan worked, at Wolf Tree taking

7    down trees along the Georgia Power lines?

8    A.    Yes.

9    Q.    Did you work at Wolf Tree?

10   A.    Yes.

11   Q.    How long did you work at Wolf Tree?

12   A.    One week.

13   Q.    And do you remember, was that back in August of 2017, the

14   week that you worked there?

15   A.    Yes.

16   Q.    Who hired you?

17   A.    Mr. Pablo.

18   Q.    And what was your job going to be?

19   A.    Handling, picking up branches and putting in the machine.

20   Q.    And you only worked one week?

21   A.    Yes.

22   Q.    Did your employment end when Pablo was arrested?

23   A.    No.  I kept working but with another gentleman.

24   Q.    Do you remember the day that Pablo was arrested?

25   A.    Yes.

378

```
 1   Q.   Were you living on the property on that day?
 2   A.   Yes.
 3   Q.   Was that a Sunday when everyone was arrested?
 4   A.   Yes.
 5   Q.   The Sunday when Pablo was arrested, was that the week
 6   ending in Sunday that you worked for Wolf Tree?
 7   A.   No, it was a Saturday.
 8   Q.   What was a Saturday?
 9   A.   The 18th?
10   Q.   August the 18th of 2017, is that the day you're referring
11   to?
12   A.   Yes.
13   Q.   I believe that's a Friday, ma'am.
14   A.   Oh.
15   Q.   Okay, let me start over.  What was your typical work hours
16   at Wolf Tree?
17   A.   We leave at 6:00 a.m. to 5:00 in the afternoon.
18   Q.   And what days were you supposed to work?
19   A.   I worked from Monday to Saturday.
20   Q.   Did you have a crew that you worked with?
21        INTERPRETER CASTILLO:  Your Honor, there is an ambiguity
22   in the word choice that the interpreter used.  Ask to rephrase
23   the question.
24        THE COURT:  Proceed.
25        THE WITNESS:  Yes.
```

379

1    (By Ms. Groover)   And the week you worked, you started on

2    Monday and you worked through Saturday; correct?

3    A.    Yes.

4    Q.    And then that following Sunday is when Pablo was arrested;

5    correct?

6    A.    Yes.

7    Q.    Who was on your work crew that you worked with?

8    A.    That day it was Jonathan, Hipolito and Refugio and Mr.

9    Juan and myself.

10   Q.    When you say "that day," let's start on the Monday, your

11   first day of work.

12   A.    They were with me.

13   Q.    Juan Rangel-Rubio?

14   A.    Yes.

15   Q.    Hipolito?

16   A.    Yes.

17   Q.    Jonathan?

18   A.    Yes.

19   Q.    Juan's son?

20   A.    Yes.

21   Q.    And then Refugio?

22   A.    Yes.

23   Q.    Was that your work crew?

24   A.    Yes, yes.

25   Q.    That's who you worked with on Monday?

380

```
1   A.    Yes.

2   Q.    From 6:00 a.m. to 5:00 p.m.; correct?

3   A.    Yes.

4   Q.    Let's go to Tuesday, who was your work crew on Tuesday?

5   A.    The same people.

6   Q.    Including the defendant, Juan Rangel-Rubio?

7   A.    Yes.

8   Q.    Go to Wednesday, who was your work crew?

9   A.    We were also there.

10  Q.    The same people?

11  A.    Yes.

12  Q.    Same hours?

13  A.    Yes.

14  Q.    Go to Thursday, who was your work crew with on Thursday?

15  A.    Thursday, it was the same people but in different places.

16  Q.    So you still worked with Juan Rangel-Rubio, his son

17  Jonathan, Hipolito, and Refugio?

18  A.    Yes.

19  Q.    Friday, did you work with Juan Rangel-Rubio?

20  A.    No.

21  Q.    And that would have been August the 18th of 2017; is that

22  correct, ma'am?

23  A.    Yes.  Yes.

24  Q.    Did you ever see Juan at work that day?

25  A.    Just in the morning when we all left to go to work
```

381

1   together.

2   Q.   At approximately 5:00 or 6:00 a.m. when you left the

3   property?

4   A.   At 6:00, and 5:00 in the afternoon, I saw him in the

5   house.

6   Q.   You never saw him at work on Friday?

7   A.   No, because I was in a different area.

8   Q.   Okay.  Let's go to Saturday, the day before the arrest.

9   Who did you work with on Saturday?

10  A.   I was with Mr. Hipolito, Mr. Refugio and Jonathan.

11  Q.   Was Juan there the entire day?

12  A.   No.  I just saw him when he left the house with them

13  because I went with Mr. Hipolito.

14  Q.   Let's talk about, walk us through your day on Saturday.

15  This was the day before the arrest.  What time did your day

16  start?

17  A.   I left the house at 6:00 in the morning with Mr. Hipolito

18  to go to Garden City to pick up the chipper.

19  Q.   And where, what location were you supposed to be working

20  at on Saturday?

21  A.   By Brownfield, I think -- I don't know the area very well.

22  I think it's like Brownfield.

23  Q.   Is it Springfield?

24  A.   Springfield, yes.

25  Q.   After leaving at 6:00 a.m. leaving with Hipolito to pick

382

1    up a piece of equipment, what time did you get to your work

2    site?

3    A.    About 8:00 in the morning.

4    Q.    And how long did you stay at work?

5    A.    We were there working.  I was with Mr. Refugio at the

6    place, and then I had to pick up what was left, and then I went

7    back to the ranch to drop off the trash and then I went back at

8    one o'clock to eat.

9    Q.    You got to the work site at eight o'clock, worked for a

10    little bit and then went to the ranch around lunchtime; is that

11    correct?

12    A.    To pick up the food, yes.

13    Q.    And then after picking up the food at the ranch, did you

14    go back to the work site?

15    A.    Yes.

16    Q.    Do you know about what time you got back to the work site?

17    A.    It was going to be about 1:00.

18    Q.    And in the morning when you were at the work site at 8:00

19    a.m. and worked for several hours, who was working with you?

20    A.    Mr. Hipolito, Jonathan and Refugio.

21    Q.    Was Juan there in the morning?

22    A.    No.

23    Q.    When you returned at one o'clock with lunch, who was

24    there?

25    A.    Just Mr. Hipolito and Refugio, Jonathan, because I was

383

1    with Refugio.

2    Q.    So the same three people were there in the afternoon?

3    A.    Yes.

4    Q.    Was Juan Rangel-Rubio there in the afternoon when you

5    returned with lunch?

6    A.    No.

7    Q.    Did Juan eventually show up?

8    A.    Around -- like around three o'clock, like around three

9    o'clock Mr. Hipolito told us to go to the house about 4:00.

10   Q.    You mean -- who told you to go to the house?

11   A.    Hipolito, well, Mr. Hipolito -- well, Mr. Juan told Mr.

12   Hipolito for us to go to the house, around four o'clock.

13   Q.    And that occurred -- let me clarify.  What time were you

14   told to go to the house?

15   A.    To go to the house at four o'clock.

16   Q.    And what time did you first see Juan on Saturday the day

17   before the arrest?

18   A.    Around 3:00 in the afternoon.

19   Q.    Did you take any pictures the day you were working?

20   A.    Yes.

21   Q.    Specifically did you take any pictures on Saturday the

22   19th of August of 2017?

23   A.    Yes.

24   Q.    Why did you take pictures?

25   A.    I always took pictures of my partner.

384

1    Q.    Is that Hipolito?

2    A.    Yes.

3    Q.    If we could please view Exhibit 61.  Can you look at

4    Exhibit 61 and tell us if you recognize that man?

5    A.    Yes, it's Mr. Hipolito and Jonathan and Refugio.

6    Q.    Is this the piece of equipment that you were using on the

7    job?

8    A.    Yes.

9    Q.    Can you please circle Hipolito?

10   A.    (Complies with request of counsel).

11   Q.    And can you please circle Jonathan?

12   A.    (Complies with request of counsel).

13    And can you please circle Refugio?

14   A.    (Complies with request of counsel).

15   Q.    And when did you take this picture?

16   A.    We had just eaten and I -- I walked ahead, and when they

17   were getting up, I took the picture.

18   Q.    And do you recall approximately what time that was?

19   A.    I remember it was about -- it's got to be 2:00 in the

20   afternoon.  It was 1:00 and change.  I'm not exactly sure of the

21   time but it was shortly going to be 2:00.

22   Q.    After you had finished eating lunch?

23   A.    Yes.

24   Q.    And 61-3, is this another photograph that you took?

25   A.    Yes.

385

1    Q.    And who is depicted in this picture, ma'am?

2    A.    You can see Mr. Hipolito, Jonathan and Refugio.

3    Q.    And was Juan present at all?

4    A.    No.  No.

5    Q.    And did you take this picture at the same time, right

6    after you finished lunch?

7    A.    Yes.

8           MS. GROOVER:  Your Honor, I have no further questions.

9           THE COURT:  Cross-examination, Ms. Brewington.

10          MS. BREWINGTON:  Thank you, Judge.

11                         CROSS-EXAMINATION

12   BY MS. BREWINGTON:

13   Q.    Ma'am, you only worked for the company for a week?

14   A.    Yes.

15   Q.    So you didn't exactly know where every person was working

16   every day?

17   A.    No.

18   Q.    Do you even know how many people worked at the company?

19   A.    No.

20   Q.    Do you know how many different sites they were working on

21   every day?

22   A.    No.

23          MS. BREWINGTON:  Nothing further.

24          THE COURT:  Any brief redirect?

25          MS. GROOVER:  Briefly, Your Honor.

386

1          THE COURT:  Proceed.

2                      REDIRECT EXAMINATION

3    BY MS. GROOVER:

4    But on one day you knew where one person was not; correct?

5    A.    Well, yeah.

6          MS. GROOVER:  No further questions.

7          THE COURT:  Any objection to this witness being excused?

8          MS. BREWINGTON:  None.

9          MS. GROOVER:  No, Your Honor.

10         THE COURT:  You may step down.

11         Ladies and gentlemen, it is time for our mid-afternoon

12   break, so we will pause here and we will gather back together at

13   five minutes after 3:00.  Remember the rules about breaks.

14   Let's rise for this jury.

15         (The jury exits the courtroom.)

16         THE COURT:  Counsel, we will be in recess.

17         (Recess from 2:49 p.m. to 3:10 p.m.)

18         THE COURT:  Let's bring in the jury.

19         (The jury enters the courtroom.)

20         THE COURT:  Ms. Groover, Mr. Howard, call your next

21   witness.

22         MS. GROOVER:  Thank you.

23         The United States calls Tony Miranda to the stand.

24

25

1                        ANTHONY MIRANDA,

2    having been first duly sworn, was examined and testified as

3    follows:

4          THE CLERK:  And if you will please state your full name,

5    spell your last, state your occupation and your business

6    address.

7          THE WITNESS:  My full name is Anthony Miranda, my last

8    name spelled M-i-r-a-n-d-a.  I'm a group supervisor with

9    Homeland Security Investigations.  My business address is 15411

10   Montana Avenue, 79936, El Paso, Texas.

11                      DIRECT EXAMINATION

12   BY MS. GROOVER:

13   Sir, how long have you been a group supervisor with Homeland

14   Security Investigations?

15   A.    I will be coming up on a year in December.

16   Q.    And can you tell the jury what are your duties as a group

17   supervisor with HSI?

18   A.    I supervise a team.  I currently work down to six agents,

19   usually anywhere between six and ten agents that investigates

20   human smuggling crimes in Santa Teresa, Mexico.

21   Q.    And you're currently in El Paso?

22   A.    Yes, I work out of the El Paso office.

23   Q.    And before El Paso, Texas, where did you work at, sir?

24   A.    I worked at the Homeland Security office here in Savannah,

25   Georgia as a criminal investigator special agent.

388

1   Q.   And how long were you in the Savannah office, sir?

2   A.   Almost six years to the day.

3   Q.   And as a special agent with Homeland Security

4   Investigations, what are your duties and how do they differ from

5   group supervisor?

6   A.   We actually do the investigations, the criminal

7   investigations, on several federal violations to include human

8   smuggling, human trafficking, drug smuggling, financial fraud,

9   varies.  There are several.

10  Q.   And before you were a special agent with Homeland Security

11  Investigation, what did you do, sir?

12  A.   Well, I also did that job in El Paso as an agent for six

13  years.  Before that, I was a border patrol agent assigned in

14  Santa Teresa, Mexico for four years.

15  Q.   And your duties as a border patrol agent?

16  A.   I patrolled the border, various, various matters.

17  Sometimes it's regular line watch.  Sometimes all-terrain

18  vehicle, ATV duties.  I was also a field training officer for

19  about a year and a half while I was there.

20  Q.   Back in 2017, were you a special agent with HSI in the

21  Savannah area?

22  A.   Yes, I was.

23  Q.   And were you assigned to investigate the murder of Eluid

24  Montoya?

25  A.   Yes, I was.

389

1    Q.    Exhibit 3, please, if we could take a look at that.  As

2    part of this case, did you come to learn Mr. Montoya's

3    immigration status?

4    A.    Yes.

5    Q.    What are we looking at in Exhibit 3, please?

6    A.    That's his -- I believe it's called N500.  It's a

7    naturalization certificate.

8    Q.    What does that mean to be a naturalized United States

9    citizen?

10   A.    That means you weren't born a US, United States, citizen.

11   You gained your citizenship through a naturalization process.

12   Q.    As part of this investigation, did you assist in a search

13   warrant at the defendant and Pablo's residence?

14   A.    Yes, I did.

15   Q.    And how did you assist, sir?

16   A.    I was there to assist with the search itself but also

17   assisted with any immigration-related matters.  I'm a Spanish

18   speaker, so I assisted with the interviews, read and write and

19   just basically whatever I was needed for the day of the search

20   warrant.

21   Q.    And backing up for just a moment, you said you speak

22   Spanish?

23   A.    Yes, I do.

24   Q.    Are you fluent in Spanish?

25   A.    Yes, I am.

390

1  Q.   Do you communicate often with individuals who speak

2  Spanish?

3  A.   Yes, I do.

4  Q.   And did you advise, did you encounter Pablo during the

5  course of that search warrant?

6  A.   Yes.

7  Q.   Did advise Pablo of his rights in the case?

8  A.   Yes.  Yes, I did.

9  Q.   And did he admit to being from Mexico and an illegal

10  alien?

11  A.   Yes, he did.

12  Q.   Exhibit 53, please.  Could you please describe to the jury

13  what is Exhibit 53?

14  A.   That's an I213.

15  Q.   What is that?

16  A.   It's pretty much a record of deportability and

17  inadmissibility to the United States.  It's what we use to

18  document when we interview somebody about their immigration

19  status in the United States.

20  Q.   Is this a document that the United States Government has

21  indicating that Pablo Rangel-Rubio is an illegal alien?

22  A.   Yes.

23  Q.   Did you also encounter Juan Rangel-Rubio, the defendant --

24  A.   Yes, I did.

25  Q.   -- during your search of the residence?

391

1    A.    Yes.

2    Q.    Did you advise the defendant of his rights?

3    A.    I did.

4    Q.    And did you ask him about his status?

5    A.    I did.

6    Q.    What did he tell you?

7    A.    That he was here in the United States illegally.

8    Q.    Exhibit 54, can you tell the jury what are we looking at

9    in Exhibit 54?

10   A.    That's Juan Rangel-Rubio's I213.

11   Q.    This is the document that the United States Government has

12   indicating that the defendant is an illegal alien?

13   A.    Yes.

14   Q.    As part of your investigation, did you interview the

15   defendant as a suspect involved in the murder of Mr. Montoya?

16   A.    I did.

17   Q.    Why did you interview him?

18   A.    Because of the evidence we had collected through like

19   phone records, bank records, video surveillance records

20   indicated that he was possibly a suspect in the -- in the

21   murder.

22   Q.    Did you interview him on August the 2nd of 2018, almost a

23   year after the murder?

24   A.    Yes, yes.

25   Q.    And who was with you at the time?

392

1    A.    Special Agent Harley Snipes.

2    Q.    And was the defendant placed in a room that had a

3    recording system?

4    A.    We had a recording system, yes.

5    Q.    Was it video and audio or just audio?

6    A.    Just audio.

7    Q.    Approximately how long was the entire encounter?

8    A.    About an hour, just over an hour and 41 minutes.

9    Q.    And was the entire encounter recorded?

10   A.    Yes, it was.

11   Q.    Prior to today, did you have an opportunity to listen to

12   the recorded interview?

13   A.    I did.

14   Q.    And did the audio capture the entire encounter?

15   A.    It did.

16   Q.    Now, was the interview conducted in Spanish?

17   A.    It was conducted in Spanish, yes.

18        MS. GROOVER:  Your Honor, may I approach the witness?

19        THE COURT:  You may.

20   (By Ms. Groover)  Sir, I'm handing you what's been marked as

21   Government's Exhibit 91 and 92.  Can you please take a look at

22   Exhibits 91 and 92, and tell me, do you recognize those, sir?

23   A.    Yes, I do.

24   Q.    And is 91, is that a recording of the interview that you

25   had with the defendant on August the 2nd of 2018?

393

1  A.    Yes, it is.

2  Q.    And Exhibit 92, is this a transcript of your interview?

3  A.    Yes, it is.

4  Q.    And prior to today, did you have an opportunity to listen

5  to the recorded interview in Spanish?

6  A.    Yes.

7  Q.    And is this transcript, does it have the Spanish on the

8  left and the English on the right?

9  A.    It does.

10  Q.    And did you follow along with the transcript while you

11  listened to the interview?

12  A.    Yes, I did.

13  Q.    And is the transcript a true and accurate translation of

14  your entire interview with the defendant in August of 2018?

15  A.    Yes, yes, it is.

16  Q.    Can you describe his demeanor when he was initially in the

17  room with you?

18  A.    Well, initially, he seemed to be happy to see me.  He had

19  something he wanted to say to me so he was happy to see me and

20  then his demeanor changed as we -- as he talked to us.

21       He seemed excited to talk to us when we spoke to him about

22  his reinstating his deportation.  He seemed excited to talk

23  about that.

24       And then as we went on, his demeanor seemed to get more

25  evasive and more -- he seemed more nervous to answer some of our

394

1    questions, and just -- what's the word I'm looking for? -- he

2    just seemed to try to minimize his role in the questions that we

3    were asking about.

4    Q.    How were you dressed at the time?

5    A.    We dressed casual.  We don't -- we usually dress casual

6    when we are out and about so it was just casual dress.  No

7    uniform.

8    Q.    T-shirt?

9    A.    Just T-shirt, jeans and a Polo shirt probably.

10   Q.    Did you show your credentials?

11   A.    Yes.  Yes.

12   Q.    Did you have firearms with you?

13   A.    I did have a firearm but we couldn't take the firearms in.

14   We had to lock them up because it was at a detention facility.

15   Q.    So there were no visible firearms when you interviewed

16   him?

17   A.    No, no visible firearms.

18   Q.    Did you have any difficulty communicating with the

19   defendant in Spanish?

20   A.    No, not at all.

21   Q.    Any trouble understanding him whatsoever?

22   A.    No, not at all.

23   Q.    Did you ever need to get another agent that spoke Spanish

24   to help you?

25   A.    No.

395

1    Q.    Were his answers appropriate to your questions?

2    A.    Yes.

3    Q.    Rational responses?

4    A.    Yes, rational responses.

5    Q.    Any confusion or rambling on the part of the defendant?

6    A.    No, no.

7    Q.    Did he have any slurred words?

8    A.    His --

9    Q.    Slurred words?

10   A.    Oh, "slurred words."  I heard "third words."  I'm sorry.

11   No, no slurred words.

12   Q.    Appear to be under the influence of drugs or alcohol in

13   any way?

14   A.    No.

15   Q.    What was his physical appearance like?

16   A.    He -- he seemed fine.  He seemed physically capable to be

17   interviewed.  He didn't seem ill in any way or any manner.

18   Q.    At any time did you use any type of physical punishment to

19   get him to speak with you?

20   A.    No, no.

21   Q.    At any time did he exhibit any kind of signs of discomfort

22   or pain or anything like that?

23   A.    No.  I mean, he did seem -- when he was nervous, he did

24   seem to not go with his normal way of being, but, no, he didn't

25   seem in pain or bothered by the interview.

396

1    Q.    Any indication that he didn't have any sleep or was
2    hungry, any kind of sleep or food deprivation?
3    A.    No.
4    Q.    At any time did he have to stop and take a break, use the
5    restroom, anything like that?
6    A.    No.
7    Q.    At any time did he need you to clarify your questions
8    because he was confused?
9    A.    No.
10   Q.    Did you advise him of his Miranda rights, his
11   constitutional warnings?
12   A.    Yes.
13   Q.    And how did you do that?
14   A.    We have a form that we read, and I read it to him and I
15   had him read along with me, and then I had done it before, so I
16   explained to him it's the same rights and he always had -- it's
17   the same rights that he had the last time I spoke to him.
18   Q.    Did you speak with him before?
19   A.    Yes, I did.
20   Q.    Tell the jury about that.
21   A.    I spoke to him the day of his initial arrest, the day of
22   the search warrant, and he -- we -- I interviewed him over the
23   guns that he had in his possession and the ammo, the ammunition
24   he had in his possession.
25   Q.    So you spoke with him about a year before?

397

1    A.    Yes.

2    Q.    And what was your understanding of what or did he say

3    where he was on the day of the murder the year before?

4    A.    I can't remember.

5    Q.    That's okay.  We will --

6    A.    I can't remember.

7    Q.    So did he admit to you to being an illegal alien?

8    A.    Yes, he did.

9    Q.    And did he also explain that he was from Mexico?

10   A.    Yes.

11   Q.    Did he explain that he was a combat engineer in the army?

12   A.    Yes, in Chiapas, Mexico.

13   Q.    Did he explain to you anything about multiple checks going

14   into his bank accounts?

15   A.    Yes, eh --

16          MS. BREWINGTON:  Objection to leading.

17          THE COURT:  Sustained.

18          THE WITNESS:  Yes, he spoke about checks going, I think

19   different checks going in his account.

20    (By Ms. Groover)  Such as?

21   A.    One was for Nemorio Cruz.  Another was his check, and I

22   can't remember the third name of the third person that he had

23   checks going to his account.

24   Q.    He agreed that there were multiple checks in other

25   people's names going in his account?

1  A.    Yes.

2  Q.    Did he admit that he would ever pay people who were

3  working at Wolf Tree?

4  A.    Yes.  Yes, he admit that he paid his son out of those

5  checks and he paid another person named Ezekiel.

6  Q.    And did he also explain that he kept some of the money?

7  A.    Yes.  He said he would keep some of that money and he --

8  sometimes he would pay out -- he said that sometime they have

9  workers for like a week at a time and that those workers would

10  be paid out of that account.  If they were working for a week or

11  two, they would pay them out of that account.

12  Q.    Did he also explain that he gave money to people in

13  Mexico?

14         MS. BREWINGTON:  Objection, more leading.

15         THE COURT:  Sustained.

16  Q.    (By Ms. Groover)  Did he explain what else he did with the

17  money?

18  A.    He did -- he did say other stuff, what he did with the

19  money.

20  Did you talk to him about any firearms?

21  A.    Yes, yes, we spoke to him about some firearms.

22  Q.    Did you talk to him specifically about firearms in

23  connection with an individual by the name of Stanley Turner?

24  A.    Yes, we did.

25  Q.    What did he tell you?

399

1  A.   He said Stanley Turner would get his firearms for -- for

2  him and he explained which -- which firearms.

3  Q.   Directing your attention to Exhibit 92, Page 63 --

4       THE COURT:  And the jury will remember my previous

5  charge to you with regard to transcripts and their admission and

6  your review of them.  The same is true with regard to Exhibit 91

7  which is an audio recording of this interview, and 92, which is

8  a transcription purporting to identify translation and the name

9  of speakers.  Continue.

10  (By Ms. Groover)  Excuse me, Your Honor.

11  Again on Exhibit 92, Page 63, did he tell you about some

12  firearms involving Mr. Stanley Turner and his possession of

13  those?

14  A.   Yes.

15  Q.   If we could pull those up on the screen now, please.  And

16  can you tell the jury exactly what he said in relation to

17  firearms from Stanley Turner?

18  A.   He said that he sold him AR -- R15 it says here, he sold

19  him a .22 rifle and a .22 Magnum and a .22 rifle Magnum.

20  Q.   Did he say what he did with the .22 Magnum, referring to

21  Chicago?

22  A.   Oh, yeah.  He said he took it, took that rifle to Chicago.

23  Q.   Like the week before?

24       MS. BREWINGTON:  Objection to leading.

25       THE COURT:  Sustained.

400

1    (By Ms. Groover)  Did you talk to the defendant about his

2    truck?

3    A.    Yes.

4    Q.    And did he admit that -- what kind of truck he had?

5    A.    Yeah, it was -- it was the truck that we encountered him

6    in the day he was arrested.  I want to say burgundy, big

7    burgundy truck, Dodge Ram, I believe it was.

8    Q.    Did he explain if he had a trailer at all?

9    A.    Yes.  He had a trailer hooked up to it the day that we

10   encountered it.

11   Q.    Did you ask him specifically about his whereabouts on the

12   day, the day before and the day of the murder?

13   A.    Yes.  He said that he -- the day of the murder he started

14   out in Springfield working with other workers and that he never

15   came anywhere near where the murder happened.

16         He said his truck was off of Highway 17 near the -- near

17   the flea market is what he said.

18   Q.    Okay.  Did he ever explain at one point he left his truck

19   somewhere?

20   A.    Yes.  Yes.

21   Q.    What else did he say about his truck?

22   A.    He said it had a flat and he left it at the -- at a

23   parking lot off of Highway 17.  It was a Kroger, but he said it

24   was -- I want to say near -- I can't remember -- I haven't been

25   here in a while so I can't remember the flea market but I

401

1  believe it's Keller Flea Market, I believe Keller Flea Market.

2  Q.    If we could go to Exhibit 92, Page 40, at the top of Page

3  40, where does he tell you that where he leaves his truck?

4      Is it near a McDonald's and Kroger?

5      MS. BREWINGTON:  Leading.

6      THE WITNESS:  Yes, that's me explaining if it's near --

7  asking him if it's near the McDonald's and the Kroger.

8  (By Ms. Groover)  And what does --

9  A.    He says, "Yes, there's where I -- where I arrived that

10  afternoon."

11  Q.    At some point does he talk about a taxi, having to get a

12  taxi?

13  A.    Yes.  He does talk about a taxi, that he got a taxi, had a

14  taxi take him to get his truck.

15  Q.    Because of the flat tire?

16  A.    Yes.

17  Q.    But then at some point does he refer to an individual who

18  helped pick him up?

19  A.    Yes.  He changed -- his story changed about that multiple

20  times.  I kept trying to get him to tell me exactly who, and

21  every time I would ask him who, who took him to pick up his

22  truck, he would -- he would respond not with an answer of who

23  but just something different, random, and I would come back and

24  ask him, "Hey, I'm asking you who -- it's a simple question --

25  give me the name of who took you," and he just kept -- kept

402

1   evading the question, and then eventually he said that he jumped

2   in the back of a van with a bunch of workers and then he

3   eventually said that an individual by the name of Higinio Perez

4   picked him up.  At one point he actually said his nephew picked

5   him up, too.

6   Q.   Gave multiple stories about how he got to a particular

7   location?

8   A.   Yes.

9   Q.   What location were you referring to?

10  A.   To the -- to his truck, how he got to his truck and he

11  never wanted to tell us how he got to -- when he eventually told

12  us that he was at the area, he didn't tell us how he got there.

13        THE COURT:  When you say the area.

14        THE WITNESS:  Where Higinio -- where Eluid was murdered

15  at.

16  (By Ms. Groover)  Prior to interviewing the defendant, did you

17  learn that his phone was located at the murder scene around the

18  time of the murder?

19  A.   Yes.

20  Q.   So did you question him about his location on the day of

21  the murder?

22  A.   Yes.

23  Q.   And did you ask him if he knew Higinio Perez-Bravo?

24  A.   Yes.

25  Q.   At first what did he tell you?

403

1   A.    He said he did not know him.  He had never talked to him.

2   Showed him a picture.  He said he did not recognize that person

3   at all.  We asked him if he knew him as his nickname being

4   Chiapas.  He said he did not know him as Chiapas.  He actually

5   said he knew somebody else as Chiapas.  Had no idea who Higinio

6   Perez was.

7   Q.    Did you ask him if he ever talked to him on the phone?

8   A.    Yes.

9   Q.    And at first what did he tell you?

10  A.    He said he had never spoke to him on the phone.

11  Q.    Then later does he admit to communicating with someone he

12  referred to as "he"?

13  A.    Yes.

14  Q.    And what does he tell you exactly about that?

15  A.    That he -- he did call him.  There are a couple of

16  conversations where he talks about talking to somebody, but he

17  did say he -- he did call him.

18  Q.    Did you talk to him in general about Mr. Montoya?

19  A.    Yes.

20  Q.    And did he explain whether or not the defendant got along

21  with Mr. Montoya?

22  A.    He said that they -- he didn't so much say they didn't get

23  along but he said that they weren't best friends, but he said

24  that when they did talk, it was mostly to talk about the

25  problems that the -- not the defendant, that the defendant's

404

1    brother had, had with the victim.

2    Q.    Exhibit 92, Page 24, towards the second half of the page,

3    did the defendant indicate anything specific about problems with

4    Mr. Montoya?  On the bottom of Page 24, did the defendant

5    indicate anything about the problem with Mr. Montoya?

6    A.    Page 24?

7    Q.    Yes.

8    A.    He, I mean, he just indicated that they didn't get along,

9    that he had a lot of issues with -- with several of the workers.

10   Q.    Did he indicate whether or not he actually spoke with Mr.

11   Montoya?

12   A.    Yes, he did indicate that.

13   Q.    Did he indicate that he would talk on the phone with Mr.

14   Montoya?

15   A.    He initially said he didn't and then he said he did.

16   Q.    At the top of Page 25, did he indicate that he would speak

17   with Mr. Montoya if his brother had a problem?

18   A.    Yes.

19   Q.    Speak with Mr. Montoya on the phone?

20   A.    Yes.

21   Q.    And on Exhibit 92, Page 26, the top of the page, did he

22   indicate whether or not Mr. Montoya was suspended and whether or

23   not he spoke with him on the phone at that time?

24        MS. BREWINGTON:  Judge, again, with the leading.

25        THE COURT:  Overruled.  It is a proper question.

405

1    Continue.

2         THE WITNESS:  Yes, he did.  He did talk to the defendant

3    about on the day of his suspension.

4     (By Ms. Groover)  The defendant admitted it?

5    A.   He admitted it, yes.  He said that they spoke the day of

6    the confession -- I mean, I'm sorry, of the -- of the -- of the

7    suspension.

8    Q.   The day the victim was suspended?

9    A.   Yes, the day of the suspension.

10   Q.   Did the defendant indicate whether or not he was present

11   at the showup meeting?

12   A.   He did.  He said he was present there.

13   Q.   When Mr. Montoya's letter was read?

14   A.   Yes.

15   Q.   And Exhibit 92, Page 41, towards the bottom of the page,

16   did he indicate what he felt Mr. Montoya was trying to do to him

17   and his family?

18   A.   I would -- can you please ask the question again?

19   Q.   At the bottom of Page 41, did the defendant indicate what

20   he believed Mr. Montoya was trying to do to him and his family?

21   A.   Well, he indicated that they were giving him problems, he

22   was giving them problems by bringing up the things he was

23   bringing.

24        What he talks about at the bottom is he says, he talks

25   about his -- about them trying to get him fired and spying on

406

1  him to get him fired because he -- they were trying to get him

2  fired through illegal dumping.  They said he would do illegal

3  dumping and they tried to get him fired that way.

4  Q.    On the day of the murder, did you go through the

5  defendant's whereabouts in particular with him?

6  A.    Yes, we did.

7  Q.    And at first, where did he tell you he was working?

8  A.    Springfield, he was working in Springfield.

9  Q.    And did he explain that he was working with Hipolito and

10  Maria that morning?

11  A.    Yes, he did.

12  Q.    Did he deny being over in the area where Mr. Montoya was

13  killed?

14  A.    Yes, he did.

15  Q.    Is that around the time he explained the flat tire with

16  his truck?

17  A.    Yes.

18  Q.    And at the beginning of this, did he also indicate he had

19  never been near Mr. Montoya's home?

20  A.    Yes.

21  Q.    Did you then confront him and explain that his phone

22  appeared to be at the murder scene around the time of the

23  murder?

24  A.    Yes, we did.

25  Q.    And after confronted with the phone records, did he then

407

1   provide a different story about where he was?

2   A.    Yes.  At that point, he did say that -- not that his

3   first -- he said -- at some point he said his phone was with his

4   nephew and that's why it was there, and then when we told him

5   his nephew was in Springfield, that's when he said his phone

6   was -- was with him.

7   Q.    Did he eventually admit to being at the location and

8   spying on Mr. Montoya?

9   A.    Yes.  He said that he -- that the reason he was in that

10  area is they were trying to spy on Mr. Montoya and get him fired

11  for illegal dumping.  They knew where he parked his -- his

12  trailer because he always parked in the same spot, his

13  tractor-trailer.

14  Q.    And then Exhibit 92, Page 46, at the top of the page, do

15  you comment to the defendant about his demeanor?

16  A.    Yes, I do.

17  Q.    And why do you discuss his demeanor with him?

18  A.    Because he was -- he was very evasive, very nervous.  He

19  was very closed off.  He -- his answers to our questions seemed

20  to be only enough to try to -- when we presented him with the

21  fact, he would try -- with the fact to disprove what he was

22  saying, he would give us another answer that would just cover

23  that area of the question, so I told him he looked nervous.

24        I told him that it's not natural for people to lie, and

25  when we lie, we tend to give off indicators that we're lying,

408

1    and when I told him that, he tried to act more relaxed, but he

2    was actually so tense that he looked awkward trying to be

3    relaxed.

4    Q.   Did his body language change after he was confronted with

5    the phone evidence?

6    A.   Yes, yes.

7    Q.   And at the bottom of Page 46, does the defendant explain

8    that unfortunately it does involve him?

9    A.   Yes.  Well, he says -- he says it happens and it's -- yes,

10   he does say that.

11   Q.   He said "unfortunately" --

12   A.   It involves him in it, yes.

13   Q.   He said, "Unfortunately that thing happened."  Is that

14   referring to Mr. Montoya's murder?

15   A.   Yes.  That's what we were talking about, Mr. Montoya's

16   murder.

17   Q.   And he explained that it does involve him because he was

18   in the area?

19   A.   Yes.

20   Q.   Does he then give an explanation as to why he was in the

21   area?

22   A.   Yeah.  His explanation was -- was that they were spying on

23   Mr. Montoya to try to get him fired.

24   Q.   And at one point, does he explain that there was a van

25   that picked him up with other workers?

409

1   A.    Yes.  He said he got in a van that picked him up full of

2   workers.  At one point I believe he said somebody from Guatemala

3   picked him up and eventually he did say some -- the man in the

4   picture picked him up.  Never said his name, though.

5   Q.    But before he said the man in the picture, did he give

6   another of his nephew that --

7   A.    Yes, he said his nephew picked him up, Refugio.

8   Q.    So he said multiple people picked him up?

9   A.    Yes.

10  Q.    Before he settled on the guy in the picture?

11  A.    Yes.

12  Q.    Who he had initially denied knowing?

13  A.    Knowing, yes.

14  Q.    Exhibit 92-50, did he explain, you indicated earlier that

15  he was trying to catch Mr. Montoya with illegal dumping --

16  excuse me, Page 53.

17       On Page 53, is this a portion of the interview where he

18  does explain that he was there in the area trying to catch Mr.

19  Montoya in the illegal dumping?

20  A.    Yes.

21  Q.    And then does he indicate whether or not he was at

22  Savannah Pines?

23  A.    He says that he wasn't at Savannah Pines.  He just passed

24  by Savannah Pines.

25  Q.    Said he was just passing by?

410

1   A.    Uh-huh.

2   Q.    Okay.  At some point does he change his statement with

3   respect to phone calls that were made?

4   A.    Yes, he does.

5   Q.    Does he at first deny ever calling his brother Pablo?

6   A.    Yes, he -- yes, he denies that.  He denies several phone

7   calls initially, and then later he comes back and says he did

8   make those calls.

9   Q.    And at one point does he say his nephew had his phone?

10  A.    Yes, he did.

11  Q.    And then he comes back around and says, no, he had the

12  phone; he made the phone calls?

13  A.    Yes.

14  Q.    Does he further explain that he was nervous and that is

15  why, because he was in the area, and that is why he didn't

16  initially say that?

17  A.    Yes.

18  Q.    Exhibit 92, Page 58, when asking him about the situation,

19  does he explain what he would have done with the firearms at the

20  top of the page?

21  A.    He said that he wouldn't have left the firearm in his

22  house if he did something like that.  He would hide the firearms

23  if he did something like that with them.

24  Q.    And did he also admit that he was at the wrong place at

25  the wrong time?

411

1    A.    Yes, he did say that.

2    Q.    And at one point in the interview, did he also admit to

3    driving by seeing Mr. Montoya's truck but just passing by?

4    A.    Yes.

5    Q.    And does he also acknowledge that he left the area at the

6    same time, around the same time, that Mr. Montoya was killed?

7    A.    Yes, he does.

8    Q.    And after going through some of the evidence with the

9    defendant, on Page 83, does he indicate that "Unfortunately all

10   the evidence points to me"?  In the middle of Page 83, does he

11   indicate that the evidence pointed to him?

12   A.    Yes, he does.

13   Q.    Okay.  You've been an investigator for many years?

14   A.    Yes.

15   Q.    And approximately how many individuals have you charged

16   who have been suspected of a criminal activity?

17   A.    I don't know.  I don't know, several.

18   Q.    Hundreds?

19   A.    Probably in -- probably maybe even in the thousands.  We

20   used to have -- we get a lot of cases where I used to work on

21   the border, do a lot of -- respond to a lot of bridge cases,

22   drug cases, a lot of human smuggling cases so ...

23   Q.    What if anything does it indicate to you if an individual

24   keeps changing or shifting their story about what happened?

25   A.    That they're -- a lot of times they're trying to evade the

412

1    question or they are trying to minimize their role in what

2    happened, what's going on.  They try to I guess compensate for

3    what they did with their answers, try to mislead us in our

4    investigation or the -- try to cover up the facts and make it

5    sounds what reason they did a certain thing, why they did it.

6    Q.    And in your interview with the defendant, he changed his

7    stories multiple times; correct?

8    A.    That's correct, yes.

9    Q.    And he also admitted to lying before?

10   A.    Yes.

11   Q.    And he also admitted that it looked bad; correct?

12   A.    That's correct.

13         MS. GROOVER:  Thank you.  I have no further questions.

14         THE COURT:  All right, cross-examination, Ms.

15   Brewington.

16         MS. BREWINGTON:  Thank you, Judge.

17                        CROSS-EXAMINATION

18   BY MS. BREWINGTON:

19   Q.    Agent Miranda, you talked about some checks that went into

20   a bank account.  Did you actually do any kind of investigation

21   on that?

22   A.    On the checks myself, no, I did not.

23   Q.    Do you have any idea who did?

24   A.    I believe it was Agent Snipes and Karen Hartley.

25   Q.    So you would have no idea who deposited those checks?

413

1    A.    No, I do not.

2    Q.    Who had access to Juan's account?

3    A.    No.

4    Q.    Do you know what grade level Juan has?

5    A.    No, I do not.  I know he was in the military.  I know he

6    fought in the battles down in -- in the Chiapas, the little

7    fighting that went on over there, and he was a combat engineer.

8    But, I mean, as far as education, no, I do not know his

9    education.

10   Q.    His story changed a lot; correct?

11   A.    That's correct.

12   Q.    But his story was consistent that he didn't kill Montoya?

13   A.    It was -- it was for the most part, yes.

14   Q.    What do you mean, "for the most part"?

15   A.    Well, there was a point where he asked me, during the

16   interview, he asked me, "What's going to happen," and I -- the

17   way I work, I never promise anything, so I said, I told him,

18   "Look, I can't promise you anything other than I will speak to

19   the prosecutor and tell her that you cooperated and told us the

20   truth; whatever happens from there is not for me to decide; it's

21   for somebody else to decide," and then he went back to not

22   wanting to -- not -- not saying that he was responsible for it,

23   not admitting he was responsible.

24        But there was a time when he did ask me during that last

25   interview, "So what's going to happen," and I believe that

414

1    was -- he was about to confess and then changed his mind,

2    because I will not -- I will not make a promise that I cannot

3    keep to somebody.

4    Q.    He couldn't make a confession that was not true is

5    basically what he was telling you?

6    A.    Can you ask me again?

7    Q.    The way you phrased that, can you say that again?  He

8    couldn't make an admission?

9    A.    He didn't make an admission, no.

10   Q.    We're going to move on.

11         You interviewed Perez-Bravo; correct?

12   A.    Yes, I did.

13   Q.    And who did you interview him with?

14   A.    With Agent Snipes.

15   Q.    When did that interview take place?

16   A.    I don't remember the exact date.

17   Q.    Couple years ago?

18   A.    Yeah, it's been a few.

19   Q.    Do you know how long that interview was?

20   A.    That was a long interview.  It was more than -- longer

21   than the defendant's, for sure.

22   Q.    If I told you four hours, that would sound about right?

23   A.    Yes.

24   Q.    Before that interview, you knew that Bravo's cars were

25   around the murder scene; correct?

415

1  A.    That's correct.

2  Q.    But you didn't know who was in those cars?

3  A.    You can't see in the video who is in those cars.

4  Q.    You also didn't know who the shooter was at that point;

5  correct?

6  A.    No.

7  Q.    No idea?

8  A.    No.

9  Q.    Did Bravo often lie during this interview?

10  A.    He was -- he tried to minimize.  I wouldn't say he lied

11  but, yeah, he -- he did the same.  He did the same pattern where

12  he like tried to -- tried to give an answer that justified why

13  he did certain things, and then, but -- but it was kind of like

14  to evade the truth, hide the facts or explain the facts in his

15  favor.

16  Q.    Would you characterize it as minimizing his behavior?

17  A.    Yes, minimizing.

18  Q.    Did you often tell him to tell the truth?

19  A.    Yes.  I say that to everybody, tell the truth.

20  Q.    If I told you that you told him to tell the truth 37 times

21  in that four hours, would that sound about right?

22  A.    That's your defendant or --

23  Q.    Bravo.

24  A.    Defendant or -- yes, probably.

25  Q.    You told him that he had an arrest warrant; correct?

416

1    A.    I did.

2    Q.    But you didn't tell him what it was for?

3    A.    No, I did not.

4    Q.    You kind of indicated that you speak to defendants during

5    these interviews and you don't make any kind of promises; right?

6    A.    Correct.

7    Q.    I'm going to quote from your interview with Bravo.  You

8    say, "What I can tell you, if you cooperate today I can talk to

9    the district attorney, give the information to the district

10   attorney that you cooperated and we can see if something can be

11   done."

12        That's not a promise; right?

13   A.    That's not a promise.

14   Q.    How would you characterize that?

15   A.    That's the way I -- it's just telling the prosecutor that

16   he is cooperating, that he's been cooperative, he's telling the

17   truth, that he's not lying.

18        I know that in the federal system that goes a long way if

19   you tell the truth, and I want -- it's not my decision to decide

20   what happens to him.  I don't decide -- I tell them that also.

21   You know, I can't, like I don't want to promise somebody that

22   they will have a lighter sentence when I can't make that

23   promise.

24   Q.    You were essentially alluding to you could talk to the DA?

25   A.    I -- it's -- I say the prosecutor, I guess, yes.

417

1   Q.    Kind of like if-you-scratch-my-back-I-will-scratch-yours

2   type of situation?

3   A.    No.

4   Q.    No?

5   A.    No.

6   Q.    So if they don't -- if somebody you're interviewing --

7   A.    Well, because if I interview them and they don't tell the

8   truth, I'm still going to go with that with the prosecutor, they

9   didn't the tell.  If they are telling the truth, yeah, they were

10  truthful.

11  Q.    If they tell you what you perceive to be the truth, then

12  you will tell the DA in the hopes that they give them some type

13  of credit.  That's the way it works?

14  A.    No, not like that.  I mean, it's just -- I just tell them

15  that they cooperated in the investigation; they were cooperative

16  and they were telling the truth.

17  Q.    So if I told you that you had spoken to him about you

18  would speak to the DA before he signed the Miranda form, does

19  that sound about right?

20  A.    Probably.  I mean, I don't know.  I could have said that

21  any point in the interview.

22  Q.    In fact, Mr. Perez-Bravo never signed the Miranda form?

23  A.    That is correct.  He did not sign.

24  Q.    Do you know why he didn't?

25  A.    You know, for some reason, illegal aliens are told not to

418

1    sign stuff when they are in the United States.  A lot of times

2    they could be -- they are afraid to sign because of their -- I

3    don't know.

4        I've had people not sign a deportation order when they

5    have previously been deported because they don't want to sign

6    it.  It might help them so they don't sign it.

7    Q.   How long would you say he minimized his behavior out of

8    this four-hour interview?

9    A.   I couldn't say.

10   Q.   And you continued to tell him that you wanted the truth;

11   correct?

12   A.   Yes.

13   Q.   But you didn't know the truth at that point; you didn't

14   know who the shooter was?

15   A.   No, I didn't know who the shooter was.

16   Q.   Again, you told him, "What we can do is say you cooperated

17   this day; I can talk to the district attorney; 'he cooperated

18   and this is what he told us' and your cooperation hopefully it

19   does count, it does count for something and usually I ask the

20   district attorney to take into account a person's cooperation."

21       MS. GROOVER:  Your Honor, I'm going to object at this

22   point.  We're getting pretty far off the scope of direct.

23       THE COURT:  It is somewhat, if you will reign it in.

24   Continue, and I will give you a little bit of leeway.

25       MS. BREWINGTON:  Thank you, Judge.

419

1    (By Ms. Brewington)   You and Agent Snipes were speaking in

2    English during this interview to each other?

3    A.   We didn't -- we didn't speak too much to each other too

4    often.  If we did, if we did it, it was when he wanted me to ask

5    something, yes.  He spoke English.

6    Q.   Do you recall at one point you spoke to Agent Snipes and

7    you said, "What if he's lying, what if he, Bravo, is actually

8    the shooter"?

9    A.   I don't recall.

10   Q.   Did you ever ask Bravo if he was the shooter?

11   A.   I don't remember if I did or not.  I might have asked him

12   what his involvement was because I knew he was involved.

13   Q.   But he was the only evidence that you ever gathered that

14   says that Juan was the shooter?

15   A.   Well, I mean, if you put his phone there, his denials.  I

16   mean, depends on what you're considering evidence, any -- any

17   direct evidence, that's probably it, yes.  But there is other

18   indicators that put Juan there, his knowledge of guns, the fact

19   that he owned guns, the fact that some guns were missing, so

20   there's a lot more than just that statement that makes us

21   believe he was the shooter.

22   Q.   But there was no eyewitness that you know of?

23   A.   We did not find an eyewitness, no.

24   Q.   So the only person that can say he was the shooter would

25   be Mr. Bravo?

420

1   A.   Directly, possibly.  Maybe somebody else out there we

2   didn't talk to, maybe somebody that didn't want to come forward.

3   I couldn't say.

4   Q.   Nobody that you talked to?

5   A.   It could go either way.  That we talked to, he's the only

6   one, yes.

7   Q.   Did he think he could leave after that interview?

8   A.   I believe he did.  I think he thought, he felt that he

9   could leave.  I think he thought he might be able to.  At the

10  time I told him, no, he's not going home today.

11  Q.   So he thought he had given enough information that he

12  could go home?

13  A.   I think he had felt he had cleared himself enough that he

14  could go home.

15       MS. BREWINGTON:  Nothing further.

16       THE COURT:  Brief redirect?

17       MS. GROOVER:  Yes, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MS. GROOVER:

20  Q.   Sir, as an investigator, your job is to interview people,

21  collect the facts; is that correct?

22  A.   That's correct.

23  Q.   And then you present the facts to the prosecuting

24  attorney; is that correct?

25  A.   That's correct.

421

1    Q.    Do you have any decision in the charging?

2    A.    I do not.

3    Q.    And do you have any decisions when somebody is sentenced

4    what their possible sentence?

5    A.    I do not.

6          MS. GROOVER:  Thank you.

7          THE COURT:  Any objection to this witness being excused?

8          MS. BREWINGTON:  No objection.

9          MS. GROOVER:  No, Your Honor.

10          THE COURT:  You may be excused.

11          THE WITNESS:  Thank you.

12          THE COURT:  Call your next witness.

13          MR. HOWARD:  Your Honor, the Government calls Stanley

14    Turner.

15                          STANLEY TURNER,

16    having been first duly sworn, was examined and testified as

17    follows:

18          THE CLERK:  Thank you.  You may be seated.  And if you

19    will please state your full name and spell your last name.

20          THE WITNESS:  Stanley Turner, T-u-r-n-e-r.

21          MR. HOWARD:  Your Honor, may I proceed?

22          THE COURT:  You may.

23                       DIRECT EXAMINATION

24    BY MR. HOWARD:

25    Q.    Sir, what do you do for a living?

422

1    A.    Remodeling, handyman stuff.

2    Q.    During the course of this investigation, you were charged

3    with selling firearms to an illegal alien; correct?

4    A.    Yes.

5    Q.    You pled guilty?

6    A.    Correct.

7    Q.    You entered into a plea agreement with the Government;

8    right?

9    A.    Correct.

10   Q.    If we could pull up Government's Exhibit 100.

11         Sir, looking at the first page of Government's Exhibit

12   100, do you recognize that document?

13   A.    Yes.

14   Q.    Is that the plea agreement that you entered into with the

15   Government?

16   A.    Yes.

17   Q.    Looking at Page 2 of that plea agreement, specifically the

18   first paragraph, did you make certain admissions in pleading

19   guilty?

20   A.    Yes.

21   Q.    And specifically did you admit to selling a .22-caliber

22   Micro-Might revolver to Juan Rangel-Rubio?

23   A.    Yes.

24   Q.    And as part of that plea agreement did you agree to

25   truthfully cooperate with the Government?

423

1    A.    Yes.

2    Q.    Were you sentenced to prison?

3    A.    Yes.

4    Q.    Did you serve your time?

5    A.    Yes.

6    Q.    Are you now out of prison?

7    A.    Yes.

8    Q.    Let's talk about those gun sales; okay?

9    A.    Okay.

10   Q.    How did you meet Juan?

11   A.    There's a Kroger and a store around the neighborhood I

12   lived in, and I met him in that general area around the Kroger.

13   Q.    What area are we talking about?

14   A.    It's called Sandfly.

15   Q.    So this is the Savannah area?

16   A.    Yes.

17   Q.    Were you living in a trailer parking on Ferguson?

18   A.    Yes.

19   Q.    So how did you come to sell Juan Rangel-Rubio guns?

20   A.    I got to see him frequently and just asked him if he

21   wanted to purchase some guns.

22   Q.    Tell me about what was going on in your life at the time.

23   A.    Oh, I was going to the methadone clinic.  I was, you know,

24   trying to survive.  I was out of work.

25   Q.    You were out of work?

424

1    A.    Right.

2    Q.    You needed money?

3    A.    Right.

4    Q.    Struggling with substance abuse?

5    A.    Correct.

6    Q.    Now, did you bring up guns when you spoke with Juan?

7    A.    Yes.

8    Q.    Did Juan say he would buy the guns?

9    A.    Yes.

10   Q.    Sitting here today, do you recall approximately how many

11   guns you sold to Juan?

12   A.    Four to six.

13   Q.    Did you sell him several .22-caliber handguns?

14   A.    Yes.

15   Q.    Do you speak Spanish, sir?

16   A.    No.

17   Q.    When you communicated with Juan, what language did you

18   communicate with him?

19   A.    English.

20   Q.    Where would you buy the guns that you sold him?

21   A.    At gun stores around the Savannah area.

22   Q.    And when you bought those guns, did you complete

23   paperwork?

24   A.    Yes.

25   Q.    If we could pull up Exhibit 101.  Looking at the first

425

1   page of Government's Exhibit 101, a document entitled "Firearms

2   Transaction Record," sir, do you recognize that document?

3   A.    Yes.

4   Q.    And do you recognize your information there?

5   A.    Yes.

6   Q.    Now, looking at Page 2, do you recognize your signature on

7   Page 2 of this exhibit?

8   A.    Yes.

9   Q.    And is this a form that would be filled out when you

10  purchased guns?

11  A.    Yes.

12  Q.    Looking specifically at Box 21A in the middle of that

13  document, does it say there that that document was submitted on

14  February 15th, 2014?

15  A.    Yes.

16  Q.    Looking at Page 3, does that show at the top of Page 3 two

17  firearms that you purchased?

18  A.    Yeah.

19  Q.    Specifically two Micro-Might .22-caliber revolvers?

20  A.    Correct.

21  Q.    Now, Mr. Turner, did you purchase those two revolvers for

22  yourself or did you purchase them to sell?

23  A.    To sell.

24  Q.    Did you ever work at Wolf Tree or Davey Tree, Mr. Turner?

25  A.    No, sir.

426

1   Q.   Did you ever work for a tree company at all?

2   A.   No.

3   Q.   Did you come to learn that your information was being used

4   as an employee of a tree company?

5   A.   Yes.

6   Q.   How did you come to learn that?

7   A.   At the time, I was struggling.  I was on the food stamp

8   program and they cut them off because they said I was working at

9   a tree company, a tree service company, which I never --

10  Q.   Was that news to you?

11  A.   Yes.

12  Q.   Why was that news to you that you were working at a tree

13  company?

14  A.   Because I've never worked for a tree company.

15  Q.   Did you have at one point certain identification documents

16  stolen from you?

17  A.   Yes, out of my vehicle in the trailer park.

18  Q.   Did you ever sell or give Juan your identification cards

19  to use?

20  A.   No.

21       MR. HOWARD:  I have no further questions for this

22  witness, Your Honor.

23       THE COURT:  Cross-examination, Ms. Brewington.

24                    CROSS-EXAMINATION

25  BY MS. BREWINGTON:

427

1    Q.    Mr. Turner, you're only here because of your plea

2    agreement told you you had to be here?

3    A.    I'm here because I got subpoenaed.

4    Q.    And your plea agreement said that you would testify?

5    A.    Yes, yes.

6    Q.    You bought many guns?

7    A.    Yes, ma'am.

8    Q.    And you sold many guns to many illegal aliens?

9    A.    Juan and possibly one, maybe.

10   Q.    Do you have any idea what they did with those guns after

11   you gave them to them?

12   A.    I have no clue, ma'am.

13   Q.    Did you ever see Juan shoot these guns?

14   A.    No.

15         MS. BREWINGTON:  No further questions.

16         THE COURT:  Any brief redirect?

17         MR. HOWARD:  No, Your Honor.

18         THE COURT:  Any objection to this witness being excused?

19         MR. HOWARD:  No, Your Honor.

20         MS. BREWINGTON:  No.

21         THE COURT:  You may step down, and you're excused.  All

22   right, call your next witness.

23         MS. GROOVER:  The United States calls Dr. Natasha

24   Grandhi to the stand.

25

428

1                          DR. NATASHA GRANDHI,

2    having been first duly sworn, was examined and testified as

3    follows:

4              THE CLERK:  Thank you.  You may be seated and if you

5    will please state your full name and spell your last name for

6    the record.

7              THE WITNESS:  My name is Natasha Grandhi, last name

8    spelled G-r-a-n-d-h-i.

9                          DIRECT EXAMINATION

10   BY MS. GROOVER:

11   Q.    Good afternoon.

12   A.    Good afternoon.

13   Q.    Are you licensed to practice medicine in the State of

14   Georgia?

15   A.    Yes, I am.

16   Q.    What is your academic background?

17   A.    I received my undergraduate degree from Youngstown State

18   University with a bachelor of combined sciences.  I then

19   completed four years of medical school at Northeast Ohio Medical

20   University followed by a four-year residency in anatomic and

21   clinical pathology at the University of Maryland Medical Center,

22   and after that, I completed a one-year fellowship in forensic

23   pathology at the office of the chief medical examiner for the

24   State of Maryland.

25   Q.    And are you a member of any professional organizations?

429

1    A.    I am currently a member of the American Academy of

2    Forensic Sciences, the National Association of Medical Examiners

3    and the College of American Pathologists.

4    Q.    And do you have a specialist?

5    A.    I practice the specialty of forensic pathology, which is a

6    subspecialty of the field of pathology.

7    Q.    And what is pathology and what is forensic pathology?

8    A.    Pathology is the branch of medicine that studies disease

9    processes and how those present within the body, so any time

10   that you go to the doctor and you have a biopsy or they take a

11   swab or do blood work and it goes to the lab, well, the

12   pathologist is the lab, and if there's something that's removed

13   at the time of surgery, the pathologist will do the dissection

14   of that tissue, will prepare slides to look at them under the

15   microscope and determine the type of disease, infectious

16   organism or other entity that may be present.

17        Forensic pathology is the subspecialty of that that

18   specifically focuses on trauma and how that presents in the body

19   and what those features may be.

20   Q.    Now, in addition to your license to practice medicine, do

21   you hold any licenses and other certifications?

22   A.    I am currently certified by the American Board of

23   Pathology in the fields of anatomic pathology and forensic

24   pathology.

25   Q.    And you mentioned your academic background.  Did you have

430

1  specific training in the areas of anatomic pathology and

2  forensic pathology that you have received?

3  A.    Yes, both in anatomic and forensic pathology.

4  Q.    And have you had the occasion to conduct research and

5  publish papers on topics pertinent to the field of forensic

6  pathology?

7  A.    Yes, I have.

8  Q.    Are you currently employed?

9  A.    I'm currently employed with the Georgia Bureau of

10  Investigations at the headquarters office in Decatur, Georgia.

11  Q.    And what are your duties?

12  A.    My duties as an associate medical examiner are to perform

13  autopsies to ultimately determine the cause and manner of death.

14  Q.    Can you tell us what is the process that's used to

15  determined whether an autopsy will be performed on an

16  individual?

17  A.    That is dictated by the Georgia Death Investigation Act,

18  and that is a legal -- I'm not quite sure the term but it's some

19  sort of legal entity that tells coroners the deaths that they

20  need to report or refer to the medical examiner's office.

21       From there we use certain criteria to determine whether or

22  not the case merits investigation and has forensic relevance, or

23  if an individual hasn't received care by a medical professional

24  in a certain period of time, then we need to look at them to see

25  if there anything of importance for either their family or a

431

1    public health perspective.

2    Q.    How long have you been an associate medical examiner with

3    GBI?

4    A.    Just over seven years.

5    Q.    Approximately how many autopsies have you performed in

6    your career?

7    A.    Approximately 2500.

8    Q.    Have you ever been qualified in a court as an expert in

9    the field of forensic pathology?

10    A.    Yes, I have.

11    Q.    How many times?

12    A.    Approximately 60.

13    Q.    And generally what courts?

14    A.    Within the states of Georgia and Maryland.

15          MS. GROOVER:  And at this time, Your Honor, the United

16    States would move The Court to qualify Dr. Grandhi as an expert

17    in the field of forensic pathology.

18          THE COURT:  Ms. Brewington, any voir dire regarding her

19    qualifications to so serve?

20          MS. BREWINGTON:  No, Judge.

21          THE COURT:  Ladies and gentlemen, when scientific,

22    technical or other specialized knowledge might be helpful, a

23    person who has special training or experience in that field is

24    allowed to state an opinion about the matter.

25          It doesn't mean you must accept the witness' opinion.

432

1   As with any other witness' testimony, you must decide for

2   yourself whether to rely upon it.  The witness has been

3   qualified as an expert in the field of forensic pathology.

4          Continue.

5          MS. GROOVER:  Thank you, Your Honor.

6    (By Ms. Groover)  Tell the jury what is an autopsy.

7   A.   An autopsy is a complete examination of an individual

8   after they have passed away.  It in its fullest sense requires a

9   head-to-toe examination of all of the organs.  We look at the

10  organs as they are positioned within the body and then do a

11  comprehensive dissection of them after we have removed them from

12  the body.  We note any natural disease process and in the

13  forensic setting we also note any trauma that may be identified.

14  Q.   So what generally is the purpose of performing the

15  autopsy?

16  A.   The ultimate purpose is to determine both the cause and

17  manner of death.

18  Q.   Can you tell us what is the difference between the cause

19  and manner of death.

20  A.   The cause of death is the underlying problem or the root

21  cause that starts the chain of events ultimately leading in the

22  death of the individual.  The manner of death is used for

23  epidemiology purposes and it categorizes how the death happened

24  to occur.  There are only five choices for manner of death.

25  Q.   And what are they?

433

1    A.    Natural deaths are ones that are the result of normal

2    disease processes or aging.  Accidental deaths are the result of

3    unforeseen circumstances, typically beyond the expectations of

4    normal everyday proceedings.  Suicide is death at one's own

5    hand.  Homicide is death at the hands of another, and

6    undetermined is the manner that we use when we need more

7    information to narrow it down amongst the four previous

8    categories or in certain cases of decomposed remains where

9    limited scientific information is available.

10    Q.    You mentioned that you had previously performed

11    approximately 2500 autopsies.  Did any of those include cases

12    where the manner of death was determined to be homicide?

13    A.    Approximately 350.

14    Q.    And also did you include cases, have you had cases

15    involving gunshot wounds?

16    A.    Approximately 500, I believe.

17    Q.    Not all gunshot wounds was the cause of death; is that

18    correct?

19    A.    Those would be cases where the gunshot wound was the cause

20    of death predominantly.

21    Q.    Okay, I see.  And on August the 21st, 2017, did you

22    perform an autopsy on Mr. Eluid Montoya?

23    A.    Yes, I did, and for future reference may I please refer to

24    my report?

25    Q.    Yes.  Did you prepare a report in this particular case?

434

1    A.    Yes, I did.

2    Q.    Will it help refresh your recollection when you testify

3    today?

4    A.    Yes, it would.

5    Q.    Yes, you may.  And where did you conduct your

6    investigation of Mr. Montoya?

7    A.    This examination was actually performed at the Savannah or

8    coastal regional office.

9    Q.    And how were you notified and selected to be medical

10   examiner in this particular case?

11   A.    At the time, the coastal regional office was short-staffed

12   with forensic pathologists, so the headquarters was on a

13   rotating basis providing coverage to the region.

14   Q.    Before you began your investigation, did you speak with

15   the investigative agent or law enforcement or anyone about Mr.

16   Montoya's body before you examined it?

17   A.    I don't recall if I spoke with them directly; however, one

18   of the things that we have prior to starting the autopsy is what

19   we call the ROME or the record of the medical examiner, and it's

20   a written narrative that is generated by one of our death

21   investigation specialists when the coroner calls to report the

22   case to them, so I did review the ROME prior to beginning the

23   examination.

24   Q.    What information did you learn about Mr. Montoya?

25   A.    At that time, it was reported that he was found

435

1   unresponsive outside of his vehicle, and he had what appeared to

2   be gunshots.

3   Q.    Did you have a photographer that was assisting you in

4   documenting your autopsy as you performed it?

5   A.    Yes, I did.

6   Q.    Were there approximately 87 slides or photographs that

7   were taken during the autopsy of Mr. Montoya?

8   A.    Approximately, yes.

9   Q.    And of those 87, have you identified approximately 16

10  photographs that best illustrate Mr. Montoya's injuries, the

11  items recovered from Mr. Montoya and your findings in this case?

12  A.    I believe when we had previously spoken it was

13  approximately 16; however, at this time I don't recall the exact

14  number.

15          MS. GROOVER:  Your Honor, may I approach the witness?

16          THE COURT:  You may.

17          MS. GROOVER:  If I could have just one moment, please,

18  Your Honor.

19  (By Ms. Groover)  Ma'am, I'm handing you a number of exhibits

20  for your reference during your testimony.  If you could please

21  identify, look at Exhibit 40, and take a moment to identify

22  Exhibit 40 and tell us what you're looking at in Exhibit 40.

23  A.    Exhibit 40 is a series of four images.  One is the sealed

24  plastic disaster bag commonly referred to as a body bag prior to

25  our opening the bag as well as three x-ray images that were

436

1    taken during the course of the examination.

2    Q.    And Exhibit 41, can you please review that.  Do you

3    recognize Exhibit 41?

4    A.    Exhibit 41 is seven photographs that were taken during the

5    course of the examination, documenting the injuries on Mr.

6    Montoya.

7    Q.    And Exhibit 42, could you please take a moment to identify

8    Exhibit 42.

9    A.    Exhibit 42 is one photograph depicting a projectile or

10   projectile fragments that were recovered from the left neck.

11   Q.    And Exhibit 44?

12   A.    You said 44; correct?

13   Q.    Correct.

14   A.    Exhibit 44 is a photograph showing the projectile fragment

15   recovered from the right frontal region of the head.

16   Q.    And Exhibit 46?

17   A.    Exhibit 46 is a photograph of the projectile fragment

18   recovered from the neck.

19   Q.    Exhibit 48, please.

20   A.    Exhibit 48 is a photograph of the projectile recovered

21   from the lower right chest.

22   Q.    And these are the photographs that were taken while you

23   performed the autopsy of Mr. Montoya?

24   A.    Correct, they are.

25            MS. GROOVER:  Your Honor, at this time we would seek

1    permission to publish these photographs but noting the graphic

2    nature as Dr. Grandhi just explained would like to make an

3    announcement to members of the gallery if they may not want to

4    see these photographs.

5         THE COURT:  Yes.  There are a few of the photographs

6    that are in that set that are about to be discussed are graphic

7    so anyone who doesn't wish to view those may want to either

8    leave the courtroom or avert their eyes.  Continue.

9         MS. GROOVER:  Thank you, Your Honor.

10   (By Ms. Groover)  Now before we get into the individual images,

11   can you please tell the jury a little bit about the standard

12   phases of the autopsy?

13   A.   The autopsy first starts, in this case, because we were

14   given the history that there were potential gunshots for Mr.

15   Montoya's body, one of our standard procedures is, prior to even

16   opening the body bag, we do full-body x-ray images to determine

17   if there are any retained projectiles or other items of a

18   metallic nature that may need to be recovered for evidentiary

19   purposes.

20        After those X rays are taken, the body is then moved into

21   the morgue.  We photograph the sealed bag showing the

22   individual's name as well as the case number for the Department

23   of Forensic Sciences so we can link the two of those

24   photographically.

25        We then proceed to open the bag and take a series of three

438

1    photographs, typically three photographs, documenting the body

2    as it is received without any additional manipulation by our

3    office.

4         At that time, if there are any items of evidence that we

5    can see on the body surfaces, we will go ahead and obtain those.

6    The individual's clothing and any personal effects that may be

7    there are documented, and then after I grant approval, the

8    individual is undressed and I do what we call the external

9    examination, which is a head-to-toe assessment looking at the

10   skin surfaces of the body, and at that time I'm documenting

11   features like scars, piercings, tattoos, other markings that may

12   be there that are unique to an individual, but some of the other

13   stuff that I document includes traumatic injuries, and

14   specifically in this case, there were some injuries that I did

15   need to document both within my report and photographically.

16   Q.    And that protocol would all apply to Mr. Montoya in this

17   particular case; correct?

18   A.    Yes, it did.

19   Q.    And sometimes are toxicology performed on individuals?

20   A.    Yes, sometimes toxicology is performed.  It depends on

21   each individual case and circumstances.

22   Q.    And can you tell the jury what is a toxicology report?

23   A.    Toxicology is an examination of a specimen which most

24   commonly is the blood but it can be fluid from the eye.  It can

25   be from the urine.  It can also be directly performed on tissues

439

1    to determine if there are any pharmacologic substances, so

2    things like medications that an individual takes, alcohol

3    consumption as well as any items of an illicit nature that may

4    be present within the blood.

5    Q.    Was toxicology performed on Mr. Montoya?

6    A.    Yes, it was.

7    Q.    And did it indicate anything?

8    A.    I -- I believe it was negative for both the alcohol and

9    complete toxicology panel.

10   Q.    When you examined the external body of Mr. Montoya, did

11   you see any evidence of defensive wounds on his body?

12   A.    Defensive wounds are a category of wounds, and it requires

13   that you have a pattern of injuries, typically present on your

14   hands, on the forearms, on the fronts of your legs, anywhere

15   where you can think of an individual placing their hands or legs

16   to try and protect or shield their body.

17        In the case of Mr. Montoya, there was a gunshot wound that

18   involved his right hand, so because it is in one of those

19   locations, it's possible that could represent a defensive

20   injury; however, I only have the one injury and that's not

21   enough to establish a pattern.

22   Q.    But he had a possible defensive wound on his finger?

23   A.    Yes, ma'am.

24   Q.    Now let's pull up Exhibit 40 to the jury, please, and can

25   you please tell them what exactly we are looking at?

440

1    A.    This is a photograph that shows the zippers of the plastic

2    disaster bag with Mr. Montoya's person inside, and you can see

3    that there is an L-shaped ruler with a GBI DOFS or Department of

4    Forensic Sciences' case number of 2017 and this on the left-hand

5    side of the image -- I apologize -- dash 6004418 as well as an

6    identification tag for Montoya Eluid.  I apologize if I

7    mispronounce that.

8    Q.    Eluid Montoya?

9    A.    Yes, ma'am.

10   Q.    Turning to Exhibit 40-2, can you please describe what is

11   depicted in this photograph.

12   A.    This is a portion of the full-body X ray that was taken,

13   and for orientation, this would be as if you were looking at Mr.

14   Montoya face to face, so on the left-hand side of your screen is

15   actually the right side of Mr. Montoya's person, and the items

16   that are important to note are at the top of the screen the

17   bright white section within his head approximately at this level

18   represents one projectile.

19        In the area of his left jaw, there is another bright white

20   section.  The area of the teeth shows some restorations or

21   dental changes that may have been there from visiting a dentist

22   as well as there appears to be another fragment present, and

23   then in the right side just below the shoulder, there is a

24   projectile that's recovered right at the edge of the torso or at

25   the edge of the chest, and then there was a small fragment on

441

1  the left shoulder region.  However -- yeah.  That arrow

2  autopopulated on there.

3  Q.   It's a touch screen, so if it will help you in describing

4  the photograph to the jury, you can draw on it and then we can

5  clear it.

6  A.   Would you like me to go over those again?  I didn't

7  realize it was a touch screen at first.

8  Q.   I don't believe so.

9       Now Exhibit 42, excuse me, 40-3, can you please describe

10  to the jury what are we looking at in 40-3?

11  A.   These are two images that were taken, and this time you're

12  looking at Mr. Montoya from the side of his body, and it helps

13  us try and put those two-dimensional images into a

14  three-dimensional relation when compared to the previous images,

15  so you can see that the projectile that was at the top of the

16  head appears to actually be in the top front of the head.

17       Additionally, there's a projectile that was about there in

18  the neck.  There's -- I guess I covered up a little bit of it

19  on -- in the neck area, but if we go to the lower image, there

20  are more fragments present as well as the one that was in the

21  right side of the chest.

22  Q.   And turning to Exhibit 42, no, excuse me, 41, 41-1, can

23  you please describe to the jury what are we looking at in

24  Exhibit 41-1?

25  A.   This is a photograph of the left side of the neck.  For

442

1  orientation, the head is at the left side of the screen and this

2  is Mr. Montoya face down.

3        So it's actually approximately here on Mr. Montoya's

4  person, and to facilitate examination, I had to shave the hair,

5  which is why there is a strange distribution of hair, but within

6  the vertex area of the L-shaped ruler there is an ovoid area of

7  defect with an abrasion or a scrape around the outside of that

8  and that is a gunshot entrance wound.

9  Q.    Exhibit 41-2, if you could please tell the jury what are

10  we looking at in 41-2?

11  A.    The important item here is on the right side of the lower

12  lip.  There appears to be a semicircular brown-red defect, and

13  that is a gunshot entrance wound to the mouth, and also there's

14  a lot of polka-dot-like red scratches or abrasions that are

15  present on the chin and the left cheek that are visible in this

16  photograph.

17  Q.    What if anything did that indicate to you?

18  A.    In this case, when we took a closer look on the left side

19  of the cheek and chin region, we actually found small bit of

20  green metal and yellow metal consistent with projectile

21  fragments, so we termed in pseudostippling.  It's a pattern of

22  injuries that looks like it can help with range of fire

23  determination or stippling, but because it's due to

24  fragmentation of another thing, in this case, the projectile, we

25  call it pseudostippling or fake stippling.

443

1    Q.    And Exhibit 41-3, is this a closer image of the gunshot

2    wound to the mouth?

3    A.    Yes, it is, and this image shows the lower lip as it has

4    been pulled down and you can see the gunshot entrance wound as

5    it tracks along the right side of the lower lip, and looking at

6    the teeth, you can see that it actually fractured the mandible

7    as well and knocked out teeth during the process.

8    Q.    Exhibit 41-4, can you please tell the jury what we are

9    looking at?

10   A.    For orientation, Mr. Montoya's head is in the lower left

11   corner of the screen.  He is face down, so the gloved hand is

12   over his left shoulder and we are looking approximately here on

13   his body, and this is a gunshot graze wound that is present on

14   the left shoulder.

15   Q.    What is a graze wound?

16   A.    A graze wound is when the projectile tracks along the

17   surface of the skin and just injures the surface of the skin,

18   the subcutaneous tissues, so the tissues underneath the skin,

19   but it doesn't actually create a hole with a path that's

20   tunneled through the surface.  It's just skimming along the top.

21   Q.    And Exhibit 41-5, can you please tell the jury what are we

22   looking at in 41-5?

23   A.    Again for orientation, Mr. Montoya's head is at the left

24   side of the screen and he is face down.  The ruler is held over

25   his left shoulder and the notable features are these two defects

444

1   on the left side of his back that both are gunshot entrance

2   wounds.

3   Q.    And is there anything about his skin that appears unusual?

4   A.    There is skin slippage, and that is a decompositional

5   change, so after the body passes away, there are some

6   post-mortem changes that occur and one of those is that the

7   skin, when exposed to heat or high ambient temperatures like the

8   ground, what-have-you, it can kind of separate like a

9   superficial burn, but in this case, it is as a result of him

10  passing away, not trauma induced.

11  Q.    And Exhibit 41-6?

12  A.    This is a closer-up photograph with the same orientation

13  as the previous photo showing the two gunshot entrance wounds on

14  the left side of the back.

15  Q.    Exhibit 41-7?

16  A.    This is a photograph of Mr. Montoya's right hand.

17  Specifically we are focused on the back of the right index

18  finger, and there is a gunshot wound that is visible in the

19  center of the screen.

20  Q.    Is this the photograph of what you described as a possible

21  defensive wound but without the pattern?

22  A.    Yes, ma'am.

23  Q.    Exhibit 42, if you could please pull Exhibit 42.  That may

24  be in the envelope in front of you, in the yellow envelope in

25  front of your screen.  Oh.  Excuse me.  42 is a photograph.  If

445

1    we could pull 42 up on the screen and if you could identify

2    that.

3    A.    So 42 is a photograph of the projectile recovered from the

4    left side of Mr. Montoya's neck.

5    Q.    And Exhibit 43, that should be in the yellow envelope in

6    front of you, I apologize.  If you could please pull Exhibit 43

7    and identify that for us.

8    A.    Exhibit 43 is the evidence collection box that has the

9    matching label with front left neck that was in Photograph 42 --

10    the photograph that's up right now, 42, yes.

11    Q.    So Exhibit 43, that is the actual metal-jacketed bullet

12    and fragment that was removed from his left neck?

13    A.    Correct.

14    Q.    Are you able to determine the direction of travel this

15    bullet and fragment went through my left body?

16    A.    Yes, I am.  Let me refer to my report to make sure that

17    I'm saying it accurately.  The projectile passed through his

18    body from his back to front, his left to right and mostly

19    upward.

20    Q.    What effect did that bullet or fragment have on Mr.

21    Montoya?

22    A.    This projectile injured the skull and the brain and was

23    associated with bleeding on the surface of the brain.

24    Q.    Would this be considered a fatal injury?

25    A.    In and of itself, yes, this would be consistent with a

446

1    fatal injury.

2    Q.    Exhibit 44, if we could please take a look at Exhibit 44,

3    please.  Can you please describe to the jury what's on the

4    screen, what is Exhibit 44?

5    A.    This is a photograph of the fragment recovered from the

6    right frontal portion of Mr. Montoya's head.

7    Q.    And Exhibit 45 -- that should be in the envelope in front

8    of you -- could you please identify Exhibit 45?

9    A.    Exhibit 45 is the matching projectile for this photograph.

10   Q.    And are you able to -- is this the actual metal-jacketed

11   bullet that was recovered from Mr. Montoya?

12   A.    It appears to be.

13   Q.    And are you able to determine the direction of travel this

14   bullet traveled as it went through Mr. Montoya's body?

15   A.    Yes.  It went from his right to left and upward through

16   his body.  This is the projectile that entered on the lip.  It

17   passed up through the hard palate or the hard part of the roof

18   of your mouth up through the skull and then up into the front of

19   the brain.

20   Q.    Was this a fatal wound?

21   A.    In and of itself, yes, it could be fatal.

22   Q.    And Exhibit 46, please, on your screen, can you please

23   identify what we are looking at in Exhibit 46?

24   A.    This is the projectile recovered from the neck.

25   Q.    A photograph of it?

447

1    A.    Yes.

2    Q.    And Exhibit 47, could you please pull that out of the

3    yellow envelope.

4    A.    Exhibit 47 is the projectile that corresponds with this

5    photograph.

6    Q.    The projectile recovered from the neck of Mr. Montoya?

7    A.    Yes, it was.

8    Q.    And are you able to determine the direction of travel that

9    this bullet and fragment went through Mr. Montoya's body?

10    A.    This projectile passed from his back to front, his left to

11    right and upward.

12    Q.    And what effect were you able to determine that this had

13    on Mr. Montoya's body?

14    A.    This projectile is associated with one of the gunshot

15    wounds to the left side of Mr. Montoya's back.  It passed

16    through his skin, his soft tissues.  It fractured some of the

17    ribs in the chest wall, and it injured his left lung.  It was

18    associated with bleeding in the space between the left lung and

19    the chest wall.

20    Q.    And what effect did this have on Mr. Montoya's body?

21    Would this have been fatal?

22    A.    It would have allowed him to be bleeding into a space that

23    he should not be bleeding into.  It could have prohibited him

24    from breathing as he normally would have, and without rapid

25    medical intervention, this is a potentially fatal wound.

448

1    Q.    Exhibit 48, could you please identify what are we looking

2    at on the screen in Exhibit 48?

3    A.    This is a photograph of the projectile that was recovered

4    from the right lower chest.

5    Q.    And Exhibit 49.  It should be in the envelope.

6    A.    49 is the projectile that corresponds with this

7    photograph.

8    Q.    And was this actually recovered from the lower right of

9    neck of Mr. Montoya?

10   A.    From the lower right side of the chest of Mr. Montoya.

11   Q.    Thank you.  Were you able to determine the direction of

12   travel this bullet fragment went through Mr. Montoya's body?

13   A.    This passed from his back to front, left to right and

14   upward.

15   Q.    And what effect would this have on Mr. Montoya's body?

16   A.    This is, again, a projectile that was recovered from the

17   two gunshot entrance wounds on the left side of Mr. Montoya's

18   chest.  This pathway injured the skin, soft tissues, the chest

19   wall, so again the ribs and the muscles as well as both lungs in

20   this case and was associated with bleeding in the space between

21   each lung and the surrounding chest wall.

22   Q.    And what effect would that have had on Mr. Montoya?

23   A.    Again, it would have had an impact on his ability to

24   breathe like normal, and it would have allowed or it would have

25   been associated with bleeding in a space where you should not

449

1    have blood.

2    Q.    And Exhibit 50 on your screen, can you please tell the

3    jury what we are looking at in Exhibit 50?

4    A.    This is a photograph showing some of the small projectile

5    fragments that were recovered from the little pinpoint abrasions

6    or scrapes that were present on the cheek and the chin of Mr.

7    Montoya's face.

8    Q.    Exhibit 51 should be the last of the envelopes, the

9    exhibits in the envelope, if you could please identify that?

10   A.    These are the very small fragments that correspond with

11   the photograph.

12   Q.    These were pulled out of Mr. Montoya's body?

13   A.    Yes, from the face.

14   Q.    When you finished your overall assessment of Mr. Montoya,

15   did you form an expert opinion concerning what caused Mr.

16   Montoya's death?

17   A.    Yes.  The cause of death was listed as multiple gunshot

18   wounds.

19   Q.    And what in your expert opinion was the -- excuse me, was

20   the manner of Mr. Montoya's death?

21   A.    The manner of death was ruled homicide.

22   Q.    Exhibit 52, please.  Is this Mr. Montoya's death

23   certificate?

24   A.    This appears to be a death certificate for a Mr. Montoya

25   Arcos.  It's a little blurry.

450

1  Q.   And is this also consistent with your expert opinion and

2  findings that the manner of death was homicide?

3  A.   Yes.

4         MS. GROOVER:  Thank you, Your Honor.  I have no further

5  questions.

6         THE COURT:  Cross-examination, Ms. Brewington.

7         MS. BREWINGTON:  No questions, Judge.

8         THE COURT:  Any opposition to this witness being

9  excused?

10         MS. BREWINGTON:  None.

11         MS. GROOVER:  No, Your Honor.

12         THE COURT:  You may step down.  Thank you, Doctor.

13  You're excused.

14         THE WITNESS:  Should I leave all this here?

15         THE COURT:  If you will leave it there, we will collect

16  it.

17         Mr. Howard, call your next witness.

18         MR. HOWARD:  Your Honor, the Government calls Kevin

19  Rippman.

20         Your Honor, while Mr. Rippman is coming up, can I

21  retrieve the evidence?

22         THE COURT:  You may.  Thank you.

23                         KEVIN RIPPMAN,

24  having been first duly sworn, was examined and testified as

25  follows:

451

1          THE CLERK:  Thank you.  You may be seated.

2          THE WITNESS:  Thank you.

3          THE CLERK:  And if you will please state your full name,

4    spell your last, state your occupation and your business

5    address.

6          THE WITNESS:  My name is Kevin Rippman, R-i-p-p-m-a-n.

7    I work for the Bureau of Alcohol, Tobacco, Firearms and

8    Explosives in Atlanta, Georgia.

9          MR. HOWARD:  Your Honor, may I proceed?

10          THE COURT:  Yes.

11                         DIRECT EXAMINATION

12    BY MR. HOWARD:

13    Q.    Sir, what's your job title?

14    A.    I'm a firearm and toolmark examiner with the ATF.

15    Q.    What are your job duties?

16    A.    Firearm examination is essentially where we examine

17    bullets and cartridge cases and try to determine if they are

18    fired from a particular firearm.  We also do toolmark analysis

19    where we examine tools to determine if certain marks left behind

20    were made by specific tools or serial number restoration where

21    we can restore serial numbers that have been obliterated from

22    items.

23    Q.    Do you ever report your findings and testify in court when

24    requested to do so?

25    A.    I do.

452

1    Q.    How long have you been employed with the ATF?

2    A.    With the ATF, it's just been under three years.

3    Q.    Before ATF what did you do?

4    A.    I was a firearm and toolmark examiner with the Georgia

5    Bureau of Investigation.

6    Q.    For how long?

7    A.    Just under nine years with the GBI.

8    Q.    What's your educational background?

9    A.    Received a bachelor's in applied physics from Armstrong

10   Atlantic State University.

11   Q.    What training did you receive to become a firearms and

12   toolmark examiner?

13   A.    Once hired on by the GBI, I underwent an 18-month training

14   program provided by both the Georgia Bureau of Investigation and

15   the National Forensic Science Technology Center.

16   Q.    Have you -- I'm sorry, go ahead.

17   A.    Since then I've attended numerous weapon and ammunition

18   manufacturing plant tours, been trained as an armor for a number

19   of weapon manufacturers.

20   Q.    And have you previously testified as an expert in firearms

21   and toolmarks examination?

22   A.    I have.

23   Q.    Approximately how many times?

24   A.    I don't have an exact count on that but I estimate between

25   70 and a hundred times.

453

1   Q.   In courts throughout Georgia?

2   A.   That's correct.

3        MR. HOWARD:  Your Honor, at this time the Government

4   would move to qualify Kevin Rippman as an expert in the analysis

5   of firearms and toolmarks examination.

6        THE COURT:  Ms. Brewington, any voir dire with regard to

7   qualifications?

8        MS. BREWINGTON:  No, Judge.

9        THE COURT:  Ladies and gentlemen of the jury, Mr.

10  Rippman has been qualified as an expert in the field of firearm

11  and toolmark analysis.  You will recall my explanation to you

12  regarding expert witnesses.  Proceed.

13  Q.   (By Mr. Howard)  Sir, what is toolmark identification?

14  A.   Simply put, when a -- when two objects come into contact

15  with each other, the harder of the two objects will leave marks

16  on the softer of the two objects.  That's the entire theory

17  behind toolmark examination.

18  Q.   What makes toolmark identification possible?

19  A.   During the manufacturing process of tools, microscopic

20  imperfections are left behind on those tools, so then when two

21  objects come into contact, the tool will leave those microscopic

22  imperfections behind when they interact with the softer of the

23  two objects.

24  Q.   So a firearm is a specialized type of tool?

25  A.   Firearm is essentially just a fancy tool, yes.

454

1    Q.    Are there different components to ammunition?

2    A.    There are.

3    Q.    Did you bring along a demonstrative that shows the

4    different components of ammunition?

5    A.    I did.

6    Q.    Can you please go through that demonstrative?

7    A.    This is a demonstrative or just a blown-up example of a

8    single unit of ammunition, what's called a cartridge.  That's

9    made up of four components.  The first would be a primer or

10   initaizer -- initiator down at the bottom.

11       When the trigger is pulled on a firearm, the hammer or

12   firing pin interacts with the base of that cartridge.  What that

13   does is create a spark.  That spark ignites what would be

14   inside.  In this demonstrative, it's not there.

15       Inside you would have gunpowder.  That spark ignites the

16   gunpowder.  As the gunpowder burns, it turns into a gas which

17   forces our next component, the bullet, down the barrel.  The

18   final component is this brown wraparound.  That's called the

19   cartridge case, and it essentially holds all the other

20   components together.

21   Q.    And all that happens when a firearm fires a round of

22   ammunition?

23   A.    That's correct.  When the trigger is pulled and the

24   cartridge is fired, that's how those components interact.

25   Q.    When a firearm is a revolver, what happens specifically

1   with the casing?

2   A.    So a revolver is a hand-held firearm.  It's a pistol.

3   However, what it has is a rotating cylinder, so the cartridges

4   are loaded into the cylinder.  When the trigger is pulled, the

5   cylinder rotates or revolves, hence revolver.  It will revolve

6   that cartridge into line with the firing pin or hammer and

7   barrel.  The trigger is pulled, then ignites, bullet is forced

8   down the barrel.  The cartridge cases remain within the cylinder

9   typically in regards to a revolver.  They are not ejected from

10  that firearm until you manually remove them.

11  Q.    How specifically are toolmarks imparted onto the surface

12  of a bullet as it's being fired by a firearm?

13  A.    So again we mentioned the whole theory of toolmarks is

14  that the harder of the two objects leaves marks on the softer.

15  Well, a barrel is a hardened component interacting with a bullet

16  that may be a variety of materials, copper, lead, brass, but as

17  that bullet is traveling down the barrel, barrels have rifling

18  or spiral grooves cut or impressed into them.  The whole point

19  is so when the bullet interacts with the rifling, it begins to

20  twist.

21        Think of a quarterback throwing a football.  You want the

22  football to rotate to stabilize in flight.  For the same reason,

23  the bullet interacts, those what we call lands and grooves, that

24  rifling, to impart the twist on the bullet.

25        Now, as it's traveling down, those microscopic

456

1    imperfections within the barrel are leaving striations on the

2    side of that bullet.  Those striations are what I'm able to

3    examine.

4    Q.    How are comparisons performed with regard to bullets?

5    A.    We use what's called a comparison microscope.  It allows

6    me to put two objects side by side, similar lighting and

7    magnification, to examine them, so if I had two cartridge cases,

8    for instance, I would put one on the right, one on the left, and

9    I could use that microscope to examine those microscopic

10   imperfections.

11   Q.    Specific to this case, were you sent several bullets to

12   analyze?

13   A.    I did.

14   Q.    How did you receive those items?

15   A.    I received those from the GBI medical examiner's office.

16        MR. HOWARD:  Your Honor, may I approach?

17        THE COURT:  You may.

18   (By Mr. Howard)  Sir, I've handed you Government's Exhibit 43,

19   45 and 49, those being three bullets.  Do you recognize those?

20   A.    Yes, I do.

21   Q.    What are those?

22   A.    These are three .22-caliber bullets that I examined.

23   Q.    And how can you tell that you examined those bullets?

24   A.    The packaging has the GBI case number, the GBI item number

25   as well as my initials on the seal when I sealed it when I was

457

1    done with my analysis.

2    Q.    How did you examine them?

3    A.    We examined these using the comparison microscope as well.

4    Q.    Now from your examination, were you able to determine

5    those bullets' design and caliber?

6    A.    Yes, I determined that those were .22-caliber metal-

7    jacketed bullets.

8    Q.    What does metal-jacketed mean?

9    A.    Go back to our demonstrative.  I mentioned the bullet can

10   have a variety of materials.  Metal-jacketed typically means a

11   lead core, so the internals would be filled with lead for

12   weight, the outside jacketed.  Much like wearing a jacket, it

13   has a copper coating around that lead.

14   Q.    Were you able to determine whether the bullets that are in

15   Government's Exhibit 43, 45 and 49, whether those bullets were

16   fired from the same firearm?

17   A.    Yes, I was.

18   Q.    How were you able to make that determination?

19   A.    We mentioned the comparison microscope, the side-by-side

20   comparison.  We were able to put these up side by side and

21   compare those microscopic striations from when these bullets

22   traveled down a barrel.  It's examining those that I am able to

23   come to my conclusion.

24   Q.    And what is your opinion as to whether those bullets were

25   fired from the same firearm?

458

1   A.    My opinion is that Government's 43 and 45 and 49 were

2   fired from the same firearm.

3   Q.    Now, sir, were you able to determine the exact firearm

4   that fired those bullets?

5   A.    No.    Through the course of my analysis, I was not able to

6   determine which firearm those bullets were fired from.

7   Q.    To determine the exact firearm that fired those bullets,

8   what would you need?

9   A.    I would need the firearm that fired them.

10  Q.    Now, did law enforcement provide you with weapons seized

11  in this case to see if you could determine which gun fired the

12  bullets recovered from Mr. Montoya's body?

13  A.    I did receive firearms for comparison against this

14  evidence.

15  Q.    And did you test the firearms that you received to make a

16  determination?

17  A.    I did.

18  Q.    What was your determination as to those firearms you

19  tested?

20  A.    Of the firearms I received, Government's Exhibit 43, 45

21  and 49 were not fired from them.

22  Q.    So all of the firearms that you were provided you were

23  able to determine none of those fired those bullets; is that

24  right?

25  A.    Correct.    It was my opinion that these bullets were not

459

1   fired from the submitted firearms.

2   Q.    If we could pull up Government's Exhibit 101 and

3   specifically Page 3 of that.  And if we could zoom in on the top

4   third of that page.

5        Now, sir, looking at the top of that page, there are two

6   firearms listed.  The first is a Micro-Might .22-caliber

7   revolver with the initials LR after it.  Do you see that?

8   A.    I do.

9   Q.    And specifically I will circle what I'm referencing.  What

10  does LR refer to?

11  A.    Now this is not something I examined in the analysis of my

12  casework.  However, looking at this, my understanding of 22LR

13  typically would be long rifle.  It is a caliber, .22 long rifle.

14  Q.    And is that different than a Magnum?

15  A.    .22 Magnum also is a caliber and .22 long rifle and .22

16  Magnum are different calibers, yes.

17  Q.    How are they different?

18  A.    There's a number of differences.  .22 Magnum is a longer

19  cartridge than the .22 long rifle.  It has more gunpowder in it.

20  The bullets have variations as well.  Typically a .22 Magnum has

21  a metal-jacketed bullet.  Typically a .22 long rifle is a lead

22  bullet.

23  Q.    Now looking at that first firearm listed on the screen in

24  front of you, did you receive and test a Micro-Might .22-caliber

25  revolver with a long rifle cylinder with a serial number ending

460

1  1281?

2  A.    If I may refer to my report?

3  Q.    Yes.

4  A.    I did receive a Micro-Might with a .22 long rifle cylinder

5  with serial number 1281.

6  Q.    And what if any determination did you make whether that

7  firearm was the one that fired the bullets that are before you?

8  A.    It was my opinion that Government's 43, 45 and 49 were not

9  fired from that firearm.

10  Q.    I want to direct your attention to the second firearm

11  listed in Government's Exhibit 101, specifically a firearm with

12  the model MM-22M, and the make being a Micro-Might.  Do you see

13  that?

14  A.    I do.

15  Q.    Are you familiar with the letter M following a model

16  number?

17  A.    I am.

18  Q.    And what, based on your training or experience, what

19  typically does that refer to?

20  A.    22M in this case, based on a conversation I had with the

21  manufacturer of Micro-Might firearm, my understanding is .22

22  Magnum.  In other words, the cylinder within the Micro-Might is

23  a Magnum-caliber cylinder.

24  Q.    And indeed staying on that same row, if we look to the

25  right, does it say 22 MAG under the column "caliber or gauge"?

461

1    A.    I do see that, yes.

2    Q.    Indicating to you what?

3    A.    That indicates to me the way that is written that it's a

4    .22 Magnum caliber.

5    Q.    Now, sir, did you examine a Micro-Might .22-caliber

6    revolver with a Magnum cylinder?

7    A.    I did not.  The Micro-Might I had had a .22 long rifle

8    cylinder.

9    Q.    Correct.  And the Micro-Might that you received is

10   consistent with what is listed in the first row of that page;

11   correct?

12   A.    It does appear to be, yes.

13   Q.    But you did not receive a Micro-Might consistent with what

14   is in the second row of that page, did you?

15   A.    I did not.

16   Q.    Are you able to say whether it's possible that the bullets

17   in Exhibits 43, 45 and 49 were fired from the .22-caliber

18   Micro-Might revolver with a Magnum cylinder listed there?

19         MS. BREWINGTON:  Judge, it's speculation.

20         THE COURT:  He asked if it were possible -- overruled.

21   Answer to the extent that you can.

22         THE WITNESS:  Yes, Your Honor.  My answer would be it's

23   possible.  I would need that firearm to make a exact

24   determination.

25    (By Mr. Howard)  You would need that specific firearm; correct?

462

1   A.    That's correct.

2   Q.    And having that specific firearm, then you would be able

3   to say whether that's the gun that fired those bullets or not;

4   is that right?

5   A.    Correct, I would render a conclusion at that time.

6   Q.    But you were not provided with that specific gun, were

7   you?

8   A.    No, I was not.

9   Q.    Let's talk about ammunition.  Were you provided a box of

10   ammunition to analyze as well?

11   A.    Yes, I was.

12        MR. HOWARD:  Your Honor, may I approach?

13        THE COURT:  You may.

14   (By Mr. Howard)  I've handed you Government's Exhibit 28.  Do

15   you recognize that?

16   A.    I do recognize Government's Exhibit 28.

17   Q.    What is that?

18   A.    This is a box of .22 Magnum ammunition that I received.

19   Q.    If we could pull up Government's Exhibit 27.  While we're

20   pulling up Government's Exhibit 27, how do you recognize

21   specifically the box of ammunition that you're holding in your

22   hands right now in Exhibit 28?

23   A.    In a similar manner, the GBI case number, item number and

24   the seal with my initials on it.

25   Q.    Now looking at the screen in front of you, do you

463

1    recognize the photograph that's Government's Exhibit 27?

2    A.    It appears to be what I'm holding in my hand, Government's

3    Exhibit 28.

4    Q.    All right, if we could zoom in on the box of ammunition.

5    Sir, let's walk through this box of ammunition.  Specifically

6    there, it says 22WMRHP.  Are you familiar with those letters?

7    A.    I am.

8    Q.    What does that mean?

9    A.    My understanding of that is that it is a .22 Winchester

10   Magnum rim fire, what's more commonly known as .22 Magnum as

11   I've been referring to it, and HP being hollow point.

12   Q.    Specifically it says there jacketed hollow point.  What

13   does "jacketed hollow point" mean?

14   A.    Again, going back to our demonstrative, essentially the

15   bullet has a metal jacket around a core of some sort.

16   Q.    And when it's talking about jacketed, what does that mean?

17   A.    So you could have, say, a solid metal bullet, a solid

18   copper bullet.  That would be solid copper all the way through.

19   Jacketed means that it is the outer surface is metal.  The

20   internal surface would be another material, lead or zinc or

21   whatever it may be.

22   Q.    Now, were you asked to compare the ammunition found in the

23   box of ammunition that you're holding with the bullets in

24   Exhibits 43, 45 and 49?

25   A.    I was asked to examine 43, 45 and 49 to see if they were

464

1    similar as the bullet design within Government's Exhibit 28.

2    Q.    How did you make that comparison?

3    A.    I made a -- pulled a sample from Government's 28, fired

4    that in a lab reference firearm so that I could get the bullet

5    out of the cartridge and then did a side-by-side comparison with

6    State's 43, 45 and 49 to determine if they had similar design

7    characteristics.

8    Q.    So you did a test fire basically?

9    A.    From Government's Exhibit 28, yes.

10   Q.    And is the test-fired bullet in a small manila envelope in

11   Exhibit 28?

12   A.    I can't open the envelope, but, yes, I do believe it is.

13   Q.    In making the comparison, did you use the test-fired

14   bullet from that box of .22-caliber metal-jacketed hollow-point

15   bullets?

16   A.    I did.

17   Q.    And did you compare it to the metal-jacketed bullets from

18   the GBI's medical examiner that you received?

19   A.    Yes, to Government's Exhibit 43, 45 and 49.

20   Q.    Were they consistent?

21   A.    Yes.  They were consistent in caliber and design

22   characteristics, the bullet from Government's Exhibit 28.

23   Q.    Were they consistent in being hollow point?

24   A.    Yes.

25   Q.    Are they consistent in being .22 caliber?

465

1   A.   Yes.

2   Q.   Are they consistent in being metal-jacketed?

3   A.   Yes.

4   Q.   The bullet that you received from the GBI examiner, when

5   compared to that box of ammunition, those design characteristics

6   are consistent; is that right?

7   A.   The design characteristics from the medical examiner

8   bullets were consistent with the test fire I made from

9   Government's Exhibit 28, yes.

10       MR. HOWARD:   I have no further questions for this

11   witness, Your Honor.

12       THE COURT:   Ms. Brewington, cross-examination.

13       MS. BREWINGTON:   Thank you, Judge.

14                    CROSS-EXAMINATION

15   BY MS. BREWINGTON:

16   Q.   Mr. Rippman, .22 bullets are pretty common?

17   A.   Yes, .22 ammunition is a relatively common caliber.

18   Q.   As well .22 Magnum?

19   A.   .22 Magnum is also a common caliber, yes.

20   Q.   .22 Magnum hollow point are common?

21   A.   Yes, those are also common.

22   Q.   We could probably go to any gun store within a hundred-

23   mile radius and buy these type of bullets?

24   A.   I don't know that I would say any gun store, but I

25   wouldn't be surprised to be able to buy .22-caliber Magnum

466

1   ammunition at a gun store.

2   Q.    The .22 Magnum gun, are you familiar with that?

3   A.    Which gun?

4   Q.    The second gun on the list that Mr. Howard showed you, the

5   .22 Magnum.  Are you familiar with those guns?

6   A.    I'm familiar with that manufacturer.  Now I have not

7   examined that firearm so I'm not familiar with that specific

8   firearm.

9   Q.    .22 Magnums are pretty common guns?

10  A.    It's not an uncommon firearm.

11  Q.    Did you only check the striations of the projectiles?

12  A.    When examining State's 43, 45 and 49, I am examining those

13  striations to make a determination on whether they were fired

14  from the same firearm.  When comparing those bullets to State's

15  28, the test-fired bullet I made, I'm not examining striations.

16  Instead there I'm just looking at the overall manufactured

17  design characteristics of it.

18  Q.    Would your job be to check for fingerprints?

19  A.    No.

20  Q.    Would your job be to check for DNA?

21  A.    No.

22  Q.    Were you asked to send them off to anybody else to check

23  for those?

24  A.    No.  Typically firearms comes at the end, so more often

25  than not, DNA and fingerprints, if they are going to be done,

467

1    they have already been done by the time I get the components.

2            MS. BREWINGTON:  Nothing further.

3            THE COURT:  Any brief redirect?

4            MR. HOWARD:  No, Your Honor.

5            THE COURT:  Any objection to this witness being excused?

6            MR. HOWARD:  No, Your Honor.

7            THE COURT:  You may be excused.  Thank you.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Ladies and gentlemen, it is just about on

10   the dot five o'clock and you've had a full day, so at this point

11   we will break for the evening.

12           We will do as we did today and start promptly at 9:00

13   a.m.  Remember the familiar admonition as you leave the

14   courthouse.  Don't discuss the case with anybody.  Don't make up

15   your mind.  Don't consume any media about the case and don't do

16   any independent research.

17           With that, let's rise for this jury.

18           (The jury exits the courtroom.)

19           THE COURT:  Counsel, let me just compliment both sides

20   on very crisp yet effective directs and cross of all the

21   witnesses.  I think we're progressing at a pace where we may

22   conclude tomorrow.  It's my understanding that although you only

23   have three witnesses, they may be on the long side of things,

24   but, nevertheless, I believe we may complete the case tomorrow.

25           And, again, without holding you to it, is that correct,

468

1    you have approximately three more witnesses for tomorrow?

2         MS. GROOVER:  Three or four witnesses, and one would be

3    a little longer, Your Honor.

4         THE COURT:  And three will be not very long?

5         MS. GROOVER:  Yes.

6         THE COURT:  And by all means, without holding you to it,

7    at this point, do you imagine presenting any evidence?

8         MS. BREWINGTON:  I don't know, Judge.

9         THE COURT:  All right, that's fine.

10        All right, then counsel, we will be in recess until nine

11   o'clock tomorrow.

12        (Proceeding concluded at 5:03 p.m.)

13                        CERTIFICATION

14

15        I certify that the foregoing is a true and correct

16   transcript of the stenographic record of the above-mentioned

17   matter.

18

19

21   _____        11/17/2022

22   Debra Gilbert, Court Reporter          Date

23

24

25