469

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA              )
                                      )
        v.                            )
                                      )          CASE NO.
JUAN RANGEL-RUBIO,                    )    4:18-CR-274-LGW-CLR-2
                                      )
_____Defendant._____ )




                        JURY TRIAL
            BEFORE THE HONORABLE LISA GODBEY WOOD
                October 27, 2022; 9:06 a.m.
                    Brunswick, Georgia
APPEARANCES:

For the Government:          TANIA D. GROOVER, Esq.
                            CHRISTOPHER HOWARD, Esq.
                            U. S. Attorney's Office
                            P. O. Box 8970
                            Savannah, Georgia  31412
                            (912) 201-2552
                            tania.groover@usdoj.gov
                            christopher.howard@usdoj.gov


For the Defendant:          KATIE A. BREWINGTON, Esq.
                            The Brewington Law Firm, LLC
                            P. O. Box 11153
                            Savannah, Georgia  31412
                            (912) 704-0858
                            kabrewington@gmail.com


Reported by:                Debbie Gilbert, RPR, CCR
                            Official Court Reporter
                            801 Gloucester Street
                            Post Office Box 1894
                            Brunswick, GA 31521-1894
                            (912) 262-2608 or (912) 266-6006
                            debra_gilbert@gas.uscourts.gov
                               - - -

470

I N D E X

PAGE

GOVERNMENT WITNESSES

    HIGINIO PEREZ-BRAVO
        Direct Examination By Mr. Howard        474
        Cross-Examination By Ms. Brewington    504
        Redirect Examination By Mr. Howard     513

    CHAD FITZGERALD
        Direct Examination By Mr. Howard        516
        Cross-Examination By Ms. Brewington    542
        Redirect Examination By Mr. Howard     552

    J. C. LOPEZ
        Direct Examination By Mr. Howard        556

    KAREN HARTLEY
        Direct Examination By Ms. Groover      562
        Cross-Examination By Ms. Brewington    599
        Redirect Examination By Ms. Groover    602

DEFENSE WITNESS
    JUAN RANGEL-RUBIO
        Direct Examination By Ms. Brewington   608
        Cross-Examination By Ms. Groover     615

GOVERNMENT RESTS                   602

DEFENSE RESTS                     637

471

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 103 | | 603 | 603 |
| No. 104 | | 474 | 474 |
| No. 312 | | 473 | 474 |
| No. 313 | | 473 | 474 |

472

P R O C E E D I N G S

1

2          (Call to order at 9:06 a.m.)

3          THE COURT:  Counsel, we have one matter to address

4     before we bring the jury in, and that is one of our jurors, who

5     happens to be an alternate, Matthew Roseman, Number 41 -- he's

6     the gentleman farthest away from me up on the top row -- he

7     called the clerk's office this morning and has had an incident

8     on the highway.

9          He is not in a wreck but he was near one and he hopes to

10    be here later this morning.  I propose that we go on without

11    him.  We do have two alternates.  The option is we just sit and

12    wait and see when he is able to get here or send a marshal to

13    try to expedite his appearance.

14         What I propose is that we carry on with the 13 who are

15    able to be here.  Let me hear from both sides beginning with the

16    United States.

17         MS. GROOVER:  The United States has no objection to

18    proceeding with 13, Your Honor.

19         THE COURT:  And the Defense.

20         MS. BREWINGTON:  No objection, Judge.

21         THE COURT:  And then when we do bring the jurors in, I

22    will just tell them that, that one of their number has had an

23    incident on the highway.  He is fine and so we're going to have

24    to proceed with the case.  Any objection to that?

25         MS. GROOVER:  No objections but I do have one question,

473

1    Your Honor.  If he does then arrive, is he remaining on the

2    panel or is he excused?

3            THE COURT:  He's going to have to be excused because

4    every juror has to hear every part of the case.  Any objection

5    to excusing him?

6            MS. GROOVER:  No, Your Honor.

7            MS. BREWINGTON:  No objection.

8            THE COURT:  And what I will do is have him brought to a

9    different area of the courthouse and, on the break, just excuse

10   him with the thanks of The Court.  It's apparently no fault of

11   his.  All right, with that, let's bring in the jury.

12           (The jury enters the courtroom.)

13           THE COURT:  Good morning, members of the jury.  Welcome

14   back to court.  As you noticed, one of your number is not among

15   us this morning.  I will let you know that he had an incident on

16   the highway through no fault of his own.  He's fine.

17           It was just something that happened near him, and we are

18   going to have to press forward with the case and so we will do

19   so with each of you.

20           When we left off yesterday, we were winding through the

21   Government's witnesses and we will start with their next.

22           MR. HOWARD:  Your Honor, the Government calls Higinio

23   Perez-Bravo.

24           Your Honor, while they're retrieving him, the Government

25   would move for admission of three exhibits, Exhibits 312, 313

474

```
 1  and 104.
 2          THE COURT:  Any objection?
 3          MS. BREWINGTON:  No objection, Judge.
 4          THE COURT:  Admitted without objection.
 5          MR. HOWARD:  I believe this witness needs to be sworn
 6  in.
 7                      HIGINIO PEREZ-BRAVO,
 8  having been first duly sworn, was examined and testified as
 9  follows:
10          THE CLERK:  Thank you.  Please be seated.  And, sir, if
11  you will please state your full name for the record.
12          THE WITNESS:  Higinio Perez-Bravo.
13          MR. HOWARD:  Your Honor, may I proceed?
14          THE COURT:  You may.
15                      DIRECT EXAMINATION
16  BY MR. HOWARD:
17  Q.   Sir, if you don't mind moving close to that microphone and
18  make sure and speak up, okay.  Are you a United States citizen?
19  A.   No.
20  Q.   Where were you born?
21  A.   In Chiapas.
22  Q.   What country?
23  A.   Mexico.
24  Q.   How old are you?
25  A.   54.  54.
```

475

1    Q.    Did you come to the United States?

2    A.    Yes.

3    Q.    When?

4    A.    When the Twin Towers fell.  I don't remember the year.

5    Q.    When you came to the United States, did you come

6    illegally?

7    A.    Yes.

8    Q.    Where in the United States have you lived?

9    A.    I've been in North Carolina, in -- in Tennessee, Florida,

10   and Savannah.

11   Q.    How long have you lived in Savannah?

12   A.    About 12 or 13 years.

13   Q.    What type of work did you do in Savannah?

14   A.    Construction, home remodeling.

15   Q.    If we could pull up Government's Exhibit 7.  Sir, looking

16   at the screen in front of you at Government's Exhibit 7, do you

17   recognize that individual?

18   A.    I don't see it.  Oh, yeah, yes, yes, Pablo.

19   Q.    Did you know Pablo?

20   A.    Yes.

21   Q.    How did you meet him?

22   A.    Through buying chickens on his ranch.

23   Q.    Where did Pablo live?

24   A.    In Rincon.

25   Q.    Did he have a large property in Rincon?

476

```
 1   A.    Yes.

 2   Q.    Did he live there alone?

 3   A.    No, with his family.

 4   Q.    If we could pull up Government's Exhibit 8.  Do you

 5   recognize that individual?

 6   A.    Yes.

 7   Q.    Who is that?

 8   A.    Juan.

 9   Q.    Did you ever see Juan at Pablo's property?

10   A.    Yes.

11   Q.    Were you close with Juan?

12   A.    No.

13   Q.    Did you perform work for Pablo?

14   A.    Exactly.

15   Q.    What type of work?

16   A.    Construction.

17   Q.    What type of construction?

18   A.    I did a job for him.  I did a carport, a carport and the

19   gutters around his house.

20   Q.    Did you also build porches for him?

21   A.    Yes.

22   Q.    And would you perform the work for Pablo during the week

23   or on the weekends?

24   A.    During the weekends.

25   Q.    What would you do for work during the week?
```

477

```
 1   A.    I worked for a company called Lanier.

 2   Q.    What type of work did you do with Lanier?

 3   A.    Home remodeling.

 4   Q.    When you worked for Pablo on the weekends, did he pay you

 5   on time?

 6   A.    Yes, yes, he would pay me.

 7   Q.    Did he pay you what you asked?

 8   A.    Yes, exactly.

 9   Q.    Did you make more money working during the week for Lanier

10   or during the weekends for Pablo?

11   A.    I would earn more on the weekends.

12   Q.    And when you did work for Pablo, were you authorized to

13   work in the United States?

14   A.    No.

15   Q.    How would Pablo typically pay you?

16   A.    In cash.

17   Q.    What name did he call you?

18   A.    He knew me -- he knew me as Chiapas.

19   Q.    And that's where you're from?

20   A.    Yes, yes.

21   Q.    Now, when you performed work at Pablo's, did you do all of

22   the work yourself?

23   A.    No.  I would get people to help me.

24   Q.    And the people that you hired, were they also illegal

25   aliens?
```

478

1   A.    Yes, that's right.

2   Q.    If we could pull up Government's Exhibit 25, Page 1.

3         Looking at the first page of Exhibit 25, do you recognize

4   what's shown there?

5   A.    Yes.

6   Q.    What is that?

7   A.    It's a porch.

8   Q.    Who built the porch?

9   A.    We built it.

10  Q.    Who is "we"?

11  A.    New workers that I had that I used.

12  Q.    Did Pablo pay you for building this porch?

13  A.    Yes, yes.

14  Q.    If we could pull up Government's Exhibit 31.  Do you

15  recognize that?

16  A.    Yes.

17  Q.    What is that?

18  A.    I received a check for 6,000.00, $6,000.00.

19  Q.    From whom did you receive the check?

20  A.    Pablo, I got it from Pablo.

21  Q.    What was this check for?

22  A.    It's for my -- for my jobs, for the porch, my porches.

23  Q.    Earlier you mentioned that Pablo typically paid you in

24  cash; right?

25  A.    Yes, he always paid me cash.

479

1    Q.    Do you know why he paid you by check this time?

2    A.    Because he didn't have enough money in cash.

3    Q.    And this check is dated May 4th of 2017; right?

4    A.    Yes.

5    Q.    Now, after the porch, did you do other work for Pablo?

6    A.    Yes.

7    Q.    What did you do?

8    A.    A real big carport.

9    Q.    If we could pull up Government's Exhibit 25-17, and as we

10   pull that up, if we could zoom in on the left side of that

11   screen.  Sir, looking at the screen in front of you, do you

12   recognize the structure there?

13   A.    Yes.

14   Q.    What is that?

15   A.    That's the big carport that was built.

16   Q.    And did you describe it as a garage?

17   A.    I called it a ranch or garage, a carport.

18   Q.    Can you circle that ranch or carport or garage?

19   A.    (Complies with request of counsel).

20   Q.    Who built that?

21   A.    The guys that worked with me.

22   Q.    Did Pablo pay you for building that garage?

23   A.    Yes.

24   Q.    How did he pay you?

25   A.    Oh, I received 30 thousand bucks in cash and I received --

480

1          INTERPRETER CASTILLO:  Interpreter correction.

2          THE WITNESS:  I received 3,000.00 --

3          INTERPRETER CASTILLO:  Interpreter correction.

4          THE WITNESS:  Oh, I received -- I received 3,000 bucks

5    in cash and I received $20,000.00 in my account.

6    Q.   (By Mr. Howard)  And was that $20,000.00 by a wire from

7    Pablo?

8    A.   Yes.

9    Do you know why Pablo wired you $20,000.00?

10   A.   Yes, because he wasn't -- he wasn't -- he wasn't at his

11   home.  He was out of Rincon.

12   Q.   When Pablo wired you the $20,000.00, had you finished

13   building that garage?

14   A.   Yes.

15   Q.   Did he wire the money to your bank account?

16   A.   Yes.

17   Q.   Which bank did you use?

18   A.   The Fargo, Fargo bank.

19   Q.   Was it Wells-Fargo?

20   A.   Oh, yeah, Wells-Fargo.

21   Q.   What did you do with the money that Pablo paid you?

22   A.   I paid my workers and I -- and I kept 7,000 or 8,000

23   bucks.  I don't remember.

24   Q.   Did you consider Pablo a friend?

25   A.   Yes.

481

1   Q.   Was there a time that Pablo complained to you about

2   problems at work?

3   A.   Yes.

4   Q.   Can you talk about the first time that you heard Pablo

5   complain?

6   A.   It was when we were working, working at his ranch.

7   Q.   What did he say?

8   A.   That he had a problem with one of his workers.

9   Q.   And did this happen around the time that you completed

10  this garage?

11  A.   Yes.

12  Q.   Later was there a time when Pablo came to your house?

13  A.   Yes.

14  Q.   When he came to your house, what vehicle was he driving?

15  A.   A white truck.

16  Q.   Was he alone?

17  A.   Yes.

18  Q.   Had he ever come to your house before?

19  A.   No, never.

20  Q.   That day did you know he was coming over to your house?

21  A.   No.

22  Q.   What did the two of you discuss?

23  A.   He -- he -- he asked me how I was doing with work, and he

24  said he had a lot of work, talked about a lot work, said he

25  would always keep me with jobs.  He said he had a lot to do

482

1   around his house and his ranch.

2   Q.    Did he mention anything else?

3   A.    Yes.  He told me that he had a problem with one of his

4   workers.

5   Q.    Do you recall what he said about that?

6   A.    Yes, yes, I remember.

7   Q.    What did he say?

8   A.    He said that he had a problem with one of his workers, and

9   he was going to fix it little by little, but I didn't -- I just

10  listened to him.  That's all.

11  Q.    At that point did Pablo ask you to do anything?

12  A.    No, at that time, no.

13  Q.    You mentioned that he came to your house.  Do you recall

14  your address?

15  A.    Yes, 1717 Ground Point RD, Lot 78.

16  Q.    Specifically is that Grove Point?

17  A.    Yes.

18  Q.    Now, weeks later, was there another meeting between you

19  and Pablo?

20  A.    Yes.

21  Q.    Where did that meeting happen?

22  A.    At a gas station.

23  Q.    Where?

24  A.    Off of 17, off of 17.  There's a dance hall in front, El

25  Paraiso, El Paraiso.

483

```
1   Q.    Who set the meeting up?

2   A.    Pablo.

3   Q.    How did Pablo set the meeting up?

4   A.    He called me on the phone.

5   Q.    What was your phone number?

6   A.    (912) 631-4590.

7   Q.    When Pablo called you to set the meeting up, do you recall

8   what he said?

9   A.    Yes, he -- yes.

10  Q.    What did he say?

11  A.    He called me to -- to -- to have me meet him at the gas

12  station.

13  Q.    And did you meet Pablo at the gas station?

14  A.    Yes.

15  Q.    Was he alone?

16  A.    Yes.

17  Q.    What was he driving?

18  A.    The -- a white truck.

19  Q.    What happened when you got there?

20  A.    The same thing.  He asked me again about work and -- and

21  he always talked about work and that he was going to keep me

22  with a lot of work and so we talked about.

23  Q.    Was Pablo holding anything?

24  A.    Yes, he showed me some documents, some documents that had

25  been sent to him.  They were like some complaints, like some
```

484

1    complaints I called them or reports.

2    Q.    Did he reference them as complaints made against him?

3    A.    Yes.

4    Q.    Did he mention any problems he was having at work?

5    A.    Yes.

6    Q.    What did he say?

7    A.    That -- that -- that he still had the problem with one of

8    his workers.

9    Q.    Did he ask you to do anything?

10   A.    Yes, he asked me if I could do him a favor of loaning him

11   one of my vehicles.

12   Q.    And what did you say when he asked you to loan one of your

13   vehicles?

14   A.    I told him yes.  I told him yes.

15   Q.    Did he mention anything about what he planned to do to

16   that problem employee?

17   A.    Yes.

18   Q.    What did he say?

19   A.    That he was going to eliminate the worker to -- to resolve

20   his problem.

21   Q.    You mentioned some vehicles.  Did you have vehicles?

22   A.    Yes.  I had an Escalade and a van.

23   Q.    Could we pull up Government's Exhibit 33, Page 1.  Do you

24   recognize what's depicted there?

25   A.    Yes.

485

1    Q.    What is that?

2    A.    It's a -- it's a van.  It's my van.

3    Q.    Is that your work van?

4    A.    Yes.

5    Q.    I'm going to circle an area with a little sign on the van.

6    Do you see the area that I circled?

7    A.    Yes.

8    Q.    Does that sign come off of the van?

9    A.    Yes.

10   Q.    If we could pull up Government's Exhibit 34.  What does

11   that show?

12   A.    That's the vehicle, the Escalade, my Escalade.

13   Q.    Do you recognize the building that that vehicle is parked

14   in front of?

15   A.    Yes, that's my house.

16   Q.    You mentioned that you agreed to loan Pablo a vehicle.  I

17   want to take you back to Friday August 18th, 2017, okay?

18   A.    Yes.

19   Q.    Do you remember that day?

20   A.    Yes.

21   Q.    Did you receive a call from someone that morning?

22   A.    Yes.

23   Q.    Who?

24   A.    From -- from Juan.

25   Q.    Earlier you said you weren't particularly close to Juan.

486

1    Did you often speak with him?

2    A.    No.

3    Q.    When Juan called that day, what did he say?

4    A.    He asked me to loan him one of his vehicles.  He said that

5    his brother -- he asked his brother --

6          INTERPRETER CASTILLO:  Interpreter correction.

7          THE WITNESS:  He asked me to loan him one of his

8    vehicles.  He said that his brother -- well, he asked me if his

9    brother had asked me about doing him a favor and I said yes.  I

10   told him that his brother had.

11   Q.    (By Mr. Howard)  I need some clarification.  Did Juan ask

12   to borrow one of your vehicles?

13   A.    Yes, that's right.

14   Q.    So after Juan calls you, asks you to borrow one of your

15   vehicles, what happens next?

16   A.    He -- he comes.  He comes to my house and -- and to pick

17   it up.  I give him the keys and he takes the vehicle.

18   Q.    Do you recall approximately what time of day this was?

19   A.    It was in the morning.

20   Q.    What vehicle did Juan take?

21   A.    The Escalade.

22   Q.    Do you know how Juan got to your house?

23   A.    Yes.

24   Q.    How?

25   A.    He came in a vehicle, a car.  It was a -- a gray, I think.

487

1   Q.   Now, after Juan takes your Escalade, do you speak with him

2   again that day?

3   A.   Yes.  He -- he -- he calls me.

4   Q.   What did he say?

5   A.   If -- if -- if I could go over to where he was off of 307

6   in front of a store La Favorita.

7   Q.   Did you go meet him at that store?

8   A.   Yes.

9   Q.   And you said this was 307.  Is that also Dean Forest Road?

10  A.   Yes.

11  Q.   What vehicle did you drive to meet him at?

12  A.   The van.

13  Q.   Remind me, what color was that van?

14  A.   White.

15  Q.   When you met Juan at the gas station, what happened?

16  A.   He -- he -- he told me to -- to get to know the area where

17  he -- where he was -- well, where we were going to be.

18  Q.   When you say "where we are going to be," what did you mean

19  by that?

20  A.   That I should get to know the area where -- where -- where

21  he was going to be the next day.

22  Q.   He mentioned something happening the next day?

23  A.   Yes.

24  Q.   And he mentioned that the two of you would be in that area

25  the next day?

488

1    A.    Yes.

2    Q.    After you talked with Juan, where did you go?

3    A.    From the gas station, we went into -- into the trailer

4    park, Savannah Pines, and we went in down to where there's a

5    pool and then went back out to the exit.  I don't remember how

6    many times we went in, but, yes, yes.  After that, I went back

7    to work.

8    Q.    Let's go to the next day, Saturday, August 19th, 2017.  Do

9    you recall that day?

10   A.    Yes.

11   Q.    Let's start in the morning.  What happened after you woke

12   up?

13   A.    I received another -- I received a call.

14   Q.    From whom?

15   A.    From Juan.

16   Q.    What did he say?

17   A.    He -- he called me and asked me to do him a favor to come

18   over to where he was.

19   Q.    Did he say where he was?

20   A.    Yes.

21   Q.    Where?

22   A.    By Kroger, off of 17.

23   Q.    Did you go to that Kroger on Highway 17?

24   A.    Yes.

25   Q.    Who was there?

489

1  A.    Just him.

2  Q.    Did you see what vehicle he was in?

3  A.    Yes.

4  Q.    What vehicle?

5  A.    It was a truck.  It was a truck.  It was burgundy in color

6  and it had a trailer to carry heavy machinery.

7  Q.    What vehicle did you drive to the Kroger?

8  A.    The van.

9  Q.    That white van?

10  A.    Yes.

11  Q.    When you arrived at Kroger, what happened?

12  A.    When I got there, he was waiting for me and he got into my

13  van and -- and he had in his hands, he had in his hands a bag or

14  a shoulder bag that was brown.

15  Q.    And so that Saturday morning after you picked up Juan,

16  where did the two of you go in your white van?

17  A.    He told me to go to the place where we had been on Friday.

18  Q.    Was that the Savannah Pines Mobile Home Park?

19  A.    Yes.

20  Q.    While you were driving, what was Juan doing?

21  A.    Nothing, nothing, just whatever he would say I would obey.

22  Q.    Would he tell you where to go?

23  A.    Yes.

24  Q.    You were driving.  Was he in the front passenger seat?

25  A.    Yes.

490

1    Q.    And would he tell you when to turn and where to go?

2    A.    Yes, yes, that's right.

3    Q.    What if anything was he doing in the passenger seat while

4    you were driving?

5    A.    He was just looking in every direction.

6    Q.    Where were you driving?

7    A.    We went into the trailer park, Savannah Pines, and we went

8    in to where the swimming pool was and we went back and we went

9    out and in, and at the end he told me to drop him off at the gas

10   station.

11   Q.    Now when you were driving Juan around, did he say anything

12   else?

13   A.    Yes.  He told -- yes, he told me that he was looking for

14   the person to eliminate him.

15   Q.    You mentioned that he asked you to drop him off at a gas

16   station.  Do you recall the name of that gas station?

17   A.    Yes.

18   Q.    What was it?

19   A.    It was like a Parker, Parker, something like that.

20   Q.    Was it a Pilot?

21   A.    Oh, yes, that's right.

22   Q.    And it's your testimony, so I want to be absolutely clear.

23   Based on your recollection that day, was it a Parker's or was it

24   a Pilot?

25   A.    It's where the trucks go to load up fuel.

491

1    Q.    And when you dropped him off there, what happened?

2    A.    He got out and he got out with the bag that I mentioned

3    earlier, and he told me that he would call me to pick him up.

4    Q.    And this bag, you mentioned it earlier.  Was it a large

5    bag or a small bag?

6    A.    It was small.

7    Q.    And he told you that he would call you to pick him up?

8    A.    Yes.

9    Q.    Where did you go?

10   A.    At that moment I went to go eat at a Mexican restaurant.

11   Q.    Where?

12   A.    On 17 by -- there was -- I don't know if there's anymore,

13   but it was a store Zapatilla, and over in that area, there was a

14   Mexican restaurant, and I went there to eat, on 17.

15   Q.    While you were there eating, what happened?

16   A.    I finished eating when later on I received the call from

17   Juan.

18   Q.    What did he say?

19   A.    He gave me the instructions to -- what roads to take to

20   where he was.  He was over by I-16.

21   Q.    And did he direct you how to get there?

22   A.    Yes.

23   Q.    Do you recall what directions he provided you?

24   A.    Yes.  I left and I took 17 to -- to -- to Chatham Parkway,

25   and from there, I got on I-16.

492

1    Q.    Once you got on I-16, what happened?

2    A.    There I saw that he was on the road and I picked him up

3    there.

4    Q.    What road?

5    A.    I-16.

6    Q.    Can you describe his appearance when you picked him up?

7    A.    Yes.  Very tired and very sweaty.

8    Q.    When he got into your white van, did he say anything?

9    A.    No.  At that time, no.  He got in, and for me, I didn't

10    have time to get off on the same -- at 307.  I went past it.

11    Q.    So where did you go?

12    A.    To the -- the -- the Pooler, Pooler exit to get off on

13    Quacco Road.

14    Q.    Then where did you go?

15    A.    I dropped him off there by the -- the Kroger.

16    Q.    The same place where you had picked him up that morning?

17    A.    Yes.  And when I was driving, he received a call.  He

18    received a call and he confirmed -- he said that the job had

19    been done.

20    Q.    You could overhear that?

21    A.    Yes.

22    Q.    Do you know exactly who was on the other end of that phone

23    call?

24            MS. BREWINGTON:  That calls for speculation.

25            THE COURT:  He asked if he knew.  Overruled.  You can

493

1    answer if you can.

2        THE WITNESS:  I think that he was talking to his

3    brother.

4    (By Mr. Howard)  But you don't know for sure, do you, who was

5    on the other end of that phone call; right?

6    A.    No.

7    Q.    But you heard him say, "The job is done"?

8    A.    Yes, that's right.

9    Q.    When you dropped off Juan at the Kroger, did he say

10   anything to you?

11   A.    Yes.  When I dropped him off, he said, "Chiapas, thank

12   you, and -- and my brother, my brother, he is going to take care

13   of you; he is going to call you; thank you."  His brother had to

14   call me but he never called me.

15   Q.    When he said, "My brother will take care of you," what did

16   you understand that to mean?

17   A.    Well, perhaps to receive some kind of reward or more work.

18   Q.    More work that had paid you thousands of dollars already;

19   right?

20   A.    Yes.

21   Q.    Where did you go after dropping Juan off at the Kroger?

22   A.    I went back to my job.

23   Q.    If we could pull up Government's Exhibit 56, let's look at

24   some maps.  Are you able to see the screen in front of you?

25   A.    Yes.

494

1  Q.    Looking at the bottom of that page, does it show the

2  Kroger where you picked up Juan?

3  A.    Yes.

4  Q.    Can you circle that?

5  A.    (Complies with request of counsel).

6  Q.    Now, can you, using that screen in front of you, trace the

7  route that you took after you picked up Juan that morning?

8        INTERPRETER GIERSBERG:  The interpreter has a question.

9  After picking up Juan?

10       MR. HOWARD:  Yes.

11       THE WITNESS:  Yes.

12  (By Mr. Howard)  Can you go ahead and do that on the screen in

13  front of you?

14  A.    To go to -- I'm sorry, what did you say?

15       THE COURT:  To pick up Juan.

16       THE WITNESS:  (Complies with request of counsel).

17  (By Mr. Howard)  Let's take this chronologically.  It wasn't

18  actually to pick up Juan.  Can you trace the route that you and

19  Juan took to that Savannah Pines Mobile Home Park?

20  A.    What route we took, 307.

21       (Complies with request of counsel).

22  Q.    And to get to Savannah Pines, do you actually cross over

23  I-16?

24  A.    Yes.

25  Q.    If we could pull up Government's Exhibit 21.  Now, you

495

1    arrived with Juan at that Savannah Pines Mobile Home Park.  Can

2    you trace the route that you and Juan drove that morning at and

3    near the Savannah Pines Mobile Home Park?

4    A.    (Complies with request of counsel).  We went back from

5    where the swimming pool is.

6    Q.    And were you driving around that general area for hours?

7    A.    Yes.

8             THE COURT:  Is that arrow marking the swimming pool

9    you're talking about?

10            THE WITNESS:  Yes.

11    (By Mr. Howard)  And if you are able to see the swimming pool

12    area, if you are able to circle that?

13    A.    Yes.

14    Q.    Looking at this map in front of you, do you see the area

15    of that gas station where you dropped Juan off?

16    A.    Yes.

17    Q.    Can you circle that area?

18    A.    (Complies with request of counsel).

19    Q.    And have you circled an area next to the Pilot gas

20    station?

21    A.    Yes.

22    Q.    If we could pull back up Government's Exhibit 56.  Now

23    after you dropped Juan off at that Pilot gas station, you

24    mentioned you went to lunch; right?

25    A.    Yes.

496

1   Q.   Can you take us through the route that you took to get to

2   lunch?

3   A.   Yes.  (Complies with request of counsel).

4   Q.   All right, and then you mentioned that at lunch, you got a

5   call from Juan to come and pick you up; right?

6   A.   Yes.

7   Q.   On the screen in front of you, can you trace the route

8   that you took to pick up Juan?

9   A.   Yes.  (Complies with request of counsel).

10  Q.   And there's an arrow there.  Does that arrow indicate the

11  approximate location of where you picked up Juan?

12  A.   Yes.

13  Q.   All right, and below that arrow, there appears to be a

14  straight line shooting down.  Did you draw that or was that just

15  an error?

16  A.   It's an error.

17  Q.   If we could pull back up Exhibit 21.  And now you've

18  arrived to pick up Juan.  Can you circle the area of I-16, the

19  approximate area, where you picked up Juan on the side of the

20  road?

21  A.   Yes.  (Complies with request of counsel).

22  Q.   Now you have picked up Juan, if we could go back to

23  Government's Exhibit 56.  Now describe the route that you took

24  after picking up Juan to go back to that Kroger gas station?

25  A.   (Complies with request of counsel).  I took 16 to get off

497

1    on Pooler.

2    Q.    On the Pooler Parkway?

3    A.    Yeah.

4    Q.    And you said that becomes Quacco Road; correct?

5    A.    Yes.

6    Q.    Now, is that area a little bit off of this map?

7    A.    Yes, it's outside.

8    Q.    And then you come down and drop Juan off at that Kroger at

9    the bottom of this page; is that right?

10   A.    Yes.

11   Q.    Why not take 307 down to 17?  And I will specifically draw

12   the route for you.  Why not go the route that I've indicated on

13   the screen, which is I-16, 307 to 17?  Why not do that?

14   A.    Because at the moment when I picked him up, it didn't give

15   me enough space to get on 307 so I went past it.

16   Q.    You missed the exit?

17   A.    Yes.

18   Q.    If we could pull back up Government's Exhibit 8.  You

19   mentioned that this is a photograph of Juan; correct?

20   A.    Yes.

21   Q.    Is that the individual who borrowed your Escalade on

22   Friday, August 18th?

23   A.    Yes.

24   Q.    The same individual you drove on Saturday August 19th in

25   Savannah Pines?

498

1    A.    Yes.

2    Q.    Mr. Perez-Bravo, do you recognize that individual in the

3    courtroom?

4    A.    Yes.

5    Q.    If you would point to him and identify an article of his

6    clothing.

7    A.    Yes, he has -- he's in the blue suit.

8    Q.    Can you point to him?

9    A.    Yes.  He's over there.

10        MR. HOWARD:  Your Honor, I would ask that the record

11   reflect that the witness has identified the defendant.

12        THE COURT:  The record will so reflect.

13   (By Mr. Howard)  Mr. Perez-Bravo, do you know why you were

14   driving Juan around and why you lent him your car?

15   A.    Yes.

16   Q.    Why?

17   A.    Because I was thinking of getting more work and maybe some

18   gratuity.

19   Q.    Was it your understanding of what would happen to an

20   individual that day?

21   A.    Yes.

22   Q.    What?

23   A.    That he was going to eliminate him.

24   Q.    And what do you understand "eliminate" to mean?

25   A.    Yes.

499

```
1   Q.   What do you understand "eliminate" to mean?

2   A.   To kill him.

3   Q.   Did you know Eluid Montoya?

4   A.   No.

5   Q.   Had you ever met him?

6   A.   No.

7   Q.   Had you ever worked at Wolf Tree or Davey Tree?

8   A.   No.

9   Q.   Why did you do what you did?

10  A.   Can you repeat it?

11  Q.   Why did you do what you did?

12  A.   For the jobs that Pablo was going to give me.

13  Q.   And to be paid?

14  A.   Yes.

15  Q.   When you were arrested, did law enforcement interview you?

16  A.   Yes.

17  Q.   Were you completely truthful in that interview?

18  A.   No.

19  Q.   In fact, did you lie to law enforcement?

20  A.   Yes.

21  Q.   Why did you lie to law enforcement?

22  A.   Because I was afraid.  I had been told not to say anything

23  to law enforcement.

24  Q.   Who told you that?

25  A.   Juan.
```

500

```
 1   Q.    When did Juan tell you that?

 2   A.    On -- on Saturday.

 3   Q.    And after you were interviewed by law enforcement, you

 4   were charged with conspiracy to commit murder for hire; correct?

 5   A.    Yes.

 6   Q.    Did you appear in court with Juan?

 7   A.    Yes.

 8   Q.    Did he say anything to you in court?

 9   A.    Yes.  He told me not to say anything to law enforcement.

10   Q.    Did he say anything else?

11   A.    No, he told me not to say anything.

12   Q.    Now you decided to go to trial in April of this year;

13   correct?

14   A.    Yes.

15   Q.    And in the middle of that trial, what did you decide to

16   do?

17   A.    To tell the truth.

18   Q.    And telling the truth, did that mean pleading guilty?

19   A.    Yes.

20   Q.    And did you plead guilty pursuant to a plea agreement with

21   the United States?

22   A.    Yes.

23   Q.    And did you plead guilty to what you were charged with?

24   A.    Yes.

25   Q.    And as you sit here today, you're awaiting sentencing for
```

501

1    that; correct?

2    A.    Yes.

3    Q.    And the judge who will sentence you is the same Judge

4    that's in this courtroom; correct?

5    A.    Yes.

6    Q.    Are you hoping that by testifying the Judge will consider

7    your cooperation at sentencing?

8    A.    Yes.

9    Q.    If we could pull up Government's Exhibit 88, a 12-page

10   document entitled "Plea Agreement."  Sir, do you recognize

11   what's on the screen in front of you?

12   A.    Yes.

13   Q.    What is that?

14   A.    It's the things so that I admit my guilt.

15   Q.    Is that the plea agreement you entered into with the

16   Government?

17   A.    Yes.

18   Q.    If we could turn to Page 11 of Government's Exhibit 88.

19   Sir, do you recognize your signature there?

20   A.    Yes.

21   Q.    Is that the signature of your attorney below that?

22   A.    Yes.

23   Q.    Does that plea agreement contain an agreement between you

24   and the Government?

25   A.    Yes.

502

1   Q.   Was that plea agreement translated to you?

2   A.   Yes.

3   Q.   If we could turn to Page 4 of this exhibit and zoom in on

4   Paragraph Number 7.

5        Sir, I will read to you the first two sentences of

6   Paragraph 7, and I want you to follow along.  It says, "If

7   Defendant elects to cooperate, he must provide full, complete,

8   candid and truthful cooperation in the investigation and

9   prosecution of the offense charged in his superseding indictment

10  and any related offenses; Defendant shall fully and truthfully

11  disclose his knowledge of those offenses and shall fully and

12  truthfully answer any question put to him by law enforcement

13  officers about those offenses."

14       Do you see that, sir?

15  A.   Yes.

16  Q.   Now before testifying today, you've met with the

17  Government; correct?

18  A.   Yes.

19  Q.   You've met with the agents and you've even met with

20  myself; correct?

21  A.   Yes.

22  Q.   Each time the Government met with you, were you told that

23  you have one job?

24  A.   Can you repeat it?

25  Q.   Sure.  Each time that the Government met with you, were

503

1   you told that you have one job to do?

2   A.    Yes.

3   Q.    What is that?

4   A.    To tell the truth.

5   Q.    You face life in prison; correct?

6   A.    Yes.

7   Q.    Now the only way you can avoid that is if the Government

8   files a motion based on your substantial assistance; is that

9   right?

10  A.    Yes.

11  Q.    Do you get any benefit at all if you are not completely

12  truthful?

13  A.    Yes.

14  Q.    Well, what benefit is that that you would receive if you

15  are not completely truthful?

16  A.    Well, prison, I can be put in a prison if I don't tell the

17  truth.

18  Q.    Now, even if the Government asks The Court to sentence you

19  to less time, it's still up to the Judge to decide your

20  sentence; isn't that right?

21  A.    Yes.

22  Q.    And when you get off the stand today, are you going back

23  to jail?

24  A.    Yes.

25        MR. HOWARD:   I have no further questions for this

504

1    witness, Your Honor.

2              THE COURT:  Cross-examination, Ms. Brewington.

3              MS. BREWINGTON:  Thank you, Judge.

4                        CROSS-EXAMINATION

5    BY MS. BREWINGTON:

6    Q.    Mr. Perez-Bravo, tell me again what that $20,000.00 was

7    for?

8    A.    For my jobs.

9    Q.    Jobs working in construction?

10   A.    Yes.

11   Q.    Do you remember having an interview with law enforcement?

12   A.    Yes.

13   Q.    Do you remember what you told them that $20,000.00 was

14   for?

15   A.    Yes.

16   Q.    What was that?

17   A.    They -- it was the 20,000 bucks were for the job that I

18   did at Pablo's ranch.

19   Q.    Can we pull up Exhibit 313, Page 72, please.

20         You didn't tell the law enforcement that's what the money

21   was for, did you?

22   A.    No.

23   Q.    Then what did you tell them it was for?

24   A.    That was for -- for -- for having loaned him my vehicles.

25   Q.    For loaning the van?

505

1   A.   Uh-huh.

2   Q.   And also for loaning the Escalade?

3   A.   Yes.

4   Q.   So you lied today?

5   A.   No.  I lied when I was interviewed the first day.

6   Q.   Do you remember getting a phone call from Pablo from jail?

7   A.   Yes.

8   Q.   What was that phone call about?

9   A.   That I couldn't do any more jobs at his house.

10  Q.   He wanted that $20,000.00 back, didn't he?

11  A.   Yes.  Yes.  The person, the girl that came to look for me

12  wanted me to give back the money.

13  Q.   Because you didn't do the job that he asked you to do;

14  correct?

15  A.   Yes.

16  Q.   So that money was to borrow the cars?

17  A.   I had lied about that part.

18  Q.   And why would he call you to get the money back?

19  A.   Could you repeat the question?

20  Q.   Then why would he call to get the money back?

21  A.   Well, he told me to give the lady money.  That's the only

22  thing he told me.

23  Q.   That was the day after he was arrested; correct?

24  A.   Yes.

25  Q.   How did he give you that money?

506

1   A.    Could you repeat the question?

2   Q.    How did he give you the money?  Did he give you a check,

3   cash?

4   A.    Pablo -- Pablo -- Pablo paid me in cash, and I received a

5   check.

6   Q.    Can you pull up Page 74, please.

7         In the middle of the page, you tell law enforcement you

8   were paid the money to lend the cars; correct?

9   A.    Yes.  I lied, like I said.

10  Q.    So you're telling me today you just lent him your cars

11  just to be a nice guy?

12  A.    Yes, because Pablo had asked me to do him a favor.

13  Q.    And this favor was to drive Juan?

14  A.    Sure.

15  Q.    And you did that out of the goodness of your heart?

16  A.    Yes.

17  Q.    You will admit that you've said two different things about

18  that money; correct?

19  A.    Yes.

20  Q.    So one time or the other you lied?

21  A.    Yes.

22  Q.    Going back to that interview, when you first walked in,

23  were you told you were under arrest?

24  A.    Yes.

25  Q.    Were you told why you were under arrest?

507

```
 1    A.    Yes.

 2    Q.    What was it for?

 3    A.    Because of Pablo's problem.

 4    Q.    And that's what they told you?

 5    A.    Yes.

 6    Q.    Did they tell you the charges?

 7    A.    Yes.

 8    Q.    Did they give you Miranda warnings?

 9    A.    Yes.

10    Q.    Why didn't you sign that Miranda statement?

11    A.    Because at the time I hadn't -- I was -- I was -- I was

12    confused.  I didn't want to sign any document.

13    Q.    Well, you thought if you talked you would be able to leave

14    that day; correct?

15    A.    Yes.

16    Q.    Do you remember being told that if you cooperated the

17    investigators would talk to the district attorney?

18    A.    Yes.

19    Q.    What does that mean to you?

20    A.    Could you repeat the question again?

21    Q.    The investigators told you that if you cooperated, they

22    would talk to the district attorney; correct?

23    A.    Yes.

24    Q.    Tell me what you understand that to mean.

25    A.    That if I cooperate, they will talk with the prosecutor
```

508

1    about the incidents that happened.

2    Q.    You thought if you told them what they were looking for,

3    you could go home that day?

4    A.    Yes.

5    Q.    You wanted to tell them what they wanted to hear so you

6    could get out of trouble; correct?

7    A.    Uh-huh, yes.

8    Q.    In fact, they told you multiple times during the interview

9    that they could talk to the district attorney on your behalf;

10   correct?

11   A.    Yes.

12   Q.    You always use the word "eliminate"; is that right?

13   A.    Yes.

14   Q.    Can we pull up Page 72.  In the middle of the page, you

15   say, "Well, Pablo, he -- when he explained to me that day we

16   were there, he told me that -- that he was going to eliminate

17   the person."  Do you see that?

18   A.    Yes.

19   Q.    And the investigator interprets that as kill him; correct?

20   A.    That's right.

21   Q.    The investigator is the first person to say the word

22   "kill" during that interview; correct?

23   A.    Yes.

24   Q.    You just agreed?

25   A.    Yes.

509

1   Q.    Can we pull up Page 83.  Bottom of the page, you say,

2   "Honestly, the one that did it, the one that was" -- and you're

3   interrupted -- Page 84, please -- the investigator say, "It was

4   Juan; it was Juan," and you agree do you see that?

5         INTERPRETER CASTILLO:  The interpreter is not able to

6   see the verbatim transcript.

7         MS. BREWINGTON:  Top of the page, 84, first two lines.

8         INTERPRETER CASTILLO:  The interpreter would request

9   that counsel please repeat -- start from the beginning of the

10  question so the interpreter can follow along with the verbatim

11  rendition.

12        MS. BREWINGTON:  No problem.

13  (By Ms. Brewington)  Page 83, at the bottom you state,

14  "Honestly, the one that did that was" -- Page 84, at the top

15  you're interrupted by the agent, and he says, "It was Juan; it

16  was Juan."  Do you see that?

17  A.    Yes.

18  Q.    So you just agreed again with the investigator and what

19  they said?

20  A.    Yes.

21  Q.    You would have agreed to anything to go home that day?

22  A.    Yes.

23  Q.    Page 111, please, the investigators talk between

24  themselves.  They say, "He said that it was a gift or a donation

25  or whatever you call it.  Pablo and Juan can say that they paid

510

1  him to do it and he didn't.  How do we know that the payment

2  wasn't for that?  Okay, do you see what I'm saying?"

3       The second investigator says, "Oh, my partner has a good

4  point here," and they finally ask you, "Are you the one that

5  killed Juan."  Do you see that?

6  A.    Where is that?

7  Q.    It is in the middle of the page.

8  A.    I don't know what -- what that is, where that is.

9  They only asked you once if you killed Juan; is that right?

10  A.    That's here?  Can you repeat the question?

11  Did they ask you if you killed Juan?

12  A.    If I killed Juan?

13  Q.    Yes, did they ask you if you killed Juan?

14  A.    No.

15       THE COURT:  Do you mean Mr. Montoya?

16       MS. BREWINGTON:  Yes, Judge.

17       THE WITNESS:  Not Juan.

18  (By Ms. Brewington) Excuse me.  Did they ask you if you killed

19  Mr. Montoya?

20  A.    Yes.

21  Q.    They only asked you once; correct?

22  A.    Yes.

23  Q.    And they never asked you again?

24  A.    No.

25  Q.    They took you at your word?

511

1    A.    Yes.

2    Q.    Even though you lied throughout that entire interview?

3    A.    What do you mean?

4    Q.    You said you lied during that interview; correct?

5    A.    Yes.  Everything that I had said was a lie.

6    Q.    Did you ever see Juan with a gun?

7    A.    Not him but on his ranch I did see that they had weapons.

8    Q.    But when you picked him up in your vehicle, you never saw

9    him with a gun?

10    A.    In -- in the bag, the gun was in the bag.  It was in the

11    bag.

12    Q.    Do you see a gun or did you just see a bag?

13    A.    The bag.

14    Q.    So you're just assuming what was in there?

15    A.    Yes.

16    Q.    You truly have no idea?

17    A.    No, but on Saturday he told me what he was going to do.

18    Q.    Did you ever see blood on Juan?

19    A.    No.

20    Q.    It was very hot that day on Saturday; correct?

21    A.    Yes.

22    Q.    So it would be normal for somebody to be sweaty?

23    A.    Yes.  But at the place where I dropped him off, that isn't

24    where I picked him up.  I picked him up on the side of the road.

25    Q.    My question is:  Would it be normal to be sweaty on a hot

512

1   day?

2   A.    Yes.

3   Q.    The only person you ever talked with about eliminating

4   this worker was Pablo; correct?

5   A.    Yes.

6   Q.    Everything you were told came from Pablo?

7   A.    Yes.

8   Q.    Any money that was paid to you came from Pablo?

9   A.    Yes.

10  Q.    Can we pull up Page 133.  You indicate, "And I also have

11  to understand, well, if you guys need anything, you can count on

12  me; I'm not going to run; what for?  Because I didn't do

13  anything."  Do you remember saying that?

14  A.    Yes.

15  Q.    You also said, "Because I did cooperate with you guys, I

16  was honest, I told you guys who were the ones that were there,

17  there is no reason for me to get into trouble"; correct?

18  A.    Yes.

19  Q.    Do you see at the bottom of Page 134 where you asked to go

20  home?

21  A.    Yes.

22  Q.    You thought that you agreed with everything that they said

23  so you could go home; correct?

24  A.    Yes.

25  Q.    Can we pull up Page 137.  Again at the bottom, you say,

513

1    "That's fine; I hope you guys help me out and take into

2    consideration that I gave you guys that information."  So again

3    you thought you were going home that day; correct?

4    A.    Yes, yes.

5    Q.    And now you have this plea agreement with the Government;

6    correct?

7    A.    Yes.

8    Q.    Did you talk to them about your testimony today?

9    A.    Yes.

10   Q.    Did you guys go over the questions that were going to be

11   asked?

12   A.    Yes.

13   Q.    Do you think if you agree with them you will be able to go

14   home earlier?

15   A.    It depends, depends on the Judge.

16   Q.    You understand that the Judge is going to sentence you.

17   That is correct.  But you think if you answer the questions the

18   way the Government has asked you to that you will get a benefit;

19   correct?

20   A.    Yes.

21         MS. BREWINGTON:  Nothing further.

22         THE COURT:  Brief redirect, Mr. Howard.

23                        REDIRECT EXAMINATION

24   BY MR. HOWARD:

25   Q.    Sir, you were just asked why you lent the vehicles and you

514

1    were specifically asked did you lend the vehicles because you

2    were a nice guy.  Do you recall that?

3    A.    Yes.

4    Q.    But you hoped to get something out of lending those

5    vehicles, didn't you?

6    A.    Yes, yes.

7    Q.    And what was that that you hoped to get out of by lending

8    the vehicles?

9    A.    Work and some kind of reward.

10   Q.    And that reward, would it be money?

11   A.    Yes.

12   Q.    Now you mentioned the bag that Juan was carrying and you

13   mentioned that being a small bag.  Do you recall that?

14   A.    Yes.

15   Q.    Would large tree-trimming equipment fit in that bag?

16   A.    No.

17   Q.    You also mentioned who you had discussions with regarding

18   eliminating that problem employee.  Do you recall that?

19   A.    Yes.

20   Q.    And on that Saturday, Juan had mentioned eliminating that

21   employee, didn't he?

22   A.    Yes.

23   Q.    You were also asked about the questions that you would be

24   asked today.  Has the Government in any way told you what to

25   say?

515

1  A.    The truth.

2          MR. HOWARD:  No further questions, Your Honor.

3          THE COURT:  Any objection to this witness being excused?

4          MS. BREWINGTON:  No objection.

5          MR. HOWARD:  No, Your Honor.

6          THE COURT:  You may step down and you are excused.

7          Ladies and gentlemen, it is time for our mid-morning

8  break, and so we will pause at that juncture for 15 minutes and

9  we will continue the case at five minutes 'til 11:00.  Remember

10 the familiar admonition.  Let's rise for this jury.

11         (The jury exits the courtroom.)

12         THE COURT:  Counsel, thinking for scheduling purposes

13 throughout the day, do you anticipate two more witnesses or

14 three?

15         MS. GROOVER:  We have three more witnesses, Your Honor.

16         THE COURT:  We will be in recess.

17         (Recess from 10:40 a.m. to 10:58 a.m.)

18         THE COURT:  All right, let's bring in the jury.

19         (The jury enters the courtroom.)

20         THE COURT:  Welcome back, members of the jury.

21         Mr. Howard, call your next witness.

22         MR. HOWARD:  The Government calls Chad Fitzgerald.

23                        CHAD FITZGERALD,

24 having been first duly sworn, was examined and testified as

25 follows:

516

1      THE CLERK:  Thank you.  You may be seated.  And if you
2  will please state your full name, spell your last, state your
3  occupation and your business address.
4      THE WITNESS:  Chad Fitzgerald.  F-i-t-z-g-e-r-a-l-d.
5  What was the other part?
6      THE CLERK:  State your occupation and your business
7  address.
8      THE WITNESS:  I'm with the Federal Bureau of
9  Investigation.  I'm a senior -- I'm a contractor with them.  My
10  position is senior systems engineer, and it's out of Washington,
11  DC.
12      MR. HOWARD:  Your Honor, may I proceed?
13      THE COURT:  You may.
14                       DIRECT EXAMINATION
15  BY MR. HOWARD:
16  You talked a little bit about what you do for a living.  Can
17   you expound?
18  A.    Well, I worked in the Atlanta office as a special agent --
19  I retired with 23 years and I was part of a unit called the
20  cellular analysis survey team or CAST, and when I retired, that
21  same unit, CAST, hired me as a contractor, so that's when I went
22  to DC to work for the same unit.
23  Q.    What's your educational background?
24  A.    I have a master's in electrical engineering.
25  Q.    You mentioned CAST.  How long has CAST been around?

517

1    A.    I think we became an official unit around 2009, so roughly

2    13 years now.  And before that, we were kind of ad hoc unit,

3    multiple guys just kind of collaborating on different types of

4    cases.

5    Q.    What is CAST's purpose?

6    A.    In the umbrella of the FBI, we worked -- we're placed in

7    the Criminal Investigative Division or CID, and our primary

8    responsibility, to boil it down in simplest terms, is we just

9    are translators, no different than a language translator would

10   be, from -- but we deal with the technical world, mostly related

11   to cellular phones.

12       That obviously expands into apps on cellular phones, and

13   we take that data, we interpret it and translate it for

14   investigators in various cases, obviously in court.  We talk

15   about what that data means and how it gets generated and, you

16   know, so most of our cases within CAST in the FBI deal with like

17   murder cases.

18       40 -- about 40 percent of our cases are murder, but our

19   primary responsibility is for child abductions and child

20   kidnappings, so we deploy out to a lot of child abductions and

21   child kidnappings around the United States.

22   Q.    Well, how do you use cellular technology to investigate

23   some of the crimes that you mentioned?

24   A.    So through the records that are generated, just as a

25   course of business, like every cellular provider, just for them

518

1    to -- for you to be able to have a phone and to be able to

2    functionally use it, there are records that have to be

3    generated.

4         Regardless of what provider you're using around the world,

5    those records exist, and we can take those records and we can do

6    things, such as come up with a pattern of life, whether that's

7    who do you most frequently call, who are you mostly in

8    communication with.

9         We also can get general geographic areas of where that

10   phone was located, so another pattern of life that we can come

11   up with is general areas you travel to and we can marry a lot of

12   these things up to come up with a kind of a picture of, you

13   know, where the user of that phone had traveled or doesn't

14   travel so ... or who they call, who they don't call or

15   communicate with is probably a better terminology and, you know,

16   when it comes to like criminal cases, if there's a crime that

17   occurred, we can look at those same records and determine that

18   they were in a general -- you know, that same general geographic

19   area or not in that geographic area.

20   Q.   Is that process, is that called historical cell site

21   analysis?

22   A.   It is, yes.

23   Q.   Can you talk to the jury a little bit about your

24   background, your training and experience with respect to

25   cellular analysis and cell tower analysis?

519

1  A.    So like I mentioned, through college I was in electrical

2  engineering, got a master's in electrical engineering.  I have

3  worked in the communications field.  I specialized during

4  college in communications systems.  I've worked in that field.

5        Once I became an FBI agent, I started working a lot of

6  kidnapping cases, robbery cases and fugitive cases, and I

7  started realizing -- you know, this is back in the nineties,

8  late nineties -- that I could utilize some of my background with

9  the records that we were being provided or obtaining and kind of

10  marry those two things up to kind of figure these things out

11  that I was talking about.

12  Q.    Have you had specialized training regarding historical

13  cell site analysis?

14  A.    Yes.  So in helping develop what is now the CAST unit, we

15  came up with different criteria, so to become a certified CAST

16  member, we have to go through required training that we set up

17  and that is both on analyzing records but it's also through

18  academia, so we have professors that we contract with out of the

19  Florida Institute of Technology that their class -- classes that

20  they teach are for people that want to become engineers in the

21  cellular field, so we go through that.

22        There's equipment we get certified on.  We meet with all

23  the different providers in the United States, both from the

24  people that are obtaining those records or generating those

25  records or getting the records out of the system, the subpoena

520

1    compliance side of things and we also meet with the engineers

2    that work with -- at the various cell phone companies and we do

3    that not only when we're initially getting certified, but to

4    maintain our certification on a yearly basis, we kind of go

5    through those same things every year.

6    Q.   About how many cases involving cell site analysis have you

7    worked on?

8    A.   Oh, I would have idea.  I mean, I can tell you -- I look

9    at phone records every single day, typically multiple sets of

10   phone records, so it would be -- if it's not in the probably

11   tens of thousands I would be shocked, but definitely in the

12   thousands for sure and, you know, just we also go around and

13   train, detect -- the unit as a whole goes around and trains

14   police departments, detectives, prosecutors.

15        Basically, we offer this free training all around the

16   world and I've trained, you know, through that class.  I've been

17   part of training, you know, probably more than a thousand.  I

18   know the unit as a whole has trained over 10,000, you know, five

19   to ten plus thousand different detectives, so ...

20   Q.   Have you testified before as an expert in cell site

21   analysis?

22   A.   Yes, as recently as last week.

23   Q.   About how many times?

24   A.   I've never kept count, but I am guessing that it's more

25   than a hundred times in both state and federal court.

521

1    Q.    Any notable cases among those?

2    A.    Yes.  I've had a few different ones, the Boston Marathon

3    bombing.  On the appeal for Adnan Syed, I testified in that

4    regarding the phone records.

5         You know, there's -- there's several of those.  Those are

6    the first two that pop in my head, though.

7              MR. HOWARD:  Your Honor, at this time I would have move

8    to have Chad Fitzgerald qualified as an expert in historical

9    cell site analysis.

10             THE COURT:  Ms. Brewington, any voir dire about

11   qualifications?

12             MS. BREWINGTON:  No, Your Honor.

13             THE COURT:  Ladies and gentlemen, Mr. Fitzgerald has

14   been qualified in the field of historical cell site analysis.

15   The jury will recall my instruction earlier about expert

16   witnesses.

17             Continue.

18   (By Mr. Howard)  Sir, were you asked to review cellular

19   telephone records in connection with a murder that occurred on

20   August 19th, 2017 near Old Dean Forest Road in Garden City,

21   Georgia?

22   A.    I was.

23   Q.    The records that you reviewed, did those include records

24   for Verizon number ending in 6350, another Verizon number ending

25   2816, an AT&T number ending 4590 and a T-Mobile number ending

522

1    9133?

2    A.    Correct, yes.

3    Q.    For what period of time did you review those records?

4    A.    It was like the beginning of August to the date of the

5    murder.

6    Q.    Do those records tell you what was said on the calls?

7    A.    No.  I have no idea the content of any communication,

8    whether it's text or phone call.

9    Q.    The records don't transcribe or provide you the substance

10   of those calls; correct?

11   A.    No, they do not.

12   Q.    Did law enforcement provide you with addresses relevant to

13   this investigation?

14   A.    They did, yes.

15   Q.    And does your analysis provide a pinpoint examination as

16   to the precise location of the phones associated with those four

17   numbers?

18   A.    They give a general geographic area.  I mean, it's fairly

19   precise in the grand scheme of the world, the United States, but

20   as far as, you know, it's not "Mission Impossible 3" on, you

21   know, movie where we can see the person going from the kitchen

22   to the bedroom or even walking down a particular street.

23        It doesn't work like that, but it gives you a defined,

24   fairly defined, area in the world for where that's located.

25   Q.    And did the records that you reviewed, those don't

523

1    provide, as you mentioned, a pinpoint but they do provide a

2    general area; correct?

3    A.    That's correct.

4    Q.    Do they tell you who was actually holding the phone at the

5    time the calls were being made and received?

6    A.    No.  So just like, you know, I don't know the content of

7    what was communicated during those connections, I also don't

8    know who was actually holding those particular phones.

9    Q.    Did you create a PowerPoint presentation that helps

10   explain your analysis of these records?

11   A.    I hope so.  I did.  I hope it helps.

12   Q.    If we could pull up Government's Exhibit 62 and look at

13   the first page of that.

14         Sir, looking at the first page of Government's Exhibit 62,

15   do you recognize what's depicted there?

16   A.    Yes.  It's just the cover page to my presentation.

17   Q.    And would that help the jury better understand your

18   testimony and the cell site analysis you conducted in this case?

19   A.    Yes.

20   Q.    Looking at the second page of Government's Exhibit 62,

21   what's discussed there?

22   A.    It's just a general super high-level methodology, just a

23   basic methodology.  At the end of the day, it says we took the

24   records.  We married it up to a mapping and we visualized, you

25   know, the records on a map.

524

1    Q.    Page 3, Government's Exhibit 62, what's shown there?

2    A.    So this is just a picture of a fairly standard cell tower

3    that -- I mean, you can still see some of these today, but most

4    of the world is kind of going away from that, especially in more

5    urban areas, suburban areas, but in 2017, these were very

6    common.

7          It's just a picture that I took, and the right half of the

8    page is just zooming in to the very top of that mast, that tower

9    mast, and the reason I wanted to zoom into it is just to show

10   that you can see there's lots of metal up there and you can see

11   that, you know, I want to point out these, in particular, this

12   triangular piece that you can see, and on that triangular piece,

13   there are several different antennas pointing in different

14   directions.

15         So there's some on the corner over here so you can see

16   that there's antennas pointing in specific directions, and the

17   engineers do that to provide that service so just think of it as

18   an imaginary spotlight -- imaginary man at the top of this tower

19   with a spotlight, and he's pointing that spotlight down on earth

20   in a particular direction, and wherever that light is

21   illuminating the earth is providing coverage, so that spotlight,

22   just like you've, you know, played with a flashlight or you've

23   seen spotlights in a theater, you can tune that spotlight of

24   where it's shining by pointing it in certain directions.  By

25   pointing it down towards the earth versus more up, you can

525

1    determine how far out it goes, and you know, you can tune it to

2    only have, you know, certain width of light, so that's what's

3    happening to provide you that service.

4         They are strategically placing these antennas mostly to

5    where people are located.  So if there's population, you know,

6    if there's a big forest and an apartment complex next to it,

7    you're going to point that spotlight more towards the apartment

8    complex where the people are versus pointing it out to this big

9    forest where there aren't any people because, you know, the

10   animals don't carry cell phones around.  The people in the

11   apartments do, so it's very tuned and strategic how they go

12   about, and not only where they place these towers but the

13   directions that they are placing -- you know, they are pointing

14   those spotlights from, so my phone, as it sit in my pocket, your

15   phone as you're carrying it around in your pocket, in your

16   purse, wherever, it's listening for that spotlight.

17        So particular companies, particular phones, if you go with

18   AT&T, your phone only speaks the AT&T language.  It's only

19   listening for or it's only looking for that AT&T spotlight.  It

20   doesn't care about the T-Mobile spotlight.  It doesn't care

21   about the Sprint spotlight or Verizon spotlight.  It only sees

22   that AT&T spotlight.  And that's what it's listening to, that

23   language.

24        It's like I'm not bilingual.  So somebody could be

25   speaking Spanish next to me.  It doesn't make any sense to me.

526

1    Same as your phone.  It speaks the language that it's programmed

2    to speak.

3    Q.    And there are some yellow arrows in the bottom picture

4    pointing in three directions.  What do those represent?

5    A.    So it's just a different view of what I was just

6    explaining.  It's just a drone picture from above one of these

7    structures, different structure, but it also just kind of shows

8    that same metal kind of triangular -- they are not always these

9    triangular metal pieces, but you can see there are multiple

10   antennas on each of those metal structures, and they are

11   pointing in three different distinct areas, so if you think of a

12   circle, or if I was to order a pizza and wanted to share it with

13   two of you and I wanted to split it in three equal pieces, each

14   of us would get a third of that pizza just like this

15   particular -- these particular towers the different sectors on

16   it are just dividing into three different equal pieces.

17        So you have, you know, a 360-degree circle.  You divide it

18   by three.  You get these nice 120-degree kind of sectors coming

19   off of that, those different spotlights.

20   Q.    And the records that you receive, the records that you

21   review, does it tell which tower and which sector certain calls

22   connect to?

23   A.    It does.

24   Q.    And from that, determining the tower, determining the

25   sector, what are you able to determine?

527

A.    So the records that are generated, they have -- like I
mentioned earlier, they have to be generated just for the course
of business for the cellular providers to exist, so if I was to
pick on, you know, like Verizon for a little bit, you know, if
you have a Verizon phone, for you to make a call, they have to
have this record to know generally where you are so they can
connect a call to you.  They have to know generally where you
are to allow you to make a call because -- I'll get into it --
but as you're connected on a call, they have to provide that
coverage because you don't go plug into this tower.

You are mobile with your mobile phone, so they have to
know generally where you are to allow that call to stay
connected seamlessly to you, the end user, and, you know, at the
end of the day, they have to have some kind of accounting of the
amount of resources you're using so they can have some kind of
record there, so we can take those records, marry it up with
another set of records, which gives us the location of where all
these tower masts are.  It also tells us which direction each of
the spotlights are pointing on those masts, and there's a unique
identifier in those records that -- it's like a snowflake or
like a fingerprint.  It doesn't exist anywhere else in the
Verizon or AT&T system.  It's a unique string of numbers and
letters, and we can cross-reference that to this other list.

We can find a point on earth, a latitude and longitude of
where this tower is stuck in the ground.  We can continue on

528

1    that record and we can see the direction those spotlights are

2    pointing, so from that, if I marry all that up together and put

3    it on a map, I can tell the general geographic area of where the

4    user had to be to generate that record to make that call, send

5    that text, whatever it is.

6    Q.    If we can go to Page 4 of Government's Exhibit 62.  What

7    does this show?

8    A.    So we have to utilize all these records because we can't

9    drive around and just look for where the towers are in the area.

10   Like I mentioned, just because I see a tower maybe it's AT&T but

11   I have a T-Mobile phone.  That tower doesn't exist in my phone's

12   world because it only speaks that one language, and just because

13   I see one, I wonder why I'm not getting coverage.  My phone

14   might not be communicating with that tower that I see, or if I

15   don't see one, it doesn't mean there isn't one behind me one

16   block over disguised as the tallest ugliest tree, you know, with

17   the limb hanging off of it in the area or on the side of a

18   building, so we have to utilize these records to determine where

19   all these towers are located.

20   Q.    Does this page show some of the different structures that

21   are used as cell towers?

22   A.    Right.  Just to give you idea, just that they come in all

23   shapes and sizes, flavors.

24   Q.    If we can go to Page 5 of Government's Exhibit 62, what

25   does this show?

529

1    A.    So taking that list of where those towers are located and

2    plotting them on a map, I'm just showing, unrelated to this

3    case, just kind of a random part in north Georgia, showing the

4    towers there are in this part of north Georgia, so all the red

5    dots that are on the map are actual tower locations and then

6    I've highlighted a few with some yellow boxes that say 520 --

7    you know, starting from the left, 525, 425 and 272, so all I did

8    is put those yellow boxes over the red dots.

9    Q.    And this particular map that we're seeing here, not

10   specific to this case but just illustrative; is that right?

11   A.    Yes, just to illustrate, yeah, just to kind of show a

12   couple of points.  As you can see, I've also marked on the ones

13   marked with yellow boxes different -- I have white boxes that

14   say Sector 1, 2 and 3, and those are the directions or the

15   sectors are the spotlights, those antennas that are pointing in

16   certain directions, and you can see it's not one size fits all.

17   It's not they all point north, you know, southeast and

18   southwest.  They point depending on where people are, what the

19   engineers have, you know, when they did their analysis, this is

20   the strategic way that they came up to place these spotlights or

21   point those spotlights.

22        So if I was standing right here on this white box that

23   said Sector 1, I pull out my phone, dial the number, hit the

24   green button, my phone is scanning, looking for those

25   spotlights, and it's determining, you know, it's ranking

530

 1    figuring out the best signal to the worst signal.

 2         Line of sight, proximity, it's always going to be a very

 3    good rule of thumb of the, you know, the signal, the best signal

 4    that comes across, so if I was standing here, my phone would

 5    request resources, so just think of a kid in a classroom that

 6    wants to ask a question to the teacher, what do they do, they

 7    raise -- in a very polite classroom, they raise their hand.

 8    They wait on the teacher to call on them, so if you think of the

 9    teacher being the tower, the tower will call on the student

10    raising their hand.  "What would you like to do?"  "I would like

11    to make a phone call."  That call gets connected, resources are

12    granted, the call gets connected and a record gets generated.

13         Once I'm in the call, I can move around.  As I get further

14    away from Sector 1, the signal is going to degrade.  I'm getting

15    out of that spotlight.  Just think if you're on a street at

16    night.  You're under a spotlight or a light, street light.  As

17    you move away from that, that street light kind of gets dimmer,

18    but there's another one next to it, and you kind of move into

19    that spotlight.  It's a little bit brighter, so I would move

20    into Sector 2.

21         The network will then connect me to that next sector and

22    allow me just to seamlessly travel around this tower and I would

23    just be handed off from sector to sector.  No different than if

24    I started way over here on the left of the map and I was on this

25    highway, I would first connect with this sector and tower, and

1    as I traveled through, I would just be connected from tower to

2    tower, sector to sector.

3         They have this overlapping coverage, you know, but we've

4    all experienced as we're driving we get a dropped call or maybe

5    sometimes we're just moving around our house, we get a dropped

6    call.

7         You moved into an area that just doesn't have a, you know,

8    good enough signal coverage, but if the engineers do everything

9    in the ideal world, there is nice overlapping, across all

10   their -- you know, everywhere in the United States for them, and

11   they can just have this seamless network that you as an end user

12   just are mobile with your phone.  You don't know any different.

13   It's just you can make a call anywhere.

14   Q.   If we could go to Page 6 of Government's Exhibit 62, what

15   does this show?

16   A.   So this is getting more specific to the case.  It's just

17   showing the AT&T network in the Savannah area.  I've also placed

18   a red map on the -- or a red flag on the map that depicts the

19   crime scene that I was -- the location of the crime scene that I

20   was provided in this case.

21        So, just to give you an idea, you know, how many towers,

22   each of those have multiple sectors on them, and this is just

23   for AT&T, so if I were to overlay, you know, Verizon, T-Mobile,

24   they would look very similar.

25        But as you can see kind of some of the main points is when

532

1    I'm out here in a more rural area, along the highway, I can put

2    the towers much further apart because there is less people I

3    need to provide so the signal can go further.  Those spotlights

4    can point a lot further, but as I get closer to downtown

5    Savannah, more population, you can see towers are, you know, in

6    some cases just a couple of blocks from each other.  So they

7    have to put the towers closer together to provide less coverage

8    so they can support all those people down there.

9    Q.    And again the records that you reviewed tell you not only

10    the tower that was connected but also the sector; is that right?

11    A.    That's correct, yes.

12    Q.    If we could go to Page 7 of Government's Exhibit 62, what

13    does this show?

14    A.    So this is starting August 2nd, going through August 17th

15    on a particular phone number.  The one is (912) 313-6350.  It's

16    just showing a, you know, going back to that pattern of life,

17    just showing over that roughly two-week time period the series

18    of transactions or records that were recorded as they relate to

19    59 Village Drive, in the area of 59 Village Drive, so there's a

20    tower right in this location, kind of in the middle of the map,

21    and for that two-week period it ends up being roughly, you know,

22    40 to 60 different transactions in that area, right in the

23    immediate area of 59 Village Drive.

24    Q.    Were you told by investigators that this number ending in

25    6350 is that associated with Pablo Rangel-Rubio?

533

1    A.    Yes.

2    Q.    And if we could zoom in on the left side of this screen

3    and go through some of the -- the left side, I'm sorry, and this

4    was approximately a two-week period between August 2nd to August

5    17th; correct?

6    A.    Yes.

7    Q.    And you said it shows around 60 calls in that

8    approximately two-week span; correct?

9    A.    Yeah.  I was adding -- yeah, it's roughly 50, 60 calls or

10   transactions for sure during that period at various different

11   times.  You know, I listed all the different times, like kind of

12   time ranges, for that -- for all those transactions to occur.

13   Q.    And with respect to those time ranges, those were ranging

14   from we see calls at 8:14 a.m. all the way to calls at 10:35

15   p.m.; correct?

16   A.    Yeah.  10:19 p.m., for sure, yeah, 10:35 p.m. on certain

17   days.

18   Q.    Even looking specifically at August 10th, that alone has

19   19 calls just on that day; correct?

20   A.    Right.  Yeah, 19 different transactions over a four-hour

21   period in that area.

22   Q.    August 11th, the next day, has 12 calls; correct?

23   A.    That's correct.

24   Q.    If we could zoom back out.  And it looks like there's a

25   little bit different colors with respect to the shading.  Can

534

1    you talk about that?

2    A.    Yeah.   It's just the way the mapping program works.   If

3    there's multiple transactions on that particular sector, it just

4    kind of stacks them up on top of each other, so you can see

5    there is much lighter shade on this sector that's pointing this

6    way versus a darker shade pointing on these two sectors.   It

7    just means there was more activity on those two sectors versus

8    the third one.

9    Q.    And the cell tower reflected here, is that a Verizon cell

10   tower?

11   A.    Yes.

12   Q.    Is that the cell tower closest to the scene of the murder?

13   A.    The closest Verizon tower, yes.

14   Q.    If we could go to Page 8 of Exhibit 62.   Looking at this,

15   what does that shown for August 18th?

16   A.    This is actually on August 18th.   It's the activity of --

17   kind of ugly activity of three different phones.   I tried to

18   color code them but it's the phone ending in 2816, the other one

19   ends in 9133 and then the third one is 4519, but they are on

20   August 18th going from roughly 12:50 p.m. to 3:54 p.m. a series

21   of calls utilizing -- and text messages -- yeah, just calls

22   utilizing two different towers because one is T-Mobile right

23   here, and the other one is a Verizon tower that we were just

24   talking about, and it's utilizing a couple of different sectors

25   on each of those towers, but I've also kind of -- I've also

535

1    tried to note that a couple of these phones are in communication

2    with each other, and how they -- and I've also shown on the map

3    a location for 59 Village Drive.

4    Q.    All right.  Now let's unpack this particular slide a

5    little bit.  Some of these numbers that you have color coded,

6    did you understand that the 2816 number and the number ending

7    9133 were numbers associated with Juan Rangel-Rubio?

8    A.    Yes.

9    Q.    And the number ending 4590, is that associated with

10   Higinio Perez-Bravo?

11   A.    Correct, yes.

12   Q.    The timeframe here, it looks like from 12:49 p.m. to 3:54

13   p.m.; is that right?

14   A.    Yes, it is.

15   Q.    And during that period, are there frequent calls among

16   those numbers?

17   A.    Yes.  In particular there's two calls right around 12:55,

18   you know, from the 2816 number.  I've marked the two calls on

19   the top, and then the associate -- the associated call with 4590

20   number is depicted there, so they are in communication with each

21   other.

22   Q.    And let me, if we could zoom in on the middle part of this

23   page.  Thank you.

24        Does that show the calls, the times of those calls, the

25   recipient of those calls?

536

1    A.    Yes, 12:55 and 12:58.

2    Q.    So around the afternoon, around 12:50 to around 3:50,

3    frequent calls between and among those numbers in that area?

4    A.    That's correct, yes.

5    Q.    This again occurred August 18th, the day before the

6    murder; correct?

7    A.    That's correct.

8    Q.    Now, would you expect a user near 59 Village Drive to be

9    within the tower and sector of several of those calls?

10   A.    Absolutely, yes.

11   Q.    And the darker color shading, what does that reflect

12   specifically where I've circled with respect to the dark maroon?

13   A.    Well, like I was testifying to earlier, it just means

14   there is more activity on that particular sector because it's

15   just -- it's the same shaded area as you see over here, but

16   there's just more of the activity so it gets to be a darker

17   shade.

18   Q.    If we could go to Page 9 of Government's Exhibit 62.  Does

19   this reflect August 19th?  Now we're at the day of the murder.

20   A.    Yes.

21   Q.    What does this show?

22   A.    So it's just showing two calls; one is at 8:34 in the

23   morning; the other one is at 10:25 in the morning.  They are

24   both utilizing the same towers and sectors from the previous

25   slide, but this is on August 19th, the morning of August 19th

537

1  and then I also depicted the location of 59 Village Drive.

2  Q.    Would you expect the user at the intersection of Old Dean

3  Forest Road and Village Drive to be within the coverage area of

4  the cell tower and sector depicted here for the 2816 number and

5  the 4590 number?

6  A.    Absolutely.

7  Q.    Now the call on that 4590 number, that's at 10:25 a.m.;

8  correct?

9  A.    That's correct.

10  Q.    If we could go, staying on that same date, if we could go

11  to Page 10, Government's Exhibit 62.  Now, what does this show

12  again staying on that same August 19th date?

13  A.    So it's just continuing later, August 19th, so starting at

14  12:18 that same phone utilizes a tower in the bottom left of my

15  map, which is right here in the sector pointing to the kind of

16  north.

17        Then continuing on at 12:26 that same phone is utilizing a

18  tower and sector that is pointing in this direction, and then at

19  12:30, it's utilizing the tower and sector depicted in the upper

20  right, and it's at sector kind of pointing in this direction.

21  Q.    Okay.  And again, the 4590 number, that you understand

22  associated with Mr. Perez-Bravo?

23  A.    That's correct.

24  Q.    If we could go back to the previous slide.  That call --

25  I'm sorry, the prior slide, so that would have been Page --

538

1   A.    It's here.

2   Q.    Page 9, thank you, so the 4590 call there is at 10:25

3   a.m.; correct?

4   A.    That's correct.

5   Q.    Going to the next slide, we see for that 4590 when we're

6   looking chronologically at this slide, it begins 12:18 call down

7   here; is that correct?

8   A.    That's correct.

9   Q.    Suggesting what?

10  A.    If you look at this slide in its entirety, it looks to me

11  like the user of that phone is traveling, you know, from the

12  area you circled going to, you know, towards the east then

13  towards the north.

14  Q.    And indeed the prior slide showed the tower up there

15  suggesting from that call at 10:25 the user going down to where

16  that call at 12:18 is placed; correct?

17  A.    Right.  I don't know what happened between 12:25 and --

18  10:25 and 12:18, but definitely the tower before was right here,

19  and so like you mentioned, it would be traveling, you know, to

20  the south, then to the east and then to the north.

21  Q.    So starting near Highway 17 and 307, moving east and then

22  north on Chatham Parkway -- is that right -- at 12:30?

23  A.    Yeah, it would be consistent, yeah, with that type of

24  travel.

25  Q.    If we could go to Page 11 of Government's Exhibit 62,

539

1    staying on this same date, now looking at around that time

2    period at the 9133 number, what does this show?

3    A.    It's just showing that there were a series of calls on the

4    9133 number utilizing that one tower that's closest to the crime

5    scene and multiple different sectors off of that tower.

6    Q.    And the 9133 number, you understand that to be associated

7    with Juan Rangel-Rubio?

8    A.    Yes.

9    Q.    And the calls reflected here begin on 12:17 p.m.?

10   A.    12:17 to 12:34, yes.

11   Q.    And can you talk a little bit about the east-to-west

12   movement that's depicted here?

13   A.    Right, so the first series of calls are using the sector

14   that points to the east and then the last call or maybe the last

15   two calls is pointing to the west.

16   Q.    And does that suggest an east-to-west movement on

17   Interstate 16?

18   A.    It could be consistent with that, or it could be in the --

19   consistent, you know, like -- there's overlapping coverage

20   between these sectors so, you know, it could be -- you could

21   just be right in that overlap area, but nonetheless you're on

22   the sector that's pointing to the east, then the sector that's

23   pointing to the west, so you're either traveling east to west or

24   you're right in that overlap area where there is mutual coverage

25   between the two, which would be, you know, close to the north/

540

1    south line.

2    Q.    And two of the four calls depicted here are with that 4590

3    associated with Mr. Perez-Bravo; correct?

4    A.    Yes, there's -- yeah, three actually calls out of the five

5    listed that are with the 4590 number.

6    Q.    And as we saw at 12:30, that 4590 from a prior slide

7    appears to be sort of returning back to that area; is that

8    correct?

9    A.    Well, it was making that kind of half-circle, semi-circle.

10    Q.    Now, if we could go to the last slide, which is Page 13 of

11    Government's Exhibit 62.  I'm sorry, if we could go to 62, Page

12    12, my apologies.

13         So looking at Page 12 of Government's Exhibit 62, what

14    does this show?

15    A.    So it's just showing the last two calls we were just

16    talking about.  You have, you know, one call on this sector and

17    then another call on this sector.  I've depicted where the crime

18    scene is located and then there's another phone, 2816, that's

19    utilizing a Verizon tower and sector that points in this

20    direction.

21    Q.    And the call, the 2816 number, does that come

22    chronologically after the 9133 numbers that are depicted there?

23    A.    Yes.  It's about 90 seconds after this last call in this

24    sector here.

25    Q.    And is that consistent with a user traveling west on I-16

541

1   to be within the coverage area of the cell tower and sector

2   depicted for the 9133 and 2816 numbers?

3   A.    Yes.  The Verizon tower is definitely to the west.  Yes.

4   Q.    Now looking at the final page, which is Page 13 of

5   Government's Exhibit 62, lots to unpack here.  Let's break it

6   down.  What does this show?

7   A.    So it's just taking into account the different phones.  We

8   have the 4590 number continuing through the day.  I have the

9   crime scene marked on the map as well as a green dot -- I'm

10  sorry, if you could clear that -- a green dot a little bit to

11  the south of that, which represents a Kroger at 5720 Ogeechee

12  Road, and the 4590 number starts utilizing a tower at 1:23 just

13  to the south of the Kroger, and then continuing through the day,

14  starting at 2:32, it uses a tower further to the east, so from

15  the crime scene, it's further south and then travels to the

16  east.

17  Q.    And can you sort of draw the area of the travel consistent

18  with the direction and sector of these towers?

19  A.    Yes.  I put a pinkish-colored arrow on there, but it goes

20  from the west to the east.

21  Q.    Okay.  So the 4590 number appears to be separating from

22  the 2816 and 9133 numbers?

23  A.    Well, yes, so ultimately the 2816 at about the same time,

24  1:13, starts utilizing a tower roughly to the west of the

25  Kroger.  And then continuing through the day, you have a tower

542

1   at 1:19 and then 1:32, 1:36 and then 1:46 to 2:05, so kind of

2   continuing, you know, to the north, you know, going north in

3   Georgia.

4   Q.   Now, is the 9133 call, is that consistent with the travel

5   of the 2816 number?

6   A.   Right.  So the 9133 number, there's a record that's

7   generated at 1:26, which if you look as compared to the 2816

8   number, just to the south at 1:19, there's a tower that's used

9   with that particular phone, and just after 1:26 at 1:32, there's

10  a tower that's used just to the north of that record that was

11  generated with the 9133, so the timing of the record with the

12  9133 at 1:26 fits right in the middle of the two transactions of

13  the other phone number.

14          MR. HOWARD:  I have no further questions for this

15  witness, Your Honor.

16          THE COURT:  Cross-examination, Ms. Brewington?

17          MS. BREWINGTON:  Thank you, Judge.

18                      CROSS-EXAMINATION

19  BY MS. BREWINGTON:

20  Q.   Mr. Fitzgerald, are you the one that pinpointed all of

21  these specific towers?

22  A.   Yes.  I mean, I -- the list that I was referring to has

23  them pinpointed.  I just put them on a map.

24  Q.   Did you use a computer software to do that?

25  A.   I did.

543

1    Q.    Was this software current and up to date?

2    A.    Right.  It's based on Google Maps so it utilizes Google

3    Maps.

4    Q.    Is it validated by peer review?

5    A.    As far as the -- yeah, my presentation was peer-reviewed

6    and validated.

7    Q.    Is there any kind of error rate that you know?

8    A.    In regards to --

9    Q.    The actual mapping of the towers?

10   A.    So from Google Maps?

11   Q.    Is there an error rate to the computer system that you

12   used?

13   A.    In what regard?  Like that's pretty broad.

14   Q.    You're putting phone numbers into specific towers.  Is

15   there an error rate that exists that would tell you that maybe

16   you are pinpointing a specific phone to a wrong tower?

17   A.    I don't see how because, like I mentioned earlier, the

18   tower list has a unique string of numbers with a lat/long and

19   direction associated to it.  The records have that unique string

20   of numbers.  We're just marrying up the two unique string of

21   numbers and plotting it on a map.

22         I don't -- based on the fact that a peer reviewer also

23   does it manually through a different system, different than what

24   I used, I don't see that there is any error rate.

25   Q.    So it could never be wrong?

544

1    A.   Well, I don't know that you could -- I mean, to say never,

2    the engineer in me would find that, even if it has 99.9999,

3    there's still an error rate.  I don't -- I would never say

4    never, but I have no -- I'm pretty confident in what I plotted.

5    I don't believe there's any errors.

6    Q.   Pretty confident but not a hundred percent?

7    A.   I have no reason to believe it's not right.

8    Q.   Did you have anybody check that work?

9    A.   I did.  I had it peer-reviewed, absolutely.

10   Q.   Who was that?

11   A.   Mack Carmen.

12   Q.   And do you have their work here today?

13   A.   I do not.

14   Q.   To show that it coincides with yours?

15   A.   Well, my final product was based on his peer -- so like I

16   turn over my product.  It goes through the peer reviewer.  He

17   reviews it.  Sends me back his notes or his -- provides me with

18   what he found, if he did find anything.  I have to make the

19   changes before I can finalize the report and provide it to the

20   prosecution.

21   Q.   You would agree this is not an exact science?

22   A.   In like cellular phones, it's not exact?

23   Q.   This particular, what you do, it's not an exact science;

24   correct?

25   A.   That's a hard statement to agree with.  I mean, once

1    again, "exact" is, you know, I'm focusing on that word, but

2    it's -- I think it's a very accurate representation of the

3    records that were provided.

4    Q.    Would GPS be more accurate?

5    A.    Most of the time, GPS would be more accurate.  You can get

6    down to the meters in GPS, but, you know, I've seen, in certain

7    cases when I'm dealing with satellite phones, and, you know,

8    getting limited GPS, it has a very large radius, and this is

9    actually more accurate than some of those that I've looked at in

10   Africa or in, you know, very remote locations.

11   Q.    When you were mapping these specific calls, were you using

12   triangulation or were you using a single pinpoint?

13   A.    We only have the record that was generated.  Triangulation

14   is a whole different level of record analysis.  This particular

15   one is just strictly the tower and sector that was used, and

16   that's it.

17   Q.    So this is just using one tower; correct?

18   A.    That's correct.

19   Q.    But if you use two, three, four, five, it would be more

20   accurate?

21   A.    If those records were available, of course, I would make

22   use of them and make it more accurate but I utilized the records

23   that were available.

24   Q.    Did you try to get those additional records?

25   A.    I know when I got involved, those records would not even

546

1    exist.

2    Q.    Do you know if they are stored by cell phone companies?

3    A.    There is something called timing events which would tell

4    us -- not only would we get the sector that's utilized.  There's

5    also a timing that goes into it so we can determine how far from

6    the tower the mobile phone was, so it gives you like an arc.

7         Those records are available from the companies but they

8    are very perishable because it's a lot of data, so they only

9    last for about -- the company that keeps them the longest is

10   about 30 to 45 days so they were not available at that -- at the

11   time that I got involved in this case.

12   Q.    But you would agree that it would make your data more

13   accurate?

14   A.    Of course.  I mean, if we have that data, that's always --

15   we always try to get that data if we can.

16   Q.    That more accurate data could be more favorable to the

17   Defense; correct?

18   A.    Depends on what the data -- I mean, we're talking about,

19   you know, just guesses.  Could it be more favorable or less

20   favorable?  I don't know the answer to that.  It's -- I would

21   have to see the data.

22   Q.    Do you know how many cell phone towers are in Garden City?

23   A.    I showed a map, you know, earlier of the area.  I mean,

24   it's quite a few towers.  I don't -- not off the top of my head.

25   Q.    Do you know the cell tower's footprint or the area of each

547

1    coverage?

2    A.    We have equipment that can measure that.  I did not go out

3    and measure that specific footprint in this specific case based

4    on when I got involved.  However, that's why, as you saw on my

5    maps, I look at the -- you know, I didn't just depend on the

6    single record that was generated.  I looked at the network

7    around it to see where the neighboring towers are so I can get

8    an idea of, you know, the general geographic area of that

9    particular tower and sector based on the network as a whole.

10   Q.    Is it possible that the towers can overlap?

11   A.    Overlap?

12   Q.    Yes.

13   A.    Oh, a hundred percent.  Yeah, they are designed to overlap

14   because if you don't have any overlap, you know, it wouldn't --

15   you wouldn't have coverage, so if you think of, you know, if you

16   set up a bunch of sprinklers in your yard, you have that overlap

17   from sprinkler to sprinkler.

18         If you didn't have any overlap, the grass would die.  The

19   grass wouldn't get watered.  It's the same with the cell phone

20   companies.  If they don't have that overlap, then as the user

21   traveled from -- away from that one signal, got into that

22   overlap where there is no overlap or the water is not being, you

23   know, in the sprinkler system, you're going to either see dead

24   grass or you're going to drop your call.  So it's the same idea.

25   So it's a very tuned system, just like a very good sprinkler

548

1    system is very tuned to just water specific areas.  Each

2    sprinkler pretty much waters the area immediately around it, but

3    you want to have that overlap so that you get nice, good

4    coverage.

5    Q.    So if I was in that overlap, could my phone ping to one or

6    the other tower?

7    A.    Absolutely.

8    Q.    Would there be any records about that?

9    A.    If there was multiple calls.  We don't typically get -- at

10   a minimum, we always get the initial tower that's used.  We

11   typically get the ending tower that's used.  We don't

12   necessarily get the towers that are utilized in between, so, you

13   know, there's a couple of answers to your question, but, yes,

14   if -- if a record -- if I were to pick up a phone, make a real

15   quick call, hang up the phone, make another call, it would show

16   that possible, you know, jump from the overlapping, the two

17   overlapping sectors, so, yes.

18   Q.    So you can be showing in your information that it was

19   closer to one particular tower, but if I was in the overlap area

20   it could actually be closer to the other tower; is that correct?

21   A.    It would be in the mutual coverage between those two

22   towers, so I don't -- I wouldn't necessarily say it's closer.

23   Q.    Is it the strongest tower or the closest tower that you

24   usually connect to?

25   A.    It's the tower providing the best signal, so that

549

1    typically, very good rule of thumb, in general, is going to be

2    that closest one, like I mentioned.  The line of sight is the

3    biggest player in any kind of RF technology, like that

4    radiofrequency technology such as cellular.  Line of sight is

5    always a good indicator, but is it a hundred percent always the

6    closest, no.

7    Q.    There's a lot of things that can affect which tower you

8    can connect to; is that right?

9    A.    Yeah.  Any kind of major obstruction like a mountain or,

10   you know, deep valley, obviously, solid structure, the signal is

11   not going to go through as an example.

12   Q.    Would call volume determine which cell phone tower you

13   connect to?

14   A.    No.

15   Q.    Like --

16   A.    Not -- not the initial -- not where the records is getting

17   generated.  No.

18   Q.    So one couldn't be busy so you connect to the other?

19   A.    No, because there's a beacon channel that gets put out.

20   So there are multiple channels that are put out but your phone

21   is looking for the beacon channel.  That beacon channel gives no

22   indication if the tower is busy.  In addition to that, to give

23   you idea, like there's teams of engineers looking at these

24   sites, and one of them that optimizes the different sites, they

25   view it as they are looking at the daily volume on these sites,

550

1   the, you know, breaking it down by even hours, and if a site is

2   getting up to the neighborhood of, back then, in 2017, it's

3   probably close to like 40 percent, but nowadays it's more like

4   25 percent.

5       If it starts hitting that kind of consistent capacity,

6   they are putting more resources out there, because they don't --

7   they don't operate these towers at 90 percent, 95 percent

8   capacity.

9       They keep them well below a half, and if it starts

10  creeping up to a half, they are going to start deploying more

11  resources so that there is always that capacity there, so it's

12  an engineer -- to answer your question, it's an engineer's

13  nightmare to have a site that is reaching capacity or is at

14  capacity.

15      It's a direct hit on the user experience, and they are all

16  about providing a great user experience so that you stay with

17  the company, generate revenue.  If you are having a very bad

18  user experience, you're going to go to a competitor.

19  Q.   Do you know if any of the towers in Garden City were in

20  disrepair at the time?

21  A.   I don't know if there was a tower in, you know, that was

22  being -- under maintenance, which usually happens in the middle

23  of the night anyway, so -- or if something was cut or down, but

24  I do know the records I looked at, all the towers were

25  operational because a record was generated with that tower, so I

551

1    know a hundred percent that they were operational.

2    Q.    Do you know a hundred percent if all those towers their

3    maintenance was up to date?

4    A.    Well, I know that they were operational to carry on the

5    activity and generate the records that I looked at.

6    Q.    That wasn't my question.  Do you know if their maintenance

7    was up to date?

8    A.    I don't know.  I didn't get any maintenance records.

9    Q.    Did you ever try to look for them?

10   A.    No, I did not.

11   Q.    Why not?

12   A.    Because, like I said, it generated the record.  I know

13   that the tower was operational.  Typically, these companies keep

14   those kind of things, those are very big metrics that get

15   measured, so I -- I'm pretty confident that it's -- I know based

16   on the records that were generated they were operational, and

17   that's the main thing.

18   Q.    So just to reiterate, you can't say for sure that the

19   phones are in the same car; right?

20   A.    No.  I do not know if the phones were, you know, in the

21   same pocket in the same car.  I just know, you know, I testified

22   to the areas where it looked like they were consistently

23   traveling in the same directions.

24   Q.    No idea what the conversations were?

25   A.    No idea.

552

1    Q.    No idea who was holding those phones?

2    A.    I don't know who held the phones.

3          MS. BREWINGTON:  Nothing further.

4          THE COURT:  Any brief redirect?

5          MR. HOWARD:  Yes, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. HOWARD:

8    Q.    You mentioned that sometimes mountains can impede a cell

9    phone signal; is that right?

10   A.    A hundred percent.

11   Q.    Are you aware of any mountains in Garden City, Georgia?

12   A.    No, I'm not.

13         MR. HOWARD:  No further questions, Your Honor.

14         THE COURT:  Any objection to this witness being excused?

15         MR. HOWARD:  No, Your Honor.

16         MS. BREWINGTON:  No, Judge.

17         THE COURT:  You may step down.  Thank you, sir.

18         Well, ladies and gentlemen, it's almost precisely time

19   for our lunch break, so we will break here from noon until 1:00.

20   Please back in the jury room in time for us to begin promptly at

21   1:00.  We are rounding completion of the Government's witnesses.

22         Remember the familiar admonition:  Don't talk about the

23   case; don't make up your mind; don't read or listen to anything

24   in any media and don't do any independent research.

25         Let's rise for this jury.

1          (The jury exits the courtroom.)

2          THE COURT:  All right, counsel, have a seat.  Let me

3     take up just a few housekeeping matters with you just before

4     lunch.  I've been looking over the agreed-upon jury

5     instructions, and there were a few I wanted to get you to

6     consider.

7          There was a 404(b) instruction submitted that we might

8     possibly need and I wonder whether that is going to be needed.

9     It seems that the evidence has been of a intrinsic nature.

10         I wouldn't really know how to fill out the 404(b), what

11    the permissive reasons for, you know, motive, opportunity.  I

12    don't know what other bad acts we would be talking about.  So

13    that's what flagged it to my attention.  Be thinking of that

14    during the lunch break, and you may be able to agree among

15    yourselves, or between yourselves, whether we do need to press

16    forward with the 404(b) instruction or whether we can set it

17    aside.

18         The two in-trial instructions that were given regarding

19    translation and the transcripts, the jury has heard those

20    instructions during trial, and my question is simply:  Do we

21    need to repeat those in written form as well, and again, I'll

22    just commend that to both sides and perhaps you can agree on

23    either including it or leaving it as is.

24         The other thing I want you to be thinking about during

25    the lunch break is approximately how long you may want for

554

 1    closing arguments, and we will address that at the end.

 2         I know that Mr. Rangel-Rubio has been present and

 3    understands he has the right to testify.  He has the right not

 4    to testify.  It's his decision in consultation with his

 5    attorney.  Nothing that I may say at any time during this trial

 6    should indicate to him that I think he should or should not

 7    testify.  That is committed to the decision of him in

 8    consultation with Ms. Brewington.  It's my understanding you

 9    have two witnesses remaining.

10         MS. GROOVER:  That is correct, Your Honor.

11         THE COURT:  And we will break at the close of the

12    Government's case, and I'll address defense counsel about how

13    you wish to proceed at that point.  All right, we will be in

14    recess until one o'clock.

15         (Recess from 12:01 p.m. to 1:02 p.m.)

16         THE COURT:  Counsel, just before we bring the jury in,

17    were you able to give some thought to the set of charges that I

18    brought to your attention?

19         MS. GROOVER:  We were, Your Honor.

20         THE COURT:  And were you able to come to an agreement?

21         MS. GROOVER:  I believe we have, Your Honor.  The

22    Government has no objection to removing the 404(b) instruction

23    and I believe Defense would like to leave in the trial

24    instructions and the Government would have no objection to that.

25         MS. BREWINGTON:  So I had thought about that over lunch,

1    Judge, and we can get rid of those, too.

2         THE COURT:  So everyone agrees to remove the 404 and the

3    transcripts and interpreter.

4         MS. BREWINGTON:  Yes.

5         THE COURT:  Then we will do that.  That way, we can

6    focus on the ones that apply and that they have never heard.  As

7    far as once we do at whatever point reach the point of closing

8    arguments, approximately how long are you thinking that you will

9    require?

10        MS. GROOVER:  Probably an hour, Your Honor.

11        THE COURT:  And for the Defense?

12        MS. BREWINGTON:  That will be very sufficient, Judge.

13        THE COURT:  We will be -- this afternoon -- working on

14   assembling the charge and, of course, will give you a written

15   copy of it and confer with you before we ever deliver it.  But

16   first we've got to get through all of the evidence so let's

17   bring in the jury.

18        (The jury enters the courtroom.)

19        THE COURT:  Welcome back, ladies and gentlemen of the

20   jury.

21        On behalf of the United States, call your next witness.

22        MR. HOWARD:  Your Honor, the Government calls J. C.

23   Lopez.

24

25

556

1                      J. C. LOPEZ,

2    having been first duly sworn, was examined and testified as

3    follows:

4              THE CLERK:  Thank you.  You may be seated and if you

5    will please state your full name, spell your last, state your

6    occupation and your business address.

7              THE WITNESS:  My name is Julio Cesar Lopez.  That's

8    L-o-p-e-z.  A special agent with the Department of Homeland

9    Security, Homeland Security Investigations in Savannah, Georgia.

10             MR. HOWARD:  Your Honor, may I proceed?

11             THE COURT:  You may.

12                      DIRECT EXAMINATION

13   BY MR. HOWARD:

14   Q.    Sir, do you go by J. C. Lopez?

15   A.    Yes, sir, I do.

16   Q.    You mentioned you're a special agent with Homeland

17   Security?

18   A.    Yes, sir.

19   Q.    Is that sometimes abbreviated HSI?

20   A.    Yes, it is.

21   Q.    How long have you been a special agent with HSI?

22   A.    Over 20 years, September 2nd was 20 years, sir.

23   Q.    Are you familiar with the case involving the murder of

24   Eluid Montoya?

25   A.    Yes, sir, I am.

557

1  Q.   How did you become involved with that case?

2  A.   The -- one of the case agents on the case, Mr. Tony

3  Miranda, left in January of this year, so I became familiar with

4  the case once he left and took over and assisted Mr. Harley

5  Snipes, Special Agent Harley Snipes.

6  Q.   On May 3rd, 2022 did you come to meet with Juan

7  Rangel-Rubio?

8  A.   Yes, sir, I did.

9  Q.   Where did that meeting occur?

10  A.   That was at McIntosh County Detention Facility in Darien,

11  Georgia.

12  Q.   Was Mr. Rangel-Rubio's attorney present for that

13  proceeding?

14  A.   Yes.

15  Q.   Were attorneys for the Government also present for that

16  meeting?

17  A.   Yes, they were, sir.

18  Q.   At the start of those meetings, was Mr. Rangel-Rubio

19  advised that he didn't have to say anything if he didn't want

20  to?

21  A.   Yes, he was.

22  Q.   Now, in the course of that meeting, did Mr. Juan

23  Rangel-Rubio maintain that he did not murder anyone?

24  A.   That is correct.

25  Q.   And did he talk about the Friday, August 18th, 2017 and

558

1    then that Saturday, August 19th, 2017?

2    A.    Yes, sir, he did.

3    Q.    Let's start with the Friday, August 18th.  Did the

4    defendant explain where he was early in that day on Friday,

5    August 18th?

6    A.    Yes, sir.  Mr. Juan Rangel mentioned that he had taken the

7    day off.  He had asked his brother Pablo for the day off and

8    that he was just going to be in Savannah, Georgia working.  He

9    was going to drive his truck and his trailer to Savannah,

10   Georgia.

11   Q.    Where did Juan say he went that day?

12   A.    He said he was going to the -- he mentioned Savannah,

13   Georgia.  I'm not sure of the exact address, sir.

14   Q.    Did he mention Higinio Perez-Bravo?

15   A.    Yes, sir.  Yes.

16   Q.    How did that come up?

17   A.    He mentioned Higinio because he said he got in contact

18   with Higinio in order to find somebody to help him with work.

19   Q.    Help with Juan's work that day?

20   A.    Correct.

21   Q.    And did he mention having any discussions with Mr.

22   Perez-Bravo?

23   A.    Yes, sir, he did.

24   Q.    Did he mention discussing or borrowing Mr. Perez-Bravo's

25   van?

559

1    A.    He did.  He stated that he ended up borrowing -- he wanted

2    to borrow the van but ended up borrowing the Escalade.

3    Q.    Did he describe whose Escalade it was that he borrowed on

4    Friday, August 18th, 2017?

5    A.    It was Higinio Perez's Escalade.

6    Q.    And where did Juan say that he went in Mr. Perez-Bravo's

7    Escalade?

8    A.    He mentioned he was looking at a job where there was some

9    type of tractor going to be used.

10   Q.    And did he describe where he went that day specifically

11   with respect to the proximity of Savannah Pines?

12   A.    In that vicinity, yes, sir.

13   Q.    Did he describe why he was at that area that day?

14   A.    Again he said he was looking for work that he was going to

15   conduct in that area that afternoon.

16   Q.    At any time did Juan mention what Higinio Perez-Bravo was

17   driving that day?

18   A.    He stated that Higinio was driving a van that day, Higinio

19   Perez's van.

20   Q.    Let's go to Saturday, August 19th, 2017.  Did that day

21   come up in your discussions with Juan?

22   A.    Yes, sir, it did.  Juan mentioned that he had asked

23   Higinio to help him on the following day and that, on Saturday,

24   he was picked up by Higinio, I think, from a Kroger, Kroger off

25   of 17, I believe.

560

1   Q.   And did Juan say why he was at that Kroger that morning of

2   Saturday, August 19th?

3   A.   He said he had driven his truck there and he didn't want

4   anything to get stolen, so he decided to park his vehicle there

5   at the Kroger.

6   Q.   After he parked his vehicle at that Kroger, did he say

7   what happened next?

8   A.   He said he got into the van which Higinio Perez was

9   driving and asked him for a ride to a location, I believe it was

10  Nassau, Nassau Woods in that area.

11  Q.   Do you recall him describing where they went, he and Mr.

12  Perez-Bravo, in that van on that day?

13  A.   Again, I believe he mentioned he was going to Nassau Woods

14  area.  He was going to do some work on some power lines.

15  Q.   And are you familiar with where Nassau Woods is in

16  relation so Savannah Pines?

17  A.   Yes, sir.

18  Q.   Can you tell the jury?

19  A.   It's off of Highway 16.  If you take Dean Ritter basically

20  it's north of I-16.  You will go north.  You will pass Savannah

21  Pines and then up towards the top is where the other location

22  is.

23  Q.   Near the area of Savannah Pines?

24  A.   It's in proximity, yes, sir.

25  Q.   Was there a discussion about Juan having phones that day?

561

1   A.    Yes, sir.  He mentioned he had two phones that day.

2   Q.    Did he describe the phones?

3   A.    He stated that one of them I believe was under a gentleman

4   named Oscar's name and that another one was a prepaid telephone.

5   Q.    Did he describe using one of the phones to call Higinio

6   Perez-Bravo?

7   A.    He stated I believe he used the prepaid to contact Higinio

8   Perez.

9   Q.    But again he maintained that he was not the one that

10  murdered Mr. Montoya?

11  A.    Yes, sir.

12        MR. HOWARD:  I have no further questions for this

13  witness, Your Honor.

14        THE COURT:  Cross-examination, Ms. Brewington?

15        MS. BREWINGTON:  I have no questions, Judge.

16        THE COURT:  Any objection to this witness being excused?

17        MR. HOWARD:  No, Your Honor.

18        MS. BREWINGTON:  No, Your Honor.

19        THE COURT:  You are excused.

20        Call your next witness.

21        MS. GROOVER:  United States calls Karen Hartley to the

22  stand.

23                       KAREN HARTLEY,

24  having been first duly sworn, was examined and testified as

25  follows:

562

1        THE CLERK:  Thank you.  You may be seated.  And if you

2   will please state your full name, spell your last, state your

3   occupation and your business address.

4        THE WITNESS:  Karen Hartley, H-a-r-t-l-e-y.  I'm an

5   investigative analyst with the US Attorney's Office.  That's 22

6   Barnard Street, Savannah, Georgia.

7                        DIRECT EXAMINATION

8   BY MS. GROOVER:

9   Q.    Ma'am, how long have you been employed with the US

10  Attorney's Office?

11  A.    14 years.

12  Q.    And can you tell us what your job responsibilities are?

13  A.    I generally review and analyze all different kinds of

14  documents to include business records, phone records, videos,

15  all kinds of things and then make an analysis of it to give to

16  work with the investigative team and attorneys in these cases.

17  Q.    You try to summarize those documents and records and make

18  sense of those?

19  A.    Correct.

20  Q.    And from time to time, do you also prepare charts on your

21  analysis of documents?

22  A.    Yes.

23  Q.    And videos as well?

24  A.    Yes.

25  Q.    Did there ever come a time where you reviewed a variety of

563

1    documents and digital evidence in the investigation of the

2    murder of Eluid Montoya?

3    A.    Yes.

4    Q.    What types of records did you review, ma'am?

5    A.    Bank records, employer records, phone records, video

6    records.    That's what I can remember.    There's all kinds of

7    records.

8    Q.    And so did the review of the records include records

9    produced from companies including Wolf Tree, Davey Tree and

10   United Rentals?

11   A.    Yes.

12   Q.    And did they include United States Exhibits 6, 58, 77, 97,

13   98 and 99?

14   A.    Yes, yes, they did.

15   Q.    And in general do these exhibits include over 11,000 pages

16   of documents produced from companies in this investigation?

17   A.    Yes, they do.

18   Q.    Did you also review bank records in this case?

19   A.    Yes.

20   Q.    Including but not limited to United States Exhibits 63

21   through 65 as well as 67 and 70, some of these documents that

22   are sitting up here?

23   A.    Yes.

24   Q.    And approximately how many bank records did you review in

25   this case?

564

1  A.    There was over 80 bank accounts.  I think there were like

2  over 17,000 pages of bank records and maybe over 35,000

3  transactions.

4  Q.    Spanning years from approximately 2007 to 2017?

5  A.    Yes.

6  Q.    Did you also review phone records in this particular case?

7  A.    Yes.

8  Q.    And specifically did you review five phone numbers

9  associated with Pablo, the defendant, Higinio Perez-Bravo as

10  well as Mr. Montoya?

11  A.    Yes.

12  Q.    Did you also look at over 19 phone reports from

13  individuals who may have been associated or witnesses in this

14  particular case?

15  A.    Yes.

16  Q.    And did you look at phone records produced by the

17  providers including Exhibits 37, 38, 39, 87, some of those

18  records here on the floor?

19  A.    Yes.

20  Q.    And approximately how many transactions of these phones

21  did you review, ma'am?

22  A.    I believe there was over 68,000 transactions in those

23  phone records.

24  Q.    Did you also review surveillance footage in this

25  particular case?

565

1    A.    Yes, I did.

2    Q.    Approximately how many hours of surveillance videos did

3    you review?

4    A.    It was over 11 hours of video.

5    Q.    And did those include Exhibits 29, 30 and 81?

6    A.    Yes.

7    Q.    And Exhibits 29 and 30, are those the video surveillance

8    records from IBEW?

9    A.    Yes.

10   Q.    And Exhibit 81, is that surveillance video from

11   McDonald's?

12   A.    Yes.

13   Q.    And have you prepared summary charts based on all your

14   review of all these documents and these records?

15   A.    Yes, we have.

16   Q.    Let's begin with the company records.  As part of your

17   duties in this case, did you review records produced from Davey

18   Tree?

19   A.    Yes.

20   Q.    Can you explain Davey Tree in relation to Wolf Tree, if

21   you know?

22   A.    Davey Tree owns Wolf Tree.

23   Q.    As you reviewed the records, did the records include

24   employees' files who worked in the Savannah area for Wolf Tree?

25   A.    Yes, they did.

566

1    Q.    As you reviewed those records, did you notice anything

2    unusual in the employee files?

3    A.    I did.  I noticed there were a number of employees who

4    started having addresses related to Pablo Rangel, also bank

5    accounts and -- that were related to Pablo Rangel's bank

6    accounts and also Juan Rangel's bank accounts.

7    Q.    Did you learn that Pablo started working there in

8    approximately 2003?

9    A.    Yes.

10    Q.    And the defendant started working in approximately 2007?

11    A.    Yes.

12    Q.    If you could pull up Exhibit 77, please.  Tell us, do you

13    recognize Exhibit 77?

14    A.    That's an employee file.

15    Q.    Is this an example of an employee file of someone who

16    worked for Pablo in the Savannah area of Wolf Tree?

17    A.    Yes.

18    Q.    And as you scroll through Exhibit 77, do you notice

19    anything about this?

20    A.    On this date, this P. O. box belongs to Pablo Rangel.

21    Q.    Did you also notice if the defendant's phone number was

22    listed in emergency contact?

23    A.    Yes.

24    Q.    For example, on Exhibit 77, Page 16.

25    A.    Yes.  You see "in case of emergency" in the middle of the

567

1    page, there's a phone (912) 677-2896, is Juan Rangel's phone

2    number.

3    Q.   And were you able to determine a pattern from looking at

4    employee files such as this?

5    A.   Yes.

6    Q.   What was the pattern?

7    A.   There were several that had this P. O. box.  There were

8    several employee files that had addresses of Pablo Rangel and

9    also they had banking information of Pablo Rangel's accounts and

10   also Juan Rangel's accounts.

11   Q.   In Exhibit 99, if we could pull up Exhibit 99 and tell us

12   if you recognize this?

13   A.   Yes.

14   Q.   Where did this document come from?

15   A.   This document came from -- this document was actually in

16   several people's employee files.  All the people that are listed

17   are employees.  You see a name with an employee number behind

18   it.  So this document more than likely was in each one of these

19   different files so there's -- I think there's about nine or 11

20   people, and the address gets changed to -- the 275 Milton Rahn

21   Road in Rincon, Georgia is the ranch compound that the Rangels

22   lived at.

23   Q.   And what is the significance, if you've learned from

24   reviewing the record, of changing an employee's address on file?

25   A.   Then the employee's either checks are going to go to this

568

1   or all their employee information, such as W2's, checks,

2   whatever employee might get from their company is going to go to

3   this address now.

4   Q.   The address where the defendant lives with his brother?

5   A.   Yes.

6   Q.   And Exhibit 97, if you could please pull that up and tell

7   us if you recognize Exhibit 97?

8   A.   Yes.

9   Q.   And what are we looking at in Exhibit 97?

10  A.   This is another employee file for Jerad Brown.

11  Q.   And is this an individual that you spoke with who

12  confirmed he did not work at Wolf Tree?

13  A.   That's correct.  Jerad Brown never worked at Wolf Tree.

14  Q.   Were you able to confirm that it was impossible for him to

15  be working at Wolf Tree?

16  A.   I issued a subpoena to his employer at that time to give

17  me records of his employment for the time that he had been

18  working there.

19  Q.   And continuing with Exhibit 97, if you scroll through, was

20  the contact of the address for this going to a P. O. box

21  associated with the Rangel-Rubios?

22  A.   This is a Mercy Boulevard address.  I believe later in the

23  file there is the P. O. box also, same P. O. box.  And he was --

24  there was checks being issued to him that were, of course, not

25  going to him.

569

1    Q.    Checks in the name of Jerad Brown that were not going --

2    A.    Yes.

3    Q.    And Exhibit 98, if we could pull that up, please, if you

4    could tell us if you recognize Exhibit 98?

5    A.    This would be the letter, cover letter response to the

6    subpoena I sent to United Rentals where he's confirming that he

7    worked an average of 45 hours per week from August 2016, and it

8    actually goes into 2018.

9    Q.    And if you scroll through Exhibit 98, did they also

10   produce some of his time sheets?

11   A.    His time records, yes, daily, daily time records.

12   Q.    The timeframe of the employment you got with United

13   Rentals was the time he was supposedly working at Wolf Tree?

14   A.    Yes.

15   Q.    And is this an example of several employee files that you

16   found issues like this with Wolf Tree files, employee files?

17   A.    They were suspected people that never worked for Wolf

18   Tree, yes.

19   Q.    And Exhibit 72, can you please pull up Exhibit 72 and tell

20   us what are we looking at in Exhibit 72?

21   A.    This is some of the documents we received from Davey Tree

22   or Wolf Tree, and this is Pablo Rangel's GPS record for his work

23   truck.

24   Q.    As part of this investigation, did you learn as well as

25   other investigators that the work truck for Pablo had GPS where

570

1    they could track his locations?

2    A.    Yes.

3    Q.    Is this the data associated with that?

4    A.    Yes.

5    Q.    And were you able to review records in the month of August

6    of 2017 of the work truck assigned to Pablo Rangel-Rubio?

7    A.    I did review those.

8    Q.    And on August the 2nd of 2017, were you able to determine

9    where Pablo Rangel-Rubio went or the truck that he drove went?

10   A.    Yes, the Wolf Tree truck, yes, I can tell -- I can tell

11   exactly where it was by this.

12   Q.    Where was it?

13   A.    On -- I know on August 2nd, I think it's the next page

14   maybe.

15   Q.    Page 2 of Exhibit 72?

16   A.    Yes.  It's a little hard to see in here.

17   Q.    If we could look at the top half of the --

18   A.    It's actually in the bottom, bottom half.

19   Q.    Thank you.

20   A.    You can see it looks specifically he was at Grove Point

21   Road, 1717 Grove Point Road, which is where Higinio Perez-Bravo

22   lived, down at 1717, it's like four lines down from the

23   highlight.  I might can press it with my finger.  I'm not sure

24   what's going to go up.

25   Q.    Yes, if you could mark it with your finger.

571

1    A.    I see it's red.  So I marked right through it.  You'll

2    have to take it off.  There we go.

3    Q.    Is that now highlighted on your screen?

4    A.    Yes.  It is now highlighted, sorry.

5    Q.    In then your review of the GPS records produced by Wolf

6    Tree associated with Pablo Rangel-Rubio, did you ever notice

7    that he ever went to Perez-Bravo's home again?

8    A.    I did -- I did not find any.

9    Q.    Just the one time?

10   A.    I believe so, from the records we had.  I think it

11   started -- we only maybe had about a month.  They had just put

12   the GPS in I think in the work trucks.

13   Q.    Zooming back out of this exhibit, on August the 18th of

14   2017, were you able to determine where Pablo's work truck was

15   the day before the murder?

16   A.    Yes.

17   Q.    And can you tell the jury where the truck was?

18   A.    I can tell you the truck started out at the compound in

19   Rincon, Georgia on Milton Rahn Road.  He traveled to what ended

20   up being St. Simons, Georgia, and around noonish, maybe 11:00ish

21   that day, he traveled back up to Savannah to the exit -- it's

22   204, Abercorn Road, intersecting with 95.  He was actually at a

23   hotel at that exit for maybe an hour or so, traveled back down

24   to St. Simons, and then to Brunswick and it ends at -- at -- he

25   stays at a hotel in Brunswick.

572

1       It ends close to that for that day, the work truck.  I

2   think it cuts off maybe around 6:00, and then the next morning,

3   it starts up at the same address that it had stopped at and

4   travels back to Savannah to that same exit, Abercorn exit at 95

5   around that hotel area, stays there a little while, and then

6   travels up to his home, ranch compound, back in Rincon.

7   Q.    From your review of the GPS records on August the 18th and

8   August the 19th of 2017, did Pablo's work truck --

9   A.    I'm sorry.  I did -- I did both days.  I did the one he

10  spent the night at, so yes.

11  Q.    Did you ever notice that the work truck was in the area of

12  where Mr. Montoya was killed?

13  A.    No.  It was not.

14  Q.    He was not there on August the 18th of 2017 the day

15  before?

16  A.    No.

17  Q.    He was not there on August the 19th of 2017, the day of

18  the murder?

19  A.    No.

20  Q.    Exhibit 57, can you please pull this up and tell us if you

21  recognize this?

22  A.    This is a map I made from Google Earth.

23  Q.    And can you explain this map?

24  A.    Yes.  Sort of down where you see the red marker with Eluid

25  Montoya on it, that is, where the red marker is is the murder

573

1   site.

2        Then if you look up, up on the map you will see the 275

3   Milton Rahn Road.  There is the ranch compound in Rincon.

4   There's a marker for Springfield, and north of that is the area

5   that Juan Rangel was working, supposed to be working at.

6        Then at the bottom of the map you will see a marker for

7   where Higinio Perez's home was so south and then also where he

8   returned to work on the 19th.

9   Q.   So where the compound is as well as where the defendant

10  was supposed to be working, nowhere near where Mr. Montoya was

11  killed?

12  A.   That's correct.

13  Q.   As well as where Mr. Higinio Perez-Bravo's home and where

14  he was supposed to be working at, also nowhere near where Mr.

15  Montoya was killed?

16  A.   That's right.

17  Q.   Exhibit 61, can we please take a look at Exhibit 61 and

18  tell us if you recognize this?

19  A.   Yes.

20  Q.   If you scroll through Exhibit 61, does this appear to be

21  two photographs with some information behind it?

22  A.   Yes.  These two photographs I pulled off a -- what we

23  refer to as a phone dump, so records received off an actual

24  phone and these two photographs come with some metadata.  So

25  this, these photographs were both taken on August 19th, the day

574

1   of the murder.  One is taken at 1:58:26 seconds in the

2   afternoon.  There is a longitude and latitude at the bottom of

3   where the photo was taken.

4        The next photo -- they were taken within a couple of

5   seconds.  One is at 1:58:24 and the other one is at 1:58:26, so

6   right in the row, same longitude latitude, same Samsung phone.

7   Q.   Which phone did you get these pictures from?

8   A.   These were from Maria Gonzalez's phone.

9   Q.   And were you able to look at the GPS location from where

10  these photographs were taken?

11  A.   I looked up the longitude and latitude, which is up in the

12  work area where the defendant was supposed to be on the previous

13  map.

14  Q.   If we could pull up Exhibit 57, please.  Can you please

15  circle on Exhibit 57 where these photographs in Exhibit 61 were

16  taken?

17  A.   That's up there in Juan Rangel, up in that area, north of

18  Springfield.

19  Q.   Is that the area where Juan was supposed to be working on

20  August the 19th, 2017?

21  A.   Yes.

22  Q.   Exhibit 66, if we could please take a look at Exhibit 66

23  and tell us if you recognize that.

24  A.   I made this chart.  This is Wolf Tree or Davey Tree, money

25  that went into Pablo Rangel accounts, so the first account, it's

575

1    between three accounts at Bank of America, and that is everybody

2    but Pablo's money that went into that account for the time

3    period of February of 2008 through September of 2017, so it was

4    2280 checks for $1,744,923.95.

5              INTERPRETER GIERSBERG:  Interpreter asks for the witness

6    to please slow down.

7    (By Ms. Groover)  And so backing up for just a moment, these

8    are 2280 direct deposit or checks in other people's names that

9    went into Pablo Rangel-Rubio's account?

10   A.    That's correct.

11   Q.    And can you please describe the second line for us?

12   A.    The second line is Wells-Fargo account ending in 6752.

13   It's the same thing.  It's other employees, not Pablo's, and the

14   time period from June 2nd, 2011 to August 17th, 2017.  It's

15   actually all direct deposits, so there's 856 for $635,945.25.

16   Q.    Going into Pablo Rangel-Rubio's account?

17   A.    You will see it's the same Bank of America numbers as the

18   other employees, but this is just Pablo Rangel money only.  It's

19   505, make sure, direct deposit and checks from December 14th,

20   2007 to November 20th, 2017 for $600,549.73.

21   Q.    And were you able to determine how many checks were

22   deposited into Pablo's bank account and how much money he got?

23   A.    The total is at the bottom, so it's 3641 checks or direct

24   deposits for $2,981,418.93.

25   Q.    And Exhibit 68, can we please take a look at Exhibit 68

576

1   and tell us if you recognize this, ma'am?

2   A.    This is the Wolf Tree or Davey Tree direct deposits, Wolf

3   Tree into Juan Rangel's Bank of America accounts ending in 8386

4   and 6933.

5         THE COURT:  Ms. Hartley, let me ask you to slow down

6   just a little bit because our interpreter has to get all these

7   numbers straight, so if you will slow down just a tad.

8         MS. GROOVER:  Thank you, Your Honor.

9         THE WITNESS:  So this is a summary actually by the

10  employees.

11  (By Ms. Groover)  And so can you please tell us what the first

12  line is representing?

13  A.    First line, well, in the columns is employee ID number for

14  each of the employees so that's an employer number, and it's got

15  the name, the account number, ending four digits of the account

16  number, then the total amount, start date, end date, and the

17  number of times that the deposits went in.

18  Q.    And can you please describe the first row then.

19  A.    The first row is Juan Rangel, to his 6931 account, for a

20  total of $21,791.49 for December 14th, 2007 through June 6th,

21  2008, 26 times.

22  Q.    So these checks actually in the defendant's name, Juan

23  Rangel?

24  A.    Yes.

25  Q.    And can you describe the second line for us.

577

1    A.    The second line, these are the next direct deposits, I

2    believe, going into this account under the name of Alvaro

3    Rangel, same account, 6931, $325,608.49 starting June 25th, 2009

4    through March 31st, 2016.  It's 324 times.

5         THE COURT:  Was that a joint account with both of these

6    Alvaro and Juan on the account or did Alvaro's checks just go

7    into Juan's account?

8         THE WITNESS:  That's correct.  It's Juan's account.

9    Alvaro is not on that account.

10   (By Ms. Groover)  This is a sole owner account of Juan

11   Rangel-Rubio; is that correct, ma'am?

12   A.    Yes.

13   Q.    And then can you please describe the next few lines for

14   us?

15   A.    All right, Rigoberto Cruz, same account, 6931, this is for

16   a short period of time.  It's $7,714.98 from July 9, 2009 to

17   September 10th, 2009.  It's ten, ten checks.

18   Q.    And did Juan Rangel-Rubio also receive checks in the name

19   of Stanley Turner that were deposited into his account?

20   A.    Yes.  This goes into the 8386 accounts, total $80,542.17

21   from April 30th, 2015 to August 24th, 2017, 122 times.

22   Q.    Did he also receive checks in the name of Nemorio Cruz?

23   A.    Direct deposits, yes.

24   Q.    In the amount of approximately $81,000.00?

25   A.    Yes.

578

1    Q.    And finally were there checks in the name of Niclaus

2    Rodriguez that were deposited into the defendant's bank account?

3    A.    Yes, for $69,074.12 from May 2016 to August 2017, 69

4    times.

5    Q.    And as part of your duties in this case, are you aware of

6    any statements that Juan Rangel-Rubio provided to law

7    enforcement throughout this case?

8    A.    Yes.

9    Q.    Generally familiar?

10   A.    Generally, yes.

11   Q.    Are you aware that he admitted to using some of these

12   names to work at Wolf Tree?

13   A.    Yes, he did.  You can see a pattern on the -- especially

14   the accounts of 6931 where the end date and then the next start

15   date would be similar or within a couple of months so Alvaro

16   Rangel ends in March of 2016.  Niclaus Rodriguez picks up in May

17   of 2016.

18   Q.    Rotating out names?

19   A.    Yes.

20   Q.    Exhibit 69, can you please tell us what are we looking at

21   in Exhibit 69?

22   A.    This is just the total between -- it's the total for Pablo

23   Rangel and Juan Rangel's account, so Juan had a total deposited

24   of $586,216.14 and there's Pablo's total, $2,981,418.93, so the

25   total, the total of both, which ends up being $3,567,635.07.

579

1    Q.    And, again, these are accounts only in the name of Juan

2    Rangel-Rubio and Pablo Rangel-Rubio; correct?

3    A.    Pablo Rangel may have added his wife and another family

4    member, another -- I think his mom or something later.  Later,

5    it might have been after August of 2017.

6    Q.    But all family members?

7    A.    Yes.

8    Q.    Now you mentioned you also reviewed phone records in this

9    case; is that correct?

10   A.    That's correct.

11   Q.    And as part of the investigation, did law enforcement

12   seize at least nine cellular phones from search warrants?

13   A.    Yes.

14   Q.    And did you review those nine cell phones, the search of

15   those phones --

16   A.    Yes.

17   Q.    -- and the data?  And did you also review phone records of

18   19 phone numbers of individuals who were associated with this

19   case?

20   A.    Yes.

21   Q.    Can you describe --

22   A.    The 19 includes the nine also.

23   Q.    Can you describe to the jury these numbers that are

24   associated with the case, for example, generally whose numbers

25   are these?

580

1    A.    It's -- it's just identified people related to this case

2    that we wanted to take a look at their phones, phone

3    information.

4    Q.    For example, if someone's name came up as a possible

5    suspect and their phone was identified, would that number be

6    included in these 19 phones?

7    A.    Yes.

8    Q.    Based on common calls and contacts saved in phones and

9    phone location data, were you able to identify phone numbers

10   associated with the defendant, Pablo and Perez-Bravo?

11   A.    Yes.

12   Q.    Exhibits 86, can we please pull that up and will you

13   describe what we're looking at?

14   A.    This is just simply a chart of the phone numbers for

15   Higinio Perez, Juan Rangel-Rubio and Pablo Rangel-Rubio.

16   Q.    And Higinio Perez, how did you determine that phone number

17   associated with him?

18   A.    That is his -- it's subscribed to him on his phone report.

19   Q.    And Juan Rangel-Rubio, the number ending in 2816, how did

20   you associate that?

21   A.    That -- that was obtained in the -- off his dash when he

22   was arrested.  That's his number.  That was also the number that

23   was in that employee file that we brought up earlier under -- as

24   an emergency contact.

25   Q.    And the 9133 number, how did you determine and associate

581

1    that with the defendant?

2    A.    There was -- several things.  That phone was set up on

3    August 18th, 2017.

4    Q.    The day before the murder?

5    A.    Yes.  And I had -- if I could, I pulled the contacts of

6    the seized phones, and so we had a contact list from all those

7    phones, and the only person that had that contact information in

8    their phone was Pablo Rangel-Rubio.

9    Q.    Indicating he would be calling his brother?

10   A.    It was -- yes.  It would be calling that -- the phone, and

11   then that phone actually traveled in the same direction after

12   the murder that Juan's phone.  It traveled north towards his

13   work, when looking at that map, towards Springfield and ...

14   Q.    Was there also a phone call from Perez-Bravo --

15   A.    Oh, yes, that's right.  Higinio said that Juan

16   Rangel-Rubio called him to come pick him up, and that's the

17   phone number that called Higinio.

18   Q.    The 9133 number called the 4590 number belonging to

19   Higinio Perez-Bravo; correct?

20   A.    That's right.  And then Pablo's number, that's his --

21   that's associated with his company.  It was also the phone that

22   he had when he was arrested.

23   Q.    Exhibit 95, can you please take a look at Exhibit 95 and

24   tell us what are we looking at.

25   A.    So this is phone calls from Mr. Montoya, pertinent phone

582

1    calls on August 16th, 2017 and August 17th, 2017.

2    Q.    The day before his death and the day of his murder?

3    A.    This is actually the day he was suspended and the next day

4    I believe when he went to the EEOC.

5    Q.    Thank you for that clarification, correction.

6          Can you please explain any interesting calls on this

7    chart?

8    A.    Well, there's an outbound call to Oscar Cruz and then half

9    an hour later there's a call, an outbound call, to Juan.

10   Q.    Let me stop for just a moment.

11   A.    I'm sorry, it's the phones of the -- I can't say -- he's

12   calling the phone of Oscar Cruz or his phone is calling the

13   phone of Oscar Cruz or the phone of Juan Rangel.

14   Q.    Again, for clarification, you don't know who is talking on

15   the phone?

16   A.    I do not.

17   Q.    You just know what the phones are doing?

18   A.    That's right, phone number to phone number.

19   Q.    When you say an outbound call, what does that mean?

20   A.    An outbound call means I'm calling somebody on the phone.

21   If there's a phone inbound, then somebody is calling me.

22   Q.    So the first line on August the 16th, 2017, there's an

23   outbound call to Oscar, a phone number associated with Oscar

24   Cruz?

25   A.    So Montoya's phone is calling the phone of Oscar Cruz.

583

1    Q.    And next who does he call?

2    A.    The next call, the phone of Montoya is calling Juan

3    Rangel's phone number.

4    Q.    And this is the day he got suspended --

5    A.    Yes.

6    Q.    -- from the company for the alleged safety violation?

7    A.    Yes.

8    Q.    Who else does he call on the 16th of August?

9    A.    Well, then Juan does call him back.  It's an inbound call

10   at 2:17 and 37 seconds.  That's a 15-minute phone call.  The

11   other one is -- it's in minutes, so there's not a minute.  It's

12   just seconds, and then there's a call to Oscar Cruz's number,

13   outbound call to Carmen Brown.  Then at 2:50 and 2:54, he is

14   calling Davey Tree.  One was very short and the other one was 14

15   minutes and 28 seconds.

16   Q.    So the day he was suspended, communicating with Juan

17   Rangel-Rubio's phone for approximately 15 minutes as well as

18   calling Ms. Brown and the company?

19   A.    Yes.

20   Q.    And do you know anything about his conduct on the 17th of

21   August?

22   A.    On the 17th in the morning, he calls -- there's a -- the

23   phone calls Carmen Brown's phone, and then Carmen Brown's phone

24   calls that number back and that is a five-minute phone call when

25   she -- when that phone calls back.

584

1       Then at 11:27, Jose Santos' phone calls Mr. Montoya's

2   phone and they talk for 23 minutes and 20 seconds, and then

3   there's an outbound call to Juan Rangel's phone.

4   Q.    And if we could, this is the day that Mr. Montoya went to

5   the EEOC; is that correct?

6   A.    That's right.

7   Q.    And do you know approximately what time he went to the

8   EEOC on the 17th?

9   A.    He was -- he was there in the morning.

10  Q.    And do you know approximately what time he finished at the

11  EEOC on the 17th?

12  A.    I am not positive on the time.  I think -- it was before

13  lunchtime.

14  Q.    If we could please pull up Exhibit 96, the last page of

15  Exhibit 96, please, and while we're pulling that up, do you

16  recognize this exhibit, ma'am?

17  A.    I prepared this exhibit.

18  Q.    Remind us what is this exhibit, please?

19  A.    This is phone calls and text messages between the phones

20  of Carmen Brown and Mr. Montoya.

21  Q.    And the last page, does the communication between Mr.

22  Montoya and Ms. Brown indicate approximately what time Mr.

23  Montoya finished reporting the situation to the EEOC on August

24  17th?

25  A.    Well, he says he's still there at 11:28 a.m. so around

585

1    11:30 that morning.

2    Q.    And then going back to Exhibit 95, please, so that the

3    telephone call with Mr. Jose Santos was approximately at the

4    time that he may have left the EEOC?

5    A.    He -- he was still there, so he might have been just

6    leaving because he definitely talked to Mr. -- the phone of Mr.

7    Santos for 23 minutes.

8    Q.    And almost a little over an hour later, who does Mr.

9    Montoya call?

10   A.    Juan Rangel's phone.

11   Q.    Exhibit 79, can we please take a look at Exhibit 79.  Can

12   you please tell us what are we looking at in Exhibit 79?

13   A.    These are for August 18th, 2017.  These are what we call

14   pertinent phone calls between phones and locations between the

15   phones of -- the two phones, one ending in 9133 and 2816 of Juan

16   Rangel and Higinio Perez's phone ending in 4590.

17        So going across, it's the phone and -- it's phone name,

18   name of the phone and the last four digits of the phone, then

19   the time, the direction of the phone call, meaning again

20   outgoing is I'm calling somebody, incoming you're calling me,

21   who they contacted, what the party was or what was happening,

22   the duration of the call and then it's the tower location

23   address listed on the phone report of whatever phone report it

24   was that I was receiving.

25   Q.    Again, you prepared this based off all of those phone

586

1    records that you were gathering of anybody pertinent to this

2    case; is that correct?

3    A.    That's right.

4    Q.    And as part of that process, were you able to determine

5    the location of phones who may have been possible suspects at

6    some point in time?

7    A.    The phone report does have an address and actual longitude

8    and latitude on some of the reports, not all the reports that we

9    received.

10    If it was requested, then we have that information in the

11    phone reports, so I could tell what phone tower they were close

12    to because it's on the report.

13    Q.    Now of these 19 phone numbers that you reviewed and

14    attempted to pull location information, when someone was a

15    suspected suspect, did you try to identify where they were at

16    the time of the murder?

17    A.    I did.  If we had the tower location information, I did.

18    Q.    For example, did you ever hear the name of Iner Teller

19    Lopez, also known as Chito?

20    A.    Yes.

21    Q.    Did you learn from this investigation that Chito was

22    present at the showup meeting?

23    A.    Yes.

24    Q.    And that individuals indicated that Chito was mad with Mr.

25    Montoya because of the letter he had submitted?

587

1  A.    Yes.

2  Q.    Were you able to determine where he was on the day of the

3  murder?

4  A.    Yes.

5  Q.    Was he anywhere near the murder site?  Was his phone

6  anywhere near the site?

7  A.    Well, Iner Lopez actually lives in the same trailer park

8  that Mr. Montoya lived, so his phone was there early in the

9  morning.  I think maybe he left around 8:00 maybe in the

10 morning, and it returned -- he was several places during the day

11 and it returned back to that trailer park around I believe 4:00

12 in the afternoon.

13 Q.    Not present during lunchtime?

14 A.    No.

15 Q.    And did you conduct an analysis like that any time a

16 possible suspect would arise in this case?

17 A.    Yes.  Now, let me clarify it's only if they made a phone

18 call could I tell where they were.  It wasn't like I could say

19 where they were every minute of the day.  They had to make a

20 phone call for me to determine.

21 Q.    Getting back to Exhibit 79, when you say pertinent phone

22 calls and locations, what did that mean exactly, "pertinent"?

23 A.    What that means is this -- this tower location is the

24 tower location that is very close to the murder site, and

25 there's actually three different addresses you will see because

588

1    T-Mobile and AT&T is actually the same tower but that just

2    happens to be the addresses they list, but that's the exact same

3    tower, and then Verizon has a different tower that is close to

4    that location also, which is Pine Meadow Road.

5         T-Mobile is the Old Dean Forest Road address and AT&T just

6    says Jim Gillis Historic Parkway, which is actually I-16 is what

7    that's named, but it's AT&T, and the longitude and latitude for

8    AT&T and T-Mobile is the same exact tower.

9    Q.    And so Exhibit 79, is this phone calls, pertinent phone

10   calls, between phones associated with the defendant and the

11   phone of Higinio Perez-Bravo the day before the murder at

12   approximately 12:49 p.m. through approximately 3:54 p.m.?

13   A.    Right.

14   Q.    And all of these phone calls are made or connecting to

15   towers near the murder site; is that correct?

16   A.    That's correct.

17   Q.    Exhibit 80?

18   A.    Can I explain just something for a minute?

19   Q.    Yes.

20   A.    You will see the third and fourth line down, so this line

21   and this line, that is Higinio is calling Juan, so it hits at

22   the same time.  So it's Higinio Perez's phone is calling Juan at

23   12:55.  Juan is receiving the call at 12:55.  So there are

24   duplicates on there, but it's because it's information because

25   Mr. Perez's phone would hit a different tower than Mr. Rangel's

589

1    phone.

2    Q.    Still in the same area?

3    A.    Still in the same area, but it's -- and actually they are

4    calling each other, but it's on there twice because one is from

5    one phone and one is from another.

6    Q.    Thank you for that clarification.

7          Exhibit 80, please, if you will please pull that up and

8    tell us what we're looking at here?

9    A.    This is the same type information except for the day of

10    the murder, August 19th, 2017.

11    Q.    Thank you.  Again, so this is the phone number in the name

12    of Juan Rangel-Rubio, a phone number associated with Juan.

13    A.    It's three phone numbers, the 9133 and 2816 associated

14    with Juan Rangel and then Higinio Perez ending in 4590, same

15    exact thing, it's -- if they were hitting off the towers that

16    were close to the murder site.

17    Q.    These are the calls between those three phones at

18    approximately 8:34 a.m. through 12:35 p.m. that were hitting off

19    the tower at or near the murder site?

20    A.    That's correct.

21    Q.    On the day of the murder?

22    A.    On the day of the murder.  It also has the same thing, you

23    will see again on the third and fourth line -- I'm sorry, not

24    the third and fourth line, the fourth and fifth line, that's the

25    same phone call between the two phones, just hitting different

590

1    towers.

2    Q.    Exhibit 93, please, do you recognize Exhibit 93?

3    A.    Yes.

4    Q.    Can you explain this chart?

5    A.    This chart is all the phone calls between those three, the

6    same three phones, the two of Juan Rangel and the one of Higinio

7    Perez, except it has all the tower locations and all the phone

8    calls made, so these would be phone calls outside of the area of

9    where the murder happened.

10    Q.    And this is on August 18th, 2017, the day before; is that

11    correct?

12    A.    That's correct.

13    Q.    And so, for example, a phone call at 7:16 a.m., it appears

14    Juan Rangel phone is calling Higinio Perez phone, and they are

15    near -- hitting a tower off of -- in Savannah at 432 Meinhard

16    Road?

17    A.    Yeah, Juan's phone is hitting that tower and Perez's phone

18    is hitting another, a different tower.

19    Q.    Indicating they are not together at that moment or are

20    those towers nearby each other?

21    A.    I don't know -- those towers are not close.

22    Q.    And if we could zoom back out on Exhibit 93, please.  And

23    again these are all the phone calls beginning at approximately

24    7:18 a.m., if I can read that correct, the top line, all the way

25    to 3:54 on the day before the murder; is that correct?

591

1   A.    Right.

2   Q.    Regardless --

3   A.    At the end, you can see Juan Rangel's phone at 3:54 is at

4   the Pine Meadow, close to the murder but Higinio Perez is not.

5   He's -- Dana Avenue is actually close to where he was working,

6   supposed to be working.

7   Q.    Indicating they had separated?

8   A.    Yes.

9   Q.    And at times on this call, were the phones together?

10  A.    Yes.

11  Q.    And Exhibit 94, can we please pull up Exhibit 94 and let

12  us know if you recognize this?

13  A.    This is the same, so it would be all the calls between

14  these three phone numbers again on August 19th, the day of the

15  murder.

16  Q.    Do the calls begin at approximately 6:38 a.m. and end at

17  approximately 12:48 p.m.?

18  A.    Yes.

19  Q.    And these are -- where exactly do these phones begin and

20  where do they end, if you could please describe it for us?

21  A.    Well, Juan Rangel's phone is in Rincon, Georgia.  You can

22  see that.

23  Q.    At 6:38 a.m.?

24  A.    Yes, at 6:38.  That's the same phone call back and forth.

25  Juan is calling Perez.  Bamboo Lane is off of Highway 17 in

1  Savannah, Georgia.

2      The next phone call is Juan calling Higinio Perez and they

3  are at different locations.  Juan is hitting -- I'm sorry, yes,

4  the 9133 number is a T-Mobile phone hitting off a tower close to

5  the murder and Higinio Perez is off of Ogeechee Road in

6  Savannah.

7  Q.    Indicating they are at different locations?

8  A.    That's correct.

9  Q.    And this is at approximately 12:17 p.m.?

10 A.    12:17 and 12 -- yes.

11 Q.    And 12:18 p.m.

12 A.    Yes.  Sometimes it takes -- it's -- on the phone reports

13 it takes time to connect to the next phone.

14 Q.    And can you please describe the next few phone calls on

15 this chart, please?

16 A.    It's two phone calls 12:26 between the 9133 number of Mr.

17 Rangel and Perez's number of 4590.  The 9133 number is hitting

18 at the tower close to the murder site and Perez's phone has

19 moved to a different location on Ogeechee Road.

20 Q.    And then the last few phone calls?

21 A.    The 12:30 phone call is the 9133 number of Rangel.  It's

22 actually Perez is calling his number at 12:30.  The 9133 number

23 is at a tower close to the murder site, and this is a tower away

24 from the murder site and then getting closer to the murder site.

25 It hits two towers and moving in two different ...

593

1    Q.   Now you mentioned you also reviewed surveillance videos;

2    is that correct?

3    A.   Yes.

4    Q.   And did you pull screenshots from the IBEW video on the

5    day before the murder?

6    A.   I did make screenshots.

7    Q.   If we could pull up Exhibit 73, please.  Do you recognize

8    Exhibit 73?

9    A.   These are -- this is a screenshot of a white Escalade

10   going down the road towards the trailer park that Mr. Montoya

11   lived in.

12   Q.   And as we scroll down through Exhibit 73, can you please,

13   do you see the vehicles moving?

14   A.   Yes.  That vehicle was going in.  This vehicle, the same

15   Escalade is going out and it gives the date and time.

16   Q.   As you keep scrolling through, does this continue --

17   A.   Yes.

18   Q.   -- through Exhibit 73?

19   A.   Now you can see the van -- a white van which we believe is

20   Higinio Perez's van coming in and that's the Escalade.  It

21   actually -- most of -- most of the traffic went back out to that

22   stop sign and out one way or the other on Dean Forest Road.

23   This is turning down a small road called Airport Park Drive,

24   kind of is a little dead end and then that's that same vehicle

25   coming back up Airport Park Drive and then the van is coming

594

1    out.

2        I believe that shot before was the last time we saw that

3    van the day, and then it's just that shot is the last time we

4    saw the van, and then -- on the video for that day and then we

5    see the Escalade continue coming in and out, or I did, yes.  So

6    these are just screenshots of those vehicles.

7    Q.    The clips from the IBEW video?

8    A.    Yes.

9    Q.    And then when you scroll down to the very end of Exhibit

10   70 -- excuse me, let's pull up Exhibit 74, please.  When you

11   scroll through Exhibit 74, can you tell us just generally what

12   this is?

13   A.    This is just another, instead of -- it has a screenshot on

14   there, the time and date and what the car, vehicle, Escalade or

15   the van.

16   Q.    And scrolling all the way through the last page, can you

17   tell us what are we looking at on the last page?

18   A.    So this is just a one-page summary of the Escalade or van

19   coming in and out, and it describes how it's -- if it's coming

20   in or coming off of Dean Forest Road and it's going into Old

21   Dean Forest Road.  That's so it's turning right and going into

22   Old Dean Forest Road, so you start with the Escalade, and you

23   see -- I saw the Escalade first -- I believe we had video that

24   started around 10:45 or so that morning, so that's the first

25   time I saw the Escalade coming in.  And then you see it coming

595

1    out and it went right on -- it came out of Old Dean Forest Road

2    and went right on Dean Forest Road.  Then it comes back in.  And

3    it's coming from the left, so that makes sense.

4         So then the first time I see the van is at 12:54 and it's

5    coming in from the right off of Dean Forest Road and goes down

6    Old Dean Forest Road, so if you look down to 12:59, that van is

7    coming out, and there's two screenshots of it because it

8    hesitates or it's -- maybe there's cars coming and it ends up

9    going right.  In the meantime, in between the van going down,

10   the Escalade came out, went down Airport Park Drive and he came

11   out of Airport Drive, thought about going -- well, paused at Old

12   Dean Forest Road and then ended up going right.

13        So then the van comes down Dean Forest and that was the

14   shot.  That's the last time we see the van.  It doesn't come

15   back into where the trailer park or the road -- Old Dean Forest

16   Road was the road that Mr. Montoya was killed on, and then after

17   that, all we see is the Escalade for the rest of the day coming

18   in and out.

19   Q.   And Exhibit 75, do you recognize Exhibit 75?

20   A.   It's same the thing.  These are screenshots on the day of

21   the murder starting at 7:51 a.m. in the morning.

22   Q.   And then just scroll through, if we could just scroll

23   through, just generally?

24   A.   It's the van coming in and, in and out.  It's the van only

25   on this day.  So it goes in and out down Airport Park Drive, out

596

1    on Dean Forest, just in and out.

2    Q.    And Exhibit 76, please, can we please take a look at

3    Exhibit 76 and tell us what are we looking at in Exhibit 76?

4    A.    First part is another typed summary chart of the time the

5    van is going in and out.

6    Q.    And can you scroll through, please, Exhibit 76 until we

7    get to the last page.

8    A.    Same thing as the other one page.  This is a one page of

9    the van coming in and out starting at 7:51 in the morning.

10   There is a light gray, and that is -- we had a witness that came

11   in and saw Mr. Montoya alive right after he came in, so that

12   is -- he identified that as his car, so that's the only

13   difference.

14        Other than that, it's the van and so it's in and out, in

15   and out up and down Airport Park Drive doing things, and at the

16   end, we can see -- I don't see it anymore after 11:42.  It's

17   heading towards I-16, and I don't see it anymore, and I looked

18   at video until about two o'clock that day.

19   Q.    And Exhibit 82, if we could pull up Exhibit 82 and tell us

20   do you recognize this?

21   A.    This is the screenshot from the video from McDonald's that

22   was in the parking lot of Kroger on Ogeechee Road, and there is

23   a van very similar to Perez's van that -- you will see it's in

24   the parking -- well, up here is the date, 8/19/2017 at 1:05 and

25   21 seconds p.m., that afternoon, so this right here is a white

597

1    van in the parking lot of Kroger.

2    And if we could please pull up Exhibit 56, please.  Can you

3    identify on this map where the location of the surveillance

4    video?

5    A.   The surveillance video?  It's right here, see where IBEW

6    faces out.

7    Q.   Can you please mark on there?

8    A.   Okay, so right here is where the video is.  This is Dean

9    Forest Road and Old Dean Forest Road runs parallel to it right

10   here but it stops at the interstate.

11   Q.   And zooming back out of Exhibit 56, can you identify on

12   this map where the McDonald's and the Kroger is where you

13   pulled --

14   A.   It's down here.  This is Ogeechee Road down here and so

15   ...

16   Q.   And finally Exhibit 104, can we please pull up Exhibit 104

17   and can you tell us if you recognize this?

18   A.   Yes.

19   Q.   What are we looking at here?

20   A.   This is on August 18th, the day before the murder.  This

21   is kind of a mismatch -- I mean, mismatch -- it's a combination

22   of the video on the left-hand side of the screen and the phone

23   activity on the right-hand side of the screen.

24        So it's the Escalade or the van coming in and out, so when

25   the Escalade, you will see times that this Juan Rangel phone of

598

1    9133 is in the area of the murder site, which is close to where

2    the video was, and then you see the van coming in at 12:54.

3        Well, at 12:55 both Juan, the phones of Juan Rangel and

4    Higinio Perez is in that vicinity and so is the van and the

5    Escalade.

6        And moving down, you will see it's the same thing, so it's

7    comparing phone call times to the times of the video, so if you

8    move it up, you will see the last time we see the van -- you

9    have to move it down a little bit so I can see the phone call

10   prior to that.  So the -- there's a phone call between Perez's

11   phone and Juan Rangel's phone.

12   Q.   If you could mark it on the screen?

13   A.   It's right here, 12:58, this phone call right here, the

14   last time I see the van at 12:59, and then at 1:03 is that shot

15   where the last shot I see the van heading towards I-16.

16       We don't see the van anymore, and I no longer have phone

17   calls from Higinio Perez's phone in the vicinity of the murder.

18   Then there's -- continues on, we see the Escalade and actually

19   the two phones of Juan Rangel, well, are in the area of where

20   the murder, off those towers.

21       It's 3:45 is the last phone call of the 9133 phone that's

22   off that tower, but the video ended at approximately three

23   o'clock that day, so I couldn't see any video after that.

24       MS. GROOVER:  Thank you.  Your Honor, may I have just

25   one moment, please?

599

1          THE COURT:  Yes.

2          MS. GROOVER:  Your Honor, I have no further questions

3    for this witness.

4          THE COURT:  Cross-examination, Ms. Brewington.

5          MS. BREWINGTON:  Thank you, Judge.

6                          CROSS-EXAMINATION

7    BY MS. BREWINGTON:

8    Q.    Ms. Hartley, you work for the US Attorney's Office?

9    A.    Yes, ma'am.

10   Q.    You're paid by them?

11   A.    Yes, ma'am.

12   Q.    You're directed by the attorneys to do the work you do?

13   A.    They -- they do, but in the beginning of a case, it's

14   usually me looking at the records trying to determine what they

15   are and what's in those records.

16   Q.    The attorneys are telling you what they are looking for?

17   A.    That is -- no, I'm looking.  I'm looking at the records to

18   see what's in those records.

19   Q.    I want to go to the documents from the employee records.

20   You indicated a lot of those documents had changed to the

21   compound's address or a P. O. box associated with Pablo.  You

22   have no idea who actually filled those forms out, do you?

23   A.    Well, I can say that forms were filled out, a lot of the

24   forms, not every one of them, were filled out in a handwriting

25   that was similar, but I'm no handwriting expert.  But it looks

600

1   like the same handwriting throughout.

2   Q.   But you don't know whose handwriting that was?

3   A.   I cannot say for certain.

4   Q.   The bank records, you're looking at the black-and-white

5   statements; correct?

6   A.   I am.

7   Q.   You never went to the banks?

8   A.   No.

9   Q.   So you don't know if these were made by an ATM, a direct

10  deposit or an in-person deposit?

11  A.   As far as deposits go?

12  Q.   Correct.

13  A.   There are some deposits made at the ATM, and I can tell --

14  if it's a direct deposit, you can tell that on the bank

15  statements.  It identifies direct deposit.

16  Q.   You never went to the bank and pulled the ATM footage to

17  see who made those deposits?

18  A.   No, ma'am, because, first of all, I didn't get into the

19  case until maybe October of 2017 and began trying to obtain bank

20  records after that, and sometimes that takes months, and that,

21  more than likely the ATM video would not even exist anymore,

22  but, no, I did not.

23  Q.   The specific account associated with Juan, how do you know

24  it's just associated with him?

25  A.   I believe the account just is in his name.  If you hold on

601

1    one second, I can tell you that.

2    Q.    Okay.

3    A.    Okay, I think I have a listing of the bank accounts in my

4    notes.  Generally when I make a listing, I put everybody that's

5    on those accounts and it just says Juan Rangel for the three

6    accounts I have with him at Bank of America.

7    Q.    That's the actual document that's lodged with Bank of

8    America; correct?

9    A.    Yes.

10   Q.    But you don't know who else could have had access to that

11   bank account information?

12   A.    Correct.  If he gave an ATM card to somebody, I would have

13   no idea.

14   Q.    So ten people could have made deposits into those accounts

15   but you would have no idea?

16   A.    Sure.

17   Q.    Did you look at withdrawals?

18   A.    Yes.

19   Q.    Do you have any ideas where those withdrawals went?

20   A.    For which account?

21   Q.    For Juan's account.

22   A.    I think I do have some notes on that if it's okay.  I'll

23   see if I can find some.

24   Q.    I will be more specific.  Can you tell if any of that

25   money was given to the people whose names were on those checks?

602

1    A.    No, I cannot tell that from a bank account.

2          MS. BREWINGTON:  Nothing further.

3          THE COURT:  Any brief redirect?

4          MS. GROOVER:  Yes, very briefly.

5                       REDIRECT EXAMINATION

6    BY MS. GROOVER:

7    Q.    Were the bulk of the deposits from direct deposits and not

8    ATM deposits?

9    A.    Into Juan Rangel's account?

10   Correct.

11   A.    Yes.

12         MS. GROOVER:  Thank you.  No further questions.

13         THE COURT:  Any objections to this witness being

14   excused?

15         MS. BREWINGTON:  No objection.

16         MS. GROOVER:  No objection.

17         THE COURT:  You're excused.  Any other witnesses?

18         MS. GROOVER:  No further witnesses, Your Honor.

19         THE COURT:  Do you rest your case in chief?

20         MS. GROOVER:  We do.

21         THE COURT:  As you do that, if you will call out by

22   number each exhibit that was introduced into evidence during

23   your case in chief.

24         MS. GROOVER:  Your Honor, I believe Exhibits 1 through

25   102 were admitted as well as Exhibit 104 and 103.

603

1        THE COURT:  All right.  Ladies and gentlemen, the

2  Government has concluded their case in chief.  Do you have --

3        MS. BREWINGTON:  There's more that was admitted.

4        MS. GROOVER:  I apologize, Your Honor.  It was written

5  on a different piece of paper.  I believe Government's Exhibit

6  312 and 313 were also admitted, Your Honor.

7        THE COURT:  With that, does that conclude all of the

8  exhibits that you have introduced?

9        MS. GROOVER:  I believe so, Your Honor.

10        THE CLERK:  Your Honor, for clarification, I don't have

11  103 marked as admitted.

12        THE COURT:  Which numbers?

13        THE CLERK:  103, 103.

14        THE COURT:  Was that one in the series that Mr. Howard

15  introduced?

16        MS. GROOVER:  I believe we admitted it after the joint

17  trial stipulation, Your Honor.  It's a map, Your Honor.

18        THE COURT:  Yes.  Any objection to 103?

19        MS. BREWINGTON:  No, Judge.

20        THE COURT:  Then the record will reflect that 1 to 104

21  have been admitted without objection as well as the two exhibits

22  in the 300 series.

23        Ladies and gentlemen, the Government has concluded its

24  case in chief.  I have a few housekeeping matters to take up

25  with the attorneys, and so although it's a little early for our

604

1    afternoon break, we will go ahead and break at this time and we

2    will also take a little bit longer break than usual so we will

3    reassemble at a quarter 'til 3:00.  Let's rise for this jury.

4            (The jury exits the courtroom.)

5            THE COURT:  Everyone be seated.  Are there any motions

6    to make?

7            MS. BREWINGTON:  Judge, I do have a motion.  Can I take

8    a five-minute break?

9            THE COURT:  Yes.  I was going to give you a break after

10   your motion, but do you need to time to collect your thoughts?

11           MS. BREWINGTON:  That's fine.

12           THE COURT:  Go ahead and proceed with your motion.

13           MS. BREWINGTON:  Judge, I'm making a motion for directed

14   verdict on all four counts because the venue has not been

15   properly established.  There have been allusions to Garden City.

16   I couldn't imagine how many Garden Citys are in the United

17   States, but it was never established that it was within the

18   Southern District of Georgia.

19           There's been many mentions of different roads, again

20   never established within Chatham County, which is within the

21   Southern District of Georgia.

22           There's been many maps that have been shown but there's

23   not been one witness that has indicated this particular crime

24   occurred within the Southern District of Georgia, and so for

25   that reason I would ask that you make a directed verdict for all

605

1    four charges.

2            THE COURT:  Any other grounds?

3            MS. BREWINGTON:  No, Judge.

4            THE COURT:  Let me hear from the United States.

5            MS. GROOVER:  Your Honor, there has been sufficient

6    evidence that this crime occurred here within the Southern

7    District of Georgia, particularly the Savannah and the Garden

8    City area.  There have been numerous maps that have been

9    entered, including Exhibit 1, that was an outside view of

10   Savannah, Georgia that scrolled inwards to the Savannah Pines

11   area as well as numerous testimony concerning the Garden City

12   area and the streets that are common in Garden City.

13           Your Honor can also take judicial notice of the location

14   where Garden City and Savannah are.  They are here within

15   Chatham County within the Southern District of Georgia, and in

16   addition, the Exhibit 52, Your Honor, is the Georgia death is

17   certificate death of Mr. Montoya.

18           THE COURT:  I am going to overrule that motion, and so

19   we will proceed with the case.

20           Ms. Brewington, do you anticipate after our break

21   presenting any witnesses?

22           MS. BREWINGTON:  I believe so, Judge.

23           THE COURT:  All right, then let me also highlight the

24   fact that we do have, once that occurs, we will have the charge

25   ready and so we will send you home tonight with the draft charge

606

1    and a draft verdict form.

2        When we reassemble in front of the jury, then I will

3    formally call on you, and any witnesses that you would like to

4    introduce you can at that time, and, of course, the United

5    States will have the opportunity to cross-examine them.  And we

6    will go through your witnesses this afternoon, and I do

7    anticipate, as I announced during jury selection, we won't be

8    meeting on Friday but we will then reassemble on Monday and I

9    would think we would have terrific closing arguments given all

10   the time that you'll have to prepare and massage those, and we

11   will proceed to the charge and then let the jury deliberate.

12   Then we will be in recess until a quarter 'til.

13       (Recess from 2:24 p.m. to 2:46 p.m.)

14       THE COURT:  Just before we bring the jury back in, I did

15   want to put on the record, I simply denied the motion that was

16   made at the close of the evidence, and I do make it pursuant to

17   Federal Rules of Evidence 201 and take judicial notice of the

18   fact that many of the locations that were identified in the

19   course of the trial and in the evidence are cities within the

20   Southern District of Georgia.

21       Chatham County, of course, is within the Southern

22   District of Georgia and all those locations are within the

23   Southern District of Georgia, and pursuant to the rules of

24   evidence, those are legislative facts of which I am entitled to

25   take judicial notice.

607

1    That said, Ms. Brewington, did you have something that

2    you wanted to put on the record with regard to another issue?

3    MS. BREWINGTON:  Yes, Judge.

4    THE COURT:  All right, if you will do that.

5    MS. BREWINGTON:  Judge, Mr. Juan Rangel-Rubio has

6    decided to testify, and I just wanted to get on the record that

7    we have gone over his rights about testifying over and over

8    again.  I have advised him multiple times that it probably is

9    not in his best interest to testify.  But he is going ahead and

10   choosing to today.

11   THE COURT:  All right.  Well, then we will proceed

12   accordingly.  We will call the jury in, and I will call on you

13   and then Juan Rangel-Rubio can exercise his right as he sees

14   fit, and the record will reflect what you've put on it.

15   With that, let's bring in the jury.

16   (The jury enters the courtroom.)

17   THE COURT:  Welcome back, members of the jury.  As you

18   will recall when we broke, the Government had rested their case

19   in chief, introduced all their witnesses and all their

20   documents.

21   At this point I will turn to the Defense who has the

22   right but not the obligation to present evidence and witnesses.

23   Ms. Brewington, are there any witnesses you'd like to

24   call?

25   MS. BREWINGTON:  There are, Judge.

608

1            THE COURT:  Proceed.

2            MS. BREWINGTON:  Defense would like to call Juan

3    Rangel-Rubio.

4            THE CLERK:  Sir, if you will please raise your right

5    hand to be sworn.

6                          JUAN RANGEL-RUBIO,

7    having been first duly sworn, was examined and testified as

8    follows through the interpreter:

9            THE CLERK:  Thank you.  You may be seated.  And if you

10   will please state your full name for the record.

11           THE WITNESS:  Juan Rangel-Rubio.

12                        DIRECT EXAMINATION

13   BY MS. BREWINGTON:

14   Q.   Juan, you want to speak to the jury.

15           MS. GROOVER:  Objection, Your Honor, calls for a

16   narrative.

17           THE COURT:  Sustained.  If you will ask your next

18   question.

19   Q.   (By Ms. Brewington)  Juan, what would you like to say to

20   the jury?

21           MS. GROOVER:  Objection, calls for a narrative.

22           THE COURT:  Sustained.

23    (By Ms. Brewington)  Juan, you have some issues with the

24   evidence; is that correct?

25   A.   Correct.

609

1    Q.    And you would like to clarify some of those issues you

2    have with the evidence; is that correct?

3            INTERPRETER GIERSBERG:  The witness asking is for the

4    interpreter to speak louder.  May the interpreter repeat?

5            THE COURT:  Yes, thank you.

6            THE WITNESS:  Yes.

7    (By Ms. Brewington)  And can you explain the evidence that you

8    do not agree with?

9    A.    Well, not just evidence but also with testimony of many of

10   the witnesses who testified.

11   Q.    Who is the first witness that testified that you don't

12   agree with?

13   A.    Well, the first one was Oscar Cruz.

14   Q.    Can you tell us what you disagree with?

15   A.    Well, I -- I disagree with what he said because there are

16   many things about which he is not telling the truth.  I know

17   that he's cooperating with the Government and he was prepared

18   but he hid some -- many things.

19   Q.    What are those things that he hid?

20           MS. GROOVER:  Objection, calls for speculation.

21           THE COURT:  Overruled, continue.

22           THE WITNESS:  Well, one of the things that I could start

23   with from my point of view, well, not to extend myself too much,

24   he was one of the people who also had serious problems with Mr.

25   Montoya.  He did not mention to the Government and to The Court

610

1    that a few months before Mr. Montoya was murdered he had a very

2    strong argument with Mr. Montoya.  And that happened in front of

3    many witnesses who it was in the parking yard where the trucks

4    were -- were parked in front of Georgia Power on --

5              INTERPRETER GIERSBERG:  The interpreter is going to ask

6    for clarification on the road.

7              THE WITNESS:  -- Ogeechee Road and Victory Drive in

8    front of the Georgia Power offices.

9    (By Ms. Brewington)  What's the next witness that you disagree

10   with?

11   A.    I'm not done yet.  He forgot to mention to the

12   Government -- of course, it was not in his best interest -- that

13   he was one of the people who would buy weapons for us.  And

14   after he had that discussion with Mr. Montoya, he bought a

15   weapon and he went to practice -- to do practice target at our

16   land.

17         He also forgot what name I was using in the company and

18   that my check would get to him.  And he also forgot to mention

19   to the Government or maybe the Government didn't ask him when he

20   was prepared what -- what role he played in the company other

21   than supervisor and what areas he was in charge of and what

22   groups.

23         And that's one of the problems in this case and I'm going

24   to, in reality, I'm going to take -- tell the honorable jury

25   right now here that he was in charge of the manual group and the

611

1  group with the buckets.  He had nothing to do with the tractors

2  or with the giraffes.

3          And I also wanted to say that I've realized -- and I'm

4  going to say it now that I'm in front of everybody and everybody

5  can hear me -- that I'm not afraid of this place and I'm not

6  afraid of the results.

7          I trust in God and this has been a good experience for me

8  because -- and I -- so I do want to say now that I'm here in

9  front of the honorable jury and the honorable judge that I want

10 to erase the image that the Government has painted of me through

11 false testimony, false witnesses against me with testimonies

12 that have -- are full of lies, including my name.

13         From the beginning, I had problems, well, I think with my

14 attorneys and also with the detectives and the investigators.  I

15 will say it in this way.

16         My dad told me to be a man.  And I am never going to

17 testify something against someone else and just to get a benefit

18 from it to lie about it.  And I'm going to say then the names of

19 the ones that are doing that.  Oscar Cruz, Juan Ramirez, Jose

20 Luis Santos, Joel Reyes and Raymundo Espino those are the people

21 that know me.

22         I was prepared for this day and I knew also that there

23 were also people that I don't know and that they don't know me.

24 And this is what I wanted to tell to the honorable jury and the

25 honorable judge that give me this opportunity because it's my

612

1   life that is at stake.

2       Government has asked me many questions from the beginning,

3   beginning with Detective Rodriguez and Agent Miranda telling me

4   to cooperate with them to tell them the truth.  And I want to

5   say here, since I'm speaking about lies, that the first time

6   that I was interrogated I gave the testimony let's not call it

7   false but I didn't say -- I didn't tell the truth because I

8   hated the fact that on that day I was in that area.

9       But I told them that I called my brother because I needed

10  oil, and that was the truth.  I returned on that day, I returned

11  late.  And there is proof about that but the Government has a

12  lot of imagination and they think that those messages, those

13  calls were -- had a hidden meaning.

14      And this is what I wanted to say and now you can ask me

15  about that.  I want to hear what you have to ask me and I will

16  tell them what they want to know.

17      And the other person whose testimony was false at the

18  beginning and was false again here where he had his hand up in

19  order to take an oath, that is Joel Reyes.  This person at the

20  beginning told Detective Rodriguez, Mr. Rodriguez asked him

21  about some letters that were found in the home of Mr. Montoya

22  that Detective Rodriguez asked did you write this letter.  He

23  said no.  Detective Rodriguez asked did you sign the letter.  He

24  said no.  Detective Rodriguez asked him did you pay $1500.00 for

25  the documents.  He said no.

613

1          MS. GROOVER:  Your Honor, I would object to this

2     continuing.  It's hearsay.

3          THE COURT:  Overruled.  I am going to give some latitude

4     given language issues.

5          THE WITNESS:  There is something that I forgot to

6     mention.  I have been reviewing the discovery for more than two

7     years.  And believe me that I paid to that much attention, even

8     if I don't read well English.

9          But I looked at many details because, as I already said,

10    it's my life, my freedom, what is at stake.  And when, as I

11    already said, Mr. -- I apologize, Mr. Joel, this is the

12    testimony that he gave at the beginning but the Government

13    didn't show that on this day or during this trial.

14         Also Joel Reyes forgot to tell Detective Rodriguez that

15    during the days when Mr. Montoya died he had two weapons, a

16    revolver, .32 caliber and another revolver caliber .32.  No, I

17    apologize, 22.  And I know who sold him these weapons.  All

18    right.

19         I am not going to tell the names, but if the Government

20    asks me, then I will tell it, tell the names.  I don't want to

21    tell the names because, as I said before, I never want to blame

22    someone just to get a benefit from that.

23         And I want to apologize for what I'm going to say next.

24    This will be something harsh.  He had no problems with Mr.

25    Montoya, but there was some comments that Mr. Joel Reyes was the

614

```
 1   lover of Mrs. Montoya.
 2         MS. GROOVER:  Objection, this is improper
 3   characterization and also relevance, Your Honor.
 4         THE COURT:  Can you repeat the answer that was just
 5   given?
 6         THE WITNESS:  It was not an answer.  It was just a
 7   statement that there were -- was gossip, some talk that Mr. Joel
 8   Reyes was the lover of Mrs. Montoya.
 9   (By Ms. Brewington)  Juan, I'm going to stop you.  It's fair to
10   say that you do not agree with a lot of the evidence put on in
11   the last three days.
12   A.   Yes, that's right but we have to follow a path.  We cannot
13   get to Savannah if we don't take the 95 so the Government wanted
14   me to talk, so now I wish to talk.
15   Q.   I have one more question for you.  Do you maintain that
16   you're innocent to all four charges?
17   A.   I need -- I will say this at the end.  I will answer this
18   at the end.
19   Q.   It's a yes-or-no question:  Do you maintain innocence to
20   all four counts?
21   A.   Not exactly because regarding the money, the money got to
22   my account, so that makes me in part guilty although I'm not
23   guilty.
24         MS. BREWINGTON:  I have no further questions.
25         THE COURT:  All right, cross-examination.
```

615

1           MS. GROOVER:  Thank you, Your Honor.

2                        CROSS-EXAMINATION

3     BY MS. GROOVER:

4     Q.    Good afternoon, Mr. Rangel-Rubio.

5     A.    Good afternoon.

6     Q.    Do you prefer to be call Rangel-Rubio?

7     A.    As you wish.  During this five years I got accused, they

8     call me Rangel or Rubio or Mexicano or different -- different

9     ways.

10    Q.    Now, you have had the opportunity to sit through this

11    entire trial and hear witnesses testify; correct?

12    A.    Yes.

13    Q.    And you have seen the exhibits displayed on a projector;

14    correct?

15    A.    Yes, of course.

16    Q.    And you've heard witnesses come into this room and take

17    the oath?

18    A.    Yes, of course.

19    Q.    Federal agents with federal agencies have come in here and

20    taken that oath; correct?

21    A.    Right.

22    Q.    Experts in the field of medical and physics have come in

23    here, and engineering, they have come in here and taken that

24    oath; correct?

25    A.    That's right.

616

1    Q.    And many people you knew came in here and took the oath;

2    right?

3    A.    Of course, yes, and I -- I don't agree with what they

4    said.

5    Q.    Okay.  And you took the oath; correct?

6    A.    Of course.

7    Q.    Tell the jury what does it mean to take the oath?  What

8    does that mean to you?

9    A.    For me, taking the oath is means that I am going to tell

10   the truth and only the truth, and that is why I am not in

11   agreement with other witnesses, including Detective Rodriguez.

12   Q.    And you take the oath seriously because obeying the law is

13   important to you; is that correct?

14   A.    Yes, to obey the law and to obey God.

15   Q.    And let's talk about obeying the law.  You're in this

16   country illegally; correct?

17   A.    Of course, yes.

18   Q.    You've been in this country illegally for years?

19   A.    Yes, of course, and I admit that I violated the law, but

20   that was before knowing God.

21   Q.    So you admit you came into this country illegally.  Every

22   single day that you've been here for your life and these years

23   you've been breaking the law?

24        MS. BREWINGTON:  Objection, asked and answered.

25        THE COURT:  Sustained.

617

1          THE WITNESS:  What was the question asked me?

2          THE COURT:  It's been overruled so next question.

3    (By Ms. Groover)  I'd like to talk about where you live.  You

4    were born in Mexico; correct?

5    A.    Yes, I was born in Mexico in the state of Hidalgo.

6    Q.    And ultimately you entered the United States and moved to

7    Georgia?

8    A.    Yes.  I entered the United States in the year 2000.  I

9    returned to Mexico several times.  The first time that I

10   returned to Mexico, it was on December of 2002.  I returned to

11   the United States in 2003 during the month of May.  I'm sorry,

12   I'm not sure if it was April or May but it was during 2003.  I

13   think that they have the record because at that time immigration

14   called me.

15   Q.    Each time you entered illegally?

16   A.    Every time I entered this country I entered illegally.

17   Q.    Ultimately in August of 2017 you came and you lived in

18   Rincon, Georgia, with your brother; correct?

19   A.    Yes, in 2017, I was living in Rincon, but I came back in

20   2012 because that year I went to Mexico and returned.

21   Q.    Exhibit 25, 25-1, this is your brother's house; correct?

22   A.    Yes, it's my brother's house.

23   Q.    And many people in your family live on this ranch with

24   you; correct?

25   A.    Yes, we were living there, my family, my brother, his

618

1    wife, well, his family, his children.  Also my cousin Hipolito

2    Martinez was living there, my nephew Refugio Ramirez, my son

3    Jonathan, I and my girlfriend during those days when she was

4    there.

5    Q.    And Exhibit 25-13, these are trailers that members of your

6    family lived in; correct?

7    A.    That was the trailer where -- so Hipolito Martinez was

8    there, his girlfriend, Maria Delrosario, who also testified

9    here, and my son Jonathan.

10   Q.    Exhibit 26-1, this is your house; correct?

11   A.    If that may be called a home, yes, that is where I was

12   staying.

13   Q.    Exhibit 26-2, this is going into your house?

14   A.    Yes.  It was a bad job that I did because I was not a

15   carpenter.

16   Q.    Exhibit 26-3, walking into your house; correct?

17   A.    Yes.

18   Q.    Exhibit 26-4, this the inside of your house?

19   A.    Yes.

20   Q.    And Exhibit 26-5, these are all your firearms in your

21   house?

22   A.    Yes.

23   Q.    That's your ammunition there in the oven?

24   A.    Yes.  As I said in the -- at the beginning, that we had

25   ammunition everywhere because it -- since it was a large

619

1    property, we spent a lot of time firing shots.

2    Q.    And the next page, please, of Exhibit 26, and that's your

3    like Micro-Might revolver in the box?

4    A.    Yes, I said that from the beginning.  I accepted that from

5    the beginning.

6    Q.    And you got that from Stanley Turner; correct?

7    A.    Not exactly.

8    Q.    Exhibit 25-16, this is your truck; correct?

9    A.    Yes.

10   Q.    The big purple maroon truck, that's yours?

11   A.    Yes, that is my truck but, in fact, I was still paying for

12   it.  I didn't complete paying for it.

13   Q.    And that's -- behind that truck you have a trailer; is

14   that correct?

15          MS. BREWINGTON:  Judge, I'm going to object on two

16   grounds, relevance and beyond the scope of direct.

17          THE COURT:  I understand relevance, but beyond the

18   scope.  I will give you a little bit of latitude, but you need

19   to tailor it more to the direct.

20          MS. GROOVER:  Thank you.

21   (By Ms. Groover)  You admitted on direct examination that you

22   didn't tell the truth when spoke to Detective Rodriguez;

23   correct?

24   A.    Yes.  That is what I said.

25   Q.    So you admitted you lied when you were working in

620

1    Springfield?

2    A.    Yes.  That is what I said, and that's what I wanted,

3    that's why I want the jury to hear what I am going to say.

4    Q.    And then you later spoke with Special Agent Anthony

5    Miranda; correct?

6    A.    Yes, and that's -- as I already said, I want to speak

7    about those two testimonies.

8    Q.    And when you spoke with Special Agent Miranda you admitted

9    to him that you lied to Detective Rodriguez; correct?

10    A.    Correct, that's right.  I told him that I was not in the

11    area at that time in order to not be involved with this, but it

12    didn't work.  Now I am involved with this.

13    Q.    You admitted you lied because you were in the area when

14    Mr. Montoya was killed and you said it looked bad?

15            MS. BREWINGTON:  Objection, again beyond the scope of

16    direct.

17            THE COURT:  Overruled.  Continue.

18            INTERPRETER ZIDOVEC:  It was overruled.  I didn't hear.

19    Please repeat your question.

20     (By Ms. Groover)  You admitted you lied because you were in the

21     area where Mr. Montoya was killed and it looked bad; correct?

22    A.    That's right, that is what I said.  I told him that

23    perhaps I had been in the wrong place at the wrong time and I

24    did not know exactly what was the time of the death of Mr.

25    Montoya.

621

1   Q.    And when you first changed your story and admitted you

2   lied, you said you were there spying on Mr. Montoya; correct?

3           MS. BREWINGTON:  Objection, argumentative.

4           THE COURT:  I'm sorry, what was the nature?

5           MS. BREWINGTON:  Argumentative.

6           THE COURT:  Overruled, continue.

7           INTERPRETER ZIDOVEC:  Repeat please the question.

8   (By Ms. Groover)  And the first time you admitted you lied you

9   indicated you were spying on Mr. Montoya; correct?

10  A.    That I want to talk about this as well.  I want you to

11  listen to me.  I want to have that opportunity.

12          THE COURT:  Did you want to elaborate on your answer?

13          THE WITNESS:  Yes, if I'm allowed.

14          THE COURT:  Proceed.

15          THE WITNESS:  Okay, we're going to talk about what I

16  told Mr. Miranda because, as I said, I said that time there are

17  many things that point at me.  And I ask the honorable jury to

18  listen to me.  I'm not asking them to necessarily believe me,

19  but I want them to listen to me and maybe they can believe what

20  I have to say.

21  (By Ms. Groover)  You told Special Agent Miranda at one point

22  you were spying on Mr. Montoya; correct?

23  A.    Yes, because I told him because what he had said had been

24  found in his car.  He had said that he had been under

25  surveillance because they had found him violating the company's

622

1    rules.

2    Q.    And then you later admitted that you weren't spying on him

3    but you were actually there to work?

4    A.    Yes.  That's what I said, and in reality that's what I

5    want to remedy, and that's why I want an opportunity to speak.

6    Q.    Well, good.  What were you doing there because you have

7    told law enforcement so many different versions it's very

8    difficult to keep it straight.  Please tell the jury.

9    A.    Okay.  Since like everybody knows we were working for the

10   power company, Georgia Power, next to the trailer park Nassau

11   Wood.

12   Q.    Nassau Woods?

13   A.    Nassau Woods.  I'm sorry, I cannot pronounce it very well.

14   My English is poor.

15   Q.    That's okay.

16   A.    Yes, there's an electric substation there.  And there the

17   power lines go from there through the Nassau Woods Mobile Park.

18   It goes into the woods and it -- and they come out on 16 across

19   the street from the jail close to Chatham Parkway.

20        So let's talk about I know I'm going to be asked day by

21   day and I want to ask my -- my attorney not to object because

22   I'm prepared to answer everything that I'm going to be asked

23   about.  So let's start with Friday.

24   Tell us where you were on Friday, and to be clear I'm referring

25   to August the 18th of 2017.  Where were you?

623

1    A.    Exactly, that's the days I want to talk about.

2    Q.    Where were you?

3    A.    Well, I live in Rincon.  From there I came to Savannah.

4    And from Savannah I went to -- I think there are several people

5    from Savannah here.  From Rincon I went to the area of Ferguson

6    Avenue because I had a contract with that trailer park to cut

7    trees.

8         And I had asked for permission from my brother on that

9    Friday because the machine I was -- the equipment I was working

10   with was failing a lot.  And I forgot to say, just like Mr.

11   Montoya, I did my own jobs on the weekends.

12        And since Hurricane Matthew, I have not rested maybe ten

13   Sundays since then, and many of my jobs were behind, the ones

14   that I did on my own.  So I told my brother since the machine is

15   breaking down, give me permission on Friday.

16   Q.    Where on Friday did you go?

17   A.    As soon as a -- as I said, I went south of Savannah, as I

18   said.  First I went to Ferguson Avenue.

19   Q.    What time did you get to Ferguson Avenue?

20   A.    I don't know exactly but it was in the morning.

21   Q.    How long did you stay on Ferguson Avenue?

22   A.    Not for long.  I was trying to see if I could find a

23   worker to help me that day.

24   Q.    Where were you looking for a worker at?

25   A.    The Marsh Point Mobile Home Park.  That's the name of it.

624

1    Q.    What's that address?

2    A.    I really don't remember the exact address.  I lived there

3    for a long time but I don't remember the exact address and I had

4    found people to help me there before.

5    Q.    How long did you stay at Marsh Point?

6    A.    Not that long, I just went around, went to a house.  There

7    was nobody, so I didn't find anybody, and since it was Friday,

8    most of the people were at work.

9    Q.    Where did you go next?

10   A.    Allow me, if I may, I still have something else to say.

11   Q.    Continue.

12   A.    The reason why I was looking for workers was because,

13   during weekends, the people who helped me at work are my son, my

14   nephew and --

15        INTERPRETER GIERSBERG:  Interpreter is going to ask for

16   the third name.

17        THE WITNESS:  -- and my cousin.  But that was a Friday,

18   and my brother gave permission only to me.  But in order to cut

19   a tree you need more than one person.

20   (By Ms. Groover)  You told us you didn't find workers.  Where

21   did you go next?

22   A.    From there I called Mr. Perez.  Well, I want to specify

23   something.  He told you that, too, that I was driving that truck

24   with the trailer.  Well, and the trailer -- well, and the truck

25   I had all my tools.  It was a tool box that you can't see --

625

1   well, maybe you can see it through the window.

2   Q.   Of the picture we're looking at?

3   A.   Yes.  But the box didn't have a key to lock it, and so

4   when I didn't find workers, since I didn't find workers, I did

5   not want -- I did not want -- I did not go straight to

6   Springfield because the equipment was not working, and so I

7   could actually fix it but I was tired of sticking my hand in it

8   every day.

9   Q.   So where did you go when you didn't find workers?

10        INTERPRETER GIERSBERG:  The interpreter is going to

11   request repeat of the name of the street.

12        THE WITNESS:  There from -- from there I went to

13   Abercorn Street, the Home Depot.  And as I said, I couldn't go

14   back to Springfield because the machine was not operating for

15   ten days, maybe more than that.  No, I'm sorry, the machine was

16   working before that, but not that day.

17   (By Ms. Groover)  What time did you get to the Home Depot?

18   A.   Well, I don't know exactly, but as I said at the beginning

19   or from the beginning, the GPS on my phone should be able to

20   tell how long but, in fact, that's one of the things that I

21   don't agree about what has been said about the phone.  That was

22   one of the problems I had with the first attorney that was

23   appointed.

24        I always told him that I wanted -- I also told Mr. Miranda

25   and Mr. Rodriguez that with the phone's GPS they could trace

626

1    exactly where we had been and -- where we had been and when.

2    Q.    Let me stop you because when you were confronted with

3    where your phone evidence was, that is when you admitted you

4    lied about being in Springfield; correct?

5    A.    Yes.  They said that through the phones they knew that I

6    had been there, and they showed me pictures of Mr. Perez and

7    they said that Mr. Perez had been talking.

8    Q.    And after you saw photographs and digital evidence and

9    location information, you then admitted that you were at the

10   murder scene the day before and the day of the murder; correct?

11   A.    Well, they didn't show me documents and photographs and

12   photographs of the towers and such, but that's what they told me

13   and I believed them.

14   Q.    Because you were there; correct?

15   A.    That I had been in the area, and so just being in the

16   area, it's different to say I was -- I was at the crime scene.

17   Q.    And you told agents that it was very bad luck that you

18   were at that area on the day that Mr. Montoya died; correct?

19   A.    Yes, and I -- I repeat, as I said to Mr. Miranda, that

20   maybe it was true that I was in the area, but not knowing at

21   what time Mr. Montoya had died, maybe I was in the wrong place

22   at the wrong time.

23   Q.    But then do you later admit to leaving at the exact time

24   Mr. Montoya was killed?

25   A.    Well, because -- well, that's -- I want to talk about --

627

1    well, I reviewed -- that's one of the points that I want to --

2    that I did review in the discovery because not -- not even the

3    Government or the forensic examiner knows exactly what time he

4    died.  Believe me, I paid much attention to those details, and I

5    wanted to mention some of those.

6    Q.    There's two people who know what time he died; correct?

7    A.    Well, yes, maybe, but that person is not here.  One person

8    would be the murderer and the other person is the person who

9    died.  The murderer is not here and the person who died cannot

10   say anything.

11        Okay, and okay, I want to talk about that, about the time.

12   You don't know what time -- what the time was and the forensic

13   examiner also didn't know the time.

14   Q.    Let me stop you for just a moment.

15        THE COURT:  Counsel and Mr. Rangel, we have to respect

16   the form of testimony, and so at this point Ms. Groover is

17   cross-examining you.  She will ask a question and you can answer

18   it and explain your answer if you need to.  But she needs to ask

19   a question so proceed.

20   Q.    (By Ms. Groover)  You worked for Wolf Tree; correct?

21   A.    Of course, 14 years.

22   Q.    And you made money working in the names of illegal -- of

23   other people?

24   A.    Yes, I admitted -- admitted that from the beginning.

25   Q.    And paychecks in other people's names came into your bank

628

1    account; correct?

2    A.    Yes, I -- I explained when we saw my bank accounts just

3    now I was surprised to see names that I -- that I don't remember

4    having used.

5    Q.    Because you used so many; correct?

6    A.    No, not exactly.  Believe me, I don't have memory

7    problems.

8    Q.    Now your brother was a supervisor at Wolf Tree; correct?

9    A.    Well, yes, he was a supervisor.  He was supervisor for

10   several years since 2004.

11   Q.    And your brother hired illegal aliens; correct?

12   A.    Yes.  Yes.  I said I was going to tell the truth and he

13   did hire them.  It was him.

14   Q.    And your brother paid illegal aliens; correct?

15   A.    Yes, he paid them and I'm going to say it this way.  Until

16   2006 when -- I don't remember exactly when, but e-Verify started

17   checking documents.  So can I expand my answer a little bit?

18            THE COURT:  Yes.

19            THE WITNESS:  Before that day, before e-Verify started

20   checking documents, we all worked under our names, under our

21   real names.  And so after that, we couldn't do that anymore.

22   The only way that we could work was using documents and using

23   the documents of legal people.

24   Q.    (By Ms. Groover)  Okay.

25   A.    So we started -- so we started -- well, I started before

629

1    e-Verify.  As I said, I was going to tell the truth.  I started

2    with a false name before that, before e-Verify, working under a

3    false name for the company.  2004 I was in -- I'm sorry.  I

4    started working for Wolf Tree in June 2003.

5    Q.    Okay.

6          THE COURT:  You've explained your answer.  Now ask a new

7    question.

8          MS. GROOVER:  Thank you, Your Honor.

9    Q.    (By Ms. Groover)  You were a foreman and had a crew of

10   workers that worked underneath you; correct?

11   A.    Well, I think that the word "foreman" is too big for me.

12   Q.    But you had people that you supervised; correct?

13   A.    Not really.  I mean, we worked together, and I was -- I

14   was a leader, but everybody knew what to do and their jobs so I

15   was only a leader.

16   Q.    And as a leader, you also paid some people; correct?  Your

17   son, for example?

18   A.    Well, that's what I want to talk about if I'm allowed.

19   Q.    Did you pay people as a leader?

20   A.    Not exactly.  As I said, there were three direct deposits

21   in my account.  I never had more than three deposits at the same

22   time.  And my brother put my son's check in my account so that

23   he would avoid having my son bothering him asking him for his

24   check every week because my son bothered people a lot.

25   Q.    And then you took money out and gave your son cash;

630

1    correct?

2    A.    Not exactly.  My son had one of my cards.

3    Q.    And Mr. Montoya, you worked with Mr. Montoya; correct?

4    A.    Of course, I worked with Mr. Montoya, and I want to talk

5    about Mr. Montoya since he started working with the company if

6    I'm allowed.

7    Q.    We will get to that a little bit later.  And Mr. Montoya

8    knew that your brother was a supervisor; correct?

9    A.    Of course, he was the one who hired him.

10   Q.    And Mr. Montoya knew that your brother was hiring illegal

11   aliens; correct?

12   A.    Yes, he himself helped him.

13   Q.    And Mr. Montoya knew that your brother was sometimes not

14   paying illegal aliens what they should be paid?

15        MS. BREWINGTON:  Objection, speculation.

16        THE COURT:  Sustained, rephrase.

17   Q.    (By Ms. Groover)  You were present at a showup meeting

18   when your brother read a letter that Mr. Montoya wrote; correct?

19        INTERPRETER ZIDOVEC:  I'm sorry, could you repeat that

20   for the interpreter?

21   Q.    (By Ms. Groover)  You were present at a meeting where your

22   brother showed a letter at a showup meeting that Mr. Montoya

23   wrote; correct?

24   A.    Yes, I was at that meeting, as I said, as Mr. Cruz said,

25   but I did not know what the meeting would be about because Mr.

631

1    Cruz was the one who called for the meeting.

2    Q.    But you stayed for the entire meeting; correct?

3    A.    Yes, until the end.

4    Q.    And you know that Mr. Montoya had filed the complaint with

5    the company about your brother; correct?

6    A.    Yes, I found out on that day about that.

7    Q.    And you talked on the phone with Mr. Montoya whenever he

8    had a problem about your brother or the company; correct?

9    A.    Yes, we speak about that.  I would find out that there

10   were problems at work.  Montoya would tell me about that.

11   Q.    And Exhibit 95, please, and you spoke with Mr. Montoya on

12   August the 16th of 2017, the day he was suspended; correct?

13   A.    Yes, he had called me and I returned the call later on.

14   Q.    And you also spoke with Mr. Montoya on August the 17th of

15   2017, the day he filed his complaint with the EEOC; correct?

16   A.    No.  The last time I spoke with Mr. Montoya was on

17   Wednesday, August 16th.

18   Q.    Does your phone number end in 2816; correct?

19   A.    Yes, that's my phone.

20   Q.    And Exhibit 68, please.  You've admitted that all of these

21   checks going into your bank account you received; correct?

22   A.    With exception of the check for Rigoberto Cruz -- except

23   the check for Rigoberto Cruz, it's not showing the year, but I

24   don't recall that I received that one.

25   Q.    But you have no reason to believe that the bank records

632

1    would be inaccurate in any way, do you?

2    A.    Well, there are many years here I want to explain.  On the

3    top line there is my real name.  The second name was my

4    brother's name or is my brother's name.  I would like to speak a

5    little bit about that name.

6    Q.    What do you want to say about that name?

7    A.    Because I began to use this name because this is the name

8    of the many that I want to mention today because --

9         INTERPRETER ZIDOVEC:  Interpreter needs a clarification.

10        THE WITNESS:  So this name is one of the names that

11   e-Verify did not check when they verified my card.  The same as

12   for my brother Pablo, the same as Mr. Ramirez and same as Jose

13   Luis Santos, Juan Amaya, Eulogio Ventura, I think that those are

14   all the names that e-Verify did not check and they could

15   continue working.

16   (By Ms. Groover)  Let me stop you there, sir.  Exhibit 33, this

17   is Higinio Perez-Bravo's van; correct?

18   A.    That's right.

19   Q.    Exhibit 34.  This is Higinio Perez-Bravo's Escalade;

20   correct?

21   A.    Yes, and I was right.  This van is not white.  It's an

22   off-white color.

23   Q.    And you know that because you borrowed it on the 18th of

24   August of 2017; correct?

25   A.    Yes, of course.  I did not actually refer to that to mean.

633

1    This is something that I was not allowed to say, and I request

2    that the jury can hear this.  I want to explain about those

3    days.

4          THE COURT:  She's asking you the question.  What is the

5    answer?

6          THE WITNESS:  Yes, that's the truck of Mr. Higinio but I

7    was right that it was not white but some off-white like a cream

8    color.

9    (By Ms. Groover)  And my question to you is:  You know that

10   because you borrowed the car on August the 18th of 2017?

11         MS. BREWINGTON:  Asked and answered.

12         THE COURT:  It hasn't been answered.  What was the

13   answer?

14         THE WITNESS:  I used it because Higinio let me use it.

15   I didn't ask to use it.  That is a different thing.

16   (By Ms. Groover)  But you were in this vehicle on August the

17   18th of 2017; correct?

18   A.   Yes, but not at the time that is shown in those images

19   from the video.

20   Q.   You think the digital evidence is incorrect?

21   A.   That's right because I begun to drive the truck after

22   12:00 noon on Friday and Mr. Perez-Bravo said I came with a

23   taxi.  That is not true.  I didn't come from a taxi, and from

24   there I went to Home Depot on Ferguson Avenue, Hurst Avenue for

25   those who know where Hurst Avenue is, and Montgomery Cross and

634

1    near Waters Avenue, and from there I went to 17, to Wisher Road,

2    to a store that sells parts for mobile homes.  I think it's

3    called Mobile Homes Parts.  And that's why I told my former,

4    told Mr. Asinc, that I was not afraid about what could happen

5    because I was not there at that time.  And I asked many times

6    that he ask the Government for proof from those stores because

7    those stores have cameras, but he always was telling me that,

8    well, he never requested that from The Court.

9    Let me ask a new question, please.  On August the 19th of 2017,

10   you called Higinio Perez at 6:38 a.m.; correct?

11   A.    Yes, I called him from my telephone, the one that ends in

12   9816.

13   Q.    And then Exhibit 34, please.

14         THE COURT:  It's already up.

15   (By Ms. Groover)  Thank you.  Exhibit 33, I apologize, Exhibit

16   33, and then Higinio Perez-Bravo picked you up in this van;

17   correct?

18   A.    Yes, that's right, and these questions are very short, and

19   I really would explain more.  I think that the jury should hear

20   more, more explanations.  These questions are too short because

21   the Government -- well, you wanted me to speak and now I want to

22   speak.

23   Q.    Your attorney can give you a chance to explain on any

24   redirect, sir.

25         THE COURT:  Any further questions?

635

1          MS. GROOVER:  Yes, Your Honor.

2          THE COURT:  Continue.

3     (By Ms. Groover)  Exhibit 75, please, and this is a photograph

4     of you and Higinio Perez-Bravo?

5          MS. BREWINGTON:  Judge, I'm going to object on two

6     grounds.  We've asked and answered at this point and we're well

7     beyond the scope of direct.

8          THE COURT:  Sustained as to asked and answered but not

9     even beyond the scope.  The scope included a question about all

10    four charges, but asked and answered, so ...

11    (By Ms. Groover)  And you agree that you were there on the day

12    of the murder; correct?

13         MS. BREWINGTON:  Asked and answered.

14         THE COURT:  That's asked and answered as well.

15    (By Ms. Groover)  You disagree that you killed Mr. Montoya;

16    correct?

17         MS. BREWINGTON:  Asked and answered, Judge.

18         THE COURT:  Overruled.

19         THE WITNESS:  Of course, I'm -- I don't agree with that.

20    (By Ms. Groover)  But of all the places in the world, on August

21    the 19th of 2017, you were at the scene that he was murdered

22    at; correct?

23    A.   Yes, because I have not been allowed to explain the real

24    reason.

25         THE COURT:  What is the reason?

636

1          THE WITNESS:  As I explained at the beginning, I was

2    working on that electrical line that goes from the substation

3    and goes to Nassau Woods to the --

4          THE COURT:  Chatham Parkway.

5          THE WITNESS:  Yeah, Chatham Parkway; correct.

6          THE COURT:  All right.

7          THE WITNESS:  So this is the reason, but when we went to

8    that substation, well, that's not the time in this photo.  I

9    don't recall arriving so early to this area.  It was a white

10   van, yes, but there are thousands of white vans.

11    (By Ms. Groover)  But you admitted being in the van with

12    Perez-Bravo?

13         MS. BREWINGTON:  Asked and answered, Judge.

14         THE COURT:  Sustained.

15         MS. GROOVER:  Your Honor, may I have just one moment,

16   please?

17         THE COURT:  Yes.

18         MS. GROOVER:  Your Honor, I have no further questions

19   for this witness.

20         THE COURT:  Redirect?

21         MS. BREWINGTON:  No redirect, Judge.

22         THE COURT:  All right.  She had no redirect.

23         INTERPRETER ZIDOVEC:  No redirect so we go back.

24         THE WITNESS:  So I'm done?

25         THE COURT:  Yes, rejoin your counsel at this point.

637

1    We're not finished with the trial.

2            Ms. Brewington, any further witnesses that you would

3    like to call at this point?

4            MS. BREWINGTON:  No, Judge, Defense rests.

5            THE COURT:  All right.  Ladies and gentlemen, that

6    concludes all of the evidence that you will hear as a part of

7    this trial.

8            What remains are the closing arguments of the attorneys,

9    my charge to you on the law that applies to the case, and then

10   it will be your duty to retire and deliberate on the case.  As I

11   mentioned during the jury selection process, we're not going to

12   meet on Friday.

13           We will readjourn on Monday.  We will do so and begin

14   promptly at 9:00 a.m.  Make sure to be in your jury room in time

15   for all of this to begin at 9:00.

16           You've put in a lot of hard work listening to all of the

17   evidence that's been submitted in this case so you will look

18   forward to hearing the closing arguments of each side.  Closing

19   arguments are neither evidence nor are they a charge on the law.

20           They are each party's attempt to summarize the evidence

21   that they believe has been brought before you.  After you've

22   heard the closings and are charged, then, as I say, you will

23   retire and at last it will be your opportunity to discuss the

24   case and reach a verdict.

25           As we leave for this break, this long break, it's very

638

1    important that you continue to respect those rules.  Don't make

2    up your mind.  Don't talk about the case.  Don't do any

3    independent research about the case and don't consume any media

4    about the case.  All right, let's rise for this jury.

5            (The jury exits the courtroom.)

6            THE COURT:  Everyone, have a seat.  I do want to put on

7    the record it is somewhat of an unusual witness presentation.

8    Part of it is the languages challenge.  Part of it is, as Ms.

9    Brewington put on the record, the defendant's decision to

10   testify, which is his right.

11           I was somewhat lenient regarding the direct examination

12   again because of the language barrier, and as far as the nature

13   of the cross, it was, of course, much longer than the direct but

14   the subject of the direct addressed in one big question, "Did

15   you do any of this," and he said no, so the United States is

16   entitled to go through some of the evidence that they had

17   presented on cross-examination.

18           As I mentioned earlier, counsel, don't leave until you

19   receive the proposed charge.  Although it is what everyone

20   agreed to and will now work in the charge where we have to make

21   the option whether Mr. Rangel opted to testify or not, we will

22   include the one that he did, and even though you all agree on

23   the charge, it's still important to read it and make sure it's

24   correct and leaves out nothing and includes nothing that it

25   shouldn't and same with the verdict form.

639

1            I'm going to send you home with that.  This will, as I

2      said, give you ample opportunity to polish your arguments and we

3      will look forward to hearing those.  I will give each side up to

4      an hour and 15 minutes for closing, and any questions?  Let me

5      begin with you, Ms. Groover.

6            MS. GROOVER:  No questions, Your Honor.

7            THE COURT:  Any questions on behalf of the Defense?

8            MS. BREWINGTON:  No questions, Judge.

9            THE COURT:  As I say, wait just a few minutes more to

10     receive that proposed charge, and we will be in recess until

11     nine o'clock on Monday.

12            (Proceeding concluded at 4:24 p.m.

13                        CERTIFICATION

14

15            I certify that the foregoing is a true and correct

16     transcript of the stenographic record of the above-mentioned

17     matter.

18

19     _Debra D Gilbert_ (signature)

21     _____          11/27/2022

22     Debra Gilbert, Court Reporter          Date

23

24

25