640

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA         )
                                 )
        v.                       )
                                 )         CASE NO.
JUAN RANGEL-RUBIO,               )    4:18-CR-274-LGW-CLR-2
                                 )
_____Defendant._____ )




JURY TRIAL
BEFORE THE HONORABLE LISA GODBEY WOOD
October 31, 2022; 9:07 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                           CHRISTOPHER HOWARD, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov
                           christopher.howard@usdoj.gov


For the Defendant:         KATIE A. BREWINGTON, Esq.
                           The Brewington Law Firm, LLC
                           P. O. Box 11153
                           Savannah, Georgia  31412
                           (912) 704-0858
                           kabrewington@gmail.com


Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov
                             - - -

641

I N D E X

PAGE

Court's Jury Charge                              698

Verdict                                         725

642

1                P R O C E E D I N G S

2              (Call to order at 9:07 a.m.)

3        THE COURT:  Good morning, counsel.  Before we turn to

4    the jury charges, I did want to just put on the record some

5    information that the Government had passed forward and make sure

6    that the defendant is aware of it.

7          It's my understanding that over the weekend, one of the

8    witnesses that we heard from last week, Karen Hartley, her

9    sister went to take cake to a neighbor.  The neighbor turned out

10   to be David Palmer, who is Juror Number 37.  Mr. Palmer asked

11   the sister, "Oh, do you have a relative that works for the

12   Government?"  The sister said yes, and the juror said, "I think

13   we heard from her in a case I'm a juror on," and the sister

14   said, "Was it the Rangel-Rubio case?"  And Mr. Palmer said yes,

15   and so the sister said, "I can't talk to you" and left.  Is that

16   an accurate summary, Ms. Groover?

17       MS. GROOVER:  Your Honor, that's the summary that Ms.

18   Hartley told me last night.  Ms. Hartley is present in the

19   courtroom if you would like to inquire.

20       THE COURT:  Ms. Hartley, I see you there.  Is that an

21   accurate summary of what happened with your sister?

22       MS. KAREN HARTLEY:  That's accurate.  She immediately

23   called me.  I immediately called Ms. Groover.

24       THE COURT:  Ms. Brewington, I wanted to make sure that

25   they had imparted that to you.

643

1          MS. BREWINGTON:  I was the next phone call, Judge, yes.

2          THE COURT:  And is there, does anyone request that we

3    interrogate Mr. Palmer or -- any desire to do that?

4          MS. BREWINGTON:  I don't think that anything

5    inappropriate happened and that it's really necessary to address

6    it.

7          THE COURT:  I would concur completely.  Ms. Groover, on

8    behalf of the United States?

9          MS. GROOVER:  I agree, Your Honor.  From all the

10   information we have, it did not appear that anything was

11   inappropriate.

12         THE COURT:  It looks like that everyone behaved

13   appropriately.  There is nothing wrong with somebody in our

14   family taking something to a neighbor.

15         It looked like neither one of them understood the

16   connection until a piece of cake was delivered, and it would

17   probably do more harm than good to single out a juror, bring

18   them in and interrogate them about this piece of cake, and I

19   think all agree that everyone acted timely and forthright and

20   there was no cause to even suspect that something troubling was

21   afoot or that any kind of influence was imparted.

22         All right, then let's turn to have our charge

23   conference, beginning first with the verdict form, which, of

24   course, is the one that each side had agreed upon and I want to

25   make sure that it still looks good to everyone and there is no

644

1    typographical errors, Ms. Brewington.

2         MS. BREWINGTON:  There is one error on Page 3.  Every

3    other count has "not guilty" first and this one was reversed.

4         THE COURT:  We were just discussing that a few minutes

5    ago and so looking at -- is it --

6         MS. BREWINGTON:  Count 7 on Page 3.

7         THE COURT:  Yes, Page 3, Count 7, 1A where the options

8    are "Eluid Montoya was killed as a result of the conspiracy" or

9    the option "Eluid Montoya was not killed" and you would like

10   those --

11        MS. BREWINGTON:  No, it's actually the first sentence on

12   that page, "We the jury find the defendant" "guilty" and "not

13   guilty."  Every other count is "not guilty" first and then

14   "guilty".

15        THE COURT:  Okay, any objection to transposing those

16   options?

17        MR. HOWARD:  No, Your Honor.

18        THE COURT:  With regard to the special factors, 1A and

19   1B.

20        MS. BREWINGTON:  I think if we switched that, we would

21   have to switch it for Count 6 as well.

22        THE COURT:  All right.

23        MS. BREWINGTON:  Judge, I think it's probably fine

24   because then we would have to look at 1B and switch those.  I

25   don't think that's necessary.  I think just having the "not

645

1    guilty" and "guilty" the same in every count is what's most

2    important.

3         THE COURT:  Right, and so for consistency's sake, we're

4    going to always have not guilty as the first option for all four

5    counts, and in order to do that, we need to transpose the

6    guilty/not guilty option in Count 7 so that it presents the "not

7    guilty" option first.

8         MS. BREWINGTON:  Correct.

9         THE COURT:  Any objection to making that one change to

10   the verdict form?

11        MR. HOWARD:  No, Your Honor.

12        THE COURT:  We will make that change then.  Aside from

13   that request with regard to the verdict form, Ms. Brewington,

14   any other objections with regard to the verdict form.

15        MS. BREWINGTON:  No objections.

16        THE COURT:  And for the United States, any objections to

17   any part of the verdict form?

18        MR. HOWARD:  No, Your Honor.

19        THE COURT:  Then with that one change, that will stand.

20   Let me next turn to The Court's instructions to the jury

21   beginning with the United States, any exceptions, objections or

22   suggestions with regard to that proposed charge?

23        MR. HOWARD:  No, Your Honor.

24        THE COURT:  Turning to the Defense, any objections or

25   exceptions or proposals with regard to that charge?

646

1          MS. BREWINGTON:  I think there's just one paragraph we

2     agree that needs to be taken out.  It would be the paragraph at

3     the end of Page 6.  It is evidence about previously convicted

4     crimes of Juan, and those never came out, so I don't think

5     that's appropriate.

6          THE COURT:  They are in the evidence.  We pulled that

7     out as well?

8          MS. GROOVER:  Yes, that is correct.

9          THE COURT:  That was Exhibit Number -- because it's in

10     the exhibits.  It's a high number, like 104, 105, something like

11     that, as I recall.  Let's make sure and take those out.

12          MS. GROOVER:  The conviction document I believe is

13     100 -- excuse me, 102.

14          THE COURT:  102.  So, just to be clear then, 102 will be

15     removed.  It will not be shown to the jury.  It was not referred

16     to during the trial, and as a result it makes sense to take that

17     paragraph out of the charge, and just to be clear, it's at the

18     bottom of Page 6.

19          It states, "Evidence that a defendant was previously

20     convicted of a crime is not evidence of guilt of the crimes in

21     this trial but you may use the evidence to decide whether you

22     believe the defendant's testimony."

23          So we will strike those two sentences at the bottom of

24     Page 6 and we will pull Exhibit 102, and it will not be shown to

25     the jury nor referred to during closings.

1        Let me remind each of you, although you are seasoned

2   counsel and have done many closing arguments, the one rule that

3   sometimes each side puts their toe on is the vouching, you know,

4   "I believe," "I think."  Keep it to what the evidence has shown.

5        All right, anything further before we bring the jury in?

6   Let's bring the jury in then.

7        (The jury enters the courtroom.)

8        THE COURT:  Good morning, members of the jury, and

9   welcome back for our final day of trial.

10       Counsel at this stage of the case will be making their

11  final arguments to you.  Counsel for the Government will have

12  the opening arguments followed by counsel for the defendant.

13       Then in conclusion, counsel for the Government will have

14  an opportunity to reply in rebuttal to the argument of counsel

15  for the defendant.  This is in accord with the rules and proper

16  because, as you've previously been instructed, it is the

17  Government that has the burden of proving its case.

18       Now, in making these arguments to you, counsel will be

19  commenting upon the testimony that you've heard and all the

20  evidence that's been introduced.

21       They, as you, will be recalling the evidence of the

22  case.  They will not try to intentionally mislead you.  However,

23  if their recollection of the evidence differs from your

24  recollection of the evidence, it is your recollection that

25  controls.

648

1          Now, these final arguments by counsel are not to be

2     construed by you as evidence or as charges or instructions on

3     the law.  Nevertheless, these arguments are intended to help you

4     understand the contentions of each side, and you should give

5     them your close attention.

6          Before I turn to counsel for the Government to give the

7     opening closing, we have a new interpreter joining us.  Sir, if

8     you will come forward to receive the oath and, Ms. Sharp, if you

9     will administer it.

10          (Interpreter Antonio Gavilanez was sworn.)

11          THE CLERK:  Thank you, if you will please state your

12     full name.

13          INTERPRETER GAVILANEZ:  Antonio Gavilanez, last name

14     spelled G-a-v-i-l-a-n-e-z.

15          Good morning, Your Honor.

16          THE COURT:  Thank you.  On behalf of the United States.

17          MS. GROOVER:  Thank you, Your Honor.  Exhibit 2-2.

18          Eluid Montoya believed in America.  He believed in the

19     American dream.  Born in Mexico, Mr. Montoya lawfully immigrated

20     to the United States.  He worked at Wolf Tree, and he had his

21     own tree-trimming business to support his family.

22          Mr. Montoya believed in America, our rule of law and our

23     rule of order.  He believed in using the laws of the United

24     States to right a wrong.  He believed when he saw a wrong he

25     could use the law to fix it.  He saw that his coworkers were

1    being mistreated.  He saw that his coworkers were working 60 to

2    a 100 hours a week and not getting paid for those hard overtime

3    hours.

4        He saw that his coworkers would get injured on the job

5    and would not always get medical attention.  He saw that his

6    coworkers would sometimes go weeks without pay and would have

7    trouble making ends meet.

8        Eluid Montoya, the General, a natural-born leader.  He

9    used his voice and his courage to step forward to speak out for

10   his coworkers who could not help themselves, who could not stand

11   tall because of their status.

12       Defendant shot and killed him for doing what was right.

13   Defendant assassinated Mr. Montoya for following the law and

14   demanding order.  Defendant fired bullet after bullet after

15   bullet after bullet after bullet into the body of Mr. Montoya.

16   Bullets that fired open like fireworks.

17       Multiple gunshots wounds were fatal to Mr. Montoya, the

18   gunshot wound to the head, a gunshot graze wound to his left

19   shoulder, two gunshot wounds to the back, both piercing his

20   lungs, a gunshot to his finger, perhaps an apparent defensive

21   wound to the gunshot wound to the face when Defendant shot him

22   in the mouth.  Defendant shot him in the mouth to say, "Shut

23   your mouth," to send a loud and clear message to "Shut your

24   mouth."

25       Defendant tried to silence him for speaking out.  You

650

1  see, Defendant needed to eliminate Mr. Montoya because Mr.

2  Montoya threatened the defendant's lifestyle and his family's

3  empire.

4       This was not an accident and this was not a robbery.

5  This was a cold, calculated, premeditated assassination.

6       The dispatch call came out at approximately 1:30 on

7  Saturday, August the 19th of 2019.  Lieutenant Rodriguez

8  remembered that day, and he described the execution scene for

9  you in words and pictures, Exhibit 22-1.

10      There were no signs of robbery at the crime scene.

11 There was nothing out of place or missing.  Exhibit 22-8, the

12 silver Honda was running.  The keys were in the ignition.  Keys

13 to the tree truck were on the seat of the Honda with the door

14 wide open.

15      Exhibit 22-7, Mr. Montoya's cell phone and his glasses

16 were left behind.  Exhibit 22-41, valuable identification

17 documents were left inside the Honda of Mr. Montoya's daughter.

18      Exhibit 22-50, and there were valuable tools inside the

19 back seat of the Honda.  Exhibit 22-52, there were valuable

20 tools left inside the trunk of the Honda.  That was not a

21 robbery.  Nothing valuable was taken.  It was all left.

22      Exhibit 22-19, Mr. Montoya was working on his truck when

23 the defendant shot him and he fell down into the grass.  He fell

24 behind his truck in a secluded area for no one to see, all

25 alone.

651

1          He was shot with a small .22-caliber weapon, a revolver.

2     Because it was a revolver, there were no shell casings left

3     behind, and because he was shot with a small-caliber revolver,

4     there was hardly any blood at this crime scene, a quick, quiet

5     killing.

6          Exhibit 22-20, there were no signs of any kind of a

7     struggle.  At the bottom of the page, you will see Mr. Montoya's

8     slides remain on his feet.  He did not try to run.  He did not

9     try to fight with his killer.

10         The execution scene was secluded.  It was quiet.  It was

11    hidden with the bush and the brush.  The crime scene depicted

12    only one option:  A cold, calculated, premeditated

13    assassination.

14         Exhibit 22-10, there was a note left inside the Honda in

15    the yellow notebook of Mr. Montoya.  It provided important

16    information for the investigators.

17         Exhibit 24-1 and 24-2, inside this yellow notebook.

18    There was a note, "Discharged by X for three days for not

19    signing the safe practice violation which wasn't true; they are

20    always watching me because of the complaint I put on the way

21    they let the foreman treat their employees."

22         While processing the scene, family members of Mr.

23    Montoya and friends began to arrive.  They identified Mr.

24    Montoya, the General, their general.

25         Lieutenant Rodriguez was also able to learn about the

652

1  complaint that Mr. Montoya submitted about the foreman, his

2  boss, Pablo, the defendant's brother.

3      Exhibit 4-2, Mr. Montoya had complained for years, for

4  years about how Pablo was treating the aliens, and when the

5  company did nothing, when they did nothing for years, he took it

6  federal.

7      The General decided it was time to act.  The General

8  took this to the United States Equal Employment Opportunity

9  Commission, the EEOC.  The investigation quickly revealed that

10 Mr. Montoya was killed to prevent him from speaking up and to

11 punish him because he did.

12     But, fortunately, we know who shot and killed the

13 defendant, who killed Mr. Montoya.  It was the defendant.

14     92-83, Exhibit 92-83, even the defendant agrees that all

15 of the evidence pointed at him.

16     And so it does.  And so it does.  Defendant had the

17 motive to conspire to kill Mr. Montoya.  Defendant killed Mr.

18 Montoya because he stood to take everything away from the

19 defendant and his family.  Mr. Montoya was a threat, so the

20 defendant conspired with his brother Pablo and Higinio

21 Perez-Bravo to hunt him down and kill him.

22     Exhibit 54, Defendant was an illegal alien.  He was

23 working at Wolf Tree.  He was in this country illegally.

24 Exhibit 55, and so was his brother, Pablo.  Not only were they

25 both illegally working in this country but so were their entire

1   family, all living together out on the ranch in Rincon and all

2   working at Wolf Tree with Pablo in the lead.

3           Mr. Montoya's complaint threatened to expose the

4   defendant, Pablo and their entire family, meaning they would all

5   be deported and sent back to Mexico.

6           Defendant risked losing his job and his family and his

7   home, all because of Mr. Montoya's complaint.  Mr. Montoya was

8   exposing the empire that Pablo built and that of hiring illegal

9   aliens and syphoning off their pay, an empire that the defendant

10  maintained and took advantage of.

11          Yeah, Pablo hired everyone, but he promoted his brother

12  to become a leader, a crew leader.  Paychecks in the names of

13  other individuals were deposited into the defendant's bank

14  account, and he would pay the workers, and in this process of

15  becoming a leader, he took jobs of everyone else.

16          You heard the testimony of Juan Ramirez.  He trained him

17  how to use the equipment and then he took his job.  Witness

18  after witness after witness after witness came into this

19  courtroom and told you how they were an illegal alien, they were

20  working for Pablo and how they weren't getting paid what they

21  should have been.

22          They explained that they weren't getting paid for

23  overtime.  They weren't getting paid for vacations.  They didn't

24  always get their medical attention and they sometimes went weeks

25  without pay.

654

1          Mr. Montoya's complaint was very much real.  It wasn't

2     just a piece of paper.  It was real.  The complaint was going to

3     expose this massive illegal hiring operation that the defendant

4     and his brother profited from harming others, and just how much

5     did the defendant and his family make from the entire scheme?

6     At times there was $3,000.00 a week deposited into the

7     defendant's bank account, Exhibit 92-73.

8          Defendant even admitted to making over a hundred

9     thousand dollars a year from this scheme.  And how is he getting

10    this money?  How was he getting it all?  Exhibit 92-16.

11         Defendant received paychecks in the names of assumed

12    identities.  And what would he do with this money, he would

13    either pay workers or keep the money.  This hiring scheme had

14    dire consequences, not only for the workers who weren't getting

15    paid and not able to make ends meet, but also for the victims of

16    identity theft.

17         You heard from Jerad Brown and the mess that he has been

18    dealing with since 2018 because his identity was used at Wolf

19    Tree.  He was fighting with the IRS since 2018 and now the

20    Georgia Department of Revenue, and for what?  All for the

21    defendant and his family so they could make more and more money

22    from this illegal scheme.

23         Exhibit 68.  Just how much money was deposited into

24    Defendant's bank account from this illegal hiring scheme?  The

25    defendant made over $500,000.00.  Over a half million dollars

1    from this.  He received paychecks totaling exactly $586,216.14

2    into his bank account, all in his name and in five other

3    people's names.

4              Exhibit 69.  And Pablo his brother made over 2.9 million

5    dollars.  Together their family was making over 3.5 million

6    dollars, 3.5 million dollars.

7              Exhibit 92-41, Defendant knew that he was making a lot

8    of money.  He knew Mr. Montoya was going to mess it up.  He

9    explained in his second interview that by exposing the

10   Rangel-Rubio brothers' illegal scheme, Mr. Montoya, he wanted to

11   screw us up.  Defendant had over three million dollars' worth of

12   motive that he and his family stood to lose because Montoya's

13   complaint was screwing them up.

14             Defendant absolutely had the motive and the reason to

15   conspire to kill Mr. Montoya.  But that didn't stop the General.

16   That didn't stop the General.  He wasn't afraid to expose this

17   massive scheme so he could right a wrong and help people.

18             Exhibit 10.  On April the 24th of 2017, he sent his

19   official complaint to the company.  He formally blew the whistle

20   on this million-dollar scheme that was harming people.  And Mr.

21   Montoya did not mince words.  He started off by saying the

22   supervisor was illegal and he was hiring other illegal aliens.

23   It's all in Exhibit 10.  You will have it in your hand.  You can

24   take it back and read it.

25             He explains the details of the scheme, how Pablo

656

1    mistreated all the workers because they were illegal.  He

2    explained he was paying them in cash and not paying them their

3    full salary.  He explained there was no vacations.  They used

4    false names and there were accidents and injuries.

5         And look at the bottom of Exhibit 10-1, at the bottom of

6    the page, the very last paragraph.  Mr. Montoya explained that

7    Pablo did not take action in this group even when they fight and

8    they drink and they miss work because his family, including his

9    brother, the defendant, are all working illegally at Wolf Tree.

10        Pablo took no action because the defendant, his brother,

11   was part of this scheme, and what did Wolf Tree, the company, do

12   about all of this?  What did they do with Mr. Montoya's

13   whistleblower complaint?  They put it in the hands of Pablo, his

14   brother.

15        Pablo then needed to end this, so he called the showup

16   meeting.  Defendant was at the meeting and he heard Montoya's

17   complaint, Exhibit 92-31.

18        The defendant admitted that he knew Mr. Montoya

19   complained not only to the company but also to the authorities.

20   Defendant heard the letter read out loud at that showup meeting.

21   Right then and there, the defendant was on notice.  The

22   defendant was on notice that Mr. Montoya was not only

23   complaining about Pablo but he was complaining about him.  He is

24   mentioned in that letter.

25        In the letter, Mr. Montoya explained that he is not

1  stopping at the company.  He was going further.  He was going

2  further to the Department of Labor.

3         Defendant was on notice that Mr. Montoya, the General,

4  had had enough.  He was done, and he was going to report this

5  scheme.  But the defendant, he needed to stop him.  He needed to

6  stop Mr. Montoya to protect his family, his home, his job, his

7  millions of dollars of family business.

8         The solution?  The defendant conspired to kill Mr.

9  Montoya with Pablo and Higinio Perez-Bravo because the General

10  could only be stopped if he was killed.

11         In addition, the defendant had the means to conspire to

12  kill Mr. Montoya.  Pablo, Mr. Montoya's boss, may have been in

13  charge and he may have had all the money, but he didn't have the

14  means to do it.

15         Only one man, the defendant, had the knowledge and the

16  willingness to act.  Like the defendant, Pablo needed to kill

17  Mr. Montoya, the problem employee, but unlike the defendant,

18  Pablo did not have the means to do it.  Defendant needed his

19  brother for the empire and Pablo needed the defendant for his

20  guns, a bloody brotherly bond.

21         Exhibit 90-22.  Defendant even laughed at the idea that

22  Pablo killed Mr. Montoya.  He said his brother wouldn't even

23  kill a fly.  He laughed at the idea that his brother had killed

24  him because he knew he did it.

25         Exhibit 90-27.  The defendant explained that Pablo, his

658

1    brother, doesn't even know how to use a gun.  He says he's never

2    carried a gun.  Pablo doesn't know about firearms, and unlike

3    Pablo, the defendant says he does know how to shoot.  He

4    explains he was in the Mexican military and he sometimes shoots

5    guns.

6          Indeed, witness after witness after witness after

7    witness came into this courtroom and told you how they saw the

8    defendant with guns, specifically two little guns, .22-caliber

9    that could fit in his hands or fit in his pocket.  Two little

10   guns.

11         Oscar Cruz said the defendant had a gun.  Jose Santos

12   Gutierrez saw Defendant with a gun.  He said it was a little

13   pocket gun.  Joel Reyes said the defendant had a gun.  He said

14   it was a small gun, and Juan Ramirez said the defendant had a

15   gun.  He said it was a .22-caliber revolver.

16         Ruben Hernandez, he also saw the defendant with a gun.

17   Raymundo Espino Vega also saw Defendant had a gun but he said he

18   had two small guns that could fit in his pocket.

19         There was no evidence that Pablo ever used a gun or

20   carried a gun.  There was no evidence that the driver, Higinio

21   Perez-Bravo, ever had any guns.

22         Throughout the ranch and the compound, law enforcement

23   seized 14 firearms and thousands of ammunition scattered

24   throughout the house.

25         Exhibit 26-5.  But what did they find inside Defendant's

659

1   home?  Law enforcement seized four firearms and key ammunition.

2       Exhibit 26-9, inside the defendant's oven was a

3   .22-caliber Magnum ammunition.  Exhibit 27, specifically

4   .22-caliber Magnum hollow-point metal-jacketed ammunition.

5       And Exhibit 26-6, right there, a tiny little Micro-Might

6   revolver in the box next to some ammunition.  One of the

7   firearms seized from the defendant's home was a .22-caliber long

8   rifle Micro-Might, a tiny gun that you could fit in your pocket

9   or fit your hand.

10       Exhibit 101-3, the gun that was seized from the

11   defendant's home was one of two guns that was purchased by

12   Stanley Turner for the defendant.

13       Well, what gun is noticeably absent?  The sister gun,

14   the other .22-caliber Micro-Might revolver that Stanley Turner

15   purchased for Juan.  The .22-caliber Micro-Might, the other

16   small pocket gun, was missing.

17       Exhibit 52-1.  Dr. Grandhi, the medical examiner, she

18   performed an autopsy on Mr. Montoya.  She confirmed that his

19   manner of death was homicide and by gunshot wounds, specifically

20   she found six gunshot wounds to Mr. Montoya.  Three of them were

21   instantly fatal, and the others would have required immediate

22   medical attention.

23       Dr. Grandhi recovered the bullets and the bullet

24   fragments from inside Mr. Montoya's body.  Exhibit 42, this is

25   the bullet and the fragment recovered from the left side of Mr.

660

1   Montoya's neck from the gunshot wound to his head.

2        And Exhibit 44, this is the bullet fragment that she

3   recovered from Mr. Montoya's brain resulting from the gunshot

4   wound to his face, the gunshot wound to "Shut your mouth."

5        Exhibit 46.  This is the bullet and the fragment

6   recovered from his neck resulting from the gunshot wound from

7   the left mid back, the superior wound, and Exhibit 48, this the

8   bullet fragment recovered from Mr. Montoya's lower right chest

9   resulting from the other left side wound to his back, and

10  Exhibit 50, these tiny little metal projectile fragments

11  recovered from Mr. Montoya's body from the gunshot wound to his

12  face.

13       All of these bullets and fragments, they were sent to

14  the ATF firearms examiner, Kevin Rippman, and what did Examiner

15  Rippman determine in his expert opinion?  Exhibit 27, first the

16  bullet and the fragments that were recovered from Mr. Montoya

17  were of a caliber and of a design that were consistent with a

18  .22-caliber Magnum hollow-point metal-jacketed ammunition, the

19  same kind found in Defendant's oven.

20       Second, Mr. Rippman was able to determine that all of

21  the bullets suitable for comparison, they came from the one, the

22  same gun.  What does that mean?  There was one shooter, one

23  shooter.

24       And third, Mr. Rippman test-fired all the guns seized

25  from the ranch, all 14 guns seized from the ranch, including

661

1    that little .22-caliber revolver found in Juan's home.  None of

2    them were the murder weapon.  He excluded all the guns and

3    concluded they were not used to kill Mr. Montoya.

4         Back to Exhibit 101-3.  But where is that missing sister

5    gun that the defendant had, the other small gun that he would

6    carry around in pairs before the murder?

7         This is the possible firearm that fired the bullets into

8    Mr. Montoya's body.  Of course, he would need the missing

9    .22-caliber Magnum firearm to confirm it, but where was this

10   missing murder weapon?  Only one man knows, the defendant, who

11   got rid of it.  Defendant got rid of it because he tried to

12   cover up this murder, because he tried to get away with it.

13        Exhibit 90-49.  In his very first interview with law

14   enforcement, the next day after the murder, Defendant is the

15   very first person to bring up to the .22-caliber Magnum firearm,

16   and what does he say about this firearm?  He says, "We don't use

17   it anymore; we took it to Chicago."

18        He brings up the .22-caliber Magnum first and he

19   distances himself from it.  He says he got rid of it.  He took

20   it to Chicago.

21        Exhibit 92-63, in Defendant's second interview, he

22   maintained that he got rid of the .22-caliber Magnum firearm.

23   He says again he sends it to a guy in Chicago and he adds a

24   timeframe.  He says the week before the murder.

25        Well, how convenient.  One week before the murder, he

662

1    just happens to get rid of the missing weapon.  Defendant got

2    rid of it the week before.

3        Exhibit 92-58.  And, of course, the defendant got rid of

4    it because, after all, in his own words, if he was going to kill

5    Mr. Montoya, he would get rid of the gun.

6        Defendant conspired to kill Mr. Montoya and he tried to

7    cover it up by getting rid of the evidence.  Of all the people

8    charged in this conspiracy, only the defendant had the means,

9    had the availability to use the gun.  Only defendant was able to

10   actually kill Mr. Montoya.

11       There is no evidence that Pablo had the means to kill

12   Mr. Montoya, and there is no evidence that Higinio Perez-Bravo

13   had any firearms or the means to kill Mr. Montoya.  Only one,

14   only the defendant.

15       Not only did the defendant have the motive and the means

16   but he had the opportunity to kill Mr. Montoya.  Working with

17   Higinio Perez-Bravo gave him that opportunity.

18       Exhibit 25-16.  This is the defendant's truck.  It's a

19   big maroon heavy work truck.  It's got a trailer attached to the

20   back so he could pick up the branches as he cuts them down, a

21   truck full of tools he used for cutting down trees, a big truck

22   the defendant needs to work, to haul things.  It's a very

23   memorable truck, a vehicle you can't use to go commit a murder

24   because everyone will see and hear you.

25       Exhibit 72, Pablo's truck had a GPS tracking system in

663

1  it, tracking his every location.  It was his work truck from

2  Wolf Tree.  You certainly can't use a truck with a GPS tracking

3  system in it to commit a murder.

4       So Pablo and Defendant, they both needed somebody else

5  and they were going to be obvious suspects.  They needed

6  somebody else to help them, somebody with discreet,

7  inconspicuous vehicles.  They needed to hide in plain sight, so

8  enter, Higinio Perez-Bravo, the trusty handyman of Pablo.

9       Higinio had two white inconspicuous and discreet

10  vehicles, and he was another illegal alien they could use to

11  help them keep the money flowing.

12       Exhibit 33.  Higinio's white van with the removable

13  magnetic sign.  And Exhibit 34, his other vehicle, the white

14  Escalade, well, off-white as the defendant confirmed when he

15  testified at trial.

16       Higinio's vehicles are hidden in plain sight, the

17  perfect vehicles to use to commit a murder if you are trying to

18  get away with it.

19       Pablo and Juan needed him.  They needed his vehicle.

20  They needed that dark tint.  They needed the plain, white,

21  ordinary vehicles so they could blend in, vehicles that weren't

22  maroon, vehicles that didn't have a GPS tracking system.  The

23  man helped them hide the crime so they could get away with it.

24       Now the conspirators have their team.  They have their

25  plan and it's time to execute it, a cold, harrowing thought.  So

1  what was his cold, calculated plan to assassinate Mr. Montoya.

2  How were they going to do it?

3       Exhibit 15-3.  On Wednesday before Mr. Montoya was

4  killed, he was suspended from work for a safety violation, a

5  violation that he disagreed with, and, again, according to his

6  notes, they were always watching him; they put on that safety

7  violation because of his complaint.

8       The General finally had enough about his complaints not

9  going anywhere and his fake safety violations, so he took the

10  case federal.

11       Exhibit 95.  Mr. Montoya, these are Mr. Montoya's phone

12  records the day before, on Wednesday and Thursday before he

13  died.  He communicated with several notable people on August the

14  16th, 2017, the day he was suspended for the alleged safety

15  violation.

16       At 1:31 p.m. the General calls the defendant after his

17  suspension.  At 2:17 p.m., the defendant called the General back

18  and they spoke for 15 minutes.  They spoke for 15 minutes after

19  he had a safety violation.

20       Now we don't know exactly what was said on that call.

21  There is no recording of that call, but it is reasonable to

22  infer that the General told the defendant that he was going to

23  report this to the authorities.  Enough was enough, and it was

24  time to fall in line.  And why is this reasonable to infer?

25       Exhibit 92-24, see, Defendant explained to law

1    enforcement that when Mr. Montoya had a problem with his

2    brother, Defendant and the victim would talk.  He would talk to

3    Mr. Montoya about problems with his brother.

4         Exhibit 92-25, Defendant again said that he talked on

5    the phone with Mr. Montoya and that Mr. Montoya would call the

6    defendant to complain about his brother.

7         Exhibit 92-26, Defendant also admitted to law

8    enforcement that he spoke on the phone with Mr. Montoya the day

9    he got suspended.

10        So it is reasonable to infer that Mr. Montoya told the

11   defendant he was going to report this after he got suspended,

12   and you remember the testimony of Carmen Brown; right?

13        Exhibit 95.  Mr. Montoya again, the day he got

14   suspended, he made multiple calls to Carmen Brown.  He made

15   plans to go to her house.  He needed a favor from her.

16        Exhibit 96-1.  This is the conversations and the text

17   messages and the phone records between Mr. Montoya and Carmen

18   Brown on Wednesday, the day he was suspended.

19        At 2:41 p.m., the day of the suspension, Mr. Montoya

20   called her and asked for a favor and she explained that Mr.

21   Montoya wanted her to call the company to report that he was

22   going to go to the Department of Labor.

23        She then researched and determined that perhaps the

24   EEOC, the US Employment Opportunity Commission, would be better

25   off.

1          Mr. Montoya agreed, and they made plans to meet at the

2     EEOC the very next day on Thursday, the 17th of September --

3     excuse me, August of 2017.

4          Exhibit 14.  And what happened on Thursday, the 17th?

5     Mr. Montoya filed that charge of discrimination.  He went to the

6     United States Equal Employment Opportunity Commission.  And that

7     formal process began.  He filed the official charge.

8          Exhibit 95.  At the bottom of the page, after he left

9     the EEOC, Mr. Montoya spoke with Jose Santos Gutierrez, also

10    known as Chilango.

11         He came in and he testified that he was a friend of Mr.

12    Montoya and Mr. Montoya told him that he got suspended, and he

13    also told him that he was going to the Department of Labor, and

14    Jose Santos Gutierrez said Mr. Montoya called him to confirm

15    that he did it.

16         He told him he did it.  He told him he was going to do

17    it and he told them he did it.

18         Still on Exhibit 95, back to the bottom of the page,

19    after Mr. Montoya filed the charge and after he told his friend

20    Jose Santos that he did it, who did he call?  The defendant.

21         Again, while we don't know what was said, it's

22    reasonable to infer that the General told the defendant he had

23    just reported this to the EEOC.

24         Exhibit 92-25.  After all, he had just reported the

25    complaint, and who does he call with problems of Pablo and the

667

1    company?  The defendant.

2         In that moment, on August the 17th of 2017, the day Mr.

3    Montoya went to the EEOC and then called the defendant, in that

4    moment, the defendant is on notice that this was a federal case

5    and the process has begun.

6         Mr. Montoya was a naturalized United States citizen.  He

7    lawfully immigrated to the United States and he was a strong

8    voice for workers being exploited by Pablo.  He just had blown

9    the whistle off their million-dollar scheme and the defendant

10   absolutely knew he did it.  He knew he did.

11        Exhibit 96-3.  Later that night, Mr. Montoya explained

12   to Ms. Brown that the EEOC was going to investigate but he was

13   not done.  He was not done.  He still wanted to go to the

14   Department of Labor and he made plans to go to the Department of

15   Labor that following Monday.  But he never got the chance.  He

16   never got the chance and why was that?

17        Because there was only one way to stop the General, by

18   killing him.  Higinio Perez-Bravo testified as to the horrible

19   facts of how they did it.  He explained that Pablo had three

20   pertinent phone conversations with him:  One out at the ranch,

21   one at Higinio's home and one at a gas station.

22        Higinio explained that Pablo told him that he had this

23   problem employee that needed to be eliminated, killed.  He

24   explained that -- Exhibit 93 -- he explained that he needed

25   Higinio's vehicles to accomplish that plan, and then on one day,

1    Juan, the defendant, called Higinio Perez-Bravo to use the

2    vehicles.

3        Exhibit 21, the day before the murder.  Defendant

4    borrowed the white Escalade and told Higinio to meet him in the

5    area of Savannah Pines, the murder scene.

6        This is the area that was captured of the IBEW video,

7    the area.  There was only one way in and out to the Savannah

8    Pines Mobile Home Park or a dead-end road down Airport Park

9    Road.  Higinio told the defendant to meet at a nearby gas

10   station, or excuse me, the defendant told Higinio to meet at a

11   nearby gas station.  Higinio was in the van and the defendant

12   was in his white Escalade.  Defendant told Higinio to be

13   familiar with the area because this is where they would be the

14   next day.  Higinio drove around the area in his white van and

15   then left.

16       Exhibit 73.  Their activity was captured, and if you

17   click on each page and scroll down, you can see that the

18   Escalade is going in and out, in and out, in and out, the

19   Escalade that the defendant is driving between 12:32 and 2:58,

20   according to the surveillance times, and the van is going in and

21   out, in and out between 12:54 and 1:03.

22       And then what happens the next day, the day of the

23   murder?  Exhibit 94.  At 6:38 a.m., the defendant called Higinio

24   early in the morning and he said to meet at the Kroger off of

25   Ogeechee Road off of Highway 17.

1          Exhibit 56.  Higinio explained that he drove the van and

2     he met the defendant at the Kroger right down here.  He said the

3     defendant parked his truck there.  The defendant got in the van

4     and had a little bag, a little bag.  He had no tools, nothing to

5     work with.  Defendant wasn't there to do work.

6          And where did they go?  They went to Savannah Pines, the

7     murder scene where Mr. Montoya lived.  Exhibit 75.  If you click

8     on each page you can watch the day that they conducted ambush

9     surveillance looking for Mr. Montoya.

10          Defendant told Higinio where to go and what to do

11     between 7:51 a.m. and 11:30 a.m., in and out, in and out, down a

12     dead-end road, back up, in and out, for hours looking for Mr.

13     Montoya, trying to hunt him down, in and out.

14          And then on Page 75-27, you see a silver Toyota sedan

15     driven by Mr. Montoya's neighbor, the last person to see Mr.

16     Montoya alive.

17          Exhibit 75-28, if you continue scrolling through, again,

18     at 11:34, you see that van with the defendant and Higinio in it

19     coming up from the dead-end road, and then by 11:42, they head

20     east on Dean Forest Road towards the Pilot gas station.

21          Higinio said that the defendant told Higinio to drop him

22     off at the Pilot.  He'd call him the next time he needed him.

23          Exhibit 56, Higinio then explained his route.  He said

24     he left the area and he went to eat at a Mexican restaurant near

25     307 and Highway 17.  It would have been right down there.

670

1    Higinio then said the defendant called him and gave him

2    directions on where to pick him up.  He told him to come down

3    through Chatham Parkway and pick him up on the side of I-16.

4    Higinio did.  He drove the route; he picked up the

5    defendant off of I-16 near 307, near the Dean Forest Road.  He

6    traveled off of Highway 17, through Chatham Parkway, back on

7    I-16.  He picked up the defendant near the 307 exit, and then

8    they continued on down through Quacco Road, back to where the

9    vehicles were.

10    That is the route that Higinio testified that he took

11    when he dropped off Defendant, ate his lunch and then went back

12    to pick up the defendant.

13    He said when he picked him up on I-16, the defendant had

14    that same little bag with him.  He was wet and he was sweaty.

15    He had been walking a lot.

16    Higinio knew that the defendant had just killed Mr.

17    Montoya.  He told him he had just killed him.  Once in the van,

18    the defendant called Pablo.  Defendant told Pablo, "It's done."

19    "It's done."  "The job is done."  Mr. Montoya was dead.

20    Higinio then drove the defendant back to the Kroger and

21    dropped him off.  Exhibit 82.  Defendant said they got there at

22    exactly -- excuse me, the surveillance video captures them there

23    at approximately 1:05.  There's the van, after dropping off the

24    defendant to pick up his maroon, noisy, colorful truck.

25    Higinio explained these horrible details of this

671

1  criminal plan to kill Mr. Montoya and how it happened and who

2  did it.

3        The Court has instructed you to consider his testimony

4  with more caution than others because he is a cooperating

5  defendant with a plea agreement, and you should be more

6  cautious.  You should be cautious, and certainly he is looking

7  to help his case, but there have been no promises given for his

8  testimony, and he only receives any benefit for the truthful

9  testimony, and it's The Court, the Judge, who decides if any

10  benefit is given.

11        So while you should consider his testimony with caution,

12  you should also consider his testimony in conjunction with the

13  digital evidence in this case, and when you align his testimony

14  to the digital evidence, you will see that it is consistent.

15  You will see that it is consistent.

16        Exhibit 72-2.  Higinio testified that Pablo came to his

17  home once when he was complaining about the problem employee.

18  Well, Pablo's work GPS, Pablo's work truck has GPS in it, and

19  the records received from Wolf Tree during the timeframe reveal

20  that on August the 2nd Pablo did, in fact, show up at Higinio's

21  home, only one time.  The records reveal that he only showed up

22  once and he did appear at his house, consistent with what

23  Higinio testified to.

24        Also Higinio said that Pablo planned for the defendant

25  and him to execute this plan, that he would not be present on

672

1    either the day before or the day of the murder.

2        Pablo planned for the defendant, his brother, and

3    Higinio to do this.  Back to Exhibit 72, where was Pablo the day

4    before and the day of the murder?  He wasn't anywhere near the

5    murder scene.  His work truck was not anywhere near the murder

6    scene the day before or the day after.  This is also consistent

7    with Higinio's testimony.

8        Exhibit 85, Higinio said that he only spoke with

9    Defendant the day before and the day of the murder.  But he

10   would talk to Pablo.  He did work for Pablo at the ranch.  The

11   date range and the number of calls of all their phone records is

12   consistent with his testimony.  Higinio and the defendant only

13   talked for 13 times the day before and the day of the murder.

14   This is consistent with Higinio's testimony.

15       Exhibit 93, the day before the murder, there are

16   frequent calls between the defendant and Higinio.  Again this is

17   consistent with Higinio's testimony that the defendant called

18   him when it was time to borrow the vehicles and Defendant called

19   him and told him where to go and where to meet up to be familiar

20   with the area.

21       Exhibit 62-8.  FBI CAST engineer Chad Fitzgerald, he

22   plotted the phone location and the information for the defendant

23   and Higinio Perez-Bravo on the day before the murder.

24       With Defendant's phone in red and Higinio's phone in

25   green, it represents the time the defendant's phone was at the

1    murder area and the time Higinio's phone was at the murder area,

2    again the day before.

3            Defendant's phone is at the murder area longer than

4    Higinio Perez-Bravo, again consistent with Higinio's testimony

5    that he was only there a short time just to be familiar with the

6    area and following Juan, the defendant's, instructions.

7            Exhibit 73, we also see the same thing with the vehicles

8    the day before the murder and IBEW camera.  If you click through

9    and look, you will notice that we see both of Higinio's vehicles

10   driving in and out, not just one, indicating there are two.

11   There are two drivers the day before the murder.  Higinio said

12   that he was in the van and the defendant was in his Escalade.

13           If you scroll through, you be will see the times in and

14   out, 12:32 to 2:58, the longer time in the Escalade and the

15   shorter time in the van between 12:54 and 1:03.  Again, this is

16   consistent with Higinio's testimony.

17           The time that the van are at the murder area and the

18   time that the Escalade are at the murder area are consistent

19   with his testimony.

20           And what about the day of the murder?  Exhibit 94,

21   Defendant's phone calls Higinio at 6:38 in the morning and he's

22   hitting a tower near the ranch, the compound.

23           This is consistent with Higinio's testimony that he said

24   Defendant called him the day of the murder and told him to go

25   that morning and meet him at the Kroger so that Higinio can

674

1    drive the defendant.

2        Exhibit 75, the IBEW camera on the day of the murder, if

3    you scroll through, you see only the van going in and out

4    between 7:51 and 7:42 a.m. indicating only one driver and that

5    the defendant is riding with Higinio Perez-Bravo.  Again this is

6    consistent with his testimony.

7        Exhibit 62-9, FBI CAST engineer Chad Fitzgerald again

8    plotted the phone location information for the defendant and

9    Higinio Perez-Bravo the day of the murder.

10       62-9 indicates that the phones are near the murder scene

11   between 8:34 a.m. and 10:25 a.m.  This is consistent with

12   Higinio's testimony that he drove the defendant in and out, in

13   and out during these times, looking, following the defendant's

14   directions.

15       Exhibit 62-10, this is Higinio's phone moving the day of

16   the murder between 12:18 and 12:30 plotted by the FBI.  This is

17   consistent with Higinio's testimony that he dropped the

18   defendant off at the Pilot and he drove to eat lunch and that he

19   drove back towards I-16 and Chatham Parkway to pick up the

20   defendant when he called him to tell him the job was done.

21       Exhibit 62-11.  This is location information for one of

22   Defendant's phones at the murder scene, and it's not moving

23   between 12:17 and 12:34, the timeframe of the murder.  This is

24   consistent with Higinio's testimony that he dropped Defendant

25   off and left him there.  Defendant is not moving.  Higinio's

675

1    phone is moving during this time period.

2        Exhibit 62-12.  This is Higinio's phone and Defendant's

3    phone moving the day of the murder between 12:30 and 12:35.

4    Again, it's consistent with Higinio's testimony that when

5    defendant called him, he circled back around and picked him up

6    to take him back down to the Kroger and the McDonald's to drop

7    him off.

8        Exhibit 82, and we know from the McDonald's surveillance

9    video that they made it back to the Kroger and the McDonald's at

10   approximately 1:05 p.m.

11       Exhibit 62-13.  This is Higinio's phone and Defendant's

12   two phones moving the day of the murder after the murder between

13   1:13 p.m. and 2:46 p.m.

14       They are consistent with Higinio's testimony that, after

15   the murder, Higinio drops Defendant off and Defendant goes on

16   his way and Higinio goes on his way.

17       Defendant's phones are traveling north towards

18   Springfield where he is supposed to be, where he was supposed to

19   be, and Higinio's phones are traveling south to where he was

20   supposed to be, to where he works.

21       Exhibit 57, this a map of where the defendant and

22   Higinio Bravo were supposed to be in relation to the murder

23   scene.  Springfield is up north.  And Higinio was down south.

24       This is consistent with the locations of where the

25   phones were moving after the murder.

676

1          So, again, while you should be careful in considering

2     Higinio's testimony, when you consider it in light of the

3     digital evidence, it is consistent with what the digital

4     evidence indicates that they are doing.

5          The digital evidence has no incentive to lie.  The

6     digital evidence has not changed.  The digital evidence is

7     accurate.  Higinio's testimony is accurate with the digital

8     evidence.

9          Defendant used Higinio's vehicles to scope out this area

10    the day of the murder, and the day of the murder, Higinio drove

11    him around, dropped him off so he could kill Mr. Montoya, so he

12    could assassinate him.

13         After Defendant killed Mr. Montoya, Higinio picked him

14    back up, looped back around and dropped him off at the Kroger

15    and the McDonald's.  Higinio's testimony is consistent with the

16    evidence.

17         But what's not consistent, what's not consistent are all

18    the multiple statements that the defendant made.  Defendant has

19    given multiple statements about where he was and what he was

20    doing at the day and time of the murder.

21         Ladies and gentlemen, he is presumed innocent.  He is

22    not presumed honest.  He is not presumed honest.  It is

23    difficult to try to keep his stories straight for the number of

24    times he has given statements about what he was doing.

25         Why is that?  Why is it so hard to give a straight

677

1    answer and give a consistent answer?  Because he planned the

2    murder.  He participated in the murder, and he tried to lie his

3    way to get out of this murder.

4           The truth is dangerous.  The truth is very dangerous.

5    It was deadly for Mr. Montoya, and it's dangerous for the

6    defendant.

7           But the truth has not changed, no matter how dangerous

8    it is.  What's interesting is that in all his statement, in all

9    the statements the defendant gave, there are some facts which he

10   is consistent on.

11          There are some facts which he has no problem admitting

12   and the facts are the same through and through.  He has always

13   admitted that he's an illegal alien.  He has always admitted

14   that worked for his brother at Wolf Tree and that he was using

15   false names.

16          He always admitted that he was getting paychecks in the

17   names of other people.  Defendant has always admitted that he

18   was paying his son and other illegal aliens to work at Wolf

19   Tree.

20          Defendant has always admitted that Mr. Montoya had

21   problems at work with his brother and that Mr. Montoya would

22   call the defendant about those problems.

23          Defendant has also always admitted that Mr. Montoya

24   filed the complaint about this.  And finally, the defendant has

25   always admitted that he knew about the complaint and that Mr.

1    Montoya was trying to screw them up.

2         The defendant has been consistent on what he perceived

3    to be the easy part of this.  He perceived this to be easy, but

4    it's much harder to tell the truth about what was happening at

5    the murder.

6         Defendant's first statement, Exhibit 90-1, he was

7    interviewed the day after the murder by Lieutenant Rodriguez.

8    You will have this, his entire transcript, and you'll have the

9    opportunity to read it and review it.

10        But in general, he tells Lieutenant Rodriguez that he

11   was in Springfield the day of the murder.  He said that he was

12   working with Maria, Hipolito and Jonathan, his son.

13        He said he called Pablo around one o'clock because he

14   needed some hydraulic oil and he said that Pablo came to

15   Springfield, the work site, around two o'clock.

16        Exhibit 57.  Again, this is the map showing the work

17   site in relationship to Springfield and the murder area.  This

18   work site is nowhere near the murder site.

19        Defendant had told law enforcement that he was in

20   Springfield the day of the murder.  The digital evidence proved

21   that Defendant wasn't there and that his phones were at the

22   murder site and that he's calling his brother at the time of the

23   murder.

24        Exhibit 61.  Who else indicated that he wasn't there

25   besides the phone evidence?  Maria Gonzalez Flores, she

679

1    testified that she was working on the crew with the defendant,

2    Hipolito, Jonathan and another cousin or another nephew,

3    Refugio.

4         Everyone was supposed to be there that whole week.

5    Everyone was there Monday through Thursday, including the

6    defendant, including the defendant, but what about Friday, the

7    day before the murder?  Defendant wasn't there.  Defendant

8    wasn't there, and Saturday, the day of the murder, Defendant was

9    noticeably absent.

10        Maria testified that the defendant did not show up until

11   about three o'clock that day, the day of the murder.  She even

12   took pictures, and the metadata from her phones indicate that

13   those photographs were taken in the Springfield area and they

14   were taken around lunchtime.  Defendant was noticeably absent.

15   He wasn't there.

16        And we know what was really going on.  Defendant was

17   driving around, trying to be familiar with the area to kill Mr.

18   Montoya.

19        The defendant's first statement was a lie to law

20   enforcement.  What about his second?  What about his second

21   statement?

22        About a year later, Exhibit 92-2, this is the transcript

23   of the interview.  Again you will have it.  You will have a

24   chance to review all of it.

25        He meets with law enforcement about a year later and he

680

1  finally says, well, after confronted that his phones were in the

2  area and that he wasn't at Springfield, he admits that he lied.

3         He said he's not working in Springfield.  "Okay, you got

4  me."  He admits that he was at the murder site.  He denies

5  knowing who Higinio was.  He denies knowing him, and at one

6  point he even denied having the phone.  Then he admits to having

7  his phone and says he was only there to spy on Mr. Montoya to

8  catch him for illegal dumping.

9         So he changes whether or not he has a phone and he

10 admits to having a phone, and he changes and says he was driving

11 around.  And he says it was his nephew that was driving around

12 and then he changes and says, "No, it was a guy that was driving

13 around," but he still doesn't admit to knowing Higinio.

14        Exhibit 92-81, he finally admits that it was bad luck

15 and that he left the area at the same time that Mr. Montoya was

16 killed.

17        And Exhibit 92-59, he admits that he was in the wrong

18 place at the wrong time.  He admits that he left at the time

19 that Mr. Montoya was killed; he was at the wrong place at the

20 wrong time.

21        After admitting that he lied the first time and after

22 admitting to being at the murder scene and spying on Mr.

23 Montoya, he then gives another version of events, Defendant's

24 third version of events.

25        Four years later, in May of 2022, Defendant met with

681

1  agents and again provided information about his whereabouts the

2  day before and the day of the murder.

3      He now admitted to knowing Higinio and he admits to

4  using his Escalade the day before the murder.  He says Higinio

5  drove the van the day before the murder, and he was at Savannah

6  Pines for a job to check on.

7      But the day of the murder Higinio called him and that

8  Higinio picked him up at the Kroger on Highway 17.  He said he

9  left his truck there with trailer because it was very far away

10 and he did not want to get anything stolen, and he admitted to

11 being in the van with Higinio and he says that Higinio dropped

12 him off at Nassau Woods, which was a nearby trailer to work.  He

13 says no, he wasn't there spying on Mr. Montoya any longer.

14     He was now there to work at Nassau Woods along the power

15 lines and he said he called Higinio to pick him up off of I-16.

16 He admitted to having two phones.  He admitted to having a,

17 using a prepaid phone to call Higinio.

18     The takeaway from all this is that now he admits to

19 knowing Higinio.  He now admits to driving in his vehicle.  He

20 now admits to having Higinio pick him up, and he denies spying

21 on Mr. Montoya.

22     He now says he was there to work and finally his

23 testimony to you, ladies and gentlemen.  Defendant took the oath

24 and told you many interesting things, didn't he?  He denied

25 being innocent on all four counts.  His lawyer asked him if he

682

1    maintained his innocence on all four counts and he responded "I

2    need -- I will say this at the end; I will answer this at the

3    end."  His lawyer then said, "It's a yes-or-no question," and

4    repeated the question, "Do you maintain your innocence to all

5    four counts?"

6            The defendant answered, "Not exactly because regarding

7    the money, the money got to my account, so that makes me part

8    guilty, although I'm not guilty."

9            He asked you not to call his first statement false about

10   being in Springfield, but he admitted he didn't tell the truth

11   about being at the murder scene.

12           Defendant told you that he hated the fact that he was

13   there at the murder scene in the area.  He said that he viewed

14   the evidence and that he paid attention during the trial and he

15   spent two years reviewing all the evidence, and he was weaving a

16   story trying to fit what he was doing and where he was after

17   spending years with the evidence.

18           Defendant admitted that he called Higinio, that he was

19   using the Escalade the day before and that Higinio drove him

20   around in the van the day of the murder.

21           Again, he admitted that he had been dropped off at

22   Kroger, at McDonald's off of I-17 and he admitted that he was in

23   the white van with Higinio on the day of the murder.

24           So the evolution of Defendant's changing story, the

25   takeaway is "No, I wasn't."

683

1              "Hey, your phones were there."

2              "Okay, you're right; I was there; I was there spying but

3      it looks bad; no, wait I wasn't there spying; I was there

4      working."

5              Which is it?  He can't keep his story straight.

6      Defendant, and then he says he was there working but he never

7      explains why he is not using his truck, why he's not using his

8      tools, why he is using Higinio's van, why he is using discreet

9      vans.  He cannot explain them because he wasn't there working.

10     He wasn't there working.

11             Defendant is charged in four counts in this indictment.

12     Count 1 is the conspiracy to conceal, harbor and shield illegal

13     aliens.  Count 2 is a money-laundering conspiracy.  Count 6 is

14     conspiracy to kill a witness and Count 7 is conspiracy to

15     retaliate against a witness.

16             You will be given a copy of the indictment to review in

17     your deliberations.  The indictment is not evidence.  It is not

18     evidence, but it is an important piece of paper that helps

19     outline the allegations in this particular case and the alleged

20     schemes and the alleged conspiracies.

21             When you go back to your jury room, you will have three

22     tools to help you decide whether Defendant is guilty.  The

23     facts, the evidence you've heard over the last several of days.

24     You will get to see all the documents and the digital evidence

25     and the physical evidence and take them back with you in the

684

1    jury room to review.

2         You will also get the law that the Judge will give you.

3    I anticipate that she will charge you on the instructions of

4    these four counts on what is needed to be proven beyond a

5    reasonable doubt.

6         And finally you will have your common sense.  You will

7    have your common sense to take with you to use in your

8    deliberations.  It's an important tool as you decide whether

9    Defendant is guilty.

10        And let's review the law that I anticipate the Judge

11   will give you in this case.  In all four counts, the defendant

12   is charged with a conspiracy.

13        So what is a conspiracy?  It is an agreement to commit

14   an unlawful act; it's a partnership in crime.  It's that simple.

15        What is not part of the conspiracy that does not need to

16   be shown?  That there was an actual formal agreement.  We do not

17   need to show there was a formal agreement.  We do not need to

18   show that all the members planned all the details together and

19   that the defendant knew every single detail of the plans.

20        We only need to show that there was a plan to commit a

21   crime, so Count 1, conspiracy to conceal, harbor and shield

22   illegal aliens, simply that the defendant and another person

23   agreed to commit the unlawful plan and that the defendant knew

24   the unlawful plan and willfully joined in it.

25        For Count 1, what was the unlawful plan?  To conceal,

1    harbor and shield from detection within the United States an

2    alien knowing and in reckless disregard that an alien had

3    entered the United States and remained in the United States in

4    violation of the law and for commercial or private financial

5    gain.  That is what needs to be proven for Count 1.  But for

6    Count 1, none of the evidence supporting this charge is in

7    dispute.  There is no dispute that Defendant is an illegal

8    alien.  There is no dispute that he worked for Wolf Tree.  There

9    is no dispute that he worked under assumed names.  There is no

10   dispute that he received money in the names of other individuals

11   into his bank accounts.  There is no dispute that defendant had

12   a criminal plan to conceal, harbor and shield illegal aliens.

13        What about for Count 2?  Money laundering, Defendant is

14   charged with conspiracy to engage in money laundering.  Two or

15   more people agreed to commit the unlawful plan to launder money.

16        INTERPRETER GERBER:  Interpreter requests for Ms.

17   Groover to slow down.

18        THE COURT:  Ms. Groover, if you will go just a little

19   bit more slowly, and the time won't count against you.  Proceed.

20        MS. GROOVER:  Thank you, Your Honor.  I anticipate The

21   Court will instruct you on when money laundering occurs.  It

22   occurs when there is conducted a knowing financial transaction

23   where money was involved where the proceeds were some kind of an

24   unlawful activity and the money did come from an unlawful

25   activity, and in this case the conspiracy to conceal, shield and

686

1  harbor illegal aliens, and finally that the defendant was

2  involved in the transaction with an intent to promote the

3  carrying on of the unlawful activity.  Again, that two or more

4  people agreed to the unlawful plan to launder money; the

5  defendant knew about its purpose and willfully joined in it.

6       As like Count 1, for Count 2, none of the evidence is in

7  dispute.  There is no dispute that the defendant made money from

8  the scheme to hire illegal aliens, and there is no dispute that

9  paychecks in the name of other individuals went into his bank

10 account.  There is no dispute that the money was deposited and

11 came from the illegal scheme to hire illegal aliens using false

12 names.  There is no dispute that he was part of this criminal

13 plan.

14      Count 6 and Count 7, the final two counts, they are very

15 similar.  First, that two or more agreed to try to accomplish an

16 unlawful plan, a plan to kill Mr. Montoya and that Defendant

17 knew about the plan's unlawful and willfully joined in it.

18      The difference between Count 6 and 7 is the purpose of

19 the plan to kill Mr. Montoya.  Count 6 is to kill Mr. Montoya to

20 prevent him from providing testimony or documents or records.

21 And Count 6, the plan to kill him to punish him for doing that.

22      It's important to note the for both Count 6 and Count 7,

23 the defendant is only charged with a conspiracy.  The Government

24 does not need to show that the defendant actually shot and

25 killed Mr. Montoya.

687

1          Rather, for both counts, the Government only needs to

2     prove that the defendant conspired with two or more people to

3     accomplish a shared and unlawful plan to kill Mr. Montoya, one

4     plan being to prevent him and the other plan being to punish him

5     for what he had done.

6          So the only issue, much of the evidence in this case is

7     not in dispute.  So the only issue that the defendant would lead

8     you to believe is whether or not he conspired to kill Mr.

9     Montoya and willfully joined in this plan.

10         The overwhelming evidence is yes.  Yes, Defendant knew

11    about this plan; yes, Defendant willfully joined into it,

12    Defendant, his phones, the vehicles, his scheming with Pablo and

13    Higinio Perez-Bravo to hunt down Mr. Montoya and kill him.

14         Exhibit 104.  This is a snapshot of the plan between

15    Defendant and Higinio the day before the murder.  On August the

16    18th of 2018, 2017, the day that he told Higinio to be familiar

17    with the are, on the left side in green you will see the times

18    that the vehicles appeared in the IBEW surveillance videos, and

19    on the right side in blue, you will see the phone activity.

20         When you marry the video with the phone activity, you

21    see this plan, this working together, the defendant and Higinio

22    are working together to hunt down and find Mr. Montoya.

23         Yes, there is no dispute that Mr. Montoya was murdered.

24    No dispute that he was killed with a .22-caliber hollow-point

25    metal-jacketed bullets.  No dispute that the bullets came from

688

1  same gun, that there was one shooter.  There is no dispute that

2  the defendant had ammunition in his oven that was consistent

3  with the bullets pulled from Mr. Montoya's body.

4        There is no dispute the defendant possessed two of the

5  .22-caliber revolvers, one a long rifle and one a Magnum.  There

6  is no dispute that the Magnum was noticeably absent and that it

7  is the possible murder weapon.  There is no dispute that their

8  cell phones were used.  There is no dispute that they were using

9  the vehicles and were in agreement with vehicles.

10        The only issue is whether or not the defendant knew of

11  the plan to kill him and willfully joined in it.  And remember

12  to use your common sense.  Out of all the places in the world

13  and of all the people on earth and of all the times, the

14  defendant is right there at the murder scene at the time that

15  Mr. Montoya is killed.  Of course, he was part of this plan.

16        Mr. Montoya believed in America.  He believed that here

17  in America the rule of law prevails.  The rule of law guides us

18  as citizens of the United States, and it's our laws, the laws of

19  the United States, that protects us.  He held these beliefs so

20  firm that he did carry, did not worry about the dangers of

21  speaking up for an injustice.

22        Mr. Montoya stepped forward to help those who needed it,

23  for workers who believed they were entitled to equal pay under

24  the laws of the United States of America.  Defendant killed Mr.

25  Montoya for speaking up.

1          Well, this is the United States of America and we don't

2     kill witnesses.  We listen to them.  Juries get to hear from

3     them.  Judges get to hear from them and the rule of law

4     prevails.  Hold Defendant accountable for what he did and find

5     him guilty.

6          THE COURT:  All right, ladies and gentlemen, it is time

7     for our mid-morning break.  It's almost 10:30 on the dot, and so

8     we will break for 15 minutes.  During this break continue not to

9     make up your mind, not to discuss the case.  All rise for this

10    jury.

11          (The jury exits the courtroom.)

12          THE COURT:  And we will be in recess until quarter up

13    'til 11:00.

14          Counsel, I do want to make sure everyone has the time

15    they need, so Ms. Brewington, we need to be mindful of the

16    interpreters, but you can take whatever time you need for your

17    closing.

18          Let me ask, while I'm thinking of it, if there were to

19    be a conviction on any of the counts, there is a forfeiture

20    allegation in the indictment.  Most people don't request that

21    the jury be retained for a forfeiture proceeding.  How does the

22    Defense wish to proceed with regard to that?

23          MS. BREWINGTON:  I don't need the jury for that, Judge.

24          THE COURT:  Counsel, we will take a brief break then and

25    resume at 10:45.

690

1          (Recess from 10:27 a.m. to 10:47 a.m.)

2          THE COURT:  Let's bring in the jury.

3          (The jury enters the courtroom.)

4          THE COURT:  Welcome back, members of the jury.

5          Ms. Brewington, closing arguments on behalf of the

6    Defense.

7          MS. BREWINGTON:  Thank you, Judge.

8          Ladies and gentlemen, throughout this trial, Juan has

9    been presumed innocent.  That's why we have this process because

10   the Government has the burden of proof.  They have to prove each

11   and every element of each and every count beyond a reasonable

12   doubt.  It's a heavy burden.

13         You're going to hear a lot of law from the Judge.  Part

14   of the law of beyond a reasonable doubt states, "It's proof so

15   convincing that you would be willing to rely and act on it

16   without hesitation in the most important of your own affairs."

17   Very heavy burden, to each and every element.

18         I'm going to go through all four charges, and I'm going

19   to tell you the elements that they did not prove, that they did

20   not present evidence for.

21         Count 1, conspiracy to conceal, harbor and shield

22   illegal aliens.  That's the Pablo show.  We've all been here.

23   We've heard Pablo, Pablo, Pablo, Pablo.  He did so many things.

24   He hired.  He fired.  He paid.  He managed.  He provided

25   documents.  He filled out time sheets.  He provided housing.

691

1        What was Juan?  A foreman, a worker.  He did none of

2   those things.  The crimes of one brother do not transfer to

3   another.

4        One of the elements of conspiracy to conceal, harbor and

5   shield illegal aliens states that Juan would have to have

6   concealed, harbored and shielded from detection an alien in the

7   United States.

8        You've heard definitions within the law.  To conceal,

9   harbor or shield from detection includes knowingly doing

10  something to help the alien escape detection.  There's been no

11  evidence presented on this particular element of Count 1, only

12  evidence to Pablo.  And so for that reason you must return a not

13  guilty to Count 1.

14       Count 2, conspiracy for money laundering.  There is two

15  elements that there was not evidence presented.  Element Number

16  3 states that money came from an unlawful activity, here a

17  conspiracy to conceal, harbor and shield illegal aliens.

18       There was no evidence of who paid the money to Juan, who

19  deposited that money into his account and where that money went

20  once the money was deposited.  Element 4 states that Juan would

21  have to be involved in the financial transaction with the intent

22  to promote the carrying on of unlawful activity.

23       Again there is no evidence of why that money went into

24  his account.  It's just evidence of financial transactions, but

25  nothing to back up what those transactions were promoting, what

692

1 crime those were promoting. There was a big number that was

2 given, $586,216.14. Remember, that was over an eight-year

3 period of time. That comes out to approximately $73,000.00 a

4 year, about $1,403.00 per week. That's not out of the realm of

5 possibility for somebody that was working this type of hard work

6 overtime 60, 70, 80, a hundred hours a week.

7        Juan was simply getting paid with other names just like

8 other employees were being paid. The Government never showed

9 that the money was deposited into his account. They never

10 connected the dots on how that money promoted an unlawful

11 activity. Therefore, you must return a not guilty to Count 2.

12        I'm going to suggest, like the Government did, that you

13 consider Count 6 and Count 7 together because they are very

14 similar, conspiracy to kill a witness and conspiracy to

15 retaliate against a witness. Both require an agreement and a

16 plan to kill Mr. Montoya and that Juan knew that plan and

17 voluntarily joined in.

18        They made a lot of hoopla about this missing .22, where

19 is this missing .22. They did this because they don't have a

20 murder weapon and so they've tried to allude to Juan having it

21 at some point or another.

22        But they don't know. Lieutenant Rodriguez and also the

23 ATF specialist both indicated .22's are common guns. So is .22

24 hollow-point ammunition, common. You can get it anywhere, any

25 store that sells guns and ammunition.

1          Worker after worker came in and said that it was common

2     for other workers to carry guns, not just Juan.  One worker even

3     said that Juan tried to sell him his .22.

4          It's not unreasonable to think that that's where that

5     second gun went or what they call the sister gun.  The

6     Government has been alluding to this .22 being the murder weapon

7     because they could not produce one.

8          What they also couldn't produce is any physical

9     evidence.  There is no DNA.  There's no fingerprints.  There's

10    no hair follicles.  There's no blood.  There's no gunshot

11    residue, and what's very interesting is that IBEW footage where

12    we see those cars go in and out, in and out, you heard me say,

13    "Did you watch every minute of those videos and did you ever see

14    somebody walking?"  And they said no.  There was one way in and

15    one way out of that trailer park, yet we never saw Juan walking

16    like Mr. Perez-Bravo said he did.

17         They have to prove that he knew the plan was to kill.

18    What evidence do they have to support that?  Well, they have

19    Perez-Bravo.  That's the only person that they have to indicate

20    what was going on that day in their cars.

21         Agent Miranda said they had no idea who the shooter was

22    before they spoke to Perez-Bravo.  The man himself told you he's

23    a liar.  He said, "I lied."  He was paid $20,000.00 to kill Mr.

24    Montoya.  There's no evidence that Juan had a large amount of

25    money transferred into his account like Perez-Bravo did.  He

694

1    said that only him and Pablo talked about the plan to eliminate

2    the worker.  Him and Pablo planned.  Three times, they talked

3    about eliminating that worker.  Juan was never present during

4    that planning.

5         He was promised during his interview with law

6    enforcement that if he did what they asked of him they would

7    talk to the ADA's, the district attorneys, maybe be able to give

8    him some type of benefit.

9         He now has a plea agreement with the Government, and he

10   has indicated to you he hopes to get a benefit from that plea

11   agreement.

12        He even told you that him and the Government prepared

13   his testimony.  They prepared for his testimony on Thursday.

14   And most importantly, he said he would do anything to minimize

15   his involvement and get to go home early, and that is why he sat

16   on the stand on Thursday and said the things that he did.

17        He and Pablo alone had a plan to kill Mr. Montoya.

18   There is no evidence that Juan knew that plan, and, therefore,

19   you will have to come back with a not guilty to Count 6 and

20   Count 7.

21        I want to thank you, jury, for your time on behalf of my

22   client.  Thank you.

23        THE COURT:  And, finally in rebuttal argument on behalf

24   of the United States.

25        MS. GROOVER:  Thank you, Your Honor.

1          Defendant created any perceived problems in this

2    investigation.  They were all created and designed by the

3    defendant.  Defendant planned the murder of Mr. Montoya.  He

4    participated in the murder and he tried to cover it up.  He

5    covered it up by using Perez-Bravo's vehicles.  They are hard to

6    track, hard to find.

7          He covered it up by depicting where he would be dropped

8    off at that Pilot.  There is no video of anyone walking around

9    because Perez-Bravo dropped him off at the Pilot, not on camera,

10   and then he walked and hid in the woods.

11         He covered it up by using a revolver.  There is no shell

12   casings.  There is no shell casing to collect to test for

13   fingerprints or DNA.  He chose a revolver.  He chose to limit

14   the evidence.

15         He covered it up by using a small caliber .22 Magnum

16   firearm, small ammunition, zero blood.  Have you seen the crime

17   scene photographs?  It's not a bloody crime scene.  There is no

18   blood splatter.  There is no blood that would be all over the

19   place.  He chose a small ammunition and he chose the crime

20   scene.

21         He covered it up by getting rid of the murder weapon.

22   The reason why we don't have it to test for fingerprints and DNA

23   is because the defendant got rid of it.  He was smart enough to

24   cover this up.

25         There is only one person who knows where that gun is,

696

1    and that's the defendant because he killed Mr. Montoya with it

2    and he had to get rid of it.  He had to get rid of it because

3    it's the only evidence to collect his fingerprints.  It's the

4    only evidence to collect the DNA.  You cannot collect DNA and

5    fingerprints off of bullets that go inside Mr. Montoya's body.

6    There is no forensic evidence to collect because Defendant

7    designed it that way.

8            With respect to Count 1, I anticipate the Judge will

9    also explain that means -- to conceal, harbor and shield from

10   detection includes knowingly doing something to help an alien

11   escape detection.  Defendant has always admitted that he got

12   paychecks into his bank account and he paid his son.  He paid

13   his son, who is also an illegal alien.  His son was working and

14   he shielded from detection and Defendant shielded him from

15   detection.  He concealed and harbored and shielded his son.  Of

16   course, he was involved in that conspiracy.

17           Also, the defendant also admitted -- you will see in his

18   transcript -- that in addition to his son there was other people

19   that worked under these names, and if they were available, he

20   would pay them; if not he would keep the money.

21           So absolutely he shielded and protected and helped other

22   aliens escape from detection.  He didn't have to be the

23   mastermind who was hiring everybody.  He didn't have to be the

24   one who was assigning the names.  It's enough that he was a

25   leader and he was organizing crews and he was paying out his son

1   and other workers who were using those names.

2          With respect to Count 2, it doesn't matter who was

3   putting the money into his account.  It doesn't matter what the

4   defendant was doing with it.  With respect to the money-

5   laundering conspiracy, what matters is that those financial

6   deposits went into his accounts, and those financial deposits

7   came from that scheme to employ illegal aliens.

8          He was absolutely promoting the conspiracy to harbor,

9   shield and protect illegal aliens because that money went into

10  his account, and that money was used to pay the illegal aliens.

11  It was promoting the schemes.  He was absolutely promoting that.

12         And with respect to Count 6 and 7, of course, the gun,

13  Defendant is the only one who had access to the gun, and of

14  all -- and what a coincidence.  Defendant would lead you to

15  believe that he's just unlucky in the wrong place at the wrong

16  time with this highly -- highly convenient ammunition that

17  everyone has -- it's available anywhere -- but what a

18  coincidence.  He's just the most unlucky man in the entire world

19  or he was there to kill him.

20         Ladies and gentlemen, you need to choose.  Was it

21  reasonable for him to be there of all the places in the world

22  with a gun, with ammunition in his oven that was consistent with

23  the ammunition in the body of Mr. Montoya, or was it just a pile

24  of inconveniences?  Was he there to kill him or not?  If he was

25  there to work, where is his truck?  Where are his tools?

1          It is not reasonable to think that he was there just to

2    work.  It is reasonable to think that he was there, the man with

3    the three-million-dollar motive, the man who had everything to

4    lose and be deported, have his family deported, to lose his

5    home, that man was there when Mr. Montoya was killed.

6          He tried to kill him.  He tried to silence him.  But he

7    didn't.  The defendant did not silence Mr. Montoya, and he did

8    not eliminate him because you got to hear from him.  You got to

9    hear the words from Mr. Montoya.  You heard his complaint.  His

10   complaint went through the process.  It went through the law and

11   it went through the order.

12         And now, ladies and gentlemen, you sit here performing

13   your high civic duty, performing the law in the United States of

14   America under the watchful eye of the flag of the United States

15   of America.

16         Mr. Montoya would be proud that his complaint has made

17   it through the system and that is now your job to review the

18   evidence and review the law and use your common sense and return

19   a verdict that speaks the truth and that justice demands and

20   find the defendant guilty.

21         THE COURT:  Ladies and gentlemen of the jury, it's my

22   duty to instruct you on the rules of law that you must use in

23   deciding this case.

24         After I've completed these instructions, you will go to

25   your jury room and at last begin your discussions, what we call

699

1    your deliberations.

2          Keep in mind that in addition to me delivering these

3    instructions to you on the law orally here in court, I'm also

4    going to have brought to each of you in your jury room a written

5    copy of my instructions on the law.

6          Now, you must decide whether the Government has proved

7    the specific facts necessary to find the defendant guilty beyond

8    a reasonable doubt.  Your decision must be based only on the

9    evidence presented here.

10          You must not be influenced in any way by either sympathy

11   for or against, prejudice against the defendant or the

12   Government.  You must follow the law as I explain it even if you

13   don't agree with the law, and you must follow all of my

14   instructions as a whole.  You must not single out or disregard

15   any of The Court's instructions on the law.

16          The indictment or formal charge against the defendant

17   isn't evidence of guilt.  The law presumes every defendant is

18   innocent.  The defendant does not have to prove his innocence or

19   produce any evidence at all.  The Government must prove guilt

20   beyond a reasonable doubt.  If it fails to do so, you must find

21   the defendant not guilty.

22          The Government's burden of proof is heavy but it doesn't

23   have to prove a defendant's guilt beyond all possible doubt.

24   The Government's proof only has to exclude any reasonable doubt

25   concerning the defendant's guilt.  A reasonable doubt is a real

700

1    doubt based on your reason and common sense after you've

2    carefully and impartially considered all the evidence in the

3    case.

4         Proof beyond a reasonable doubt is proof so convincing

5    that you would be willing to rely and act on it without

6    hesitation in the most important of your own affairs.  If you

7    are convinced that the defendant has been proved guilty beyond a

8    reasonable doubt, say so.  If you are not convinced, say so.

9         As I said before, you must consider only the evidence

10   that has been admitted into the case.  That evidence includes

11   the testimony of witnesses and the exhibits admitted, but

12   anything the lawyers say is not evidence and is not binding on

13   you, and you shouldn't assume from anything that I've said that

14   I have any opinion about any factual issue in the case.

15        Except for my instructions to you on the law, you should

16   disregard anything I may have said during the trial in arriving

17   at your own decision about the case, about the facts of the

18   case.  It is your own recollection and interpretation of the

19   evidence that matters.

20        Now, in considering the evidence, you may use reasoning

21   and common sense to make deductions and reach conclusions.  You

22   shouldn't be concerned about whether the evidence is direct or

23   circumstantial.

24        As you've heard, direct evidence is testimony of a

25   person who asserts that he or she has actual knowledge about the

1   fact, such as an eyewitness, while circumstantial evidence is

2   proof of a chain of facts and circumstances that tend to prove

3   or disprove a fact.  There is no legal difference in the weight

4   you may give to either direct or circumstantial evidence.

5           Now, when I say you must consider all the evidence, I

6   don't mean that you must accept all the evidence as true or

7   accurate.  You should decide whether you believe what each

8   witness had to say and how important that testimony was.

9           In making that decision you may believe or disbelieve

10  any witness in whole or in part.  The number of witnesses

11  testifying concerning a particular point doesn't necessarily

12  matter.

13          To decide whether you believe any witness, I suggest

14  that you ask yourself a few questions.  Did the witness impress

15  you as one who was telling the truth?  Did the witness have any

16  particular reason not to tell the truth?  Did the witness have a

17  personal interest in the outcome of the case?  Did the witness

18  seem to have a good memory?  Did the witness have the

19  opportunity and ability to accurately observe the things he or

20  she testified about?  Did the witness appear to understand the

21  questions clearly and answer them directly?  Did the witness'

22  testimony differ from other testimony or other evidence?

23          You should also ask yourself whether there was evidence

24  that a witness testified falsely about an important fact and ask

25  whether there was evidence that at some other time a witness

1   said or did something or didn't say or do something that was

2   different from the testimony the witness gave during the trial.

3          To decide whether you believe a witness you may consider

4   the fact that the witness has been convicted of a felony or a

5   crime involving dishonesty or false statement.  But keep in mind

6   that a simple mistake doesn't mean a witness wasn't telling the

7   truth as he or she remembers it.  People naturally tend to

8   forget some things or remember them inaccurately.  So if a

9   witness misstated something, you must decide whether it was

10  because of an innocent lapse in memory or an intentional

11  deception, and the significance of your decision may depend on

12  whether the misstatement is an important fact or rather an

13  unimportant detail.

14         A defendant has a right not to testify, but since the

15  defendant did testify, you should decide whether you believe the

16  defendant's testimony in the same way as that of any other

17  witness.

18         If the Government offers evidence that a defendant made

19  a statement or admission to someone after being arrested or

20  detained, you must consider that evidence with caution and great

21  care.  You must decide for yourself first whether the defendant

22  made the statement and, second, if so, how much weight to give

23  it.

24         To make these decisions you must consider all the

25  evidence about the statement including the circumstances under

1    which it was made.

2         Now you must consider some witnesses' testimony with

3    more caution than others.  In this case, the Government has made

4    a plea agreement with a codefendant in exchange for his

5    testimony.  Such plea bargaining as it is called provides for

6    the possibility of a lesser sentence than the codefendant would

7    normally face.

8         Plea bargaining is lawful and proper and the rules of

9    this Court expressly provide for it.  But a witness who hopes to

10   gain more favorable treatment may have a reason to make a false

11   statement in order to strike a good bargain with the Government,

12   so while a witness of that kind may be entirely truthful when

13   testifying, you should consider that testimony with more caution

14   than the testimony of other witnesses.

15        And the fact that a witness has pleaded guilty to an

16   offense isn't evidence of the guilt of any other person.

17        As you've heard, when scientific, technical or other

18   specialized knowledge might be helpful, a person who has special

19   training or experiences in that field is allowed to state an

20   opinion about the matter, and during the course of this trial,

21   you heard from multiple experts.

22        It doesn't mean that you must accept their opinions.  As

23   with any other witness' testimony, you must decide for yourself

24   whether to rely upon the opinion.

25        The indictment in this case charges four separate

704

1    crimes, sometimes called counts, against the defendant.  Each

2    count has a number.  You will be given a copy of the indictment

3    to refer to during your deliberations.

4         Count 1 charges that the defendant knowingly conspired

5    to conceal, harbor and shield illegal aliens.  Count 2 charges

6    that the defendant knowingly conspired to commit money

7    laundering.  Count 6 charges that the defendant knowingly

8    conspired to kill a witness, and Count 7 charges that the

9    defendant knowingly conspired to retaliate against a witness.

10        Note that the defendant is not charged in those counts

11   with committing a substantive offense.  He's charged with

12   conspiring to commit the offense.  I will give you specific

13   instructions on conspiracy in just a moment.

14        Where a statute specifies multiple alternative ways in

15   which an offense may be committed, the indictment may allege the

16   multiple ways in the conjunctive, that is, by using the word

17   "and."  If only one of the alternatives is proved beyond a

18   reasonable doubt, that is sufficient for conviction so long as

19   you all agree unanimously as to that alternative.

20        You will see that the indictment charges that a crime

21   was committed on or about a certain date.  The Government

22   doesn't have to prove that an offense occurred on an exact date.

23   The Government only has to prove beyond a reasonable doubt that

24   the crime was committed on a date reasonably close to the date

25   alleged.

1          The word "knowingly," that means that an act was done

2     voluntarily and intentionally and not because of a mistake or by

3     accident.

4          Each count of the indictment charges a separate crime.

5     You must consider each crime and the evidence relating to it

6     separately.  If you find the defendant guilty or not guilty of

7     one crime, that must not affect your verdict for any other

8     crime.

9          And I caution you that the defendant is on trial only

10    for the specific crimes charged in the indictment.  You're here

11    to determine from the evidence in this case whether the

12    defendant is guilty or not guilty of those specific crimes.

13         You must never consider punishment in any way to decide

14    whether the defendant is guilty.  If you find the defendant

15    guilty, the punishment will be for me alone to decide later.

16         Now, some of the people who may have been involved in

17    these events are not on trial.  This does not matter.  There is

18    no requirement that all members of a conspiracy be charged and

19    prosecuted or tried together in one proceeding.

20         So it is a federal crime to conspire with someone else

21    to conceal, harbor or shield from detection an alien knowing or

22    in reckless disregard of the fact that the alien entered or is

23    in the United States illegally.  A conspiracy is an agreement by

24    two or more people to commit an unlawful act.

25         In other words, it's a kind of partnership for criminal

1    purposes.  Every member of the conspiracy becomes the agent or

2    partner of every other member.  The Government does not have to

3    prove that all the people named in the indictment were members

4    of the plan or that those who were made any kind of formal

5    agreement.  The heart of a conspiracy is the making of the

6    unlawful plan itself.  So the Government does not have to prove

7    that the conspirators succeeded in carrying out the plan.

8         A person may be a conspirator even without knowing all

9    the details of the unlawful plan or the names and identities of

10   all the other alleged conspirators.

11        If the defendant played only a minor part in the plan

12   but had a general understanding of the unlawful purpose of the

13   plan and willfully joined in the plan on at least one occasion,

14   that is sufficient for you to find the defendant guilty, but

15   simply being present at the scene of an event or merely

16   associating with certain people and discussing common goals and

17   interests does not establish proof of conspiracy.

18        Also, a person who does not know about a conspiracy but

19   happens to act in a way that advances some purpose of one does

20   not automatically become a conspirator.

21        The defendant can be found guilty of Count 1 only if all

22   the following facts are proved beyond a reasonable doubt:

23   First, the defendant and one or more persons in some way agreed

24   to try to accomplish a shared and unlawful plan; second, that

25   the defendant knew the unlawful purpose of the plan and

1    willfully joined in it; and third, that the object of the plan

2    was to conceal, harbor or shield from detection within the

3    United States an alien knowing or in reckless disregard of the

4    fact that the alien had entered or remained in the United States

5    in violation of law and for the purpose of commercial advantage

6    or private financial gain.

7        An alien is any person who isn't a natural-born or

8    naturalized citizen or national of the United States.  A citizen

9    of the United States is a person who was born within the United

10   States or naturalized through judicial proceedings.  A person

11   who was born outside the United States is a citizen of the

12   United States if both parents were United States citizens and at

13   least one of them had a residence in the United States before

14   the birth.  A national of the United States includes any United

15   States citizen and any non-citizen who owes permanent allegiance

16   to the United States.

17       To act with reckless disregard of a fact means to be

18   aware of but consciously and carelessly ignore facts and

19   circumstances clearly indicating that the person transported was

20   an alien who had entered or remained in the United States

21   illegally.  To conceal, harbor or shield from detection includes

22   knowingly doing something to help the alien escape detection.

23       It's a federal crime to conspire to engage in money

24   laundering or transactions involving the proceeds of specified

25   unlawful activity that violates Title 18 USC Section 1956.

708

1    Money laundering occurs when, Number 1, a defendant knowingly

2    conducted or tried to conduct a financial transaction; 2,

3    knowing that the money or property involved in the transaction

4    were the proceeds of some kind or unlawful activity; 3, that the

5    money or property did come from an unlawful activity, here a

6    conspiracy to conceal, harbor and shield illegal aliens; and

7    fourth, that the defendant was involved in the financial

8    transaction with the intent to promote the carrying on of that

9    specified unlawful activity.

10        So the defendant can be found guilty of Count 2 only if

11   all the following facts are proved beyond a reasonable doubt:

12   First, that two or more people agreed to try to accomplish a

13   common and unlawful plan to violate 18 USC Section 1956; second,

14   that the defendant knew about the plan's unlawful purpose and

15   voluntarily joined in it.

16        To conduct a transaction, that means to start or finish

17   a transaction or to participate in a transaction at any point.

18   A transaction means a purchase, sale, loan, promise, gift,

19   transfer or delivery or other disposition of money or property.

20        A transaction with a financial institution also includes

21   a deposit, withdrawal, transfer between accounts, exchange of

22   currency, loan, extension of credit, use of a safe deposit box

23   or purchase or sale of any stock, bond, certificate of deposit

24   or other monetary instrument.  A financial transaction means a

25   transaction that in any way or to any degree affects interstate

1    or foreign commerce by sending or moving money by wire or other

2    means or a transaction involving the use of a financial

3    institution that is involved in interstate or foreign commerce

4    or whose activities affect interstate or foreign commerce in any

5    way or degree.

6          Interstate or foreign commerce means trade and other

7    business activity between people or businesses in at least two

8    states or between people or businesses in the United States and

9    people or businesses outside the United States.

10          To know that the money or property involved in the

11    transaction came from some kind of unlawful activity is to know

12    that the money or property came from an activity that's a felony

13    under state, federal or foreign law.

14          The term "proceeds" means any property derived from or

15    obtained or retained directly or indirectly through some form of

16    unlawful activity, including the gross receipts of the activity.

17          The term "specified unlawful activity" means conspiracy

18    to conceal, harbor and shield illegal aliens from detection for

19    the purpose of commercial advantage or private financial gain.

20          The term "with the intent to promote the carrying out of

21    specified unlawful activity" means to conduct or attempt to

22    conduct the financial transaction for the purpose of making it

23    easier or helping to bring about the specified unlawful activity

24    as just defined.

25          It is a federal crime to conspire to kill or try to kill

1    a witness to prevent the witness from attending or testifying in

2    any official proceeding.  The defendant can be found guilty of

3    Count 6 only if all the following facts are proved beyond a

4    reasonable doubt:  First, that two or more people agreed to try

5    to accomplish a common and unlawful plan to kill Eluid Montoya

6    with the intent to prevent his attendance or testimony in an

7    official proceeding; and second, that the defendant knew about

8    the plan's unlawful purpose and voluntarily joined in it.

9         Official proceeding includes a proceeding before a

10   federal government agency, such as the Equal Employment

11   Opportunity Commission.  The question of whether the proceeding

12   alleged and proved by the Government is an official proceeding

13   is for the Judge to determine.  An official proceeding need not

14   be pending or about to be instituted at the time of the

15   defendant's alleged conduct, and the testimony or the record

16   document or other object need not be admissible in evidence or

17   free of a claim of privilege.  It's not necessary for the

18   Government to prove that the defendant knew of the federal

19   status of the proceeding involved.

20        If you find the defendant guilty of conspiring to kill a

21   witness as charged in Count 6, you must also determine if Mr.

22   Montoya was killed as a result of the conspiracy charged in

23   Count 6 and whether such killing was premeditated.

24        To kill with premeditated intent is to kill in cold

25   blood after the accused has had time to think over the matter

711

1   and form the intent to kill.  There is no exact amount of time

2   that must pass between forming the intent to kill and the

3   killing itself but it must be enough time for the killer to be

4   fully conscious of having the intent to kill.

5          Now, it's a federal crime to conspire to kill or attempt

6   to kill another person with intent to retaliate against any

7   person for being a witness at an official proceeding.  The

8   defendant can be found guilty of Count 7 only if all the

9   following facts are proved beyond a reasonable doubt:  First,

10  that two or more people agreed to try to accomplish a common and

11  unlawful plan to kill Eluid Montoya with the intent to retaliate

12  against him for his attendance at an official proceeding or for

13  any testimony given or any record, document or other object

14  produced by him in an official proceeding; and second, that the

15  defendant knew about the plan's unlawful purpose and voluntarily

16  joined in it.

17         If you find the defendant guilty of conspiring to

18  retaliate against a witness as charged in Count 7, you must also

19  determine if Mr. Montoya was killed as a result of the

20  conspiracy charged in Count 7 and whether such killing was

21  premeditated.

22         Now you've been permitted to take notes during the

23  trial, and I think most of you, perhaps all of you, have taken

24  advantage of that opportunity.  Recall that you must use your

25  notes only as a memory aid during your deliberations.  You must

712

1    not give your notes priority over your independent recollection

2    of the evidence, and you must not allow yourself to be unduly

3    influenced by the notes of others.  I emphasize that notes are

4    not entitled to any greater weight than your memories or

5    impressions about the testimony.

6              Now your verdict, whether guilty or not guilty, must be

7    unanimous.  In other words, you must all agree.  Your

8    deliberations are secret and you will never have to explain your

9    verdict to anyone.

10             Each of you must decide the case for yourself but only

11   after fully considering the evidence with your other jurors, so

12   you must discuss the case with one another and try to reach an

13   agreement.  While you're discussing the case, don't hesitate to

14   reexamine your opinion and change your mind if you become

15   convinced that you were wrong, but don't give up your honest

16   beliefs just because others think differently or because you

17   simply want to get the case over with.  Remember that in a very

18   real way, you are judges.  You are judges of the facts and your

19   only interest is to seek the truth from the evidence in the

20   case.

21             And when you get back to the jury room, choose one of

22   your members to act as a foreperson.  Your foreperson will

23   direct your deliberations and will speak for you here in court

24   if necessary, and a verdict form has been prepared for your

25   convenience.  You will each get a copy of it.

713

1          You will see that it has you select either not guilty or

2    guilty for each of the four counts with which the defendant is

3    charged.  If you were to find the defendant guilty of Count 6,

4    it directs you make other further choices with regard to that

5    count, and if you were to find the defendant guilty of Count 7,

6    it directs you to find other findings with regard to that count.

7          You will take the verdict form with you to the jury

8    room, and when you've all agreed on your verdict, your

9    foreperson will fill in the form, sign it, date it and bring it

10    back into the courtroom and you will all be returned to the

11    courtroom.

12          If for some reason you wish to communicate with me at

13    any time, please write down your message or question and get it

14    to the marshal and the marshal will bring it to me, and I'll

15    respond as promptly as possible either in writing or by talking

16    to you here in the courtroom, but I caution you not to tell me

17    how many jurors are voting one or the other at any time until

18    you have unanimously arrived at your verdict.

19          Counsel, to sidebar quickly.

20          (The following occurred at sidebar.)

21          THE COURT:  My only question to you:  Did I read that

22    correctly?

23          MS. BREWINGTON:  Yes.

24          MS. GROOVER:  Yes, Your Honor.

25          THE COURT:  All right, thank you.

1          (The following occurred in open court.)

2          THE COURT:  Mr. Robert Hill, you are the alternate, and

3   so you will be retained with us during the deliberation separate

4   from your colleagues in case we should need you for some reason,

5   and the marshal will place you somewhere comfortable apart from

6   the rest.  You're not to discuss the case with anyone or make up

7   your mind.

8          For the remaining 12 of you, it is now time to retire to

9   your jury room to talk about the case, to deliberate and to

10  reach a unanimous verdict.

11         Let's rise for this jury.

12         (The jury exits the courtroom.)

13         THE COURT:  Counsel, before we deliver the exhibits into

14  the jury room, I need counsel to actually approach the evidence

15  and confirm on the record that what is going out to the jury is

16  all of the evidence and only the appropriate evidence to go, and

17  if you will confirm that in just a moment when we recess on the

18  record with Ms. Sharp.

19         I compliment both sides on very good closing arguments.

20  We need to make sure when we deliver a copy of the indictment

21  that we take out the pages that counsel has agreed to take out

22  including the forfeiture allegation, and so if you will confirm

23  on the record with Ms. Sharp that the version of the indictment

24  that reaches the jury is the correct version.

25         I will note that we made the one change that was agreed

715

1    to by counsel on the jury instructions and, of course, the ones

2    that the jurors will get will reflect that change.

3            All of the charges were agreed to as to the timing of

4    giving them.  I did direct counsel to let me know during the

5    trial if they wanted me to advance any of those cautionary

6    instructions and give them during trial, and I can understand

7    why both sides wanted them given only at the end.

8            One other thing that I had intended to put on the record

9    Friday, both sides I think were very careful and judicious with

10   their objections.  There was an objection during the defendant's

11   testimony to the giving of narrative testimony.  The Government

12   made that objection.  I did sustain that objection, and although

13   there are some limited situations where a defendant can just get

14   up and narrate, none of those exceptions were present in this

15   case to the extent that would justify overruling that objection.

16           Namely, if a defendant is pro se, they are allowed to

17   get up and just tell their version to the jury or if defense

18   counsel has alerted The Court that they believe there is perjury

19   coming and they can't participate, then they can give a

20   narrative or if both sides for whatever reason agree that a

21   narrative is appropriate, then The Court can allow its

22   discretion in allowing that, but, of course, none of that was

23   present.

24           Again, if you will remain and confirm what goes in with

25   the jury so we have that all set.  It is almost time for lunch.

716

1    I do require everyone to remain in the courthouse until a

2    verdict is reached, but I anticipate at approximately 12:15

3    excusing everyone for a lunch break and protecting you from

4    12:15 to 1:15 to allow you to get some lunch.

5          With that, we will be in recess awaiting the verdict.

6          (Honorable Lisa Godbey Wood exits the courtroom.)

7          THE CLERK:  What I'm going to do is make a spot for

8    y'all and lay it out.

9          Can we split?  These will all be Government exhibits,

10   Ms. Gilbert.  So we have Government Exhibit 1.

11         MS. BREWINGTON:  Yes.

12         THE CLERK:  Government Exhibit 2.

13         MS. BREWINGTON:  Yes.

14         MS. GROOVER:  The tags should just say Juan since some

15   of the exhibits were the same from the last trial.

16         THE CLERK:  Government Exhibit 3.

17         MS. BREWINGTON:  Yes.

18         MS. GROOVER:  Yes.

19         THE CLERK:  And if you just want to speak up if there is

20   something wrong.

21         MR. HOWARD:  Silence equals yes.

22         THE CLERK:  Government Exhibit 4, Government Exhibit 5,

23   Government Exhibit 6, Government Exhibit 7, Government's 8,

24   Government's 9, Government's 10, Government's 11, Government's

25   12, Government's 13, Government 's 14, Government's 15,

717

1    Government's 16, Government's 17, Government's 18, Government's

2    19, Government's 20, Government's 21.  Is that all for that set?

3            MS. BREWINGTON:  Yes.

4            MS. GROOVER:  Yes.

5            THE CLERK:  Do they all look correct?

6            MS. GROOVER:  Yes.

7            MS. BREWINGTON:  Correct.

8            THE CLERK:  Ladies, Government Exhibit -- and gentleman,

9    Government's 22.  That's not in its own little Redweld.  So ...

10   Government's 24.

11           MS. BREWINGTON:  Did 23 disappear?

12           THE CLERK:  23 is an actual notebook.  This is physical

13   evidence.  Do you want to hand me 23?

14           MS. GROOVER:  Would you like to keep the box for the

15   physical exhibit?

16           THE CLERK:  Sure.  So we have Government's 23, which is

17   the physical notebook.

18           MS. BREWINGTON:  Yes.

19           THE CLERK:  24 is the photo.  We have that one.

20           MS. GROOVER:  Correct.

21           THE CLERK:  Government's 25.

22           MS. GROOVER:  Yes.

23           THE CLERK:  Government's 26.

24           MS. GROOVER:  Yes.

25           THE CLERK:  Government's 27, 28 is going to be in the

718

1    box.

2         MR. HOWARD:  Yeah, more bullets.

3         THE CLERK:  Government's Exhibit 28.  29, this is all

4    video, which is going back electronically.

5         MS. GROOVER:  Yes.  Do you want to keep the place holder

6    in there or would you like to remove that?  That was for the

7    notebooks.

8         THE CLERK:  Just note it that indicate that there's not

9    something to go with it physically or visually, a picture.

10   Okay.

11        Government's 29A through 29H, also video, surveillance

12   video, going back electronically.

13        MS. GROOVER:  Correct.

14        THE CLERK:  Government's 30, surveillance video.

15        MR. HOWARD:  Yep.

16        THE CLERK:  30.1 through 34.

17        MS. GROOVER:  Correct.

18        MS. BREWINGTON:  Yes.

19        MS. GROOVER:  It was a large file that had to be saved

20   in multiple files.  That's why.

21        THE CLERK:  Government's 30A through 30I, surveillance

22   clips.

23        MS. GROOVER:  That's correct.

24        THE CLERK:  Government's 31, Government's 32,

25   Government's 33, Government's 34, Government's 35, Government's

719

1   36, Government's 37, which is one of these big boxes, I think,

2   yes.

3           MS. BREWINGTON:  Two boxes.

4           THE CLERK:  Two boxes.  One in 37.

5           MS. BREWINGTON:  A hundred percent.

6           THE CLERK:  So it's 32 individual sets of Redwelds,

7   there is one, just lay eyes on them, one, two, three, four,

8   five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17,

9   18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32.

10  Those are also going back as one large electronic file.

11          So Government's 38 is also a large box, multiple large

12  boxes.  There's three boxes of 38.  So it should be 17 within

13  38, so there's one, two, three, four, five, six, seven, eight,

14  nine, ten, 11, 12, 13, 14, 15, 16, and 17.  Again that is also

15  going back in electronic files.

16          Government's 39, which is also a box, just one box.  16

17  folders, one, two, three, four, five, six, seven, eight, nine,

18  ten, 11, 12, 13, 14, 15 and 16.

19          Exhibit 40, Exhibit 41, Exhibit 42.  Exhibit 43, which

20  is going to be in your box, Chris.  Exhibit 44, which is a

21  photograph.  We did Exhibit 45, which is a physical.  So Exhibit

22  46, which is a photograph.  Exhibit 47 is physical evidence.

23  Exhibit 48, which is a photograph.  49 is a physical exhibit.

24  Exhibit 50 is a photograph.  51 will be a physical exhibit.  And

25  Exhibit 52.  There are two in here.  One is a copy and one is

720

1    certified.

2          MS. GROOVER:  We only need one.

3          THE CLERK:  I only signed the certified one.

4          MR. HOWARD:  Do we need to jump back to 5?  This was in

5    the box as well.

6          THE CLERK:  Yes.

7          MR. HOWARD:  So Number 5 was the physical documents that

8    are now in your hands.

9          THE CLERK:  So I have copies, Number 5 is also a

10   physical exhibit.  Exhibit 5 are copies of the physical

11   evidence.  Correct?

12         MS. GROOVER:  Correct, we could remove the copies if

13   you'd like to replace the copies with the original.

14         MS. BREWINGTON:  Let's do it.

15         MS. GROOVER:  Prevent confusion.

16         THE CLERK:  Moving on, Government's 53, 54, 55, 56, 57,

17   58.

18         MR. HOWARD:  Good.

19         THE CLERK:  59.

20         MS. GROOVER:  Yeah.

21         THE CLERK:  60.

22         MS. GROOVER:  For the record, there is a CD and the CD

23   should not be in there.  It's only the letter.

24         THE CLERK:  Okay, returning the CD.  So Government

25   Exhibit 60 is a one-page document, which is a letter.

721

1           MS. GROOVER:  It's now correct.  Correct to the Defense?

2           MS. BREWINGTON:  Correct.

3           MS. GROOVER:  61 is correct.

4           THE CLERK:  Government's 62.

5           MS. GROOVER:  Correct.

6           THE CLERK:  Government Exhibit 63.  63 is a big box.  So

7    63 is four banker boxes.  There's one of nine, can you see

8    those?

9           MS. BREWINGTON:  I can.

10          THE CLERK:  Three of nine, four of nine.  Five, six,

11   seven, eight, eight, nine.  Exhibit 63 is also going back in a

12   digital format.  Then we will have Government's 64.

13          MS. GROOVER:  64, 66 and 67.

14          THE CLERK:  64, 67 and 70.

15          MS. BREWINGTON:  What's the difference between that and

16   that?

17          MS. GROOVER:  This one ends in 88.

18          THE CLERK:  This one also ends in 88.

19          MS. GROOVER:  They appear to be duplicates.  I propose

20   we remove the blue folder.

21          MS. BREWINGTON:  That's okay.

22          THE CLERK:  64 is good.

23          MS. BREWINGTON:  64 is good.

24          THE CLERK:  65 is going to be this bankers box here,

25   which has three folders within it, one, two and three.  65 is

722

1    also going back in a digital format.

2        Ready?

3        MS. GROOVER:  Yes, ma'am.

4        THE CLERK:  Government's 66, 67, which is going to be

5    within this box.  Government's 67; correct?

6        MS. BREWINGTON:  Correct.

7        THE CLERK:  Also 67 is going back in a digital format.

8    Government's 68.

9        MS. GROOVER:  Okay.

10       THE CLERK:  69, 70.

11       MS. GROOVER:  That's correct.  There's no box.  I stand

12   corrected.  Apparently we have multiple duplicate copies.  The

13   blue folder is 70.  I propose we use this one, which is the

14   Bates stamp.

15       MS. BREWINGTON:  Sounds good to me.

16       MS. GROOVER:  The last two pages do appear to be

17   similar.  I will take out the pages that are unmarked.

18       THE CLERK:  So Government's 70 --

19       MS. BREWINGTON:  Correct.

20       THE CLERK:  71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81

21   is a video which is going back in electronic format.

22       MS. GROOVER:  Correct.

23       THE CLERK:  82, 83, 84, 85, 86, 87 is going to be within

24   a bankers box.  So 87 is one bankers box with four folders

25   within it.  So that's one, two, three, and four also going back

723

1    as one large digital file.  88, 89 is an audio disk, which is

2    going back in an electronic format, 90, 91 is a disk within the

3    folder that's going back in an electronic format of audio.  92.

4         MS. BREWINGTON:  Uh-huh.

5         THE CLERK:  Government's 93.

6         MS. GROOVER:  Okay.

7         THE CLERK:  94, 95, 96, 97, 98, 99, 100, 101.

8         MS. GROOVER:  Correct.

9         THE CLERK:  We pulled 102.

10        MS. GROOVER:  Correct.

11        THE CLERK:  We have 103.  104, 312, which is a disk,

12   audio going back in an electronic format, 313 is the transcript

13   going back in paper format.

14        MS. GROOVER:  Would you like a folder for 312?

15        THE CLERK:  It's fine to go like that.  I marked it as

16   312 and 313.

17        For the Government, does that appear to be all the

18   correct exhibits going back to the jury.

19        MS. GROOVER:  Yes.

20        THE CLERK:  For the defendant?

21        MS. BREWINGTON:  Yes.

22        THE CLERK:  Defense has no exhibits going back?

23        MS. BREWINGTON:  Correct.

24        THE CLERK:  Let's also have you look at -- she had you

25   looking at the indictment.

724

1          MS. GROOVER:  She wanted us to look at the indictment.

2     I have not confirmed it was redacted with the forfeiture.

3          THE CLERK:  I'll get you that.  We still have to verify

4     on the record the correct copy of the indictment to go back to

5     the jury.  Stand by, please.

6          MS. BREWINGTON:  Can I look at the verdict form?

7          THE CLERK:  Yeah, y'all can look at the verdict form and

8     the instructions.  If y'all will look at that.

9          MR. HOWARD:  Is this the one where we e-mailed it?

10         MS. GROOVER:  We filed it on the docket but I can go out

11    to --

12         MR. HOWARD:  I think Edwina uploaded it to the --

13         THE CLERK:  Did you file it on the docket?

14         MS. GROOVER:  We did file it on the docket under -- it

15    would have been notice of proposed redacted indictment and we

16    need to pull off the forfeiture.

17         MR. HOWARD:  That should be the last page.

18         MS. GROOVER:  The good news is because we already

19    redacted all the page numbers we can pull it out and it's not

20    weird looking.

21         MS. BREWINGTON:  Love that.

22         THE CLERK:  I don't see it on the docket.

23         MS. GROOVER:  I do have it upstairs.  If you would like

24    me to run upstairs and get it.

25         THE CLERK:  Did you e-mail it to me?

725

1          MS. GROOVER:  I believe we filed a notice.

2          THE CLERK:  This will be the copy we ran off to go back.

3    You look at it, Ms. Brewington, and Ms. Groover, you look at it

4    and confirm that is the correct copy of the indictment.

5          MS. BREWINGTON:  It looks good to me.

6          MS. GROOVER:  Me, too.

7          MS. BREWINGTON:  The Government and the Defense have

8    both agreed on the copy of the indictment to go back to the

9    jury.  I believe that's all we need.

10          (Recess from 12:17 p.m. to 1:34 p.m.)

11          THE COURT:  All right, counsel, I am told the jury has

12   reached a verdict so let's bring the jury in.

13          (The jury enters the courtroom.)

14          THE COURT:  Madam Foreperson, has the jury reached a

15   verdict?

16          JUROR NUMBER 46:  Yes, we have, Your Honor.

17          THE COURT:  And is it unanimous?

18          JUROR NUMBER 46:  Yes, it is.

19          THE COURT:  If you will please hand the form to the

20   marshal.

21          Ms. Sharp, please publish the verdict.

22          THE CLERK:  In the United States District Court for the

23   Southern District of Georgia, Savannah Division, United States

24   of America versus Juan Rangel-Rubio, Case Number 4:18-CR-274.

25   Verdict form, Count 1, we the jury find the defendant guilty of

726

1   Count 1 of the superseding indictment.  Count 2, we the jury

2   find the defendant guilty of Count 2 of the superseding

3   indictment.  Count 6, we the jury find the defendant guilty of

4   Count 6 of the superseding indictment.  If you find the

5   defendant not guilty as charged in Count 6 you need not consider

6   Paragraphs 1A and 1B below.  1A, we the jury, having found the

7   defendant guilty of the offense charged in Count 6, further find

8   with respect to that count that Eluid Montoya was killed as a

9   result of the conspiracy in Count 6; 1B, we the jury, having

10  found the defendant guilty of the offense charged in Count 6,

11  further find with respect to that count that Eluid Montoya's

12  killing was premeditated.

13          Count 7, we the jury find the defendant guilty of Count

14  7 of the superseding indictment; 1A, we the jury, having found

15  the defendant guilty of the offense charged in Count 7, further

16  find with respect to that count that Eluid Montoya was killed as

17  a result of the conspiracy in Count 7; 1B, we the jury, having

18  found the defendant guilty of the offense charged in Count 7,

19  further find with respect to that count that Eluid Montoya's

20  killing was premeditated.  So say we all signed by the

21  foreperson on this date.

22          THE COURT:  Please poll the jury.

23          THE CLERK:  As your name is called, if you will please

24  stand and answer the questions that shall be asked of you.

25          Anthony Garner, is the verdict as read and published

727

1    still your verdict?

2            JUROR NUMBER 19:  Yes.

3            THE CLERK:  Was it freely and voluntarily made?

4            JUROR NUMBER 19:  Yes.

5            THE CLERK:  Thank you.  You may be seated.

6            Heather Newsome, is the verdict as read and published

7    still your verdict?

8            JUROR NUMBER 35:  Yes, ma'am.

9            THE COURT:  Was it freely and voluntarily made?

10           JUROR NUMBER 35:  Yes, ma'am.

11           THE COURT:  Thank you.  You may be seated.

12           David Palmer, is the verdict as read and published still

13   your verdict?

14           JUROR NUMBER 37:  Yes.

15           THE CLERK:  Was it freely and voluntarily made?

16           JUROR NUMBER 37:  Yes.

17           THE CLERK:  Thank you.

18           Maribeth Evans, is the verdict as read and published

19   still your verdict?

20           JUROR NUMBER 16:  Yes.

21           THE CLERK:  Was it freely and voluntarily made?

22           JUROR NUMBER 16:  Yes.

23           THE CLERK:  Thank you.

24           Vivienne Shipman-Davis, is the verdict as read and

25   published still your verdict?

728

1          JUROR NUMBER 46:  Yes.

2          THE CLERK:  Was it freely and voluntarily made?

3          JUROR NUMBER 46:  Yes.

4          THE CLERK:  Thank you.

5          Elizabeth Scully, is the verdict as read and published

6     still your verdict?

7          JUROR NUMBER 43:  Yes.

8          THE CLERK:  Was it freely and voluntarily made?

9          JUROR NUMBER 43:  Yes.

10          THE CLERK:  Thank you.

11          Gregory Robinson, is the verdict as read and published

12     still your verdict?

13          JUROR NUMBER 40:  Yes.

14          THE CLERK:  Was it freely and voluntarily made?

15          JUROR NUMBER 40:  Yes.

16          THE CLERK:  Thank you.

17          Austin Davis, is the verdict as read and published still

18     your verdict?

19          JUROR NUMBER 10:  Yes, ma'am.

20          THE CLERK:  Was it freely and voluntarily made?

21          JUROR NUMBER 10:  Yes, ma'am.

22          THE COURT:  Thank you.

23          Forrest Hunter, is the verdict as read and published

24     still your verdict?

25          JUROR NUMBER 29:  Yes.

729

1          THE CLERK:  Was it freely and voluntarily made?

2          JUROR NUMBER 29:  Yes.

3          THE CLERK:  Thank you.

4          Amy Ochoa, is the verdict as read and published still

5    your verdict?

6          JUROR NUMBER 36:  Yes.

7          THE CLERK:  Was it freely and voluntarily made?

8          JUROR NUMBER 36:  Yes.

9          THE CLERK:  Thank you.

10         Michael Bennett, is the verdict as read and published

11   still your verdict?

12         JUROR NUMBER 4:  Yes, ma'am.

13         THE CLERK:  Was it freely and voluntarily made?

14         JUROR NUMBER 4:  Yes, ma'am.

15         THE COURT:  Thank you.

16         Mark Blanchard, is the verdict as read and published

17   still your verdict?

18         JUROR NUMBER 6:  Yes, ma'am.

19         THE CLERK:  Was it freely and voluntarily made?

20         JUROR NUMBER 6:  Yes, ma'am.

21         THE CLERK:  Thank you.

22         THE COURT:  Counsel, any reason the verdict shall not be

23   made the judgment of The Court at this time?

24         MS. GROOVER:  No, Your Honor.

25         MS. BREWINGTON:  No, Judge.

730

1          THE COURT:  Ladies and gentlemen, I can now excuse you

2    from service in this case, and I can excuse you with the sincere

3    thanks of The Court.  You remained attentive, vigilant to your

4    duties every day of this trial.  You showed up on time every

5    day, every session of the trial.

6          I thank you not for a particular verdict because that is

7    up to you to decide.  No one will ask whether you will perform

8    your civic duty because you've shown it all week long.  Let's

9    rise for this jury.

10          (The jury exits the courtroom.)

11          THE COURT:  Everyone have a seat and, Ms. Brewington and

12    Mr. Juan Rangel-Rubio, if you will approach the podium.

13          Mr. Rangel-Rubio, as you've heard, the jury has found

14    you guilty as to Counts 1, 2, 6 and 7.  Their verdict will be

15    made the judgment of this Court.

16          You have a period of 14 days from today to file any

17    motion such as a motion for a new trial or a motion for a

18    judgment of acquittal.  If you want to file any such motions

19    you're entitled to the assistance of counsel to help you make

20    any such motions.

21          If you can't afford an attorney, one will be appointed

22    to represent you at no charge to you, and Ms. Brewington, you

23    are to continue in your role as his defender unless you are at

24    some point relieved by some court.

25          Mr. Rangel-Rubio, at some point in the future, you will

731

1    meet with the US Probation Office and they will conduct an

2    interview and prepare a presentence report.

3         After that report is shared with the Defense and the

4    prosecution, you will then come before me at some point in time

5    to be sentenced.

6         After your sentence is pronounced and if you are

7    dissatisfied with it, you can file a notice of appeal.  You will

8    need to file that notice of appeal within 14 days of the date

9    that you're sentenced.  Failure to file a notice of appeal

10   within that timeframe would act as a waiver of your right to

11   appeal.

12        You are likewise entitled to the assistance of counsel

13   in making any such appeal.  If you are unable to afford an

14   attorney, then one will be appointed to represent you at no

15   charge to you, and again, Ms. Brewington you're to continue in

16   your role unless relieved by some court.

17        Also, Mr. Rangel-Rubio, if you would like the clerk of

18   court to file a notice of appeal on your behalf, you can have

19   them do so.  Understand?

20        THE DEFENDANT:  Yes.

21        THE COURT:  Then Mr. Rangel-Rubio, at this time I will

22   remand you back to the custody of the US Marshal and counsel, we

23   will be in recess.

24        (Proceeding concluded at 1:48 p.m.)

25

732

1                        CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4   transcript of the stenographic record of the above-mentioned

5   matter.

6

7

9   _____        11/27/2022

10  Debra Gilbert, Court Reporter           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25