1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA            )
                                    )
          v.                        )
                                    )        CASE NO.
JUAN RANGEL-RUBIO,                  )   4:18-CR-274-LGW-CLR-2
                                    )
_____Defendant._____)




SENTENCING HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
April 10, 2023; 10:34 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:          TANIA D. GROOVER, Esq.
                            U. S. Attorney's Office
                            P. O. Box 8970
                            Savannah, Georgia  31412
                            (912) 201-2552
                            tania.groover@usdoj.gov


For the Defendant:          KATIE A. BREWINGTON, Esq.
                            The Brewington Law Firm, LLC
                            P. O. Box 11153
                            Savannah, Georgia  31412
                            (912) 704-0858
                            kabrewington@gmail.com


Reported by:                Debbie Gilbert, RPR, CCR
                            Official Court Reporter
                            801 Gloucester Street
                            Post Office Box 1894
                            Brunswick, GA 31521-1894
                            (912) 262-2608 or (912) 266-6006
                            debra_gilbert@gas.uscourts.gov
                               - - -

2

1                        P R O C E E D I N G S

2           THE COURT:  Good morning.

3           SPEAKERS:  Good morning.

4           THE COURT:  Ms. Sharp, call the case.

5           THE CLERK:  United States of America versus Juan

6    Rangel-Rubio, Tania Groover for the Government, Katie Brewington

7    for the Defense.

8           MS. GROOVER:  Good morning.  The United States is ready

9    to proceed.

10          MS. BREWINGTON:  Good morning, Judge.  Defense is ready

11   as well.

12          THE COURT:  Ms. Brewington, approach with your client,

13   Mr. Juan Rangel-Rubio, and let me have our interpreter as well

14   as our reserve interpreter approach to receive the oath, and,

15   Ms. Sharp, if you will administer it.

16          (Interpreters sworn.)

17          THE COURT:  Thank you.  All right, we are here, of

18   course, for the purposes of sentencing following the jury trial

19   of Mr. Rangel-Rubio.  I did want to say at the beginning the

20   defendant had filed a motion for a new trial and renewed his

21   motion for acquittal and I have denied both of those motions.

22   I've issued a 15-page written order that addresses both and that

23   has been posted on the record.

24          With that, Mr. Rangel-Rubio, you appeared before this

25   Court on October 25th, 2022 accompanied by your attorney, Ms.

3

1   Brewington, for your jury trial.  On October 31st, 2022, you
2   were found guilty by a jury of your peers of Count 1 of the
3   superseding indictment charging you with conspiracy to conceal,
4   harbor and shield illegal aliens in violation of 8 USC Section
5   1324(a)(1)(A)(b)(1), Count 2 of the superseding indictment
6   charging you with money-laundering conspiracy in violation of 18
7   USC Section 1956(h), Count 6 of the superseding indictment
8   charging you with conspiracy to kill a witness in violation of
9   18 USC Section 1512(k) and Count 7 of the superseding indictment
10  charging you with conspiracy to retaliate against a witness in
11  violation of 18 USC Section 1513(f).
12          Following that jury's verdict, I directed the probation
13  office to prepare a presentence report and to disclose that
14  report to the Defense and to the Government.
15          Now, Mr. Rangel-Rubio, have you had the opportunity with
16  the help of a translator to read that report and its brief
17  addendum and with the help of an interpreter to discuss them
18  with your attorney?
19          THE DEFENDANT:  Yes.
20          THE COURT:  And are there any objections remaining to
21  that report including any objections to the probation officer's
22  factual findings set forth in that report or to any of her
23  conclusions about application of the advisory sentencing
24  guidelines, any objections to that report on behalf of the
25  Defense?

4

1          MS. BREWINGTON:  Judge, just overall, Mr. Rangel-Rubio

2    does maintain his innocence, so we did an overall objection to

3    the recitation of facts but do not expect to have to flesh that

4    all out today.  We just wanted that on the record.

5          THE COURT:  On behalf of the United States, any

6    objections?

7          MS. GROOVER:  No objections, Your Honor.

8          THE COURT:  Then let me turn to you, Ms. Brewington.

9    Are there any witnesses you'd like to call, evidence you'd like

10   to bring forth or argument you would like to make in support of

11   any objections to the factual statements that you've raised?

12   The presentence report sets forth the factual background in

13   Paragraph 7 through 28.  It's my understanding that because Mr.

14   Rangel-Rubio maintains his innocence, he objects to Paragraphs 7

15   through 28.  Is there any elaboration you would like to make on

16   that, proof to offer?

17         MS. BREWINGTON:  No, Judge.  We just wanted that for the

18   record.

19         THE COURT:  And the record will reflect that you are

20   maintaining innocence and object to those facts as set forth in

21   Paragraphs 7 through 28.

22         I do overrule those objections.  I was the trial judge

23   in the case and was present for, of course, all of the evidence

24   that was brought forth that overwhelmingly established guilt of

25   the charges that were set forth and by a preponderance of the

1   evidence showed that the facts that are recited in Paragraphs 7

2   through 28 are certainly supported by the evidence that was

3   brought forth through the trial, and a jury of Mr.

4   Rangel-Rubio's peers found that he was guilty and heard that

5   evidence, and as a result, I find that a preponderance of the

6   credible evidence does support the facts as set forth in

7   Paragraphs 7 through 28.

8         I find beyond a reasonable doubt the evidence set forth

9   in Paragraphs 7 through 28 was supported by the evidence at

10  trial and as a result the objections are overruled.  As it

11  relates to the paragraphs that were not objected to in the

12  report, I'll adopt those as my findings of fact and also adopt

13  all of the conclusions with regard to the advisory guidelines

14  reached by the probation officer.

15        All those conclusions that were not objected to, I will

16  adopt those as my conclusions and therefore determine in Mr.

17  Rangel-Rubio's case a total offense level of 43, a criminal

18  history category of 1.  That results in life imprisonment, one

19  to three years of supervised release as to Counts 1 and 2, two

20  to five years of supervised release as to Counts 6 and 7.  The

21  advisory guidelines are $50,000 to $500,000.00 fine,

22  $1,351,217.05 restitution, $400.00 of special assessments.

23        As for the statutory penalties, for Count 1, there is no

24  minimum term in prison required and there's a maximum of ten

25  years in prison; as for Count 2, there is no minimum term of

6

1    imprisonment required and there's a maximum of 20 years; and as

2    for Counts 6 and 7, the statutory penalty is life in prison.

3          Ms. Groover, let me turn to you.  Are there any victims

4    present who wish to make a statement regarding impact, financial

5    or otherwise, that the instant offenses have had on them?

6          MS. GROOVER:  Your Honor, I believe there are two

7    members of Mr. Montoya's family who would like to speak.  There

8    are others present, but may I confirm that if there are others

9    who would like to speak?

10          THE COURT:  And as she's doing that, Mr. Rangel-Rubio,

11    if you will have a seat.

12          MS. GROOVER:  Your Honor, there are two members who

13    would like to address Your Honor.

14          THE COURT:  And if you'll call the first to the podium.

15          MS. GROOVER:  Yes, Your Honor.  And they do speak

16    Spanish.  The first is Mr. Alvarez, who is Mr. Montoya's uncle.

17          THE COURT:  Okay.

18          MR. ALVAREZ:  A very good morning to everybody with the

19    respect that everyone here is deserving of.  So I would just

20    like to reiterate this has been a very long case that's taken a

21    long time to see come to its end but I would like to thank

22    everybody involved in making it possible for this case to have

23    gotten to this point and have been handled correctly and

24    finalized.

25          And lastly I would just like to say as far as the other

1  family members and towards the people that did bad things as

2  well that from the Montoya family and the Rubio family that

3  things are fine and just that.  Thank you to everybody and

4  that's all I had to say.

5            THE COURT:  All right, thank you, sir.

6            Ms. Groover, your next victim.

7            MS. GROOVER:  Mr. Montoya, Mr. Eluid Montoya's brother,

8  would also like to speak to Your Honor.

9            MR. MONTOYA:  Good morning.  First of all, I would just

10  like to thank everybody for all of the effort that was put into

11  this and to you, Your Honor, for assuring that justice was done.

12  And also to the police for being able to gather and present all

13  of the evidence that was necessary.  And I hope that Juan

14  Rangel-Rubio that was willing to murder in cold blood like a

15  coward, I hope that he finds peace in prison seeing that this is

16  going to be the punishment that he's going to have for the rest

17  of his life.

18            And in the meantime the rest of us will be left here

19  trying to learn how to live without having the person with us

20  that we love and we have to learn to live in this condition

21  unfortunately, and we have God to thank that justice was done,

22  and even though this took a very long time for all of this to

23  happen, perhaps now that it's ending, we can move ahead and try

24  and get past this as well as we possibly can.  And on behalf of

25  the Montoya family, my sister-in-law, my nephews, everybody, we

8

1    would just like to say thank you very much.

2            THE COURT:  Thank you, sir.

3            Ms. Groover, anyone else?

4            MS. GROOVER:  No, Your Honor.

5            THE COURT:  Ms. Brewington and Mr. Rangel-Rubio,

6    reapproach.

7            Ms. Brewington, as far as sentencing goes, are there any

8    witnesses you'd like to call or evidence you'd like to bring

9    forth or argument you would like to make in mitigation?

10           MS. BREWINGTON:  Argument, Judge.

11           THE COURT:  Proceed.

12           MS. BREWINGTON:  Thank you, Judge.  In looking at the

13   factors of USC 3553, I think there are different aspects of

14   Juan's life that are important to highlight.  He was born in

15   Hidalgo, Mexico in conditions I don't think any of us could ever

16   begin to understand.  He grew up in such poverty that his

17   extended family lived in a one-bedroom home.  They had to walk

18   half an hour every day for water.  He received little to no

19   education, about six formal years of education.  He saw much

20   violence and corruption and things that United States citizens

21   are not used to.

22           And for that, he came to the United States for a better

23   life.  Even though he came here, he remained in very close

24   contact with his family and his children.  He sent money

25   regularly as much as he could and he maintained phone calls on a

9

1  weekly basis with his brothers, sisters and his children.

2       While he's been here and really his whole life he has

3  been an extremely hard worker.  He began work at Age 6.  He

4  entered the Mexican army and completed about five years of

5  service with them.

6       And while here in the United States, he's mostly done

7  construction and tree-trimming jobs.  During the time of his

8  arrest he was working about six to seven days a week.

9       It is definitely important to note that he was here for

10 quite some time and he is a criminal history 1.  There wasn't a

11 lot of things that occurred before this case at hand before you

12 today.

13      In getting to know Juan, he is an extremely religious

14 man.  He brought his Bible with him to every single day of the

15 trial.  He reads his Bible daily and plans to continue to do so.

16      And looking back at the evidence, Judge, I think one of

17 the things that sticks out for me the most is the relationship

18 that he had with Pablo, his codefendant.  I think that he was a

19 very much subordinate to Pablo.  I think that is most evident

20 when we look at the living conditions on the compound that these

21 people were staying in.

22      Pablo had a brand-new home, a brand-new outbuilding, a

23 plethora of land and Juan was living in an old dilapidated

24 camper with his girlfriend.  He was not living in -- I would say

25 Pablo was living high on the hog in the things that they were

1  doing and Juan was not.  He was very much a subordinate to what

2  Pablo told him to do.

3       In looking at the sentence that Pablo got, he received

4  584 months.  I believe the culpability between the two is

5  similar, and so what I'm asking for The Court to do today is

6  sentence Juan to 600 months.  I think this serves the purpose of

7  the USC 3553.  It's a just punishment.  It will deter further

8  criminal conduct, and it promotes respect for the law, so that

9  is what we're asking from The Court here today and Juan would

10 like to speak when it is time and appropriate for him, Judge.

11      THE COURT:  And I will hear from him last of all.  If

12 you two will have a seat and let me turn to Ms. Groover for the

13 Government's position with regard to sentencing.

14      MS. GROOVER:  Thank you, Your Honor.  Many people come

15 to America in search of a better life and they work hard when

16 they are in this country just like the defendant did but not all

17 of them kill to protect and conceal their crimes.

18      The defendant is an assassin.  He is a cold-blooded

19 killer who hunted down and shot Eluid Montoya, a federal

20 whistleblower.  This is not an accidental killing.  This was not

21 a crime of passion, and it was not a crime of opportunity.  No,

22 it was a premeditated assassination of a good man who blew the

23 whistle on a multi-million dollar scheme to hire and mistreat

24 illegal aliens, other people who came here to this country in

25 search of a better life.  The defendant killed a man who

1  believed in the rule of law.  He killed a man who believed in

2  standing up for what was right.  He killed a man who believed in

3  helping others who could not help themselves.

4          Mr. Montoya saw that his coworkers were mistreated by

5  their supervisor, the defendant's brother.  Mr. Montoya saw that

6  Pablo, who was an illegal alien, was also hiring other illegal

7  aliens and not paying them for all the hours that they worked

8  including Juan Ramirez, an individual who is seeking restitution

9  today.

10         Mr. Montoya saw that his coworkers would sometimes get

11  injured on the job and they couldn't get the medical treatment

12  that they needed because of these working conditions.

13         Mr. Montoya saw his coworkers would sometimes go weeks

14  without pay and they struggled financially not knowing when

15  their next paychecks would come because Pablo, the defendant's

16  brother, was holding them.

17         Mr. Montoya reported these injustices to the company,

18  and what happened?  His complaint was given to Pablo, and Mr.

19  Montoya was written up for safety violations, something that Mr.

20  Montoya disagreed with.

21         But that didn't stop him, Mr. Montoya, from standing up

22  for what was right and what he believed in.  He kept on.  After

23  he was suspended on one day, the next day he reported this to

24  the United States Equal Employment Opportunity Commission and he

25  had planned to go to department of labor on Monday, that

12

1   following Monday.  Mr. Montoya took this case to the federal, to

2   the United States Equal Employment Opportunity Commission, and

3   blew the whistle on a 3.5-million-dollar scheme.

4        But he never got the chance to go to the department of

5   labor on Monday as he had planned because the defendant was

6   planning to kill him.

7        Juan made plans.  While Mr. Montoya was planning to

8   right a wrong, Juan was planning to kill him.  The defendant is

9   illegally in this country, stealing over -- personally stealing

10  over $500,000.00 from this illegal scheme, living on the land

11  with his brother and his family, willing to kill to protect it

12  all.

13       He killed Mr. Montoya to punish him for complaining

14  because he threatened to take away everything from him and his

15  family.  He also killed him to prevent him from going any

16  further.  He shot him five times, and several of those shots

17  were fatal, not once, but five times, one of which went inside

18  his mouth to shut him up from talking, to prevent him from going

19  any further.  It was also a symbolic killing, not just a

20  premeditation assassination.

21       The defendant killed a son to Mr. Montoya's mother.  He

22  killed a brother to Mr. Montoya's brothers and sisters.  He

23  killed a nephew to Mr. Montoya's uncle.  He killed a husband to

24  his wife.  He killed a father to his daughters.  He killed a

25  provider for a family.  He stole all of it and left the family

1  without their son, their brother, their husband, their father,

2  their provider, their rock.

3       He took the life of a good man, and justice requires

4  that he spend the rest of his life in prison.  In addition,

5  justice would also demand restitution.  United States is

6  requesting restitution in the amount of $1,326,000.00 payable to

7  Maria Montoya for the loss of future wages of Mr. Montoya, and

8  restitution in the amount of $21,804.25 payable to Juan Ramirez

9  for the lost wages when he worked for Pablo, a scheme that the

10 defendant benefited from.

11      Thank you, Your Honor.

12      THE COURT:  Thank you, Ms. Groover.

13      Ms. Brewington and Mr. Rangel-Rubio, reapproach.

14      And Ms. Brewington, I understand that the Defense is

15 maintaining innocence, but with regard to the amount of

16 restitution that the probation officer recommends and that the

17 victim letters indicate, is there any dispute about the amount?

18      MS. BREWINGTON:  There is not, Judge.

19      THE COURT:  All right, well, Mr. Rangel-Rubio, let me

20 turn to you.  It is your opportunity to address me last.  Is

21 there anything you would like to say before I decide your

22 punishment?

23      THE DEFENDANT:  Yes.

24      THE COURT:  Proceed.

25      THE DEFENDANT:  Well, before anything else, I want to

14

1   apologize to this Court and to the United States, people of the

2   United States.  I want to apologize for coming to this country

3   illegally.  I also want to apologize for putting my life in

4   danger by removing trees that are close to the power lines,

5   trees that are on top of houses and trees that put in risk, are

6   in risk of causing disasters during tornadoes and hurricanes and

7   storms and working very hard for so that the power companies can

8   restore power and so that hundreds and thousands of Americans

9   can go back to their homes.

10      I want to apologize for being such an ignorant person

11  that doesn't know that being a hard worker is illegal in this

12  country.  I also want to tell Mrs. Montoya and the Montoya

13  family that I didn't kill her husband and their brother.  And

14  that I -- I feel their loss.  Montoya was a coworker and we

15  worked together often.

16      I'm sorry, Ms. Montoya and the Montoya family, but Mr.

17  Montoya was not the person that they showed in this court.  I

18  know that he's dead.  He cannot defend himself, but many of us

19  know he did like they said help many families.  But at the same

20  time he took advantage of them when he helped them.

21      In 2009, Mr. Refugio Ramirez was stopped by police.  And

22  his truck was seized.  Mr. Montoya offered helping him to get

23  the truck out of impound.  But he never returned the truck to

24  Mr. Refugio Ramirez.  Two or three years after that, two or

25  three years later, Mr. Montoya stole from Jose Cortez Martinez

15

1   more than $5,000.00 for his taxes.  One or two years before his

2   death, he told me that during tax time he would make more than

3   $60,000.00.  That's the year he bought the truck to work, to do

4   the tree work.

5           Montoya family, Mrs. Montoya, maybe you didn't know what

6   Mr. Montoya did, but he had many enemies out there.  I know that

7   you, your children, your brothers hurt a lot with his death.

8   But I want you to know that I'm innocent and that I'm going to

9   pay for a crime I did not commit and the real guilty person is

10  out there walking out there free.

11          We're in a country that likes to call itself the most

12  powerful in the world and with the best technology.  And they

13  couldn't find real evidence, nothing that would show, point out

14  the real murderer.

15          And do you know why?  Because these people in the

16  government, "professional" is only a name.  They don't like to

17  work and they always take the easiest way.

18          I apologize, Ms. Montoya, for these words and also

19  Montoya family.  And I ask for the favor to think if you -- if

20  you really think that the Government had the evidence to find me

21  guilty, without real evidence, and also through -- and only

22  through lies of people because we all know that the witnesses

23  were all fake witnesses.

24          Today is the third time that I hear a lie from the

25  Government.  Initially they said that Mr. Montoya had been shot

16

1    three times.  During the trial they said that Mr. Montoya had

2    been shot six times.  And now madam district attorney said that

3    he was shot five times.  Which one is the truth?

4         I know that you didn't see, referring to the evidence,

5    that the Government had against me.  But there were many things

6    that the Government, they said that they think, only they think.

7    You saw me here during the trial.  I've always been calm.  And

8    I've said it before.  I met God, and now that I met God I say it

9    again, I have never been afraid of dying or of prison or

10   anything.

11        If Mr. Montoya were here, he would tell you about so

12   many times that I risked my life with trees that were very

13   dangerous on top of the power lines, that nobody in the company

14   wanted to do that job and Americans much less.

15        Sirs, ma'am, Your Honor, I came to this country to work

16   and I've worked all my life.  As my attorney said, I started

17   working when I started walking.  I left my family 14 to go work

18   away from the family.  I always worked hard.  At the beginning

19   because I was so young it was difficult to find a job in Mexico

20   City.

21        Well, I worked in construction for years.  After I was

22   eight I started in the military.  And I also wanted to say that

23   I've always been responsible at my job.  It was what my father

24   taught me.  And in this place in the United States since the

25   year 2000 when I entered this country, I always worked hard to

17

1    earn a place at work.  At the company, the Wolf Tree Company, I

2    started working there in 2003 in Nashville, Tennessee.

3         As I said before, if the Government had investigated my

4    life, they would have a different image of myself.  But

5    unfortunately I was not able to present witnesses to testify in

6    my favor and tell the truth because in the company everybody

7    knew that I was a wonderful worker.

8         I was accused of harboring and hiring illegals.  But I

9    never hired anybody because I was never a supervisor.  I was

10   just a worker.  If my brother was doing that things, only he

11   knew, or, well, Oscar Cruz did, too, because he was also a

12   supervisor.  My brother would only pay me my check.  If I made

13   money, it was because as well as Mr. Montoya I also worked

14   Saturdays and Sundays.  His family knows about that because we

15   worked together sometimes.

16        Regarding the money laundering, well, as I told my

17   attorneys from the beginning, that money would come to my

18   account but it was not my money.  I never stole one dollar from

19   the workers.

20        But, you know, if the money was in my account and the

21   account -- and the account was my account, what can I say?  As

22   well as Mr. Montoya sometimes I would help other coworkers if

23   they were paid with a check and they didn't have -- they didn't

24   have an account or they didn't have an ID.

25        And as I've told everybody and my attorneys, I'm going

18

1   to come back with a witnesses because the Government never

2   questioned, never interrogated people that I told them that were

3   the owners of the money that was in my account.  And as I said,

4   they all always take the easy way and I've been here by myself

5   from the beginning.  I hope you understand me and I hope that

6   you -- I apologize.

7         And, well, I said I'm going to come back -- I don't know

8   when -- to show my innocence and -- and fight my case.  I want

9   to fight my case and show my innocence, I'm sorry.

10        I know that I need an attorney later for that and that I

11   need a lot of money, money that I don't have.  As I've told many

12   people, I'm going to wash clothes, clean cells, sell candy until

13   I have enough money to pay for an attorney.

14        I also want to ask this Court if it's possible -- if

15   it's possible, Your Honor, if you could send me to a prison

16   close to my family where my family can come visit.  And I don't

17   know, Your Honor, how many options there are, but I have family

18   in Texas, in New Mexico, in Oklahoma and Florida, and I would

19   like to be housed in one of those places.

20        What I've learned from other people that have been in

21   federal prisons, I know that I'm going to be sent to a maximum

22   security prison, maybe not maximum security but high security

23   prison.  And I know that it's -- I know that it's dangerous in

24   those prisons.  But as I -- I've told many people, as I just

25   said in this court, I'm not afraid of anything because I'm not

1    looking for enemies.  I've never been a person creating

2    problems.

3            And well, I think the Government knows it because when

4    Ms. Christina -- Christina Bishop went to Mexico to investigate

5    my life there, I don't think that she was able to find any --

6    any bad record about me.  I know that the only thing she was

7    able to find was the way of life there, the way we grew up, and,

8    well, she was the one who brought with her my military record.

9            Here in this court the Government portrayed me as a

10   cold-blooded killer because of my military record and

11   professional killer, but I want to say, to tell you in front of

12   all of you, that is a lie.  The only training I had when I

13   joined the army was basic training, two months.

14           After that they sent me to the southern region of Mexico

15   to the state of Chiapas to work building roads, hospitals,

16   parks, to help the people in Chiapas, after the guerillas in

17   1994.  I didn't go there to fight.  I went there to work.  As I

18   said, I've worked all my life.

19           I want to go back for a moment to something that my

20   attorney said.  My brother was the boss.  And when I told my

21   attorneys before Ms. Kathy was that my brother really, he lived

22   like a king, while I lived like my attorney said in a -- in a

23   camper that was falling apart because it was so old.  That means

24   I didn't have money.

25           When I was arrested I had about $2,000.00 in my account.

1    That's very little money for a person that works seven days a

2    week.  I've told many people that I feel like my brother took

3    advantage of me as well as of other people.  He took advantage

4    of the fact that I was a hard worker.  And, well, as everybody

5    knows I always worked out in the country.  And my brother never,

6    never checked on me because he knew that I was a very hard

7    worker.

8         And while he used that time that he didn't have to use

9    supervising me at work, he used that time to travel.  And as

10   I've told many people my story, he traveled all over the United

11   States.  In fact, I spoke about to one of my sisters because he

12   often went to Texas while I would stay here working.

13        I didn't get any extra money.  Even the company saved a

14   lot of money or he did -- I don't know who kept that money --

15   but I also did mechanical work at the company.  I saved them

16   thousands of dollars but I didn't get any of that money.  As I

17   said, I was just happy with my check and with what I made on

18   weekends, Saturdays and Sundays.

19        I know, well, maybe nothing of what I say now will

20   convince other people.  Well, I say one more time, I'm innocent

21   of his death and I'm also innocent I could say of the money

22   because even though the money went to my account I didn't steal

23   money from anybody.

24        And well, I'm in your hands.  I'm not going to cry

25   because crying only makes things worse.  I'm going to be strong,

21

1    and as I said from the beginning I'm going to trust God and I'm

2    going to accept whatever God has for me.

3          Thank you, God bless you.  That's all.

4          THE COURT:  Mr. Rangel-Rubio, you need to remain in

5    place.  Of course, I've listened to the defendant, Mr.

6    Rangel-Rubio, today and to his attorney, listened to counsel for

7    the Government, am very familiar with the facts of the case

8    having presided over the trial.  I've studied the presentence

9    report and its addendum and I've given a great deal of thought

10   to each of the Section 3553 factors as they apply uniquely to

11   Mr. Rangel-Rubio.

12         In particular, I've considered at length the factor the

13   nature of the offense.  Here we have among the most serious

14   offenses.  I've considered the nature of the offender, both the

15   good and the bad regarding Mr. Rangel-Rubio, and it's clear on

16   the good side of things, Mr. Rangel-Rubio has been a hard

17   worker.  He's talked today about some of the dangerous work that

18   he's done with the tree removal and so forth.

19         I've considered the negative things about Mr.

20   Rangel-Rubio.  I've considered the need to promote deterrence,

21   both general and specific, the need to promote respect for the

22   law and the need for the punishment to reflect the seriousness

23   of the underlying conduct.

24         I did listen, Mr. Rangel-Rubio, to your semi-veiled but

25   fully weak attempts to tear down Mr. Montoya and the government

22

1    witnesses who built a strong case against you here in this

2    courtroom.

3          The evidence at trial showed that the victim, Mr. Eluid

4    Montoya, took a brave and righteous path to complain to the EEOC

5    about mistreatment, and in response to Mr. Montoya voicing

6    complaints, you conspired to shoot him in the mouth.  You took

7    his life.  Mr. Montoya will never spend another day anywhere

8    else on this earth.

9          As a result, it is proper that you spend all your

10   remaining days in prison.  It is the judgment of The Court that

11   the defendant, Mr. Juan Rangel-Rubio, is hereby committed to the

12   custody of the Bureau of Prisons to be in prison for a term of

13   life.  That term will consist of imprisonment of 120 months as

14   to Count 1, 240 months as to Count 2 and life imprisonment as to

15   each of Counts 6 and 7, all to be served concurrently.

16         Upon release from confinement, you will be delivered to

17   a duly authorized immigration and customs enforcement officer

18   for deportation proceedings.

19         I find no reason to depart from the sentence called for

20   by application of the advisory guidelines.  The facts that were

21   found are all accounted for in this sentencing guideline

22   calculation.  Restitution is due in the total amount of

23   $1,351,217.05.  That will consist of $21,804.25 paid to Juan

24   Ramirez and $1,329,412.80 paid to Maria Montoya.  That

25   restitution owed to Ms. Montoya is joint and several with Pablo

23

1    Rangel-Rubio's restitution obligations in Case Number 4:22-30

2    and Higinio Perez-Bravo's restitution obligations in Case

3    4:18-CR-274.

4          And restitution owed to Mr. Ramirez is joint and several

5    with Pablo Rangel-Rubio's restitution obligations in Docket

6    Number 4:22-30.

7          Of course, the economic circumstances of this Mr.

8    Rangel-Rubio do not allow for payment in full of that large

9    restitution obligation, and as a result, pursuant to 18 USC

10   Section 3664(f)(3)(B), nominal payments of either quarterly

11   installments of a minimum of $25.00 if working non-UNICOR or a

12   minimum of 50 percent of monthly earnings if working UNICOR

13   shall be paid, and then upon release from imprisonment and while

14   on supervised release, nominal payments of $300.00 per month

15   shall be made.  Those payments will be made payable to the Clerk

16   of the US District Court for disbursement to the victim.

17         I've determined that Mr. Rangel-Rubio does not have the

18   ability to pay interest and so I'm going to waive the interest

19   requirements, nor does he have the ability to pay a fine, and so

20   pursuant to the guidelines, I'm not going to order a fine

21   payment.  There is $400.00 special assessment -- that is $100.00

22   per count -- that is due immediately.

23         I do recommend to the Bureau of Prisons that to the

24   extent space and security can accommodate his request, I do

25   recommend that Mr. Rangel-Rubio be placed in a facility perhaps

1  in Texas or New Mexico or Oklahoma or Florida so that he can be

2  placed near family who can visit him during his lifetime of

3  incarceration.

4         If he is released from imprisonment, then he will be on

5  supervised release for a term of five years.  That term will

6  consist of three as to each of Counts 1 and 2 and five

7  years as to each of Counts 6 and 7 all to be served

8  concurrently.

9         While on supervised release, he will comply with all the

10  standard conditions of supervision required by The Court and all

11  the mandatory terms of supervised release that are required by

12  federal law.  Those will include a prohibition against the

13  possession of any firearm or dangerous weapon, a prohibition

14  against the violation of any law.  He will cooperate in the

15  collection of a DNA sample as directed by Probation.  I've

16  determined based on the specific facts of this case that certain

17  special conditions are in order and I order those special

18  conditions acknowledging that they do entail some deprivation of

19  liberty but nevertheless have decided that they are important

20  and order them as follows.

21         If he is released on supervised release and ordered

22  deported from the United States, he must remain outside the

23  United States unless legally authorized to reenter.

24         If he does reenter the United States, he must report to

25  the nearest probation officer within 72 hours after returning.

25

1    If he's not deported, he must report to the nearest probation

2    officer within 72 hours of release from custody.

3         He must provide the probation officer with access to any

4    requested financial information and authorize the release of

5    that financial information and that may be shared with the US

6    Attorney's Office.

7         He must not incur new credit charges or open additional

8    lines of credit without the approval of the probation officer

9    and he must pay the financial penalty in accordance with the

10   schedule of payment sheets that will accompany this judgment.

11        He must not communicate or otherwise interact with the

12   family of Eluid Montoya.  That means Jose Luis Santos Gutierrez,

13   Ricardo Ramirez Benitez, Stanley Turner, Charles Tilson, Jerad

14   Brown, Ruben Hernandez Ramirez, Joel Reyes Pena or Juan Ramirez.

15   All of those individuals he must not have either direct or

16   indirect contact without obtaining first the permission from the

17   probation officer.

18        I also order as a special condition of supervised

19   release if applicable that he be subject to certain searches as

20   directed by Probation but only based on a reasonable suspicion

21   of a violation of one of these terms and only conducted at a

22   reasonable time and in a reasonable manner.

23        The probation officer is hereby directed to provide Mr.

24   Rangel-Rubio with a written set of instructions that governs all

25   the terms of his supervised release.

26

1          Mr. Rangel-Rubio, it's my duty to advise you that you

2     now have the right to appeal this sentence and conviction 14

3     days from today's date.  A failure to file a timely appeal

4     within 14 days of today's date would result in a waiver of your

5     right to appeal.  The Government may likewise file an appeal

6     from this sentence.  You're also advised that you have the right

7     to the assistance of an attorney in making any such appeal and

8     if you are unable to afford an attorney, which I understand you

9     are not, if you are unable to afford an attorney, you're

10    entitled to the assistance of an attorney at no charge to you,

11    and Ms. Brewington, you are to remain as his attorney for the

12    purposes of making any such appeal.

13          In the event of an appeal, it will be the obligation and

14    responsibility of your counsel to continue her representation on

15    appeal unless and until relieved by order of the Court of

16    Appeals.

17          Mr. Rangel-Rubio, I'll also inform you that if you so

18    request, the clerk of court will prepare and file a notice of

19    appeal on your behalf.

20          Well, sentence has now been pronounced.  Other than the

21    objections that were made and ruled upon, do you now have any

22    objections to my findings of fact, my conclusions of law, or to

23    the manner in which sentence was pronounced, Ms. Brewington?

24          MS. BREWINGTON:  No, Your Honor.

25          THE COURT:  And Ms. Groover?

27

1        MS. GROOVER:  No objections.

2        THE COURT:  All right, then Mr. Rangel-Rubio, I'll

3  remand you to the custody of the US Marshal and counsel, we will

4  be in recess.

5        (Proceeding concluded at 11:41 a.m.)

6                    CERTIFICATION

7

8        I certify that the foregoing is a true and correct

9  transcript of the stenographic record of the above-mentioned

10  matter.

11

12

14  _____        06/05/2023

15  Debra Gilbert, Court Reporter          Date

16

17

18

19

20

21

22

23

24

25